1   KAREN JOHNSON-MCKEWAN (STATE BAR NO. 121570)
    kjohnson-mckewan@orrick.com
2   NANCY E. HARRIS (STATE BAR NO. 197042)
    nharris@orrick.com
3   NIKKA N. RAPKIN (STATE BAR NO. 244207)
    nrapkin@orrick.com
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
5   405 Howard Street
    San Francisco, CA  94105-2669
6   Telephone:    (415) 773-5700
    Facsimile:    (415) 773-5759
7
    Attorneys for Defendant
8   GOOGLE INC.

9

10                    UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                       SAN JOSE DIVISION

13

14
    JENNA GODDARD, on her own behalf and      CASE NO.  C 08-02738 (JF)
15  on behalf of all others similarly situated,
                                              **REQUEST FOR JUDICIAL NOTICE**
16                Plaintiff,                   **IN SUPPORT OF GOOGLE INC.'S**
                                              **MEMORANDUM OF POINTS AND**
17         v.                                 **AUTHORITIES IN OPPOSITION TO**
                                              **PLAINTIFF'S MOTION TO**
18  GOOGLE INC., a Delaware corporation,      **REMAND**

19                Defendant.                   **Date: September 19, 2008**
                                              **Time: 10:30 a.m.**
20                                            **Judge:  The Honorable Jeremy Fogel**

21                                            **Date Action Filed: May 30, 2008**
                                              **No Trial Date Set**
22

23

24

25

26

27

28
    OHS West:260497579.1

1    Defendant Google Inc. ("Google") respectfully requests that this Court take judicial notice

2    of the following documents in support of Google's Memorandum of Points and Authorities in

3    Opposition to Plaintiff's Motion to Remand pursuant to Federal Rule of Evidence 201.

4    1.    Plaintiff's Motion and Memorandum in Support of Preliminary Approval of Class

5    Action Settlement and exhibits thereto, filed in *Tracie McFerren v. AT&T Mobility, LLC,* Case

6    No. 2008-CV-151322, Superior Court of Fulton County, Georgia, dated May 28, 2008.  A true

7    and correct copy of these documents are attached hereto as Exhibit A.

8    2.    Amended Stipulation of Settlement and Order [approving same], filed in *Lisa*

9    *Gray v. Mobile Messenger Americas, Inc.*, Case No. 08-cv-61089, United States District Court,

10    Southern District of Florida, entered on August 4 and 5, 2008 respectively.  A true and correct

11    copy of these documents are attached hereto as Exhibit B.

12    3.    Plaintiff's Application for Attorneys' Fees Pursuant to Stipulated Entry of

13    Judgment of Dismissal, filed in *Lindsay Abrams v. Facebook, Inc.*, Case No. 07-05378 PVT,

14    United States District Court, Northern District of California – San Jose Division, filed on May 8,

15    2008.  A true and correct copy of these documents are attached hereto as Exhibit C.

16    4.    Declaration of Miles McGuire, filed in support of Plaintiff's Memorandum in

17    Support of Preliminary Approval of Class Action Settlement, filed in *Tracie McFerren v. AT&T*

18    *Mobility, LLC,* Case No. 2008-CV-151322, Superior Court of Fulton County, Georgia, dated May

19    28, 2008.  A true and correct copy of these documents are attached hereto as Exhibit D.

20    5.    Google, Inc., Form 10-K for the yearly period ending on December 31, 2007, filed

21    with the United States Securities and Exchange Commission, February 15, 2008,

22    http://www.sec.gov/Archives/edgar/data/1288776/000119312508032690/d10k.htm.  A true and

23    correct copy of this document is attached hereto as Exhibit E.

24    6.    Google, Inc., Form 10-Q for the quarterly period ending on March 31, 2008, filed

25    with the United States Securities and Exchange Commission, May 12, 2008,

26    http://investor.google.com/order.html.  A true and correct copy of this document is attached

27    hereto as Exhibit F.

28    7.    Docket Sheet, *Tracie McFerren v. AT&T Mobility, LLC,* Case No. 2008-CV-

1    151322, Superior Court of Fulton County, Georgia.  A true and correct copy of this document is

2    attached hereto as Exhibit G.

3         8.    Wireless Quick Facts, CTIA (International Association for the Wireless

4    Telecommunications Industry) webpage,

5    http://www.ctia.org/media/industry_info/Index.cfm?bPrint=1@showbox=0&AID=1-323.  A true

6    and correct copy of this document is attached hereto as Exhibit H.

7         9.    "U.S. Consumer Mobile Phone Unit-Sales Declined 13 Percent Year-over-Year in

8    Q2 2008," The NPD Group Press Release, August 19, 2008,

9    http://www.npd.com/press/releases/press_080819.html.  A true and correct copy of this document

10   is attached hereto as Exhibit I.

11        10.    "AT&T Eager to Wield its iWeapon", USA Today, May 23, 2007,

12   http://www.usatoday.com/tech/wireless/2007-05-21-at&t-iphone>N.htm.  A true and correct copy

13   of this document is attached hereto as Exhibit J.

14        11.    "Off-Portal Premium SMS Transactions Generated Nearly $215 Million in

15   Download Purchases and $35 Million in Voting/Sweepstakes Revenues During Q1 2007",

16   Nielsen Mobile Press Release, June 1, 2007,

17   http://www.telephia.com/html/PremiumSMSJune2007revised.html.  A true and correct copy of

18   this document is attached hereto as Exhibit K.

19   I.    DISCUSSION

20        The documents attached hereto are properly subject to judicial notice under Federal Rule

21   of Evidence 201 and related precedent.  Google respectfully requests the court take notice of three

22   categories of documents in support of its opposition to Plaintiff's motion to remand: (1) public

23   disclosure documents filed with the United States Securities and Exchange Commission ("SEC");

24   (2) court documents filed in other jurisdictions; and (3) documents in the public domain. The

25   information contained in each of these documents is either generally known or capable of

26   accurate and ready determination.  *See* Fed. R. Evid. 201(b).

27        A.    **Documents Filed With the SEC Are Judicially Noticeable**

28        Courts routinely take judicial notice of public disclosure documents required to be filed

OHS West:260497579.1                                    - 2 -

1    with the SEC. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999) (taking

2    judicial notice of SEC filings since "the documents are required by law to be filed with the SEC

3    and no serious question as to their authenticity can exist"); *Kramer v. Time Warner, Inc.*, 937

4    F.2d 767, 774 (2d Cir. 1991) (holding same).

5        Appling these principles, the Court may take judicial notice of the following documents

6    filed with the SEC: (1) Exhibit E, Google, Form 10-K for the yearly period ending on December

7    31, 2007, filed February 15, 2008 and (2) Exhibit F, Form 10-Q for the quarterly period ending on

8    March 31, 2008, filed May 12, 2008.

9        **B.    Court Filings Are Judicially Noticeable**

10        It is appropriate for the Court to take judicial notice of pleadings and other documents

11    filed before courts in other jurisdictions. *Beazley v. Fujii*, No. 04-56237, 2007 U.S. App. LEXIS

12    526, at *2 & n. 1 (9th Cir. Jan. 8, 2007) (taking judicial notice of complaint); *In re Silicon

13    Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 n.13 (9th Cir. 1999) (taking judicial notice of five

14    complaints).  Because court proceedings are matters of public record, "courts routinely take

15    judicial notice of documents filed in other courts." *Kramer*, 937 F.2d at 774; *Hunt v. Check

16    Recovery Systems, Inc.*, 478 F. Supp. 2d 1157, 1160 (N.D. Cal. 2007) (taking judicial notice of

17    motion for summary judgment and supporting exhibits, and documents from other pending

18    actions).

19        Consequently, the Court may take judicial notice of these court filings: (1) Exhibit A,

20    Plaintiff's Motion for Preliminary Approval of Class Action Settlement and Memorandum in

21    Support of Preliminary Approval of Class Action Settlement and exhibits thereto, filed in *Tracie

22    McFerren v. AT&T Mobility, LLC*, Case No. 2008-CV-151322, Superior Court of Fulton County,

23    Georgia, dated May 28, 2008; (2) Exhibit B, Amended Stipulation of Settlement and Order

24    [approving same], filed in *Lisa Gray v. Mobile Messenger Americas, Inc.*, No. 08-cv-61089,

25    United States District Court, Southern District of Florida, entered on August 4 and 5, 2008

26    respectively; (3) Exhibit C, Plaintiff's Application for Attorneys' Fees Pursuant to Stipulated

27    Entry of Judgment of Dismissal, filed in *Lindsay Abrams v. Facebook, Inc.*, Case No. 07-05378

28    PVT, United States District Court, Northern District of California – San Jose Division, dated May

8, 2008; (4)  Exhibit D, Declaration of Miles McGuire, filed in support of Plaintiff's

Memorandum in Support of Preliminary Approval of Class Action Settlement, filed in *Tracie*

*McFerren v. AT&T Mobility, LLC,* Case No. 2008-CV-151322, Superior Court of Fulton County,

Georgia, dated May 28, 2008, and (5) Exhibit G, Docket Sheet, *Tracie McFerren v. AT&T*

*Mobility, LLC,* Case No. 2008-CV-151322, Superior Court of Fulton County, Georgia.

### C.    Information in the Public Domain Is Judicially Noticeable

The Court may take judicial notice of news reports or articles and similar information

published in the public domain.  *Ritter v. Hughes Aircraft Co.,* 58 F.3d 454, 458-59 (9th Cir.

1995) (taking judicial notice of information based on newspaper article).  The Court may also

take judicial notice of information made available on a webpage when the information is

considered "public records and [is] capable of accurate and ready confirmation by sources that

cannot reasonably be questioned." *Wible v. Aetna Life Insurance Co.*, 375 F. Supp. 2d 956, 965

(C.D. Cal. 2005) (taking judicial notice of an opinion letter, webpages from Amazon.com, and a

webpage from the American Academy of Allergy Asthma & Immunology).

Because they were published in the public domain, the Court may take judicial notice of:

(1) Exhibit H, Wireless Quick Facts, CTIA (International Association for the Wireless

Telecommunications Industry) webpage, (2) Exhibit I, "U.S. Consumer Mobile Phone Unit-Sales

Declined 13 Percent Year-over-Year in Q2 2008, The NPD Group, August 19, 2008, (3) Exhibit

J, "AT&T Eager to Wield its iWeapon", USA Today, May 23, 2007 and (4) Exhibit K, Off-Portal

Premium SMS Transactions Generated Mearly $215 Million in Download Purchases and $35

Million in Voting/Sweepstakes Revenues During Q1 2007", Nielsen Mobile Press Release, June

1, 2007.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

2

**II.    CONCLUSION**

For the foregoing reasons, Google respectfully requests that the Court take judicial notice

of each of the documents referenced herein and attached hereto.

Dated: August 29, 2008                              KAREN JOHNSON-MCKEWAN
                                                    NANCY E. HARRIS
                                                    NIKKA N. RAPKIN
                                                    ORRICK, HERRINGTON & SUTCLIFFE LLP


                                                    _____
                                                              Nikka N. Rapkin
                                                          Attorneys for Defendant
                                                            GOOGLE INC.

# EXHIBIT A

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | |
|---|---|
| TRACIE MCFERREN, individually and on behalf of a class of similarly situated individuals, | ) No. <br> ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) <br> ) |
| AT&T Mobility, LLC, a Delaware limited liability company, | ) <br> ) <br> ) |
| Defendant. | ) |

**PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT**

The plaintiff, by and through the undersigned counsel, and with the express consent of defendant, and for the reasons set forth in the attached Memorandum in Support of Preliminary Approval of Class Action Settlement, moves to this Court to enter an Order pursuant to O.C.G.A. § 9-11-23 granting preliminary approval of a class action settlement in the above-styled action and certifying a class for the purpose of settlement, showing as follows:

1.

The parties, after extensive mediation, have reached an agreement regarding the settlement of the above-styled action and fifteen related cases that is fair, adequate and reasonable and is well within the range of possible approval.

2.

The parties have also stipulated to the certification of the proposed class for the purposes of settlement as the class is so numerous that joinder is impracticable, there are questions of law and fact common to the class, the claims of the representative parties are typical of the claims of the class, and the representative parties will fairly and adequately protect the interests of the class.

3.

In addition, the questions of law and fact common to the class predominate over individual questions and a class action is the superior method for the efficient adjudication of this controversy.

WHEREFORE, Plaintiff moves this Court to enter an Order granting preliminary approval of the class action settlement, to certify the class for purpose of settlement, and to enter such additional relief that it deems necessary and just. A proposed order accompanies this motion.

Respectfully submitted,

BOONE & STONE

By: /S/ William S. Stone
William S. Stone
GA Bar No. 684636

P.O. Drawer 7
589 College Street
Blakely, Georgia 39823
Tel 229.723.3045
Fax 229.723.4834

Attorneys for Plaintiff

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

TRACIE MCFERREN, individually and on behalf )
of a class of similarly situated individuals,     )
                                                  )
                    Plaintiff,                    )        No.
                                                  )
              v.                                  )        Judge Bonner
                                                  )
AT&T MOBILITY LLC,                                )
                                                  )
                    Defendant.                    )

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

This proposed class action settlement involves a practice known in the cellular telephone

industry as "cramming." That is, the Defendant, AT&T Mobility LLC's ("AT&T Mobility"), is

alleged to have allowed third-party mobile content providers to place charges on its customers'

bills for unauthorized "premium mobile content."[1] Although AT&T Mobility has not directly

contributed to the cramming, plaintiffs' claims (which are disputed by AT&T Mobility) allege

that AT&T Mobility has simultaneously benefited from and neglected to act aggressively enough

to prevent it. Class Counsel and the members of the Plaintiff's Steering Committee have been

litigating this case and 15 related cases for over two years. During that time, Plaintiffs engaged

in motion practice, conducted formal and informal discovery, and participated in upwards of ten

in-person settlement meetings with AT&T Mobility and other defendants named in these

lawsuits prior to agreeing upon a formal mediation process. The parties ultimately held joint[2]

---

[1] Typical "premium mobile content" services include products such as customized ringtones,
sports score updates, weather alerts, stock tips, jokes, daily horoscopes, and even interactive
radio and participatory television delivered to consumers primarily in the form of text messages.
[2] It is plaintiffs' understanding that, both prior to and contemporaneous with these sessions,
AT&T Mobility had a number of in-person and telephonic mediation sessions involving it and
several third-party mobile content providers and aggregators.

mediation sessions on May 12-13, 2008, and again on May 22-24, 2008 before mediator Rodney A. Max, a principle of the Upchurch Watson White & Max Mediation Group.

Through the mediation process, the parties were able to reach an incredibly strong settlement. (A true and accurate copy of the settlement agreement is attached as Exhibit A). The settlement provides the class with refunds equal to the amount of all unauthorized third-party mobile content charges. (If the charge recurred on a monthly basis based on a subscription or similar arrangement, class members may recover up to three times the amount of any such recurring charge). AT&T has also agreed to take steps to inform its customers about mobile content, the ability to restrict its purchase through parental controls, and methods for its customers to dispute unauthorized charges and cancel mobile content subscriptions. In total, the settlement terms approach the best plaintiffs could have hoped to achieve at trial. Given the hurdles facing them in this litigation, the results achieved are well beyond those required to preliminary approve the settlement and are supported not only by Plaintiff and AT&T Mobility, but also by the lead plaintiffs and their respective counsel in fifteen[3] cases filed or pending in other state or federal courts throughout the country.

---

[3] Joining in support of the settlement are plaintiffs and counsel in the following class actions that assert similar claims and are presently pending in other state or federal jurisdictions: *Baker v. New Motion, Inc. et al,* 2007-46363 (Fl. St. Ct.); *Dedek v. AT&T Mobility LLC,* No. BC387728 (Sup. Ct. L.A. County); *Fiddler v. AT&T Mobility LLC, et al.,* No. 1:08-cv-00416 (N.D. Ill.); *Goddard v. Google, Inc.,* BC 667876 (Cal. St. Ct.); *Gray v. Mobile Messenger Americas, Inc. et al,* 07-36302 (Fl. St. Ct.); *Hensley v. AT&T Mobility LLC,* (4th Jud. Dist., Hennepin Cty, Minn.); *Jiran v. AT&T Mobility LLC, et al.,* No. 4:08-cv-00013 (N.D. Cal.); *Paluzzi v. mBlox, et al.,* No: 2007-CH-37213 (Cir. Ct. Cook Cty, Ill.); *Thielen v. Buongiorno USA, Inc.,* No. 1:06-cv-00016 (W.D. Mich.) (dismissed); *Walsh v. mBlox, et al.,* No. BC 382356 (Cal. St. Ct.); *Warren et al. v. OpenMarket, Inc., et al.,* No. 6:07-cv-02043 (M.D. Fla.); *White v. AT&T Mobility LLC,* No. 104651-08 (N.Y. Sup. Ct.); *Pishvaee v. VeriSign, Inc., et al.,* No. 4:07-cv-03407 (N.D. Cal.); *Valdez v. Buongiorno USA, Inc. et al,* No. 4:07-cv-06496-CW (N.D. Cal.); *Knox et al. v. M-Qube, Inc.,* 1:07-cv-10124 (D. Mass.).

Plaintiff thus moves the Court to preliminary approve the instant settlement, certify the settlement class, and appoint the following leadership structure for Class Counsel in this case:

- <u>Liaison Counsel</u>: David W. Boone, William S. Stone and Aileen Page of Boone & Stone.

- <u>Lead Counsel</u>: Jay Edelson, Scott A. Kamber, and Myles McGuire of KamberEdelson, LLC.

- <u>Plaintiff's Steering Committee</u>: Robert Shelquist of Lockridge Grindal Nauen, P.L.L.P. (chairman), Orin Giskan, of Giskan, Solotaroff, Anderson & Stewart, LLP, David Healey of the Law Offices of David Healey and John G. Jacobs of The Jacobs Law Firm, Chtd.

For convenience, a proposed preliminary schedule of events leading to a final approval hearing (the "Settlement Hearing") is provided in Section VI of this brief.

## I.    NATURE OF THE LITIGATION

### A.    The Mobile Content Class Actions

Over the last two years, class actions have been filed throughout the country by consumers challenging the "cramming" practices related to AT&T Mobility, whereby charges for mobile content are allegedly included in consumers' cellular telephone bills without their authorization. As alleged in these complaints, though disputed by the defendants, "cramming" is the result of systematic flaws in AT&T Mobility's billing system that arose due to the rapid and largely unplanned growth of the mobile content industry. To provide for the ever-increasing demand of consumers for mobile content, AT&T Mobility contracted with entities called "aggregators" (such as mBlox Inc., VeriSign, and M-Qube, Inc.) who act as middlemen between the mobile content providers and the wireless carriers. Most mobile content providers lack the wherewithal to enter into contractual relationships with the large wireless carriers such as AT&T

Mobility. In addition to fostering these ties, the aggregators are responsible for the actual billing and delivery of mobile content to the consumers via cell phone technology.

The providers of mobile content charge and collect payment from their customers by "piggybacking" on the cell phone bills sent to consumers by AT&T Mobility. Both the aggregators and the wireless carriers are compensated for their services to the mobile content providers by retaining a substantial percentage of the amount each mobile content transaction. Although AT&T Mobility has taken preventative steps, plaintiffs' complaints allege that its billing and collection systems in aid of the premium mobile content industry lack sufficient checks or safeguards to prevent unauthorized charges from being added to customers' bills.

Of the lawsuits filed, many (including McFerren's Complaint), broadly challenge the alleged occurrence of "unauthorized charges" for third-party mobile content and broadly define the putative class to include AT&T Mobility subscribers across the nation who suffered damages as a result of being billed for mobile content that was not authorized by the subscriber. Additional class actions have been filed against AT&T Mobility involving a subset[4] of the "cramming" flaw, the so-called "recycled numbers" charges. These cases address charges that were allegedly unauthorized by the current holder of a wireless telephone number, but were

---

[4] It should be noted that another, more narrow subset of the cramming issue focuses largely on: (1) the alleged industry practice of targeting mobile content advertisements specifically to minors, who may not have the authority to bind their parents to pay for such services; and (2) the marketing practices of mobile content by Jamster International SARL ("Jamster"). AT&T Mobility and certain aggregators and third-party content providers, including Jamster, are named in those suits, in addition to other carriers. The majority of these cases (some await ruling on pending motions to transfer) have been consolidated by the Judicial Panel on Multidistrict Litigation in the case of *In Re Jamster Marketing Litigation*, MDL No. 1751, Master File No. 05-CV-0819 JM (CAB) and are presently pending in the United States District Court for the Southern District of California. Plaintiffs' understanding is that the MDL cases have only litigated certain procedural issues, most notably arbitration clauses, and have not progressed into the merits. As a prerequisite to negotiating with AT&T Mobility, Class Counsel secured representations from AT&T Mobility and the other related parties that they were not negotiating with any other plaintiffs' group. (McGuire Decl. ¶ 6).

authorized by the former holder of the number before it was abandoned and "recycled" to the current owner. The proposed settlement would cover the claims asserted in all of these actions as they relate to AT&T Mobility customers as well as those alleged in McFerren's Complaint.

### B.    Litigation and Investigation.

Proposed Class Counsel began a wide-ranging investigation into the premium mobile content industry in 2005. (*See* Declaration of Myles McGuire ¶ 2, a true and accurate copy of which is attached as Exhibit B). To date, that investigation has resulted in information gathered from over 1,000 aggrieved consumers. (McGuire Decl. ¶ 2). It has lead to an exchange of information and litigation strategy with multiple governmental agencies, including attorney general offices in Florida and Minnesota. (McGuire Decl. ¶ 2). Class Counsel has received and reviewed numerous documents produced from both the Maryland and Florida attorney generals' offices. (McGuire Decl. ¶ 2). And, most relevant, it has resulted in litigation throughout the country.

In January of 2006, Class Counsel filed the first case involving third party mobile content sold to AT&T customers. (McGuire Decl. ¶ 3). During the following 28 months, they and the members of the proposed Plaintiff's Steering Committee, filed fifteen addition lawsuits that now have joined in support of the settlement. (McGuire Decl. ¶ 3). These lawsuits, which collectively name AT&T Mobility, every major U.S. aggregator, and several third party content providers, are as follows:

- *McFerren v. AT&T Mobility LLC,* (Fulton County, GA) (Complaint is attached hereto as Exhibit C);

- *Baker v. New Motion, Inc.* et al, 2007-46363 (Fl. St. Ct.)

- *Goddard v. Google, Inc.* BC 667876 (Cal. St. Ct.);

- *Paluzzi v. mBlox, et al.*, No: 2007-CH-37213 (Cook Cty, IL),

- *Thielen v. Buongiorno USA, Inc.*, 1:06-cv-00016 (W.D. Mich.) (dismissed);

- *Walsh v. mBlox, et al.*, No. BC. BC 382356 (Cal. St. Ct.),

- *White v. AT&T Mobility*, No. 104651-08 (N.Y. Sup. Ct.)

- *Warren et al. v. OpenMarket Inc., et al.* No. 6:2007cv02043 (M.D. Fl.)

- *Jiran v. AT&T Mobility LLC, et al.*, Civ. A. No. 08-00013, (N.D. Cal.);

- *Hensley v. AT&T Mobility LLC* (Dist. Ct., 4th Jud. Dist., Hennepin Cty, Minn.);

- *Gray v. Mobile Messenger Americas, Inc. et al.*, 07-36302 (Fl. St. Ct.);

- *Fiddler v. AT&T Mobility LLC*, et al., Civ. A. No. 08-0416, (N.D. Ill.);

- *Jiran v. AT&T Mobility LLC, et al.*, Civ. A. No. 08-00013, (N.D. Cal.);

- *Valdez v. Buongiorno USA, Inc. et al*, 4:07-cv-06496-CW (N.D. Cal.);

- *Knox v. m-Qube, Inc.* 1:07-cv-10124 (D.Mass.); and

- *Dedek v. AT&T Mobility LLC*, Case No. BC387728 (Sup. Ct. L.A. Cty).

(McGuire Decl. ¶ 3).

The procedural history of these cases is varied. In many cases, procedural motions—such as motions to remand or motions to compel arbitration—have been briefed and/or decided by the courts. (McGuire Decl. ¶ 4). In others, substantive motions have been filed and/or decided. (McGuire Decl. ¶ 4). Formal and informal discovery have been produced and witnesses have been made available for interviews by the various key defendants including AT&T Mobility, mQube, Verisgn, and m-Blox. (McGuire Decl. ¶ 4). The information received

in these cases has also been cross-checked against information produced in litigation involving carriers other than AT&T Mobility.

## C.    Mediation & Settlement

During the time that the parties have been litigating the issues arising from plaintiffs' claims for so-called "unauthorized" charges for third-party mobile content, counsel for plaintiffs, AT&T Mobility and several of the aggregators and third party content providers have had preliminary negotiations, which essentially centered on exchanges of information and discussions about their respective approaches to these cases. (McGuire Decl. ¶ 5). Specifically, Class Counsel met in person with both outside and in-house counsel for AT&T Mobility in Chicago, Illinois in February of 2008 and then again in Seattle, Washington in March of 2008. (McGuire Decl. ¶ 7). Class Counsel met in person with m-Qube's in-house and outside counsel in Chicago in August of 2007 and in Washington D.C. in October of 2007. (McGuire Decl. ¶ 8). Class Counsel met with mBlox's outside counsel in Chicago in November of 2007 and again in February of 2008. (McGuire Decl. ¶ 9).

As a result of these discussions, AT&T Mobility, along with several aggregators and third-party mobile content providers, and plaintiffs engaged Rodney A. Max as mediator for sessions that took place on May 12-13, 2008 in Chicago, Illinois. (McGuire Decl. ¶ 10). Although no settlement was reached after the initial two-day meeting, the parties continued to exchange information and to discuss a framework for settlement. (McGuire Decl. ¶ 11). The parties, this time without the aggregators or third-party mobile content providers, agreed to again meet with Mr. Max to mediate for an additional three days over Memorial Day weekend in the hope that a settlement could be finalized. (McGuire Decl. ¶ 11) As a result of the second round of mediation, the parties were able to reach an agreement in principle. (McGuire Decl. ¶ 12)

Only after that was accomplished, did the parties discuss attorneys' fees and class representative incentive awards. (McGuire Decl. ¶ 13). The parties' agreement was later formalized and executed on May 28, 2008. (McGuire Decl. ¶ 14).

## II.    SUMMARY OF THE PROPOSED SETTLEMENT

The key terms of the proposed settlement follow:

1.    *Class Definition.* The settlement class is defined as follows:

> All current and former AT&T Mobility Account Holders Nationwide who, at any time from January 1, 2005 to the Notice Date, were billed and paid for Third Party Mobile Content. Excluded from the Class are the following: the Defendant, the Third Party Providers, the Claims Administrator, the Mediator, and any of their respective parent, subsidiary, affiliate or control person of the Defendant, as well as the officers, directors, agents, servants, or employees of the Defendant, any trial judge presiding over this case over any of the actions which comprise the Action or Coordinated Actions, and the immediate family members of any such Person(s).

2.    *Individual Class Member Benefits.* AT&T Mobility has agreed to refund the amount of all unauthorized third-party mobile content charges that were billed to the settlement class from January 1, 2004 to the notice date.  If the charge recurring on a monthly basis based on a subscription or similar arrangement, the settlement class members may only recover up to three times the amount of any such recurring charge.  To be eligible for any refund, the charges must have been unauthorized and not previously refunded to your account.   The refund can come in one of two forms:  (a) a credit on their AT&T Mobility bill; or (b) a cash payment from the claims administrator.

3.    *Group Relief and Additional Relief.*

In addition to the individual relief to the Settlement Class provided above, the Defendant has agreed to provide the following group and other relief.

A.    **AT&T Mobility Service Improvements & Assurances**: AT&T Mobility has agreed to provide disclosures regarding mobile content in its Wireless Customer Service Agreement and on its website. In addition, AT&T Mobility will provide a telephone number and website address in all bills for customers who seek to dispute a charge. AT&T Mobility has further agreed to provide and enhance as necessary the means for its customers to freely address billing issues and cancel third-party mobile content subscriptions.

B.    **Payment of Notice and Administrative Fees**: AT&T Mobility will pay for the cost of sending the Class Notice and any other notice as required by the Court as well as all costs of administration of the settlement.

C.    **Compensation for the Class Representative**: In addition to any award under the Settlement, and in recognition of their efforts on behalf of the Class, Tracie McFerren, Morris Fiddler and Kristen Hensley, along with the other Plaintiffs in the related cases, will share $10,000 to be paid by AT&T Mobility as appropriate compensation for serving as class representatives in this litigation.

D.    **Payment of Attorneys Fees**: Defendant has agreed to pay Class Counsel, subject to Court approval, Four Million Three Hundred Thousand dollars ($4,300,000) in attorneys' fees and for the reimbursement of costs. AT&T Mobility has agreed that this amount is fair and reasonable and that it will not object to, or otherwise challenge, Class Counsel's application for reasonable attorneys' fees and for reimbursement of costs and other expenses. Class Counsel has, in turn, agreed not to seek more than said amount from the Court.

4.    *Release.*

With respect to any and all Claims, and upon entry of Final Order and Judgment without further action, for good and valuable consideration, Plaintiff, on behalf of herself and the

Settlement Class and as the representative of the Settlement Class, shall expressly, and all Settlement Class members shall be deemed to have, and by operation of the final judgment contemplated by the parties agreement shall have, fully, finally, and forever expressly waived and relinquished with respect to Settled Claims, to the fullest extent permitted by law, any and all provisions, rights, and benefits of section 1542 of the California Civil Code and any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or principle of common law that is similar, comparable, or equivalent to section 1542 of the California Civil Code, which provides: "A general release does not extend to claims which the creditor does not  know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

For the purposes of this release, "Settled Claims" means any claim, liability, right, demand, suit, matter, obligation, damage, loss or cost, action or cause of action, of every kind and description that the Settlement Class has or may have, including assigned claims, whether known or unknown, asserted or unasserted, latent or patent, that is, has been, could reasonably have been or in the future might reasonably be asserted by the Releasing Party either in the Action or in any other action or proceeding in this Court or any other court or forum, regardless of legal theory, and regardless of the type or amount of relief or damages claimed, against any of the Released Parties arising out or relating to a charge to any Account Holder for Third Party Mobile Content, including all claims that were brought or could have been brought in the Action, the Coordinated Actions or the Recycled Number Actions, and involving any allegation on any basis that such charge was unauthorized.  Settled Claims include, but are not limited to, claims that the Third Party Mobile Content charges were the result of fraudulent or misleading

marketing or billing practices, the actions of minors who did not have the capacity to agree to

such charges, or that were the result of receiving a "recycled" cellular telephone number.

The Release is only between the class members defined above, AT&T Mobility, and

Third-Party Providers[5] and includes their respective predecessors, successors, assigns, parents,

subsidiaries, divisions, departments, and affiliates, and any and all of their past, present and

future officers, directors, employees, stockholders, partners, agents, servants, successors,

attorneys, representatives, subrogees and assigns of any of the foregoing.

## III.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

Like Federal Rule of Civil Procedure 23, O.C.G.A § 9-11-23(e) provides that "[a] class

action shall not be dismissed or compromised without the approval of the court."[6]  The procedure

for review of a proposed class action settlement is a well-established two-step process.  Alba &

Conte, 4 *Newberg on Class Actions*, §11.25, at 38-39 (4th Ed. 2002).  The first step is a

preliminary, pre-notification hearing to determine whether the proposed settlement is "within the

range of possible approval."  *Newberg*, §11.25, at 38-39 (quoting *Manual for Complex

Litigation*, §30.41 (3rd Ed.)); *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1110 (9th Cir. 2008); *In

re Chicken Antitrust Litig.*, 560 F. Supp. 957, 960 (N.D. Ga. 1980).  This hearing is not a fairness

---

[5] As used here, Third Party Providers means entities other than AT&T Mobility who advertise, aggregate billing for, offer, and/or sell Third Party Mobile Content, including Third Party Mobile Content Subscriptions, directly to AT&T Mobility's wireless customers as well as their marketing agents and/or licensors, and includes VeriSign, M-Qube, Jamster International SARL, and mBlox. Providers who sell Mobile Content on or through AT&T Mobility's Media Mall are not thereby Third Party Providers for the purposes of such sales.

[6] Plaintiff's Motion cites to Georgia state law where available and to federal authority due to the similarity between the two rules as well as Georgia Courts' history of looking to federal law for guidance on both the approval of this class action settlement as well as class certification. *See Sta-Power Indus. Inc. v. Avant*, 216 S.E.2d 897, 900 (Ga. Ct. App. 1975); Casurella, Jeffrey, & Bevis, John *Class Action Law in Georgia: Emerging Trends in Litigation, Certification, & Settlement,"* 49 Mercer L. Rev. 39, 59 (Fall 1997) (recognizing that "Georgia case precedent dealing with . . . class action settlements is scarce").

hearing; its purpose, rather, is to ascertain whether there is any reason to notify the class

members of the proposed settlement and to proceed with a fairness hearing. *Newberg*, §11.25, at

38-39; O.C.G.A § 9-11-23(e)(requiring "notice of the proposed dismissal or compromise shall be

given to all members of the class . . . ."). The *Manual for Complex Litigation* (Fourth) (2004)

(the "Manual") characterizes the preliminary approval stage as an "initial evaluation" of the

fairness of the proposed settlement made by the court on the basis of written submissions and

informal presentation from the settling parties. *Manual*, § 21.632. If the court finds a settlement

proposal "within the range of possible approval," it then proceeds to the second step in the

review process—the final approval hearing. *Newberg*, §11.25, at 38-39; *In re Chicken Antirust

Litig.*, 560 F. Supp. at 960 (finding "it is well settled that a proposed settlement, taken on the

whole, need only be fair, adequate, and reasonable in light of the interests of all the parties and

not a product of fraud or collusion" in order to meet preliminary approval).

    A strong judicial policy exists that favors the voluntary conciliation and settlement of

complex class action litigation. *In re Syncor*, 516 F.3d at 1101; *see also Warren v. City of

Tampa*, 693 F. Supp. 1051, 154 (M.D. Fla. 1998) (noting courts favor settlement of disputed

claims), *aff'd* 893 F. 2d 347 (11th Cir. 1998). With a settlement, the class members are ensured

a benefit as opposed to the "mere possibility of recovery at some indefinite time in the future."

*In re Domestic Air Transport.*, 148 F.R.D. 297, 306 (N.D. Ga. 1993). While this Court has

discretion regarding the approval of a proposed settlement, it should give proper deference to the

private consensual decision of the parties. *Warren*, 693 F. Supp. at 1054 ("affording great

weight to the recommendations of counsel for both parties, given their considerable experience

in this type of litigation"). In fact, when a settlement is negotiated at arms' length by

experienced counsel, there is a presumption that it is fair and reasonable. *In re Inter-Op Hip*

*Prosthesis Liab. Litig.*, 204 F.R.D. 359, 380 (N.D. Ohio 2001). Ultimately, the Court's role is to

ensure that the settlement is fundamentally fair, reasonable and adequate. *In re Syncor*, 516 F.3d

at 1100.

> In determining whether the instant proposed settlement is "fair, adequate, and
> reasonable," the following factors are often considered:
>
> > (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the
> > point on or below the range of possible recovery at which settlement is fair,
> > adequate and reasonable; (4) the complexity, expense and duration of litigation;
> > (5) the substance and amount of opposition to the settlement; and (6) the stage of
> > proceedings at which the settlement was achieved.

*Bennett v. Behring*, 737 F. Supp. 982, 986 (11th Cir. 1984); *see also Domestic Air Transport.*,

148 F.R.D. at 312-13. · Finally, "approval of a class action settlement does not require a final

decision on the substantive law merits . . . and does not require the trial court to expressly

consider the law of every state involved . . . ." *Smith v. AirTouch Cellular of Ga. Inc.*, 534

S.E.2d 832, 835 fn 1 (Ga. Ct. App. 2000).

> In this case, there is no question that the proposed settlement is both "fair, adequate, and

reasonable" and "within the range of possible approval." The fairness, reasonableness, and

adequacy of this settlement are apparent from the full reimbursement of all allegedly

unauthorized charges, the substantial service improvements and assurances from AT&T

Mobility, and the agreement of the parties' experienced counsel. In fact, this settlement is

entitled to a presumption of fairness, as it is the product of extensive arms' length negotiations of

the parties represented by highly experienced counsel. Although Plaintiff's counsel is confident

in the strength of the claims alleged in the Complaint and that they would ultimately prevail at

trial, their experience imparts the wisdom that litigation is inherently risky. When the strengths

of the Plaintiff's claim are weighed against the legal and factual obstacles combined with the

complexity of class action practice, it is apparent that the proposed settlement is clearly in the best interest of class members as it approaches the recovery they could recover at trial.

The amount of recovery to the class to the proposed class members is also unquestionably fair, adequate, and reasonable: AT&T Mobility has agreed to refund the amount of all unauthorized third-party mobile content charges paid by the class members, subject to the limitation that if the charge was recurring on a monthly basis based on a subscription that only three times the recurring charge can be recovered. In addition, AT&T Mobility has also agreed to take steps to inform its customers about mobile content, the ability to restrict its purchase through parental controls, and to provide enhanced methods for its customers to dispute unauthorized charges and cancel mobile content subscriptions. Given the strength of this settlement, the parties expect little no significant opposition to the settlement by class members;[7] in fact, the settlement is supported not only by McFerren and AT&T Mobility, but also by the lead Plaintiffs and their respective counsel in fifteen other separately pending class actions.

Finally, although the present suit is in its infancy, the stage of the related proceedings that formed the foundation of this settlement provides an ample basis on which to evaluate the proposed settlement. The numerous pending class actions involving alleged unauthorized charges for mobile content have allowed the parties to conduct extensive investigations into the

---

[7] Given that over 70 million people will receive direct notice of this settlement, there is virtually no likelihood that there will be no filed objections. Class Counsel expects that these objections will fall into four categories. First, there will be "philosophical" objections, i.e. objections made by attorneys, class members, or think tanks who are opposed to class actions and seek to use large settlements as a venue to make political statements. Second, there will be objections filed by serial objectors, who look to object to large class actions and threaten to hold up settlements as a way to extract payouts. Third, due to the existence of the MDL litigation, it is likely that so-called "competing" plaintiffs' firms will be motivated to search for reasons to object to this settlement, again due to motivations separate and apart from the interests of the class. Finally, there will likely be the "random" objections, filed by pro se objectors or law firms that have not taken the time to understand the settlement and whose objections will reveal that approach. Based both on the procedure employed in reaching the settlement and the results ultimately obtained, Class Counsel believe that these likely objections will not gain any traction.

relevant facts and law. It has allowed the parties to test certain issues through motion practice. In the end, each party had the necessary information to evaluate the strengths and weaknesses of their cases to mediate effectively. Armed with this information, the parties were able to reach the present settlement only after five days of mediation. As such, this settlement is well within the range of possible approval and should be preliminarily approved by this Court.

## IV.    THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED

For settlement purposes only, the parties ask the Court to certify the Settlement Class defined above. Likewise, for settlement purposes only, the parties agree this action satisfies the criteria for certification under Georgia law:

> (1) The class is so numerous that joinder of all members is impracticable; (2) There are questions of law or fact common to the class; (3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) The representative parties will fairly and adequately protect the interests of the class.

O.C.G.A. § 9-11-23(a). As in most other jurisdictions, to certify a class the court must find that each of the four § 9-11-23(a) requirements are satisfied as well as a finding that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *See* O.C.G.A § 9-11-23. Georgia courts deciding whether to certify a class must enter and written order addressing the above factors specifying the findings of fact and conclusions of law on which the court has made its decision; however, the court may rely on the stipulations of the parties regarding whether the factors have been established. O.C.G.A § 9-11-23(f). In this case, the parties have stipulated to the certification of the class for settlement purposes.

### A.    The Class is Sufficiently Numerous

The first prerequisite to class certification—that the class be so numerous that joinder is impracticable—is a threshold issue. *Murphy v. Hope*, 195 S.E.2d 24, 25 (Ga. 1972). "[A] class action [may] proceed upon a mere estimation of the size of the proposed class." *Amswiss Int'l Corp. v. Heublein*, 69 F.R.D. 663, 666 (N.D. Ga. 1975). The numerosity requirement is easily satisfied "as few as 40 class members should raise a presumption that joinder in impracticable." 1 *Newberg* § 3.5; *see also Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988). In this case, the estimated number of class members is in the tens of millions. Given the approximate number of class members, numerosity is easily met.

### B.    Common Issues of Fact and Law Predominate

Section 9-11-23(a)(2) is satisfied when "[t]here are questions of law or fact common to the class." Although common questions of law or fact must predominate, the law does not require plaintiffs to prove the complete absence of individual issues because there is no need to burden the Court or the class with requiring each member to pursue their own action. *Trend Star Cont'l Ltd. v. Branham*, 469 S.E.2d 750, 752-53 (Ga. Ct. App. 1996). "The character of the right to be enforced may be common although the facts may be different as to each class member." *UNUM Life Ins. Co. of Am. v. Crutchfield*, 568 S.E.2d 767, 769 (Ga. Ct. App. 2002)(quoting *Ga. Inv. Co. v. Norman*, 190 S.E. 48, 50 (Ga. 1972)). Common questions predominate where consumers with agreements from a common source seek to enforce common rights and seek common relief. *UNUM Life Ins. Co.*, 568 S.E.2d at 769; *see also J.M.I.C. Life Ins. Co. v. Toole*, 634 S.E.2d 123, 128 (Ga. Ct. App. 2006)(upholding certification of class involving laws of 38 states where the class members executed materially similar form contracts and no evidence was

presented showing the laws of the different states would yield different results among members of the class).

In the present litigation, all class members share the common issue of having entered into substantially similar form contracts for wireless service with AT&T Mobility and were then subsequently billed by AT&T Mobility for mobile content that they allegedly did not authorize. In addition, such common questions for the settlement including whether the settlement is fair, and what is the proper form of notice.

### C.    Plaintiff's Claims Are Typical of The Claims of the Class

McFerren, Fiddler and Hensley, who seek to be appointed class representatives, must also show that their claims are typical of those of the putative class members. O.C.G.A. § 9-11-23(a)(3); *Life Ins. Co. of Ga. v. Meeks*, 617 S.E.2d 179, 185 (Ga. Ct. App. 2005). "[T]ypicality measures whether a significant nexus exists between the claims of the named representative and those of the class at large." *Hines v. Widnall*, 334 F.3d 1253, 1256 (11th Cir. 2003) (internal quotation omitted). McFerren, Fiddler and Hensley's claims are each typical of the claims of the class in that they "arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984); *see also Cooper v. Southern Co.*, 390 F.3d 695, 714 (11th Cir. 2004)(finding that "[n]either the typicality nor the commonality requirement mandates that all putative class members share identical claims, and . . . factual differences among the claims of the putative members do not defeat certification." In fact, "a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences." *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985); *see also Cooper*, 390 F.3d at 714 (finding that named representative need only share the same "essential characteristics" or the larger class). Simply put, when the same

unlawful course of conduct is directed at both the named plaintiff and the members of the proposed class, the typicality requirement is met. *Kennedy v. Tallant*, 710 F.2d 771, 717 (11th Cir. 1983).

In this case, McFerren, Fiddler and Hensley and the proposed class suffered the same or similar injuries that resulted from the Defendant's alleged practice billing consumers for unauthorized charges for mobile content. Accordingly, the Plaintiffs' claims are typical of those of the class and Section 9-11-23(a)(3) is satisfied.

### D.     Plaintiffs and Their Counsel Adequately Represent the Class

The final Section 9-11-23(a) requirement mandates consideration of the Plaintiffs' ability to "fairly and adequately protect the interests of the class." O.C.G.A § 9-11-239(a)(4). McFerren, Fiddler and Hensley shoulder the burden of demonstrating their adequacy as class representatives, which necessarily includes a showing that they are members of the class they seek to represent. *McGarry v. Cingular Wireless, LLC*, 599 S.E.2d 34, 36 (Ga. Ct. App. 2004). The remaining determination of adequacy of representation rests on whether the attorneys representing the class are experienced and competent to conduct the litigation, and whether the plaintiffs' interests are antagonistic to those of the class. *Jones v. Douglas County*, 418 S.E.2d 19, 24 (Ga. 1992). The Court may also require a showing that other putative class members share in the Plaintiff's dissatisfaction with the Defendant's conduct. *See id.* at 25.

In this case, McFerren, Fiddler and Hensley are members of the proposed class and have the same interests as its members—all have been charged for allegedly unauthorized mobile content through the Defendant. Class Counsel has also heard from over 1,000 individuals who have expressed dissatisfaction with AT&T alleged conduct. (McGuire Decl. ¶ 2). Further, proposed Class Counsel and members of the Plaintiff's Steering Committee are well respected

members of their respective legal communities, have regularly engaged in major complex litigation, have had extensive experience in consumer class action lawsuits, including ones similar to the instant case. (*See* Firm Resumes of KamberEdelson LLC; Boone & Stone; Lockridge Grindal Nauen PLLP; Giskan, Solotaroff, Anderson, & Stewart, and The Jacobs Law Firm Chtd, attached as Exhibits D-H, respectively). Accordingly, McFerren, Fiddler, Hensley and their counsel adequately represent the class.

###### E.   A Class Action is the Superior Method of Adjudicating these Consumer Claims

In addition to satisfying the Section 9-11-23(a) prerequisites, the Court must also determine both that the common questions of law and fact predominate over individual issues and "that a class action is superior to other methods available for the fair and efficient adjudication of the controversy." O.C.G.A. § 9-11-23(b)(3). In making its determination, pertinent inquires include:

> (A) The interest of members of the class in individually controlling the prosecution of . . . separate actions; (B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of claims in the particular forum; and (D) The difficulties likely to be encountered in the management of a class action.

O.C.G.A. § 9-11-23(b)(3)(A-D). In consumer class actions, "[a] class based effort is more effective than an individual consumer in getting a defendant to modify its conduct." Newberg, § 21.1 at 386. The certification of consumer class actions "enable[s] class members to share in financial recovery which they might otherwise never pursue on their own behalf, [and] also provides an opportunity to educate a segment of the public, those included in the class, or the obligations . . . owed to them." *Duran v. Credit Bureau, Inc.,* 93 F.R.D. 607, 610 (D. Ariz. 1982)(quoting *Watkins v. Simmons and Clark,* 618 F.2d 398, 404 (6th Cir. 1980).

In this case and especially in the context of settlement, the issues of fact and law common to the class present in this litigation predominate over individual issues. AT&T Mobility's alleged practice of billing its customers for unauthorized charges is common to the class. The only real distinction among class members is the number of unauthorized mobile content charges they were billed for by the Defendant. However, such variations do not defeat class certification, as the exact amount of damages is invariably an individual question. *See Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975).

In addition, class relief offers a clearly superior alternative to other forms of adjudicating these cases. The claims of the named Plaintiff and the proposed class are small, discouraging the individual prosecution of their claims. Absent a class action, the Defendant would not be as motivated to provide the service improvements and assurances guaranteed by the proposed settlement and its customers will become more knowledgeable about the pervasiveness of unauthorized charges for mobile content. Additionally, although the present action was recently filed, these matters are currently ripe for settlement as they are the culmination of hard-fought negotiation concerning a multitude of similar suits filed by class counsel and the Plaintiff's Steering Committee that have been pending since January of 2006. It is fitting that the settlement of this class action occurs in this Court, given AT&T Mobility's relationship to the State of Georgia. Finally, because the action will now settle, the Court need not consider issues of manageability relating to trial. *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997)(citation omitted) (finding that "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial"). Accordingly, this Court should enter an order certifying the proposed class for the purposes of this settlement.

## V.    THE PROPOSED NOTICE AND FORM OF NOTICE SHOULD BE APPROVED

Pursuant to the Settlement Agreement, Defendant has agreed to notify the class of this settlement in several ways. First, AT&T Mobility will publish Notice in USA TODAY and PARADE within ninety (90) days after the preliminary approval of this settlement. Second, direct notice will be provided to current AT&T Mobility customers via a bill insert within 120 days after entry of the preliminary approval order, which will be inserted in customers monthly bill and an electronic copy will be sent via email to those customers who receive bills electronically. Finally, the settlement administrator will erect a settlement website that will serve as a replacement for a typical "long-form" notice and will provide links to the Settlement Agreement and provide for the on-line submission of claims. Copies of the Proposed Notices are attached as Exhibits 2-4 to the Settlement Agreement attached here as Exhibit A.

The proposed notices are neutral in tone and neither promote nor discourage the assertion of claims. The Notices also provide the settlement class members with a detailed explanation of their options to allow each of them to make an informed decision. The parties request the Court to approve the form and methods of notice proposed.

## VI.    PROPOSED PRELIMINARY SCHEDULE

The parties propose the following schedule leading to the Fairness Hearing for final approval of the settlement:

1.    Website Notice Posted by Settlement Administrator: shortly after entry of Preliminary Approval Order (PAO).

2.    Notice Published in USA TODAY and PARADE:  Within 90 days after PAO entered.

3.    Defendant will send out Bill Insert Notice:  Within 120 days after PAO entered.

4.    Deadline for Opt-outs/Objections:  14 days prior to Final Settlement Hearing

Date.

5.     Submission of papers in support of final approval of settlement and in response to objections: 7 days prior to Final Settlement Hearing Date.

6.     Final Fairness Hearing: Date to be set by the parties and the Court.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that (1) the Court certify the requested settlement class, (2) appoint Tracie McFerren, Morris Fiddler and Kristen Hensley as class representatives, (3) appoint Class Counsel as set forth above, (4) preliminarily approve the proposed settlement, (5) approve the form and methods of proposed Notice, and (6) that the Court order the issuance of the Notice and all other actions detailed in the schedule proposed in Section VI above.

Dated:  May 28      , 2008          KAMBEREDELSON, LLC

Jay Edelson
53 W. Jackson Blvd., Suite 550
Chicago, IL 60604
Telephone: 312.589.6370
Facsimile: 312.913.9401

*On Behalf of Plaintiffs and the Class*

Dated: _____, 2008          BOONE & STONE LP

**LIAISON CLASS COUNSEL**

# Exhibit A

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

TRACIE MCFERREN, individually and on behalf )
of a class of similarly situated individuals,          )
                                                        )
                    Plaintiff,              )      No.
                                                        )
            v.                              )      Judge Bonner
                                                        )
AT&T MOBILITY LLC,                      )
                                                        )
                    Defendant.          )

## CLASS ACTION SETTLEMENT AGREEMENT

THIS CLASS ACTION SETTLEMENT AGREEMENT (the "Agreement") is entered by and among Plaintiff in this Action, for herself and on behalf of the Settlement Class, and AT&T Mobility LLC ("AT&T Mobility") (together, the "Parties"). Subject to Court approval as required by the applicable law and rules, and as provided herein, the Parties hereby stipulate and agree that, in consideration of the promises and covenants set forth in this Agreement and upon the entry by the Court of a Final Order and Judgment, this Action shall be settled and compromised upon the terms and conditions contained herein.

WHEREAS, Plaintiff filed this action captioned *McFerren v. AT&T Mobility LLC*, No. 2008-EV-004400F (Fulton County, GA) (the "Complaint"), alleging claims for damages and injunctive and declaratory relief against AT&T Mobility arising out of the sale and marketing of Third Party Mobile Content, such as ring tones, wallpaper, news and information alerts, and other digital and electronic content to AT&T Mobility wireless telephone subscribers; and

WHEREAS, a number of putative class actions have been filed by Class Counsel and

SETTLEMENT AGREEMENT

members of the Plaintiff's Steering Committee against and/or involving AT&T Mobility and certain Third Party Content Providers and related entities, including VeriSign, Inc. ("VeriSign"), M-Qube, Inc. ("M-Qube"), Jamster International, SARL ("Jamster") and Mblox, Inc. ("Mblox") (together with the other entities identified below, the "Third Party Content Providers") regarding the marketing and sale of Third Party Mobile Content.   These actions are listed below and defined herein as the Coordinated Actions; and

WHEREAS, other putative class actions have been filed by Class Counsel and members of the Plaintiff's Steering Committee, alleging claims arising out of the imposition of charges for Third Party Mobile Content authorized by the previous owner of a mobile number but not the current owner charged for the Mobile Content.  These actions are listed below and defined herein as the Recycled Number Actions; and

WHEREAS, AT&T Mobility has denied and continues to deny all Plaintiff's claims in the Action and other similar actions, and has denied any wrongdoing or liability to all plaintiffs in all of the pending actions; and

WHEREAS, Class Counsel have conducted an examination and investigation of the facts and law relating to the matters set forth in the Complaint regarding the claims and potential defenses of AT&T Mobility; and

WHEREAS, the Parties have engaged in extensive, arms-length negotiations, including multiple, in person sessions in front of Rodney Max, Esquire, Upchurch Watson White & Max Mediation Group in his capacity as a mediator, and reached this settlement agreement; and

WHEREAS, based upon extensive analysis of the facts and the law applicable to Plaintiffs' claims in the Coordinated Actions, and taking into account the burdens and expense of litigation,

SETTLEMENT AGREEMENT

including the risks and uncertainties associated with protracted trials and appeals, as well as the fair, cost-effective and assured method of resolving the claims of the Settlement Class, Class Counsel have concluded that this Agreement provides substantial benefits to the Settlement Class and the public as a whole, and is fair, reasonable, adequate and in the best interests of Plaintiff and the Settlement Class; and

WHEREAS, AT&T Mobility has similarly concluded that this Agreement is desirable in order to avoid the time, risk and expense of defending multiple and protracted litigation, and to resolve finally, completely and globally the pending and potential claims of Plaintiff and the Settlement Class, and thus to resolve all of the litigation pending and described above; and

WHEREAS, the Parties agree that all potential Settlement Class Members shall have an individual right to be excluded ("opt out") from the Settlement Class (as provided in this Agreement), such that participation in the settlement benefits shall be voluntary;

NOW, THEREFORE, the Parties stipulate and agree that any and all Settled Claims against all Released Parties regarding the marketing and sale of Third Party Mobile Content to AT&T Mobility subscribers shall be finally settled and resolved on the terms and conditions set forth in this Agreement, subject to Court approval of this Agreement, as a good faith, fair, reasonable and adequate settlement under applicable rules, regulations and laws.

## I.    DEFINITIONS

As used in this Agreement and the exhibits hereto, in addition to any definitions set forth elsewhere in this Agreement, the following terms shall have the meanings set forth below:

"*Action*" means the case captioned *McFerren v. AT&T Mobility LLC*, No.____,

SETTLEMENT AGREEMENT

(Fulton County GA).

"*Account Holder*" means any Person with an account for wireless service with AT&T Mobility.

"*Account Holder Claims*" means any claims arising out or relating to a charge to any Account Holder for Third Party Mobile Content, including all claims that were brought or could have been brought in the Action, the Coordinated Actions or the Recycled Number Actions.

"*Agreement*" means this Settlement Agreement (including all exhibits hereto).

"*Approved Claim*" means a claim by a member of the Settlement Class that is a timely (submitted before the Claims Deadline), truthful, and complete claim and that provides at least the following information:

> (i)  .  Full name, current address, home phone number, current or former AT&T Mobility wireless number and/or AT&T Mobility wireless account number;
>
> (ii)  Total amount of refund sought, along with the date, description of charge, and amount of each Third Party Mobile Content charge to be refunded;
>
> (iii)  Certification under oath that each of these charges for which a refund is sought was unauthorized and that no refund was previously sought and/or provided on any such charge.

"*AT&T Mobility*" means AT&T Mobility LLC, f/k/a Cingular Wireless LLC, and all of its current and former parents, affiliates, subsidiaries, predecessors, successors and assigns.

SETTLEMENT AGREEMENT

"*AT&T Mobility's Counsel*" means Drinker Biddle and Reath LLP and McKenna, Long & Aldridge LLP.

"*Claimant*" means a person or entity that submits a claim form for a Settlement Benefit.

"*Claim Form*" means the form attached hereto as Exhibit 1, as it may be revised and as approved by the Court.

"*Claims Administration Expenses*" means the expenses incurred by the Claims Administrator in handling claims by Class Members.

"*Claims Administrator*" means the Person selected by the Parties and approved by the Court to oversee the processing and payment of Class Members' claims as set forth in this Agreement. The Parties agree that Rust Consulting shall perform the duties of Claims Administrator and shall act as Claims Administrator.

"*Claims Deadline*" means the date by which all Claims Forms must be received to be considered timely and shall be set as the date ninety (90) days after entry of the Judgment. The Claims Deadline shall be clearly set forth in the Court Order granting final approval of this Agreement as well as on the front page of all Claims Forms.

"*Class Counsel*" means Lead Class Counsel consisting of attorneys Jay Edelson, Scott Kamber and Myles McGuire of KamberEdelson, LLC and "Liaison Class Counsel" consisting of David W. Boone, William S. Stone and Aileen Page of Boone & Stone.

"*Class Notice*" means the form of Court-approved notice (or notices) of this Settlement Agreement that are directed to the Class. The Parties have proposed that the Court approve the notices in the form of Exhibits 2, 3 and 4 to this Agreement.

"*Class Representatives*" shall mean the plaintiff in this Action, Tracie McFerren, as well as

the following plaintiffs from the Coordinated Actions:  Morris Fiddler and Kristen Hensley.

"*Coordinated Actions*" means the following pending class actions filed or pending in other

state or federal courts asserting similar class claims whose plaintiffs and counsel have agreed to the

terms and conditions of this settlement: *Baker v. Sprint, New Motion, Inc.*, 2007-46363 (Fl. St. Ct.);

*Dedek v. AT&T Mobility LLC*, Case No. BC387728, (Sup. Ct. L.A. County); *Fiddler v. AT&T*

*Mobility LLC, et al.*, Civ. A. No. 08-0416, (N.D. Ill.); *Goddard v. Google, Inc.* BC 667876

(Cal.St.Ct.); *Gray v. Verizon, Mobile Messenger Americas, Inc.*, 07-36302 (Fl. St. Ct.); *Hensley v.*

*AT&T Mobility LLC* (Dist. Ct., 4th Jud. Dist., Hennepin Cty, Minn.); *Jiran v. AT&T Mobility LLC, et*

*al.*, Civ. A. No. 08-00013, (N.D. Cal.), *Paluzzi v. mBlox, et al.*, No: *2007-CH-37213* (Cook Cty,

Illinois), *Thielen v. Buongiorno USA, Inc.*, 1:06-cv-00016 (W.D. Mich.); *Walsh v. mBlox, et al.*, No.

BC. BC 382356 (Cal.St.Ct.), *Warren et al. v. Verisign, et al.* No. 6:2007cv02043 (M.D. Fl.) and

*White v. AT&T Mobility* (Supreme Court of New York County) and the Recycled Number Actions.

"*Court*" means the Superior Court of Fulton County, Georgia.

"*Defendant*" means AT&T Mobility.

"*Effective Date*" means the date on which the Judgment becomes final and not subject to

appeal under the applicable law or, in the event of a timely appeal from the entry of the Judgment,

the date on which such appeal is resolved and the Judgment is not subject to further review.

"*Fairness Hearing*" means the hearing to be conducted by the Court to determine the

fairness, adequacy and reasonableness of this Settlement Agreement in accordance with applicable

jurisprudence.

"*Judgment*" means the Order and Final Judgment to be entered by the Court, approving this

Agreement without material alterations, as fair, adequate and reasonable in accordance with

applicable jurisprudence, confirming the certification of the Class, and issuing such other findings and determinations as the Court or the parties deem necessary and appropriate to effectuate the terms of this Agreement.

*"Mediator"* means Rodney Max, Esquire of Upchurch Watson White & Max Mediation Group.

*"Mobile Content"* refers to content, applications, and goods and services such as ring tones, wallpaper, news and information alerts, and other digital and electronic content charged to the wireless bill of an Account Holder.

*"Nationwide"* means the 50 United States and its territories.

*"Notice Date"* means the date upon which Class Notice is first disseminated to the Class.

*"Notice Expenses"* means all reasonable costs and expenses expended in the execution of the Notice Plan, including (i) all reasonable costs and expenses incurred in connection with preparing, printing, mailing, disseminating, posting, promoting, emailing, internet hosting and publishing the Notice to the Class of the proposed Settlement, identifying and notifying Class Members and informing Class Members of the proposed settlement and (ii) any necessary notice and notice-related expenses.

*"Notice of Intention to Appear and Object"* is the written communication that may be filed by a Class member in order to object to this Agreement.

*"Notice Plan"* means the proposed plan of disseminating notice of the Agreement to Class Members.

*"Opt-Out Period"* means the period for filing a Request For Exclusion to be set by the Court in this action. The deadline for filing Opt-Outs will be clearly set forth in the Class Notice.

**SETTLEMENT AGREEMENT**

"*Person*" means any individual, corporation, trust, partnership, limited liability company or other legal entity and their respective successors or assigns.

"*Plaintiff*" means Tracie McFerren and the Settlement Class.

"*Plaintiff's Steering Committee*" means the committee consisting of chairman Robert Shelquist of Lockridge Grindal Nauen, P.L.L.P., Orin Giskan, of Solotaroff, Anderson & Stewart, LLP, David Healey of the Offices of David Healy and John Jacobs of The Jacobs Law Firm, Chtd.

"*Preliminary Approval*" means the Court's conditional certification of the Class, preliminary approval of this Agreement, and approval of the form and dissemination of Class Notice.

"*Recycled Number Actions*" means actions arising out of the imposition of charges for Third Party Mobile Content authorized by the previous owner of a mobile number but not the then-current owner such as *Jiran v. AT&T Mobility LLC, et al.*, Civ. A. No. 08-00013, (N.D. Cal.), *Valdez v. Buongiorno USA, Inc., m-Qube, Inc.* 4:07-cv-06496-CW (N.D. Cal.); *Knox v. m-Qube, Inc.* 1:07-cv-10124 (D.Mass.).

"*Released Party*" means Defendant (as defined above) and the Third Party Providers (as defined below) including their respective predecessors, successors, assigns, parents, subsidiaries, divisions, departments, and affiliates, and any and all of their past, present and future officers, directors, employees, stockholders, partners, agents, servants, successors, attorneys, representatives, subrogees and assigns of any of the foregoing.

"*Releasing Party*" means Plaintiff and each member of the Settlement Class and any Person claiming by or through him/her/it as his/her/its spouse, child, heir, associate, co-owner, attorney, agent, administrator, devisee, predecessor, successor, assignee, representative of any kind, shareholder, partner, director, employee, or affiliate.

*"**Request For Exclusion**"* is the written communication that must be filed with the Claims Administrator that is postmarked on or before the end of the Opt Out Period if a Class Member wishes to be excluded from the Settlement Class.

*"**Settled Claim**"* means any claim, liability, right, demand, suit, matter, obligation, damage, loss or cost, action or cause of action, of every kind and description that the Releasing Party has or may have, including assigned claims, whether known or unknown, asserted or unasserted, latent or patent, that is, has been, could reasonably have been or in the future might reasonably be asserted by the Releasing Party either in the Action or in any other action or proceeding in this Court or any other court or forum, regardless of legal theory, and regardless of the type or amount of relief or damages claimed, against any of the Released Parties arising out or relating to a charge to any Account Holder for Third Party Mobile Content, including all claims that were brought or could have been brought in the Action, the Coordinated Actions or the Recycled Number Actions, and involving any allegation on any basis that such charge was unauthorized. Settled Claims include, *inter alia*, claims that the Third Party Mobile Content charges were the result of fraudulent or misleading marketing or billing practices, the actions of minors who did not have the capacity to agree to such charges, or that were the result of receiving a "recycled" cellular telephone number. Without limiting the generality of the foregoing, Settled Claim shall include, with regard to the foregoing subject matter:

(1)      any class, group, collective or individual claim for any breach or violation of any federal or state statute, case law, common law or other law;

(2)      any claim for breach of any duty imposed by law, by contract or otherwise; and

SETTLEMENT AGREEMENT

(3)    any claim for damages, injunctive relief, declaratory relief, class damages or relief,

penalties, punitive damages, exemplary damages, restitution, rescission or any claim for damages

based upon any multiplication or enhancement of compensatory damages associated with the above.

"*Settlement Benefit*" means the benefits a Settlement Class Member may receive pursuant to

this Settlement Agreement.

"*Settlement Class*" shall consist of all current and former AT&T Mobility Account Holders

Nationwide who, at any time from January 1, 2004 to the Notice Date, were billed for Third Party

Mobile Content.  Excluded from the Class are the following:  the Defendant, the Third Party

Providers, the Claims Administrator, the Mediator, and any of their respective parent, subsidiary,

affiliate or control person of the Defendant, as well as the officers, directors, agents, servants, or

employees of the Defendant, any trial judge presiding over this case over any of the actions which

comprise the Action or Coordinated Actions, and the immediate family members of any such

Person(s).

"*Special Master*" means an independent person agreed upon by the parties to evaluate those

claims that have been challenged by AT&T Mobility or rejected by the Claims Administrator after an

initial appeals process.

"*Third Party Mobile Content*" means Mobile Content sold by Third Party Providers directly

to AT&T Mobility wireless customers and charged to the wireless bill of one of AT&T Mobility's

wireless customers, and excludes Mobile Content sold through the AT&T Media Mall or directly by

AT&T Mobility to such Account Holders.

"*Third Party Providers*" means entities other than AT&T Mobility who advertise, aggregate

billing for, offer, and/or sell Third Party Mobile Content, including Third Party Mobile Content

SETTLEMENT AGREEMENT

Subscriptions, directly to AT&T Mobility's wireless customers as well as their marketing agents and/or licensors, and includes VeriSign, M-Qube, Jamster International SARL, and Mblox. Providers who sell Mobile Content on or through AT&T Mobility's Media Mall are not thereby Third Party Providers for the purposes of such sales.

## II.    FOR SETTLEMENT PURPOSES ONLY

A.    This Agreement, whether or not consummated, and any proceedings taken pursuant to this Agreement are for settlement purposes only, and neither the fact of, nor any provision contained in this Agreement or its exhibits, nor any action taken hereunder shall constitute, be construed as, or be admissible in evidence as any admission of the validity of any claim or any fact alleged by Plaintiff in this Action or in any other pending action or of any wrongdoing, fault, violation of law, or liability of any kind on the part of AT&T Mobility or admission by AT&T Mobility of any claim or allegation made in this Action or in any other action, nor as an admission by Plaintiff, Settlement Class Members or Class Counsel of the validity of any fact or defense asserted against them in this Action or in any other action.

B.    This Agreement is without prejudice to the rights of AT&T Mobility to: (i) seek to compel arbitration of any claim in any forum, excepting claims arising under this Agreement by class members who have not opted-out; (ii) oppose Class certification in this Action should this Agreement not be approved or implemented for any reason; (iii) oppose certification in any other proposed or certified class action; or (iv) use the certification of the Class to oppose certification of any other proposed or existing class arising out of or related to the Settled Claims.

SETTLEMENT AGREEMENT

## III.  REQUIRED EVENTS AND COOPERATION BY THE PARTIES

### A.    Preliminary and Final Approval

Promptly after execution of this Agreement, Class Counsel shall submit this Agreement to the Court for its Preliminary Approval and shall move the Court for one or more orders which by their terms shall:

　　　　1.    Appoint the Class Representatives as the representatives of the Settlement Class;

　　　　2.    Appoint Lead and Interim Class Counsel, as well as the Plaintiff's Steering Committee;

　　　　3.    Preliminarily and conditionally certify the Class under Ga. Code Ann., § 9-11-23 for settlement purposes only and preliminarily approve this Agreement for purposes of issuing notice to the Class;

　　　　4.    Approve the form and contents of the Settlement Class Notice and the method of its dissemination to Class Members;

　　　　5.    Provides for appropriate confirmatory discovery; and

　　　　6.    Schedule the Fairness Hearing to review comments and/or objections regarding this Agreement, to consider its fairness, reasonableness and adequacy, and the application for an award of attorneys' fees and reimbursement of expenses and to consider whether the Court shall issue a Judgment approving the Settlement, granting Class Counsel's application for fees and expenses, and dismissing the Action with prejudice.

**B.     Cooperation**

The Parties shall, in good faith, cooperate, assist and undertake all reasonable actions and steps in order to accomplish these required events on the schedule set by the Court.

**C.     Dismissal of Coordinated Actions**

Class Counsel shall dismiss, with prejudice, the Coordinated Actions or, to the extent appropriate, amend the pleadings to limit the respective classes to exclude Settled Claims, no later than thirty (30) days following the Effective Date, and shall cooperate in seeking stays of such actions as to Settled Claims prior to the Effective Date.

**D.     Certification of Settlement Class**

For settlement purposes only, AT&T Mobility and the Settlement Class stipulate to the certification of the Settlement Class, as defined above.

This Agreement is contingent upon the Court finally certifying the Settlement Class as defined in the preceding paragraph. Should the Court fail to certify the Settlement Class substantially as defined in the preceding paragraph, the Parties shall each have the option of rescinding this Agreement within 10 business days of the date the Court grants final certification of the class in this Action. Should the Court fail to certify a class or approve this Agreement, this Agreement may not be used by the Parties for any purpose related to class certification.

**IV.     SETTLEMENT BENEFITS**

**A.     Service Improvements and Assurances.** AT&T Mobility has agreed that it shall, as soon as practicable but in no event later than a date 45 days after preliminary approval is entered in this action, institute the following:

1.    AT&T Mobility shall include in its Wireless Service Agreement a disclosure concerning Mobile Content substantially consistent with the following:

Mobile Content

I understand that wireless devices may be used to purchase goods, content, and services (including subscription plans) like ring tones, graphics, games, horoscopes and news alerts from AT&T and other companies ("Mobile Content"). I understand that I am responsible for all authorized charges associated with such purchases from any device assigned to my account, that these charges will appear on my bill (including charges on behalf of other companies), and that such purchases can be restricted by using parental controls available from your AT&T salesperson, at www.wireless.att.com, or by calling AT&T.

2.    AT&T Mobility shall post on its website a disclosure concerning Mobile Content substantially consistent with the following:

Your wireless devices may be used to purchase goods, content, and services (including subscription plans) like ring tones, graphics, games and news alerts, from AT&T or other companies ("Mobile Content"). You are responsible for all authorized charges associated with such purchases from any device assigned to your account. Charges for Mobile Content will appear on your bill (including charges on behalf of other companies), and Mobile Content purchases can be restricted by use of parental controls or similar features. Parents should consider using parental controls available from

14 of 32

**SETTLEMENT AGREEMENT**

AT&T. Please visit our website at www.wireless.att.com or speak with an
AT&T customer representative for further information.

3.    All bills, electronic and paper, will disclose the telephone number for Account
Holders who seek to dispute a charge to call and reach an appropriate customer service representative
as well as the website address for performing the same.

4.    AT&T Mobility will continue to provide and enhance as necessary the systems,
processes and training to support the ability for Account Holders to have a free and ready means to
address billing issues and cancel Third Party Mobile Content subscriptions via a single point of
contact or through an equally effective means to address such issues.

**B.    Refund Benefit.**

1.    *Refunds.*  AT&T Mobility shall credit or refund any current or former
Account Holder who submits a valid and timely Claim Form for the amount of past unauthorized
charges for Third Party Mobile Content purchases ("Settlement Benefit") billed to a member of the
Settlement Class, subject to the provisions of this Settlement Agreement and in accordance with the
claims process set forth herein.

2.    *Subscription Charge Claims.*  With respect to any Account Holder Claims
relating to charges associated with Third Party Mobile Content sold by subscription, the Settlement
Benefit shall be capped at an amount equal to three times the monthly subscription charge.

**V.    CLAIMS PROCESS**

**A.    Claims Administrator's Duties**    The Claims Administrator shall, under
the supervision of the Court, administer the relief provided by this Settlement Agreement by
resolving claims in a rational, responsive, cost effective and timely manner.    The Claims

**SETTLEMENT AGREEMENT**

Administrator shall maintain reasonably detailed records of its activities under this Agreement. The Claims Administrator shall maintain all such records until expiration of the Term of Agreement and such records will be made available to Class Counsel and AT&T Mobility's Counsel. The Claims Administrator shall also provide reports and other information to the Court as it may require. The Claims Administrator shall provide Class Counsel and AT&T Mobility's Counsel with such information concerning notice, administration and implementation of the Settlement. Should the Court request, the Parties, in conjunction with the Claims Administrator, shall submit a timely report to the Court summarizing the work performed by the Claims Administrator, including a report of all amounts paid to Class Members. The Claims Administrator shall cause a website to be created containing claims information and relevant documents. The Parties shall agree on all information and documents to be posted on this website.

**B.    Written and Electronic Claims Submission**

Settlement Class Members are entitled to Settlement Benefit(s) through submission of an Approved Claim. The claims process shall be conducted online through the claims website administrated by the Claims Administrator. Any Class member unable to complete an online Claim Form may call a toll free number, provide their name and address, and receive a paper Claim Form. Paper Claim Forms may be mailed to the Claims Administrator and must be postmarked on or before the Claims Deadline. The paper Claim Form agreed to by the Parties is attached hereto as Exhibit 1. The Claims Administrator shall reject any claims not submitted in accordance with the above provided, however, that nothing in this provision shall be construed to prevent the Claims Administrator, in its discretion, from permitting a Settlement Class Member to remedy deficiencies in such Settlement Class Member's Claim Form.

**C.    Processing and Validation of Claims**

1.    *Claims Must be for Unauthorized Charges.* All claims shall be validated by the Claims Administrator to establish that the Third Party Mobile Content charges associated with each claim were not authorized.

2.    *Claims Administrator Review.* The Claims Administrator may reject a claim, or any part of a claim, where there is evidence of customer abuse or fraud or where indicia of authorization are present. For example, the Claims Administrator may reject a claim or any portion of a claim if it appears that the Claimant has previously received multiple refunds for the same type of charge that is being requested for refund in the Claim Form, provided that such charges do not arise from a subscription cancelled by the Account Holder and not reactivated by an authorized user on the account.

3.    *Review for Indicia of Authorization.* The Claims Administrator shall make the determination by a totality of the circumstances and shall have the right to request additional information. To determine whether the charge was unauthorized, the Claims Administrator may review, *inter alia*, the Claimant's Third Party Mobile Content purchase history, including but not limited to the following:

(a)    whether a refund was previously issued for the charges associated with a claim;

(b)    whether refunds were previously given for other Third Party Mobile Content charges associated with the wireless number tied to a claim;

(c)    if refunds were previously given, the amount of the refunds given for the charges associated with the wireless number tied to a claim;

(d)    the number and frequency of similar Third Party Mobile Content charges associated

SETTLEMENT AGREEMENT

with the wireless number tied to a claim;

(e)     the amount of similar charges associated with the wireless number tied to a claim;

(f)     the existence of charges from a different wireless number on the same account tied to a claim;

(g)     the reputation of the source of the Third Party Mobile Content;

(h)     the nature and type of the Third Party Mobile Content;

(i)     the number of telephone lines associated with the account;

(j)     a comparison of the date the Third Party Mobile Content was ordered and the date the account was opened;

(k)     whether the charges were voluntarily paid; and

(k)     any explanation given by the Account Holder.

        4.     **Subscription Charges.** As provided in Section IV.B.2, the Settlement Benefit for any claim made for a recurring charge that was billed and paid for by the Claimant for more than three successive billing cycles shall be limited to three times the amount of such recurring charges appearing on a monthly basis.  For example, if a Claimant requests refund for four months of a recurring monthly charge, the Claims Administrator may refund three months of the recurring charge but will reject the claim for refund of the fourth month of this charge.

        5.     **Previously Refunded Amounts.** The Claims Administrator shall not provide a Settlement Benefit for any charge associated with a claim that has been previously refunded by AT&T Mobility or a Third Party Provider.

**D.**     **Resolution Procedure For Challenged or Rejected Claims**

1.     *Abuse of Discretion by Claims Administrator.*  Both AT&T Mobility and Plaintiffs' Counsel shall have the right to challenge systematic abuse(s) in processing or handling of the claims as submitted by Settlement Class members and such challenges will be timely decided by the Mediator.  The Parties agree that the Claims Administrator shall thereafter follow the decision of the Mediator resulting from any such challenge.

2.     *Challenging Individual Claims.*

a.     AT&T Mobility may challenge any claim, and the Claim Form will disclose the right of AT&T Mobility to challenge claims.

b.     AT&T Mobility shall have thirty (30) days upon receiving notice of such approval to dispute any claim for a Settlement Benefit approved by the Claims Administrator.  Any Settlement Class member whose claim for a Settlement Benefit is denied by the Claims Administrator shall also have thirty (30) days upon receiving notice of such denial to dispute the denial of the claim.  In either case, each party shall receive written notice that the denial/approval of the claim is being disputed and shall be provided an Appeal Form wherein the appealing party must provide a detailed written explanation as to why the Claims Administrator erred in its denial/approval of the claim for a Settlement Benefit.

c.     All Appeal Forms will be submitted to an Appeal Panel that will be comprised of three (3) members: one (1) member to be appointed by AT&T; one member (1) to be appointed by the Claims Administrator; and one (1) member to be appointed by Plaintiffs' Counsel.  The Appeal Panel shall meet at regularly determined times to decide all appeals based solely on the Appeal Forms submitted and AT&T records.  There will be no in-person hearings

of any kind. In order to overrule the decision of the Claims Administrator to approve/deny a claim for a Settlement Benefit, the party submitting the appeal must garner two (2) votes from the Appeal Panel.

        d.    If the Appeal Panel affirms the decision of the Settlement Administrator, the losing party has a right to one final appeal to have the issue of the denial/approval determined by a Special Master, to be either jointly agreed to by the Parties, or, if no such agreement is reached, as selected by the Mediator. All decisions regarding the denial/approval of any claim submitted and ruled upon by the Special Master are final.

## VI.   SETTLEMENT PAYMENTS

    **A.**    AT&T Mobility shall be solely responsible to pay all Claims Administration Expenses, including but not limited to reasonable fees and costs for the Special Master, and all Notice Expenses for a Notice Plan as described in this Agreement, as well as the Fee Award approved by the Court to Class Counsel.

    **B.**    The Claims Administrator shall request funds from AT&T Mobility in amounts, from time to time, sufficient to timely pay: (i) the costs of administration of this Settlement; (ii) the attorneys' fees and costs awarded by the Court to Class Counsel; and (iii) all Approved Claims. The Claims Administrator shall, in its discretion, request funds periodically and from time to time only as necessary to make payments due under this Agreement.

    **C.**    AT&T Mobility will use its best efforts to pay an Approved Claim as soon as practicable following approval by the Claims Administrator, but in no event more than 90 days following such approval. The Claims Administrator shall pay all Approved Claims (not paid by AT&T Mobility via a bill credit) by check and mail them to the Claimant via first-class mail.

**SETTLEMENT AGREEMENT**

## VIII.  NOTICE TO THE CLASS

A.    Upon Preliminary Approval of this Agreement (and as the Court may direct), the Parties (or their designee) shall cause the Class Notice describing the Fairness Hearing and the terms of the Settlement embodied herein to be disseminated to potential Class Members as provided herein.  Notice shall comport with due process and be effectuated pursuant to a Notice Plan.

B.    The Notice Plan shall include:

1.    Publication Notice shall be made in a single publication each in USA TODAY WEEKEND and PARADE, to be published within ninety (90) days of receipt of Preliminary Approval of the Settlement.  The text of such notice is provided in Exhibit 2.

2.    A paper Bill Insert Notice shall be provided to current direct bill wireless Account Holders who receive bills by paper and an electronic Bill Insert Notice shall be provided to Account Holders who receive bills electronically.  The text of such notice is provided in Exhibit 3. Bill Insert Notice will be completed within one hundred and twenty (120) days after Preliminary Approval of the Settlement.

3.    Internet Publication Notice.  Immediately following Preliminary Approval of the Settlement, Website Notice shall be provided on the website to be administered by the Claims Administrator.  The text of such Notice is provided in Exhibit 4.

C.    The Class Notice shall advise Class Members of their rights, including the right to opt-out and/or comment or object upon the Settlement Agreement or its terms.  The Notice shall provide that any objection to the proposed Settlement Agreement, and any papers submitted in support of said objection, shall be received by the Court at the Fairness Hearing, only if, on or before a date approved by the Court and to be specified in the Class Notice, the Person making an objection

SETTLEMENT AGREEMENT

shall file notice of his or her intentions to do so and shall file copies of such papers he or she proposes to submit at the hearing with the Clerk of the Court and mail, hand or overnight delivery service to both Class Counsel and AT&T Mobility's Counsel on or before the date specified in the Class Notice.

     **D.**     The cost of the Notice, the Notice Plan as outlined herein, and the dissemination of the Notice shall be borne solely by AT&T Mobility.

## IX.    OPT-OUT AND OBJECTIONS

     **A.**     A Class Member may opt out of the Class at any time during the Opt-Out Period, as will be outlined in the Court-approved Notice. Opt-outs must be post-marked by a date approved by the Court and specified in the Notice. In order to exercise the right to opt out, the Class Member must complete and return a Request For Exclusion to the Claims Administrator during the Opt-Out Period. Except for those potential Class Members who have properly opted out, all Class Members will be deemed a Class Member for all purposes under this Agreement. Any potential Class Member who elects to opt out of the Class shall not (i) be bound by any orders or judgments entered in this Action; (ii) be entitled to relief under or be affected by this Agreement; (iii) gain any rights by virtue of this Agreement; or (iv) be entitled to object to any aspect of this Agreement. The Request For Exclusion must be personally signed by the Person requesting exclusion. So called "mass" or "class" opt-outs shall not be allowed.

     **B.**     Any Settlement Class Member who intends to object to the Settlement Agreement must include his/her name and address, include all arguments, citations, and evidence supporting the objection. An objecting Class Member must state, in writing, all objections and the basis for any such objection(s), and provide a statement whether the Objector intends to appear at the Fairness

Hearing, either with or without counsel. Objections must be post-marked by a date approved by the Court and specified in the Notice. Any Settlement Class Member who fails to timely file a written objection and notice of his or her intent to appear at the Fairness Hearing pursuant to this paragraph or as detailed in the Notice, shall not be permitted to object to the Class Settlement at the Fairness Hearing, and shall be foreclosed from seeking any review of the Class Settlement by appeal or other means.

## X.    AT&T MOBILITY'S RIGHT OF WITHDRAWAL

A.    If an excess of a reasonable amount of Class Members, in an amount to be agreed upon by the Parties and approved of by the Court prior to Notice being effectuated, timely file valid opt-out requests, AT&T Mobility shall have the right to terminate from this Agreement. AT&T Mobility shall exercise such withdrawal right, if at all, no later than ten (10) business days after being advised by the Claims Administrator in writing of the number of opt-out requests following the end of the Opt-Out Period. In the event AT&T Mobility exercise its right of termination, AT&T Mobility shall promptly notify Class Counsel and cause the Claims Administrator to notify the Class by posting information on the Settlement website and e-mailing information to those Class Members who provided an e-mail address to the Claims Administrator.

## XI.    EXCLUSIVE REMEDY; DISMISSAL OF ACTION; JURISDICTION OF COURT

A.    This Agreement shall be the sole and exclusive remedy for any and all Settled Claims of all Class Members against the Released Parties. No Released Party shall be subject to liability or expense of any kind to any Class Member with respect to any Settled Claim. Upon entry of the Judgment pursuant to the Fairness Hearing, each and every Class Member shall be permanently barred and enjoined from initiating, asserting and/or prosecuting any Settled Claim(s) against any

Released Party in any court or forum.

B.      The Parties agree that the Court shall retain exclusive and continuing jurisdiction of the Action, Parties, Class Members and the Claims Administrator to interpret and enforce the terms, conditions, and obligations under this Agreement.

## XII.    RELEASES

A.      Upon entry of the Judgment, each Settlement Class Member who has not validly opted out of the Settlement, shall be deemed to and does hereby release and forever discharge each Released Party of and from liability for any and all Settled Claims.

B.      Upon entry of Judgment without further action, for good and valuable consideration, Plaintiff, on behalf of herself and the Settlement Class and as the representative of the Settlement Class, shall expressly, and all Settlement Class Members shall be deemed to have, and by operation of the final judgment contemplated by this Agreement shall have, fully, finally, and forever expressly waived and relinquished with respect to Settled Claims, to the fullest extent permitted by law, any and all provisions, rights, and benefits of section 1542 of the California Civil Code and any and all similar provisions, rights, and benefits conferred by any law of any state or territory of the United States or principle of common law that is similar, comparable, or equivalent to section 1542 of the California Civil Code, which provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

## XIII.   CLASS COUNSEL FEES AND COSTS AND INCENTIVE AWARDS

A.      **The Fee Award.**  In addition to the consideration provided to the Claimants in Section IV, above, AT&T Mobility has agreed to pay Class Counsel, subject to Court approval, $4.3

Million (the "Maximum Fee Amount") in attorneys' fees and reimbursement of costs (the "Fee Award"). AT&T Mobility agrees that the Maximum Fee Amount is fair and reasonable and will not object to or otherwise challenge Class Counsel's application for reasonable attorneys' fees and for reimbursement of costs and other expenses if limited to the Maximum Fee Amount. Class Counsel has, in turn, agreed not to seek more than the Maximum Fee Amount from the Court.

**B.    Payment of the Fee Award.** Notwithstanding any appeal or objection or challenge to the Settlement or to the Fee Award, provided Lead Class Counsel provides adequate security for the recovery of amounts paid in the event of reversal of the award of fees on appeal, AT&T Mobility shall pay (by wire) to Lead Counsel the Fee Award approved by the Court within thirty (30) days after entry of the order approving such award of fees or reimbursement of expenses. The adequacy of security shall be determined by AT&T Mobility in its sole discretion. Absent the provision of such security, AT&T Mobility shall pay the Fee Award to Lead Class Counsel by wire transfer within thirty (30) days of the Effective Date.

**C.    Class Representatives' Incentive Award:** In addition to any award under the Settlement, and in recognition of their efforts on behalf of the Class, the Class Representatives shall, subject to Court approval, receive and award collectively of the sum of $10,000.00 as appropriate compensation for their time and effort serving as the Class Representative in this litigation. Such amount shall be paid by AT&T Mobility to Lead Class Counsel within twenty (20) days after the Effective Date.

## XIV.  SETTLEMENT APPROVAL ORDER

A.      This Agreement is subject to and conditioned upon the issuance by the Court of the Judgment which finally certifies the Settlement Class and grants final approval of this Agreement in accordance with applicable jurisprudence, and providing the relief specified below, which relief shall be subject to the terms and conditions of this Agreement and the Parties' performance of their continuing rights and obligations hereunder.  Such Judgment shall:

1.      Confirm the certification, for settlement purposes only, of the Settlement Class under applicable jurisprudence;

2.      Dismiss all complaints in the Action as with prejudice and without costs;

3.      Decree that neither the Judgment nor this Agreement constitute an admission by AT&T Mobility of any liability or wrongdoing whatsoever;

4.      Bar and enjoin all Class Members from asserting against any Released Party any and all Settled Claims which the Class member had, has, or may have in the future;

5.      Release each Released Party from the Settled Claims which any Class Members have, had, or may have in the future, against such Released Party;

6.      Determine that this Agreement is entered into in good faith, is reasonable, fair and adequate, in the best interest of the Class; and

7.      Preserve the Court's continuing and exclusive jurisdiction over the Parties to this Agreement, including AT&T Mobility and all Class Members, to administer, supervise, construe and enforce this Agreement in accordance with its terms for the mutual benefit of the Parties, but without affecting the

SETTLEMENT AGREEMENT

finality of the Judgment.

**B.**    In the event that the Court or any appellate court enters an order altering this Settlement Agreement in a way that materially and adversely affects AT&T Mobility or Plaintiff, within five (5) business days from the date the Court or appellate court enters such an order, AT&T Mobility or Plaintiff, as the case may be, may terminate this Settlement Agreement by giving written notice of its intent to do so to the opposing party's counsel.

## XV.    REPRESENTATIONS AND WARRANTIES

AT&T Mobility represents and warrants (i) that it has all requisite corporate power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby; (ii) that the execution, delivery and performance of this Agreement and the consummation by it of the actions contemplated herein have been duly authorized by all necessary corporate action on the part of AT&T Mobility; and (iii) that this Agreement has been duly and validly executed and delivered by AT&T Mobility and constitutes its legal, valid and binding obligation.

## XVI.    MISCELLANEOUS PROVISIONS

### A.    Entire Agreement

This Agreement, including all exhibits hereto, shall constitute the entire Agreement among the Parties with regard to the subject of this Agreement and shall supersede any previous agreements, representations, communications and understandings among the Parties with respect to the subject matter of this Agreement. This Agreement may not be changed, modified, or amended except in writing signed by all Parties, subject to Court approval. The Parties contemplate that, subject to Court approval, the exhibits to this Agreement may be modified by subsequent Agreement of AT&T

SETTLEMENT AGREEMENT

Mobility and Class Counsel prior to dissemination to the Class.

### B.    Governing Law

This Agreement shall be construed under and governed by the laws of the State of Georgia, applied without regard to laws applicable to choice of law.

### C.    Execution by Counterparts

This Agreement may be executed by the Parties in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Facsimile signatures or signatures sent by e-mail shall be treated as original signatures and shall be binding.

### D.    Confirmatory Discovery

In addition to the discovery received and investigation conducted by Class Counsel, AT&T Mobility shall provide to Class Counsel reasonable additional discovery and information as necessary to confirm the material representations made by AT&T Mobility which form the basis of this Settlement, and the Parties shall cooperate in seeking any third-party discovery as may be necessary and appropriate, such additional discovery to be completed prior to the Fairness Hearing.

### E.    Notices

Any notice, instruction, application for Court approval or application for Court orders sought in connection with this Agreement or other document to be given by any Party to any other Party shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, if to AT&T Mobility to the attention of AT&T Mobility's respective representatives and to Class Counsel on behalf of Class Members, or to other recipients as the Court may specify.

All notices to the Parties or counsel required by this Agreement, except Settlement Class

member opt outs and objections, shall be made in writing and communicated by fax and mail to the following addresses:

If to Plaintiff or Plaintiff's Counsel or Lead Counsel:

> Jay Edelson, Esq.
> KamberEdelson, LLC
> 53 West Jackson Boulevard, Suite 550
> Chicago, Illinois 60604

If to AT&T Mobility or AT&T Mobility's Counsel:

> Seamus C. Duffy
> Drinker, Biddle and Reath LLP.
> One Logan Square
> Philadelphia, Pennsylvania 19103-6996

> David L. Balser
> McKenna, Long and Aldridge LLP
> 303 Peachtree Street, NE
> Suite 5300
> Atlanta, GA 30308

## F.    Dismissal

Plaintiffs or Class Counsel in the affiliated Coordinated Actions shall, upon final approval of the settlement in this Action, obtain dismissal of their respective class action complaints.

## G.    Miscellaneous Provisions

This Agreement shall be binding upon and inure to the benefit of the heirs, successors, assigns, executors and legal representatives of all parties to the Settlement.

Subject to Court approval, the Parties may agree to reasonable extensions of time to carry out any of the provisions of this Agreement.

The determination of the terms of, and the drafting of, this Agreement has been by mutual agreement after negotiation, with consideration by and participation of all Parties hereto and their

**SETTLEMENT AGREEMENT**

counsel.

The waiver by one Party of any provision or breach of this Agreement shall not be deemed a waiver of any other provision or breach of this Agreement.

## XVII. TERMINATION OF THIS AGREEMENT

This Agreement shall, without notice, be automatically terminated if the Judgment is not entered, if the Judgment is reversed on appeal and the reversal becomes final, or in the event of AT&T Mobility's termination pursuant to this Agreement. Upon termination, all Parties shall be restored to their respective positions as immediately prior to the date of execution of this Settlement Agreement except as otherwise provided.

## XVIII. AUTHORITY TO SIGN

Any individual signing this Agreement on behalf of any Person represents and warrants that he or she has full authority to do so.

Facsimile signatures shall be considered valid signatures as of the date hereof, although the original signature pages shall thereafter be appended to this Agreement.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed on its behalf by its duly authorized counsel of record, all as of the day set forth below.

**AGREED:**

**PLAINTIFF AND PLAINTIFF'S IN THE COORDINATED ACTIONS, by their attorneys:**

**LEAD CLASS COUNSEL**

Dated: May 26, 2008

KAMBEREDELSON, LLC

Jay Edelson
53 W. Jackson Blvd., Suite 550
Chicago, IL 60604
Telephone: 312.589.6370
Facsimile: 312.913.9401

*On Behalf of Plaintiffs and the Class*

**LIAISON CLASS COUNSEL**

Dated: _____, 2008

BOONE & STONE LP

**SETTLEMENT AGREEMENT**

COORDINATED ACTION COUNSEL

Dated: _____, 2008          LOCKRIDGE GRINDAL NAUEN P.L.L.P

_____

Dated: _____, 2008          GISKAN, SOLOTAROFF, ANDERSON &
                                       STEWART LLP

_____

Dated: _____, 2008          THE JACOBS LAW FIRM, CHTD.

_____

AT&T MOBILITY LLC, by its attorneys:

Dated: *May 28*, 2008                  AT&T MOBILITY LLC

                                       By: _____
                                           Neal S. Berinhout

32 of 32
SETTLEMENT AGREEMENT

# Exhibit 1

Return this Claim Form to: AT&T Mobility Claims Administrator, Claims Administrator, PO Box 509, Minneapolis, MN 55440-0509, Questions, call 1-877-465-4797

**MUST BE POSTMARKED BY [date]**

| PART A - CLAIMANT INFORMATION |
|---|

Name: _____ _____ _____
    *(First)*                    *(Middle)*         *(Last)*

Address: _____
    *[Street]*

_____     ___ ___   ___ ___ ___ ___ ___
*(City)*                            *(State)*    *(Zip Code)*

| Daytime Phone Number: ( _ _ ) _ _ _ - _ _ _ _ | Email address : _____ |
|---|---|
| AT&T Mobility/Cingular Wireless <br> Telephone Number: ( _ _ ) _ _ _ - _ _ _ _ | Account Number: _ _ _ _ _ _ _ - _ _ _ - _ _ <br> AND <br> Social Security Number (last 4 digits): _ _ _ _ |
| Are you a current AT&T Mobility Customer: ☐ **YES** ☐ **No** | |

| PART B – CERTIFICATION UNDER PENALTY OF PERJURY |
|---|

If you incurred eligible third-party mobile content charges on your wireless bill, you must list those charges in Part C below. **CLAIMS MAY BE AUDITED AND PERSONS OR COMPANIES THAT FILE FALSE OR FRAUDULENT CLAIMS MAY BE PROSECUTED TO THE FULL EXTENT OF THE LAW. FAILURE TO COMPLETELY FILL OUT THIS CLAIM FORM MAY RESULT IN A REJECTION OF YOUR CLAIM.**

I declare under penalty of perjury that between January 1, 2004 and [date of notice], I incurred the charges listed below on my wireless bill for third-party mobile content, did not authorize the purchases for third-party mobile content to incur these charges, and have not previously received a refund for these charges, and that all of the information on this form is true and correct.

Signature: _____     Date: _____

Print Name: _____

| PART C – ELIGIBLE MOBILE CONTENT CHARGES |
|---|

(List all eligible* third-party mobile content charges below. If you have any additional eligible charges, list the date, description, merchant name and amount of charge on a separate page and attach to the claim form. If you wish to further explain any of the listed charges, please do so on a separately attached page as well).

*Eligible charges include any charge incurred between January 1, 2004 and [date of notice] for third-party mobile content (i.e. ringtones, joke-a-day etc.) that was not authorized and not previously refunded. See www.ThirdPartyContentRefund.com or call 1-877-465-4797 for more information.*

List the following information for each of the eligible third-party mobile content charges that you incurred between January 1, 2004 and [date of notice]. This information will be reviewed for adequacy by the Claims Administrator.

| | Date of Charge | Description of Charge | Merchant Name | Charge Amount |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| | | | Total Amount Claimed: | |

# Exhibit 2

**If You Were Billed for Third Party Mobile Content (such as Ringtones, Games, Graphics, News and Other Alerts) on Your AT&T Mobility Account from January 1, 2004 to _____, You May Receive a Credit or Refund From a Class Action Lawsuit. Please Read This Legal Notice.**

*Para Una Notificacioin en Espanol, Llamar or Visitar Nuestro Website*

## NOTICE OF CLASS ACTION AND PROPOSED SETTLEMENT

This notice is to inform you of the proposed Settlement of several similar lawsuits. These lawsuits relate to the sale, marketing and billing of third party mobile content such as ring tones and news alerts to AT&T Mobility wireless telephone subscribers.

This notice is a summary only. You should read the Full Notice for complete information. You can get a copy of the Full Notice by visiting the Web site, calling the toll-free number listed, or writing to the address listed below.

### What is Third Party Mobile Content?
Third party mobile content is a product (such as ringtones, games, graphics and news or other alerts) that may be purchased and downloaded to your wireless device and is advertised, marketed and sold directly by a third party content provider/merchant other than AT&T Mobility.   Third party mobile content is not advertised, marketed or directly sold by AT&T Mobility LLC ("AT&T Mobility").

### Who is Involved?
You are a member of the Settlement Class and your rights are affected if you are a person (or entity) in the United States or its Territories with an AT&T Mobility (previously known as Cingular Wireless) account who was billed for third party mobile content from January 1, 2004 to [date] and were not previously refunded for this charge.

### What is the Case About?
Plaintiffs claim that Defendants charged AT&T Mobility subscribers for third party mobile content that was not authorized. AT&T Mobility denies these claims but are settling to avoid the burden and cost of continuing the case.

### What are the Terms of the Settlement?
AT&T Mobility has agreed to refund the amount of all eligible third party mobile content charges that were billed for between January 1, 2004 to [date].  If the charge was recurring on a monthly or other basis based on a subscription or similar arrangement, you may only recover up to three times the amount of any such monthly charge.  To be eligible for any refund, the charges must have been unauthorized and not previously refunded to your account. AT&T has also agreed to take steps to inform its customers about mobile content, the ability to restrict its purchase through parental controls, and methods for its customers to dispute unauthorized charges and cancel mobile content subscriptions. The settlement is not an admission of wrongdoing by any party.

### Who Represents Me?
The Court has appointed a team of 10 attorneys ("Class Counsel") to represent you for 16 related cases against AT&T and/or other entities.  As part of the settlement, Class Counsel will request an award of attorneys' fees and expenses not to exceed $4,300,000 payable by AT&T Mobility.  No award of fees or expenses will reduce the benefit to any Class Member. The Court has also appointed three Class Representatives who will share an award of $10,000 for their services.  You may hire your own lawyer, but at your own expense.

### What are my Legal Rights?
• *Stay in the Settlement Class:* You do not have to do anything to stay in the Class, but you must submit a Claim Form to receive a credit or refund.   You may also object to the proposed Settlement.
• *Submit a Claim Form for a credit/refund:* If you wish to file a claim, you must complete a Claim Form.  Claim Forms *must* be postmarked by [date].  The Claims Administrator will review your Claim Form and determine whether you have eligible charges and are therefore a member of the Settlement Class.
• *Object to the proposed Settlement:* You or your lawyer have the right to appear before the Court and object to the proposed Settlement.  Your written objection must be postmarked by [date].
• *Exclude Yourself from the Settlement Class:* If you do not wish to be a member of the Settlement Class, you may exclude yourself by writing to the Claims Administrator.  Your request *must* be postmarked by [date].

If you remain in the Settlement Class and the Court approves the proposed Settlement, you will receive the benefits of the proposed Settlement.  You will also be bound by all orders and judgments of the Court and your claims against AT&T Mobility and other entities, including VeriSign, Inc., M-Qube, Inc., Jamster International SARL, and Mblox, Inc., for the conduct at issue in these cases will be resolved and released.

### When will the Court Consider the Proposed Settlement?
The Court will hold a Fairness Hearing to determine if the proposed Settlement is fair, reasonable and adequate and to consider a motion for attorneys' fees and expenses on [date] at [time] in Courtroom [number], [Court name]. If comments or objections have been received, the Court will consider them at this time.

For more information about the proposed Settlement and a copy of the Full Notice and Claim Form, visit: www.ThirdPartyContentRefund.com, call: 1-877-465-4797, write to: Claims Administrator [address] or contact Lead Class Counsel: Jay Edelson, Scott A. Kamber, & Myles McGuire, KamberEdelson, LLC, 53 W. Jackson, Ste. 550, Chicago, IL 60604 [toll free number]

By Order of the Court Dated: May 30, 2008

SUPERIOR COURT OF FULTON COUNTY, GEORGIA

# Exhibit 3

# Attention Customers:
## You may be eligible to receive a credit or refund for unauthorized mobile content charges.
## Please read this legal notice.
### *Para Una Notificacioin en Espanol, Llamar or Visitar Nuestro Website*

**What is this notice about?**
Certain AT&T/Cingular customers are eligible to obtain refunds for unauthorized purchases of third party mobile content, such as ringtones, graphics, games and news or other alerts ("Mobile Content") because of a proposed Settlement of a class action lawsuit. This notice is just a summary. You should read the Full Notice for complete information. You can get a copy of the Full Notice by visiting the Web site, calling the toll-free number or writing to the address listed below.

**What is the case about?**
Plaintiffs claim that Defendants charged AT&T Mobility subscribers for third party mobile content that was not authorized. AT&T Mobility, which was formerly known as Cingular, has entered into a proposed settlement agreement in a class action lawsuit about the marketing, advertising and billing practices of certain third party mobile content providers. AT&T Mobility denies these claims but are settling to avoid the burden and cost of continuing the case.

**What will I get?**
As part of the agreement, AT&T Mobility is offering to provide account holders with credits or refunds for unauthorized mobile content purchases made from January 1, 2004 to [date] that have not been previously refunded. AT&T has also agreed to take steps to inform its customers about mobile content, the ability to restrict its purchase through parental controls, and methods for its customers to dispute unauthorized charges and cancel mobile content subscriptions. The settlement is not an admission of wrongdoing by any party.

**How do I know if I am eligible for a credit or refund?**
If AT&T/Cingular has billed your account for the purchase of a third party mobile content that you did not authorize, you may be entitled to receive a refund for these charges. If a charge was recurring on a monthly or other basis based on a subscription or similar arrangement, you may only recover up to three times the amount of the recurring charge as to this type of charge.

**Who represents me?**
The Court has appointed a team of 10 attorneys ("Class Counsel") to represent you for 16 related cases against AT&T and/or other entities. As part of the settlement, Class Counsel will request an award of attorneys' fees and expenses not to exceed $4,300,000 payable by AT&T Mobility. No award of fees or expenses will reduce the benefit to any Class Member. The Court has also appointed three Class Representatives who will share an award of $10,000 for their services. You may retain your own counsel, but only at your own expense.

**What are my Legal Rights?**
• *Stay in the Settlement Class:* You do not have to do anything to stay in the Class, but you must submit a Claim Form to receive a credit or refund. You may also object to the proposed Settlement.
• *Submit a Claim Form for a credit/refund:* If you wish to file a claim, you must complete a Claim Form. Claim Forms *must* be postmarked by [date]. The Claims Administrator will review your Claim Form and determine whether you have eligible charges and are therefore a member of the Settlement Class.
• *Object to the proposed Settlement:* You or your lawyer have the right to appear before the Court and object to the proposed Settlement. Your written objection must be postmarked by [date].
• *Exclude Yourself from the Settlement Class:* If you do not wish to be a member of the Settlement Class, you may exclude yourself by writing to the Claims Administrator. Your request *must* be postmarked by [date].

If you remain in the Settlement Class and the Court approves the proposed Settlement, you will receive the benefits of the proposed Settlement. You will also be bound by all orders and judgments of the Court and your claims against AT&T Mobility and other entities, including VeriSign, Inc., M-Qube, Inc., Jamster International SARL, and Mblox, Inc., for the conduct at issue in these cases will be resolved and released.

**When will the Court Consider the Proposed Settlement?**
The Court will hold a Fairness Hearing to determine if the proposed Settlement is fair, reasonable and adequate and to consider a motion for attorneys' fees and expenses on [date] at [time] in Courtroom [number], [Court name]. If comments or objections have been received, the Court will consider them at this time.

For more information about the proposed Settlement and a copy of the Full Notice and Claim Form, visit: www.ThirdPartyContentRefund.com, call: 1-877-465-4797, write to: Claims Administrator [address] or contact Lead Class Counsel: Jay Edelson, Scott A. Kamber, & Myles McGuire, KamberEdelson, LLC, 53 W. Jackson, Ste. 550, Chicago, IL 60604 [toll free number]

By Order of the Court Dated: May 30, 2008

SUPERIOR COURT OF FULTON COUNTY, GEORGIA

# Exhibit 4

NOTICE OF PENDENCY OF CLASS ACTION SETTLEMENT

**IN THE SUPERIOR COURT OF FULTON COUNTY- STATE OF GEORGIA**
*Tracie McFerren v. AT&T Mobility LLC,* **Case No. _____**

>> **Click Here to Make a Claim**<<
>>**Click Here to Download a Paper Claim Form**<<
**(You must submit a claim form by _____)**
>>**Click Here to Download a Copy of the Settlement Agreement**<<

**IF YOU WERE BILLED FOR THIRD PARTY MOBILE CONTENT ON**
**YOUR**
**AT&T MOBILITY ACCOUNT FROM JANUARY 1, 2004 TO _____**

IMPORTANT

PLEASE READ THIS NOTICE CAREFULLY
THIS NOTICE RELATES TO THE PENDENCY OF CLASS ACTION LITIGATION
AND IF YOU ARE A CLASS MEMBER CONTAINS
IMPORTANT INFORMATION ABOUT YOUR RIGHTS TO MAKE A CLAIM UNDER THE
SETTLEMENT OR TO OBJECT TO THE SETTLEMENT

The Superior Court of Fulton County, State of Georgia authorized this notice. This is not a solicitation from a lawyer.

**What Is This?** This notice is to inform you of the proposed Settlement of a lawsuit pending in Georgia. The Court has granted preliminary approval of the settlement and has certified the Settlement Class defined above, subject to a fairness hearing which will take place on [date] at [time] in Courtroom [number], [Court name] to determine if the proposed Settlement is fair, reasonable and adequate and to consider the request for attorneys' fees and expenses.

Similar lawsuits were filed and are pending in state and federal courts in California, Illinois, Minnesota, and New York. These lawsuits relate to the sale, marketing and billing of third party mobile content to AT&T Mobility LLC ("AT&T" or "AT&T Mobility") wireless telephone subscribers.

This notice explains the nature of the lawsuit and the terms of the settlement and informs you of your legal rights and obligations.

By settling this lawsuit, AT&T Mobility is not admitting that it is liable to the Settlement Class.

You have options, explained below.

**What is Third Party Mobile Content?** Third party mobile content is a product (such as ringtones, games, graphics and news or other alerts) that may be purchased and downloaded to your wireless device and is advertised, marketed and sold directly by a third party content

provider/merchant other than AT&T Mobility. Third party mobile content is not advertised, marketed or directly sold by AT&T Mobility.

**Who is in the Settlement Class?** You are a member of the Settlement Class and your rights are affected if you are a person (or entity) in the United States or its Territories with an AT&T Mobility account, and who was billed for third party mobile content from January 1, 2004 to [date] and were not previously refunded for this charge.

**What is the Litigation About?** Plaintiffs filed a class action in the Superior Court of Fulton County, Georgia, on behalf of a proposed class, alleging that AT&T Mobility charged its wireless subscribers for third party mobile content that was not authorized. Similar lawsuits were filed and are pending in state and federal courts throughout the county, including in California, Illinois, Minnesota, New York and other states. These class actions likewise allege that AT&T Mobility charged its subscribers for third party mobile content that was not authorized. You need not live in any of these States to receive a benefit under the proposed settlement. The Georgia class action asserts claims for breach of contract and violation of state consumer protection statutes and seeks monetary and injunctive relief. To resolve this matter without the expense and uncertainties of litigation in several class actions, the Parties have reached a proposed settlement. The settlement requires AT&T Mobility to implement certain service improvements, assurances, and monetary relief under specific circumstances. This settlement is not an admission of wrongdoing by any party.

**What Relief is Provided To Class Members Under The Settlement?**

**A.      Relief for All Settlement Class Members – AT&T Mobility Service Improvements & Assurances.** AT&T Mobility has agreed to provide disclosures regarding mobile content in its Wireless Customer Service Agreement and on its website. In addition, AT&T Mobility will provide a telephone number and website address in all bills for customers who seek to dispute a charge. AT&T Mobility has further agreed to provide and enhance as necessary the means for its customers to freely address billing inquiries related to Third Party Mobile Content.

**B.      Relief for Settlement Class Members Filing Claims.** In addition to the above-described service improvements, all Settlement Class members are entitled to individual relief with respect to the Settlement. AT&T Mobility has agreed to refund the amount of all eligible third party mobile content charges that were billed from January 1, 2004 to [date], and subject to the limitations concerning subscriptions that follow. These refunds will be provided to the Settlement Class members as follows:

    **1.      *Refunds.*** AT&T Mobility shall credit or refund to any former or current account holder all unauthorized charges for third party mobile content from January 1, 2004 to [date]. The refund can come in one of two forms: (1) a credit on your AT&T Mobility bill; or (b) a cash payment via first-class mail. In order to obtain this relief you must properly submit either an on-line or paper claim form by **[date]** and follow the instructions contained on the respective form and contained in this notice.

- 2 -

    **2.**    ***Subscription Charge Refund.***  AT&T Mobility shall refund to any former or current account holder up to three times the monthly subscription amount if the charge was recurring on a monthly or other basis based on a subscription or similar arrangement from January 1, 2004 to **[date]**. The refund can come in one of two forms: (1) a credit on your AT&T Mobility bill; or (b) a cash payment via first-class mail. In order to obtain this relief you must properly submit either an on-line or paper claim form by **[date]** and follow the instructions contained on the respective form and contained in this notice.

To be eligible for any refund, the charges must have been unauthorized and not previously refunded to your account.

## What are my Legal Rights?

*How Do I File A Claim for a Refund or Subscription Charge Refund?*
If you were billed for unauthorized third party mobile content on your AT&T Mobility account from January 1, 2004 until **[date]**, you may submit a claim form to obtain the "refunds" and/or the "subscription charge refund" described above. To receive any refund you must properly submit an on-line claim form by going to www.ThirdPartyContentRefund.com. If you do not have access to the internet, you may obtain a claim form by downloading [insert link] and printing it out or by calling the toll-free number and requesting a copy from the Claims Administrator. You must then mail a completed paper claim form to the Claims Administrator. **Either the on-line form must be submitted or the paper form must be postmarked by [INSERT DATE] or your claim will be rejected.** Follow the steps below to make claim for a Refund or Subscription Claim Refund.

    **Step 1 – Identify Unauthorized Third party Mobile Content Billed and Paid for By You.** Identify third party mobile content charges that were billed by AT&T Mobility from January 1, 2004 to [date]. This information is located on your AT&T Mobility wireless bill. The claim form will ask you to specifically identify the third party mobile content charges that you seek to have refunded.

    **Step 2 – Complete a Claim Form.** You must complete all information requested in the claim form and verify that the charges are unauthorized as well as the accuracy of the information provided in the claim form. Claim forms that are incomplete or are not signed will be rejected.

    **Step 3 – Submit On-Line Form or Mail Paper Form to Claims Administrator.** Submit the completed on-line claim form following the instructions for submission or mail the completed claim form to the claims administrator.

*What Happens After a Claim Form is Filed?*
Upon receipt, the Claims Administrator will review your claim form and determine whether you have eligible charges and are a member of the Settlement Class. If your claim is approved, the Claims Administrator will mail you a cash refund check via first-class mail or instruct AT&T Mobility to credit the proper amount to your account. You will then be bound by all orders and judgments of the Court and your claims against AT&T Mobility and other entities, including

VeriSign, Inc., M-Qube, Inc., Jamster International SARL, and Mblox, Inc., for the conduct alleged in these actions will be resolved and released. If your claim is rejected by the Claims Administrator or challenged by AT&T Mobility, you will be notified of the reasons for the denial or challenge. If your initial claim is denied, you will be given the opportunity to appeal this decision. A full explanation of this process is set out in the Settlement Agreement.

The Claims Administrator may consider numerous factors in its review of your claim, which are fully set out in the Settlement Agreement.

*How Not to Participate in the Settlement Class*
If you do not wish to be a member of the Settlement Class, you may exclude yourself by writing to the Claims Administrator. You must provide your full name and address, state that you want to opt out of the AT&T Mobility settlement, and deliver your request by mail, hand, or overnight delivery service to the Claims Administrator, at [address]. Your request *must* be postmarked no later than [date].

*How Do I Object to the Settlement?*
The Court will hold a Fairness Hearing to determine if the proposed Settlement is fair, reasonable and adequate and to consider a motion for attorneys' fees and expenses on [date] at [time] in Courtroom [number], [Court name]. If you remain a member of the Settlement class you or your counsel have the right to appear before the Court and object to the Settlement. However, you must file a Notice of Intention to Appear and Object. All objections *must* be filed by [date]. You must (1) provide your full name and address; (2) include all arguments, citations, and evidence supporting your objection; (3) specify who, if anyone, will attend the hearing to speak for your objection; (4) deliver your objection by mail, hand, or overnight delivery service to the Claims Administrator to the address listed above; and (5) file a copy of your objection with the Clerk of Court.

**If I Remain in the Settlement Class, Who Represents Me?**
The Court has approved the following team of attorneys to represent the Settlement Class. They are called "Class Counsel." You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

**Lead Class Counsel:**

| | |
|---|---|
| Jay Edelson | Scott A. Kamber |
| Myles McGuire | KamberEdelson LLC |
| KamberEdelsonLLC | 11 Broadway, 22nd Fl |
| 53 W. Jackson Blvd. | New York, NY 10004 |
| Suite 550 | Tel: [toll free number] |
| Chicago, IL 60604 | |
| Tel: [toll free number] | |

**Liaison Counsel:**
David W. Boone
William S. Stone
Aileen Page

Boone & Stone
3166 Mathieson Dr.
Atlanta, GA 30305

**Plaintiff's Steering Committee:**
Robert Shelquist (Chairman)
Lockridge Grindal Nauen PLLP
100 Washington Avenue, Suite 2200
South Minneapolis, MN 55401-2197

Orin Giskan
Giskan, Solotaroff, Anderson & Stewart
11 Broadway, Suite 2150
New York, NY 10004

David Healey
Law Offices of David P. Healey
2846-B Remington Green Cir
Tallahassee, FL 32308

John G. Jacobs
The Jacobs Law Firm, Chtd.
122 South Michigan Ave., Suite 1850
Chicago, IL 60603

**What is the Plaintiff's Attorneys' Fees Award?**
The Court has appointed a team of 10 attorneys involved in 16 related class actions to represent the Plaintiffs ("Class Counsel") against AT&T Mobility and/or other entities including VeriSign, Inc., M-Qube, Inc., Jamster International SARL, and Mblox, Inc., and will request approval of the Court for attorney's fees and costs of up to $4.3 Million. If approved by the Court, this amount will be paid directly by AT&T Mobility to Class Counsel and will not reduce any benefit to you from the settlement.

**What is the Award To Class Representatives?**
The Court has appointed Tracie McFerren, Morris Fiddler and Kristen Hensley as Class Representatives, who along with additional named Plaintiffs in the related cases, will share $10,000 for their service as class representatives. If approved by the Court, this amount will be paid directly by AT&T Mobility to the Class Representatives and will not reduce the benefit to you from the settlement.

**Who Is Paying the Costs Associated with the Settlement?**
Costs associated with the notice and administration of this settlement will be paid by AT&T Mobility.

**What Claims Are Being Released in this Settlement?**
Unless you exclude yourself from the settlement, you will be part of the Settlement Class. By

- 5 -

staying in the Settlement Class, all of the Court's orders will apply to you, and you will give AT&T Mobility, VeriSign, Inc, M-Qube, Inc., Jamster International SARL, and Mblox, Inc. and all of their affiliated companies and their predecessors and successors (the "Released Parties"), a "release" for certain claims arising from or relating to the unauthorized mobile content which you have been billed for from the beginning of time until the Effective Date of the Settlement Agreement. A release means you cannot sue or be part of any other lawsuit against the Released Parties about the claims or issues in this Lawsuit ever again. To read the full release, see the Settlement Agreement.

**What Is Class Counsel's Opinion Of The Settlement?**
As part of this litigation, the Court approved and appointed Class Counsel who have conducted investigation into the factual and legal claims of the Settlement Class members and the defenses that might be asserted against those claims. Class counsel completed a five-day mediation before Rodney Max, Esquire, of the Upchurch Watson White & Max Mediation Group, who in his capacity as neutral mediator expressed his views about the case and the settlement. Based on their investigation and this process, Class Counsel believe that the settlement is fair, reasonable and adequate and in the best interests of the Settlement Class. Class Counsel and Plaintiff also recognize the expense and length of continued proceedings necessary to continue to prosecute this case through verdict, judgment and appeals and have taken into account the uncertainty and the risk of the outcome of continued litigation, especially in complex actions such as these as well as the difficulties and delays inherent in such actions.

**When Will the Court Determine the Fairness of the Settlement?**
A hearing will be held on the fairness of the proposed settlement. At the hearing, the Court will be available to hear any objections and arguments concerning the fairness of the proposed settlement, including the amount of the award to Plaintiffs' counsel for costs and attorney's fees. The Court will hold the Fairness Hearing on [date] at [time] in Courtroom [number], [Court name]. YOU ARE NOT OBLIGATED TO ATTEND THIS HEARING UNLESS YOU PLAN TO OBJECT TO THE SETTLEMENT.

If the settlement is not approved, the case will proceed as if no settlement had been attempted. There can be no assurance that if the settlement is not approved, the Settlement Class will recover more than is provided in the settlement, or indeed, anything.

**May I Contact AT&T Mobility Directly?**
Class Members are always able to call customer service to discuss third party mobile content charges made to their accounts. Calling customer service will not prohibit a Class Member from participating in the claims process.

**Where Can I Obtain More Information?**
Any questions you or your attorney may have concerning this notice should be directed to Class Counsel at the address listed above, or you can contact the Claims Administrator at [address, 1-877-465-4797, email]. Please include the case name and number, and your name and your current return address on any letters, not just the envelopes. **You may also contact Lead Class Counsel at [toll free number]. You may also read the Settlement Agreement by downloading it from this site or by requesting a copy from the Claims Administrator.**

**Please do not contact the Court Clerk or the Defendant's Attorneys as they are not in a position to give you any advice about this settlement.**

By Order of the Court Dated: May 30, 2008
SUPERIOR COURT OF FULTON COUNTY,
STATE OF GEORGIA

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

TRACIE MCFERREN, individually and on behalf )
of a class of similarly situated individuals,       )
                                                    )
                          *Plaintiff,*               )        No.
                                                    )
                          v.                         )        Judge Bonner
                                                    )
AT&T MOBILITY LLC,                                  )
                                                    )
                          *Defendant.*               )

## DECLARATION OF MYLES MCGUIRE

I, Myles McGuire, certify under oath and penalty of perjury, that the following statements
are true and correct, except to those matters herein stated to be made upon information and
belief, and as to such matters, the undersigned certifies that he verily believes the same to be
true:

1.  I am a partner at the Chicago office of KamberEdelson LLC. I, along with Jay Edelson
    and Scott Kamber, seek to be appointed Lead Counsel for the class in the above-
    referenced case.

2.  Class Counsel, as that term is defined in our settlement papers, began a wide-ranging
    investigation into the premium mobile content industry in 2005. To date, that
    investigation has resulted in information gathered from over 1,000 aggrieved consumers.
    It has lead to an exchange of information and litigation strategy with multiple
    governmental agencies, including attorney general offices in Florida and Minnesota. We
    have received and reviewed numerous documents produced from the Maryland and
    Florida attorney general offices.

3.  In January of 2006, we filed the first case involving third party mobile content sold to
    AT&T customers. During the following 28 months, Class Counsel, including members

of the proposed Plaintiff's Steering Committee, filed fifteen additional lawsuits that now have joined in support of the settlement, including:

- *McFerren v. AT&T Mobility LLC,* (Ga. St. Ct.) (Complaint attached to Plaintiff's Motion for Preliminary Approval of the Class Action Settlement as Exhibit C);

- *Baker v. New Motion, Inc.* et al, 2007-46363 (Fl. St. Ct.);

- *Goddard v. Google, Inc.* BC 667876 (Cal. St. Ct.);

- *Paluzzi v. mBlox, et al.*, No: 2007-CH-37213 (Ill. St. Ct.);

- *Thielen v. Buongiorno USA, Inc.*, 1:06-cv-00016 (W.D. Mich.) (dismissed);

- *Walsh v. mBlox, et al,* No. BC. BC 382356 (Cal. St. Ct.);

- *White v. AT&T Mobility,* No. 104651-08 (N.Y. St. Ct.);

- *Warren et al. v. OpenMarket Inc., et al.* No. 6:2007cv02043 (M.D. Fl.);

- *Jiran v. AT&T Mobility LLC, et al.,* Civ. A. No. 08-00013, (N.D. Cal.);

- *Hensley v. AT&T Mobility LLC* (Minn. St. Ct.);

- *Gray v. Mobile Messenger Americas, Inc. et al.,* 07-36302 (Fl. St. Ct.);

- *Fiddler v. AT&T Mobility LLC,* et al., Civ. A. No. 08-0416, (N.D. Ill.);

- *Jiran v. AT&T Mobility LLC, et al.,* Civ. A. No. 08-00013, (N.D. Cal.);

- *Valdez v. Buongiorno USA, Inc. et al,* 4:07-cv-06496-CW (N.D. Cal.);

- *Knox v. m-Qube, Inc.* 1:07-cv-10124 (D. Mass.); and

- *Dedek v. AT&T Mobility LLC,* Case No. BC387728 (Cal. St. Ct.).

4.  In many of these cases, procedural motions—such as motions to remand or motions to compel arbitration—have been briefed and/or decided by the courts. In others,

substantive motions have been filed and/or decided. Formal and informal discovery have been produced and witnesses have been made available for interviews by the various key defendants including AT&T Mobility, m-Qube, Verisign, and mBlox.

5.  During the time that the parties have been litigating the issues arising from plaintiffs' claims for so-called "unauthorized" charges for third-party mobile content, counsel for plaintiffs, AT&T Mobility and several of the aggregators and third-party mobile content providers have had preliminary negotiations, which essentially centered on exchanges of information and discussions about their respective approaches to these cases.

6.  As a pre-requisite to negotiating with AT&T Mobility, Class Counsel secured representations from AT&T Mobility and the other related parties that they were not negotiating with any other plaintiffs' group.

7.  Class Counsel met in person with both outside and in-house counsel for AT&T Mobility in Chicago, Illinois in February of 2008 and then again in Seattle, Washington in March of 2008.

8.  Class Counsel met in person with m-Qube's in-house and outside counsel in Chicago, Illinois in August of 2007 and in Washington, D.C. in October of 2007.

9.  Class Counsel met with mBlox's outside counsel in Chicago, Illinois in November of 2007 and again in February of 2008.

10. As a result of the above discussions, AT&T Mobility, along with several aggregators and third-party mobile content providers, and plaintiffs engaged Rodney A. Max as mediator for sessions that took place on May 12-13, 2008 in Chicago, Illinois.

11. Although no settlement was reached after the initial two-day meeting, the parties continued to exchange information and to discuss a framework for settlement. The parties, this time without the aggregators or third-party mobile content providers, agreed to again meet with Mr. Max to mediate for an additional three days over Memorial Day weekend in the hope that a settlement could be finalized.

13. Only after that was accomplished, did the parties discuss attorneys' fees and class representative incentive awards.

14. The parties' agreement was later formalized and executed on May 28, 2008.

15. Based on my experience as a class action attorney, I believe this settlement to be fair and in the best interest of the class.

16. A true and accurate copy of the firm resume of KamberEdelson LLC is attached to Plaintiff's Motion for Preliminary Approval of the Class Action Settlement as Exhibit D.

17. If called on to testify, I can competently do so.

18. Further affiant sayeth not.


_____

Myles McGuire


Dated this 28th day of May 2008.

# Exhibit C

State Court of Fulton County
***EFILED***
LexisNexis Transaction ID: 19214877
Date: Apr 1 2008 10:36AM
Mark Harper, Clerk

# IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| TRACIE MCFERREN, individually and on behalf of a class of similarly situated individuals, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action File No. _____ |
| v. | ) ) ) | |
| AT&T MOBILITY, LLC , a Delaware Limited liability company, | ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) ) | |

————————————————————x

## CLASS ACTION COMPLAINT

For her complaint against defendant, plaintiff states as follows:

### Introduction

Plaintiff Tracie McFerren brings this class action complaint against Defendant AT&T Mobility, LLC f/k/a Cingular Wireless ("AT&T") seeking to stop Defendant's unlawful practice of charging cellular telephone customers for products and services the customers have not authorized, a practice which has resulted in Defendant unlawfully collecting money from consumers statewide, and to obtain redress for all persons injured by their conduct. Plaintiff, for her class action complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

### Parties and Jurisdiction

1.    Plaintiff Tracie McFerren is an Ohio resident.

2.　　Defendant AT&T Mobility, LLC d/b/a the new AT&T Wireless ("AT&T") f/k/a Cingular Wireless is a leading provider of cellular telephone service in the United States. AT&T is a Delaware limited liability company with its headquarters and principal place of business in the State of Georgia, Fulton County.　AT&T can be served through its registered agent, Neal Berinhout, 5565 Glenridge Connector, Suite 1725B, Atlanta, GA 30342.　AT&T does business and has offices throughout the nation.

3.　　The amount in controversy exceeds the sum of $15,000 exclusive of interest, costs and attorney's fees.　This Court has jurisdiction over the subject matter.

4.　　Venue is proper in this court.

### Factual Background

5.　　This case arises from two closely related phenomena.　The first is the capability of most cellular telephones, not only to make and receive telephone calls, but also to send and receive text messages, including -- most significantly for present purposes – "premium" text message services.　These services, also known as "mobile content" include products that range from the basic (customized ringtones for use with cell phones, sports score reports, weather alerts, stock tips, horoscope services, and the like) to those requiring more advanced capabilities (such as direct payment services, interactive radio and participatory television).

6.　　The second underlying phenomenon of this case constitutes its very core.　That is, just as providers of premium mobile content, such as Mobile Messenger, deliver their products by means of cell phone technology, they likewise charge and collect from their customers by "piggybacking" on the cell phone bills sent out by the wireless carriers, such as AT&T.　Further, because the mobile content providers by themselves most often lack the wherewithal to negotiate the necessary relationships with the much larger wireless carriers, they do so with the help of

2

third-party companies, such as m-Qube, known as aggregators. These aggregators act as middle-men, representing numerous mobile content providers in arriving at the agreements that allow them to use the billing and collection mechanisms of the wireless carriers. In turn, both the aggregators and the wireless carriers are compensated for their services to the mobile content providers by retaining a substantial percentage of the amount each premium mobile content transaction.

7.    The rapid and largely unplanned growth of the premium mobile content industry has led both to the above-described structure and to a disastrous flaw within it. That flaw — understood, perpetuated, and even encouraged by carriers, aggregators, and mobile content providers such as the instant defendants – is an open secret within the industry, but little understood outside of it. In short, the billing and collection systems established by companies including Defendant in aid of the premium mobile content industry that enriches them are conspicuously free of any checks or safeguards to prevent erroneous and unauthorized charges from being added to customers' bills.

8.    As Defendant also knows, significant amounts of money have been collected on account of such unauthorized charges for premium mobile content in the industry over the last few years. And while it has always been within the power of companies such as Defendant to institute simple and effective measures that would prevent this, they have instead knowingly maintained the very system that has allowed these erroneous charges. Indeed Defendant have reaped and retained their respective shares of the improper collections.

9.    While the total sales in Georgia of premium mobile content in 2007 amount to a significant sum, the business is still in its infancy. The burgeoning industry has already expanded from ordinary ringtones into mass media-related products such as interactive radio and

3

participatory voting at television and concert events and, most recently, into services that enable cell phones to function as credit cards. Unchecked, Defendant's practices will injure an ever-increasing number of unwitting consumers, inflicting damages of an untold magnitude.

10. Unlike transactions made using checks and credit cards, which require a signature or a highly private sixteen-digit credit card number, the only thing a mobile content provider needs to charge a consumer for its products is the consumer's cellular telephone number. Once a mobile content provider has a consumer's cell phone number, it can cause that consumer to be billed for services and products irrespective of whether the consumer actually agreed to purchase them.

11. Armed with only a cell phone number, the mobile content provider can simply provide that number, along with an amount to be charged, to a billing aggregator (such as m-Qube or mBlox). The aggregator, in turn, instructs the relevant cellular carrier to add the charge to the bill associated with that cell phone number. The charge will then appear on the consumer's cell phone bill, often with only minimal, cryptic identifying information.

12. Because the protections normally present in consumer transactions -- such as signatures and private credit card numbers -- are absent from this process, the likelihood of false charges increases enormously. And because a substantial part of mobile content "sales" are effected through web sites using misleading, oblique, or inadequately explained "consent" procedures, that likelihood increases by another order of magnitude. Mobile content providers have powerful financial incentives to collect as many cell phone numbers as possible but little incentive to ensure that the owners of those numbers have truly agreed to purchase their goods and services.

4

13.    While aggregators charge their content provider customers some upfront fees, their revenue is primarily generated through a "revenue share" on transactions for which they bill cell phone subscribers: each time a charge is incurred in connection with the purchase of mobile content services offered by a content provider, the aggregator and/or the content provider cause said charge to be billed directly on the cellular telephone bill of the carrier's customer who currently owns and/or uses the telephone number (claimed to be) associated with said purchase.

14.    The carrier then bills and collects the charge from its current subscriber, retains about a portion of the proceeds as its "revenue share" and then remits the balance to the aggregator who has direct access to its network, who retains a percentage of the balance in the form of its own "revenue share," and then remits the remainder directly to the mobile content provider.

15.    AT&T uses uniform form contracts ("Service Agreements") under which customers purchase cell phone services.

16.    As described above, AT&T's services include providing access to and billing for various third-party mobile content services such as ring tones, chat services, horoscopes, stock tips, weather alerts, participatory television, mobile payment services and other forms of software provided by hundreds of third-party vendors with names such as New Motion and many others.

17.    AT&T has contracted with third-party providers to bill and collect from AT&T's customers the services provided by such third-party content providers, the charges for which are included directly on a customer's monthly wireless bill.

18.    The duty of good faith and fair dealing, a part of every contract, requires that AT&T not bill any customer for any good or service not authorized by the customer.

5

19.    Upon execution of said Service Agreements and activation of cellular telephone accounts, AT&T provides its customers a ten-digit cellular telephone number.

20.    As explained above, unbeknownst to its customers, AT&T frequently charges consumers for services that were never authorized.

21.    As a result, AT&T has for years been systematically, repeatedly and without authorization, billing its customers for purchase of products and services not agreed to by those customers.  AT&T and third-party service providers have, on information and belief, profited significantly through this practice.

22.    AT&T's conduct is by no means accidental. As previously alleged, it knows that many of its cellular telephone customers dispute the claim the mobile content provider's claim that such customer consented to be charged for their mobile content services. AT&T further knows that it cannot authenticate such customer's authority to be billed for such mobile content charges. In light of its knowledge of these facts, AT&T's decision to continue to charge its customers for mobile content without taking steps to authenticate the representations of the mobile content providers that the customer's authority to be charged was obtained constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

23.    Because the amount AT&T is taking is small on an individual basis -- as little as a few dollars to at most several hundreds of dollars per person -- and because of AT&T's vast resources and superior bargaining power, Defendant employ this scheme with the hope and expectation that its illegal conduct will go unpunished.

### The Facts Relating to Named Plaintiff

24.    In or about 2006, Plaintiff purchased new cell phone service for her family's personal use from an authorized AT&T sales representative.

6

25.    On that same day, in exchange for an AT&T cell phone service plan, Plaintiff agreed to pay a specific amount each month for a period of approximately 12 months.

26.    Upon activating her cellular telephone account, AT&T provided Plaintiff a cellular telephone number.

27.    In or about late 2007, Plaintiff's cell phone account was charged for multiple unwanted mobile content services in the form of "premium" text messages from mBlox, Inc. and/or m-Qube, Inc. , third party providers of mobile content services.

28.    At no time did Plaintiff authorize the purchase of these products and services offered by Defendant and/or its agents at no time did Plaintiff consent to their sending of text messages to her cellular telephone.

29.    During the relevant time period, Defendant caused Plaintiff to be charged service fees in varying amounts for so-called "Premium" text messages and mobile content downloads provided by Defendant and/or its agents.

30.    At no time did Plaintifff authorize Defendant or anyone else to bill her for these services.

31.    At no time did Defendant verify Plaintiff's purported authorization of these charges and no time did Defendant provide a complete refund consisting of the premium text message charges, ordinary text messages, data charges and/or back interest. Nor did AT&T provide Plaintiff an assurance that such unauthorized charges would not appear in future billing periods.

### Class Representation Allegations

32.    Plaintiff brings this action on behalf of herself and a class consisting of all AT&T wireless telephone subscribers in the nation who suffered losses or damages as a result of AT&T

7

billing for mobile content products and services not authorized by the subscriber (the "Carrier Class") provided, however, that the following are excluded from this proposed Class: (i) Defendant, and (ii) any employee of Defendant.

33.    **Numerosity.** The class consists of thousands of members throughout the State of Georgia and the nation. The membership of the class is so numerous that joinder of all of them in this lawsuit would be impractical.

34.    **Typicality.** The claims of Plaintiff are typical of the claims of all of the other members of the Class. The practices of Defendant are and have been uniform with regard to all class members. And the contracts that Defendant has entered into with the class members are substantially identical. Defendant's actions also have affected the members of the class in similar ways. Members of the class have sustained damage as a direct result of the wrongful conduct described in this complaint.

35.    **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class, and have the financial resources to do so. Neither Plaintiff nor her counsel has any interest adverse to those of the other members of the Class.

36.    **Common Questions of Law and Fact.** Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive, and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

8

37.     Defendant has acted and failed to act on grounds generally applicable to the plaintiff and the other members of the respective Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class.

38.     The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the respective Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class.  Plaintiff and the other Class members have all suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

39.     There are many questions of law and fact common to the claims of Plaintiff and the other members of the respective Class, and those questions predominate over any questions that may affect individual members of the Class.  Common questions for the Class include but are not limited to the following:

        (a)     Whether AT&T's conduct described herein is in breach of contract; and

        (b)     Whether AT&T's conduct described herein violates Georgia Code § 46-5-171.1.

### COUNT I
### (Breach Of Contract on behalf of the Class)

40.     Plaintiff incorporates by reference the foregoing allegations.

41.     Plaintiff and the Class entered into substantially identical agreements with Defendant AT&T whereby Plaintiff and the AT&T agreed to pay a certain sum of money in exchange for AT&T's activation of Plaintiff and the AT&T's cellular telephone account and its promise to provide various communication and related services to Plaintiff and the Class.

9

42. Defendant AT&T expressly and/or impliedly agreed to provide Plaintiff and the Class with a cellular telephone number free of unauthorized charges for third-party products and services.

43. Defendant AT&T further expressly and/or impliedly agreed to bill Plaintiff and the Class only for products or services the purchase of which they had authorized.

44. Defendant AT&T further expressly and/or impliedly agreed to carry out its obligations in good faith and fair dealing.

45. Defendant AT&T breached its contractual obligations by providing Plaintiff and the Class with cellular telephone accounts that included unauthorized charges for mobile content.

46. Defendant AT&T further breached its contractual obligations, including its contractual obligation of good faith and fair dealing, by thereafter billing Plaintiff and the Class for products or services, the purchase of which they never authorized.

47. The aforementioned breaches of contract have proximately caused the Plaintiff and the Class economic injury and other damages.

## COUNT II
### (Violation of Georgia Code § 46-5-171.1 on behalf of the class)

48. Plaintiff incorporates by reference the foregoing allegations.

49. Defendant provided Plaintiff and the other class members with local telephone service.

50. Defendant charged Plaintiff and the other class members for third-party content, as alleged elsewhere in this Complaint.

51.    Plaintiff and the other class members did not consent or authorize these services. Defendant does not have any evidence that Plaintiff or the other class members gave prior express authorization for those third-party content services.

52.    In violation of Georgia Code § 46-5-171.1, the invoice for charges for such services were not clear, conspicuous, separate, and distinct manner so as to ensure that the customer is aware of such charges.

WHEREFORE, Plaintiff Tracie McFerren, on behalf of herself and the Class, prays for the following relief:

a.    Certify this case as a class action on behalf of the Class as defined above and appoint Tracie McFerren Class Representative, and appoint the undersigned counsel as lead counsel;

b.    Declare that the actions of AT&T, as set out above, constitute a breach of contract and violates Georgia state law;

c.    Enter judgment against AT&T for all economic, monetary, actual, consequential, and compensatory damages caused by its conduct, and if its conduct is proved willful, award Plaintiff and the Class exemplary damages;

d.    Award Plaintiff and the Class reasonable costs and attorneys' fees;

e.    Award Plaintiff and the Class pre- and post-judgment interest;

f.    Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

g.    Award such other and further relief as equity and justice may require.

### JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: March 31, 2008.

11

Respectfully submitted,

BOONE & STONE

David Wm. Boone
Georgia State Bar No. 067730
Simone R. Siex
Georgia State Bar No. 645858

3166 Mathieson Drive
Atlanta, Georgia 30305
TEL    404/239-0305
FAX    404/239-0520

By:    /S/William S. Stone
William S. Stone
Georgia State Bar No. 684636

P. O. Drawer 70
Blakely, Georgia 39823
TEL    229/723-3045
FAX    229/723-4834

# Exhibit D

## KAMBEREDELSON, LLC -- FIRM RESUME

In October of 2007, two nationally recognized plaintiffs' class action firms joined to form KamberEdelson, LLC. With lawyers in New York, Los Angeles, Florida, and Chicago, KamberEdelson has a practice that is national in scope.

KamberEdelson focuses its practice on all types of plaintiff's-side class and mass actions, and has eight primary practice areas:

- "New technology" class actions;
- Privacy class actions;
- Securities class actions;
- Mass tort class and mass actions;
- Consumer class actions;
- Insurance class actions;
- Antitrust cases; and
- International arbitrations.

The firm's cases frequently involve important legal issues, and regularly receive attention from local, national, and international media. Our cases and attorneys have been reported in the Chicago Tribune, USA Today, the Wall Street Journal, the New York Times, the LA Times, by the Reuters and UPI news services, and BBC International. Our attorneys have appeared on numerous national television and radio programs, including on ABC World News, CNN, Fox News, NPR, and CBS Radio, as well as television and radio programs outside of the United States. We have also been called upon to give congressional testimony and other assistance in hearings involving our cases.

## OUR ATTORNEYS

**SCOTT A. KAMBER** is a founding member of KamberEdelson. Mr. Kamber currently serves as lead or co-lead counsel in numerous major national class actions including In re Pet Food, In re ATI Tech HDCP Litig., Johnson v. Microsoft, In re Network Commerce Securities Litigation, and In re HP Power Plug and Graphic Card Litig. Mr. Kamber has also served in leadership roles in numerous private and class actions including suits on behalf of shareholders, consumers and private corporations in the United States and abroad,, including: In re Song BMG CD Technologies (one of the largest computer virus cases ever resolved), Wormley v. GeoCities (consumer class action for privacy violations that is believed to be the first internet privacy case to recover a benefit for impacted class members); In re Starlink Growers (represented sub-class of farmers who grew Starlink in a consolidated settlement of federal class action valued in excess of $100 million); In re Loch Harris (derivative action that successfully obtained dissolution of corporation and distribution of assets to shareholders); In re Command Systems (securities class action in which participating shareholders recovered over 80% of their losses); and In re WebTV (consumer class action for false advertising).

In addition to these commercial cases, Mr. Kamber has been involved in the efforts of

African torture victims to bring their persecutors to justice under the Alien Tort Claims Act and has achieved significant decisions for his clients before the United States Court of Appeals for the Second Circuit and the Southern District of New York. One such result, Cabiri v. Ghana, 165 F.3d 193 (1999), is a leading Second Circuit case under the Foreign Sovereign Immunities Act.

Mr. Kamber graduated cum laude from University of California, Hastings College of the Law in 1991 where he was Order of the Coif, Articles Editor for Hastings Constitutional Law Quarterly and a member of the Moot Court Board. Mr. Kamber graduated with University and Departmental Honors from The Johns Hopkins University in 1986. Mr. Kamber has extensive courtroom experience and has tried over 15 cases to verdict. Prior to founding Kamber & Associates, LLC, Mr. Kamber represented both plaintiffs and defendants in a wide range of commercial litigation. Mr. Kamber is admitted to practice in the State of New York as well as the United States Supreme Court, the United States Court of Appeals for the Second Circuit and Ninth Circuit, and the United States District Courts for the Southern and Eastern Districts of New York. In addition, Mr. Kamber is well-versed in the procedures and practice of numerous arbitration forums, both domestic and international. Prior to practicing law, Mr. Kamber was a financial consultant.

**JAY EDELSON** is a founding member of KamberEdelson. He has served as lead counsel in over 40 class actions, resulting in hundreds of millions of dollars in relief for his clients. His class action cases have established precedent concerning the ownership rights of domain name registrants, the applicability of consumer protection statutes to internet businesses, and the interpretation of numerous life insurance, health insurance, and other state statutes. In February of 2007, the Chicago Sun Times nicknamed Mr. Edelson the "Spam Slammer" after he secured the first settlement of a suit under the Telephone Consumer Protection Act for the alleged transmission of unsolicited text messages. Mr. Edelson has been involved in a number of high-profile "mass tort" class and mass actions and product recall cases, including ones against Menu Foods for selling contaminated pet food, a class action settlement involving the Thomas the Tank toy train recall, and suits involving damages arising from second hand smoke.

Mr. Edelson is frequently asked to participate in legal seminars and discussions regarding the cases he is prosecuting. He has also appeared on dozens of television and radio programs to discuss his cases. In April of 2007, Mr. Edelson provided testimony to the Subcommittee on Agriculture Appropriations, Senate Committee on Appropriations, U.S. Senate Hearing on "Pet Food Contamination" in connection with one of the class action cases he is prosecuting. Mr. Edelson consults with the University of Chicago Medical Center and the Pritzker School of Medicine on internet and legal ethics issues. Mr. Edelson is a graduate of Brandeis University and the University of Michigan Law School.

**ALAN HIMELFARB** is a member of KamberEdelson. Mr. Himmelfarb was admitted to the practice of law in California in July, 1979. At that time, at the age of 23, he was the youngest member of the California Bar. Within five years, he became managing attorney of a law firm employing six attorneys and a support staff of ten. He specialized in complex litigation, contracts, high technology, foreign licensing, and foreign technology

transfers, and practiced before both state and federal courts. In 1988, he took a position overseas as a foreign legal consultant in Asia. In this capacity, he acted as chief negotiator for international sales/service/technical transfer agreements, mediated cross-cultural (Asian--Western) business and governmental interests, evaluated international business/marketing strategies for multinational corporations, drafted and negotiated a full range of international transactional agreements for Korean, European and American corporations and businessmen and marketed legal services to Korean domestic market and international community. In 1992, Mr. Himmelfarb returned to Los Angeles in the capacity of a litigator, with an emphasis on plaintiff's work against banks and other financial institutions. He has been engaged in class action litigation since 1994.

**ETHAN PRESTON** is a member of KamberEdelson. Mr. Preston focuses on consumer technology, and concentrates his practice in antitrust/competition issues and information security issues. Mr. Preston has taken substantial leadership roles in numerous class action lawsuits. Mr. Preston is admitted to practice before the Northern District of Illinois, the District of New Mexico, and Illinois state courts. Mr. Preston is an inactive member of the New Mexico state bar. Mr. Preston has authored the following law review articles: Cross-Border Collaboration by Class Counsel in the U.S. and Ontario, 4 Canadian Class Action Rev. 164 (2007), The Global Rise of a Duty to Disclose Information Security Breaches, 22 J. Marshall J. Computer & Info. L. 457 (2004) (with Paul Turner), Computer Security Publications: Information Economics, Shifting Liability and the First Amendment, 24 Whittier L. Rev. 71 (2002) (with John Lofton), and The USA PATRIOT Act: New Adventures in American Extraterritoriality, 10 J. Fin. Crime 104 (2002). Mr. Preston has lectured on copyright issues at the University of Illinois at Chicago, and on comparative law on attorneys' fees and costs for the Center for International Legal Studies. Mr. Preston received his Bachelor of Arts degree with honors from the Plan II honors program at the University of Texas at Austin, and his J.D. with distinction from the Georgetown University Law Center in 2001.

**MYLES MCGUIRE** is a member of KamberEdelson. His practice concentrates, nearly exclusively, on consumer protection law and class actions. Mr. McGuire has taken leadership roles in many nationwide and multi-state class actions. His specific area of emphasis is on "new technology" class actions, including those involving electronic commerce, cellular telephony and wireless media, among others. He has served in leadership positions in groundbreaking settlements involving Facebook, Verizon, Sprint, and T-Mobile.

Mr, McGuire graduated from Marquette University Law School in 2000 and is admitted to practice in Wisconsin and Illinois. He is a member of the National Association of Consumer Advocates and the Chicago Bar Association. Prior to working as a plaintiff's attorney, Mr. McGuire spent several years counseling high-tech companies.

**STEVEN W. TEPPLER** is Senior Counsel to KamberEdelson. Mr. Teppler concentrates his practice on data protection and information technology law, including electronic discovery, loss or destruction of information, authentication and admissibility issues uniquely inherent to computer generated information, including spoliation issues

arising from unauthorized or illegal data manipulation or alteration. He is the Co-Vice-Chair of the American Bar Association Information Security Committee as well as the Florida Bar's Professional Ethics Committee.

Mr. Teppler has authored over a dozen articles relating to information technology law and routinely presents his work at conferences. Mr. Teppler's recent publications include: Spoliation in the Digital Universe, The SciTech Lawyer, Science and Technology Law Section of the American Bar Association, Fall 2007; Life After Sarbanes-Oxley – The Merger of Information Security and Accountability (co-author), 45 Jurimetrics J. 379 (2005); Digital Signatures Are Not Enough (co-author), Information Systems Security Association, January 2006; *State of Connecticut v. Swinton*: A Discussion of the Basics of Digital Evidence Admissibility (co-author), Georgia Bar Newsletter Technology Law Section, Spring 2005; The Digital Signature Paradox (co-author), IETF Information Workshop (The West Point Workshop) June 2005; Observations on Electronic Service of Process in the South Carolina Court System, efiling Report, June 2005. Mr. Teppler is also a contributing author to an American Bar Association book working titled "Foundations of Digital Evidence" (publication expected March 2008).

Mr. Teppler graduated from the Benjamin N. Cordozo School of Law in 1980 after earning his B.A., summa cum laude, from the City College of New York in 1977. Mr. Teppler is admitted to the bars of New York, the District of Columbia and Florida.

**DANA B. RUBIN** is an associate at KamberEdelson focusing her practice on a wide range of class action issues. She graduated with honors from the University of Maryland, College Park in 1993. She received her J.D. in 1999 from Fordham University School of Law, where she was an Associate Editor on the Intellectual Property, Media & Entertainment Law Journal.

Prior to joining KamberEdelson, Ms. Rubin played a role in numerous private and class actions on behalf of shareholders and consumers. Ms. Rubin has also represented both plaintiffs and defendants in employment litigation and civil rights matters. Ms. Rubin is admitted in the State Courts of New York and the United States District Courts for the Southern and Eastern Districts of New York. She is a member of the New York State Bar Association.

**JENNIFER H. FELDSCHER** is an associate at KamberEdelson. Ms. Feldscher was previously a litigation associate at Lewis, Brisbois Bisgaard & Smith, LLP, where she concentrated her practice on all areas of complex commercial litigation.

Ms. Feldscher is a 2001 graduate of Georgetown University School of Law and a 1998 graduate of Brown University.

**STEVEN LEZELL** is an associate at KamberEdelson. Mr. Lezell has tried a number of bench trials, engaged in extensive motion practice from routine to complex, written appellate briefs, litigated class action matters and arbitrated cases.

Mr. Lezell received his J.D. at Chicago-Kent College of law with High Honors in 2005. Mr. Lezell received his certificate in litigation and alternative dispute resolution and was awarded to Chicago-Kent's Order of the Coif. He served as President of the Student Bar Association and as a Notes and Comments Editor for the Chicago-Kent Law Review. Mr. Lezell also represented Chicago-Kent at the National Sports Law Moot Court Competition in New Orleans in 2004 and was awarded the ABA-ALI Scholarship and Leadership Award, for best representing the combination of leadership and scholarship in his graduating class. Mr. Lezell also received the Lowell H. Jacobson Memorial Scholarship which is awarded each year to one law student in the Seventh Circuit. Mr. Lezell received his B.A. in political science, with Distinction, from the University of Michigan in 2002.

**RYAN D. ANDREWS** is an associate at KamberEdelson, LLC. Prior to joining the firm, Mr. Andrews engaged in all aspects of the prosecution and defense of claims on behalf of individual and corporate clients, including motion practice, arbitration, mediation, trial to verdict, and appeals.

Mr. Andrews received his J.D. with high honors from the Chicago-Kent College of Law in 2005 and was named Order of the Coif. While in law school, Mr. Andrews was Notes & Comments Editor for the Chicago-Kent Law Review, a teaching assistant for both Property Law and Legal Writing courses, externed for the Hon. Joan B. Gottschall in the Northern District of Illinois, and earned CALI awards for the highest grade in five classes.

Mr. Andrews graduated from the University of Michigan in 2002 earning his B.A., with distinction, in Political Science and Communications.

**STUART WESCHLER** is Of Counsel to KamberEdelson. The efforts of Mr. Wechsler in the area of securities litigation have received considerable judicial comment. U.S. District Court Judge Alvin K. Hellerstein commented in Doney v. Command Systems, (98 Civ. 3279), in an opinion dated August 10, 1999, "I don't think it needs my comment to note that, Mr. Wechsler, you are a senior and most respected and most competent member of the securities class action bar. I would take it as a given your hours are worth the rates that you charge and that the hours that you have put in reflect the efficiency with which you work." In a report dated May 23, 1977, in Bucher v. Shumway, 76 Civ. 2420 (S.D.N.Y.), United States Magistrate Leonard Bernikow stated that "Stuart Wechsler . . . is a leading expert in securities class action litigation." Mr. Wechsler also led the team of attorneys that successfully prosecuted the class action, Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979), to a landmark decision in federal civil procedure. He was also the responsible partner in Van Gemert v. Boeing, one of the earliest actions maintained as a class action under the then newly amended Federal Rules of Civil Procedure and one of the very few securities class actions ever to go to trial and judgment. Moreover, Mr. Wechsler played an integral role in obtaining a landmark Supreme Court decision in an important phase of that action. See Boeing Co. v. Van Gemert, 444 U.S. 472 (1980).

Mr. Wechsler was admitted to the bar 1958, New York; Supreme Court; U.S. Court of

Appeals, Second, Third and Fifth Circuits; U.S. District Court, District of Arizona; U.S. District Court, Western District of Michigan. Education: University of Pennsylvania (B.S., 1953); Yale University (J.D., 1955). Editor: "Prosecuting and Defending Stockholder Suits," Practicing Law Institute, Nov., 1973. Author: "The Securities Acts Amendments of 1964," Stock Market Magazine, November, 1964; "Notice to Debenture Holders," The Review of Securities Regulation, April 15, 1976. Chairman: PLI Programs regarding class actions and stockholder suits, 1970-1977, "New Trends in Securities Litigation," 1977-79 and "Exemptions from Registration: Spinoffs-Shells and other Devices," 1970. Faculty Member, Columbia Law School Continuing Education Programs, 1979-1982. Chairman: Practicing Law Institute program, "Stockholder Suits and Class Actions," 1986; University of Virginia seminar, "Trial of a Securities Case," 1989. Lecturer, Panels on Securities Litigation and Class Actions, American Bar Association, 1975; ALI-ABA Study Course, Civil Rico Member, Board of Directors, Concert Artists Guild, 1982-1984. Member, Board of Editors, "Class Action Reports," 1977. Chairman, Securities Law Committee, Federal Bar Council, 1980-1985. Member, Committee on Second Circuit Courts of the Federal Bar Council, 1986. Member: American Bar Association; Federal Bar Council.

**JOHN BLIM** is Of Counsel to KamberEdelson. Mr. Blim is a graduate of Northwestern University School of Law, where he received his J.D. degree cum laude in 1994 and was elected to the Order of the Coif. He served as an associate articles editor on the Northwestern University Law Review from 1993 to 1994. Mr. Blim was also a member of the winning team and voted Best Speaker in the law school's moot court competition. From 1994 to 2000, he was a litigation associate at nationally recognized law firms, including Sidley & Austin.

Mr. Blim has published articles in major legal journals, and his writing has been described as "thoughtful commentary" by a leading treatise on constitutional law. Before attending law school, John earned his Ph.D. in English literature from Northwestern University, where he was also a lecturer in the school's English department.

State and federal courts have appointed John as class counsel in numerous class action cases collectively benefiting millions of individuals.

**NOTABLE CASES**

Our members have taken leading roles in the following cases:

**"NEW TECHNOLOGY" CONSUMER PROTECTION CLASS ACTIONS**

*Shen v. Distributive Networks LLC.* No. 06 C 4403 (N.D.Ill.)
Co-lead counsel in a class action alleging that defendant violated federal law by sending unsolicited text messages to the cellular telephones of consumers throughout the country. The settlement - which is the first of its kind in the country - provided each class member with up to $150 in cash.

*Gresham v. Cellco Partnership*, No. BC 387729 (Los Angeles Sup. Ct.) lead counsel in case alleging unauthorized charges were placed on cell phone bills. Settlement provided class members with full refunds.

*Abrams v. Facebook, Inc.*, No. 07-05378 (N.D.Cal.) lead counsel in settlement concerning the transmission of allegedly unauthorized mobile content.

*Zurakov v. Register.com*, No. 01-600703 (N.Y.Cty, New York)
Co-lead counsel in a class action brought on behalf of an international class of over one million members against Register.com for its deceptive practices in registering internet domain names. In November, 2003, the New York Supreme Court (trial division) granted final approval of a settlement that required Register.com to fully disclose its practices and provided the class with a relief with a collective face value in excess of $17 million.

*Kiesel v. Time Warner*, No. 809542 (Orange County Sup. Ct.)
Co-lead counsel in a representative action on behalf of thousands of apartment and condominium residents in which firewalls were breached during cable installation. The settlement provided the class with complete relief including the inspection of every multi-unit dwelling in the affected county and repair of all breached units wherever they were found.

*Weaver v. WebTV*, No. 793551 (Santa Clara Sup Ct.) co-lead counsel in a certified nationwide consumer class action case Alleging consumer fraud / deceptive advertising of computer services and capabilities. The settlement provided the class with a collective award with a guaranteed minimum face value of six millions of dollars.


## GENERAL CONSUMER PROTECTION CLASS ACTIONS

*Pulcini v. Bally Total Fitness Corp.*, No. 05 CH 10649 (Cook County, Ill.)
Co-lead counsel in four class action lawsuits brought against two health clubs and three debt collection companies. A global settlement provided the class with over $40 million in benefits, including cash payments, debt relief, and free health club services.

*Kozubik v. Capital Fitness, Inc.*, 04 CH 627 (Cook County, Ill.)
Co-lead counsel in state-wide suit against a leading health club chain, which settled in 2004, providing the over 150,000 class members with between $11 million and $14 million in benefits, consisting of cash refunds, full debt relief, and months of free health club membership.

*Kim v. Riscuity*, No. 06 C 01585 (N.D.Ill)
Co-lead counsel in suit against a debt collection company accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with full debt relief and return of all money collected.

*Jones v. TrueLogic Financial Corp.*, No. 05 C 5937 (N.D.Ill)
Co-lead counsel in suit against two debt collectors accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with approximately $2 million in debt relief.

*Chancer v. Princess Cruises*, No. BC 115472 (Los Angeles Sup. Ct.)
Co-lead counsel in a class action lawsuit challenging a cruise line's deceptive "low price guarantee" as a consumer fraud class action. The settlement provided the class with a collective award with a face value of millions of dollars.

*Fertelmeyster v. Match.com*, No. 02 CH 11534 (Cook County, Illinois)
Co-lead counsel in a state-wide class action suit brought under Illinois consumer protection statutes. The settlement provided the class with a collective award with a face value in excess of $3,000,000.

*Cioe v. Yahoo!, Inc.*, No. 02 CH 21458 (Cook County, Illinois)
Co-lead counsel in a state-wide class action suit brought under state consumer protection statutes. The settlement provided the class with a collective award with a face value between $1,600,000 and $4,800,000.

*Cioe v. Lycos*, No. 02 CH 21456 (Cook County, Illinois)
Co-lead counsel in a state-wide class action suit settled under state consumer protection statutes.

*Gavrilovic v. Vintacom Media Group, Inc.*, No. 04 CH 11342 (Cook County, Illinois);
Co-lead counsel in a state-wide class action suit settled under state consumer protection statutes.

*McArthur v. Spring Street Networks*, 100766/2004 (NY Cty.)
Co-lead counsel in a nationwide class action suit settled under New York consumer protection statutes.

*California Reconveyance Cases*
Part of a team of attorneys who settled a series of state court class action cases under California's Reconveyance Statute. Cases settled for a collective amount of over $10,000,0000.

## INSURANCE CLASS ACTIONS

*Holloway v. J.C. Penney*, No. 97 C 4555, (N.D.Ill.)
One of the primary attorneys in a multi-state class action suit alleging that the defendant illegally denied life insurance benefits to plaintiffs' class. The case settled in or around December of 2000, resulting in a multi-million dollar cash award to the class.

*Ramlow v. Family Health Plan* (Wisc.Cir.Ct.):

Co-lead counsel in a class action suit challenging defendant's termination of health insurance to groups of self-insureds. The plaintiff won a temporary injunction, which was sustained on appeal, prohibiting such termination and eventually settled the case ensuring that each class member would remain insured.

## PRODUCTS LIABILITY CLASS ACTIONS

*Barrett v. RC2 Corp.*, No. 07 CH 20924 (Cook County, Illinois): Appointed co-lead counsel in lead paint recall case involving Thomas the Tank toy trains. Settlement is valued at over $30 million and provides class with full cash refunds and reimbursement of certain costs related to blood testing.

*In re Pet Foods Product Liability Litigation*, No. 07-2867 (D.NJ)
Appointed co-lead counsel in class action involving largest pet food recall in United States history. Settlement provided $24 million common fund and $8 million in charge backs.

*In re Starlink Corn Products Liability Litigation* (N.D.Ill.)
Represented sub-class of farmers who grew recalled Starlink corn in a consolidated settlement of federal class action valued in excess of $100 million.

*Kan v. Toshiba America Information Systems, Inc.* No. BC327273 (Los Angeles Sup. Ct.)
Class counsel in a defective product / breach of warranty action concerning laptop computers. The settlement provided the class with a collective award with a face value of approximately $45,000,000.

## SECURITIES CLASS ACTIONS

*Stassi et al. v. Loch Harris et al.*, No. GN 200180 (Tex)
Brought derivative action on behalf of technology development company that successfully obtained dissolution of corporation and distribution of assets to shareholders);

*In re Command Systems*, Case No. 98-cv-3279 (S.D.N.Y.)
Brought securities class action against technology company in which participating shareholders recovered over 80% of their losses

## PRIVACY CLASS ACTIONS

*Wormley v. GeoCities*, No. 196032 (Los Angeles Sup. Ct.)
Class Counsel in consumer class action for privacy violations that is believed to be the first internet privacy case to recover a benefit for impacted class members

*Elvey v. TD AMERITRADE Inc.* (N.D.Cal.)
Pursuing class action against an Internet-based securities broker for failing to disclose a security breach which involved customer names and email addresses for over 6 million accounts.

## MASS/CLASS TORT CASES

*Aaron v. Chicago Housing Authority*, 99 L 11738, (Cook County, Illinois)
Part of team representing a group of public housing residents bringing suit over
contamination-related injuries. Case settled on a mass basis for over $10,000,000.

*Sturman v. Rush Presbyterian-St.Luke's Medical Center*, 2000 L 11069 (Cook
County, Ill.)
Part of team of attorneys in suit against hospital and national association of blood
banks alleging failure to warn of risks of hepatits C infection as a result of past
blood transfusions.

*Januszewski v. Horseshoe Hammond*, No. 2:00CV352JM (N.D.Ind.)
Part of team of attorneys in mass suit that alleged that defendant riverboat casino
caused injuries to its employees arising from exposure to second-hand smoke. Case
settled on confidential terms.

# Exhibit E

# Boone & Stone Firm Resume

Mr. Boone, a nationally board certified trial lawyer, has personally recovered over 75 million dollars in verdicts and settlements for injured consumers since 1979.

An avid protector of our justice system, Mr. Boone has served as the President and a Director of the Georgia Civil Justice Foundation, a nonprofit corporation founded by the Georgia Supreme Court and funded by the Georgia Legislature for the purpose of educating consumers and preserving the United States civil justice system.

Mr. Boone is active in both the American Association for Justice and Georgia Trial Lawyers Associations, having held the offices of President and Treasurer of the Georgia Trial Lawyers Association and Vice Chair of the Council of State Presidents. He has served on the Board of Directors of the Brain Injury Association of Georgia and the Experimental Aircraft Association.

A graduate of the University of Central Florida and Cumberland School of Law, Mr. Boone has held faculty positions and lectured around the country for various organizations including the American Trial Lawyers Association, National Board of Trial Advocacy, Georgia Civil Justice Foundation, Idaho Trial Lawyers; and Wyoming Trial Lawyers Association.

In addition to his law practice, Mr. Boone is President of Attorneys Air Travel, Inc., a company engaged in aircraft leasing, and Vice President and General Counsel for Air Sunshine, Inc., a regional scheduled air taxi operation servicing South Florida, the Bahamas, and the Caribbean. Mr. Boone holds an Airline Transport Pilot certificate with a Cessna Citation C500 type rating, as well as Commercial Pilot License for single engine land and sea. He has been flying for thirty years and has over 7,000 hours of general aviation flying.

**Current Employment Position(s):**

- Of Counsel, Adams, Hayward, Nicolas & Welsh

**Year Joined Organization:**

- 1979

**Areas of Practice:**

- Civil Litigation
- Personal Injury
- Medical Malpractice
- Products Liability
- Wrongful Death
- Aviation Litigation
- Commercial Litigation

**Certification/Specialties:**

- Board Certified, Civil Trial Law, Florida Bar Board of Legal Specialties, 1999
- Board Certified, Civil Trial Law, Florida Bar Board of Legal Specialties, 1999
- Licensed Salesman, The Florida Board of Realtors, 1973

**Bar Admissions:**

- Florida, 1978
- Georgia, 1987
- U.S. District Court Southern District of Florida, 1979
- U.S. District Court Middle District of Florida, 1979
- U.S. District Court Northern District of Florida, 1991
- U.S. District Court Northern District of Georgia, 1987
- U.S. District Court Middle District of Georgia, 1987
- U.S. District Court Southern District of Georgia, 1992
- U.S. Court of Federal Claims
- U.S. Court of Appeals 5th Circuit, 1981
- U.S. Court of Appeals 11th Circuit, 1981
- U.S. Court of Appeals 6th Circuit, 1982
- U.S. Court of Appeals 6th Circuit, 1982

**Education:**

- Cumberland School of Law, Samford University, Birmingham, Alabama, 1978
- J.D.
- Honors: Cum Laude
- Honors: Delta Theta Phi
- University of Central Florida, Orlando, Florida, 1975
- B.A.

**Published Works:**

- Tort Reform, Georgia Healthcare News, Atlanta, Georgia, 1994

**Representative Cases:**

- Coleman v. Puhalovich, North Fulton Anesthesia (2007)
- Smith v. Steinmetz (2004)
- Norberg v. Nationwide - Southeast, (2004)
- Layne v. Shands Hospital, (2003)
- Thomas v. Kaiser, (2003)
- Turpin v. Macon Aviation, et al., (2003)
- Washington v. Housing Assistance, (2003)
- Henry v. Atlanta Gas Light, (2003)
- Lee v. Kennestone Hospital, (2001)

- Alen v. Gateway Construction, Broward County, Florida
- Loveless v. Luna LaserPerfect Skin Centers, LLC (1999)
- Johns v. Cherokee Trucking Company (1999)
- Collicott v. Haines Trucking Company (1999)
- Malon v. General Motors (1998)
- Sylvestre v. Holmes Regional Hospital, Brevard County, Florida
- Hughes v. Cobb County, 441 S.E.2d 406 (1994)
- Fugate v. Honda, Michigan (1989)
- Clemons v. Ft. Sanders Regional Medical Center, et. al., Knoxville, TN
- Gaines v. Winne Dixie, 542 So.2d 432 (1989)
- Sullivan v. Sullivan

**Classes/Seminars Taught:**

- Filing a Qui Tam Action, Washington State Trial Lawyers Association, Trial Advocacy-Navigating in the New Millennium Seminar, 2007
- Qui Tams, Can you beat the Pleading requirement without Government Intervention, Kentucky Academy of Trial Attorneys, Spring Break Seminar, 2006
- Getting to Verdict: Coding Information for Juror Motivation, NJ ATLA, Boardwalk Seminar, 2006
- If Jurors Want to Do "Right" Why Don't We Always Win, NJ ATLA, Boardwalk Seminar, 2006
- Peer Review Privilege, ATLA, Winter Convention, Honolulu, Hawaii, 2006
- Proving Damages in a Medical Negligence Case in a Skeptical World, ATLA Summer Convention, Seattle, Washington, 2006
- Good Faith, Bad Faith: Holding Non-Parties Responsible For Increasing The Expense And Burden Of Litigation, ATLA, Weekend With the Stars, New York, New York 2006
- Deposition of a Pathologist, ATLA, Summer Convention, Toronto, Canada, 2005
- Professionalism, Ethics and Malpractice, Institute of Continuing Legal Education in Georgia, 2004
- Winning Brain Injury Cases, Institute for Continuing Legal Education in Georgia, Atlanta, 2003
- Determining the Value of Your Case: Pre-Litigation Focus Groups and Jury Research, Institute for Continuing Legal Education in GA, Atlanta, 2003
- ATLA Case Workshop Program Faculty Member, ATLA, Winter Convention, 2003
- Jury Trial, Institute of Continuing Legal Education in Georgia, 2003
- Aviation Law, Institute of Continuing Legal Education in Georgia, 2003
- Demonstration and Analysis of a Direct Examination of the Plaintiff, ATLA, All Stars, Dallas, Texas, 2002
- Faculty Member, ATLA, Cambridge Trial Advocacy, Cambridge, Massachusetts, 2002
- Courtroom Technology and Persuasive Proof You Can Afford, ATLA, Cambridge Trial Advocacy, Cambridge, Massachusetts, 2002
- What Do You Do When the Unexpected Happens in Discovery and in the Courtroom, ATLA, Cambridge Trial Advocacy, Cambridge, Massachusetts, 2002

- Effective Jury Questionnaire, ATLA, Winter Convention, Miami, Florida, 2002
- General Strategies with Examining Witnesses, ICLE, Trial Advocacy, Atlanta, Georgia, 2001
- Email Ethics - Protecting the Attorney-Client Privilege, ATLA, Winter Convention, San Juan, Puerto Rico, 2000
- The Present Status of 9-11-9.1, ICLE, Motions Practice in Georgia, 2000
- Engineering Professionals in the Court Room, Southern Polytechnic State University, Atlanta, Georgia, 2000
- Cross Examination of Defendant Experts, ABOTA, Advocacy Roundtable, 1997
- Advanced Medical Malpractice Skills, and Jury Selection and Medical Anatomy, ATLA, National College of Advocacy, Reno, Nevada, 1996
- Proof of General Damages Through Use of "Character Testimony", Georgia Trial Lawyers Auto Wreck Seminar, Columbus, Atlanta, and Augusta, Georgia, 1995
- Domestic Violence, ATLA Summer Convention, 1995
- Personal Injury Seminar for Legal Assistants, and Preparation of the Settlement Package, Law Seminars International, Atlanta, Georgia, 1994
- The First Opening: Voir Dire, National Board of Trial Advocacy, Miami, Florida, 1994
- Domestic Violence: When the Police Fail to Respond, Wyoming Trial Lawyers Association Convention, Sheridan, Wyoming, 1994
- Creating Civil Justice Jury/History of the Jury System, Georgia Civil Justice Foundation, LRE Seminar, Athens, Georgia, 1994
- Critique of Student Presentations on Direct Examination, Atlanta College of Trial Advocacy, Atlanta, Georgia, 1994
- Domestic Violence: When the Police Fail to Respond, Idaho Trial Lawyers Seminar, Moscow, Idaho, 1994
- Faculty Member, The First Opening: Voir Dire, National College of Advocacy, Washington, D.C., 1994
- The Best Files are the Ones in Your Office, Plaintiff's Personal Injury Seminar, Atlanta, Georgia, 1994
- The Best Files are the Ones in Your Office, Georgia Trial Lawyers Annual Meeting, St. Simons Is., Georgia, 1994
- Making the Most of Settlements, Georgia Trial Lawyers Seminar, Atlanta, Georgia, 1994
- An Update on Georgia's Fair Claims Practice Act, GTLA, Motor Vehicle Wreck Seminar, Atlanta, Georgia, 1992
- Use of Mediation as an Alternative Dispute Resolution Technique: The Plaintiff's Perspective, ATLA, Winter Convention, Boca Raton, Florida, 1992
- The Psychology of Trial: Choosing Your Theme, ATLA, National College of Advocacy, Atlanta, Georgia, 1992
- Litigation Cost Containment Strategies for 1993, Attorney's Information Exchange Group, Sonoma, California, 1992
- Personal Injury Seminar for Legal Assistants, Law Seminars International, Atlanta, Georgia, 1992
- Using Experts as Consultants: Types of Experts, Permanency of Impairment, Evaluation of Pain, Extent of Disability and Life Expectancy, ATLA, National College of Advocacy and Hastings College of Law, San Francisco, California, 1991

- Preparing Lay Witnesses: Finding the Best Way to Present the Truth, ATLA, National College of Advocacy and Hastings College of Law, San Francisco, California, 1991
- Obtaining & Interpreting Medical Records in Personal Injury Cases Opening Statement: Getting their Attention, ATLA, National College of Advocacy and Hastings College of Law, San Francisco, California, 1991
- Handling Pre-Existing Injuries & Disabilities, ATLA, National College of Advocacy and Hastings College of Law, San Francisco, California, 1991
- Cutting Edge Theories of Recovery in Torts, GTLA, Liability Evidence Enclave, December, 1991
- Basic Trial College, ATLA, Athens, Georgia, 1990
- Aviation Section, The Weather Case: Can it be Won?, ATLA, Annual Convention, San Diego, California, 1990
- The Art of Expert Witnessing, Society of Real Estate Appraisers, Annual Conference, Lake Buena Vista, Florida, 1990
- Basic Trial College, ATLA, Detroit, Michigan, 1989
- Psychology of a Trial - How to Plan It, ICLE, Selected Problems in Trial Advocacy, Atlanta, 1989
- Selected Problems in Trial Advocacy, GTLA, Atlanta, Georgia, 1989
- Moderator, GTLA, Fall Seminar, 1988
- Final Preparation and Use of a Trial Notebook, ATLA, Basic Trial College, Nashville, Tennessee, 1987
- Convention Seminar Speaker, ATLA, 1987
- Trial Techniques Seminar, TTLA, 1987
- Final Preparation and Use of a Trial Notebook, and Workshop Leader, ATLA, Basic Trial College, University of Michigan, 1986
- Final Preparation and Use of a Trial Notebook, and Cross-examination of Defense Experts, and Workshop Leader, ATLA, Basic Trial College, Samford University, 1986
- Cross-examination of Expert Witnesses, and Final Preparation and Use of a Trial Notebook, and Workshop Leader, ATLA, Basic Trial College, American University, 1985
- Defining Medical Negligence, Broward County Psychological Association, 1985

**Honors and Awards:**

- AAJ Wiedmann Wysocki National Finance Council Award, July 2007
- Pilot Proficiency Certificate, Cessna, Sim Com Training Center, 1999 - Present
- Who's Who Among Top Executives, Honored Member, 1998 - 2000
- Award for Recognition 1999 National Conference, hosted by Tallulah Falls School, 1999
- Recognition for High Professional Legal Standards and Ethics in the 1999 Bar Register of Preeminent Lawyers, 83rd edition
- Recognition for Significant Contributions to Waterfowl Conservation as a Sponsor of Ducks Unlimited, Inc., 1996
- Fellow, National College of Advocacy, 1996
- Award of Appreciation for Outstanding Participation and Dedicated Service at 1994 WTLA Convention, Wyoming, 1994

**Professional Associations and Memberships:**

- The American Association for Justice (f/ka Association of Trial Lawyers of America) - Life Member
- Civil Justice Foundation 2007- Present - President Board of Trustees
- The Academy of Florida Trial Lawyers, 1980 - Present - Member
- The State Bar of Georgia, 1987 - Present - Member
- The Florida Bar, 1978 - Present - Member
- Georgia Trial Lawyers Association - Life Member
- Georgia Trial Lawyers Association - Member, Executive Committee
- The Broward County Bar Association - Member
- The Atlanta Bar Association - Member
- The American Bar Association, 1979 - Present
- Million Dollar Advocates Forum - Member
- Texas Trial Lawyers Association - Member
- The Federal Bar, Atlanta and Ft. Lauderdale Chapters - Member
- National Board of Trial Advocacy, 1991 - Present
- Georgia Trial Lawyers Association, 1996 - Present - Past-President
- Aircraft Owners and Pilot Association, 1975 - Present
- National Business Aviation Association, Inc., 2000 - Present
- The National Transportation and Safety Administration Bar Association - Member
- Association of Trial Lawyers of America - Counsel of Presidents, Vice President
- Civil Justice Foundation 2006-2007 - Secretary, Board of Trustees
- Civil Justice Foundation 2005-2006 - Treasurer, Board of Trustees
- National Board of Trial Advocacy, 2003 - State Coordinator
- Association of Trial Lawyers of America, 2000-2001 - Trustee, Permanent Endowment Committee
- Pilot Proficiency Award Program, 2000-2001
- The Georgia Trial Lawyers Association, 2000-2001 - Chair, Constitutional Review Committee
- Association of Trial Lawyers of America - Permanent Endowment Committee, Member 2000 - 2001
- Association of Trial Lawyers of America - Leadership Development Committee, Trustee 2000
- Georgia Civil Justice Foundation, 1994-1997 - Member, Board of Directors
- Brain Injury Association of Georgia, 1994-1997 - Board Member
- Georgia Civil Justice Foundation, 1994-1997 - Member, Board of Directors
- Georgia Trial Lawyers Association, 1995-1996 - President
- Association of Trial Lawyers of America, Council of State Presidents, 1995-1996 - Vice Chair
- Experimental Aircraft Association @ PDK, 1994-1996 - Board Member
- Association of Trial Lawyers of America, 1994-1996 - Co-Chair, Permanent Endowment Committee
- National College of Advocacy, 1996 - Advocate
- Georgia Trial Lawyers Association, 1994-1995 - President-Elect
- Association of Trial Lawyers of America, 1992-1995 - Co-Chair, Convention Committee
- Association of Trial Lawyers of America - Amicus Curiae Committee, Member 1989-1995

- Georgia Civil Justice Foundation, 1993-1994 - President
- Association of Trial Lawyers of America, Domestic Violence Litigation Group, 1993-1994 - Member, Executive Committee
- Association of Trial Lawyers of America, 1993-1994 - Member, Long Range Planning Committee
- Georgia Civil Justice Foundation, 1993-1994 - President
- Georgia Trial Lawyers Association, 1992-1994 - Treasurer
- Texas Forestry Association, 1994
- Association of Trial Lawyers of America, 1992-1993 - Co-Chair, Leadership Development Committee
- Association of Trial Lawyers of America 1992-1993 - Leadership Development Committee, Co-Chair
- Association of Trial Lawyers of America, 1991-1993 - Secretary, Alternative Dispute Resolution Committee
- Georgia Trial Lawyers Association, 1991-1992 - Chairman, Public Relations Committee
- Association of Trial Lawyers of America, 1990-1991 - Member, Basic & Advanced Trial Colleges and Seminars Faculty Training
- Program for Practicing Lawyers; The Negotiation Workshop, Harvard University, 1991
- Georgia Trial Lawyers Association, 1990-1991 - Chairman, Legislative Committee
- Association of Trial Lawyers of America, Tobacco Litigation Group, 1989-1991 - Secretary
- Association of Trial Lawyers of America , Aviation Section, 1989-1990 - Secretary
- Georgia Trial Lawyers Association, Speakers Bureau, 1989-1990 - Co-Chair
- Georgia Trial Lawyers Association, 1987-1988 - Chairman, Judicial Liaison Committee
- Association of Trial Lawyers of America, 1986-1987 - Member, Public Relations Committee
- Association of Trial Lawyers of America, 1985-1988 - Member, Exchange Committee
- Association of Trial Lawyers of America, 1984-1986 - Member, Education Committee
- Professional Trial Lawyers Institute, 1983
- Florida Academy of Trial Lawyers - Member
- Trial Lawyers for Public Justice
- Bar Register of Preeminent Lawyers
- Professional Association of Diving Instructors
- Attorney's Information Exchange Group
- National Aeronautic Association
- Nicolas, Welsh, Brooks & Hayward - Of Counsel
- Mosca & Falco, Sarasota, Florida - Of Counsel

## Past Employment Positions:

- Harrell & Johnson, Jacksonville, Florida, Of Counsel
- Global Photonic Energy Corporation, President, Chief Operation Officer, 1999 - 2002
- Global Photonic Energy Corporation, President, Chief Operation Officer, 1999 - 2002
- Second District Court of Appeal, Appellate Division, Bartow, Florida, Assistant Public Defender, 1978

**Pro Bono Activities:**

- Brain Trauma Litigation Group
- Georgia Civil Justice Foundation

**Birth Information:**

- September 23, 1954, Frankfurt, Germany

Mr. Stone is a trial lawyer from Blakely, Georgia, who specializes in personal injury, wrongful death, professional malpractice, product liability, commercial and consumer fraud cases. He is the senior member of his own firm, BOONE & STONE, 589 College Street, Blakely, Georgia 39823, and 3166 Mathieson Drive, Atlanta, Georgia 30305. The firm's predecessor was founded in 1915 by Mr. Stone's grandfather, the late Wm. Lowrey Stone. Past members of the firm include Mr. Stone's father, Lowrey S. Stone, who formerly served as Chief Judge of Superior Courts, Pataula Judicial Circuit.

Mr. Stone was born in Dothan, Alabama, on August 19, 1953. He attended the public schools in Early County, Georgia and graduated from Early County High School in 1971. He attended the University of Georgia College of Business Administration and received a Bachelor's Degree in Business Administration with a major in accounting on graduation in 1975. Mr. Stone also attended the Netherlands Institute of Industrial Economics near Amsterdam in The Netherlands in 1973.

Mr. Stone received his Juris Doctor Degree from the University of Georgia School of Law in 1977. He was admitted to practice law in the state of Georgia in 1977 and in the state of Alabama in 1985. He is also member of the bars of the United States District Courts for the Middle and Northern Districts of Georgia, the Middle District of Alabama, and the Central District of Illinois, as well as the United States Courts of Appeals for the Fifth and Eleventh Circuits.

The publishers of the Martindale Hubble Law Directory have awarded Mr. Stone its highest rating (AV) for legal ability and integrity.

Mr. Stone is a Life Member and past president of the Georgia Trial Lawyers Association, and is also a member of the American Bar Association, the State Bar of Georgia, the Alabama State Bar, the Association of Trial Lawyers of America, and the Southwest Georgia Trial Lawyers Association.

Mr. Stone is one of 3 members of the Board of Governors for the Association of Trial Lawyers of America from Georgia. Mr. Stone is a member of the ATLA President's Club and serves as Co-chair of the Ethics Committee of the Association of Trial Lawyers of America.

Mr. Stone has served on the Georgia Judicial Nominating Commission that recommends candidates to the Governor for appointment to vacant judgeships in Georgia.

Mr. Stone has authored a number of published articles and is a frequent lecturer at legal seminars on the subject of trial practice and tort law.

Mr. Stone serves on a number of committees with the State Bar of Georgia, including the Advertising Regulation Committee.

Mr. Stone is a past president of the Blakely Rotary Club, and a member of the First United Methodist Church of Blakely.

Mr. Stone has five children, Ryals, 25, Katie, 21, James, 20, John, 20, and Andrew 16.

Ms. Siex is a lawyer in the Atlanta office of Boone & Stone who practices in the area of civil litigation including medical negligence, wrongful death, aviation crashes, product liability, and business and commercial litigation.

Ms. Siex was born in Baldock, England, on November 17, 1962. The daughter of a military family, she traveled extensively throughout the United States and Europe. She graduated with honors from Niceville High School in 1980. She then attended Randolph-Macon Woman's College on an academic scholarship where she earned her undergraduate degree cum laude and with honors in Political Science in 1984. Ms. Siex also studied abroad in Paris in the areas of French and Art History.

Ms. Siex received her Juris Doctor Degree from Emory Law School in 1987 after receiving an Emory Merit Scholarship. She was admitted to practice law in the State of Georgia that same year. Ms. Siex spent a year as a judicial Clerk with the Superior Court of Bibb County, working with the Honorable Cloud C. Morgan and Bryant G. Culpepper, before entering private practice.

For legal ability and integrity, Ms. Siex has achieved the highest rating (AV) that is awarded by the publishers of the Martindale Hubble Law Directory. She is admitted to practice before the U.S. Court of Appeals for the 11th Circuit, the U.S. District Court of the Northern District of Georgia, the U.S. District Court of the Middle District of Georgia, the Georgia Court of Appeals the Georgia Supreme Court and the United States Supreme Court.

Ms. Siex has actively championed the rights of United States Citizens to trial by jury as former President of the Georgia Civil Justice Foundation, a non-profit organization for the promotion of the civil justice system. She is involved in the American Association for Justice (f/k/a Association of Trial Lawyers of America) and the Georgia Trial Lawyers Association, where she has served as a Vice President and Chairperson of the Constitutional Challenge Committee and as a member of the Ethics and Long Range Planning Committees. She is also a member of the Atlanta, Federal and American Bar Associations, and the State Bar of Georgia, where she is published. Ms. Siex has appeared as a guest on the Georgia Public Broadcasting program, "The Layman's Lawyer."

**Areas of Practice:**

- Aviation Law
- Catastrophic Injuries
- Civil Litigation
- Commercial Litigation
- Medical Malpractice
- Personal Injury
- Premises Liability
- Product Liability
- Professional Negligence
- Wrongful Death

**Bar Admissions:**

- U.S. Supreme Court, 2006
- Georgia Court of Appeals, 1989
- Supreme Court of Georgia, 1989
- U.S. District Court Middle District of Georgia, 1989
- U.S. Court of Appeals 11th Circuit, 1988
- U.S. District Court Northern District of Georgia, 1988
- Georgia, 1987

**Education:**

- Emory University School of Law, Atlanta, Georgia, 1987
- J.D., Recipient: Emery Merit Scholarship
- Randolph-Macon Women's College, Virginia, 1984
- B.A.
- Honors: Cum Laude
- Honors: With Honors
- Major: Political Science

**Published Works:**

- "Claims Against Attorneys Based in Sexual Misconduct: Sexual Misconduct as Professional Malpractice", 30 Georgia State Bar Journal 7, Fall, 1993

**Representative Cases:**

- Coleman v. Puhalovich, North Fulton Anestesia (2007)
- Smith v. Steinmetz (2004)
- Norberg v. Nationwide - Southeast, (2004)
- Layne v. Shands Hospital, (2003)
- Thomas v. Kaiser, (2003)
- Turpin v. Macon Aviation, et al., (2003)
- Washington v. Housing Assistance, (2003)
- Henry v. Atlanta Gas Light, (2003)
- Lee v. Kennestone Hospital, (2001)
- Collicott v. Haines Trucking Company, (1999)
- John v. Cherokee Trucking Company, (1999)
- Loveless v. Luna LaserPerfect Skin Centers, LLC, (1999)
- Malone v. General Motors (1998)

**Honors and Awards:**

- Emory Merit Scholarship
- Edmonds Merit Scholarship

**Professional Associations and Memberships:**

- Atlanta Bar Association - Member
- American Bar Association - Member
- The Federal Bar Association - Member
- State Bar of Georgia - Member
- Georgia Trial Lawyers Association, 1991-1994 - Chairperson, Constitutional Challenge Committee
- Georgia Trial Lawyers Association - Member, Amicus Curiae Committee
- Georgia Civil Justice Foundation, 1994-1996 - President
- American Judicature Society - Member
- American Association for Justice (f/k/a The Association of Trial Lawyers of America) - Member, President's Club

**Past Employment Positions:**

- Beltran & Associates, Atlanta Georgia, 1988-1995
- Hon. C. Cloud Morgan and Bryant Culpepper, Bibb County Superior Court, Law Clerk, 1987 - 1988

**Languages:**

- French

**Birth Information:**

- November 17, 1962, Baldock Herts, England

Ms. Cardones is a lawyer in the Atlanta office of Boone & Stone who practices in the areas of products liability, medical negligence, wrongful death, personal injury, as well as commercial and consumer litigation.

Ms. Cardones was born and raised in Rhode Island, where she graduated with high honors from Rocky Hill School in 1999. She earned her undergraduate degree in French Studies from Emory University in 2003. Also during that time, she studied Spanish abroad in Salamanca, Spain.

Ms. Cardones received her Juris Doctor Degree from Emory University School of Law in 2007. While attending law school, she interned with the Office of Regional Counsel for the Southern Region of the Federal Aviation Administration. She also participated in Emory's Moot Court Society, both as a competitor on the Society's Jessup International Law Team and the following year as the coach for the Jessup Team. For her excellence in advocacy throughout law school, she was selected for membership in the National Order of Barristers.

In Fall 2007, Ms. Cardones became a member of the State Bar of Georgia and began practicing full time with Boone & Stone. She is admitted to practice before the Georgia Supreme Court.

Ms. Cardones is married to Justin Cardones, an Electrical Engineer. They enjoy being active and outside and are involved in their neighborhood association, the Virginia-Highlands.

**Areas of Practice:**

- Aviation Law
- Catastrophic Injury
- Civil Litigation
- Commercial Litigation
- Consumer Litigation
- Medical Malpractice
- Personal Injury
- Products Liability
- Professional Negligence
- Wrongful Death

**Bar Admissions:**

- Georgia, 2007
- Supreme Court of Georgia, 2008

**Education:**

- J.D. - Emory University School of Law, Atlanta, Georgia 2007
- B.A.- Emory University, Atlanta, Georgia 2003

**Honors and Awards:**

- Emory University Law School 1L Oralist Competition-Top 10% Oralist Award (2004-2005)
- Emory University Law School Moot Court Competition- Top Oralist and recipient of the Gunster, Yoakley and Stewart Best Oralist Award, (2005-2006)
- The National Order of the Barristers, 2007

**Professional Associations and Memberships:**

- State Bar of Georgia - Member
- Georgia Trial Lawyers Association
- Atlanta Bar Association
- The Lamar American Inn of Court
- Georgia Association of Women Lawyers

Mr. Williams is a lawyer in the Blakely office of Boone & Stone who practices in the areas of products liability, medical negligence, wrongful death, personal injury, as well as commercial and consumer litigation.

Mr. Williams was born in Dothan, Alabama in 1981. He grew up in Blakely, Georgia and graduated with honors from Early County High School in 1999. Afterwards, he attended Georgia Southwestern State University on several academic scholarships and earned his undergraduate degree in Political Science in 2002.

Mr. Williams received his Juris Doctor Degree from Cumberland School of Law in 2006 with a Certificate in Trial Advocacy. Mr. Williams' love of the courtroom developed before he graduated law school. During his last year at Cumberland, Mr. Williams obtained his third year practice card in Alabama and helped the Bessemer District Attorney's Office prosecute various individuals for a wide variety of crimes.

Mr. Williams's career with Boone & Stone began before he ever attended law school. After graduating college, Mr. Williams began working in our Blakely office as a legal assistant. During summer breaks from law school, he returned to Boone & Stone to serve as a summer associate. Mr. Williams became a member of the State Bar of Georgia in 2006. He is admitted to practice before the U.S. District Court of the Northern District of Georgia, the U.S. District Court of the Middle District of Georgia, the Georgia Court of Appeals and the Georgia Supreme Court.

Mr. Williams is married to the former Courtney Bean, a teacher at Early County Elementary School. In his spare time, he enjoys the outdoors, attending church, and spending time with his friends and family.

**Areas of Practice:**

- Catastrophic Injuries
- Civil Litigation
- Commercial Litigation
- Consumer Litigation
- Medical Malpractice
- Personal Injury - Plaintiff
- Premises Liability
- Product Liability
- Professional Negligence
- Wrongful Death

**Bar Admissions:**

- Georgia, 2006
- U.S. District Court Northern District of Georgia, 2007
- U.S. District Court Middle District of Georgia, 2006

- Georgia Court of Appeals, 2006
- Supreme Court of Georgia, 2006

**Education:**

- J.D.- Samford University, Cumberland School of Law 2006
- Certificate in Trial Advocacy
- B.S. - Georgia Southwestern State University, 2002

**Honors and Awards:**

- Judge Abraham Caruthers Fellow
- Chi Phi College of Excellence Intern - Vanderbilt University

**Professional Associations and Memberships:**

- Pataula Circuit Bar Association - Member
- State Bar of Georgia - Member
- The Association of Trial Lawyers of America, 2006 - Member
- American Association for Justice - Member
- Phi Alpha Delta Law Fraternity, International - Member
- The National Scholars Honor Society – Member

Ms. Davis is an attorney with Boone & Stone who practices in the area of civil litigation, including consumer and commercial fraud, product liability, wrongful death, and professional negligence. She specializes in state and federal appellate practice

Ms. Davis was born in Tennessee and grew up in North Carolina. She graduated from the University of North Carolina at Chapel Hill in 1974 with Highest Honors in English. She received her J.D. from the University of Georgia School of Law in 1978, and served as the Director of the Legal Research and Writing Program at the UGA law school from 1978-1980. She served as a judicial clerk at the Supreme Court of Georgia from 1980 until 1994 when she entered private practice.

Ms. Davis has authored and co-authored publications for the Mercer Law Review, Trial Magazine, The Verdict Magazine and articles for the Product Liability Section of the State Bar of Georgia. She has authored and co-authored successful amicus briefs on behalf of Boone & Stone in the areas of consumer fraud and the burden of proof under the Georgia RICO statute, and amicus briefs on behalf of the Georgia Trial Lawyers' Association in areas of professional malpractice, evidentiary standards and spoliation of evidence.

**Areas of Practice:**

- Product Liability
- Commercial Fraud
- Consumer Fraud
- Professional Negligence
- Civil Litigation
- Wrongful Death

**Bar Admissions:**

- Georgia, 1978

**Education:**

- University of Georgia School of Law, Athens Georgia, 1978
- J.D.
- University of North Carolina at Chapel Hill, 1974
- B.A.
- Major: English

**Professional Associations:**

- State Bar of Georgia
- Georgia Trial Lawyers Association
- Former member of GTLA Amicus Committee

- Attorneys' Information Exchange Group

**Professional Publications:**

- The Verdict, "The Statute of Limitations in Misdiagnosis Cases in Georgia: an Update", Winter 2003
- The Verdict, "Medical Malpractice Trends: Continuous Treatment and Informed Consent", Winter, 2002
- Trial Magazine "When Time Is Running Out", October, 2001 (co-author) [an analysis of misdiagnosis in breast cancer patients]
- Mercer Law Review, Annual Survey of Georgia Law, "Evidence", Vol. 34, No., 1, Fall, 1982 (co-author)

As a member of Boone & Stone, Aileen Page represents individuals in product liability, premises liability, medical malpractice, civil racketeering (RICO) and other complex litigation matters. Aileen has litigated cases in Georgia state courts, in all three federal district courts in Georgia, as well as in states across the country, including California, New York, New Jersey, Pennsylvania, Texas, Louisiana, Tennessee, Alabama, South Carolina, Kentucky, Missouri and Rhode Island.

Aileen is a Magistrate Court Judge in Fulton County (Atlanta), Georgia.

As a mediator credentialed and registered with the Georgia Office of Dispute Resolution, Aileen is expanding upon more than a decade of trial and litigation work by developing her mediation practice.

Aileen began her career as an Assistant District Attorney in the Coweta Judicial Circuit where, within weeks of graduating law school, she independently tried and won her first felony jury trial. Then based in LaGrange, Georgia, she traveled the multi-county circuit, trying and winning felony jury cases. She was undefeated in Coweta, Troup, Meriwether and Heard counties.

Aileen then joined the DeKalb County District Attorney's Office in metropolitan Atlanta, and continued to try and win serious felony jury cases. As a result of her performance, Aileen was selected to join the Special Prosecutions Unit dedicated exclusively to child deaths, child molestations, and other crimes against children. Assigned to four of eight Superior Court divisions, she was solely responsible for half of all such prosecutions in DeKalb County, and was on call for trial nearly every week. During her tenure with the Dekalb County District Attorney's Office, Aileen was undefeated.

Aileen began her civil practice with the litigation department of a firm representing the world's largest retail corporation in all its tort litigation throughout the state of Georgia. She was lead counsel in a large number of lawsuits involving claims of serious personal injury, malicious prosecution, and employment discrimination. Soon after joining that firm, Aileen was lead counsel in her first civil jury trial, pending in the United States District Court for the Northern District of Georgia, in which she won a directed verdict. She proceeded to develop her civil practice, litigating cases in state and federal courts throughout Georgia.

Aileen then joined a prominent downtown Atlanta firm representing primarily plaintiffs in matters involving catastrophic injury and complex litigation. Within six months, Aileen was promoted to Managing Attorney. In addition to executing administrative responsibilities, Aileen represented Georgia clients in various tort, domestic, and civil RICO matters, as well as clients from across the United States in multidistrict mass-tort pharmaceutical product liability litigation.

In 2005, Aileen was selected from among thousands of trial lawyer applicants to compete in the nationally televised David E. Kelly legal reality drama, "The Law Firm". The attorneys tried real cases against one another before California judges and juries, and were required to prepare and try each case within 48 - 72 hours of receiving the case file. All aspects of preparation and trial were filmed. Competitors were evaluated and eliminated from the competition by prominent Florida attorney Roy Black. Aileen was the only woman in the final six, finished in the top three,

and achieved the best win-loss ratio of all the competitors. At the conclusion of the competition, Roy Black stated that there were two attorneys he would want to hire, one of whom was Aileen. In connection with the show, she was personally featured in the Los Angeles Times, USA today, the Fulton County Daily Report, and other publications.

Aileen won the award for Best Orator in Georgia State University College of Law's 1996 Appellate Advocacy Competition. In appreciation of the invaluable training she received during law school by competing in both moot court and mock trial programs, she has served as both a coach and judge in high school and law school competitions.

Aileen volunteers for Dress for Success, an organization which assists women in their efforts to become self-sufficient by entering the workforce.

Born in New York City, Aileen lived in Toronto, Canada, before moving to Atlanta. She earned a Bachelor of Arts Degree in Philosophy and Political Science from the University of Toronto, and obtained her law degree in 1996 from Georgia State University College of Law.

Aileen is a member of the American Association for Justice, the Georgia Trial Lawyers Association, the Georgia Association of Women Lawyers, the Atlanta Bar Association, and the Lawyers Club of Atlanta.

# Exhibit F



Founded in 1978, Lockridge Grindal Nauen P.L.L.P. has extensive experience in product liability, antitrust, securities, environmental, employment, health care, commercial, intellectual property and telecommunications law.

LGN attorneys have taken leadership roles in federal court multi-district litigations and state court consolidated proceedings in products liability, consumer fraud, antitrust, and securities actions. These cases have resulted in billions of dollars of recoveries for injured individuals, small businesses, farmers, and investors.

The firm's work, as part of the leadership structure in several MDL's, has been recognized by the Courts:

### *Monosodium Glutamate Antitrust Litigation*

LGN was Co-Lead Counsel for the Plaintiff Class in this case, in which $124 million was recovered for the benefit of a class of businesses which purchased food flavor enhancers from suppliers in the U.S., Japan, Korea, and Taiwan. Judge Paul Magnuson, then Chief Judge of the United States District Court for the District of Minnesota, said:

> *Plaintiffs' counsel conducted themselves in an exemplary fashion throughout the litigation, and are to be commended for their fine work in this litigation.*

### *Linerboard Antitrust Litigation*

Lockridge Grindal Nauen P.L.L.P. partner Joseph Bruckner was one of a five-person Class Plaintiffs= Executive Committee in this case. The class actions in this litigation were resolved with the recovery of more than $202 million for the benefit of a class of businesses C including many Fortune 500 companies C which purchased corrugated boxes and sheets. Judge Jan DuBois of the United States District Court for the Eastern District of Pennsylvania said:

> *The result achieved is the clearest reflection of [class plaintiffs=*
> *counsel=s] skill and expertise. . . . The Court has repeatedly*
> *stated that the lawyering in the case at every stage was superb,*
> *and does so again.*

### Bulk Vitamins Antitrust Litigation

In addition to its extensive role in trial preparation, the firm chaired a critical committee for Class Plaintiffs in this case, one of the largest and most successful antitrust cases in history. Through settlement and verdict Class Plaintiffs= Counsel recovered over $400 million for the benefit of a class of businesses which purchased bulk vitamin products. Chief Judge Thomas Hogan of the United States District Court for the District of Columbia said:

> *[T]he attorneys involved are among some of the most highly*
> *skilled in the country with extensive experience in similar class*
> *action litigation . . . .*

Lockridge Grindal Nauen P.L.L.P. attorneys are assisted by more than 20 paralegals and government relations specialists, and an extensive support staff. The firm has offices in Minneapolis, Minnesota and Washington, D.C.

**Robert K. Shelquist**

Robert K. Shelquist is a partner in the Lockridge Grindal Nauen P.L.L.P. firm. He is a graduate of the University of California at Berkeley (A.B. Legal Studies; A.B. Political Science with high honors 1987) and the University of Minnesota Law School (J.D. *cum laude* 1990). Thereafter, he was associated with the law firm of Popham, Haik, Schnobrich & Kaufman in Minneapolis, Minnesota from 1990 until 1995, and a partner in the law firm of Plunkett Schwartz Peterson, P.A., also in Minneapolis from 1995 to 2000.

Mr. Shelquist has successfully prosecuted national class actions to verdict in two cases. In Peterson v. BASF Corp., Mr. Shelquist was court-appointed class counsel and was one of the trial attorneys who secured a jury verdict for a nation-wide class seeking redress for defendant's marketing of its herbicide products. After multiple state appellate opinions and two trips to the U.S. Supreme Court, a judgment in excess of $60,000,000 was paid. He also was one of the court-appointed class counsel and trial counsel representing a certified sub-class as part of a nationwide antitrust trial that was tried to verdict in the United States District Court for the Southern District of New York.

Mr. Shelquist has been active in class action, consumer fraud, product liability, and other complex litigation, including the following court appointed co-lead counsel or class counsel in Peterson v. BASF Corp., Civil No. C2-97-295 (Norman County District Court, Minnesota); In Re Air Transportation Excise Tax Litigation, Civil File No. 3-96-CV-453 (D. Minn.); In Re Laminates, MDL File No. 1368, (S.D.N.Y.) (Counsel to Miami Sub-class); and In re CertainTeed Corp. Roofing Shingle Products Liability Litigation, MDL – 1817.

Mr. Shelquist also is or has been also involved in the following litigation: In Re Baycol Products Litigation, MDL No. 1431 (D. Minn.) (discovery and briefing committees); In re Vioxx

<u>Litigation</u>, MDL 1657 (E.D. LA); <u>In re Rezulin Litigation</u>, MDL 1348 (S.D. N.Y.); <u>In re Serzone</u>

<u>Products Liability Litigation</u>, MDL 1477 (S.D. W.V.); <u>In re Tamoxifen Citrate Antitrust</u>

<u>Litigation</u>, MDL 1408 (E.D. N.Y.); <u>In re Western Union Money Transfer Litigation</u>, Master File

No. CV 01 0335 (CPS) (VVP) (E.D. N.Y.); <u>In re Meridia Products Liability Litigation</u>, MDL

1481 (N.D. Ohio) (co-chair discovery committee); <u>In Re StarLink Corn Products Liability</u>

<u>Litigation</u>, MDL 1403 (N.D. IL); <u>In Re Propulsid Products Liability Litigation</u>, MDL 1355 (E.D.

LA); <u>In Re Digi International, Inc. Securities Litigation</u>, Master File No. 97-5 (D. Minn.); <u>In Re</u>

<u>Flat Glass Antitrust Litigation</u>, MDL 1200 (W.D. PA); <u>In Re Milk Products Antitrust Litigation</u>,

Master File 3-96-458 (D. Minn.) (co-chair discovery committee); <u>In Re Linerboard Antitrust</u>

<u>Litigation</u>, MDL 1261 (E.D. PA); <u>In Re MSG Litigation</u>, MDL File No. 00-1328 (D. Minn); <u>In</u>

<u>Re Blue Cross Blue Shield Subscriber Litigation</u>, Master File No. 19-C3-98-7780 (Dakota

County District Court, Minnesota) (co-chair of discovery committee; <u>Brown v. State of</u>

<u>Minnesota</u>, Court File No. 98-11152 (Hennepin County District Court, Minnesota); <u>In Re</u>

<u>Propulsid Products Liability Litigation</u>, MDL 1355 (E.D. LA); <u>Good v. Fluor Daniel Corp.</u>, Case

No. CT-00-5021-RHW (E.D. Wash.); <u>In Re Berg</u>, Master File No. CY-96-3151-AAM (E.D.

Wash.); <u>In Re Lutheran Brotherhood Variable Insurance Products Co. Sales Practices Litigation</u>,

MDL No. 1309 (D. Minn.); <u>Crosby v. Aid Association for Lutherans</u>, File No. 00-CV-2112

MJD/RLE (D. Minn.); <u>Villa v. Rexall Sundown, Inc.</u>, Court File No. 00-9061 (Palm Beach

County Court, Florida); <u>In Re European Rail Pass Antitrust Litigation</u>, MDL 1386; <u>In Re Green</u>

<u>Tree Acceptance Corp. Securities Litigation</u>, Master File No. 97-2666 (JRT/RLE) (D. Minn.);

<u>Hanson v. TCI Cable Corp.</u>, Court File No. CX- 97-1434 (Mower County District Court,

Minnesota); <u>Birkemeyer Farm Partnership, et al. v. Monsanto Co., et al.</u>, Court File No. 07-CV-

04-1092 (D. Minn.); <u>Larson v. Burlington Northern Santa Fe Railway Company</u>, Civil No. CV

01-527 JEL/RLE (D. Minn.).   In re: Medtronic, Inc., Inplantable Defibrillators Products Liability Litigation, MDL No. 05-1726 (JMR/AJB) (trial team); In re Guidant Corp. Implantable Defibrillators Products Liability Litigation, MDL No. 05-1708 (DWF/AJB) (trial team); Robert Smale v. Sears Roebuck & Co. and Whirlpool Corp., Court File No. C3-04-8891 (Hennepin County District Court) (Liaison Counsel); Jeffrey H. Leech, et. al. v. Excel Title, LLC, Court File No. 27-CV-06-4625; Hennepin County District Court; Davenport, et al. v. Illinois Farmers Insurance Company, et al., Case No. CIV-03-158-F; In Re: Aredia and Zometa Products Liability Litigation, MDL 06-1760 (M.D. Tenn); and In re: Vytorin/Zetia Marketing, Sales Practices, and Products Liability Litigation, MDL 1938 (D.N.J.).

Mr. Shelquist has been recognized as a ASuper Lawyer@ by *Minnesota Law and Politics* and listed by the *Guide to Leading American Attorneys*.  He is currently a member of AAJ, the Federal Bar Association, and the Minnesota Bar Association.

# Exhibit G

# GISKAN, SOLOTAROFF & ANDERSON, LLP

## Firm Biography

Giskan, Solotaroff Anderson & Stewart, LLP is a firm with significant experience in complex litigation involving consumer fraud, antitrust, and employment discrimination litigation in state and federal courts, on behalf of plaintiffs and often involving class actions.

**OREN GISKAN** is admitted to practice in the states of New York (1993) and Illinois (1990). He received his law degree from the University of Pennsylvania in 1990 and his Bachelor of Arts from the University of Chicago in 1986.

Mr. Giskan served as lead class counsel in Education Station v. Yellow Book USA, Superior Court of New Jersey ($70 million settlement of false advertising claims), Danielson v. Rockford Memorial Hospital, Circuit Court of Winnebago County Illinois, No. 01 L 139 (settlement of patient billing claims under the Illinois Consumer Fraud Act), and Truschel v. Juno Online Inc., Supreme Court of the State of New York, New York County, No. 01/602486 (settlement of consumer protection claims regarding failure to provide Internet service). He is actively litigating several other consumer fraud actions throughout the country as lead or class counsel against companies including T-Mobile, LG Electronics, RCN Corporation, Chase Mortgage, Dow Jones and others.. Prior to forming the firm of Giskan & Solotaroff in October 2002, Mr. Giskan worked for the firms of Prongay & Borderud, the Law Offices of James V. Bashian, P.C. and Zwerling, Schachter & Zwerling, LLP, in New York, New York where he was actively involved as lead counsel for plaintiffs in many securities class action lawsuits including: Hal Bloomberg Trust v. Gencor Industries, Inc., M.D. Fla., 99-106-Civ-Orl; Kaplan v. Prins Recycling Corp., D.N.J., 96 Civ. 2444; In re Lady Luck Gaming Corporation Securities Litigation, D. Nev., CV-S-95-266-LDG (RLH); In re American Pacific Securities Litigation, D. Nev., CV-S-93-00576-PMP; and In re Foodmaker/Jack-in-the-Box Securities Litigation, W.D. Wash., No. C93-517WD. He also actively participated as one of the lead counsel in coordinated nationwide class actions against America Online Inc. regarding its deceptive billing practices.

From 1990-92, Mr. Giskan was an associate with Jenner & Block in Chicago, Illinois where he focused on securities and general commercial litigation.

**JASON L. SOLOTAROFF** is admitted to practice in the State of New York. He is a 1990 graduate of Columbia Law School where he was an Editor of the Columbia Law Review and a Harlan Fiske Stone Scholar. He graduated from the Johns Hopkins University with General Honors.

Mr. Solotaroff clerked for the Hon. Eugene H. Nickerson, United States District Court for the Eastern District of New York. Following the clerkship, Mr. Solotaroff was a Staff Attorney at the Legal Aid Society, Criminal Defense Division from 1991 to 1993. In 1993, he joined the Society's Federal Defender Division. As a federal defender, Mr. Solotaroff represented clients in a

wide variety of matters including complex white-collar cases. Of the nine clients he represented in criminal trials, six were acquitted and one received a partial acquittal.

Mr. Solotaroff entered private practice in 1997. Since 1997, he has devoted a substantial part of his practice to the representation of plaintiffs in class action matters. Among the cases in which he has had substantial responsibility are consumer class actions against Juno Online Inc., Lincoln Security Life Insurance of New York, Verizon Communications, American Express and antitrust class actions against Abbott Laboratories, Bristol-Myers Squibb and Astrazeneca Inc. He also represents individuals in employment discrimination and criminal defense matters.

**CATHERINE E. ANDERSON** is admitted to practice in the States of New York and New Jersey. She received her law degree from New York University School of Law in 1995, where she was an editor of the Journal of International Law and Politics and a participant in the Human Rights Clinic. She graduated magna cum laude from Colgate University in 1992, where she was elected Phi Beta Kappa. Ms. Anderson has specialized in consumer fraud and securities class action litigation and has also represented plaintiffs in employment discrimination and ERISA actions.

Ms. Anderson has served as lead or co-lead counsel in consumer class actions against Fry's Electronics, Chase Mortgage, Dow Jones, Inc., Panasonic and Sieba, Ltd. In January 2007, Ms. Anderson settled the class action captioned Russo v. Whole Arts, et al., Supreme Court of the State of New York, County of New York, Index No. 03603037, alleging claims for breach of contract, deceptive conduct in violation of NY GBL § 349, breach of fiduciary duty and fraud on behalf of approximately 170 members of the Whole Arts Group Health Plan (the "Plan"). The class settlement resolved outstanding medical bills incurred by members of the Plan with a market value in excess of $700,000.

Prior to joining Giskan, Solotaroff & Anderson, LLP, Ms. Anderson was associated with the firm of Wolf Popper LLP, where she served as lead or co-lead counsel in the following class actions which obtained a substantial recovery for the class: Garcia v. General Motors Corp., Docket No. L-4394-95, Superior Court of New Jersey, Bergen County (obtaining a nationwide settlement of $19.5 million in cash on behalf of a consumer class comprised of 2.6 million owners of GM W-Body cars with allegedly defective braking systems); Whipple v. Happy Kids, Inc., Index No. 99-603371, IAS Part 10, Supreme Court of the State of New York, New York County (obtaining a settlement providing, among other things, an increase of $0.50 per share on behalf of the Happy Kids public shareholders in a revised buyout transaction); In re Segue Software, Inc., Sec. Litig., C.A. 99-10891-RGS, United States District Court, District of Massachusetts (obtaining a cash settlement of $1.25 million on behalf of a class of all persons who purchased the common stock of Segue Software, Inc. during the period July 14, 1998 through April 9, 1999); Jonas v. Aspec Technology, Inc., Lead Case No. CV775037, Superior Court of the State of California (obtaining a settlement with a $13 million cash component and a stock component of 1.75 million shares of the common stock of Aspec Technologies, Inc. for a class comprised of all persons who owned Aspec common stock during the period April 27, 1998 through June 30, 1998); In re Ugly Duckling Corp. Shareholders Derivative and Class Action, Consolidated C.A. No. 18843, Delaware Court of Chancery, New Castle County (obtaining an increase from $2.51 per share to $3.53 per share cash in going private transaction on

behalf of a class comprised of the Company's minority shareholders, resulting in an aggregate cash benefit of more than $4.7 million).

**DARNLEY D. STEWART** joined Giskan, Solotaroff & Anderson as Of Counsel on December 1, 2007 and became a member of the firm on March 1, 2008. She is admitted to practice in the States of New York (1993) and Massachusetts (1990). She graduated from Princeton University in 1984 and received her law degree from Northeastern University School of Law in 1990. After law school, Ms. Stewart served as Law Clerk to the Honorable R. Ammi Cutter and the Honorable Mel. L. Greenberg of the Massachusetts Court of Appeals.

Ms. Stewart specializes in employment class and collective actions and has prosecuted high impact cases against a number of large companies, including Ford Motor Company, Gerber, Coastal Corporation, First Union Bank, National Car Rental, General Motors, Nissan, Toyota, and Bank of America. In connection with her work on *Coleman, et al. v. General Motors Acceptance Corporation*, Ms. Stewart was named as a finalist for "Trial Lawyer of the Year" in 2004 by the Trial Lawyers for Public Justice. She has also been named as one of the leading 500 plaintiffs' lawyers in the country and one of America's top 1500 litigators by *Lawdragon* magazine. In addition, Ms. Stewart was selected for inclusion in the list of 2006 and 2007 New York *Super Lawyers*.

Prior to joining Giskan, Solotaroff & Anderson, Ms. Stewart was a partner at the law firm of Bernstein, Litowitz, Berger & Grossmann LLP. At Bernstein Litowitz, Ms. Stewart was the partner in charge of the employment and civil rights practice, and also prosecuted a number of securities class actions, including *Ohio Public Employees Public Retirement System, et al. v. Freddie Mac, et al.*, C.A. 03-CV-4261 (S.D.N.Y.) (obtaining a settlement of $410 million) and *In re Williams Securities Litigation*, Case No. 02-CV-72 –SPF (N.D. Ok.) (obtaining a settlement of $311 million).

Ms. Stewart is a member of the Class and Collective Action Committee of the National Employment Lawyers Association and serves as Vice-President of the Executive Board of the New York affiliate (NELA/NY) of that organization. She is also plaintiffs' Co-Chair of the Technology in the Law and Workplace Committee of the American Bar Association's Labor and Employment Section. Ms. Stewart lectures regularly on employment class action issues, and has frequently commented in the media, including the *Wall Street Journal*, the *New York Times*, National Public Radio and the Today show, regarding issues raised in a variety of employment discrimination cases.

From 1991-97, Ms. Stewart was an associate with Schulte Roth & Zabel LLP, in New York, where she focused on securities, employment and general commercial litigation.

# Exhibit H

## THE JACOBS LAW FIRM, CHTD.

The Jacobs Law Firm, Chtd. specializes in complex civil litigation with a special emphasis on plaintiffs' class actions, including those involving consumer fraud issues, securities fraud, and ERISA. The Jacobs Law Firm, Chtd. was founded by John G. Jacobs in November of 2000. For 25 years prior thereto, Mr. Jacobs was associated with the firm of Plotkin, Jacobs & Orlofsky, Ltd. (PJ&O) and its predecessors as a principal and managing partner.

The firm (and prior thereto, the Plotkin, Jacobs & Orlofsky firm) has a national practice, engaged in significant litigation across the country representing plaintiffs almost exclusively in matters including securities law, ERISA, RICO, antitrust, consumer fraud, and insurance-related issues. In *McLendon v. Continental Group, Inc.*, Judge H. Lee Sarokin wrote about PJ&O's efforts in that case, where the firm was lead counsel, that counsel "performed in a heroic, superb, and extraordinary manner." *McLendon v. Continental Group, Inc.*, 872 F. Supp. 142, 165 (D.N.J. 1994). "No one," Judge Sarokin wrote, "could review the record in this case and help but conclude that the risks were monumental, the dedication and sacrifice of counsel heroic, the quality of performance superb, and the result extraordinary." Id. at 146.

In the last few years, The Jacobs Law Firm or the PJ&O firm have either been lead counsel or shared a significant lead role in the following cases, among others:

1. *Daniel v. Aon*, Case No. 99 CH 11893, Cook County Circuit Court (Judge Nowicki) ($87 million cash settlement plus injunctive relief regarding business practices of major insurance brokerage firm in receiving undisclosed "contingent commissions." Appeal pending.)

2. *Shen v. Distributive Networks*, 06 C 4403, (Settlement preliminarily approved providing cell phone customers up to $150 cash payments for alleged violations of the Telephone Consumer Protection Act with regard to receipt of text message solicitations.)(Judge Filip)

3.  *Brannan v. Health Care Service Corp.*, Case No. 00C 6884, Northern District of Illinois (Magistrate Judge Brown) ($6.95 million cash settlement plus injunctive relief against insurer for its practices in collecting so-called "reimbursement liens" from insureds' tort recoveries).

4.  *Ramlow v. Family Health Plan*, Case No. 00 CV 00386, Milwaukee County Circuit Court. Obtained injunction, affirmed by appellate court, against termination of class's health insurance and obtained continued coverage for the class by successor firm.

5.  *Holloway v. J.C. Penney Life Insurance Co.*, Case No. 97 C 4555 (N.D. Ill.) Obtained ruling from 7th Circuit (190 F.3d 838, 7th Cir. 1999) as to illegality of company's intoxication exclusion clause, and obtained full or partial payments of death benefits for class of denied beneficiaries.

6.  *McLendon v. Continental Group, Inc.*, 602 F.Supp. 1492 (D.N.J. 1985); 749 F.Supp. 582 (D.N.J. 1989), *aff'd* 908 F.2d 1171 (3rd Cir. 1990); 802 F.Supp. 1216 (D.N.J. 1992) ($415 million cash settlement of nationwide class action for employer's ERISA violations in preventing employees from vesting for benefits at plants across the country). (Judge Sarokin)

7.  *Martin v. Heinold Commodities, Inc.*, No. 80 CH 6439, 163 Ill.2d 33 (1994), 240 Ill.App.3d 536 (1992), 117 Ill.2d 67 (1987), 139 Ill.App.3d 1049 (1985). (Breach of fiduciary duty and Illinois Consumer Fraud Act class action. $3.5 million cash settlement in 1995 after a trial on liability and damages.) (Judge Green)

8.  *Bennett v. Berg,* Case No. 80-0381-CV-W-O consolidated with No. 80-0459-CV-W-O, U.S. District Court for the Western District of Missouri; 710 F.2d 1361 (8th Cir. En Banc 1983). (Settlement on behalf of 400-plus elderly residents of a "life care" village resulting in payment of $14-plus million plus cancellation of $48 million mortgage.) (Judge Roberts)

9.  *Pickering v. USX Corporation*, 809 F.Supp. 1501 (D. Utah 1992) ($42 million cash settlement of an ERISA action on behalf of approximately 2,000 steelworkers laid off in order to prevent their attaining pension benefits after a trial on liability and a second trial on damages). (Judge Jenkins)

10. *Carrao v. Health Care Service Corp.*, 118 Ill.App.3d 477, N.E.2d 417 (1st Dist. 1983). (Affirming class certification and decision by trial court that Blue Cross/Blue Shield may not refuse to pay insureds' medical bills because it believes the underlying medical services were "not medically necessary.") (Judge Green)

11. *Cosentino v. State Farm Mutual Automobile Insurance Company*, 83 CH 0378, Cook County Circuit Court. (Obtained retroactive underinsured and uninsured motorist insurance for a class of approximately 1.2 million insureds.) (Judge Wosik)

12. *O'Neill v. Allstate Insurance Company*, 83 CH 535, Cook County Circuit Court. ($5 million settlement fund for the payment of retroactive underinsured and uninsured motorists' losses.) (Judge Green)

13. *Kaszuk v. Bakery and Confectionery Union*, 638 F.Supp. 365 (N.D. Ill. 1984); aff'd, 791 F.2d 548 (7th Cir. 1986). (Obtained declaration of ERISA violations and injunction requiring pension fund to give notice of such rulings to widows with potential entitlement to some $10 million in back payments plus future payments for life.) (Chief Judge Grady)

14. *Hedberg v. Schanck*, 83 C 2993, U.S. District Court, N.D. Ill. ($11 million -- exclusive of attorneys' fees and costs -- class action settlement in going-private leveraged buyout transaction.) [1985 Tr. Binder] Fed.Sec.L.Rep. (CCH) par.92,384 (Judge Moran)

15. *Mayer v. Northwest Industries*, 82 C 658, U.S. District Court, N.D. Ill. (Obtained $18 million jury verdict for securities fraud and breach of fiduciary duty after three-week jury trial on behalf of class of stockholders. Settled on appeal for $10 million.) (Judge McGarr)

16. *King v. Blum*, 84 C 10917, 85 C 4261, 85 C 5384, U.S. District Court, N.D. Ill. ($3.9 million settlement in securities fraud class action.) (Judge Leinenweber)

17. *Hickerson v. Velsicol Chemical Corporation*, No. 81 C 2543 (N.D. Ill.) 778 F.2d 365 (7th Cir. 1985). (ERISA class action. $2.5 million cash settlement, exclusive of fees and expenses, for conversion of profit sharing plan to pension plan.) (Judge Hart)

18. *Goldberg v. Sweet*, 117 Ill.2d 493, 512 N.E.2d 1262 (1987); 488 U.S. 252, 109 S.Ct. 582 (1989). (Class action challenging the Illinois tax on interstate telephone communications that eventually reached the United States Supreme Court on important Commerce Clause issues.)

19. *In re Jackpot Enterprises, Inc. Securities Litigation*, No. CV-S-89-805 U.S. District Court, Nevada. ($3.25 million settlement of fraud-on-the-market Rule 10b-5 class action.) (Judge George)

20. *Picardi v. Chicago Truck Drivers Union*, No. 83 C 343 U. S. District Court, N.D. Ill. (ERISA class action. Obtained $3.75 million cash recovery plus structural relief mandating installation of new computer system and reduction of administrative personnel resulting in annual savings of approximately $1 million.) (Judge Alesia)

The firm currently is involved in various class actions and cases brought as class actions in state and federal courts in Illinois, California and Massachusetts, and recently concluded substantial involvement in non-class antitrust litigation in Arkansas. Several of the firm's pending cases involve issues surrounding cellular telephone billing, where agreements in principle have been made to settle various nationwide class actions regarding those issues. Additionally, Mr. Jacobs has extensive appellate experience, and currently is involved in various appeals pending in state and federal courts around the country.

The Jacobs Law Firm, Chtd. consists of John G. Jacobs and Bryan G. Kolton. Mr. Jacobs is a 1972 graduate of the University of Chicago Law School, where he was the winner of the 1972 Hinton Moot Court Competition (Justice Rehnquist, Justice Stevens and Judge Elbert Tuttle). Following service in the U.S. Navy JAG Corps, he has been engaged in complex civil litigation for the last 33 years, first with PJ&O and then with The Jacobs Law Firm. Mr. Jacobs is a member of the ABA, ATLA, the Chicago Bar Association and The Chicago Council of Lawyers, where he served as Chair of its Judiciary Committee and Vice-President. Bryan G. Kolton is a 1999 graduate of Loyola University Chicago School of Law, where he served on the Law Journal. He has been associated with The Jacobs Law Firm since September of 2001.

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| LISA GRAY, individually and on behalf of a class of similarly situated individuals, | ) ) ) | |
| *Plaintiff*, | ) ) | No. 08-cv-61089 |
| v. | ) ) ) | |
| MOBILE MESSENGER AMERICAS, INC., a Delaware Corporation; one or more JOHN DOES; and one or more JOHN DOE CORPORATIONS, | ) ) ) ) | AMENDED STIPULATION OF SETTLEMENT |
| *Defendants*. | ) ) | |

This Stipulation of Settlement (the "Agreement") is entered by and among Plaintiff in this

Action, for herself individually and on behalf of the Settlement Class, and Mobile Messenger

Americas, Inc. ("Mobile Messenger") (together, the "Parties"). (Except as otherwise specified,

defined terms shall have the meanings set forth in Section II of this Agreement.) Subject to Court

approval of this Agreement, in accordance with applicable law, the Parties hereby stipulate and agree

that, in consideration of the mutual promises, covenants and consideration set forth in this

Agreement, and upon the occurrence of the Effective Date, this Action together with the Settled

Claims of the Settlement Class shall be settled and compromised upon the terms and conditions

contained herein.

## I.    RECITALS

WHEREAS, Plaintiff filed an action captioned *Gray v. Cellco Partnership d/b/a Verizon*

*Wireless and Mobile Messenger Americas, Inc.*, No. 07-36302 (Broward County, FL) (the

"Complaint"), alleging claims for damages and injunctive and declaratory relief against Cellco

Partnership d/b/a Verizon Wireless ("Verizon") and Mobile Messenger arising out of the sale and

billing of allegedly unauthorized Mobile Content, such as ring-tones, news and information alerts, and other digital and electronic content to wireless telephone subscribers; and

WHEREAS, Mobile Messenger is engaged in the business of providing consulting, customer support, and premium SMS billing and reporting services to online merchants wishing to sell Mobile Content or other services via mobile subscription and mobile payments in a manner intended to safeguard consumer interests,

WHEREAS, Class Counsel have filed other putative class actions against other Wireless Carriers, Aggregators and Third Party Content Providers. In one such action, *McFerren v. AT&T Mobility LLC,* No. 2008-CV-151322 (Fulton County, GA), a settlement of all claims on a Nationwide basis for allegedly unauthorized charges for Mobile Content has received preliminary approval, and a fairness hearing is presently scheduled for December 8, 2008 (the "AT&T Settlement").

WHEREAS, other putative class actions have been filed by Class Counsel against Mobile Messenger alleging claims substantially similar to those alleged against Mobile Messenger in the Action. (the "Related Actions"); and

WHEREAS, Mobile Messenger has denied and continues to deny all Plaintiffs' claims in the Action and the Related Actions; and

WHEREAS, Class Counsel have conducted an examination and investigation of the facts and law relating to the matters set forth in the Action and Related Actions regarding the claims and potential defenses of Mobile Messenger; and

WHEREAS, the Parties have engaged in arms-length negotiations, including in person sessions, whereby they were able to reach this Agreement. The Plaintiff amended her Complaint,

STIPULATION OF SETTLEMENT

which is now captioned *Gray v. Mobile Messenger Americas, Inc. et al,* No. 07-36302. dismissing

Verizon Wireless and alleging federal and state claims for damages and injunctive relief against

Mobile Messenger and John Does and John Doe Corporations arising out of the sale and billing of

allegedly unauthorized Mobile Content.  The Action was subsequently removed to this Court; and

WHEREAS, based upon extensive analysis of the facts and the law applicable to Plaintiffs'

claims in the Action and Related Actions, and taking into account the burdens and expense of such

litigation, including the risks and uncertainties associated with protracted trials and appeals, as well

as the fair, cost-effective and assured method of resolving the claims of the Settlement Class, Class

Counsel have concluded that this Agreement provides substantial benefits to the Settlement Class

and the public as a whole, and is fair, reasonable, adequate and in the best interests of Plaintiff and

the Settlement Class; and

WHEREAS, Mobile Messenger has similarly concluded that this Agreement is desirable in

order to avoid the time, risk and expense of defending multiple and protracted litigations, and to

resolve finally, completely and globally the pending and potential claims of Plaintiff and the

Settlement Class, and thus to resolve all of the litigation regarding the allegations of the Settlement

Class in this Action and the Related Actions relating to the Settled Claims; and

WHEREAS, the Parties agree that all potential Settlement Class members shall have an

individual right to exclude him or herself from the Settlement Class, such that participation in the

Settlement Benefits provided by this Agreement shall be voluntary;

NOW, THEREFORE, the Parties stipulate and agree that any and all Settled Claims against

all Released Parties regarding in any manner the sale and billing of Mobile Content attributable to

Mobile Messenger shall be finally settled and resolved on the terms and conditions set forth in this

STIPULATION OF SETTLEMENT

Agreement, subject to Court approval of this Agreement, as a good faith, fair, reasonable and adequate settlement.

## II.    **DEFINITIONS**

As used in this Agreement, in addition to any definitions set forth elsewhere in this Agreement, the following terms shall have the meanings set forth below:

"*Action*" means the case captioned *Gray v. Cellco Partnership, etc. and Mobile Messenger Americas, Inc.*, No. 07-36302 (Broward County, FL), as amended and captioned *Gray v. Mobile Messenger Americas, Inc. and one or more John Does and one or more John Doe Corporations*, No. 07-36302 (Broward County, FL), and subsequently removed to the United States District Court for the Southern District of Florida.

"*Agreement*" means this Class Action Settlement Agreement (including all exhibits hereto).

"*Aggregators*" means an entity —such as VeriSign (m-Qube), mBlox, or Mobile Messenger—that acts as an intermediary between Third Party Content Providers and the Wireless Carriers.  Aggregators facilitate agreements whereby Third Party Content Providers can use the billing and collection mechanisms of the Wireless Carriers to charge Wireless Subscribers for Mobile Content.

"*Approved Claim*" means a claim by a member of the Settlement Class submitted on a Claim Form that is a timely (submitted before the Claims Deadline), truthful, and complete, signed under penalty of perjury, and that provides at the least the following information:  (a) the Wireless Subscriber's full name, current address, telephone number, the last 4 digits of a social security number (in the case of an individual) or the last 4 digits of a Taxpayer ID number (in the case of a business), and any e-mail address used in any communications with Mobile Messenger;

STIPULATION OF SETTLEMENT

(b) the wireless number for which a refund of an unauthorized Mobile Content charge is requested; (c) the total amount of the refund requested, along with the date, description of the charge and the amount of each Mobile Content charge claimed by the Claimant to be unauthorized; (d) a statement by the Claimant that the Mobile Content was unauthorized; (e) for each such charge for which a refund is requested, a statement by the Claimant that no refund was previously requested from any source and was not previously provided from any source. Any Claim Form that indicates that a Settlement Class member has submitted a claim for the same allegedly unauthorized Mobile Content charges as part of the AT&T Settlement will not become an Approved Claim until after final approval of the AT&T Settlement and a determination by the Claims Administrator that the charge stated therein has not previously been paid.

"*Claimant*" means a Person that submits a Claim Form for a Settlement Benefit.

"*Claim Form*" means the form attached hereto as Exhibit 1 as approved by the Court. The Claim Form shall state that there are other class action settlements relating to Mobile Content, including but not limited to the AT&T Settlement, and shall require Settlement Class members to state if they have submitted any other Claim Forms for the same Mobile Content charges. The Claim Form will further provide that although Wireless Subscribers may submit Claim Forms in each such class action settlement in which they are a class member, a Person will only receive a single refund. The Claim Form shall also authorize the Claims Administrator and Mobile Messenger to use the information contained therein to contact such Person's Wireless Carrier and the Claims Administrator for the AT&T Settlement to verify the information on the Claim Form, including that no refund was previously furnished for the charge for Mobile Content listed on the Claim Form.

STIPULATION OF SETTLEMENT

"*Claims*" means any and all claims, allegations, causes of action of whatever nature, whether legal, statutory or equitable in nature, whether sounding in contract, tort or otherwise, arising in any manner out of or relating to a charge to any Person for Mobile Content, including all Claims that were brought or could have been brought in the Action and/or the Related Actions.

"*Claims Administration Expenses*" means the expenses incurred by the Claims Administrator in handling Claim Forms submitted by Settlement Class members pursuant to this Agreement, including Notice Expenses.

"*Claims Administrator*" means Rosenthal & Company LLC, subject to approval by the Court to oversee the processing and payment of Settlement Class members' Claim Forms as set forth in this Agreement. Among other duties, the Claims Administrator shall have the power to contact the Claims Administrator in the AT&T Settlement, or any other settlement of class actions containing allegations of allegedly unauthorized charges for Mobile Content.

"*Claims Deadline*" means the date by which all Claims Forms must be received to be considered timely and shall be set as the date sixty (60) days after the entry of the Judgment. The Claims Deadline shall be clearly set forth in the Court's order granting final approval of this Agreement as well as on the front page of all Claims Forms.

"*Class Counsel*" means attorneys Jay Edelson, Myles McGuire, and Ryan D. Andrews of KamberEdelson, LLC and "*Liaison Class Counsel*" of David P. Healy of the Law Offices of David P. Healy.

"*Class Representative*" shall mean the named plaintiffs in this Action and the Related Actions.

**STIPULATION OF SETTLEMENT**

"*Court*" means the United States District Court for the Southern District of Florida.

"*Defendant*" means Mobile Messenger.

"*Effective Date*" means the date, if any, on which the Judgment entered pursuant to this Agreement becomes final and not subject to appeal under the applicable law or, in the event of a timely appeal from the entry of the Judgment, the date on which such appeal is resolved affirming the Judgment in all material respects and the Judgment is not subject to further judicial review.

"*Fairness Hearing*" means the hearing to be conducted by the Court to determine the fairness, adequacy and reasonableness of this Agreement in accordance with applicable jurisprudence.

"*Fee Award*" means the amount of attorneys' fees and reimbursement of costs awarded by the Court to Settlement Class Counsel up to the Maximum Fee Amount.

"*Judgment*" means the Order and Final Judgment to be entered by the Court, approving this Agreement, without modifications that are unacceptable to the Plaintiff or Defendant, as fair, adequate and reasonable in accordance with applicable jurisprudence, confirming the certification of the Settlement Class, and issuing such other findings and determinations as the Court or the Parties deem necessary and appropriate to effectuate the terms of this Agreement.

"*Maximum Fee Amount*" means the limit of the amount of attorneys' fees and reimbursement of costs to be requested by Settlement Class Counsel, or one million two hundred twenty-five thousand dollars ($1,225,000.00).

"*Mobile Content*" refers to content, applications, and goods and services, such as ring tones, wallpaper, news and information alerts, and other digital and electronic content charged to the wireless bill of a Wireless Subscriber.

STIPULATION OF SETTLEMENT

"*Mobile Messenger*" means Mobile Messenger Americas, Inc., and all of its current and former parents, subsidiaries and affiliates, predecessors, successors and assigns, as well as directors, officers, employees, agents, and shareholders of each of them.

"*Mobile Messenger's Counsel*" means Philip F. Atkins-Patterson of Sheppard Mullin Richter & Hampton LLP.

"*Nationwide*" means the 50 United States of America and its territories.

"*Notice Date*" means the date upon which Settlement Class Notice is first disseminated to the Settlement Class.

"*Notice Expenses*" means all reasonable costs and expenses expended in the execution of the Notice Plan, including (i) all reasonable costs and expenses incurred in connection with preparing, printing, mailing, disseminating, posting, promoting, emailing, internet hosting and publishing the Settlement Class Notice to the Settlement Class of the proposed settlement, identifying and notifying members of the Settlement Class and informing them of the proposed settlement and (ii) any necessary notice and notice-related expenses.

"*Notice of Intention to Appear and Object*" is the written communication that may be filed by a Settlement Class member in order to object to the approval of this Agreement.

"*Notice Plan*" means the proposed plan of disseminating notice to members of the Settlement Class of this Agreement and the Fairness Hearing.

"*Opt-Out Period*" means the period for a Settlement Class Member to file a Request For Exclusion to be set by the Court in this action. The deadline for filing a Request For Exclusion will be clearly set forth in the Settlement Class Notice.

"*Person*" means any individual, corporation, trust, partnership, Limited Liability Company

STIPULATION OF SETTLEMENT

or other legal entity and their respective predecessors, successors or assigns.

"*Plaintiff*" means Lisa Gray and the Settlement Class.

"*Preliminary Approval*" means the Court's conditional certification of the Settlement Class, preliminary approval of this Agreement, and approval of the form and methods of dissemination of the Settlement Class Notice and the Notice Plan.

"*Related Actions*" means the following pending actions:  (a) *Robert Walsh v. Mobile Messenger Americas, Inc. and mBlox, Inc.,* Case No. BC 385961 (Los Angeles County, CA); (b) *Jason and Nancy Batanides v. 2WayTraffic Mobile USA, Inc. and Mobile Messenger Americas, Inc.,* Case No. BC392123 (Los Angeles County, CA); and (c) *Louis Jiran and Delores Gresham v. AT&T Mobility, LLC, et al.*, Case No. Civ. A No. 08-00013 (N.D. Cal.).

"*Released Party*" means Mobile Messenger, the Wireless Carriers, the Aggregators, the Third Party Content Providers, and the John Does and John Doe Corporations (whose identities are known to Mobile Messenger), as well as their marketing agents and/or licensors and including their respective predecessors, successors, assigns, parents, subsidiaries, divisions, departments, and any and all of their past, present and future officers, directors, employees, stockholders, partners, agents, servants, successors, attorneys, representatives, subrogees and assigns of any of the foregoing, including but not limited to Funbox Pty Ltd, Comtech Media Pty Ltd., Trans World Sales Pty. Ltd. Vflair Pty Ltd., CommandM Pty Ltd., Entertone Pty Ltd., Mobilefinger Pty Ltd., Cellular Ink Pty Ltd., Zhenya Enterprises Pty Ltd., Skycell International Pty Ltd., Cellular Dreams (USA) Pty Ltd.

"*Releasing Party*" means Plaintiff and each member of the Settlement Class and any Person claiming by or through him/her/it as his/her/its spouse, child, heir, associate, co-owner, attorney,

STIPULATION OF SETTLEMENT

agent, administrator, devisee, predecessor, successor, assignee, representative of any kind, shareholder, partner, director, employee, or affiliate.

*"Remaining Funds"* means the amount of the Settlement Fund remaining after the approved payments of Approved Claims to the Settlement Class members, Claims Administration Expenses, incentive awards to Class Representatives, and the Fee Award.

*"Request For Exclusion"* is the written communication on behalf of a Settlement Class member that must be filed with the Claims Administrator that is postmarked on or before the end of the Opt Out Period if a Settlement Class member wishes to be excluded from the Settlement Class.

*"Settlement Benefit"* means the benefits a Settlement Class member may receive pursuant to this Agreement.

*"Settled Claim"* means any claim, liability, right, demand, suit, matter, obligation, damage, loss or cost, action or cause of action, of every kind and description that the Releasing Party has or may have, including assigned claims, whether known or unknown or suspected to exist, asserted or unasserted, latent or patent, that is, has been, could have been or in the future might be asserted by the Releasing Party either in the Action or in any other action or proceeding in this Court, or any other court, tribunal or forum, regardless of legal theory, and regardless of the type or amount of relief or damages claimed, against any of the Released Parties arising out of or in any manner relating to a charge to any Wireless Subscriber for Mobile Content associated in any manner with Mobile Messenger, including all claims that were brought or could have been brought in the Action and/or the Related Actions and involving any allegation or contention on any basis that such charge was unauthorized. Settled Claims include, by are not limited to, *inter alia*, allegations or contentions

that the Mobile Content charges associated with Mobile Messenger were the result of fraudulent or misleading marketing or billing practices, "cramming," or that they were the result of the imposition of charges for Mobile Content authorized by the previous owner of a mobile number, i.e. "recycled" numbers. Without limiting the generality of the foregoing, Settled Claims shall include, with regard to the foregoing subject matter:

(1)    any class, group, collective or individual claim for any breach or violation of any federal or state statute or regulation, local ordinance, case law, common law or other law;

(2)    any claim for breach of any duty imposed by law, by contract or otherwise; and

(3)    any claim for damages, injunctive relief, declaratory relief, class damages or relief, penalties, punitive damages, exemplary damages, restitution, rescission or any claim for damages based upon any multiplication or enhancement of compensatory damages associated with the above.

"*Settlement Class*" shall consist of all current and former Wireless Subscribers Nationwide who, at any time from January 1, 2005 to the Notice Date, were billed and paid for Mobile Content associated with Mobile Messenger. Excluded from the Class are the following: the Defendant, the Claims Administrator, and any of aforementioned respective parent, subsidiary, affiliate or control person of the Defendant, as well as the officers, directors, agents, servants, or employees of the Defendant, any trial judge presiding over this case over any of the actions which comprise the Action and/or the Related Actions, and the immediate family members of any such Person(s).

"*Settlement Class Notice*" means the form of Court-approved notice (or notices) of this Agreement that is directed to the Settlement Class. The Parties have proposed that the Court approve the notices in the form attached to this Agreement as Exhibits 2-3.

STIPULATION OF SETTLEMENT

"*Settlement Fund*" means the fund from which Mobile Messenger shall pay all Approved Claims, Claims Administration Expenses, incentive awards to Class Representatives, and the Fee Award. The amount of the Settlement Fund is twelve million dollars ($12,000,000); provided, however, that if the Court in the AT&T Settlement gives final approval to the AT&T Settlement before the Court gives final approval of this Agreement, then the Settlement Fund will be nine million dollars ($9,000,000). Subject to the occurrence of the Effective Date, the Settlement Fund represents the limit and extent of Mobile Messenger's obligations under this Agreement. Upon the occurrence of the Effective Date, Mobile Messenger is obligated to fund the Settlement Fund only on an "as needed" basis to pay the Approved Claims required by this Agreement. All Remaining Funds are the property of Mobile Messenger.

"*Special Master*" means an independent person agreed upon by the Parties to evaluate those Claim Forms that have been challenged by Mobile Messenger or rejected by the Claims Administrator after an initial appeals process.

"*Third Party Content Providers*" means Persons other than Mobile Messenger who advertise, offer, and/or sell Mobile Content, including Mobile Content subscriptions, directly to Wireless Subscribers and who utilize the billing or other services provided by Mobile Messenger. For the avoidance of doubt, "Third Party Content Providers" also comprises all Persons, including but not limited to, media companies that sold advertising space or opportunities to any Released Party or any of their clients or customers, which Persons include, but are not limited to, Google, Inc., AOL LLC, Time Warner, Inc., Yahoo!, Inc., News Corporation (including without limitation its divisions MySpace, Fox Interactive Media and IGN Entertainment), Microsoft Corporation and Facebook, Inc., Cyberplex, Inc., CX Digital Media,

STIPULATION OF SETTLEMENT

Inc., CanadianSponsors.com, Inc., Adbrite, Inc., PV Media Group, Inc., DSNR Media Group Ltd., Viveli, Inc., CPX Interactive LLC., NeverBlue Media, Inc., Hydra Media LLC, Stepping Stone Entertainment LLC, ValueClick, Inc., Traffic Venue, Inc., and Etology Inc.

*"Wireless Carriers"* means any entity that offers transmission services to users of wireless devices (handheld computers and telephones) through radio frequency signals rather than through end-to-end wire communication, such as AT&T Mobility, Verizon, T-Mobile, Inc., Sprint Nextel Corp, and Alltel Wireless.

*"Wireless Subscriber"* means any Person who entered into a service agreement with any Wireless Carriers or otherwise paid for the wireless service from such Wireless Carriers.

## III.    **FOR SETTLEMENT PURPOSES ONLY**

**A.**    This Agreement, whether or not consummated, and any actions or proceedings taken pursuant to this Agreement, are for settlement purposes only, and neither the fact of, any provision contained in this Agreement, nor any action taken hereunder shall constitute, be construed as, or be admissible in evidence as any admission of the validity of any claim or any fact alleged by Plaintiff in this Action, the Related Actions or in any other pending or future action, or of any wrongdoing, fault, violation of law, or liability of any kind on the part of Mobile Messenger or admission by Mobile Messenger of any claim or allegation made in this Action or in any other pending or future action, nor as an admission by Plaintiff, Settlement Class members or Class Counsel of the validity of any fact or defense asserted against them in this Action or in any pending or future other action.

**B.**    This Agreement is without prejudice to the rights of Mobile Messenger to: (i) oppose class certification in this Action should this Agreement not be approved or implemented for any reason; (ii) oppose certification in any other proposed or certified class action, including the Related

Actions; or (iii) use the certification of the Settlement Class to oppose certification of any other proposed or existing class arising out of or in any manner related to the Settled Claims.

## IV.     REQUIRED EVENTS AND COOPERATION BY THE PARTIES

### A.     Preliminary and Final Approval

Promptly after execution of this Agreement, Class Counsel shall submit this Agreement to the Court for its Preliminary Approval and shall move the Court for one or more orders, which by their terms shall:

1.     Appoint the Class Representatives in the Action as the representatives of the Settlement Class;

2.     Appoint Class Counsel;

3.     Preliminarily and conditionally certify the Settlement Class under Federal Rule of Civil Procedure 23 for settlement purposes only and preliminarily approve this Agreement for purposes of issuing notice to the Settlement Class;

4.     Approve the form and contents of the Settlement Class Notice and the method of its dissemination to members of the Settlement Class;

5.     Provide for appropriate confirmatory discovery; and

6.     Schedule the Fairness Hearing to review comments and/or objections regarding this Agreement, to consider its fairness, reasonableness and adequacy, and the application for an award of attorneys' fees and reimbursement of expenses and to consider whether the Court shall issue a Judgment approving this Agreement, granting Class Counsel's application for fees and expenses, and dismissing the Action with prejudice.

### B.     Cooperation

STIPULATION OF SETTLEMENT

The Parties shall, in good faith, cooperate, assist and undertake all reasonable actions and steps in order to accomplish these required events on the schedule set by the Court.

### C.    Certification of Settlement Class

For settlement purposes only, Mobile Messenger and the Class Representative stipulate to the certification of the Settlement Class, which agreement is contingent upon the occurrence of the Effective Date. Should the Effective Date not occur, this Agreement may not be used by the Parties for any purpose related to class certification in this Action or any other action, including the Related Actions.

### V.    <u>SETTLEMENT BENEFITS</u>

### A.    Service Improvements and Assurances

Mobile Messenger has agreed that it shall, as soon as practicable but in no event later than a date forty-five (45) days after Preliminary Approval of this Agreement is entered in this Action, institute the following:

1.    Mobile Messenger agrees to continue and enhance its refund policy through which all Wireless Subscribers who contact customer service are informed of their option to have Mobile Messenger unsubscribe them from Mobile Content of which they complain.

2.    Mobile Messenger agrees that subsequent to the deadline for submission of Claim Forms in the Action, it will contract with an independent company to perform audits of both the procedure through which Wireless Subscribers contact Mobile Messenger with requests to cancel subscriptions for Mobile Content or with requests for refunds of unauthorized charges. To the extent that such audits reveal systematic flaws, the Defendant agrees to correct deficiencies in its policies.

3.    Mobile Messenger must certify that they remain in compliance with the recycled

number requirements established by the Mobile Marketing Association ("MMA"), an industry consortium with 450 members, including agencies, advertisers, hand-held device manufacturers, carriers and operators, retailers, software providers, and service providers, in effect as of the Effective Date of this Agreement.

The measures set forth in this subsection consist of actions that Mobile Messenger itself will undertake, and by agreeing to undertake them the Parties agree that such measures do not obligate or make Mobile Messenger responsible for the acts or omissions of others, including without limitation any Aggregators, Wireless Carriers, or Third Party Content Providers.

### B.    Refund Benefit

1.    *Refunds.*  Subject to the occurrence of the Effective Date, Mobile Messenger shall refund from the Settlement Fund any current or former Wireless Subscriber who timely submits a valid Claim Form and has an Approved Claim as provided in this Agreement.

2.    *Subscription Charge Claims.*  With respect to any Wireless Subscriber Claims relating to charges associated with Mobile Content sold by subscription, the amount of that portion of a Settlement Class member's Approved Claim shall not exceed an amount equal to three times such Settlement Class member's monthly subscription charge.

## VI.    CLAIMS PROCESS

### A.    Claims Administrator's Duties

The Claims Administrator shall, under the supervision of the Court, administer the relief provided by this Agreement by resolving Claim Forms in a rational, responsive, cost effective and timely manner.  The Claims Administrator shall maintain reasonably detailed records of its activities under this Agreement.  The Claims Administrator shall maintain all such records as

STIPULATION OF SETTLEMENT

required by applicable law in accordance with their business practices and such records will be made available to Class Counsel and Mobile Messenger's Counsel. The Claims Administrator shall also provide reports and other information to the Court as the Court may require. The Claims Administrator shall provide Class Counsel and Mobile Messenger's Counsel with information concerning notice, administration and implementation of the Settlement. Should the Court request, the Parties, in conjunction with the Claims Administrator, shall submit a timely report to the Court summarizing the work performed by the Claims Administrator, including a report of all amounts from the Settlement Fund paid to members of the Settlement Class on account of Approved Claims. The Claims Administrator shall cause a website to be created containing claims information and relevant documents. The Parties shall agree on all information and documents to be posted on this website.

**B.      Written and Electronic Claims Submission**

Settlement Class members are entitled to Settlement Benefits through submission of a Claim Form and the Claims Administrator's determination that such Settlement Class member has an Approved Claim. The Claims Administrator shall not commence its determination whether a Claim Form represents an Approved Claim until after the occurrence of the Effective Date. The claims process shall be conducted online through the website administrated by the Claims Administrator. If a Claim Form is submitted electronically, it must be posted on-line prior to the Claim Deadline. Any Class member unable to complete an online Claim Form may call a toll free number, provide their name and address, and receive a paper Claim Form. Paper Claim Forms may be mailed to the Claims Administrator and must be postmarked on or before the Claims Deadline. The Claims Administrator shall reject any Claim Forms that are not timely in accordance with the

above; provided, however, that nothing in this provision shall be construed to prevent the Claims Administrator, in its discretion, from permitting a Settlement Class member to remedy informational deficiencies in such Settlement Class member's Claim Form if otherwise timely.

**C.     Processing and Validation of Claim Forms**

**1.     *Claims Must be for Unauthorized Charges*.**  All Claim Forms shall be validated by the Claims Administrator to establish that the Person submitting the Claim Form has an Approved Claim.

**2.     *Claims Administrator Review*.**  The Claims Administrator may reject a Claim Form, or any part of a claim for a refund reflected therein, where there is evidence of customer abuse or fraud or where *indicia* of authorization for Mobile Content charges are present.  For example, the Claims Administrator may reject a Claim Form or any portion of a claim contained therein if it appears that the Claimant has previously received a refund from any source (including, but not limited to Mobile Messenger, a Wireless Carrier, an Aggregator, a Third Party Content Provider, or through the AT&T Settlement) for the same type of charge that is being requested for refund in the Claim Form, provided that such charges do not arise from a subscription cancelled by the Wireless Subscriber and not reactivated by an authorized user on the Claimant's account.

**3.     *Review for Indicia of Authorization*.**  The Claims Administrator shall make the determination of whether a Claim Form is for an Approved Claim by a totality of the circumstances and shall have the right to request additional information from the Claimant.  To determine whether the charge was unauthorized, the Claims Administrator may review, *inter alia*, the Claimant's Mobile Content purchase history, including but not limited to the following:

(a)     whether a refund was previously issued for the charges associated with a claim(s)

STIPULATION OF SETTLEMENT

stated in the Claim Form;

(b)    whether refunds were previously given for other Mobile Content charges associated with the wireless number stated on the Claim Form;

(c)    if refunds were previously given, the amount of the refunds given for the charges associated with the wireless number stated on the Claim Form;

(d)    the number and frequency of similar Mobile Content charges associated with the wireless number stated on the Claim Form;

(e)    the amount of similar charges associated with the wireless number stated on the Claim Form;

(f)    the existence of charges from a different wireless number on the same account identified on the Claim Form; and

(g)    the reputation of the source of the Mobile Content;

(h)    the nature and type of the Mobile Content;

(i)    the number of telephone lines associated with the account identified on the Claim Form;

(j)    a comparison of the date the Mobile Content was ordered and the date the account was opened; and

(k)    any explanation given by the Wireless Subscriber.

4.    *Subscription Charges*. As provided above, the Settlement Benefit for any Approved Claim made for a recurring charge that was billed and paid for by a Claimant for more than three successive billing cycles shall be limited to three times the amount of such recurring charges appearing on a monthly basis. For example, if a Claimant requests refund for four months

STIPULATION OF SETTLEMENT

of a recurring monthly charge, the Claims Administrator may refund up to three months of the recurring charge, provided that it is an Approved Claim, but will reject the claim for refund of the fourth month of such charge.

      5.      ***Previously Refunded Amounts.***  The Claims Administrator shall not provide a Settlement Benefit for any charge for Mobile Content associated with a Claim Form where such amount has been previously refunded by Mobile Messenger, any Wireless Carrier, any Aggregators, any Third Party Content Providers, or through the AT&T Settlement.

      6.      ***Processing of Multiple Claims.***  The Claims Administrator shall separate all Claim Forms that indicate a Settlement Class member has previously submitted a claim form for the same Mobile Content charges in the AT&T Settlement.  The Claims Administrator shall hold in abeyance the payment of the Settlement Benefit on account of such Claim Form until such time, if ever, that the claim stated on the Claim Form becomes an Approved Claim.

**D.     Resolution Procedure For Challenged Or Rejected Claims**

      1.      ***Abuse of Discretion by Claims Administrator.***  Both Mobile Messenger and Plaintiff's Counsel shall have the right to challenge a Claim Form submitted by Settlement Class members and such challenges will be timely decided by a Special Master, to be jointly agreed to by the Parties.  The Parties agree that the Claims Administrator shall thereafter follow the decision of the Special Master resulting from any such challenge.

      2.      ***Challenging Individual Claims.***

      a.      Mobile Messenger may challenge any claim, and the Claim Form will disclose the right of Mobile Messenger to challenge claims.

**STIPULATION OF SETTLEMENT**

      b.     Mobile Messenger shall have thirty (30) days to dispute any Claim Form for a Settlement Benefit approved by the Claims Administrator. Any Settlement Class member whose Claim Form for a Settlement Benefit is denied, in whole or in part, by the Claims Administrator shall also have thirty (30) days to dispute the denial of the claim. In either case, each party shall receive written notice that the denial/approval of the Claim Form shall be provided an "Appeal Form" wherein the appealing party must provide a detailed written explanation as to why the Claims Administrator erred in its denial/approval of the Claim Form for a Settlement Benefit.

      c.     All Appeal Forms will be submitted to an "Appeal Panel" that will be comprised of three (3) members: one (1) member to be appointed by Mobile Messenger; one member (1) to be appointed by the Claims Administrator; and one (1) member to be appointed by Plaintiff's Counsel. The Appeal Panel shall meet at regularly determined times to decide all appeals based solely on the Appeal Forms submitted and Mobile Messenger records. There will be no in-person hearings of any kind. In order to overrule the decision of the Claims Administrator to approve/deny a Claim Form for a Settlement Benefit, the party submitting the appeal must garner two (2) votes from the Appeal Panel.

      d.     If the Appeal Panel affirms the decision of the Claims Administrator, the losing party has a right to one final appeal to have the issue of the denial/approval of the Claim Form determined by a Special Master, to be jointly agreed to by the Parties. All decisions regarding the denial/approval of any Claim Form submitted and ruled upon by the Special Master are final.

## VII.   <u>SETTLEMENT PAYMENTS</u>

STIPULATION OF SETTLEMENT

1.      Provided that the Effective Date occurs, Mobile Messenger shall be solely responsible for making payments from the Settlement Fund.

2.      Settlement Class members shall have until the Claims Deadline to submit a Claim Form for an Approved Claim for payment from the Settlement Fund as follows: after the payment of Claims Administration Expenses, the Fee Award,, and incentive awards, Settlement Class members will receive a Settlement Benefit being the lesser of the full amount of the Approved Claim or the *pro rata* amount of the Approved Claim as calculated in paragraph 3 below.

3.      If the total amount Approved Claims would exceed the amount in the Settlement Fund after payment of Claims Administration Expenses, the Fee Award, and incentive awards, then each Settlement Class member with an Approved Claim shall instead receive a *pro rata* share of the amount of the Settlement Fund available after payment of such amounts.

4.      The Remaining Funds are the property of Mobile Messenger. In no event will the Remaining Funds constitute abandoned or unclaimed property and Mobile Messenger is entitled to all such Remaining Funds.

5.      Provided that the Effective Date has occurred, the Claims Administrator shall pay all Approved Claims by check and mail them to the Claimant via first-class mail within three months of the Claims Deadline, or the earliest date thereafter when a claim for a Settlement Benefit becomes an Approved Claim.

## VIII.   NOTICE TO THE CLASS

A.      Upon Preliminary Approval of this Agreement (and as the Court may direct), the Parties (or their designee) shall cause the Settlement Class Notice describing the Fairness Hearing

and the terms of the settlement embodied herein to be disseminated to potential Settlement Class members as provided herein. Such notice shall comport with due process and be effectuated pursuant to a Notice Plan.

     **B.**    The Notice Plan shall include:

        1.    Publication Notice shall be made by purchasing a one-day 1/8th page ad space in the New York Daily News, the Los Angeles Times, the Chicago Sun Times, the Philadelphia Inquirer, the Houston Chronicle, the Miami Herald, the Washington Post, the Atlanta Journal-Constitution, the Boston Globe, USA TODAY, and Rolling Stone Magazine, to be published within forty five (45) days of receipt of Preliminary Approval of this Agreement. The text of such notice is provided in Exhibit 2, but may be modified as appropriate to fit space limitations.

        2.    Press release. The Parties shall prepare and distribute a joint press release to local, national, and syndicated news organizations discussing the Agreement.

        3.    Internet Publication Notice. Immediately following Preliminary Approval of the Settlement, notice shall be provided on the website to be administered by the Claims Administrator. The Claims Administrator shall expend an amount not to exceed $25,000 on promoting the website notice. The text of such notice is provided in Exhibit 3.

     **C.**    The Settlement Class Notice shall advise Settlement Class members of their rights, including the right to opt-out and/or comment or object upon the Agreement or its terms. The Settlement Class Notice shall provide that any objection to this Agreement, and any papers submitted in support of said objection, shall be received by the Court at the Fairness Hearing, only if, on or before a date approved by the Court and to be specified in the Settlement Class Notice, the Person making an objection shall file notice of his or her intentions to do so and shall file copies of

STIPULATION OF SETTLEMENT

such papers he or she proposes to submit at the Fairness Hearing with the Clerk of the Court and mail, hand or overnight delivery service to both Class Counsel and Mobile Messenger's Counsel on or before the date specified in the Settlement Class Notice.

**D.**    The Settlement Class Notice will state that there are other class action settlements, including the AT&T Settlement, and any Person is entitled to submit a claim form in any class action settlement in which they are a member of the settlement class. The Settlement Class Notice will also clearly state that any Person is entitled to only one refund for the same allegedly unauthorized charge for Mobile Content.

**E.**    The cost of the Settlement Class Notice, the Notice Plan and the dissemination of the Settlement Class Notice are Claims Administration Expenses to be paid from the Settlement Fund.

**IX.    OPT-OUT AND OBJECTIONS**

**A.**    A member of the Settlement Class may opt out of the Settlement Class at any time during the Opt-Out Period, as will be outlined in the Court-approved Settlement Class Notice. Opt-outs must be post-marked by a date approved by the Court and specified in the Settlement Class Notice. In order to exercise the right to opt out, the Settlement Class member must complete and return a Request For Exclusion to Class Counsel and Mobile Messenger's Counsel during the Opt-Out Period. Except for those Settlement Class members who have properly opted out, all Settlement Class members will be bound by this Agreement and the Judgment to be entered following final approval of this Agreement. Any Settlement Class member who elects to opt out of the Settlement Class shall not (i) be bound by any orders or Judgment entered in this Action; (ii) be entitled to relief under this Agreement; (iii) gain any rights by virtue of this Agreement; or (iv) be entitled to object to any aspect of this Agreement. The Request For Exclusion must be personally signed by the Person

**STIPULATION OF SETTLEMENT**

requesting exclusion. So called "mass" or "class" opt-outs shall not be allowed.

**B.** Any Settlement Class member who intends to object to this Agreement must include his/her name and address, include all arguments, citations, and evidence supporting the objection and that they are a member of the Settlement Class, and provide a statement whether the objector intends to appear at the Fairness Hearing, either with or without counsel. Objections must be post-marked by a date approved by the Court and specified in the Settlement Class Notice. Any Settlement Class member who fails to timely file a written objection and notice of his or her intent to appear at the Fairness Hearing pursuant to this paragraph or as detailed in the Settlement Class Notice, shall not be permitted to object to this Agreement at the Fairness Hearing, and shall be foreclosed from seeking any review of this Agreement by appeal or other means.

**X.    TERMINATION OF AGREEMENT**

**A.** The Named Representative in this Action, on behalf of the Settlement Class, or Mobile Messenger, shall have the right to terminate this Settlement by providing written notice of their election to do so ("Termination Notice") to all other Parties hereto within thirty (30) days, whichever is later, of: (i) the Court's refusal to grant Preliminary Approval of this Agreement in any material respect; (ii) the Court's refusal to grant final approval of this Agreement in any material respect; (iii) the Court's refusal to enter the final Judgment in this Action in any material respect; (iv) the date upon which the final Judgment is modified or reversed in any material respect by the Court of Appeals or the Supreme Court; or (v) the date upon which an alternative form Judgment is modified or reversed in any material respect by the Court of Appeals or the Supreme Court.

**B.** If more than three hundred (300) Settlement Class members timely file valid Requests

For Exclusion, Mobile Messenger in the exercise of its sole discretion shall have the right to terminate this Agreement. Mobile Messenger shall exercise such termination, if at all, no later than ten (10) business days after being advised by Class Counsel in writing of the number of valid Requests for Exclusion. In the event Mobile Messenger exercises its right of termination, Mobile Messenger shall promptly notify Class Counsel and cause the Claims Administrator to notify the Settlement Class by posting information on the website and e-mailing information to those Settlement Class members who provided an e-mail address to the Claims Administrator.

  **C.**  If the amount of Approved Claims exceeds one hundred fifty percent (150%) of the Settlement Fund, Plaintiff shall have the exclusive right to void this Settlement Agreement. In order to make such an election, Plaintiff must so notify Mobile Messenger's Counsel in writing of their decision fifteen (15) business days prior to the Judgment.

**XI.**  **EXCLUSIVE REMEDY; DISMISSAL OF ACTION; JURISDICTION OF COURT**

  **A.**  This Agreement shall be the sole and exclusive remedy of Settlement Class members against any Released Party relating to any and all Settled Claims. No Released Party shall be subject to liability or expense of any kind to any Settlement Class member who has not timely filed a valid Request For Exclusion with respect to any Settled Claim. Upon the occurrence of the Effective Date, each and every Settlement Class member shall be permanently barred and enjoined from initiating, asserting and/or prosecuting any Settled Claim(s) against any Released Party in any court, tribunal , forum or proceeding.

  **B.**  The Parties agree that the Court shall retain exclusive and continuing jurisdiction over the Action, the Parties, Settlement Class members, and the Claims Administrator in order to interpret and enforce the terms, conditions, and obligations under this Agreement.

**STIPULATION OF SETTLEMENT**

## XII.  **RELEASES**

**A.**    Upon the occurrence of the Effective Date, each Settlement Class member who has

not timely filed a valid Request For Exclusion, shall be deemed to have and hereby does release and

forever discharge each Released Party from liability for any and all Settled Claims.

**B.**    Upon the occurrence of the Effective Date, for good and valuable consideration,

Plaintiff, on behalf of herself and the Settlement Class and as the representative of the Settlement

Class, shall expressly, and all Settlement Class Members shall be deemed to have, and by operation

of the final Judgment as provided in this Agreement shall have, fully, finally, and forever expressly

waived and relinquished with respect to Settled Claims, to the fullest extent permitted by law, any

and all provisions, rights, and benefits of section 1542 of the California Civil Code and any and all

similar provisions, rights, and benefits conferred by any law of any state or territory of the United

States or principle of common law that is similar, comparable, or equivalent to section 1542 of the

California Civil Code, which provides: "A general release does not extend to claims which the

creditor does not  know or suspect to exist in his or her favor at the time of executing the release,

which if known by him or her must have materially affected his or her settlement with the debtor."

## XIII.  **CLASS COUNSEL FEES, PLAINTIFF'S INCENTIVE AWARD, AND COSTS**

**A.    The Fee Award.** In addition to the consideration provided to the Claimants pursuant

to this Agreement, Mobile Messenger has agreed to pay Class Counsel, subject to Court approval, an

amount up to one million two hundred twenty-five thousand dollars ($1,225,000) in attorneys' fees

and reimbursement of costs (the "Maximum Fee Amount"). Mobile Messenger agrees that the

Maximum Fee Amount is fair and reasonable and will not object to or otherwise challenge Class

Counsel's application for reasonable attorneys' fees and for reimbursement of costs and other

STIPULATION OF SETTLEMENT

expenses if limited to the Maximum Fee Amount. Class Counsel has, in turn, agreed not to seek more than the Maximum Fee Amount from the Court. The amount so awarded by the Court shall be referred to as the "Fee Award."

    **B.**    **Payment of the Fee Award.** Notwithstanding any appeal or objection or challenge to the Court's final approval of this Agreement, including the Fee Award, provided Class Counsel provides adequate security for the recovery of amounts paid in the event of reversal on appeal of the final approval of this Agreement, Mobile Messenger shall pay (by wire) from the Settlement Fund to Class Counsel the Fee Award approved by the Court within thirty (30) days after entry of the order approving such award of fees or reimbursement of expenses. The adequacy of the security proffered by Class Counsel shall be determined by Mobile Messenger in its sole discretion. Absent the provision of acceptable security, Mobile Messenger shall pay the Fee Award to Class Counsel by wire transfer within thirty (30) days of the Effective Date.

    **C.**    **Class Representatives' Incentive Award:** In addition to any award under the Agreement, and in recognition of their efforts on behalf of the Class, the Class Representatives shall, subject to Court approval, each receive an award of the sum of one thousand dollars ($1,000) as appropriate compensation for their time and effort serving as the Class Representatives in this litigation. Mobile Messenger shall pay such amount from the Settlement Fund to the Class Representatives, in care of Class Counsel, within thirty (30) days after the Effective Date.

**XIV.**  **SETTLEMENT APPROVAL ORDER**

    **A.**    This Agreement is subject to and conditioned upon the issuance by the Court of the Judgment which finally certifies the Settlement Class and grants final approval of this Agreement in accordance with applicable jurisprudence, and providing the relief specified below, which relief shall

be subject to the terms and conditions of this Agreement, the occurrence of the Effective Date and the Parties' performance of their continuing rights and obligations hereunder. Such Judgment shall:

1.   Confirm the certification, for settlement purposes only, of the Settlement Class under applicable jurisprudence;

2.   Dismiss all complaints in the Action as with prejudice and without costs;

3.   Decree that neither the Judgment nor this Agreement constitute an admission by Mobile Messenger of any liability or wrongdoing whatsoever;

4.   Bar and enjoin all Settlement Class members from asserting against any Released Party any and all Settled Claims which the Settlement Class member had, has, or may have in the future;

5.   Release each Released Party from the Settled Claims which any Settlement Class members have, had, or may have in the future, against such Released Party;                                                              .

6.   Determine that this Agreement is entered into in good faith, is reasonable, fair and adequate, in the best interest of the Class; and

7.   Preserve the Court's continuing and exclusive jurisdiction over the Parties to this Agreement, including Mobile Messenger and all Settlement Class members, to administer, supervise, construe and enforce this Agreement in accordance with its terms for the mutual benefit of the Parties, but without affecting the finality of the Judgment.

**B.**    In the event that the Court or any appellate court enters an order altering this Agreement in a way that materially and adversely affects Mobile Messenger or Plaintiff, within five

**STIPULATION OF SETTLEMENT**

(5) business days from the date the Court or appellate court enters such an order, Mobile Messenger or Plaintiff, as the case may be, may terminate this Agreement by giving written notice of its intent to do so to the opposing party's counsel.

## XV.    REPRESENTATIONS AND WARRANTIES

Mobile Messenger represents and warrants (i) that it has all requisite corporate power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby; (ii) that the execution, delivery and performance of this Agreement and the consummation by it of the actions contemplated herein have been duly authorized by all necessary corporate action on the part of Mobile Messenger; and (iii) that this Agreement has been duly and validly executed and delivered by Mobile Messenger and constitutes its legal, valid and binding obligation.

## XVI.    FINAL APPROVAL OF THE AT&T SETTLEMENT

This Agreement is independent of, and in no way contingent upon, the final approval of the AT&T Settlement.

## XVII.    MISCELLANEOUS PROVISIONS

### A.    Entire Agreement

This Agreement, including all exhibits hereto, shall constitute the entire Agreement among the Parties with regard to the subject matter of this Agreement and shall supersede any previous agreements, representations, communications and understandings among the Parties with respect to the subject matter of this Agreement. This Agreement may not be changed, modified, or amended except in writing signed by all Parties, subject to Court approval. The Parties contemplate that, subject to Court approval, the exhibits to this Agreement may be modified by subsequent Agreement

of Mobile Messenger and Class Counsel prior to dissemination to the Class.

**B.     Governing Law**

This Agreement shall be construed under and governed by the laws of the State of Florida, applied without regard to laws applicable to choice of law.

**C.     Execution by Counterparts**

This Agreement may be executed by the Parties in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Facsimile signatures or signatures sent by e-mail shall be treated as original signatures and shall be binding.

**D.     Confirmatory Discovery**

In addition to the discovery received and investigation conducted by Class Counsel, Mobile Messenger has provided to Class Counsel reasonable additional discovery and information as necessary to confirm the material representations made by Mobile Messenger which form the basis of this Agreement. Should the occasion arise, the Parties shall cooperate in seeking any third-party discovery as may be necessary and appropriate, which additional discovery is to be completed prior to the Fairness Hearing.

**E.     Notices**

Any notice, instruction, application for Court approval or application for Court orders sought in connection with this Agreement or other document to be given by any Party to any other Party shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, if to Mobile Messenger to the attention of Mobile Messenger's respective representatives and to Class Counsel on behalf of Class Members, or to other recipients as the Court may specify.

All notices to the Parties or counsel required by this Agreement, except Settlement Class

member opt outs and objections, shall be made in writing and communicated by fax and mail to the

following addresses:

> If to Plaintiff or Plaintiff's Counsel or Class Counsel:

> > Jay Edelson, Esq.
> > KamberEdelson, LLC
> > 53 West Jackson Boulevard, Suite 550
> > Chicago, Illinois 60604

If to Mobile Messenger or Mobile Messenger's Counsel:

> > Philip F. Atkins-Pattenson
> > Sheppard Mullin Richter & Hampton LLP
> > Four Embarcadero Center, 17th Floor
> > San Francisco, CA 94111-4109

**F.    Dismissal**

Plaintiffs or Class Counsel in the Related Actions shall, upon the occurrence of the Effective

Date obtain dismissal of all portions of their respective class action complaints pertaining to Settled

Claims against any Released Party.  Pending the occurrence of the Effective Dates, Plaintiffs or

Class Counsel in the Related Actions shall seek a stay of such actions in order for the Effective Date

to occur.

**G.    Miscellaneous Provisions**

This Agreement shall be binding upon and inure to the benefit of the heirs, successors,

assigns, executors and legal representatives of all parties to this Agreement.

Subject to Court approval, the Parties may agree to reasonable extensions of time to carry out

any of the provisions of this Agreement.

The determination of the terms of, and the drafting of, this Agreement has been by mutual

agreement after negotiation, with consideration by and participation of all Parties hereto and their

counsel. Accordingly, the rule of construction that any ambiguities are to be construed against the

drafter shall have no application.

The waiver by one Party of any provision or breach of this Agreement shall not be deemed a

waiver of any other provision or breach of this Agreement.

## XVII.  AUTHORITY TO SIGN

Any individual signing this Agreement on behalf of any Person represents and warrants that

he or she has full authority to do so.

Facsimile signatures shall be considered valid signatures as of the date hereof, although the

original signature pages shall thereafter be appended to this Agreement.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed on its behalf by its duly authorized counsel of record, all as of the day set forth below.

**AGREED:**

**PLAINTIFF by her attorneys:**

**CLASS COUNSEL**

Dated: July 21, 2008                    KAMBEREDELSON, LLC

                                        /s/ Myles McGuire
                                        Myles McGuire
                                        KamberEdelson LLC
                                        53 W. Jackson Blvd., Suite 550
                                        Chicago, IL 60604
                                        Telephone: 312.589.6370
                                        Facsimile: 312.913.9401
                                        mmcguire@kamberedelson.com

                                        *On Behalf of Plaintiff and the Class*

**MOBILE MESSENGER AMERICAS, INC. by its attorneys:**

Dated: July 21, 2008                    Mobile Messenger Americas, Inc

                                        /s/ Philip F. Attkins-Pattenson
                                        Philip F. Atkins-Pattenson
                                        Sheppard Mullin Richter & Hampton LLP
                                        Four Embarcadero Center, 17th Floor
                                        San Francisco, CA 94111-4109
                                        patkinspattenson@sheppardmullin.com
                                        Telephone: 415.774.2933

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 08-61089-CIV-ALTONAGA/Brown

**LISA GRAY**, individually and on behalf
of a class of similarly situated individuals,

       Plaintiff,

v.

**MOBILE MESSENGER AMERICAS, INC.,**
*et al.,*

       Defendants.

_____/

**ORDER**

    THIS CAUSE came before the Court for a hearing on August 4, 2008 on Plaintiff, Lisa

Gray's Motion for Preliminary Approval of Class Action Settlement [D.E. 4], filed on July 15, 2008.

Being fully advised, it is

    **ORDERED AND ADJUDGED** that Plaintiff's Motion **[D.E. 4]** is **GRANTED**. It is further

**ORDERED** as follows:

    1.    The Parties have agreed to settle this Action and related actions upon the terms and

conditions set forth in the Stipulation of Settlement (the "Stipulation of Settlement"), which has been

filed with the Court.

    2.    The Court has reviewed the Stipulation of Settlement, as well as the files, records, and

proceedings to date in this matter. The definitions in the Stipulation of Settlement are hereby

incorporated as though fully set forth in this Order, and capitalized terms shall have the meanings

attributed to them in the Stipulation of Settlement.

CASE NO. 08-61089-CIV-ALTONAGA/Brown

3.     Based upon preliminary examination, the Court finds that the Stipulation of Settlement of the Parties substantially fulfills the purposes and objectives of the class action, and provides substantial relief to the Settlement Class without the risk, cost, or delay associated with continued litigation, trial, and/or appeal; the Stipulation of Settlement appears fair, reasonable, and adequate; the Settlement Class should be certified for settlement purposes, subject to Paragraph 16 below; and after notice to the Settlement Class a Fairness Hearing should be held to determine whether the Stipulation of Settlement is fair, reasonable, and adequate and whether Judgment should be entered in this action, based upon the Stipulation of Settlement.

4.     The Stipulation of Settlement, including its exhibits, is preliminarily approved as fair, reasonable, and adequate.  The Court finds that: (a) the Stipulation of Settlement is the result of arms' length negotiations between experienced attorneys familiar with the legal and factual issues of this case; (b) all Settlement Class members are treated fairly under the Agreement; and (c) the Stipulation of Settlement is sufficient to warrant notice thereof to members of the Class and the Fairness Hearing described below.

5.     The Court conditionally certifies, for settlement purposes only, the Settlement Class consisting of: all current and former Wireless Subscribers Nationwide who, at any time from January 1, 2005, to the Notice Date, were billed and paid for Mobile Content associated with Mobile Messenger.  Excluded from the Class are the following: the Defendant, the Claims Administrator, and any of aforementioned respective parent, subsidiary, affiliate or control person of the Defendant, as well as the officers, directors, agents, servants, or employees of the Defendant, any trial judge presiding over this case or any of the actions which comprise the Action and/or the Related Actions, and the immediate family members of any such Person(s).

2

CASE NO. 08-61089-CIV-ALTONAGA/Brown

6.    In connection with the conditional certification, the Court makes the following preliminary findings pursuant to Rule 23 of the Federal Rules of Civil Procedure:

(a)    The Settlement Class, encompassing over 100,000 wireless telephone subscribers across the United States, is so numerous that joinder of all members is impracticable;

(b)    There are questions of law or fact common to the above-described Settlement Class, such as (1) whether Mobile Messenger has unjustly received money belong to the Plaintiff and members of the Settlement Class and whether under principles of equity and good conscience Mobile Messenger should not be able to keep such monies; (2) whether Mobile Messenger tortiously interfered with contracts between the Plaintiff and the Settlement Class and their respective wireless service providers by causing them to be charged for unauthorized mobile content; and (3) whether Mobile Messenger's conduct violates the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*;

(c)    The claims of the named Plaintiff are typical of the claims being resolved through the proposed Stipulation of Settlement as the Plaintiff and the proposed class members were allegedly equally charged for unauthorized mobile content associated with Mobile Messenger as a result of a common course of conduct;

(d)    The named Plaintiff is capable of fairly and adequately protecting the interests of the above-described Settlement Class in connection with the proposed Stipulation of Settlement;

(e)    For purposes of determining whether the Stipulation of Settlement is fair, adequate, and reasonable, common questions of law and fact predominate over questions affecting only individual Settlement Class members. Accordingly, the Settlement Class is sufficiently cohesive to warrant adjudication through settlement by representation; and

3

CASE NO. 08-61089-CIV-ALTONAGA/Brown

(f)    For purposes of settlement, a settlement with the above-described Settlement Class is superior to other available methods for the fair and efficient resolution of the claims of the Settlement Class.

7.    In making the findings set forth in Paragraph 6, the Court finds that the Settlement Class warrants conditional certification on a nationwide basis. Named plaintiff Lisa Gray is designated as Class Representative.

8.    The Court appoints Jay Edelson, Myles McGuire, and Ryan D. Andrews of Kamber Edelson, LLC as Class Counsel and David P. Healy of the Law Offices of David P. Healy as Liaison Class Counsel. For purposes of these settlement approval proceedings, the Court finds that these attorneys are competent and capable of exercising their responsibilities as Class Counsel.

9.    A final approval hearing (the "Fairness Hearing") shall be held before this Court on December 1, 2008 at 8:30 a.m. to determine whether the Stipulation of Settlement is fair, reasonable, and adequate and should be approved. At that time, the Court shall also consider the incentive awards to the Class Representatives and the Fee Award to Class Counsel. Papers in support of final approval of the Stipulation of Settlement, Incentive Awards, and the Fee Award shall be filed with the Court according to the schedule set forth in Paragraph 14 below. The Fairness Hearing may be postponed, adjourned, or continued by order of the Court without further notice to the Settlement Class. After the Fairness Hearing, the Court may, in its discretion, enter Judgment in accordance with the Stipulation of Settlement that will adjudicate the rights of the Settlement Class with respect to the claims being settled.

10.    As soon as possible after the entry of this Order, the Parties shall disseminate notice of the Stipulation of Settlement and Fairness Hearing to the members of the Settlement Class by

4

CASE NO. 08-61089-CIV-ALTONAGA/Brown

effectuating the Notice Plan. The Notice Plan includes: (1) publication of one-day 1/8th page ads in

the Miami Herald, the New York Daily News, the Los Angeles Times, the Chicago Sun Times, the

Philadelphia Inquirer, the Houston Chronicle, the Washington Post, the Atlanta Journal-Constitution,

the Boston Globe, and USA TODAY within thirty (30) days after the preliminary approval of this

settlement; (2) a 1/4th page ad in Rolling Stone Magazine within forty-five (45) days after the

preliminary approval of this settlement or as soon as practicable; (3) the erection of a settlement

website by the Claims Administrator that will serve as a replacement for a typical "long-form" notice

and will provide links to the Settlement Agreement and provide for the on-line submission of claims;

(4) $25,000 spent by the Claims Administrator on Internet ads promoting the Website Notice; and

(5) the parties preparation of a joint press release that will be disseminated to local, national, and

syndicated news organizations discussing the Agreement. The settlement website shall be accessible

on or before publication of the ads described in this Paragraph and shall remain accessible until at

least 31 days after the Court enters an order on the Fairness Hearing.

11.    The Court finds that the contents of the long form "web" notice and summary form

notices and the manner of their dissemination described in Paragraph 10 is the best practicable notice

under the circumstances and is reasonably calculated, under all the circumstances, to apprise the

Settlement Class members of the pendency of this action, the terms of the Stipulation of Settlement,

and their right to object to the Settlement or exclude themselves from the Settlement Class. The

Court further finds that the long form "web" notice and summary form notices are reasonable, that

they constitute due, adequate, and sufficient notice to all persons entitled to receive notice, and that

they meet the requirements of due process.

5

CASE NO. 08-61089-CIV-ALTONAGA/Brown

12.    Each Settlement Class member who wishes to be excluded from the Settlement Class and follows the procedures set forth in this Paragraph shall be excluded.  Any potential member of the Settlement Class may mail a written request for exclusion, in the form specified in the notice, to Rosenthal & Company or its designee(s), postmarked no later than October 31, 2008.  All persons or entities who properly make a request for exclusion from the Settlement Class shall not be Settlement Class members and shall have no rights with respect to the Stipulation of Settlement, should it be approved.  The names of all such excluded individuals shall be attached as an exhibit to any final Order and Judgment of this Court.

13.    Any Settlement Class member who has not timely submitted a written request for exclusion from the Settlement Class, and thus is a Settlement Class member, may object to the fairness, reasonableness or adequacy of the Agreement, the Incentive Award, or the Fee Award, or any of them.  Settlement Class members may do so either on their own or through counsel hired at their expense.  Any Settlement Class member who wishes to object to the Stipulation of Settlement must file an objection with this Court on or before October 31, 2008.  The objection must contain the following: (i) a notice of the objector's intention to appear at the Fairness Hearing, if the objector so intends; (ii) the name and address of the objector and the objector's counsel (if the objector intends to appear through counsel); (iii) a statement of the basis for each objection asserted; (iv) documentary proof that the objector is a Settlement Class member; (v) any legal authorities that the objector wishes the Court to consider; (vi) a list of documents and things the objector wishes the Court to consider; (vii) a list of documents and things the objector may offer as evidence or exhibits; and (viii) the names and addresses of any witnesses the objector may call to testify and a summary of each such witness's expected testimony.  On or before that same date, any such objecting

6

CASE NO. 08-61089-CIV-ALTONAGA/Brown

Settlement Class members shall serve a copy of such papers by first-class mail on each of the

following counsel:

> Jay Edelson, Esq.
> Kamber Edelson, LLC
> 53 West Jackson Boulevard, Suite 550
> Chicago, Illinois 60604

and

> Philip F. Atkins-Pattenson
> Sheppard Mullin Richter & Hampton LLP
> Four Embarcadero Center, 17th Floor
> San Francisco, CA 94111-4109

14.    Papers in support of final approval of the Stipulation of Settlement, Incentive Awards,

and the Fee Award shall be filed with the Court on or before **November 17, 2008**.

15.    The Fairness Hearing shall be held on **December 1, 2008, at 8:30 a.m.** at 400 North

Miami Avenue, Miami, FL, 33128, Courtroom 12-2.

16.    In the event the Stipulation of Settlement is not approved by the Court, or for any

reason the parties fail to obtain a Judgment as contemplated in the Stipulation of Settlement, or the

Stipulation of Settlement is terminated pursuant to its terms for any reason, then the following shall

apply:

(a)    All orders and findings entered in connection with the Stipulation of Settlement

shall become null and void and have no force and effect whatsoever, shall not be used or

referred to for any purposes whatsoever, and shall not be admissible or discoverable in this

or any other proceeding;

(b)    The conditional certification of a Settlement Class pursuant to this Order shall

be vacated automatically, the Action and Related Actions shall proceed as though the

7

CASE NO. 08-61089-CIV-ALTONAGA/Brown

Settlement Class had never been certified pursuant to this Stipulation of Settlement and such findings had never been made, and the Actions shall return to the procedural status quo before entry of the Preliminary Approval order.

(c)    Nothing contained in this Order is, or may be construed as, any admission or concession by or against the Defendant or Plaintiffs on any point of fact or law, including, but not limited to, factual or legal matters relating to any effort to certify this case as a class action;

(d)    Nothing in this Order or pertaining to the Stipulation of Settlement shall be used as evidence in any further proceeding in this case, including, but not limited to, motions or proceedings seeking treatment of this case as a class action; and

(e)    All of the Court's prior Orders having nothing whatsoever to do with class certification shall, subject to this Order, remain in force and effect.

17.    Pending final determination of whether the proposed Settlement should be approved, no Class member directly, derivatively, in a representative capacity, or in any other capacity, shall commence any action against any of the Released Parties in any court or tribunal asserting any of the Released Claims.

18.    The firm of Rosenthal & Company is appointed as Settlement Administrator for the Agreement and shall perform all of the duties of the Settlement Administrator set forth in the Stipulation of Settlement.

19.    Counsel are authorized to use all reasonable procedures in connection with approval and administration of the settlement that are not materially inconsistent with this Order or the Stipulation of Settlement, including making, without further approval of the Court, minor changes

8

CASE NO. 08-61089-CIV-ALTONAGA/Brown

to the form or content of the Notice, Summary Notice, and other exhibits that they jointly agree are

reasonable or necessary.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 5th day of August, 2008.


_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

# EXHIBIT C

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION

NOTICE IS HEREBY GIVEN that Lindsey Abrams ("Ms. Abrams") will move the Court for an award of Attorneys' Fees Pursuant to Stipulated Entry of Judgment of Dismissal in the above referenced proceedings on July 11, 2008, at 9:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled Court, located at 280 South First Street, San Jose, CA 95113, in Courtroom 3, 5th Floor, before the Honorable Jeremy Fogel.

Ms. Abrams respectfully requests this Court grant her attorneys' fees pursuant to the terms of the settlement reached by the parties as a result of face-to-face and telephonic negotiations between their attorneys. The agreement provides that fees should be awarded based on the benefits conveyed generally by the settlement. As explained below, the settlement's injunctive feature will—using the most conservative analysis available—save recipients of Facebook Mobile text messages over $20.1 million dollars during the settlement period. In consideration of these significant benefits, Plaintiff Abrams respectfully requests attorneys' fees in the amount of $5,033,000.

PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT

# TABLE OF CONTENTS

INTRODUCTION .... ...................................................................................... 1

I.    BACKGROUND FACTS ........................................................................ 2

      A.    Understanding Facebook.............................................................. 2

      B.    The Flaws in Facebook Mobile .................................................... 3

      C.    The Settlement Terms .................................................................. 4

II.   COMPUTING THE VALUE OF THE BENEFITS CONVEYED BY THE
      SETTLEMENT ....................................................................................... 6

      A.    Total Number of Text Messages = 7.8 billion – 11.4 billion ............... 7

      B.    The Opt-Out Rate for SMS Messages = A range of 2.98% – 4.58%.......... 8

            1.    *Recycled Numbers = 100% of 1% - 100% of 2.6%* ............... 8

            2.    *General Opt-Out Rate = 1.98%* ......................................... 8

      C.    The Cost Per Text Message = $.10 - $.15 ......................................... 10

      D.    Reductions Based on Legacy Opt-Outs and Costs of Opting Out .......... 10

      E.    The Total Range of Benefits = $25 million to $57 million ................. 11

III.  THE APPROPRIATE PERCENTAGE OF ATTORNEYS FEES ............... 12

IV.   FACEBOOK'S EVASIVE DISCOVERY ANSWERS CANNOT SHEILD THE
      COMPANY FROM ITS BURDEN TO PAY ATTORNEYS' FEES .......... 15

CONCLUSION......... ...................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

### United States Supreme Court

*Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources,*
    532 U.S. 598 (2001) ............................................................................................ 14

*City of Burlington v. Dague,*
    505 U.S. 557 (1992) ...................................................................................... 14, 15

### Ninth Circuit Court of Appeals

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ........................................................................... 12

*In re Washington Public Power Supply System Securities Litigation,*
    19 F.3d 1291, 1302 (9th Cir. 1994) ................................................................... 14

*Jeff D. v. Andrus,*
    899 F.2d 753, 759 (9th Cir. 1989) ..................................................................... 13

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) ............................................................... 12, 14, 15

*United Commercial Ins. Serv., Inc. v. Paymaster Corp.,*
    962 F.2d 853, 856 (9th Cir. 1992) ..................................................................... 13

*Vizcaino v. Microsoft Corp.,*
    290 F.3d 1043, 1047 (9th Cir. 2002) ................................................................. 12

### Other Circuit Courts of Appeal

*Florin v. Nationsbank of Georgia, N.A.,*
    34 F.3d 560 (7th Cir. 1993) ............................................................................... 14

### United States District Courts

*Daynard v. MRRM, P.A.,*
    335 F. Supp. 2d 156 (D.Mass., 2004) ............................................................... 13

*Fulmore v. Home Depot U.S.A., Inc.,*
    No. 1:03-cv-0797-DFH-JMS, 2007 WL 2746882 at *2 (S.D. Ind. Sept. 19, 2007) ...... 14

*In re Sears Retiree Group Life Ins. Litig.,*
    No. 97 C 7453, 2002 WL 475180 (N.D. Ill. March 27, 2002) ....................... 15

**California State Courts**

*Chavez v. Netflix, Inc.*,
    Nos. A114334, A115395, A115571, 2008 WL 1777550 (Cal. App. 1st Dist.) ....... 12, 13

*Lealao v. Beneficial California, Inc.*,
    82 Cal. App. 4th 19, 45 (1st Dist. 2000) .................................................................. 13, 15

**Other State Courts**

*Brown v. Drillers, Inc.*,
    630 So. 2d 741, 748 (La.1994)........................................................................................ 13

*Gardner v. City of Columbia Police Dep't*,
    216 S.C. 219, 57 S.E. 2d 308 (S.C. 1950)..................................................................... 13

*Royer Homes of Miss., Inc. v. Chandeleur Homes*,
    857 So.2d 748, 752-53 (Miss. 2003) ............................................................................ 13

*Schuster v. Baskin*,
    354 Mass. 137, 140-41, 236 N.E. 2d 205 (Mass. 1968) .............................................. 13

**Statutes**

Telephone Consumer Protection Act, 47 U.S.C. § 227 .................................................... 15

Bus. & Prof. § 6146 .......................................................................................................... 13

**Supreme Court Rules**

Federal Rule of Civil Procedure 23(e) ............................................................................... 1

# INTRODUCTION

Lindsey Abrams brought this case to stop the 6th most-trafficked website in the world, Facebook, Inc. d/b/a Facebook.com ("Facebook"),[1] from bombarding the cellular telephones owned by her and numerous others like her[2] with costly, unauthorized text messages. Abrams did not initially know the unauthorized text messages had come from Facebook—she was neither a member of Facebook Mobile when she received the messages, nor did the messages clearly disclose their Facebook origin.[3] (Compl. ¶ 27). With the assistance of counsel,[4] Abrams learned of Facebook's involvement, filed suit that brought unprecedented claims, and engaged in in-person and telephonic negotiations between her attorneys and Facebook's in-house and outside lawyers.

The result is a strong injunctive settlement that will fundamentally alter how Facebook transmits the *billions* of text messages it will send out over the next 27 months (i.e. the timeframe corresponding to the agreed-upon injunctive relief).[5] (Stip. Entry of J. ¶ 5). By clearly identifying that these text messages come from Facebook and providing recipients with an easy way to avoid receiving unwanted messages in the future, consumers will save tens of millions of dollars in unauthorized cellular telephone charges.

---

[1] According to Facebook, the website "is a social utility that helps people communicate more efficiently with their friends, family and coworkers…through the social graph, the digital mapping of people's real-world social connections. http://www.facebook.com/press/info.php?factsheet (last visited April 22, 2008).

[2] Although this was brought as a class action, it was settled on an injunctive basis only pursuant to Fed.R.Civ.P. 23(e).

[3] Facebook disputes, erroneously, that the text messages it sent failed to conspicuously identify their Facebook connection. (Answer to Interrogs. 7).

[4] The firm resume of KamberEdelson LLC is attached as Ex. A.

[5] After this time period, Facebook must use commercially reasonable methods to ensure that consumers can opt out of the receipt of future text messages so long as Facebook provides mobile telephone messages in substantially the same manner as it currently does. To discontinue the injunctive relief altogether, Facebook bears the burden of demonstrating that "material subsequent events, development or occurrences have transpired which can be shown…to reasonably obviate the need therefor." (Stip. Entry of J. ¶ 5).

The settlement also calls for attorneys' fees to Abrams' counsel. Facebook has specifically agreed that in the event this Court is called upon to decide the fee amount, the determination will be "based *not solely* on the relief obtained for the plaintiff, but *also on the benefits conveyed more generally through this settlement*." (Stip. Entry of J. ¶ 6) (emphasis added). In light of the substantial relief achieved both on behalf of members of Facebook and the cellular telephone-owning public generally, Abrams respectfully requests $5,033,000 in attorneys' fees, reflecting 25% of the most conservative valuation of the settlement benefits.

## I.    BACKGROUND FACTS

### A.    Understanding Facebook

Facebook is an Internet success story with few peers. Started in 2003 in a university dorm room, Facebook experienced rapid growth since its inception and stands today as one of only a handful of multi-billion dollar corporations at the vanguard of the Internet. Initially comprised primarily of college students and young people, today Facebook's membership attracts persons of all ages and walks of life. With more than 70 million active users, the Facebook website "enables companies and engineers to…gain access to millions of users…[and] [m]ore than 50 percent of Facebook users return to the site each day, providing unparalleled distribution potential…." http://www.facebook.com/press/info.php?factsheet (last visited April 22, 2008).

At issue here is one of Facebook's most prominent applications, Facebook Mobile, which allows users to send and receive short-message-service (SMS) messages, also known as text messages, to users' mobile devices (cellular telephones, personal digital assistants, etc.). (*See* Declaration of R. Snyder, ¶ 4, a true and accurate copy of which is attached as Ex. B).[6] To

---

[6] Mr. Snyder is an independent mobile telecommunications technology consultant with 24 years of experience and is an expert in the field of mobile and cellular telecommunications. He spent seven years developing standards within the American National Standards Institute's (ANSI) subsidiary organization, the Telecommunications Industry Association (TIA), providing technical contributions and authoring and editing mobile telecommunications proposed standards

PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT

receive these text messages, a Facebook member registers her cellular telephone number into her Facebook profile. (Snyder Decl. ¶¶ 4-5). The member's Facebook "friends" can then log onto the website, visit the member's profile page, and send text messages to the member's mobile telephone device. (Snyder Decl. ¶ 5). Importantly, the Facebook member associated with sending the text message need not even know the cellular telephone number of the intended text message recipient to send the text message; rather, all that is required is access to the recipient's Facebook profile page. (Snyder Decl. ¶¶ 4-5). Approximately 14 million text messages were sent to mobile phones via Facebook Mobile in January 2007; the number of text messages sent has since followed a trajectory of exponential growth, climbing to 59.9 million messages monthly by January 2008. (*See* Facebook's Answers to Interrogatories, 2(c), a true and accurate copy of which is attached as Ex. C; Snyder Decl. ¶ 8).

**B.    The Flaws in Facebook Mobile**

The first major problem with Facebook Mobile is that not everyone who receives text messages sent through the application has authorized the transmission. (Snyder Decl. ¶ 7). For Abrams, the issue began when she received a "recycled" telephone number [7] from her wireless service provider. (Compl. ¶ 19). The number's prior owner had registered the number with Facebook Mobile, but no one, including Facebook's wireless carrier partners, disclosed this to Abrams. (Compl. ¶ 20). Facebook users then went onto Facebook to send the prior owner text messages, which instead went to Abrams because she was the number's current owner. (Compl. ¶¶ 19-25). Because Abrams was never a member of Facebook Mobile, and the messages were

---

documents. Most notably, Mr. Snyder co-founded m-Qube, Inc., a leading billing and processing company, or "aggregator," in the mobile content industry. (Snyder Decl. ¶¶ 1-3)

[7] A recycled number is one that was previously used by a prior customer of the wireless carrier (*i.e.* AT&T, Verizon Wireless, Sprint, Alltel etc.). When the customer canceled his or her service with the carrier, the carrier re-assigned the number to a new customer. (Compl. ¶¶ 19-20). Prior to re-assigning the number, however, the carriers failed to clean the number, or remove from it any text message services, such as Facebook Mobile, for which the number had been registered. (Compl. ¶¶ 19-20).

PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT

unclear as to their Facebook connection, she knew of no method by which she could prevent these text messages—for which she was required to pay (and in fact paid) $.10 each—from being sent to her phone. (Compl. ¶¶ 27-29).

Facebook was aware of the extent of this "recycling" problem, even as it profited from this practice. Prior to this lawsuit, Facebook had implemented a program with AT&T and Verizon whereby the carriers would provide Facebook with notices of telephone numbers that had been deactivated. (Answer to Interrogs., 6). AT&T provided deactivation notices starting in May 2006, but "in late 2006, a technical problem arose, and AT&T stopped sending such notices." (Answer to Interrogs., 6). AT&T resumed providing notice in "October/November 2007." (Answer to Interrogs., 6). Verizon eventually began sending such notices in November 2007.[8] (Answer to Interrogs., 6). Facebook, however, did not require any other wireless service providers, which collectively service approximately 50 percent of all U.S. cellular telephone customers, to apprise it of deactivations. (Answer to Interrogs., 6).

Another major problem afflicting Facebook Mobile is that it fails to provide meaningful opt-out instructions on a regular basis to text message recipients, even to those who had at one time authorized Facebook Mobile. As Facebook's own discovery responses attest, some Facebook Mobile users do not remain members indefinitely and elect to discontinue their receipt of Facebook text messages altogether.[9] Numerous reasons contribute to this dynamic, such as the per instance cost of each text message, the inability to filter desirable text messages from undesirable, and the emergence of unwanted mobile advertisements. (Snyder Decl. ¶ 14-16).

## C.    The Settlement Terms

The settlement agreement combats the unwanted text message problem in three critical

---

[8] As a point of reference, Abrams filed the instant case October 22, 2007.
[9] Approximately 3.2% of Facebook Mobile users have elected to opt-out prior to the Settlement Agreement. (Frankenfeld Exp. Rep., 3).

4

1    ways. (Snyder Decl. ¶ 6).  First, it requires Facebook to brand each text message sent out as

2    originating from "Facebook."  This will notify non-members such as Abrams of the origin of the

3    text messages so they can contact Facebook simply and effectively to stop the problem.  (Stip

4    Entry of J. ¶ 1).  Second, Facebook will now include specific opt-out instructions in the body of

5    every 15th text message sent to a particular telephone number.  Recipients will be able to avoid

6    future text messages by replying to the message with the word "Off."  (Stip. Entry of J. ¶ 1).

7    
8    Third, Facebook will implement improved notification procedures with the wireless carriers

9    sufficient to maintain accurate and updated telephone number deactivation and recycling logs.

10   (Stip. Entry of J. ¶ 3).  Accordingly, the settlement enables recipients to avoid receiving

11   these unwanted text messages and incurring related service fees imposed by their wireless

12   carriers.  (Snyder Decl. ¶¶ 6-7).

13   
14   Additionally, the settlement provides that Facebook will pay for Plaintiff's attorneys' fees

15   and a reasonable award to Ms. Abrams.  By agreement, the parties specifically contracted as to

16   how attorneys' fees are to be determined and, if necessary, the parameters for Court

17   determination:

18   Facebook agrees that plaintiff's counsel is entitled to a reasonable award of
19   attorneys' fees and expenses in an amount to be determined by the parties, or
     failing such an agreement, by the Court.  *Facebook agrees that any such*
20   *determination by the Court will be based not solely on the relief obtained for the*
     *plaintiff, but also on the benefits conveyed more generally through this settlement.*
21   *Facebook further agrees that plaintiff shall be entitled to reasonable, limited*
     *discovery on this issue, including information relating to (a) the number of text*
22   *messages Facebook sends out on a daily basis, (b) the number of text messages*
     *sent to previously to recycled numbers, and (c) the steps Facebook did or did not*
23   *previously take to ensure that text messages were not sent to people who did not*
     *want them.* The parties have agreed that plaintiff's counsel shall submit to the
24   Court in the Action an application in support of an award to plaintiff's counsel of
     fees and costs, and that an evidentiary hearing (on such terms as the Court
25   determines are appropriate) shall be held in respect thereto (at a time to be set by
     the Court) and further that, in connection therewith, Facebook shall be entitled to
26   object to or otherwise contest the amounts to be awarded plaintiff's counsel via
     written submissions and briefs and orally at the hearing on such application.  The
27   parties state further that it is their collective intention to expedite the process of
28   

PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT

conducting the forgoing evidentiary hearing and enabling the necessary judicial determinations.  Facebook agrees not appeal the District's Court's final Order with respect to such application and to pay any amounts awarded thereby within thirty (30) calendar days of the entry of the final order thereon.

(Stip. Entry of J. ¶ 6) (emphasis added).  Upon such a determination, Facebook agreed to pay the amount awarded within 30 days. (Stip. Entry of J. ¶ 6).  Further, Facebook has explicitly waived any right to appeal.  (Stip. Entry of J. ¶ 6).  Since executing the Stipulated Order, Facebook has refused to seek a private determination of the amount of the attorneys' fees, which has necessitated Plaintiff's submission of this application pursuant to Paragraph 6 of the Stipulated order of Judgment.  Plaintiff respectfully requests that this Court honor the parties' intent—as embodied in the agreement—and award reasonable fees based on the value of the benefits conveyed through the settlement.

## II.    COMPUTING THE VALUE OF THE BENEFITS CONVEYED BY THE SETTLEMENT

At its most basic, the settlement is designed to spare cellular telephone owners of the inconvenience and cost associated with receiving unauthorized text messages from Facebook. The actual value to all potential recipients is calculated through intuitive yet straightforward math. To that end, the settlement's value is the product of the number of text messages sent by Facebook during the minimal settlement term, multiplied by the number of the recipients who opt-out during the term and the cost to each recipient of receiving text messages.

Of course, prudent arithmetic dictates the subtraction of amounts for which the settlement cannot take credit.  For example, each individual who opts out may incur charges for the 15 text messages received from Facebook, plus an additional message the user must send to stop the text messages.  This money is properly excluded from being considered part of the settlement's benefits.  Additionally, a range of 2,000–4,000 users had deactivated monthly from Facebook Mobile prior to the start of the settlement's corrective measures.  (Answer to Interrogs., 3).

6

Neither Abrams nor her counsel may claim the benefit of these "legacy opt-outs."

In equation form, then, the General Settlement Benefits appear as follows:

**GSB = [total # of texts x opt-out rate x cost per text] – [legacy opt-outs + cost of opting out]**

Each of these variables, and the expert opinions that support them, are explained below.

**A.    Total Number of Text Messages = 7.8 billion – 11.4 billion**

Facebook transmits a massive number of text messages, and, as explained in the declaration of industry expert Randall Synder, the number is growing rapidly. During the calendar year from January 2007 to January 2008, Facebook Mobile experienced an average month-to-month growth rate in text message volume of 12.9%, which resulted in Facebook sending 59.9 million text messages in the month of January 2008 alone. (Answer to Interrogs. 2; Snyder Decl. ¶ 8). Mr. Snyder cautiously predicts more modest growth going forward, however, due to "the waning novelty of the Facebook Mobile application among users as well as a natural anticipated decline in ongoing growth rates." (Snyder Decl. ¶ 9). Also, a further rate reduction is necessary in light of the fact that settlement will result in members opting-out of Facebook Mobile. (Snyder Decl. ¶ 11). Thus, Mr. Snyder surmises, "a conservative monthly growth rate through mid-year 2010 in the range of 9% to 11% is reasonable." (Snyder Decl. ¶ 9).

Mr. Snyder further cautions that the effects of the settlement are unlikely to be realized in the initial weeks following implementation. Though Facebook is required to send opt-out instructions and identification notices for a period of 27 months, the corrective action must first be allowed to permeate the Facebook Mobile user base. (Snyder Decl. ¶ 10). Therefore, Mr. Snyder projects that this will require approximately 3 month's time, meaning the relevant period is limited conservatively to the final 24 months. (Snyder Decl. ¶ 10). Mr. Snyder calculated the approximate number of text messages that will be sent by Facebook during that period at 9% and 11% monthly growth respectively. (Snyder Decl. ¶ 9). Projecting 9% growth amounts to 21

1   million users sending a total of approximately 7.8 billion text messages through Facebook Mobile

2   during the restricted injunctive period.  (Snyder Decl. ¶ 9).  For 11% growth, the total reaches

3   11.4 billion text messages from approximately 36 million users.  (Snyder Decl. ¶ 9).

4   **B.    The Opt-Out Rate for SMS Messages = A range of 2.98% – 4.58%**

5

6        Prior to the settlement, users wishing to discontinue the text messages were required to log

7   onto the Facebook website and cumbersomely navigate their way to a link that would shut-off the

8   application.  Non-users encountered more obstacles.[10]  Presenting clearer notice and instructions

9   to all recipients will result in a materially greater opt-out rate.  (Snyder Decl. ¶ 7).  Two rates are

10  at play:  recycled numbers and general opt-outs.

11  **1.    *Recycled Numbers = 100% of 1% - 100% of 2.6%***

12

13       First, for people like Ms. Abrams who never signed up for Facebook Mobile in the first

14  place, it is reasonable to conclude an opt-out rate of 100%—the only messages they receive are

15  intended for other people, and it is costing them money.  There is no reason to suspect they will

16  elect to continue to receive these text messages in the future.  (Snyder Decl. ¶ 7).  Based on

17  figures provided by the Federal Communications Commission ("FCC"), Mr. Snyder calculates

18  that between 1–2.6% of all cellular telephone numbers in the United States, including those

19  registered on Facebook Mobile, are recycled monthly.  (Snyder Decl. ¶ 7).

20  **2.    *General Opt-Out Rate = 1.98%***

21

22       The settlement also benefits all recipients of Facebook text messages generally by

23  informing them how to opt-out.  The general opt-out rate for recipients of Facebook text messages

24  will be 2%.  (Snyder Decl. ¶ 15).

25  _____

26  [10] Facebook has indicated in its interrogatory responses that prior to the settlement, it recognized
    terms such as "STOP" or "END" and that it would honor such responsive texts sent by recipients

27  of Facebook texts by ceasing to send messages.  (Answer to Interrogs., 6).  While this could
    potentially be true, it was of little value given that Facebook provided no effective notice to text

28  message recipients that it accepted such requests.

Given the relative youth of text messaging as a viable communications medium, Mr. Snyder bases his opinion on the opt-out rates for email, where research has shown that approximately 2% of email subscribers will opt-out of receiving future emails when provided the chance to do so. (Snyder Decl. ¶ 15). Mr. Snyder explains conceptually that the opt-out rate for text messaging is likely to far exceed that of email for a variety of reasons. (Snyder Decl. ¶ 15). First, people take notice of their unwanted text messages. Whereas email is free to receive, most text message recipients are charged on average between $.10 to $.15 per message. (Snyder Decl. ¶ 15). Also, email applications have spam filters, "junk email" programs, and other devices designed to quarantine unwanted email communications. (Snyder Decl. ¶ 15). Consequently, one would expect that if presented the opportunity, recipients of unwanted text messages would opt-out with far greater frequency than recipients of emails. (Snyder Decl. ¶ 15).

Nevertheless, and again erring on the conservative side, Snyder does not speculate just how much greater the text message opt-out rate will be over email. Using email rates then as both a floor and ceiling, Mr. Snyder's 2% rate is a cautious projection of the percent of Facebook Mobile members who will elect to discontinue the service as a result of the settlement.

This aspect of the equation requires one additional step. The rates for recycled numbers and general opt-outs cannot simply be added together. Rather, the 2% general opt-out rate may only apply to the 99% of messages that remain after subtracting out the 1% from the recycled number recipients. Adjusting for this overlap results in a general opt-out rate of 1.98%.[11] (*See* "Expert Report of D. Frankenfeld, 2, a true and accurate copy of which is attached as Ex

---

[11] Accounting for the overlap if the higher opt-out rate for recycled numbers (2.6%) were used would result in a general opt-out rate of 1.948%. As this Application adopts the lowest opt-out rate for recycled numbers (1%), however, the general opt-out rate to be used going forward with the analysis will be 1.98%.

D).[12] Accordingly, adding this adjusted rate for general opt-outs to the range for recycled opt-outs results in a total opt-out range of 2.98%–4.58% for all text messages.

## C.    The Cost Per Text Message = $.10 - $.15

Recipients incur charges from their respective wireless service providers, frequently on a per text message basis. (Snyder Decl. ¶ 12). "AT&T Mobility, Verizon Wireless, Sprint Nextel and T-Mobile, the four largest domestic wireless carriers by market share, all charge individual text message fees of $0.15 per message, according to their respective websites, and such amount may increase over the Settlement Period." (Snyder Decl. ¶ 12). Ms. Abrams was charged $.10 per text message. (Snyder Decl. ¶ 10; *see also* Compl. ¶¶ 27-29). Accordingly, Mr. Snyder opines that for the settlement period, "an average fee of between $0.10 and $0.15 per text message both sent and received is reasonable." (Snyder Decl. ¶ 12).

Revisiting our equation then, the first half ranges look like this:

**GSB = [7.8 billion x .0298 x .10] – [legacy opt-outs + cost of opting out]** on the low end to

**GSB = [11.4 billion x .0458 x .15] – [legacy opt-outs + cost of opting out]** on the high end.

## D.    Reductions Based on Legacy Opt-Outs and Costs of Opting Out

Plaintiff cannot take credit for all the money that is going to be saved based on opt-outs over the settlement period. First, and as noted previously, 2,000–4,000 Facebook Mobile members deactivated the service monthly prior to the start of the settlement. (Answer to Interrogs. 3). Economist Donald L. Frankenfeld calculated the extent of the issue and found the legacy opt-out rate was approximately 3%. This translates into recipients opting out each month who the settlement cannot champion. (Frankenfeld Exp. Rep. App. 1-9).

The second issue addresses the reality that the opt-out instructions are not sent to text message recipients until the 15th message, and a recipient must text "OFF" in a reply message to

---

[12] Mr. Frankenfeld is a forensic economist and financial expert, with a specific expertise in computer modeling of economic damages. (Frankenfeld Exp. Rep., 1).

Facebook (16 total messages). These costs to recipients who opt out should not be considered in the general benefits. At $.10 per message, this results in $1.60 per recipient who opts out, or $1,590,677 (at 9% growth) or $2,695,131 (at 11% growth) being subtracted from the total settlement benefits. (Frankenfeld Exp. Rep. App. 1 and 7). At $.15 per message, $2.40 for every person who opts out, or $2,386,015 (at 9% growth) or $4,042,697 (at 11% growth) total should be subtracted. (Frankenfeld Exp. Rep. App. 3 and 9).

Indeed, many individuals will opt-out prior to the 15th message. Non-members will likely learn of the opt-out instructions through news reports, word of mouth, or other means. Facebook users could post messages that would instantly reach wider audiences on the website itself. Ms. Abrams, by her counsel and experts, declines to speculate as to the impact of these realities and instead adheres to the common sense notion that a recipient should have to incur no more than $1.60–$2.40 to effectively opt-out of Facebook Mobile and achieve the settlement's benefits.

Subtracting these values, the equation presents a range of benefits from:

**GSB = [7.8 billion x .0298 x .10] − [3.2% + ($1.60 to $2.40)] on the low end to**

**GSB = [11.4 billion x .0458 x .15] − [3.2% + ($1.60 to $2.40)] on the high end.**

**E.    The Total Range of Benefits = $25 million to $57 million**

Mr. Frankenfeld has provided exhaustive spreadsheets detailing the potential ranges if different combinations of each variable are used. (*See* Frankenfeld Exp. Rep. App. 1-9). Following the mathematical model, a reasonable range of settlement benefits to users and non-users equals between $25,967,094 and $57,234,736. Broken down, the ranges produced equal:

| Call Value | | Snyder Low | Snyder Middle | Snyder Upper |
|---|---|---|---|---|
| ↔ | | $0.100 | $0.125 | $0.150 |
| Growth | 9.0% | $25,967,094 | $32,458,867 | $38,950,641 |
| | 10.0% | $31,457,205 | $39,321,506 | $47,185,808 |
| | 11.0% | $38,156,491 | $47,695,613 | $57,234,736 |

1   (Frankenfeld Exp. Rep., 4). These results take the mid-range value of each chart in Mr.

2   Frankenfeld's appendix and show that the settlement will provide recipients of unwanted

3   Facebook Mobile messages with substantial relief—ultimately saving them millions of dollars in

4   unauthorized text messaging fees.

5

6       With respect to which figure most accurately depicts the settlement benefits, the mid-

7   range point reasonably takes into account each of the different variables in the equation. The

8   benefits achieved by this settlement could be much greater, of course, eventually hitting north of

9   the $70 million mark. (Frankenfeld Exp. Rep. App. 9). In the final analysis, however, Plaintiff is

10  prepared to limit her projection to the low end figure, representing a bare minimum of the actual

11  anticipated relief to message recipients. This number presumes the shortest injunctive period (24

12  months), the slowest growth rate (9%), the lowest opt-out rates (2.98%), and the lowest per

13  message value ($.10, a full 33% lower than the amounts currently being charged by the major

14

15  wireless carriers). Accordingly, Plaintiff respectfully submits the general settlement benefits

16  conferred by the parties agreement equals no less than $20,134,762, as reflected in the first page

17  of Mr. Frankenfeld's appendix.

18  **III.   THE APPROPRIATE PERCENTAGE OF ATTORNEYS FEES**

19       Having calculated the general benefits, the question remains as to what represents an

20  appropriate fee award.[13] In class action cases, courts have recognized a benchmark fee award of

21

22  25%. *See Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003), *Vizcaino v. Microsoft Corp.*, 290

23  F.3d 1043, 1047 (9th Cir. 2002), *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998).

24  California law further recognizes contingency fees in the marketplace provide a range of 20–40%.

25  *See e.g., Chavez v. Netflix, Inc.*, Nos. A114334, A115395, A115571, 2008 WL 1777550 (Cal.

26  ————————————

27  [13] The Court's determination of "reasonableness" arises from the terms of the settlement
    agreement, and, unlike class actions, not from any legal imperative. However, Abrams believes
    class action and personal injury decisions provide relevant guidance as to percentages of value

28  found to be reasonable and reflective of the marketplace.

App. 1st Dist.) (discussing marketplace fee ranges and their applicability when determining proper fee percentages based on value of settlement); *see also Lealao v. Beneficial California, Inc.* 82 Cal. App. 4th 19, 45 (1st Dist. 2000) (considering the amount of the proposed award and the monetizeable value of the class benefits to estimate what the market would pay for comparable litigation services rendered pursuant to a fee agreement); *see also* Bus. & Prof. § 6146 (setting contingency fee percentages in medical malpractice cases).

As a result, a reasonable fee from the low-end of the range would be $5,033,690.50 (25% of $20,134,762). This figure represents 12.8% of the mid-range ($39,321,506)[14] and a mere 8.79% of the high-end projection ($57,234,736).[15] Taking the mid-point range, 25% would have equaled a fee award of $9,830,376.50 and $14,308,684.00 for the high-end. Again, in keeping with the spirit of this application's cautious temperament, Abrams limits her request to the bottom figure, despite the expert's opinion that the mid-range presents a more accurate assessment of the benefits.

To be sure, the parties specifically bargained for a settlement of the attorneys' fees issue to be based broadly on the relief afforded through the settlement. It is well settled that "[t]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992) (*quoting Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989)).[16] Parties have flexibility in negotiating settlement agreements, "including

---

[14] To be clear, $39,321,506 is the mid-point for 10% growth at $.125 per message. (Frankenfeld Exp. Rep. App. 5).
[15] $57,234,736 is the mid-point for 11% growth at $.15 per message. (Frankenfeld Exp. Rep. App. 9).
[16] Sister jurisdictions agree that settlements are subject to ordinary contract interpretation. *See, e.g., Brown v. Drillers, Inc.*, 630 So. 2d 741, 748 (La.1994); *Schuster v. Baskin*, 236 N.E. 2d 205 (Mass. 1968); *Royer Homes of Miss., Inc. v. Chandeleur Homes*, 857 So.2d 748, 752-53 (Miss. 2003); *Gardner v. City of Columbia Police Dep't*, 57 S.E. 2d 308 (S.C. 1950). *Daynard v. MRRM, P.A.*, 335 F. Supp. 2d 156 (D.Mass. 2004).

PLAINTIFF ABRAMS' APPLICATION FOR
ATTORNEY'S FEES
C 07-05378 PVT

1   the attorneys' fee provisions." *Staton*, 327 F.3d at 972 n. 22 (describing potential models for

2   class action settlements on common-fund and statutory fee-shifting principles)[17] (*relying in part*

3   on *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560 (7th Cir. 1993)).

4
    This is true even when other legal principles would apply if not for the settlement terms.
5
    For example, in *Florin* the parties agreed to settle an ERISA case through the creation of a
6
    common fund, and that attorneys' fees for class counsel would be paid out of the fund itself. 34
7
8   F.3d at 562. Since the ERISA statute contained a fee-shifting provision, however, the district

9   court denied class counsel a multiplier under the holding of *City of Burlington v. Dague*, 505 U.S.

10  557 (1992) (prohibiting multipliers in cases with federal fee-shifting statutes). 34 F.3d at 564-65.

11  On appeal, the Seventh Circuit honored the intent of the parties and found that because the
12
    settlement was made on a common fund basis, *Dague* did not apply despite the fact it otherwise
13
14  would have acted to bar a multiplier. *Id.*

15  Likewise, the court in *Fulmore v. Home Depot U.S.A., Inc.*, awarded fees under settlement

16  provisions where the lawsuit had triggered a defendant's voluntary change in business practices.

17  No. 1:03-cv-0797-DFH-JMS, 2007 WL 2746882 at *2 (S.D. Ind. Sept. 19, 2007) (Slip. Op.).
18
    Although the Supreme Court had abolished the use of such a "catalyst theory" in federal fee-
19
    shifting cases in the case of *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of Health*
20
21  *and Human Resources*, 532 U.S. 598 (2001), the *Fulmore* court reasoned:

22

23  [17] This matter, however, should not be confused with a class action common fund—because there
    is only injunctive relief, counsel's interests are not antagonistic to those of the class members (no
24  increase in the fee amount will result in a corresponding reduction of relief to the class). *See In re*
    *Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1302 (9th Cir.
25  1994) (in common fund cases the relationship between plaintiffs and their attorneys turns
26  adversarial at the fee-setting stage). Rather, the parties here agreed to apply understood legal
    principles so as to help them, and if necessary this Court, calculate the fee award, and this
27  calculation is wholly independent of the relief afforded to recipients of unwanted Facebook
    Mobile text messages.
28

In this case, ultimately, the court is being called upon to apply and enforce the intentions of the parties, as expressed in their agreements. Those agreements not only allow for the possibility of a fee award, notwithstanding the rule under *Buckhannon* and its progeny, but go further and clearly indicate that a fee award in a reasonable amount was anticipated and would be appropriate.

2007 WL 2746882 at *2; *see also In re Sears Retiree Group Life Ins. Litig.*, No. 97 C 7453, 2002 WL 475180 (N.D. Ill. March 27, 2002) (applying common fund principles instead of lodestar where provision of settlement agreement for fees stated Sears could not argue for lodestar or application of *Dague*). Accordingly, honoring the intent of the instant parties requires a fee based on a percentage of the benefits generally conveyed by the settlement.

## IV.  FACEBOOK'S EVASIVE DISCOVERY ANSWERS CANNOT SHEILD THE COMPANY FROM ITS BURDEN TO PAY ATTORNEYS' FEES

Courts may consider injunctive relief's value to individuals where the value of the injunctive relief may be accurately ascertained or monetized. *Lealao*, 82 Cal. App. 4th at 45; *see also Staton*, 327 F.3d at 974 (the relief must be more tangible than a redress of a general social grievance).[18] If its discovery responses are any indication, Facebook is likely to argue that the settlement benefits here are too speculative for valuation. Facebook objected when asked to provide an estimate of the value of the settlement benefits on the grounds that the term "benefits" is "vague, ambiguous and unintelligible," that the interrogatory calls for the opinions of attorneys in violation of work product, and for "speculation" and "hypothetical opinion." (Answer to Interrogs., 12). This is not true. Putting aside the fact that Facebook's position suggests it willingly agreed to settlement language it found ambiguous so as to frustrate the intentions of the parties, the settlement itself helps define what is meant by "benefits." The agreement calls for discovery on this issue in the form of *"(a) the number of text messages Facebook sends out on a*

---

[18] The settlement protects message recipients from intrusions into their telephone devices, a privacy concern reflected in statues such as the Telephone Consumer Protection Act, 47 U.S.C. § 227. The settlement's redress of this social grievance is too speculative to quantify, however, rendering it properly excluded from the attorney's fees calculation.

1   *daily basis, (b) the number of text messages sent to previously recycled numbers, and (c) the steps*

2   *Facebook did or did not previously take to ensure that text messages were not sent to people who*

3   *did not want them.*" (Stip. Entry of J. ¶ 6) (emphasis added).  Accordingly, Facebook's sudden

4

5   lack of understanding does not reflect well on its intentions.

6           Finally, the expert opinions contained in the attached declarations show the valuation to be

7   both understandable and reasonable.  The math is neither complicated or beyond the point where

8   the benefits may be accurately ascertained.  These messages cost recipients money; they will save

9   money going forward.  While the exact dollar figure of the benefits is unavailable, such exactitude

10   is not required by the settlement agreement—the parties agreed on language that suggests a more

11   general valuation.  According to an industry expert and an economist, the settlement value is

12   between \$25,967,094 and \$57,234,736.  Abrams errs more cautiously than these monetizations

13

14   and uses the most conservatively generated figure, \$20,134,762, to support a fee application of

15   \$5,033,000.

16

17

18

19

20

21

22

23

24

25

26

27

28

# CONCLUSION

Abrams and Facebook settled for injunctive relief that will save the recipients of Facebook Mobile text messages millions of dollars. Central to the bargain was the provision that requires—in the event the Court is to decide attorney's fees—that the calculation be based on the benefits conveyed generally by the settlement. Expert modeling of the relief has demonstrated that the monetizable settlement benefits range from $25,967,094 to $57,234,736. This is not speculation, but is rather the product of thoughtful and reasonable mathematics. Abrams, however, limits her request to 25% of the lowest figure in the lowest range, being $20,134,762. Given these substantial benefits, a fee award of $5,033,000 is reasonable and appropriate under the terms of the settlement.

Respectfully submitted,

KAMBEREDELSON, LLC
SCOTT A. KAMBER


/s/ Scott A. Kamber
Attorneys for Lindsey Abrams

Jay Edelson
Myles McGuire
Steven Lezell
KAMBEREDELSON, LLC
53 West Jackson Bvld., Suite 550
Chicago, Illinois 60604
(312) 589-6370

Scott A. Kamber
KAMBEREDELSON, LLC
11 Broadway, 22nd floor
New York, NY 10004
(212) 920-3072

Alan Himmelfarb
KAMBEREDELSON, LLC
2757 Leonis Boulevard
Vernon, California 90058
(323) 585-8696

# EXHIBIT D

1     ALAN HIMMELFARB (S # 90480)
2     KAMBEREDELSON, LLC
      2757 Leonis Boulevard
3     Vernon, California 90058
      Telephone: (323) 585-8696
4     ahimmelfarb@kamberedelson.com

5     JAY EDELSON (*pro hac vice* pending)
      MYLES MCGUIRE (*pro hac vice* pending)
6     KAMBEREDELSON, LLC
      53 West Jackson Boulevard
7     Suite 550
      Chicago, Illinois 60604
8     Telephone: (312) 589-6370
      jedelson@kamberedelson.com
9     mmcguire@kamberedelson.com

10    [Add'l Counsel On Signature Page]

11    Attorneys for Plaintiff
      LINDSEY ABRAMS

12

13             **UNITED STATES DISTRICT COURT**

14   **NORTHERN DISTRICT OF CALIFORNIA—SAN JOSE DIVISION**

15

| | |
|---|---|
| 16   LINDSEY ABRAMS, individually and on behalf of a class of similarly situated | Case No. C 07-05378 PVT |
| 17   individuals, | |
| | **PLAINTIFF'S APPLICATION FOR** |
| 18            Plaintiff, | **ATTORNEYS' FEES PURSUANT TO STIPULATED ENTRY OF JUDGMENT OF** |
| 19      v. | **DISMISSAL** |
| 20   FACEBOOK, INC., a Delaware corporation, | Hearing Date: July 11, 2008 |
| | Time: 9:00 AM |
| 21          Defendant. | |

22

23     **PLAINITFF'S APPLICATION FOR ATTORNEYS' FEES PURSUANT TO**
          **STIPULATED ENTRY OF JUDGMENT OF DISMISSAL**

24

25

26

27

28

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

TRACIE MCFERREN, individually and on behalf )
of a class of similarly situated individuals,      )
                                                   )
                          *Plaintiff,*             )    No.
                                                   )
                          v.                       )    Judge Bonner
                                                   )
AT&T MOBILITY LLC,                                 )
                                                   )
                          *Defendant.*             )

## DECLARATION OF MYLES MCGUIRE

I, Myles McGuire, certify under oath and penalty of perjury, that the following statements are true and correct, except to those matters herein stated to be made upon information and belief, and as to such matters, the undersigned certifies that he verily believes the same to be true:

1. I am a partner at the Chicago office of KamberEdelson LLC. I, along with Jay Edelson and Scott Kamber, seek to be appointed Lead Counsel for the class in the above-referenced case.

2. Class Counsel, as that term is defined in our settlement papers, began a wide-ranging investigation into the premium mobile content industry in 2005. To date, that investigation has resulted in information gathered from over 1,000 aggrieved consumers. It has lead to an exchange of information and litigation strategy with multiple governmental agencies, including attorney general offices in Florida and Minnesota. We have received and reviewed numerous documents produced from the Maryland and Florida attorney general offices.

3. In January of 2006, we filed the first case involving third party mobile content sold to AT&T customers. During the following 28 months, Class Counsel, including members

of the proposed Plaintiff's Steering Committee, filed fifteen additional lawsuits that now have joined in support of the settlement, including:

- *McFerren v. AT&T Mobility LLC,* (Ga. St. Ct.) (Complaint attached to Plaintiff's Motion for Preliminary Approval of the Class Action Settlement as Exhibit C);

- *Baker v. New Motion, Inc.* et al, 2007-46363 (Fl. St. Ct.);

- *Goddard v. Google, Inc.* BC 667876 (Cal. St. Ct.);

- *Paluzzi v. mBlox, et al.,* No: 2007-CH-37213 (Ill. St. Ct.);

- *Thielen v. Buongiorno USA, Inc.,* 1:06-cv-00016 (W.D. Mich.) (dismissed);

- *Walsh v. mBlox, et al.,* No. BC. BC 382356 (Cal. St. Ct.);

- *White v. AT&T Mobility,* No. 104651-08 (N.Y. St. Ct.);

- *Warren et al. v. OpenMarket Inc., et al.* No. 6:2007cv02043 (M.D. Fl.);

- *Jiran v. AT&T Mobility LLC, et al.,* Civ. A. No. 08-00013, (N.D. Cal.);

- *Hensley v. AT&T Mobility LLC* (Minn. St. Ct.);

- *Gray v. Mobile Messenger Americas, Inc. et al.,* 07-36302 (Fl. St. Ct.);

- *Fiddler v. AT&T Mobility LLC,* et al., Civ. A. No. 08-0416, (N.D. Ill.);

- *Jiran v. AT&T Mobility LLC, et al.,* Civ. A. No. 08-00013, (N.D. Cal.);

- *Valdez v. Buongiorno USA, Inc. et al,* 4:07-cv-06496-CW (N.D. Cal.);

- *Knox v. m-Qube, Inc.* 1:07-cv-10124 (D. Mass.); and

- *Dedek v. AT&T Mobility LLC,* Case No. BC387728 (Cal. St. Ct.).

4. In many of these cases, procedural motions—such as motions to remand or motions to compel arbitration—have been briefed and/or decided by the courts. In others,

substantive motions have been filed and/or decided. Formal and informal discovery have been produced and witnesses have been made available for interviews by the various key defendants including AT&T Mobility, m-Qube, Verisign, and mBlox.

5. During the time that the parties have been litigating the issues arising from plaintiffs' claims for so-called "unauthorized" charges for third-party mobile content, counsel for plaintiffs, AT&T Mobility and several of the aggregators and third-party mobile content providers have had preliminary negotiations, which essentially centered on exchanges of information and discussions about their respective approaches to these cases.

6. As a pre-requisite to negotiating with AT&T Mobility, Class Counsel secured representations from AT&T Mobility and the other related parties that they were not negotiating with any other plaintiffs' group.

7. Class Counsel met in person with both outside and in-house counsel for AT&T Mobility in Chicago, Illinois in February of 2008 and then again in Seattle, Washington in March of 2008.

8. Class Counsel met in person with m-Qube's in-house and outside counsel in Chicago, Illinois in August of 2007 and in Washington, D.C. in October of 2007.

9. Class Counsel met with mBlox's outside counsel in Chicago, Illinois in November of 2007 and again in February of 2008.

10. As a result of the above discussions, AT&T Mobility, along with several aggregators and third-party mobile content providers, and plaintiffs engaged Rodney A. Max as mediator for sessions that took place on May 12-13, 2008 in Chicago, Illinois.

11. Although no settlement was reached after the initial two-day meeting, the parties continued to exchange information and to discuss a framework for settlement. The parties, this time without the aggregators or third-party mobile content providers, agreed to again meet with Mr. Max to mediate for an additional three days over Memorial Day weekend in the hope that a settlement could be finalized.

13. Only after that was accomplished, did the parties discuss attorneys' fees and class representative incentive awards.

14. The parties' agreement was later formalized and executed on May 28, 2008.

15. Based on my experience as a class action attorney, I believe this settlement to be fair and in the best interest of the class.

16. A true and accurate copy of the firm resume of KamberEdelson LLC is attached to Plaintiff's Motion for Preliminary Approval of the Class Action Settlement as Exhibit D.

17. If called on to testify, I can competently do so.

18. Further affiant sayeth not.


Myles McGuire


Dated this 28th day of May 2008.

# EXHIBIT E

10-K 1 d10k.htm FORM 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

## FORM 10-K

---

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the fiscal year ended December 31, 2007

### OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### Commission file number: 000-50726

# Google Inc.
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0493581** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**1600 Amphitheatre Parkway**
**Mountain View, CA 94043**
**(Address of principal executive offices)**

**(650) 253-0000**
**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Exchange on Which Registered |
|---|---|
| **Class A Common Stock, $0.001 par value** | **The Nasdaq Stock Market LLC (Nasdaq Global Select Market)** |

Securities registered pursuant to Section 12(g) of the Act:

**Title of Each Class**
**Class B Common Stock, $0.001 par value**
**Options to purchase Class A Common Stock**

Indicate by check mark if the Registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐   No ☒

At June 29, 2007, the aggregate market value of shares held by non-affiliates of the Registrant (based upon the closing sale price of such shares on the Nasdaq Global Select Market on June 29, 2007) was approximately $104,596,093,551. Shares of the Registrant's Class A common stock and Class B common stock held by each executive officer and director and by each entity or person that, to the Registrant's knowledge, owned 5% or more of the Registrant's outstanding common stock as of June 29, 2007 have been excluded in that such persons may be deemed to be affiliates of the Registrant. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

At January 31, 2008, there were 236,750,181 shares of the Registrant's Class A common stock outstanding and 76,628,707 shares of the Registrant's Class B common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's Proxy Statement for the 2008 Annual Meeting of Stockholders are incorporated herein by reference in Part III of this Annual Report on Form 10-K to the extent stated herein. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days of the Registrant's fiscal year ended December 31, 2007.

**Form 10-K**
**For the Fiscal Year Ended December 31, 2007**
**INDEX**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| | Executive Officers of the Registrant | 17 |
| Item 1A. | Risk Factors | 19 |
| Item 1B. | Unresolved Staff Comments | 33 |
| Item 2. | Properties | 33 |
| Item 3. | Legal Proceedings | 33 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 33 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 34 |
| Item 6. | Selected Financial Data | 37 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operation | 38 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 63 |
| Item 8. | Financial Statements and Supplementary Data | 64 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 98 |
| Item 9A. | Controls and Procedures | 98 |
| Item 9B. | Other Information | 98 |
| **PART III** | | |
| Item 10. | Directors and Executive Officers of the Registrant | 99 |
| Item 11. | Executive Compensation | 99 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 99 |
| Item 13. | Certain Relationships and Related Transactions | 99 |
| Item 14. | Principal Accounting Fees and Services | 99 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 100 |

i

Table of Contents

# PART I

## ITEM 1.  BUSINESS

### Overview

Google is a global technology leader focused on improving the ways people connect with information. Our innovations in web search and advertising have made our web site a top internet destination and our brand one of the most recognized in the world. We maintain the largest, most comprehensive index of web sites and other online content, and we make this information freely available to anyone with an internet connection. Our automated search technology helps people obtain nearly instant access to relevant information from our vast online index.

We generate revenue primarily by delivering relevant, cost-effective online advertising. Businesses use our AdWords program to promote their products and services with targeted advertising. In addition, the thousands of third-party web sites that comprise the Google Network use our AdSense program to deliver relevant ads that generate revenue and enhance the user experience.

We were incorporated in California in September 1998 and reincorporated in Delaware in August 2003. Our headquarters are located at 1600 Amphitheatre Parkway, Mountain View, California 94043, and our telephone number is (650) 253-0000.

### Our Mission

Our mission is to organize the world's information and make it universally accessible and useful. We believe that the most effective, and ultimately the most profitable, way to accomplish our mission is to put the needs of our users first. We have found that offering a high-quality user experience leads to increased traffic and strong word-of-mouth promotion. Our dedication to putting users first is reflected in three key commitments:

- We will do our best to provide the most relevant and useful search results possible, independent of financial incentives. Our search results will be objective and we will not accept payment for inclusion or ranking in them.

- We will do our best to provide the most relevant and useful advertising. Advertisements should not be an annoying interruption. If any element on a search result page is influenced by payment to us, we will make it clear to our users.

- We will never stop working to improve our user experience, our search technology and other important areas of information organization.

We believe that our user focus is the foundation of our success to date. We also believe that this focus is critical for the creation of long-term value. We do not intend to compromise our user focus for short-term economic gain.

### How We Provide Value to Our Users

We serve our users by developing products that let them more quickly and easily find, create, organize and share information. We place a premium on products that matter to many people and have the potential to improve their lives.

Some of the key benefits we offer include:

*Comprehensiveness and Relevance.* Our search technologies sort through a vast and growing amount of information to deliver relevant and useful search results in response to user queries. This is an area of continual development for us. When we started the company in 1998, our web index contained approximately 30 million

1

Table of Contents

documents. We now index billions of web pages and strive to provide the most comprehensive search experience possible. Our team continually improves our relevance algorithms to objectively determine the best answers to our users' queries and to place these answers at the top of our search results. We are also constantly developing new functionality and enhancing our offerings to allow our users to more easily and quickly find information.

*Objectivity.* We believe it is very important that the results users get from Google are produced with only their interests in mind. We do not accept payment for search result ranking or inclusion. We do accept fees for advertising, but the advertising is clearly marked and separated and does not influence how we generate our search results. This is similar to a newspaper, where the articles are independent of the advertising. Inclusion and frequent updating in our index are open to all sites free of charge. We believe it is important for users to have access to the best available information, not just the information that someone pays for them to see.

*Global Access.* We strive to provide our services to everyone in the world. Users from around the world visit our destination sites at Google.com and our international domains, such as Google.ba, Google.dm, Google.nr, Google.co.jp and Google.ca. The Google interface is available in 116 languages. Through Google News, we offer an automated collection of frequently updated news stories in 18 languages tailored to 45 international audiences. We also offer automatic translation of content between various languages and provide localized versions of Google in many developing countries.

*Ease of Use.* We have always believed that the most useful and powerful search technology hides its complexity from users and gives them a simple, intuitive way to get the information they want. We have devoted significant efforts to create a streamlined and easy-to-use interface based on a clean search box set prominently on a page free of commercial clutter. We introduce new navigational or informational features when we believe they will be most useful to our users, and only after extensive usability testing and experimentation.

*Pertinent, Useful Commercial Information.* The search for information often involves an interest in commercial information—researching a purchase, comparing products and services or actively shopping. We help people find commercial information through our search services and advertising products. We also present advertisements that are relevant to the information people seek. Our technology automatically rewards ads that users prefer and removes ads that they do not find helpful.

*Multiple Access Platforms.* Mobile devices are a fundamental development platform for us. Many people around the world have their first experience of the internet—and Google—on their mobile phones or other mobile devices. We have continued to invest in improving mobile search and have introduced applications that allow users to access search, email, maps, directions and satellite imagery through their mobile devices.

**Products and Services for our Users**

Our product development philosophy involves rapid and continuous innovation, with frequent releases of early-stage products that we seek to improve with every iteration. We often make products available early in their development stages by posting them on Google Labs, at test locations online or directly on Google.com. If our users find a product useful, we promote it to "beta" status for additional testing. Once we are satisfied that a product is of high quality and utility, we remove the beta label and make it a core Google product. Our main products and services are described below.

2

<u>Table of Contents</u>

*Google.com—Search and Personalization*

We are focused on building products and services on our web sites that benefit our users and let them find relevant information quickly and easily. These products and services include:

*Google Web Search.* In addition to providing easy access to billions of web pages, we have integrated special features into Google Web Search to help people find exactly what they are looking for on the web. The Google.com search experience also includes items like:

- Advanced Search Functionality—enables users to construct more complex queries, for example by using Boolean logic or restricting results to languages, countries or web sites.

- Web Page Translation—automatically translates web pages published in 12 languages, including Arabic, Chinese, French, German, and Spanish, into English, or vice versa.

- Integrated Tools—such as a spell checker, a calculator, a dictionary and currency and measurement converters.

- Search by Number—lets people do quick searches by entering shipping tracking numbers, vehicle ID numbers, product codes, telephone area codes, patent numbers, airplane registration numbers and electronic equipment ID government numbers.

- Cached Links—provides snapshots of web pages taken when the pages were indexed, letting users view web pages that are no longer available.

- Movie, Music and Weather Information—enables people to quickly and easily find movie reviews and showtimes, information about artists, songs and albums and weather conditions and forecasts.

- News, Finance, Maps, Image, Book and Groups Information—when relevant, we also display results from other Google products including Google News, Google Finance, Google Maps, Google Image Search, Google Book Search and Google Groups.

*Google Image Search.* Google Image Search is our searchable index of images found across the web. To extend the usefulness of Google Image Search, we offer advanced features, such as searching by image size, format and coloration and restricting searches to specific web sites or domains.

*Google Book Search.* Google Book Search lets users search the full text of a library-sized collection of books to discover books of interest and to learn where to buy or borrow them. Through this program, publishers can host their content and show their publications at the top of our search results. We also work closely with participating libraries to digitize all or part of their collections to create a full-text searchable online card catalog. Google Book Search links bring users to pages containing bibliographic information and several sentences of the search term in context, sample book pages, or full text, depending on author and publisher permissions and book copyright status.

*Google Scholar.* Google Scholar provides a simple way to do a broad search for relevant scholarly literature including peer-reviewed papers, theses, books, abstracts, and articles. Content in Google Scholar is taken from academic publishers, professional societies, preprint repositories, universities, and other scholarly organizations.

*Google Base.* Google Base lets content owners submit content that they want to share on Google web sites. Content owners can describe and assign attributes to the information they submit and Google uses this descriptive content to better target search results to what users are looking for.

*Google Webmaster Tools.* Google Webmaster Tools provides information to webmasters to help them enhance their understanding of how their web sites interact with the Google search engine. Content owners can submit sitemaps and geotargeting information through Google Webmaster Tools to improve search quality.

*Google Finance.* Google Finance provides a simple user interface to navigate complex financial information in an intuitive manner, including linking together different data sources, such as correlating stock price movements to news events.

3

Table of Contents

*Google News.* Google News gathers information from thousands of news sources worldwide and presents news stories in a searchable format within minutes of their publication on the web. The leading stories are presented as headlines on the user-customizable Google News home page. These headlines are selected for display entirely by a computer algorithm, without regard to political viewpoint or ideology.

*Personalized Homepage and Search.* Our Google.com personalized homepage gives our users a way to add the information they care about most to their own version of the Google homepage. Personalized homepages bring together content from across the web and other Google properties, such as Gmail and Google News, in ways that are useful to our users. Personalized Search gives our users better search results based on what they have searched for in the past, making it easier to quickly find the information that is more relevant to them. Users can also view and manage their history of past searches and the results they have clicked on, and create bookmarks with labels and notes.

*Google Co-op and Custom Search.* Google Co-op extends the power of Google's search technology by combining our algorithms with the context, knowledge and expertise of individuals. Google Custom Search allows communities of users familiar with particular topics to build customized search engines. These customized search engines allow them to help improve the quality of search results by labeling and annotating relevant web pages or by creating specialized, subscribed links for users to get more detailed information about a particular topic.

*Google Video and YouTube.* Google Video and YouTube let users find, upload, view and share video content worldwide.

### Communication, Collaboration and Communities

Information created by a single user becomes much more valuable when shared and combined with information from other people or places. Therefore our strategy for products we develop in this space is simple: develop tools for our users to create, share and communicate any information generated by the user, thus making the information more useful and manageable. Examples of products we have developed with this strategy in mind include:

*Google Docs.* Google Docs allows our users to create, view and edit documents, spreadsheets, and presentations from anywhere using a browser. These documents are useful to our users as they are accessible anywhere internet access is available, manageable as they are stored within our servers and automatically backed up, and shareable in that they allow real time editing with co-workers and friends over the internet.

*Google Calendar.* Google Calendar is a free online shareable calendar service that allows our users to keep track of the important events, appointments and special occasions in their lives and share this information with anyone they choose. In addition, web sites and groups with an online presence can use Google Calendar to create public calendars, which are automatically indexed and searchable on Google. Google Calendar uses open calendar standards so the product co-operates with other calendar applications and devices.

*Gmail.* Gmail is Google's free webmail service that comes with built-in Google search technology to allow searching of emails and over 6,300 megabytes of storage, allowing users to keep their important messages, files and pictures. In addition, we have integrated our instant messaging product into Gmail. We serve small text ads that are relevant to the messages in Gmail.

*Google Groups.* Google Groups is a free service that helps groups of people connect to information and people that interest them. Users can discuss topics by posting messages to a group, where other people can then read and respond. Google Groups now contains more than one billion messages from Usenet internet discussion groups dating back to 1981. The discussions in these groups provide a comprehensive look at evolving viewpoints, debate and advice on many subjects.

4

**Table of Contents**

*Google Reader*. Google Reader is a free service that lets users subscribe to feeds and receive updates from multiple web sites in a single interface. Google Reader also allows users to share content with others, and function with many types of media and reading-styles.

*orkut*. orkut enables users to search and connect to other users through networks of trusted friends. Users can create, join or manage online communities, personal mailboxes, photos, and a profile.

*Blogger*. Blogger is a web-based publishing tool that lets people publish to the web instantly using weblogs, or "blogs." Blogs are web pages usually made up of short, informal and frequently updated posts that are arranged chronologically. Blogs can facilitate communications among small groups or to a worldwide audience in a way that is simpler and easier to follow than traditional email or discussion forums. Blogger now features improved spam protection and is available in nine languages.

### Downloadable applications

*Google Desktop*. Google Desktop lets people perform a full-text search on the contents of their own computer, including email, files, instant messenger chats and web browser history. Users can view web pages they have visited even when they are not online. Google Desktop also includes an enhanced, customizable Sidebar that includes modules for weather, stock tickers and news.

*Google Pack*. Google Pack is a free collection of safe, useful software programs from Google and other companies that improve the user experience online and on the desktop. It includes programs that help users browse the web faster, remove spyware and viruses and organize their photos.

*Google Toolbar*. Google Toolbar is a free download that adds a Google search box to web browsers (Internet Explorer and Firefox) and improves people's web experience through features such as a pop-up blocker that blocks pop-up advertising, an autofill feature that completes web forms with information saved on a user's computer and customizable buttons that let users search their favorite web sites and stay updated on their favorite feeds.

*Picasa*. Picasa is a free service that allows users to view, manage and share their photos. Picasa enables users to import, organize and edit their photos, and upload them to Picasa Web Albums where the photos can be shared with others on the internet.

### Google GEO—Maps, Earth and Local

*Google Earth*. Google Earth lets users see and explore the world and beyond from their desktop. Users can fly virtually to a specific location and learn about that area through detailed satellite and aerial images, 3D topography, street maps and millions of data points describing the location of businesses, schools, parks and other points of interest around the globe. Google Earth includes Sky, an astronomical imagery library with images of over 100 million stars and 200 million galaxies.

*Google Maps*. Google Maps helps people navigate map information. Users can look up addresses, search for businesses, and get point-to-point driving directions—all plotted on an interactive street map or on satellite imagery. Google Maps includes 360-degree street-level imagery in several cities. Google Maps provides a comprehensive search experience by combining yellow-pages listings with ratings and reviews and other business information. We display relevant targeted ads for searches done through Google Maps.

*Google Sketchup and Sketchup Pro*. Google Sketchup is a free tool that enables users to model buildings in 3D, and can be used as a tool for populating Google Earth with architectural content. The Pro version of this tool is sold to professional designers and includes additional features.

5

Table of Contents

### Google Checkout

Google Checkout is a service for our users, advertisers and participating merchants that is intended to make online shopping faster, more convenient and more secure by providing a single login for buying online and helping users find convenient and secure places to shop when they search. Google Checkout improves the user search experience by:

- placing a small shopping cart icon on the AdWords advertisements of stores who accept Google Checkout so that users can easily identify and visit participating merchants.

- saving users time by letting them buy with a single login for use across the web and track shipping and purchase histories in one place.

- improving security by not revealing the user's full credit card number to the seller, reimbursing a user for unauthorized purchases and helping the user control commercial spam from online shopping.

For merchants, Google Checkout is integrated with AdWords to help advertisers attract more leads, convert more leads to sales and process sales. We believe that Google Checkout's streamlined checkout process lowers shopping cart abandonment and barriers to purchase, which increases conversion of clicks to sales for participating merchants. On February 1, 2008, we began charging merchants who use Google Checkout 2% of the transaction amount plus $0.20 per transaction to the extent these fees exceed 10 times the amount they spend on AdWords advertising.

### Google Mobile

*Google Mobile*. Google Mobile lets people search and view both the "mobile web," consisting of pages created specifically for wireless devices, and the entire Google index. Users can also access online information using Google SMS by typing a query to the Google shortcode and checking their email using Gmail Mobile. Google Mobile is available through many wireless and mobile phone services worldwide.

*Google Maps for Mobile*. Google Maps for Mobile is a free downloadable Java client application that lets users view maps and satellite imagery, find local businesses and get driving directions on mobile devices. Maps for Mobile offers many of the same functions as Google Maps, including draggable maps combined with satellite imagery. In addition, the My Location feature allows users to view their approximate location on the map.

*Blogger for Mobile*. With Blogger for mobile devices, users can take pictures with their camera phones and then post their pictures and text comments to their blog using MMS or email.

*Google Gmail, News and Personalized Home for Mobile*. Several of our services, such as Gmail, News and Personalized Home are also available as mobile applications.

*GOOG-411*. GOOG-411 is a free speech-enabled application allowing users to call 1-800-GOOG-411 to search for businesses by name or category.

*Android*. Android is an open-source and free mobile software platform which allows developers to create applications for mobile devices. Android is being developed with the Open Handset Alliance, a group of more than 30 technology and mobile companies, with the goal of providing consumers a less expensive and richer mobile experience.

### Google Labs

Google Labs is our testbed for our engineers and adventurous Google users. On Google Labs, we post product prototypes and solicit feedback on how the technology could be used or improved. Current Google Labs examples include: *Google Code Search*, an interface that lets developers search publicly available open-source

6

Table of Contents

code, and *Google Web Accelerator*, a downloadable client application that uses Google's global computer network to enhance user web experience by enabling faster loading of web pages.

## The Technology Behind Search and Our User Products and Services

Our web search technology uses a combination of techniques to determine the importance of a web page independent of a particular search query and to determine the relevance of that page to a particular search query.

*Ranking Technology.* One element of our technology for ranking web pages is called PageRank. While we developed much of our ranking technology after Google was formed, PageRank was developed at Stanford University with the involvement of our founders and was therefore published as research. PageRank is a query-independent technique for determining the importance of web pages by looking at the link structure of the web. PageRank treats a link from web page A to web page B as a "vote" by page A in favor of page B. The PageRank of a page is the sum of the pages that link to it. The PageRank of a web page also depends on the importance (or PageRank) of the other web pages casting the votes. Votes cast by important web pages with high PageRank weigh more heavily and are more influential in deciding the PageRank of pages on the web.

*Text-Matching Techniques.* Our technology employs text-matching techniques that compare search queries with the content of web pages to help determine relevance. Our text-based scoring techniques do far more than count the number of times a search term appears on a web page. For example, our technology determines the proximity of individual search terms to each other on a given web page, and prioritizes results that have the search terms near each other. Many other aspects of a page's content are factored into the equation, as is the content of pages that link to the page in question. By combining query independent measures such as PageRank with our text-matching techniques, we are able to deliver search results that are relevant to what people are trying to find.

In addition, we provide our products and services using our homegrown software and hardware infrastructure, which provides substantial computing resources at low cost. We currently use a combination of off-the-shelf and custom software running on clusters of commodity computers. Our considerable investment in developing this infrastructure has produced several benefits. This infrastructure simplifies the storage and processing of large amounts of data, eases the deployment and operation of large-scale global products and services, and automates much of the administration of large-scale clusters of computers. Although most of this infrastructure is not directly visible to our users, we believe it is important for providing a high-quality user experience. It enables significant improvements in the relevance of our search and advertising results by allowing us to apply superior search and retrieval algorithms that are computationally intensive. We believe the infrastructure also shortens our product development cycle and lets us pursue innovation more cost effectively.

## How We Provide Value to Our Advertisers and Content Owners

### Google AdWords

For advertisers seeking to market their products and services to consumers and business users over the internet, we offer Google AdWords, an auction-based advertising program that lets advertisers cost effectively deliver relevant ads targeted to search queries or web content across Google sites and through the Google Network, which is how we refer to the network of third parties that use our advertising programs to deliver relevant ads on their web sites. The Google Network is also increasingly encompassing different forms of online and offline media as well, including content providers who use our advertising programs to deliver ads in print, online video and television and radio broadcasts. AdWords is accessible to advertisers in 41 different interface languages.

Advertisers in our AdWords program create text-based or display ads, bid on the keywords that will trigger the display of their ads and set daily spending budgets. AdWords features an automated, low-cost online signup

7

Table of Contents

process that lets advertisers implement ad campaigns that can very quickly go live on Google properties and the Google Network. Ads are ranked for display in AdWords based on a combination of the maximum cost per click (CPC) set by the advertiser and click-through rates and other factors used to determine the relevance of the ads. This favors the ads that are most relevant to users, improving the experience both for the person looking for information and for the advertiser who is generating relevant ads. The AdWords program offers advertisers the following additional benefits:

*Return on Investment.* Many advertising dollars are spent delivering messages in an untargeted fashion, and payment for these advertisements is not tied to performance. AdWords shows ads only to people seeking information related to what the advertisers are selling, and advertisers choose how much they pay when a user clicks on their ad. Because we offer a simple ad format, advertisers can also avoid incurring significant costs associated with creating ads. As a result, even small advertisers find AdWords cost-effective for connecting with potential customers. In addition, advertisers can create many different ads, increasing the likelihood that an ad is suited to a user's search. Users can find advertisements for what they are seeking, and advertisers can find users who want what they are offering.

*Branding.* We also offer Site Targeting, a service that lets advertisers target specific web sites with text, image and Flash ads, so that they can more effectively reach specific sets of customers. In addition to targeting sites by content, advertisers can choose placements on sites based on user demographic attributes. To protect user privacy, we use only third-party opt-in panel data to map the demographics of sites in our networks. Site Targeting is an auction-based system where bidding is based on a maximum cost per impression, and Site-Targeted ads compete with keyword-targeted ads in the same auction.

*Access to the Google Search and Content Network.* We serve AdWords ads on Google properties, our syndicated search partners' web sites, and the thousands of third-party web sites that make up the Google Network. As a result, we can offer extensive search and content inventory on which advertisers can advertise. Apart from keyword-based Search Targeting and Site Targeting, we also offer advertisers an effective contextual advertising option—Content Targeting—that displays their ads on relevant content pages across our network of partner sites and products. As a result, AdWords advertisers can target users on Google properties and on search and content sites across the web. This gives advertisers increased exposure to people who are likely to be interested in their offerings. The Google Network significantly enhances our ability to attract interested advertisers.

*Broader Range of Media.* Our experiments with targeted ads in new media also open up new inventory options to AdWords advertisers. With the acquisition of dMarc Broadcasting in February 2006 and YouTube in October 2006, we have broadened the distribution options for our advertisers. In addition, we have been testing ad placements in mobile search. We are also currently placing ads in over 650 newspapers in the U.S. and, among other things, experimenting with ways of further streamlining the process of placing print ads.

*Campaign Control.* Google AdWords gives advertisers hands-on control over most elements of their ad campaigns. Advertisers can specify the relevant search or content topics for each of their ads. Advertisers can also manage expenditures by setting a maximum daily budget and determining how much they are willing to pay whenever a user clicks or views an ad. Other features that make it easy to set up and manage ad campaigns include:

- *Campaign management.* Advertisers can target multiple ads to a given keyword and easily track individual ad performance to see which ads are the most effective.

- *Conversion tracking.* Conversion tracking is a free tool integrated into AdWords reports that measures the conversions of an advertiser's campaigns, enabling a better understanding of the overall return on investment generated for the advertiser by the AdWords program.

- *Traffic estimator.* This tool estimates the number of searches and potential costs related to advertising on a particular keyword or set of keywords.

8

- *Quality-based bidding.* Advertisers' keywords are assigned dynamic minimum bids based on their Quality Score—the higher the Quality Score, the lower the minimum bid. This rewards advertisers with relevant keywords and ads.

- *Budgeted delivery.* Advertisers can set daily budgets for their campaigns and control the timing for delivery of their ads.

- *AdWords Discounter.* This feature gives advertisers the freedom to increase their maximum CPCs because it automatically adjusts pricing so that they never pay more than one cent over the next highest bid.

We offer larger advertisers additional services that help maximize returns on their internet marketing investments and improve their ability to run large, dynamic campaigns. These include dedicated client service representatives as well as:

- *Creative maximization.* Our AdWords specialists help advertisers select relevant keywords and create more effective ads.

- *Vertical market experts.* Specialists with experience in particular industries offer guidance on how to target potential customers.

- *Bulk posting.* We help businesses launch and manage large ad campaigns with hundreds or even thousands of targeted keywords.

- *The AdWords API and Commercial Developer Program.* For large advertisers as well as third parties, Google's free AdWords API service lets developers engineer computer programs that interact directly with the AdWords system. With such applications, advertisers and third parties can more efficiently and creatively manage their large AdWords accounts and campaigns. The AdWords Commercial Developer Program also enables our third-party developer ecosystem to continue designing and delivering innovative business applications based on the AdWords platform and distribution channel.

*Global Support.* We provide customer service to our advertiser base through our global support organization as well as through over 60 offices in over 20 countries. AdWords is available on a self-service basis with email and real-time chat support. At certain spending levels and through certain signup channels, phone support is also available. Advertisers with more extensive needs and advertising budgets can request strategic support services, which include an account team, to help them set up and manage their campaigns. Depending on geography, we accept bank and wire transfers, direct debit, and local debit cards carrying the Visa and MasterCard logos. We also accept payment through international credit cards. For selected advertisers, we offer several options for credit terms and monthly invoicing. We accept payments in over 40 currencies.

### Google AdSense

We are enthusiastic about helping content owners monetize their content, which facilitates the creation of better content to search. If there is better content on the web, people are likely to do more searches, and we expect that will be good for our business and for users. Our Google AdSense program enables web sites that are part of the Google Network to deliver AdWords ads that are relevant to the search results or content on their pages. It also allows offline media companies, such as newspaper and radio stations, to deliver print ads and audio ads to the content they provide. We share most of the revenue generated from ads shown by a member of the Google Network with that member. The key benefits we offer to content owners in the Google Network include:

- *Access to Advertisers.* Many small web site companies and content producers do not have the time or resources to develop effective programs for generating revenue from online advertising. Even larger sites, with dedicated sales teams, may find it difficult to generate revenue from pages with specialized content. Google AdSense promotes effective revenue generation by providing Google Network members access to Google's base of advertisers and their broad collection of ads. Our technology

9

Table of Contents

automatically starts delivering ads on a web site as soon as the site joins the Google Network. Because the ads are related to what the web site's visitors are looking for on the site, AdSense provides web sites with a way to both monetize and enhance their sites. The Google Network member determines the placement of the ads on its web site, and controls and directs the nature of ad content.

- *Improved User Satisfaction.* Many web sites are cluttered with intrusive or untargeted advertising that may distract or confuse users and may undermine users' ability to find the information they want. Some web sites have adopted practices we consider to be abusive, including pop-up ads or ads that take over web pages. We believe these tactics can cause dissatisfaction with internet advertising and reduce use of the internet overall. Our AdSense program extends our commitment to improving the overall web experience by enabling web sites to display AdWords ads in a fashion that we believe people find useful rather than disruptive.

- *Better Storage, Management, Access and Visibility.* We have developed new storage, management and access technologies to allow content owners and producers to distribute and, if they wish, monetize more types of online and offline content. We believe that only a small fraction of the world's information and content is easily and effectively stored and searchable, and that bringing non-traditional, online or offline content into Google's index will encourage the preservation and continued creation of this content. Google Scholar, Google Book Search, and Google Video enable more print and video content to be made easily accessible (and monetizable) online, while Google Base allows owners and creators to put online even non-traditional forms of structured information.

- *Syndicated Search.* We provide our search technology to partners of all sizes, allowing Google search service to be offered through these partners' properties. For commercial partners, we provide an extensive range of customization options. We also provide free standard Web Search and Site Search to other partners through Google Free.

Our Google AdSense program includes:

*Google AdSense for Search.* For internet companies that want to target search audiences, we offer Google AdSense for search. To use AdSense for search, most of our AdSense for search partners add Google search functionality to their web pages in the form of customizable Google search boxes. We offer this service free to these partners. When visitors to these web sites search either the web site or the internet using these customizable search boxes, we display relevant ads (generally text ads) on the search results pages, targeted to match user search queries. These web sites can then generate additional revenue when visitors click on or view these ads. Because we also offer to license our web search technology along with Google AdSense for search, companies without their own search service can offer Google Web Search to improve the usefulness of their web sites for their users while increasing their revenue. We generally charge a fee related to these license agreements. We also offer a more customizable premium offering to web sites with significant traffic.

*Google AdSense for Content.* Google AdSense for content lets web sites generate revenue from advertising by serving relevant AdWords ads targeted to web content. Web sites can use our automated sign-up process to quickly display AdWords ads on their sites. Under this program, we use automated technology to analyze the meaning of the content on the web site and serve relevant ads based on the meaning of such content. For example, a web page on an automotive blog that contains an entry about vintage cars might display ads for vintage car parts or vintage car shows. These ads are displayed in spaces that our AdSense for content partners have set aside on their web sites for our AdWords content. AdSense for content allows a variety of ad types to be shown, including text ads, image ads, video ads, link units (which are sets of clickable links to topic pages related to page content) and themed units (which are regular text ad units with graphic treatments that change seasonally and by geography). We share the majority of the revenues generated from these ads with the Google Network members that display the ads. Important AdSense for content features include:

- *Competitive ad filters.* Web sites can block competitive ads, or other ads they want to keep off their site, simply by telling us which URLs to block.

10

- *Reports*. Publishers can view customizable reports about their AdSense performance.

- *Sensitive content filters*. At times, certain ads may be inappropriate for some pages. For example, Google automatically filters out ads that would be inappropriate on a news page about a catastrophic event.

- *Choose default ads*. In the unlikely event that Google is unable to serve targeted ads on a page, we offer web sites the option of displaying a default ad of their choice.

*Google AdSense for Domains and Feeds*. Google AdSense for domains allows owners of undeveloped domains that receive traffic from users typing generic terms into browsers or search to generate revenue from relevant advertising. AdSense for feeds is a free program that allows publishers to monetize their feeds—user-subscribable content streams containing structured data such as stock and financial information, web log posts, and weather reports—through text ads targeted to the content of the feed. Like AdSense for search or content, Google shares the majority of the advertising revenue from AdSense for domains and AdSense for feeds with the domain owner or feed publisher.

*Google AdSense for Audio and Audio Ads*. Google AdSense for Audio is an early-stage product for radio broadcasters that automatically schedules and places advertising into radio programs, with the objective of increasing revenue for broadcasters by making their ad inventory available to new advertisers and decreasing the costs associated with processing advertisements. Google Audio Ads makes radio advertising easier for small and large businesses by providing an online interface for creating and launching radio advertising campaigns.

*Google AdSense for Newspapers and Print Ads*. Google AdSense for Newspapers is an early-stage product that lets newspaper publishers identify and manage available ad inventory and access bids submitted by advertisers who use Google Print Ads to create and launch their print campaigns. Google Print Ads makes it easier for advertisers to place advertisements in newspapers by simplifying the evaluation and selection of newspapers for print advertising campaigns, letting advertisers set their own prices and providing an online interface to create and upload ads and view electronic versions of published ads.

*Google TV Ads*. Google TV Ads is an early-stage product that allows advertisers to use their AdWords account to create TV campaigns. Advertisers can use our online advertising platform to place and monitor the effectiveness of their TV ads, enhancing relevance and accountability as compared to traditional TV advertising.

**The Technology Behind Google's Advertising Programs**

Our AdWords and AdSense programs serve millions of relevant, targeted ads each day based on search terms people enter or content they view on the web. The key elements of our advertising technology include:

*Google AdWords Auction System*. The Google AdWords auction system lets advertisers automatically deliver relevant, targeted advertising. Every search query we process involves the automated execution of an auction, resulting in our advertising system often processing hundreds of millions of auctions per day. To determine whether an ad is relevant to a particular query, this system weighs an advertiser's willingness to pay for prominence in the ad listings (the cost-per-click or cost-per-impression bid) and interest from users in the ad as measured by the click-through rate and other factors. Our Quality-based Bidding system also assigns minimum bids to advertiser keywords based on the Quality Scores of those keywords—the higher the Quality Score, the lower the minimum bid. The Quality Score is determined by an advertiser's keyword click-through rate, the relevance of the ad text, historical keyword performance, the quality of the ad's landing page and other relevancy factors. This prevents advertisers with irrelevant ads from "squatting" in top positions to gain exposure, and rewards more relevant, well-targeted ads that are clicked on frequently. Because we are paid only when users click on ads, the AdWords ranking system aligns our interests with those of our advertisers and our users. The more relevant and useful the ad, the better for our users, for our advertisers and for us.

11

Table of Contents

The AdWords auction system also incorporates the AdWords Discounter, which automatically lowers the amount advertisers actually pay to the minimum needed to maintain their ad position. Consider a situation where there are three advertisers—Pat, Betty and Joe—each bidding on the same keyword for ads that will be displayed on Google.com. These advertisers have ads with equal click-through rates and bid $1.00 per click, $0.60 per click and $0.50 per click, respectively. With our AdWords discounter, Pat would occupy the first ad position and pay only $0.61 per click, Betty would occupy the second ad position and pay only $0.51 per click, and Joe would occupy the third ad position and pay the minimum bid of $0.01 per click. The AdWords discounter saves money for advertisers by minimizing the price they pay per click, while relieving them of the need to constantly monitor and adjust their CPCs. Advertisers can also experience greater discounts through the application of our smart pricing technology, which can reduce the price of clicks for ads served across the Google Network based on the expected value of the click to the advertiser.

*AdSense Contextual Advertising Technology.* Our AdSense technology employs techniques that consider factors such as keyword analysis, word frequency and the overall link structure of the web to analyze the content of individual web pages and to match ads to them almost instantaneously. With this ad targeting technology, we can automatically serve contextually relevant ads. To do this, Google Network members embed a small amount of custom HTML code on web pages that generates a request to Google's AdSense service whenever a user views the web page. Upon receiving a request, our software examines the content of web pages and performs a matching process that identifies advertisements that we believe are relevant to the content of the specific web page. The relevant ads are then returned to the web pages in response to the request. We employ similar techniques for matching advertisements to other forms of textual content, such as email messages and Google Groups postings. For example, our technology can serve ads offering tickets to fans of a specific sports team on a news story about that team.

## Google Enterprise

We provide our search technology for use within enterprises through the Google Search Appliance and Google Mini. These search appliances are a software and hardware solution that companies can implement to extend Google's search performance to their internal or external information. They leverage our search technology to identify the most relevant pages on public web sites and across the corporate network, making it easy for people to find the information they need. We also provide hosted applications for businesses, schools, and nonprofit organizations through Google Apps.

*Google Mini.* The Google Mini is targeted at small-and medium-sized businesses who want to let employees and customers search designated documents, intranets and web sites.

*Google Search Appliance.* The Google Search Appliance is similar to the Google Mini except that it can handle more documents and offers more advanced features. Some advanced features of the Google Search Appliance include integration with advanced corporate security protocols, integration with other enterprise applications, such as content management systems, portals and other systems, and real-time search of business applications. The Google Search Appliance is available in three models: the GB-1001, for mid-sized companies; the GB-5005, for dedicated, high-priority search services such as customer-facing web sites and company-wide intranet applications; and the GB-8008, for centralized deployments supporting global business units.

*Google Apps.* Google Apps provides hosted communication and collaboration tools for organizations such as small businesses, enterprises, schools, and groups. Google Apps includes communication features such as Gmail, Google Calendar, and Google Talk and collaboration features such as Google Docs. It is available on an organization's own domain. Google Apps is available in Standard and Premier Editions, with the Premier Edition providing security and compliance features allowing administrators to implement rules for how messages are handled, as well as search for and recover deleted mail across their domain.

For companies, universities and government agencies, Google also offers the Google Toolbar for Enterprise and Google Desktop for Enterprise. Google Toolbar gives employees a search box in the browser and the ability

12

Table of Contents

to create custom search buttons. Google Desktop for Enterprise indexes the contents of a user's hard drive for easy search and retrieval of documents, email, IM chats and other items. Google Earth's Enterprise offerings let business users view, modify and export their data in a geographic context. Google Earth Pro, a downloadable application with pricing starting at $400 per user, lets users overlay company-specific data and information in Google Earth. Google Earth Enterprise lets users integrate and host proprietary geographic data or satellite imagery with Google Earth content.

## Sales and Support

We have put significant effort into developing our sales and support infrastructure. We have over 60 offices in over 20 countries, the large majority of which include sales people. We deploy specialized sales teams across 11 vertical markets. We bring businesses into our advertising network through both online and direct sales channels. We work to use technology and automation wherever possible to improve the experience for our advertisers and to grow our business cost-effectively. The vast majority of our advertisers use our automated online AdWords program to establish accounts, create ads, target users and launch and manage their advertising campaigns. Our direct advertising sales team focuses on attracting and supporting companies around the world with the largest advertising budgets. Our AdSense program follows a similar model. Most of the web sites in the Google Network sign up for AdSense using an automated online process. Our direct sales force focuses on building AdSense relationships with leading internet companies. Our global support organization concentrates on helping our advertisers and Google Network members get the most out of their relationships with us.

## Marketing

We have always believed that building a trusted, highly-recognized brand begins with providing high-quality products and services that make a notable difference in people's lives. Our user base has grown primarily by word-of-mouth. Our early marketing efforts focused on feeding this word-of-mouth momentum and used public relations efforts to accelerate it. Through these efforts and people's increased usage of Google worldwide, we have been able to build our brand with relatively low marketing costs as a percentage of our revenues. Today, we use the quality of our own products and services as our most effective marketing tool, and word-of-mouth momentum continues to drive consumer awareness and user loyalty worldwide. We also engage in targeted marketing efforts, such as those we deliver to our advertising clients, designed to inform potential advertisers, Google Network members and enterprises of the benefits they can achieve through Google—as well as targeted consumer marketing in certain geographies. In addition, we sponsor industry conferences and have promoted the distribution of Google products to internet users in order to make our search services easier to access.

## Competition

We operate in a market that is characterized by rapid change and converging, as well as new and disruptive, technologies and we face formidable competition in every aspect of our business, particularly from companies that seek to connect people with information on the web and provide them with relevant advertising. Currently, we consider our primary competitors to be Microsoft and Yahoo.

We also face competition from other web search providers, including start-ups as well as developed companies that are enhancing or developing search technologies. We compete with internet advertising companies, particularly in the areas of pay-for-performance and keyword-targeted internet advertising. We may compete with companies that sell products and services online because these companies, like us, are trying to attract users to their web sites to search for information about products and services. In addition to internet companies, we face competition from companies that offer traditional media advertising opportunities. We also provide a number of online products and services, including Google Checkout, YouTube and our communications tools such as Google Docs, that compete directly with new and established companies that offer communication, information and entertainment services integrated into their products or media properties. We also compete with web sites that provide their own or user-generated content and seek to provide advertising to their users.

13

Table of Contents

We compete to attract and retain relationships with users, advertisers and Google Network members and other content providers in different ways:

- *Users.* We compete to attract and retain users of our search and communication products and services. Most of the products and services we offer to users are free, so we do not compete on price. Instead, we compete in this area on the basis of the relevance and usefulness of our search results and the features, availability and ease of use of our products and services.

- *Advertisers.* We compete to attract and retain advertisers. We compete in this area principally on the basis of the return on investment realized by advertisers using our AdWords and AdSense programs. We also compete based on the quality of customer service, features and ease of use of our products and services.

- *Google Network members and other content providers.* We compete to attract and retain content providers (Google Network members, as well as other content providers for whom we distribute or license their content) primarily based on the size and quality of our advertiser base, our ability to help these partners generate revenues from advertising and the terms of the agreements.

## Intellectual Property

We rely on a combination of patent, trademark, copyright and trade secret laws in the U.S. and other jurisdictions as well as confidentiality procedures and contractual provisions to protect our proprietary technology and our brand. We also enter into confidentiality and invention assignment agreements with our employees and consultants and confidentiality agreements with other third parties, and we rigorously control access to proprietary technology.

Google, AdSense, AdWords, Gmail, I'm Feeling Lucky, PageRank, Blogger, orkut, Picasa and Keyhole are registered trademarks in the U.S. Our unregistered trademarks include, Blog*Spot, Writely and YouTube.

The first version of the PageRank technology was created while Larry and Sergey attended Stanford University, which owns a patent to PageRank. The PageRank patent expires in 2017. We hold a perpetual license to this patent. In October 2003, we extended our exclusivity period to this patent through 2011, at which point our license will become non-exclusive.

Circumstances outside our control could pose a threat to our intellectual property rights. For example, effective intellectual property protection may not be available in every country in which our products and services are distributed. Also, the efforts we have taken to protect our proprietary rights may not be sufficient or effective. Any significant impairment of our intellectual property rights could harm our business or our ability to compete. Also, protecting our intellectual property rights is costly and time consuming. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and harm our operating results.

Companies in the internet, technology and media industries own large numbers of patents, copyrights and trademarks and frequently enter into litigation based on allegations of infringement or other violations of intellectual property rights. As we face increasing competition, the possibility of intellectual property claims against us grows. Our technologies may not be able to withstand any third-party claims or rights against their use.

## Government Regulation

We are subject to a number of foreign and domestic laws and regulations that affect companies conducting business on the internet. In addition, laws and regulations relating to user privacy, freedom of expression,

14

Table of Contents

content, advertising, information security and intellectual property rights are being debated and considered for adoption by many countries throughout the world. We face risks from some of the proposed legislation that could be passed in the future.

In the U.S., laws relating to the liability of providers of online services for activities of their users and other third parties are currently being tested by a number of claims, which include actions for libel, slander, invasion of privacy and other tort claims, unlawful activity, copyright and trademark infringement and other theories based on the nature and content of the materials searched, the ads posted or the content generated by users. Certain foreign jurisdictions are also testing the liability of providers of online services for activities of their users and other third parties. Any court ruling that imposes liability on providers of online services for activities of their users and other third parties could harm our business.

A range of other laws and new interpretations of existing laws could have an impact on our business. For example, the Digital Millennium Copyright Act has provisions that limit, but do not necessarily eliminate, our liability for listing, linking or hosting third-party content that includes materials that infringe copyrights. The Child Online Protection Act and the Children's Online Privacy Protection Act restrict the distribution of materials considered harmful to children and impose additional restrictions on the ability of online services to collect information from children under 13. In the area of data protection, many states have passed laws requiring notification to users when there is a security breach for personal data, such as California's Information Practices Act. The costs of compliance with these laws may increase in the future as a result of changes in interpretation. Furthermore, any failure on our part to comply with these laws may subject us to significant liabilities.

Similarly, the application of existing laws prohibiting, regulating or requiring licenses for certain businesses of our advertisers, including, for example, online gambling, distribution of pharmaceuticals, adult content, financial services, alcohol or firearms, can be unclear. Application of these laws in an unanticipated manner could expose us to substantial liability and restrict our ability to deliver services to our users.

We also face risks due to government failure to preserve the internet's basic neutrality as to the services and sites that users can access through their broadband service providers. Such a failure to enforce network neutrality could limit the internet's pace of innovation and the ability of large competitors, small businesses and entrepreneurs to develop and deliver new products, features and services, which could harm our business.

We are also subject to federal, state and foreign laws regarding privacy and protection of user data. We post on our web site our privacy policies and practices concerning the use and disclosure of user data. Any failure by us to comply with our posted privacy policies or privacy-related laws and regulations could result in proceedings against us by governmental authorities or others, which could potentially harm our business. In addition, the interpretation of data protection laws, and their application to the internet, in Europe and other foreign jurisdictions is unclear and in a state of flux. There is a risk that these laws may be interpreted and applied in conflicting ways from country to country and in a manner that is not consistent with our current data protection practices. Complying with these varying international requirements could cause us to incur additional costs and change our business practices. Further, any failure by us to protect our users' privacy and data could result in a loss of user confidence in our services and ultimately in a loss of users, which could adversely affect our business.

In addition, because our services are accessible worldwide, certain foreign jurisdictions have claimed and others may claim that we are required to comply with their laws, even where we have no local entity, employees or infrastructure.

## Culture and Employees

We take great pride in our company culture and embrace it as one of our fundamental strengths. Our culture encourages the iteration of ideas to address complex technical challenges. In addition, we embrace individual thinking and creativity. As an example, we encourage our engineers to devote as much as 20% of

15

Table of Contents

their time to work on independent projects. Many of our significant new products have come from these independent projects, including Google News, AdSense for content and orkut.

We began as a technology company and have evolved into a software, technology, internet, advertising and media company all rolled into one. We take technology innovation very seriously. We compete aggressively for talent, and our people drive our innovation, technology development and operations. We strive to hire the best computer scientists and engineers to help us solve very significant challenges across systems design, artificial intelligence, machine learning, data mining, networking, software engineering, testing, distributed systems, cluster design and other areas. We work hard to provide an environment where these talented people can have fulfilling jobs and produce technological innovations that have a positive effect on the world through daily use by millions of people.

We have assembled what we believe is a highly talented group of employees. Despite our rapid growth, we constantly seek to maintain a small-company feel that promotes interaction and the exchange of ideas among employees. We try to minimize corporate hierarchy to facilitate meaningful communication among employees at all levels and across departments, and we have developed software to help us in this effort. We believe that considering multiple viewpoints is critical to developing effective solutions, and we attempt to build consensus in making decisions. While teamwork is one of our core values, we also significantly reward individual accomplishments that contribute to our overall success. As we grow, we expect to continue to provide compensation structures that are more similar to those offered by start-ups than established companies. We will focus on very significant rewards for individuals and teams that build amazing things that provide significant value to us, our advertisers and our users.

At December 31, 2007, we had 16,805 employees, consisting of 5,788 in research and development, 6,647 in sales and marketing, 2,844 in general and administrative and 1,526 in operations. All of Google's employees are also equityholders, with significant collective employee ownership. As a result, many employees are highly motivated to make the company more successful.

## Seasonality

Both seasonal fluctuations in internet usage and traditional retail seasonality have affected, and are likely to continue to affect, our business. Internet usage generally slows during the summer months, and commercial queries typically increase significantly in the fourth quarter of each year. These seasonal trends have caused and will likely continue to cause, fluctuations in our quarterly results, including fluctuations in sequential revenue growth rates.

## Available Information

Our web site is located at www.google.com, and our investor relations web site is located at http://investor.google.com. The information on or accessible through our web sites is not part of this Annual Report on Form 10-K. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to such reports are available, free of charge, on our investor relations web site as soon as reasonably practicable after we electronically file or furnish such material with the SEC. Further, a copy of this Annual Report on Form 10-K is located at the SEC's Public Reference Room at 100 F Street, NE, Washington, D.C. 20549. Information on the operation of the Public Reference Room can be obtained by calling the SEC at 1-800-SEC-0330. The SEC maintains an internet site that contains reports, proxy and information statements and other information regarding our filings at www.sec.gov.

16

Table of Contents

**Executive Officers of The Registrant**

The names of our executive officers and their ages, titles and biographies as of January 31, 2008 are set forth below:

| Name | Age | Position |
| --- | --- | --- |
| Eric Schmidt | 52 | Chairman of the Board of Directors, Chief Executive Officer and Director |
| Sergey Brin | 34 | President of Technology and Director |
| Larry Page | 35 | President of Products and Director |
| Omid Kordestani | 44 | Senior Vice President of Global Sales and Business Development |
| David C. Drummond | 44 | Senior Vice President of Corporate Development, Chief Legal Officer and Secretary |
| George Reyes | 53 | Senior Vice President and Chief Financial Officer |
| Jonathan J. Rosenberg | 46 | Senior Vice President of Product Management |
| Shona L. Brown | 41 | Senior Vice President of Business Operations |
| Alan Eustace | 51 | Senior Vice President of Engineering and Research |

Our executive officers are appointed by, and serve at the discretion of, our board of directors. Each executive officer is a full-time employee. There is no family relationship between any of our executive officers or directors.

*Eric Schmidt* has served as our Chief Executive Officer since July 2001 and served as Chairman of our board of directors from March 2001 to April 2004 and again from April 2007 to the present. In April 2004, Eric was named Chairman of the Executive Committee of our board of directors. Prior to joining us, from April 1997 to November 2001, Eric served as Chairman of the board of Novell, a computer networking company, and, from April 1997 to July 2001, as the Chief Executive Officer of Novell. From 1983 until March 1997, Eric held various positions at Sun Microsystems, a supplier of network computing solutions, including Chief Technology Officer from February 1994 to March 1997 and President of Sun Technology Enterprises from February 1991 until February 1994. Eric is also a director of Apple Inc., an electronic device company. Eric has a Bachelor of Science degree in electrical engineering from Princeton University and a Masters degree and Ph.D. in computer science from the University of California at Berkeley.

*Sergey Brin*, one of our founders, has served as a member of our board of directors since our inception in September 1998 and as our President of Technology since July 2001. From September 1998 to July 2001, Sergey served as our President. Sergey holds a Masters degree in computer science from Stanford University and a Bachelor of Science degree with high honors in mathematics and computer science from the University of Maryland at College Park.

*Larry Page*, one of our founders, has served as a member of our board of directors since our inception in September 1998 and as our President of Products since July 2001. Larry served as our Chief Executive Officer from September 1998 to July 2001 and as our Chief Financial Officer from September 1998 to July 2002. Larry holds a Masters degree in computer science from Stanford University and a Bachelor of Science degree in engineering, with a concentration in computer engineering, from the University of Michigan.

*Omid Kordestani* has served as our Senior Vice President of Global Sales and Business Development, formerly known as Worldwide Sales and Field Operations, since May 1999. Prior to joining us, Omid served as Vice President of Business Development, from 1995 to 1999, at Netscape, an internet software and services company. Prior to Netscape, he held positions in business development, product management and marketing at The 3DO Company, a video game company, Go Corporation, a developer of software for mobile devices, and Hewlett-Packard, a provider of technology products, software and services. Omid holds a Masters of Business Administration degree from Stanford University and a Bachelor of Science degree in electrical engineering from San Jose State University.

17

Table of Contents

*David C. Drummond* has served as our Senior Vice President of Corporate Development since January 2006 and as Chief Legal Officer since December 2006. Previously, he served as our Vice President of Corporate Development and General Counsel since February 2002. Prior to joining us, from July 1999 to February 2002, David served as Chief Financial Officer of SmartForce, an educational software applications company. Prior to that, David was a partner at the law firm of Wilson Sonsini Goodrich & Rosati. David holds a J.D. from Stanford University and a Bachelor of Arts degree in history from Santa Clara University.

*George Reyes* has served as our Senior Vice President and Chief Financial Officer since January 2006. Previously, he served as our Vice President and Chief Financial Officer since July 2002. Prior to joining us, George served as Interim Chief Financial Officer for ONI Systems, a provider of optical networking equipment, from February 2002 until June 2002. From April 1999 to September 2001, George served as Vice President and Treasurer of Sun Microsystems, a supplier of networking computing solutions, and as Vice President, Corporate Controller of Sun Microsystems from April 1994 to April 1999. George is also a director of BEA Systems, an application infrastructure software company, Symantec, an information security company, and Flextronics, an electronics design, fabrication, assembly, and test company. George holds a Masters of Business Administration degree from Santa Clara University and a Bachelor of Arts degree in accounting from the University of South Florida. On August 27, 2007, George informed Google of his intention to resign as Chief Financial Officer. The effective date of his retirement has not been determined.

*Jonathan J. Rosenberg* has served as our Senior Vice President of Product Management since January 2006. Previously, he served as our Vice President of Product Management since February 2002. Prior to joining us, from October 2001 to February 2002, Jonathan served as Vice President of Software for palmOne, a provider of handheld computer and communications solutions. From March 1996 to November 2000, Jonathan held various executive positions at Excite@Home, an internet media company, most recently as its Senior Vice President of Online Products and Services. Jonathan holds a Masters of Business Administration degree from the University of Chicago and a Bachelor of Arts degree with honors in economics from Claremont McKenna College.

*Shona L. Brown* has served as our Senior Vice President of Business Operations since January 2006. Previously, she served as our Vice President of Business Operations since September 2003. Prior to joining us, from October 1995 to August 2003, Shona was at McKinsey & Company, a management consulting firm, where she had been a partner in the Los Angeles office since December 2000. Shona holds a Ph.D. and Post-Doctorate in industrial engineering and engineering management from Stanford University, a Masters of Arts degree from Oxford University (as a Rhodes Scholar), and a Bachelor of Science degree in computer systems engineering from Carleton University.

*Alan Eustace* has served as our Senior Vice President of Engineering and Research since January 2006. Previously, he served as our Vice President of Engineering since July 2003. Prior to joining us, from May 2002 to June 2003, Alan was at Hewlett-Packard, a provider of technology products, software and services, where he most recently served as Director of the Western Research Laboratory. Prior to that, Alan worked at Compaq from June 1998 until its acquisition by Hewlett-Packard in May 2002. Prior to that, Alan held various positions at Digital Equipment Corporation until its acquisition by Compaq in June 1998. Alan holds a Bachelor of Science degree, a Masters of Science degree and a Ph.D. in computer science from the University of Central Florida.

18

Table of Contents

## ITEM 1A.   RISK FACTORS

### Risks Related to Our Business and Industry

*We face significant competition from Microsoft and Yahoo.*

We face formidable competition in every aspect of our business, and particularly from other companies that seek to connect people with information on the web and provide them with relevant advertising. Currently, we consider our primary competitors to be Microsoft Corporation and Yahoo! Inc. Microsoft has developed features that make web search a more integrated part of its Windows operating system and other desktop software products. We expect that Microsoft will increasingly use its financial and engineering resources to compete with us. Microsoft has more employees and cash resources than we do. Also, both Microsoft and Yahoo have longer operating histories and more established relationships with customers and end users. They can use their experience and resources against us in a variety of competitive ways, including by making acquisitions, investing more aggressively in research and development and competing more aggressively for advertisers and web sites. Microsoft and Yahoo also may have a greater ability to attract and retain users than we do because they operate internet portals with a broad range of content products and services. If Microsoft or Yahoo are successful in providing similar or better web search results or more relevant advertisements, or in leveraging their platforms or products to make their web search or advertising services easier to access, we could experience a significant decline in user traffic or the size of the Google Network. Any such decline could negatively affect our revenues.

*We face competition from other internet companies, including web search providers, internet access providers, internet advertising companies and destination web sites.*

In addition to Microsoft and Yahoo, we face competition from other web search providers, including start-ups as well as developed companies that are enhancing or developing search technologies. We compete with internet advertising companies, particularly in the areas of pay-for-performance and keyword-targeted internet advertising. Also, we may compete with companies that sell products and services online because these companies, like us, are trying to attract users to their web sites to search for information about products and services. We also provide a number of online products and services, including Google Checkout, YouTube and our communications tools such as Google Docs, that compete directly with new and established companies that offer communication, information and entertainment services integrated into their products or media properties.

We also compete with web sites that provide their own or user-generated content and provide advertising to their users. These destination web sites include those operated by internet access providers, such as cable and DSL service providers. Because our users need to access our services through internet access providers, they have direct relationships with these providers. If an access provider or a computer or computing device manufacturer offers online services that compete with ours, the user may find it more convenient to use the services of the access provider or manufacturer. In addition, the access provider or manufacturer may make it hard to access our services by not listing them in the access provider's or manufacturer's own menu of offerings, or may charge users to access our web sites or the web sites of our Google Network members. Also, because the access provider gathers information from the user in connection with the establishment of a billing relationship, the access provider may be more effective than we are in tailoring services and advertisements to the specific tastes of the user.

There has been a trend toward industry consolidation among our competitors, and so smaller competitors today may become larger competitors in the future. If our competitors are more successful than we are at generating traffic, our revenues may decline.

*We face competition from traditional media companies, and we may not be included in the advertising budgets of large advertisers, which could harm our operating results.*

In addition to internet companies, we face competition from companies that offer traditional media advertising opportunities. Most large advertisers have fixed advertising budgets, a small portion of which is

19

Table of Contents

allocated to internet advertising. We expect that large advertisers will continue to focus most of their advertising efforts on traditional media. If we fail to convince these companies to spend a portion of their advertising budgets with us, or if our existing advertisers reduce the amount they spend on our programs, our operating results would be harmed.

### *We expect our revenue growth rate to decline and anticipate downward pressure on our operating margin in the future.*

We expect that our revenue growth rate will decline over time and anticipate that there will be downward pressure on our operating margin. We believe our revenue growth rate will generally decline as a result of increasing competition and the inevitable decline in growth rates as our revenues increase to higher levels. We believe our operating margin will experience downward pressure as a result of increasing competition and increased expenditures for many aspects of our business. Our operating margin will also experience downward pressure if a greater percentage of our revenues comes from ads placed on our Google Network members' sites compared to revenues generated through ads placed on our own sites or if we spend a proportionately larger amount to promote the distribution of certain products, including Google Toolbar. The margin on revenue we generate from our Google Network members is significantly less than the margin on revenue we generate from advertising on our web sites. Additionally, the margin we earn on revenue generated from our Google Network members could decrease in the future if we pay an even larger percentage of advertising fees to our Google Network members.

### *Our operating results may fluctuate, which makes our results difficult to predict and could cause our results to fall short of expectations.*

Our operating results may fluctuate as a result of a number of factors, many outside of our control. As a result, comparing our operating results on a period-to-period basis may not be meaningful, and you should not rely on our past results as an indication of our future performance. Our quarterly, year-to-date and annual expenses as a percentage of our revenues may differ significantly from our historical or projected rates. Our operating results in future quarters may fall below expectations. Any of these events could cause our stock price to fall. Each of the risk factors listed in this Item 1A and the following factors may affect our operating results:

- Our ability to continue to attract users to our web sites.
- Our ability to monetize (or generate revenue from) traffic on our web sites and our Google Network members' web sites.
- Our ability to attract advertisers to our AdWords program.
- Our ability to attract web sites to our AdSense program.
- The mix in our revenues between those generated on our web sites and those generated through our Google Network.
- The amount and timing of operating costs and capital expenditures related to the maintenance and expansion of our businesses, operations and infrastructure.
- Our focus on long-term goals over short-term results.
- The results of our investments in risky projects.
- Our ability to keep our web sites operational at a reasonable cost and without service interruptions.
- Our ability to achieve revenue goals for partners to whom we guarantee minimum payments or pay distribution fees.
- Our ability to generate revenue from services in which we have invested considerable time and resources, such as YouTube, Gmail, orkut and Google Checkout.

20

Table of Contents

Because our business is changing and evolving, our historical operating results may not be useful to you in predicting our future operating results. In addition, advertising spending has historically been cyclical in nature, reflecting overall economic conditions as well as budgeting and buying patterns. For example, in 1999, advertisers spent heavily on internet advertising. This was followed by a lengthy downturn in ad spending on the web. Also, user traffic tends to be seasonal. Our rapid growth has tended to mask the cyclicality and seasonality of our business. As our growth rate has slowed, the cyclicality and seasonality in our business has become more pronounced and caused our operating results to fluctuate.

*If we do not continue to innovate and provide products and services that are useful to users, we may not remain competitive, and our revenues and operating results could suffer.*

Our success depends on providing products and services that make using the internet a more useful and enjoyable experience for our users. Our competitors are constantly developing innovations in web search, online advertising and web based products and services. As a result, we must continue to invest significant resources in research and development in order to enhance our web search technology and our existing products and services and introduce new products and services that people can easily and effectively use. If we are unable to provide quality products and services, then our users may become dissatisfied and move to a competitor's products and services. Our operating results would also suffer if our innovations are not responsive to the needs of our users, advertisers and Google Network members, are not appropriately timed with market opportunities or are not effectively brought to market. As search technology continues to develop, our competitors may be able to offer search results that are, or that are seen to be, substantially similar to or better than ours. This may force us to compete in different ways and expend significant resources in order to remain competitive.

*We generate our revenue almost entirely from advertising, and the reduction in spending by or loss of advertisers could seriously harm our business.*

We generated approximately 99% of our revenues in 2007 from our advertisers. Our advertisers can generally terminate their contracts with us at any time. Advertisers will not continue to do business with us if their investment in advertising with us does not generate sales leads, and ultimately customers, or if we do not deliver their advertisements in an appropriate and effective manner. If we are unable to remain competitive and provide value to our advertisers, they may stop placing ads with us, which would negatively harm our revenues and business. In addition, expenditures by advertisers tend to be cyclical, reflecting overall economic conditions and budgeting and buying patterns. Any decreases in or delays in advertising spending due to general economic conditions could reduce our revenues or negatively impact our ability to grow our revenues.

*We rely on our Google Network members for a significant portion of our revenues, and we benefit from our association with them. The loss of these members could adversely affect our business.*

We provide advertising, web search and other services to members of our Google Network, which accounted for 35% of our revenues in 2007. Some of the participants in this network may compete with us in one or more areas. They may decide in the future to terminate their agreements with us. If our Google Network members decide to use a competitor's or their own web search or advertising services, our revenues would decline. Our agreements with a few of the largest Google Network members account for a significant portion of revenues derived from our AdSense program. If our relationship with one or more large Google Network members were terminated or renegotiated on terms less favorable to us, our business could be adversely affected.

Also, certain of our key network members operate high-profile web sites, and we derive tangible and intangible benefits from this affiliation. If one or more of these key relationships is terminated or not renewed, and is not replaced with a comparable relationship, our business would be adversely affected.

21

Table of Contents

***Our business and operations are experiencing rapid growth. If we fail to effectively manage our growth, our business and operating results could be harmed.***

We have experienced, and continue to experience, rapid growth in our headcount and operations, which has placed, and will continue to place, significant demands on our management, operational and financial infrastructure. If we do not effectively manage our growth, the quality of our products and services could suffer, which could negatively affect our brand and operating results. Our expansion and growth in international markets heightens these risks as a result of the particular challenges of supporting a rapidly growing business in an environment of multiple languages, cultures, customs, legal systems, alternative dispute systems, regulatory systems and commercial infrastructures. To effectively manage this growth, we will need to continue to improve our operational, financial and management controls and our reporting systems and procedures. These systems enhancements and improvements will require significant capital expenditures and management resources. Failure to implement these improvements could hurt our ability to manage our growth and our financial position.

***Our business depends on a strong brand, and failing to maintain and enhance our brand would hurt our ability to expand our base of users, advertisers and Google Network members.***

The brand identity that we have developed has significantly contributed to the success of our business. Maintaining and enhancing the "Google" brand is critical to expanding our base of users, advertisers, Google Network members, and other partners. We believe that the importance of brand recognition will increase due to the relatively low barriers to entry in the internet market. If we fail to maintain and enhance the "Google" brand, or if we incur excessive expenses in this effort, our business, operating results and financial condition will be materially and adversely affected. Maintaining and enhancing our brand will depend largely on our ability to be a technology leader and continue to provide high-quality products and services, which we may not do successfully.

***Acquisitions could result in operating difficulties, dilution and other harmful consequences.***

We do not have a great deal of experience acquiring companies, and the companies we have acquired have typically been small. We frequently evaluate and enter into discussions regarding a wide array of potential strategic transactions. Any of these transactions could be material to our financial condition and results of operations. In addition, the process of integrating an acquired company, business or technology may create unforeseen operating difficulties and expenditures and is risky. The areas where we may face risks include:

- Implementation or remediation of controls, procedures and policies at the acquired company.
- Diversion of management time and focus from operating our business to acquisition integration challenges.
- Coordination of sales and marketing functions.
- Cultural challenges associated with integrating employees from the acquired company into our organization.
- Retention of employees from the businesses we acquire.
- Integration of each company's accounting, management information, human resource and other administrative systems.

Foreign acquisitions involve unique risks in addition to those mentioned above, including those related to integration of operations across different cultures and languages, currency risks and the particular economic, political and regulatory risks associated with specific countries.

22

Table of Contents

Future acquisitions or dispositions could also result in dilutive issuances of our equity securities, the incurrence of debt, contingent liabilities or amortization expenses, or write-offs of goodwill, any of which could harm our financial condition. Future acquisitions may require us to obtain additional equity or debt financing, which may not be available on favorable terms or at all. Also, the anticipated benefit of many of our acquisitions may not materialize. For example, we have yet to realize significant revenue benefits from our acquisitions of dMarc Broadcasting (Audio Ads), YouTube or Postini.

### *Our international operations are subject to increased risks which could harm our business, operating results and financial condition.*

International revenues accounted for approximately 48% of our total revenues in 2007, and more than half of our user traffic came from outside the U.S. during this period. We have limited experience with operations outside the U.S. and our ability to manage our business and conduct our operations internationally requires considerable management attention and resources and is subject to a number of risks, including the following:

- Challenges caused by distance, language and cultural differences and by doing business with foreign agencies and governments.

- Difficulties in developing products and services in different languages and for different cultures.

- Longer payment cycles in some countries.

- Credit risk and higher levels of payment fraud.

- Currency exchange rate fluctuations.

- Foreign exchange controls that might prevent us from repatriating cash earned in countries outside the U.S.

- Import and export requirements that may prevent us from shipping products or providing services to a particular market and may increase our operating costs.

- Political and economic instability.

- Potentially adverse tax consequences.

- Higher costs associated with doing business internationally.

In addition, compliance with complex foreign and U.S. laws and regulations that apply to our international operations increases our cost of doing business in international jurisdictions and could expose us or our employees to fines and penalties. These numerous and sometimes conflicting laws and regulations include import and export requirements, content requirements, trade restrictions, tax laws, sanctions, internal and disclosure control rules, data privacy requirements, labor relations laws, U.S. laws such as the Foreign Corrupt Practices Act, and local laws prohibiting corrupt payments to governmental officials. Violations of these laws and regulations could result in fines, criminal sanctions against us, our officers or our employees, prohibitions on the conduct of our business and damage to our reputation. Although we have implemented policies and procedures designed to ensure compliance with these laws, there can be no assurance that our employees, contractors or agents will not violate our policies. Any such violations could include prohibitions on our ability to offer our products and services to one or more countries, and could also materially damage our reputation, our brand, our international expansion efforts, our ability to attract and retain employees, our business and our operating results.

### *Our corporate culture has contributed to our success, and if we cannot maintain this culture as we grow, we could lose the innovation, creativity and teamwork fostered by our culture, and our business may be harmed.*

We believe that a critical contributor to our success has been our corporate culture, which we believe fosters innovation, creativity and teamwork. As our organization grows, and we are required to implement more

23

Table of Contents

complex organizational management structures, we may find it increasingly difficult to maintain the beneficial aspects of our corporate culture. This could negatively impact our future success.

***Our intellectual property rights are valuable, and any inability to protect them could reduce the value of our products, services and brand.***

Our patents, trademarks, trade secrets, copyrights and other intellectual property rights are important assets for us. Various events outside of our control pose a threat to our intellectual property rights as well as to our products and services. For example, effective intellectual property protection may not be available in every country in which our products and services are distributed or made available through the internet. Also, the efforts we have taken to protect our proprietary rights may not be sufficient or effective. Any significant impairment of our intellectual property rights could harm our business or our ability to compete. Also, protecting our intellectual property rights is costly and time consuming. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and harm our operating results.

Although we seek to obtain patent protection for our innovations, it is possible we may not be able to protect some of these innovations. In addition, given the costs of obtaining patent protection, we may choose not to protect certain innovations that later turn out to be important. Furthermore, there is always the possibility, despite our efforts, that the scope of the protection gained will be insufficient or that an issued patent may be deemed invalid or unenforceable.

We also face risks associated with our trademarks. For example, there is a risk that the word "Google" could become so commonly used that it becomes synonymous with the word "search." If this happens, we could lose protection for this trademark, which could result in other people using the word "Google" to refer to their own products, thus diminishing our brand.

We also seek to maintain certain intellectual property as trade secrets. The secrecy could be compromised by outside parties, or intentionally or accidentally by our employees, which would cause us to lose the competitive advantage resulting from these trade secrets.

***We are, and may in the future be, subject to intellectual property rights claims, which are costly to defend, could require us to pay damages and could limit our ability to use certain technologies in the future.***

Companies in the internet, technology and media industries own large numbers of patents, copyrights, trademarks and trade secrets and frequently enter into litigation based on allegations of infringement or other violations of intellectual property rights. As we have grown, the intellectual property rights claims against us have increased. Our products, services and technologies may not be able to withstand any third-party claims and regardless of the merits of the claim, intellectual property claims are often time-consuming and expensive to litigate or settle. In addition, to the extent claims against us are successful, we may have to pay substantial monetary damages or discontinue any of our services or practices that are found to be in violation of another party's rights. We also may have to seek a license to continue such practices, which may significantly increase our operating expenses. In addition, many of our agreements with members of our Google Network and other partners require us to indemnify these members for certain third-party intellectual property infringement claims, which would increase our costs as a result of defending such claims and may require that we pay damages if there were an adverse ruling in any such claims.

Companies have filed trademark infringement and related claims against us over the display of ads in response to user queries that include trademark terms. The outcomes of these lawsuits have differed from jurisdiction to jurisdiction. Courts in France have held us liable for allowing advertisers to select certain trademarked terms as keywords. We are appealing those decisions. We were also subject to two lawsuits in Germany on similar matters where the courts held that we are not liable for the actions of our advertisers prior to notification of trademark rights. We are litigating or have recently litigated similar issues in other cases in the U.S., France, Germany, Israel, Italy, Austria and Australia.

24

Table of Contents

We have also had copyright claims filed against us alleging that features of certain of our products and services, including Google Web Search, Google News, Google Video, Google Image Search, Google Book Search and YouTube, infringe another party's rights. Adverse results in these lawsuits may include awards of substantial monetary damages, costly royalty or licensing agreements or orders preventing us from offering certain functionalities, and may also result in a change in our business practices, which could result in a loss of revenue for us or otherwise harm our business. In addition, any time one of our products or services links to or hosts material in which others allegedly own copyrights, we face the risk of being sued for copyright infringement or related claims. Because these products and services comprise the majority of our products and services, the risk of harm from such lawsuits could be substantial.

### *Privacy concerns relating to our technology could damage our reputation and deter current and potential users from using our products and services.*

From time to time, concerns have been expressed about whether our products and services compromise the privacy of users and others. Concerns about our practices with regard to the collection, use, disclosure or security of personal information or other privacy-related matters, even if unfounded, could damage our reputation and operating results. While we strive to comply with all applicable data protection laws and regulations, as well as our own posted privacy policies, any failure or perceived failure to comply may result in proceedings or actions against us by government entities or others, which could potentially have an adverse effect on our business.

In addition, as nearly all of our products and services are web based, the amount of data we store for our users on our servers (including personal information) has been increasing. Any systems failure or compromise of our security that results in the release of our users' data could seriously limit the adoption of our products and services as well as harm our reputation and brand and, therefore, our business. We may also need to expend significant resources to protect against security breaches. The risk that these types of events could seriously harm our business is likely to increase as we expand the number of web based products and services we offer as well as increase the number of countries where we operate.

A number of legislative proposals pending before the U.S. Congress, various state legislative bodies and foreign governments concern data protection. In addition, the interpretation and application of data protection laws in Europe and elsewhere are still uncertain and in flux. It is possible that these laws may be interpreted and applied in a manner that is inconsistent with our data practices. If so, in addition to the possibility of fines, this could result in an order requiring that we change our data practices, which could have an adverse effect on our business. Complying with these various laws could cause us to incur substantial costs or require us to change our business practices in a manner adverse to our business.

### *Our business is subject to a variety of U.S. and foreign laws that could subject us to claims or otherwise harm our business.*

We are subject to a variety of laws in the U.S. and abroad that are costly to comply with, can result in negative publicity and diversion of management time and effort, and can subject us to claims or other remedies. For example, the laws relating to the liability of providers of online services are currently unsettled both within the U.S. and abroad. Claims have been threatened and filed under both U.S. and foreign law for defamation, libel, slander, invasion of privacy and other tort claims, unlawful activity, copyright and trademark infringement, or other theories based on the nature and content of the materials searched and the ads posted by our users, our products and services, or content generated by our users.

In addition, the Digital Millennium Copyright Act has provisions that limit, but do not necessarily eliminate, our liability for listing or linking to third-party web sites that include materials that infringe copyrights or other rights, so long as we comply with the statutory requirements of this act. The Child Online Protection Act and the Children's Online Privacy Protection Act restrict the distribution of materials considered harmful to children and impose additional restrictions on the ability of online services to collect

25

Table of Contents

information from minors. In the area of data protection, many states have passed laws requiring notification to users when there is a security breach for personal data, such as California's Information Practices Act. We face similar risks and costs as our products and services are offered in international markets and may be subject to additional regulations.

Any failure on our part to comply with these laws and regulations may subject us to additional liabilities.

*We compete internationally with local information providers and with U.S. competitors who are currently more successful than we are in various markets, and if we fail to compete effectively in international markets, our business will be harmed.*

We face different market characteristics and competition outside the U.S. In certain markets, other web search, advertising services and internet companies have greater brand recognition, more users and more search traffic than we have. Even in countries where we have a significant user following, we may not be as successful in generating advertising revenue due to slower market development, our inability to provide attractive local advertising services or other factors. In order to compete, we need to improve our brand recognition and our selling efforts internationally and build stronger relationships with advertisers. We also need to better understand our international users and their preferences. If we fail to do so, our global expansion efforts may be more costly and less profitable than we expect.

*Our business may be adversely affected by malicious applications that interfere with, or exploit security flaws in, our products and services.*

Our business may be adversely affected by malicious applications that make changes to our users' computers and interfere with the Google experience. These applications have in the past attempted, and may in the future attempt, to change our users' internet experience, including hijacking queries to Google.com, altering or replacing Google search results, or otherwise interfering with our ability to connect with our users. The interference often occurs without disclosure to or consent from users, resulting in a negative experience that users may associate with Google. These applications may be difficult or impossible to uninstall or disable, may reinstall themselves and may circumvent other applications' efforts to block or remove them. In addition, we offer a number of products and services that our users download to their computers or that they rely on to store information and transmit information to others over the internet. These products and services are subject to attack by viruses, worms and other malicious software programs, which could jeopardize the security of information stored in a user's computer or in our computer systems and networks. The ability to reach users and provide them with a superior experience is critical to our success. If our efforts to combat these malicious applications are unsuccessful, or if our products and services have actual or perceived vulnerabilities, our reputation may be harmed and our user traffic could decline, which would damage our business.

*Proprietary document formats may limit the effectiveness of our search technology by preventing our technology from accessing the content of documents in such formats, which could limit the effectiveness of our products and services.*

A large amount of information on the internet is provided in proprietary document formats such as Microsoft Word. The providers of the software application used to create these documents could engineer the document format to prevent or interfere with our ability to access the document contents with our search technology. This would mean that the document contents would not be included in our search results even if the contents were directly relevant to a search. The software providers may also seek to require us to pay them royalties in exchange for giving us the ability to search documents in their format. If the software provider also competes with us in the search business, they may give their search technology a preferential ability to search documents in their proprietary format. Any of these results could harm our brand and our operating results.

26

Table of Contents

*New technologies could block our ads, which would harm our business.*

Technologies may be developed that can block the display of our ads. Most of our revenues are derived from fees paid to us by advertisers in connection with the display of ads on web pages. As a result, ad-blocking technology could, in the future, adversely affect our operating results.

*If we fail to detect click fraud or other invalid clicks, we could face additional litigation as well as lose the confidence of our advertisers, which would cause our business to suffer.*

We are exposed to the risk of fraudulent clicks and other invalid clicks on our ads from a variety of potential sources. We have regularly refunded fees that our advertisers have paid to us that were later attributed to click fraud and other invalid clicks, and we expect to do so in the future. Invalid clicks are clicks that we have determined are not intended by the user to link to the underlying content, such as inadvertent clicks on the same ad twice and clicks resulting from click fraud. Click fraud occurs when a user intentionally clicks on a Google AdWords ad displayed on a web site for a reason other than to view the underlying content. If we are unable to stop these invalid clicks, these refunds may increase. If we find new evidence of past invalid clicks we may issue refunds retroactively of amounts previously paid to our Google Network members. This would negatively affect our profitability, and these invalid clicks could hurt our brand. If invalid clicks are not detected, the affected advertisers may experience a reduced return on their investment in our advertising programs because the invalid clicks will not lead to potential revenue for the advertisers. This could lead the advertisers to become dissatisfied with our advertising programs, which has led to litigation alleging click fraud and could lead to further litigation, as well as to a loss of advertisers and revenues.

*Index spammers could harm the integrity of our web search results, which could damage our reputation and cause our users to be dissatisfied with our products and services.*

There is an ongoing and increasing effort by "index spammers" to develop ways to manipulate our web search results. For example, because our web search technology ranks a web page's relevance based in part on the importance of the web sites that link to it, people have attempted to link a group of web sites together to manipulate web search results. We take this problem very seriously because providing relevant information to users is critical to our success. If our efforts to combat these and other types of index spamming are unsuccessful, our reputation for delivering relevant information could be diminished. This could result in a decline in user traffic, which would damage our business.

*If we were to lose the services of Eric, Larry, Sergey or other members of our senior management team, we may not be able to execute our business strategy.*

Our future success depends in a large part upon the continued service of key members of our senior management team. In particular, our CEO, Eric Schmidt, and our founders, Larry Page and Sergey Brin, are critical to the overall management of Google as well as the development of our technology, our culture and our strategic direction. All of our executive officers and key employees are at-will employees, and we do not maintain any key-person life insurance policies. The loss of any of our management or key personnel could seriously harm our business.

*We rely on highly skilled personnel and, if we are unable to retain or motivate key personnel or hire qualified personnel, we may not be able to grow effectively.*

Our performance largely depends on the talents and efforts of highly skilled individuals. Our future success depends on our continuing ability to identify, hire, develop, motivate and retain highly skilled personnel for all areas of our organization. Competition in our industry for qualified employees is intense, and certain of our competitors have directly targeted our employees. Our continued ability to compete effectively depends on our ability to attract new employees and to retain and motivate our existing employees.

27

Table of Contents

We have in the past maintained a rigorous, highly selective and time-consuming hiring process. We believe that our approach to hiring has significantly contributed to our success to date. As we grow, our hiring process may prevent us from hiring the personnel we need in a timely manner. In addition, as we become a more mature company, we may find our recruiting efforts more challenging. The incentives to attract, retain and motivate employees provided by our equity award grants may not be as effective as in the past. In addition, our other current and future compensation arrangements, which include cash bonuses and our transferable stock option (TSO) program, may not be successful in attracting new employees and retaining and motivating our existing employees. If we do not succeed in attracting excellent personnel or retaining or motivating existing personnel, we may be unable to grow effectively.

***We have a short operating history and a relatively new business model in an emerging and rapidly evolving market. This makes it difficult to evaluate our future prospects and may increase the risk that we will not continue to be successful.***

We first derived revenue from our online search business in 1999 and from our advertising services in 2000, and we have only a short operating history with our cost-per-click advertising model, which we launched in 2002 and our cost-per-impression advertising model which we launched in the second quarter of 2005. As a result, we have little operating history to aid in assessing our future prospects. Also, we derive nearly all of our revenues from online advertising, which is an immature industry that has undergone rapid and dramatic changes in its short history. We will encounter risks and difficulties as a company operating in a new and rapidly evolving market. We may not be able to successfully address these risks and difficulties, which could materially harm our business and operating results.

***More individuals are using non-PC devices to access the internet. If users of these devices do not widely adopt versions of our web search technology developed for these devices, our business could be adversely affected.***

The number of people who access the internet through devices other than personal computers, including mobile telephones, personal digital assistants (PDAs), smart phones and handheld computers and video game consoles, as well as television set-top devices, has increased dramatically in the past few years. The lower resolution, functionality and memory associated with alternative devices make the use of our products and services through such devices more difficult. If we are unable to attract and retain a substantial number of alternative device users to our web search services or if we are slow to develop products and technologies that are more compatible with non-PC communications devices, we will fail to capture a significant share of an increasingly important portion of the market for online services, which could adversely affect our business.

***We may have difficulty scaling and adapting our existing architecture to accommodate increased traffic and technology advances or changing business requirements, which could lead to the loss of users, advertisers and Google Network members, and cause us to incur expenses to make architectural changes.***

To be successful, our network infrastructure has to perform well and be reliable. The greater the user traffic and the greater the complexity of our products and services, the more computing power we will need. We have spent and expect to continue to spend substantial amounts on the purchase and lease of data centers and equipment and the upgrade of our technology and network infrastructure to handle increased traffic on our web sites and to roll out new products and services. This expansion is expensive and complex and could result in inefficiencies or operational failures. If we do not expand successfully, or if we experience inefficiencies and operational failures, the quality of our products and services and our users' experience could decline. This could damage our reputation and lead us to lose current and potential users, advertisers and Google Network members. Cost increases, loss of traffic or failure to accommodate new technologies or changing business requirements could harm our operating results and financial condition.

28

Table of Contents

*We rely on bandwidth providers, data centers and others in providing products and services to our users, and any failure or interruption in the services and products provided by these third parties could damage our reputation and harm our ability to operate our business.*

We rely on vendors, including data center and bandwidth providers in providing products and services to our users. Any disruption in the network access or colocation services provided by these providers or any failure of these providers to handle current or higher volumes of use could significantly harm our business. Any financial or other difficulties our providers face may have negative effects on our business. We exercise little control over these vendors, which increases our vulnerability to problems with the services they provide. We license technology and related databases to facilitate aspects of our data center and connectivity operations including internet traffic management services. We have experienced and expect to continue to experience interruptions and delays in service and availability for such elements. Any errors, failures, interruptions or delays in connection with these technologies and information services could harm our relationship with users, adversely affect our brand and expose us to liabilities.

Our systems are also heavily reliant on the availability of electricity. If we were to experience a major power outage, we would have to rely on back-up generators. These back-up generators may not operate properly and their fuel supply could be inadequate during a major power outage. This could result in a disruption of our business.

*Our business depends on continued and unimpeded access to the internet by us and our users. Internet access providers may be able to block, degrade or charge for access to certain of our products and services, which could lead to additional expenses and the loss of users and advertisers.*

Our products and services depend on the ability of our users to access the internet, and certain of our products require significant bandwidth to work effectively. Currently, this access is provided by companies that have significant and increasing market power in the broadband and internet access marketplace, including incumbent telephone companies, cable companies and mobile communications companies. Some of these providers have stated that they may take measures that could degrade, disrupt or increase the cost of user access to certain of our products by restricting or prohibiting the use of their infrastructure to support or facilitate our offerings, or by charging increased fees to us or our users to provide our offerings. These activities may be permitted in the U.S. after recent regulatory changes, including recent decisions by the U.S. Supreme Court and Federal Communications Commission. While interference with access to our popular products and services seems unlikely, such carrier interference could result in a loss of existing users and advertisers and increased costs, and could impair our ability to attract new users and advertisers, thereby harming our revenue and growth.

*Interruption or failure of our information technology and communications systems could hurt our ability to effectively provide our products and services, which could damage our reputation and harm our operating results.*

The availability of our products and services depends on the continuing operation of our information technology and communications systems. Any damage to or failure of our systems could result in interruptions in our service, which could reduce our revenues and profits, and damage our brand. Our systems are vulnerable to damage or interruption from earthquakes, terrorist attacks, floods, fires, power loss, telecommunications failures, computer viruses, computer denial of service attacks or other attempts to harm our systems. Some of our data centers are located in areas with a high risk of major earthquakes. Our data centers are also subject to break-ins, sabotage and intentional acts of vandalism, and to potential disruptions if the operators of these facilities have financial difficulties. Some of our systems are not fully redundant, and our disaster recovery planning cannot account for all eventualities. The occurrence of a natural disaster, a decision to close a facility we are using without adequate notice for financial reasons or other unanticipated problems at our data centers could result in lengthy interruptions in our service.

29

Table of Contents

*Our business depends on increasing use of the internet by users searching for information, advertisers marketing products and services and web sites seeking to earn revenue to support their web content. If the internet infrastructure does not grow and is not maintained to support these activities, our business will be harmed.*

Our success will depend on the continued growth and maintenance of the internet infrastructure. This includes maintenance of a reliable network backbone with the necessary speed, data capacity and security for providing reliable internet services. Internet infrastructure may be unable to support the demands placed on it if the number of internet users continues to increase, or if existing or future internet users access the internet more often or increase their bandwidth requirements. In addition, viruses, worms and similar programs may harm the performance of the internet. The internet has experienced a variety of outages and other delays as a result of damage to portions of its infrastructure, and could face outages and delays in the future. These outages and delays could reduce the level of internet usage as well as our ability to provide our solutions.

*Payments to certain of our Google Network members have exceeded the related fees we receive from our advertisers.*

We are obligated under certain agreements to make non-cancelable guaranteed minimum revenue share payments to Google Network members based on their achieving defined performance terms, such as number of search queries or advertisements displayed. In these agreements, we promise to make these minimum payments to the Google Network member for a pre-negotiated period of time. At December 31, 2007, our aggregate outstanding non-cancelable guaranteed minimum revenue share commitments totaled $1.75 billion through 2012 compared to $1.17 billion at December 31, 2006. It is difficult to forecast with certainty the fees that we will earn under agreements with guarantees, and sometimes the fees we earn fall short of the guaranteed minimum payment amounts.

*We rely on outside providers for our worldwide billing, collection, payment processing and payroll. If these outside service providers are not able to fulfill their service obligations, our business and operations could be disrupted, and our operating results could be harmed.*

Outside providers perform various functions for us, such as worldwide billing, collection, payment processing and payroll. These functions are critical to our operations and involve sensitive interactions between us and our advertisers, partners (e.g., Google Network members) and employees. Although we have implemented service level agreements and have established monitoring controls, if we do not successfully manage our service providers or if the service providers do not perform satisfactorily to agreed-upon service levels, our operations could be disrupted resulting in advertiser, partner or employee dissatisfaction. In addition, our business, reputation and operating results could be adversely affected.

*To the extent our revenues are paid in foreign currencies, and currency exchange rates become unfavorable, we may lose some of the economic value of the revenues in U.S. dollar terms.*

As we expand our international operations, more of our customers may pay us in foreign currencies. Conducting business in currencies other than U.S. dollars subjects us to fluctuations in currency exchange rates. If the currency exchange rates were to change unfavorably, the value of net receivables we receive in foreign currencies and later convert to U.S. dollars after the unfavorable change would be diminished. This could have a negative impact on our reported operating results. Hedging strategies, such as forward contracts, options and foreign exchange swaps related to transaction exposures, that we have implemented or may implement to mitigate this risk may not eliminate our exposure to foreign exchange fluctuations. Additionally, hedging programs expose us to risks that could adversely affect our operating results, including the following:

- We have limited experience in implementing or operating hedging programs. Hedging programs are inherently risky and we could lose money as a result of poor trades.

30

Table of Contents

- We may be unable to hedge currency risk for some transactions or match the accounting for the hedge with the exposure because of a high level of uncertainty or the inability to reasonably estimate our foreign exchange exposures.
- We may be unable to acquire foreign exchange hedging instruments in some of the geographic areas where we do business, or, where these derivatives are available, we may not be able to acquire enough of them to fully offset our exposure.
- We may determine that the cost of acquiring a foreign exchange hedging instrument outweighs the benefit we expect to derive from the derivative, in which case we would not purchase the derivative and be exposed to unfavorable changes in currency exchange rates.

### We may have exposure to greater than anticipated tax liabilities.

Our future income taxes could be adversely affected by earnings being lower than anticipated in jurisdictions where we have lower statutory rates and higher than anticipated in jurisdictions where we have higher statutory rates, by changes in the valuation of our deferred tax assets and liabilities or by changes in tax laws, regulations, accounting principles or interpretations thereof. Our determination of our tax liability is always subject to review by applicable tax authorities. Any adverse outcome of such a review could have a negative effect on our operating results and financial condition. In addition, the determination of our worldwide provision for income taxes and other tax liabilities requires significant judgment, and there are many transactions and calculations where the ultimate tax determination is uncertain. Although we believe our estimates are reasonable, the ultimate tax outcome may differ from the amounts recorded in our financial statements and may materially affect our financial results in the period or periods for which such determination is made.

### Risks Related to Ownership of our Common Stock

### The trading price for our Class A common stock has been and may continue to be volatile.

The trading price of our Class A common stock has been volatile since our initial public offering and will likely continue to be volatile. The trading price of our Class A common stock may fluctuate widely in response to various factors, some of which are beyond our control. These factors include:

- Quarterly variations in our results of operations or those of our competitors.
- Announcements by us or our competitors of acquisitions, new products, significant contracts, commercial relationships or capital commitments.
- Recommendations by securities analysts or changes in earnings estimates.
- Announcements about our earnings that are not in line with analyst expectations, the risk of which is enhanced because it is our policy not to give guidance on earnings.
- Announcements by our competitors of their earnings that are not in line with analyst expectations.
- The volume of shares of Class A common stock available for public sale.
- Sales of stock by us or by our stockholders.
- Short sales, hedging and other derivative transactions on shares of our Class A common stock (including derivative transactions under our TSO program).

In addition, the stock market in general, and the market for technology companies in particular, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of those companies. These broad market and industry factors may seriously harm the market price of our Class A common stock, regardless of our actual operating performance. In the past, following periods of volatility in the overall market and the market price of a company's securities, securities class action litigation has often been instituted against these companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

31

Table of Contents

*We do not intend to pay dividends on our common stock.*

We have never declared or paid any cash dividend on our capital stock. We currently intend to retain any future earnings and do not expect to pay any dividends in the foreseeable future.

*The concentration of our capital stock ownership with our founders, executive officers and our directors and their affiliates will limit our stockholders' ability to influence corporate matters.*

Our Class B common stock has 10 votes per share and our Class A common stock has one vote per share. As of December 31, 2007, our founders, executive officers and directors (and their affiliates) together owned shares of Class A common stock, Class B common stock and other equity interests representing approximately 70% of the voting power of our outstanding capital stock. In particular, as of December 31, 2007, our two founders and our CEO, Larry, Sergey and Eric, owned approximately 88% of our outstanding Class B common stock, representing approximately 67% of the voting power of our outstanding capital stock. Larry, Sergey and Eric therefore have significant influence over management and affairs and over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets, for the foreseeable future. This concentrated control limits our stockholders' ability to influence corporate matters and, as a result, we may take actions that our stockholders do not view as beneficial. As a result, the market price of our Class A common stock could be adversely affected.

*Provisions in our charter documents and under Delaware law could discourage a takeover that stockholders may consider favorable.*

Provisions in our certificate of incorporation and bylaws may have the effect of delaying or preventing a change of control or changes in our management. These provisions include the following:

- Our certificate of incorporation provides for a dual class common stock structure. As a result of this structure our founders, executives and employees have significant influence over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets. This concentrated control could discourage others from initiating any potential merger, takeover or other change of control transaction that other stockholders may view as beneficial.

- Our board of directors has the right to elect directors to fill a vacancy created by the expansion of the board of directors or the resignation, death or removal of a director, which prevents stockholders from being able to fill vacancies on our board of directors.

- Our stockholders may not act by written consent. As a result, a holder, or holders, controlling a majority of our capital stock would not be able to take certain actions without holding a stockholders' meeting.

- Our certificate of incorporation prohibits cumulative voting in the election of directors. This limits the ability of minority stockholders to elect director candidates.

- Stockholders must provide advance notice to nominate individuals for election to the board of directors or to propose matters that can be acted upon at a stockholders' meeting. These provisions may discourage or deter a potential acquiror from conducting a solicitation of proxies to elect the acquiror's own slate of directors or otherwise attempting to obtain control of our company.

- Our board of directors may issue, without stockholder approval, shares of undesignated preferred stock. The ability to issue undesignated preferred stock makes it possible for our board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to acquire us.

As a Delaware corporation, we are also subject to certain Delaware anti-takeover provisions. Under Delaware law, a corporation may not engage in a business combination with any holder of 15% or more of its

32

Table of Contents

capital stock unless the holder has held the stock for three years or, among other things, the board of directors has approved the transaction. Our board of directors could rely on Delaware law to prevent or delay an acquisition of us.

## ITEM 1B.  UNRESOLVED STAFF COMMENTS

We have received no written comments regarding our periodic or current reports from the staff of the Securities and Exchange Commission that were issued 180 days or more preceding the end of our 2007 fiscal year and that remained unresolved.

## ITEM 2.  PROPERTIES

We lease approximately 1.5 million square feet of space in our headquarters in Mountain View, California. We also lease additional research and development, sales and support offices in the United States in Ann Arbor, Michigan, Atlanta, Georgia, Austin, Texas, Birmingham, Michigan, Boulder, Colorado, Cambridge, Massachusetts, Chapel Hill, North Carolina, Chicago, Illinois, Coppell, Texas, Dallas, Texas, Denver, Colorado, Herndon, Virginia, Irvine, California, Kirkland, Washington, New York, New York, Overland Park, Kansas, Pittsburgh, Pennsylvania, Reston, Virginia, San Bruno, California, San Francisco, California, Santa Monica, California, Seattle, Washington, Tempe, Arizona and Washington, D.C.

We own land and buildings primarily near our headquarters in Mountain View, California. We own approximately 1.4 million square feet of buildings and approximately 83 acres of developable land to accommodate anticipated future growth.

We maintain leased facilities internationally in Argentina, Austria, Australia, Belgium, Brazil, Canada, China, Czech Republic, Denmark, Egypt, England, Finland, France, Germany, Hungary, India, Ireland, Israel, Italy, Japan, Korea, Mexico, New Zealand, Norway, Poland, Russia, Singapore, Spain, Sweden, Switzerland, Taiwan, Turkey and United Arab Emirates.

We also operate and own data centers in the United States, the European Union and Asia pursuant to various lease agreements and co-location arrangements.

## ITEM 3.  LEGAL PROCEEDINGS

From time to time, we are involved in a variety of claims, suits, investigations and proceedings arising from the ordinary course of our business, including actions with respect to intellectual property claims, breach of contract claims, labor and employment claims, tax and other matters. Although claims, suits, investigations and proceedings are inherently uncertain and their results cannot be predicted with certainty, we believe that the resolution of our current pending matters will not have a material adverse effect on our business, consolidated financial position, results of operations or cash flow. Regardless of the outcome, litigation can have an adverse impact on us because of defense costs, diversion of management resources and other factors. In addition, it is possible that an unfavorable resolution of one or more such proceedings could in the future materially and adversely affect our financial position, results of operations or cash flows in a particular period. See the risk factors "*We are, and may in the future be, subject to intellectual property rights claims, which are costly to defend, could require us to pay damages and could limit our ability to use certain technologies in the future*" and "*Our intellectual property rights are valuable, and any inability to protect them could reduce the value of our products, services and brand*" in Item 1A of this Annual Report on Form 10-K.

## ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters were submitted to a vote of our security holders during the fourth quarter of 2007.

33

Table of Contents

**PART II**

**ITEM 5.   MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

Our Class A common stock has been listed on the Nasdaq Global Select Market under the symbol "GOOG" since August 19, 2004. Prior to that time, there was no public market for our stock. The following table sets forth for the indicated periods the high and low sales prices per share for our Class A common stock on the Nasdaq Global Select Market.

| Fiscal Year 2007 Quarters Ended: | High | Low |
|---|---|---|
| March 31, 2007 | $513.00 | $437.00 |
| June 30, 2007 | 534.99 | 452.12 |
| September 30, 2007 | 571.79 | 480.46 |
| December 31, 2007 | 747.24 | 569.61 |

| Fiscal Year 2006 Quarters Ended: | High | Low |
|---|---|---|
| March 31, 2006 | $475.11 | $331.55 |
| June 30, 2006 | 450.72 | 360.57 |
| September 30, 2006 | 427.89 | 363.36 |
| December 31, 2006 | 513.00 | 398.19 |

Our Class B common stock is neither listed nor traded.

**Holders of Record**

As of January 31, 2008, there were approximately 2,776 stockholders of record of our Class A common stock, and the closing price of our Class A common stock was $564.30 per share as reported by the Nasdaq Global Select Market. Because many of our shares of Class A common stock are held by brokers and other institutions on behalf of stockholders, we are unable to estimate the total number of stockholders represented by these record holders. As of January 31, 2008, there were approximately 111 stockholders of record of our Class B common stock.

**Dividend Policy**

We have never declared or paid any cash dividend on our common stock. We currently intend to retain any future earnings and do not expect to pay any dividends in the foreseeable future.

34

Table of Contents

**Stock Performance Graph**

This performance graph shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or incorporated by reference into any filing of Google under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such filing.

The following graph shows a comparison from August 19, 2004 (the date our Class A common stock commenced trading on the Nasdaq Global Select Market) through December 31, 2007 of the cumulative total return for our Class A common stock, The Nasdaq Composite Index, the RDG Internet Composite Index and the S&P 500 Index. Such returns are based on historical results and are not intended to suggest future performance. Data for The Nasdaq Composite Index, the RDG Internet Composite Index and the S&P 500 Index assume reinvestment of dividends. We have never paid dividends on our Class A common stock and have no present plans to do so.



COMPARISON OF 40 MONTH CUMULATIVE TOTAL RETURN*
Among Google Inc., The S & P 500 Index, The NASDAQ Composite Index
And The RDG Internet Composite Index

\* $100 invested on 8/19/04 in stock or on 7/31/04 in index-including reinvestment of dividends. Fiscal year ending December 31.

Copyright© 2008, Standard & Poor's, adivision of The McGraw-Hill Companies, Inc. All rights reserved. www.researchdatagroup.com/S&P.htm

*The stock price performance included in this graph is not necessarily indicative of future stock price performance.*

Table of Contents

## Purchases of Equity Securities by Google

Pursuant to the terms of our 1998 Stock Plan, 2000 Stock Plan, 2003 Stock Plan, 2003 Stock Plan (No. 2), 2003 Stock Plan (No. 3), 2004 Stock Plan and equity incentive plans assumed through acquisitions (collectively referred to as our "Stock Plans"), options may typically be exercised prior to vesting. We have the right to repurchase unvested shares from service providers upon their termination, and it is generally our policy to do so. The following table provides information with respect to purchases made by us of shares of our common stock during the three-month period ended December 31, 2007:

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number (or Approximate Dollar Value) of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| October 1 – 31 | — | $ — | — | — |
| November 1 – 30 | 401 | $ 0.30 | — | — |
| December 1 – 31 | — | $ — | — | — |
| Total | 401 | $ 0.30 | — | — |

(1) All shares were originally purchased from us by employees pursuant to exercises of unvested stock options. During the months listed above, we routinely repurchased the shares from our service providers upon their termination of employment pursuant to our right to repurchase unvested shares at the original exercise price under the terms of our Stock Plans and the related stock option agreements.

## Results of Google's Transferable Stock Option Program

Under our transferable stock option (TSO) program, which we launched in April 2007, eligible employees are able to sell vested stock options to participating financial institutions in an online auction as an alternative to exercising options in the traditional method and then selling the underlying shares. The following table provides information with respect to sales by our employees of TSOs during the three-month period ended December 31, 2007:

| Period (1) | Aggregate Amounts | | | Weighted-Average Per Share Amounts | | |
|---|---|---|---|---|---|---|
| | Number of Shares Underlying TSOs Sold | Sale Price of TSOs Sold (in thousands) | TSO Premium (2) (in thousands) | Exercise Price of TSOs Sold | Sale Price of TSOs Sold | TSO Premium (2) |
| October 1 – 31 | 216,659 | $ 92,586 | $ 5,480 | $ 262.22 | $ 427.33 | $ 25.29 |
| November 1 – 30 | 167,813 | $ 68,642 | $ 6,982 | $ 330.54 | $ 409.04 | $ 41.61 |
| December 1 – 31 | — | — | — | | | |
| Total (except weighted-average amounts) | 384,472 | $ 161,228 | $ 12,462 | $ 292.04 | $ 419.35 | $ 32.41 |

(1) The TSO program is generally active during regular NASDAQ trading hours when Google's trading window is open. However, we have the right to suspend the TSO program at any time for any reason, including for maintenance and other technical reasons.

(2) TSO premium is calculated as the difference between (a) the sale price of the TSO and (b) the intrinsic value of the TSO, which we define as the excess, if any, of the price of our Class A common stock at the time of the sale over the exercise price of the TSO.

36

Table of Contents

ITEM 6.  SELECTED FINANCIAL DATA

You should read the following selected consolidated financial data in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operation" and our consolidated financial statements and the related notes appearing elsewhere in this Form 10-K.

The consolidated statements of income data for the years ended December 31, 2005, 2006 and 2007, and the consolidated balance sheet data at December 31, 2006 and 2007, are derived from our audited consolidated financial statements appearing elsewhere in this Annual Report on Form 10-K. The consolidated statements of income data for the years ended December 31, 2003 and 2004, and the consolidated balance sheet data at December 31, 2003, 2004 and 2005, are derived from our audited consolidated financial statements that are not included in this Annual Report on Form 10-K. The historical results are not necessarily indicative of the results to be expected in any future period.

| | Year Ended December 31, | | | | |
| | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| | (in thousands, except per share amounts) | | | | |
| **Consolidated Statements of Income Data:** | | | | | |
| Revenues | $1,465,934 | $3,189,223 | $6,138,560 | $10,604,917 | $16,593,986 |
| Costs and expenses: | | | | | |
| Cost of revenues | 634,411 | 1,468,967 | 2,577,088 | 4,225,027 | 6,649,085 |
| Research and development | 229,605 | 395,164 | 599,510 | 1,228,589 | 2,119,985 |
| Sales and marketing | 164,935 | 295,749 | 468,152 | 849,518 | 1,461,266 |
| General and administrative | 94,519 | 188,151 | 386,532 | 751,787 | 1,279,250 |
| Contribution to Google Foundation | — | — | 90,000 | — | — |
| Non-recurring portion of settlement of disputes with Yahoo | — | 201,000 | — | — | — |
| Total costs and expenses | 1,123,470 | 2,549,031 | 4,121,282 | 7,054,921 | 11,509,586 |
| Income from operations | 342,464 | 640,192 | 2,017,278 | 3,549,996 | 5,084,400 |
| Interest income and other, net | 4,190 | 10,042 | 124,399 | 461,044 | 589,580 |
| Income before income taxes | 346,654 | 650,234 | 2,141,677 | 4,011,040 | 5,673,980 |
| Provision for income taxes | 241,006 | 251,115 | 676,280 | 933,594 | 1,470,260 |
| Net income | $ 105,648 | $ 399,119 | $1,465,397 | $ 3,077,446 | $ 4,203,720 |
| Net income per share of Class A and Class B common stock | | | | | |
| Basic | $ 0.77 | $ 2.07 | $ 5.31 | $ 10.21 | $ 13.53 |
| Diluted | $ 0.41 | $ 1.46 | $ 5.02 | $ 9.94 | $ 13.29 |

| | As of December 31, | | | | |
| | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| | (in thousands) | | | | |
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash, cash equivalents and marketable securities | $ 334,718 | $2,132,297 | $ 8,034,247 | $11,243,914 | $14,218,613 |
| Total assets | 871,458 | 3,313,351 | 10,271,813 | 18,473,351 | 25,335,806 |
| Total long-term liabilities | 33,365 | 43,927 | 107,472 | 128,924 | 610,525 |
| Redeemable convertible preferred stock warrant | 13,871 | — | — | — | — |
| Deferred stock-based compensation | (369,668) | (249,470) | (119,015) | — | — |
| Total stockholders' equity | 588,770 | 2,929,056 | 9,418,957 | 17,039,840 | 22,689,679 |

Table of Contents

**ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION**

*In addition to historical information, this Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These statements include, among other things, statements concerning our expectations:*

- *regarding the growth and growth rate of our operations, business, revenues, operating margins, costs and expenses;*

- *that seasonal fluctuations in internet usage and traditional advertising seasonality are likely to affect our business;*

- *that growth in advertising revenues from our web sites will continue to exceed that from our Google Network members' web sites;*

- *regarding our future stock-based compensation charges including charges related to our TSO program;*

- *that we will continue to pay most of the Google AdSense fees we receive from advertisers to our Google Network members;*

- *that we may take steps to improve the relevance of the ads we deliver;*

- *regarding our actions to reduce the number of accidental clicks;*

- *that we will continue to make significant capital expenditure investments;*

- *that the growth rate of our costs and expenses may exceed the growth rate of our revenues;*

- *that our cost of revenues will increase in dollars and may increase as a percentage of revenues;*

- *that traffic acquisition costs may increase as a percentage of revenues;*

- *regarding the increase of research and development, sales and marketing and general and administrative expenses in the future;*

- *regarding quarterly fluctuations in paid clicks;*

- *that we will continue to make investments and acquisitions;*

- *regarding the sufficiency of our existing cash, cash equivalents, marketable securities and cash generated from operations;*

- *regarding continued investments in international markets;*

- *regarding our expectations about making future donations to the Google Foundation;*

*as well as other statements regarding our future operations, financial condition and prospects and business strategies. These forward-looking statements are subject to certain risks and uncertainties that could cause our actual results to differ materially from those reflected in the forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those discussed in this Annual Report on Form 10-K, and in particular, the risks discussed under the heading "Risk Factors" in Item 1A of this Annual Report on Form 10-K and those discussed in other documents we file with the Securities and Exchange Commission. We undertake no obligation to revise or publicly release the results of any revision to these forward-looking statements. Given these risks and uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements.*

The following discussion and analysis of our financial condition and results of operations should be read together with our Consolidated Financial Statements and related notes included elsewhere in this Annual Report on Form 10-K.

38

Table of Contents

### Overview

Google is a global technology leader focused on improving the ways people connect with information. Our innovations in web search and advertising have made our web site a top internet destination and our brand one of the most recognized in the world. Our mission is to organize the world's information and make it universally accessible and useful. We serve three primary constituencies:

- *Users.* We provide users with products and services that enable people to more quickly and easily find, create and organize information that is useful to them.

- *Advertisers.* We provide advertisers with several ways to deliver relevant targeted advertising including:

  - *Google AdWords*, an auction-based advertising program that enables advertisers to deliver relevant ads targeted to search results or web content on our web site and our Google Network members' web sites.

  - *Google Audio Ads*, an automated online media platform that schedules and places advertising into radio programs.

  - *Google Print Ads*, a web-based marketplace for placing ads in print media.

  - *Google TV Ads*, an automated online media platform that schedules and places advertising into TV programs.

  - *Google Video Ads*, user-initiated click-to-play video ads that run on our web sites and the web sites of our Google Network members.

These advertising programs provide advertisers with a cost-effective way to deliver ads to customers across Google sites and through the Google Network, which is the network of online and offline third parties that use our advertising programs to deliver relevant ads with the search results and content they provide.

- *Google Network Members and Other Content Providers.* We provide the online and offline members of our Google Network with our Google AdSense programs. These include programs through which we distribute our advertisers' AdWords ads for display on the web sites of our Google Network members as well as programs to deliver audio ads on radio broadcasts, print ads for display in newspapers and magazines and ads on television. We share most of the fees these ads generate with our Google Network members, thereby creating an important revenue stream for them. In addition, we have entered into arrangements with certain other content providers under which we distribute or license their video and other content, and we may display ads next to or as part of this content on the pages of our web sites and our Google Network members' web sites. We share most of the fees these ads generate with these content providers and our Google Network members, thereby creating an important revenue stream for these partners.

### How We Generate Revenue

Advertising revenues made up 99% of our revenues in 2005, 2006 and 2007. We derive the balance of our revenues from the license of our web search technology, the license of our search solutions to enterprises and the sale and license of other products and services.

Google AdWords is our automated online program that enables advertisers to place targeted text-based and display ads on our web sites and the web sites of our Google Network members. Most of our AdWords customers pay us on a cost-per-click basis, which means that an advertiser pays us only when a user clicks on one of its ads. We also offer AdWords on a cost-per-impression basis that enables advertisers to pay us based on the number of times their ads appear on Google Network members' sites specified by the advertiser. For advertisers using our AdWords cost-per-click pricing, we recognize as revenue the fees charged advertisers each time a user clicks on one of the ads that appears next to the search results on our web sites or next to the search results or content on

39

Table of Contents

Google Network members' sites. For advertisers using our AdWords cost-per-impression pricing, we recognize as revenue the fees charged advertisers each time their ads are displayed on the Google Network members' sites. Our AdWords agreements are generally terminable at any time by our advertisers.

Google AdSense is the program through which we distribute our advertisers' AdWords ads for display on the web sites of our Google Network members. Our AdSense program includes AdSense for search and AdSense for content.

AdSense for search is our service for distributing relevant ads from our advertisers for display with search results on our Google Network members' sites. To use AdSense for search, most of our AdSense for search partners add Google search functionality to their web pages in the form of customizable Google search boxes. When visitors of these web sites search either the web site or the internet using these customizable search boxes, we display relevant ads on the search results pages, targeted to match user search queries. Ads shown through AdSense for search are generally text ads.

AdSense for content is our service for distributing ads from our advertisers that are relevant to content on our Google Network members' sites. Under this program, we use automated technology to analyze the meaning of the content on the web site and serve relevant ads based on the meaning of such content. For example, a web page on an automotive blog that contains an entry about vintage cars might display ads for vintage car parts or vintage car shows. These ads are displayed in spaces that our AdSense for content partners have set aside on their web sites for our AdWords content. AdSense for content allows a variety of ad types to be shown, including text ads, image ads, Google Video Ads, link units (which are sets of clickable links to topic pages related to page content), themed units (which are regular text ads with graphic treatments that change seasonally and by geography) and gadget ads (which are customized "mini-sites" that run as ads on AdSense publisher web sites).

For our AdSense program, our advertisers pay us a fee each time a user clicks on one of our advertisers' ads displayed on Google Network members' web sites or, for those advertisers who choose our cost-per-impression pricing, as their ads are displayed. To date, we have paid most of these advertiser fees to the members of the Google Network, and we expect to continue doing so for the foreseeable future. We recognize these advertiser fees as revenue and the portion of the advertiser fee we pay to our Google Network members as traffic acquisition costs under cost of revenues. In some cases, we guarantee our Google Network members minimum revenue share payments. Members of the Google Network do not pay any fees associated with the use of our AdSense program on their web sites.

Our agreements with Google Network members consist largely of uniform online "click-wrap" agreements that members enter into by interacting with our registration web sites. The standard agreements have no stated term and are terminable at will. Agreements with our larger members are individually negotiated. Both the standard agreements and the negotiated agreements contain provisions requiring us to share with the Google Network member most of the advertiser fees generated by users clicking on ads on the Google Network member's web site or, for advertisers who choose our cost-per-impression pricing, as the ads are displayed on the Google Network member's web site.

We have entered into arrangements with certain content providers under which we distribute or license their video and other content. In a number of these arrangements we display ads on the pages of our web sites and our Google Network members' web sites from which the content is viewed and share most of the fees these ads generate with the content providers and Google Network members. We recognize these advertiser fees as revenue and the portion of the advertiser fee we pay to our content providers as content acquisition costs under cost of revenues. In some cases, we guarantee our content providers minimum revenue share or other payments.

Our agreements with content providers are typically standard agreements with no stated term and are terminable at will. Agreements with our larger members are individually negotiated. Both the standard

40

Table of Contents

agreements and the negotiated agreements contain provisions requiring us to pay the content providers for the content we license or share, and the content providers receive most of the advertiser fees generated by ads displayed on our web sites and our Google Network members' web sites.

In the third quarter of 2005, we launched our Google Print Ads program through which we distribute our advertisers' ads for publication in print media. We recognize as revenue the fees charged advertisers when their ads are published in print media. Also, in the first quarter of 2006, we acquired dMarc Broadcasting, Inc. (dMarc), a digital solutions provider for the radio broadcast industry and launched our Google Audio Ads program, which distributes our advertisers' ads for broadcast in radio programs. We recognize as revenue the fees charged advertisers each time an ad is broadcasted or a listener responds to that ad. We consider the magazines and radio stations that participate in these programs to be members of our Google Network.

In the fourth quarter of 2006, we acquired YouTube, a consumer media company for people to watch and share videos worldwide through the web. We recognize as revenue the fees charged advertisers each time an ad is displayed on the YouTube site.

In the second quarter of 2007, we began delivering Google TV ads to viewers and helping advertisers, operators and programmers buy, schedule, deliver and measure ads on television. We recognize as revenue the fees charged advertisers each time an ad is displayed on TV in accordance with the terms of the related agreements. We consider the TV providers that participate in this program to be members of our Google Network.

We believe the factors that influence the success of our advertising programs include the following:

- The relevance, objectivity and quality of our search results.
- The number and type of searches initiated at our web sites.
- The number and type of searches initiated at, as well as the number of visits to and the content of, our Google Network members' web sites.
- The advertisers' return on investment (ad cost per sale or cost per conversion) from advertising campaigns on our web sites or our Google Network members' web sites or other media compared to other forms of advertising.
- The number of advertisers and the breadth of items advertised.
- The total and per click or per impression advertising spending budgets of each advertiser.
- The amount we ultimately pay our Google Network members and our content providers for traffic and content compared to the amount of revenue we generate.
- The monetization of (or generation of revenue from) traffic on our web sites and our Google Network members' web sites.

We believe that the monetization of traffic on our web sites, and our Google Network members' web sites is affected by the following factors:

- The relevance and quality of ads displayed with each search results page on our web sites and our Google Network members' web sites, as well as with each content page on our Google Network members' web sites, including the relevance and quality of an ad's "landing page" or page a user views after an ad is clicked.
- The number and prominence of ads displayed with each search results page on our web sites and our Google Network members' web sites, as well as with each content page on our Google Network members' web sites.
- The rate at which our users and users of our Google Network members' web sites click on advertisements.
- Our minimum fee per click.

41

Table of Contents

We also generate revenue from the sale and license of our Search Appliance, which includes hardware, software and 12 to 24 months of post-contract support. We recognize as revenue the fee we charge customers ratably over the term of the post-contract support arrangement.

In the second quarter of 2006, we launched Google Checkout, an online shopping payment processing system for both consumers and merchants. We did not charge merchants any fees associated with the use of Google Checkout in 2007. On February 1, 2008, we began charging merchants who use Google Checkout to process sales 2% of the transaction amount plus $0.20 per transaction to the extent these fees exceed 10 times the amount they spend on AdWords advertising. We recognize as revenue any fees charged merchants on transactions processed through Google Checkout. Further, cash ultimately paid to merchants under Google Checkout promotions, including cash paid to merchants as a result of discounts provided to consumers on certain transactions processed through Google Checkout, is accounted for as an offset to revenues.

In the third quarter of 2007, we acquired Postini, a provider of electronic communications security, compliance, and productivity software. We recognize as revenue the fees we charge customers for hosting enterprise applications and services ratably over the terms of the service arrangements.

## Trends in Our Business

Our business has grown rapidly since inception, resulting in substantially increased revenues, and we expect that our business will continue to grow. However, our revenue growth rate has generally declined over time, and we expect it will continue to do so as a result of increasing competition and the difficulty of maintaining growth rates as our revenues increase to higher levels. In addition, the main focus of our advertising programs is to provide relevant and useful advertising to our users, reflecting our commitment to constantly improve their overall web experience. As a result, we may continue to take steps to improve the relevance of the ads displayed on our web sites and our Google Network members' web sites. These steps include removing ads that generate low click-through rates or that send users to irrelevant or otherwise low quality sites and terminating Google Network members whose web sites do not meet our quality requirements. In addition, we may continue to take steps to reduce the number of accidental clicks. These steps could negatively affect our near-term advertising revenues. Both seasonal fluctuations in internet usage and traditional retail seasonality have affected, and are likely to continue to affect, our business. Internet usage generally slows during the summer months, and commercial queries typically increase significantly in the fourth quarter of each year. These seasonal trends have caused and will likely continue to cause, fluctuations in our quarterly results, including fluctuations in sequential revenue and paid click growth rates.

From the inception of the Google Network in 2002 through the first quarter of 2004, the growth in advertising revenues from our Google Network members' web sites exceeded that from our web sites, which had a negative impact on our operating margins. The operating margin we realize on revenues generated from ads placed on our Google Network members' web sites through our AdSense program is significantly lower than the operating margin we realize from revenues generated from ads placed on our web sites because most of the advertiser fees from ads served on Google Network member web sites are shared with our Google Network members. However, beginning in the second quarter of 2004, growth in advertising revenues from our web sites has exceeded that from our Google Network members' web sites. This trend has had a positive impact on our operating margins, and we expect that this will continue for the foreseeable future, although the relative rate of growth in revenues from our web sites compared to the rate of growth in revenues from our Google Network members' web sites may vary over time.

We are heavily investing in building the necessary employee and systems infrastructures required to manage our growth and develop and promote our products and services, and this may cause our operating margins to decrease. We have experienced and expect to continue to experience substantial growth in our operations as we build our research and development programs, expand our base of users, advertisers, Google Network members and content providers and increase our presence in international markets. Also, we have acquired and expect to

42

continue to acquire businesses and other assets from time to time. These acquisitions generally enhance the breadth and depth of our expertise in engineering and other functional areas, our technologies and our product offerings. In addition, we are incurring significant costs and expenses to support our Google Checkout product and promote its adoption by merchants and consumers, as well as promote the distribution of certain other products, including the Google Toolbar. Our headcount growth has required us to make substantial investments in property and equipment. Our full-time employee headcount has significantly increased over the last 12 months, growing from 10,674 at December 31, 2006 to 16,805 at December 31, 2007, and we also utilize a significant number of temporary employees. We also expect to continue to make significant capital expenditure investments, including information and technology infrastructure and corporate facilities. In April 2007, we launched our employee transferable stock option (TSO) program. We modified employee options to allow them to participate in this program, and as a result we incurred a modification charge of approximately $95 million in 2007 related to vested options, and we expect to incur an additional modification charge of approximately $134 million related to unvested options over their remaining vesting periods through the second quarter of 2011. In addition, the fair value of each option granted under the TSO program will be greater than it would have been otherwise because of a longer expected life, resulting in more stock-based compensation per option. As a result of all of the above, the growth rate of our costs and expenses may exceed the growth rate of our revenues.

We expect our cost of revenues to continue to increase in dollars and may increase as a percentage of revenues in 2008 and in future periods, primarily as a result of forecasted increases in traffic acquisition costs, data center costs and credit card and other transaction fees, including transaction processing fees related to Google Checkout, as well as content acquisition costs. In particular, traffic acquisition costs as a percentage of advertising revenues may increase in the future if we are unable to continue to improve the monetization of traffic on our web sites and our Google Network members' web sites, particularly with those members to whom we have guaranteed minimum revenue share payments.

Our international revenues have grown as a percentage of our total revenues to 48% in 2007 from 43% in 2006. This increase in the portion of our revenues derived from international markets results largely from increased acceptance of our advertising programs, increases in our direct sales resources and customer support operations and our continued progress in developing localized versions of our products in these international markets.

## Results of Operations

The following table presents our historical operating results as a percentage of revenues for the periods indicated:

| | Year Ended December 31, | | | Three Months Ended | |
| | | | | September 30, 2007 | December 31, 2007 |
| | 2005 | 2006 | 2007 | (unaudited) | |
| **Consolidated Statement of Income Data:** | | | | | |
| Revenues | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Costs and expenses: | | | | | |
|    Cost of revenues | 42.0 | 39.8 | 40.1 | 39.3 | 40.5 |
|    Research and development | 9.8 | 11.6 | 12.8 | 13.0 | 13.1 |
|    Sales and marketing | 7.6 | 8.0 | 8.8 | 9.0 | 8.8 |
|    General and administrative | 6.2 | 7.1 | 7.7 | 7.6 | 7.8 |
|    Contribution to Google Foundation | 1.5 | — | — | — | — |
| Total costs and expenses | 67.1 | 66.5 | 69.4 | 68.9 | 70.2 |
| Income from operations | 32.9 | 33.5 | 30.6 | 31.1 | 29.8 |
| Interest income and other, net | 2.0 | 4.3 | 3.6 | 3.6 | 3.5 |
| Income before income taxes | 34.9 | 37.8 | 34.2 | 34.7 | 33.3 |
| Net income | 23.9% | 29.0% | 25.3% | 25.2% | 25.0% |

Table of Contents

**Revenues**

The following table presents our revenues, by revenue source, for the periods presented (in millions):

| | Year Ended December 31, | | | Three Months Ended | |
| | | | | September 30, 2007 | December 31, 2007 |
| | 2005 | 2006 | 2007 | (unaudited) | |
|---|---|---|---|---|---|
| **Advertising Revenues** | | | | | |
| Google web sites | $3,377.1 | $ 6,332.8 | $10,624.7 | $ 2,734.8 | $ 3,121.6 |
| Google Network web sites | 2,687.9 | 4,159.8 | 5,787.9 | 1,454.7 | 1,635.8 |
| Total advertising revenues | 6,065.0 | 10,492.6 | 16,412.6 | 4,189.5 | 4,757.4 |
| Licensing and other revenues | 73.6 | 112.3 | 181.4 | 41.9 | 69.3 |
| Revenues | $6,138.6 | $10,604.9 | $16,594.0 | $ 4,231.4 | $ 4,826.7 |

The following table presents our revenues, by revenue source, as a percentage of total revenues for the periods presented:

| | Year Ended December 31, | | | Three Months Ended | |
| | | | | September 30, 2007 | December 31, 2007 |
| | 2005 | 2006 | 2007 | (unaudited) | |
|---|---|---|---|---|---|
| **Advertising Revenues** | | | | | |
| Google web sites | 55% | 60% | 64% | 65% | 65% |
| Google Network web sites | 44 | 39 | 35 | 34 | 34 |
| Total advertising revenues | 99 | 99 | 99 | 99 | 99 |
| Google web sites as % of advertising revenues | 56 | 60 | 65 | 65 | 66 |
| Google Network web sites as % of advertising revenues | 44 | 40 | 35 | 35 | 34 |
| Licensing and other revenues | 1% | 1% | 1% | 1% | 1% |

Growth in our revenues from 2006 to 2007 and from 2005 to 2006, as well as from the three months ended September 30, 2007 to the three months ended December 31, 2007 resulted primarily from growth in advertising revenues for Google web sites and Google Network web sites. Our advertising revenue growth for Google web sites and Google Network web sites resulted primarily from an increase in the total number of paid clicks and ads displayed through our programs, rather than from changes in the average fees paid by our advertisers. The increase in the number of paid clicks and ads displayed through our programs was due to an increase in aggregate traffic both on our web sites and those of our Google Network members, certain monetization improvements and the continued global expansion of our products, our advertiser base and our user base. Improvements in our ability to monetize this increased traffic primarily relate to enhancing the end user experience, including providing end users with ads that are more relevant to their search queries or to the content on the Google Network members' sites they visit. These improvements included, for instance, enhancements to the accuracy of our quality scoring, which is our measurement of an ad's quality, a change in the background color from blue to yellow for certain ads displayed on our search results pages, a change to the formula used to determine which ads appear at the top of our search results pages, a change to consider not only a user's current search query, but also their immediately preceding query, to determine the ads displayed on our search results pages, as well as a change to the clickable area around our AdSense for content text-based ads to only the title and URL to reduce the number of accidental clicks.

The sequential quarterly revenue growth rate from our web sites increased from 10.0% for the three months ended September 30, 2007, to 14.1% for the three months ended December 31, 2007. This increase is primarily the result of increased traffic, substantially due to seasonality, and to a lesser extent, improvements in our ability

44

Table of Contents

to monetize traffic on our web sites, as well as the continued global expansion of our products, our advertiser base and our user base. The sequential quarterly revenue growth rate from our Google Network members' web sites increased from 7.6% for the three months ended September 30, 2007, to 12.5% for the three months ended December 31, 2007. This increase is primarily the result of increased traffic of certain core partners, substantially due to seasonality, as well as the continued global expansion of our advertiser base and partner network, partially offset by an improvement to AdSense for content text-based ads which reduced the number of accidental clicks (see above). The sequential quarterly revenue growth from our web sites was greater than that from our Google Network members' web sites primarily as a result of a greater increase in the total number of paid clicks on our web sites, which was largely due to higher traffic growth and monetization improvements. We expect that our revenue growth rates will generally decline in the future as a result of increasing competition and the difficulty of maintaining growth rates as our revenues increase to higher levels.

Aggregate paid clicks on our web sites and our Google Network members' web sites increased approximately 9% from the three months ended September 30, 2007 to the three months ended December 31, 2007, approximately 43% from the year ended 2006 to the year ended 2007 and approximately 65% from the year ended 2005 to the year ended 2006. In general, the increase in paid clicks has historically correlated with increases in our revenues. However, the rate of increase in paid clicks, and its correlation with the rate of increase in revenues, may fluctuate from quarter to quarter based on various factors including seasonality, advertiser competition for keywords and the revenue growth rates on our web sites compared to those of our Google Network members. In addition, traffic growth in emerging markets compared to more mature markets and across various advertising verticals also contributes to these fluctuations.

We believe that the increase in the number of paid clicks and ads displayed through our programs is substantially the result of our commitment to improving the relevance and quality of both our search results and the advertisements displayed, which we believe results in a better user experience, which in turn results in more searches, advertisers, and Google Network members and other partners. Revenues realized through the Google Print Ads Program, Google Audio Ads, Google TV Ads, Google Checkout, YouTube, Postini and Search Appliance were not material in any of the periods presented.

## Revenues by Geography

Domestic and international revenues as a percentage of consolidated revenues, determined based on the billing addresses of our advertisers, are set forth below.

| | Year Ended December 31, | | | Three Months Ended | |
| | | | | September 30, 2007 | December 31, 2007 |
| | 2005 | 2006 | 2007 | (unaudited) | |
| United States | 61% | 57% | 52% | 52% | 52% |
| United Kingdom | 14% | 15% | 15% | 16% | 14% |
| Rest of the world | 25% | 28% | 33% | 32% | 34% |

The decrease in the United Kingdom revenues as a percentage of total revenues from the three months ended September 30, 2007 to the three months ended December 31, 2007 is primarily a result of seasonal slowdown in certain advertising verticals, such as finance and travel.

The yearly growth in international revenues resulted largely from increased acceptance of our advertising programs and increases in our direct sales resources and customer support operations in international markets and our continued progress in developing localized versions of our products for these international markets.

In addition, the weakening of the U.S. dollar relative to other foreign currencies (primarily the euro and the British pound) in the three and twelve months ended December 31, 2007 compared to the three months ended September 30, 2007 and the twelve months ended December 31, 2006 had a favorable impact on our international revenues, which increased $295.2 million and $3,321.2 million. Had foreign exchange rates

45

Table of Contents

remained constant in these periods, our total revenues would have been approximately $93.6 million and $542.0 million, or 1.9% and 3.3%, lower.

While international revenues in each of the periods presented accounted for less than half of our total revenues, more than half of our user traffic during these periods came from outside the U.S. Although we expect to continue to make investments in international markets, they may not result in an increase in our international revenues as a percentage of total revenues in 2008 or thereafter. See Note 14 of Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for additional information about geographic areas.

## Costs and Expenses

*Cost of Revenues.* Cost of revenues consists primarily of traffic acquisition costs. Traffic acquisition costs consist of amounts ultimately paid to our Google Network members under AdSense arrangements and to certain other partners (our "distribution partners") who distribute our toolbar and other products (collectively referred to as "access points") or otherwise direct search queries to our web site (collectively referred to as "distribution arrangements"). These amounts are primarily based on the revenue share arrangements with our Google Network members and distribution partners. Certain distribution arrangements require us to pay our partners based on a fee per access point delivered and not exclusively—or at all—based on revenue share. We recognize fees under these arrangements over the estimated useful lives of the access points (two years) to the extent we can reasonably estimate those lives or based on any contractual revenue share, if greater. Otherwise, the fees are expensed as incurred.

In addition, certain AdSense agreements obligate us to make guaranteed minimum revenue share payments to Google Network members based on their achieving defined performance terms, such as number of search queries or advertisements displayed. To the extent we expect revenues generated under such an arrangement to exceed the guaranteed minimum revenue share payments, we recognize traffic acquisition costs on a contractual revenue share or on a basis proportionate to forecasted revenues, whichever is greater. Otherwise, we recognize the guaranteed revenue share payments as traffic acquisition costs on a straight-line basis over the term of the related agreements. In addition, concurrent with the commencement of a small number of AdSense and other agreements, we have purchased certain items from, or provided other consideration to, our Google Network members and partners. We have determined that certain of these amounts are prepaid traffic acquisition costs and are amortized on a straight-line basis over the terms of the related agreements.

Cost of revenues also includes the expenses associated with the operation of our data centers, including depreciation, labor, energy and bandwidth costs, credit card and other transaction fees related to processing customer transactions as well as content acquisition costs. We have entered into arrangements with certain content providers under which we distribute or license their video and other content. In a number of these arrangements we display ads on the pages of our web sites and our Google Network members' web sites from which the content is viewed and share most of the fees these ads generate with the content providers and the Google Network members. To the extent we are obligated to make guaranteed minimum revenue share or other payments to our content providers, we recognize content acquisition costs equal to the greater of the following three amounts: the contractual revenue share amount, if any, based on the number of times the content is displayed, or on a straight-line basis over the terms of the agreements. The following tables present our cost of revenues and cost of revenues as a percentage of revenues, and our traffic acquisition costs and traffic acquisition costs as a percentage of advertising revenues for the periods presented (dollars in millions):

| | Year Ended December 31, | | | Three Months Ended | |
| | 2005 | 2006 | 2007 | September 30, 2007 | December 31, 2007 |
| | | | | (unaudited) | |
| Cost of revenues | $2,577.1 | $4,225.0 | $6,649.1 | $ 1,662.6 | $ 1,955.8 |
| Cost of revenues as a percentage of revenues | 42.0% | 39.8% | 40.1% | 39.3% | 40.5% |

Table of Contents

| | Year Ended December 31, | | | Three Months Ended | |
| | | | | September 30, 2007 | December 31, 2007 |
| | 2005 | 2006 | 2007 | (unaudited) | |
| Traffic acquisition costs | $2,114.9 | $3,308.8 | $4,933.9 | $ 1,221.1 | $ 1,439.8 |
| Traffic acquisition costs as a percentage of advertising revenues | 34.9% | 31.5% | 30.1% | 29.1% | 30.3% |

Cost of revenues increased $293.2 million from the three months ended September 30, 2007 to the three months ended December 31, 2007. There was an increase in traffic acquisition costs of $218.7 million which includes an increase of $20.0 million in fees related to distribution arrangements. Over this same period there was an increase in data center costs of $60.6 million primarily as a result of the depreciation of additional information technology assets and data center buildings as well as additional personnel required to manage the data centers. In addition, there was an increase in credit card and other transaction processing fees of $8.3 million resulting from more advertiser fees generated through AdWords as well as more transaction processing fees related to Google Checkout. The traffic acquisition costs associated with revenues generated from ads placed on our web sites is considerably lower that the traffic acquisition costs associated with revenues generated from ads placed on our Google Network members' web sites. The increase in cost of revenues as a percentage of revenues, as well as traffic acquisition costs as a percentage of advertising revenues, was primarily related to the performance of a few Google Network member web sites for which we are required to make guaranteed payments, including social networking traffic, which is not monetizing as well as expected. This more than offset the increase in the proportion of advertising revenues coming from our web sites rather than from our Google Network members' web sites.

Cost of revenues increased $2,424.1 million from 2006 to 2007. This increase was primarily the result of additional traffic acquisition costs, the depreciation of additional information technology assets purchased in the current and prior periods, other additional data center costs and additional credit card and other transaction fees. There was an increase in traffic acquisition costs of $1,625.1 million which includes an increase of $216.7 million in fees related to distribution arrangements. Over this same period there was an increase in data center costs of $565.2 million primarily resulting from the depreciation of additional information technology assets as well as additional labor required to manage the data centers. In addition, there was an increase in expenses related to acquiring content on our web sites of $80.7 million, an increase in the amortization of developed technology of $56.0 million resulting from acquisitions in the current and prior years and an increase in credit card and other transaction processing fees of $44.5 million resulting from more advertiser fees being generated through AdWords as well as transaction processing fees related to Google Checkout in 2007. The increase in cost of revenues as a percentage of revenues was primarily the result of the depreciation of additional information technology assets purchased in the current and prior periods and other additional data center costs as well as the increased expenses related to acquiring content on our web sites, which more than offset the proportionately greater revenues from our web sites compared to our Google Network members' web sites. The decrease in traffic acquisition costs as a percentage of advertising revenues was primarily the result of proportionately greater revenues from our web sites compared to our Google Network members' web sites, partially offset by the factors discussed in the paragraph above.

Cost of revenues increased $1,647.9 million from 2005 to 2006. There was an increase in traffic acquisition costs of $1,193.9 million which includes an increase of $84.1 million in fees expensed related to distribution arrangements. Over this same period there was an increase in data center costs of $307.9 million primarily resulting from the depreciation of additional information technology assets purchased in the current and prior years as well as additional labor required to manage the data centers. In addition, there was an increase in credit card and other transaction processing fees of $58.4 million resulting from more advertiser fees being generated through AdWords as well as transaction processing fees related to Google Checkout in 2006, an increase in expenses related to acquiring content on our web sites of $23.0 million, an increase in the amortization of developed technology of $21.6 million resulting from acquisitions in the current and prior years as well as an increase in Search Appliance costs of $10.8 million. The decrease in cost of revenues as a

47

Table of Contents

percentage of revenues, as well as traffic acquisition costs as a percentage of advertising revenues, was primarily the result of proportionately greater revenues from our web sites compared to our Google Network members' web sites.

We expect cost of revenues to continue to increase in dollars and may increase as a percentage of revenues in 2008 and in future periods, primarily as a result of increases in traffic acquisition costs, data center costs, credit card and other transaction fees, including transaction processing fees related to Google Checkout, content acquisition costs and other costs. Traffic acquisition costs as a percentage of advertising revenues may fluctuate in the future based on a number of factors, including:

- the relative growth rates of revenues from our web sites and from our Google Network members' web sites.

- whether we are able to enter into more AdSense arrangements that provide for lower revenue share obligations or whether increased competition for arrangements with existing and potential Google Network members results in less favorable revenue share arrangements.

- whether we are able to continue to improve the monetization of traffic on our web sites and our Google Network members' web sites, particularly with those members to whom we have guaranteed minimum revenue share payments.

- whether we share with existing and new partners proportionately more of the aggregate advertising fees that we earn from paid clicks derived from search queries these partners direct to our web sites.

- the relative growth rates of expenses associated with distribution arrangements and the related revenues generated.

*Research and Development.* The following table presents our research and development expenses, and research and development expenses as a percentage of our revenues for the periods presented (dollars in millions):

| | Year Ended December 31, | | | Three Months Ended | |
| | | | | September 30, 2007 | December 31, 2007 |
| | 2005 | 2006 | 2007 | (unaudited) | |
|---|---|---|---|---|---|
| Research and development expenses | $599.5 | $1,228.6 | $2,120.0 | $ 548.7 | $ 630.8 |
| Research and development expenses as a percentage of revenues | 9.8% | 11.6% | 12.8% | 13.0% | 13.1% |

Research and development expenses consist primarily of compensation and related costs for personnel responsible for the research and development of new products and services, as well as significant improvements to existing products and services. We expense research and development costs as they are incurred.

Research and development expenses increased $82.1 million from the three months ended September 30, 2007 to the three months ended December 31, 2007. This increase was primarily due to an increase in labor and facilities related costs of $74.0 million as a result of a 7% increase in research and development headcount including an increase in stock-based compensation expense of $30.7 million.

Research and development expenses increased $891.4 million from the year ended December 31, 2006 to the year ended December 31, 2007. This increase was primarily due to an increase in labor and facilities related costs of $708.0 million as a result of a 57% increase in research and development headcount, including an increase in stock-based compensation expense of $282.3 million. In addition, there was an increase in depreciation and related expenses of $72.3 million due to our increased capital expenditure.

Research and development expenses increased $629.1 million from the year ended December 31, 2005 to the year ended December 31, 2006, primarily due to an increase in labor and facilities related costs of $514.5 million as a result of a 77% increase in research and development headcount, including an increase in stock-

48

Table of Contents

based compensation cost of $172.0 million. In addition, there was an increase in depreciation and related expenses of $53.4 million primarily as a result of increasing dollar amounts of information technology assets purchased during 2005 and 2006, as well as an increase in the amortization of developed technology acquired in 2006 and prior years of $12.4 million.

We anticipate that research and development expenses will increase in dollar amount and may increase as a percentage of revenues in 2008 and future periods because we expect to hire more research and development personnel and build the infrastructure required to support the development of new, and improve existing, products and services. In addition, we expect to recognize greater stock-based compensation on a per option basis as a result of our employee transferable stock option (TSO) program.

*Sales and Marketing.* The following table presents our sales and marketing expenses, and sales and marketing expenses as a percentage of revenues for the periods presented (dollars in millions):

| | Year Ended December 31, | | | Three Months Ended | |
| | | | | September 30, 2007 | December 31, 2007 |
| | 2005 | 2006 | 2007 | (unaudited) | |
| Sales and marketing expenses | $468.2 | $849.5 | $1,461.3 | $ 380.8 | $ 422.3 |
| Sales and marketing expenses as a percentage of revenues | 7.6% | 8.0% | 8.8% | 9.0% | 8.8% |

Sales and marketing expenses consist primarily of compensation and related costs for personnel engaged in customer service and sales and sales support functions, as well as promotional and advertising expenditures.

Sales and marketing expenses increased $41.5 million from the three months ended September 30, 2007 to the three months ended December 31, 2007. This increase was primarily due to an increase in labor and facilities related costs of $43.6 million mostly as a result of an increase in certain bonuses and a 3% increase in sales and marketing headcount, including an increase in stock-based compensation expense of $8.2 million, partially offset by a decrease in advertising and promotional expense of $3.9 million.

Sales and marketing expenses increased $611.8 million from the year ended December 31, 2006 to the year ended December 31, 2007. This increase was primarily due to an increase in labor and facilities related costs of $435.7 million mostly as a result of a 52% increase in sales and marketing headcount, including an increase in stock-based compensation expense of $72.2 million, and an increase in depreciation and related expense of $74.2 million due to our increased capital expenditures. In addition, there was an increase in promotional and advertising expense of $37.5 million and an increase in travel and entertainment expense of $28.9 million.

Sales and marketing expenses increased $381.3 million from the year ended December 31, 2005 to the year ended December 31, 2006. This increase was primarily due to an increase in labor and facilities related costs of $240.1 million mostly as a result of an 88% increase in sales and marketing headcount, including an increase in stock-based compensation of $31.0 million, an increase in promotional and advertising expenses of $83.5 million and an increase in depreciation and related expenses of $21.6 million.

We anticipate sales and marketing expenses will continue to increase in dollar amount and may increase as a percentage of revenues in 2008 and future periods as we continue to expand our business on a worldwide basis. A significant portion of these increases relate to our plan to hire additional personnel and increase advertising and promotional expenditures to increase the level of service we provide to our advertisers and Google Network members. We also plan to add a significant number of international sales personnel to support our worldwide expansion. In addition, we expect greater stock-based compensation expenses on a per option basis as a result of our TSO program.

49

Table of Contents

*General and Administrative.* The following table presents our general and administrative expenses, and general and administrative expenses as a percentage of revenues for the periods presented (dollars in millions):

| | Year Ended December 31, | | | Three Months Ended | |
| | | | | September 30, 2007 | December 31, 2007 |
| | **2005** | **2006** | **2007** | (unaudited) | |
| General and administrative expenses | $386.5 | $751.8 | $1,279.3 | $    321.4 | $    377.0 |
| General and administrative expenses as a percentage of revenues | 6.2% | 7.1% | 7.7% | 7.6% | 7.8% |

General and administrative expenses consist primarily of compensation and related costs for personnel and facilities related to our finance, human resources, facilities, information technology and legal organizations, and fees for professional services. Professional services are principally comprised of outside legal, audit, information technology consulting and outsourcing services.

General and administrative expenses increased $55.6 million from the three months ended September 30, 2007 to the three months ended December 31, 2007. This increase was primarily due to an increase in labor and facilities related costs of $24.9 million primarily as a result of a 6% increase in general and administrative headcount, including an increase in stock-based compensation expense of $6.2 million, an increase in professional services of $15.9 million and an increase in charitable contributions of $7.3 million.

General and administrative expenses increased $527.5 million from the year ended December 31, 2006 to the year ended December 31, 2007. This increase was primarily due to an increase in labor and facilities related costs of $306.4 million, primarily as a result of a 72% increase in general and administrative headcount from 2006 to 2007, including an increase in stock-based compensation expense of $51.3 million and an increase in professional services fees of $95.1 million. In addition, there was an increase in bad debt expense of $35.6 million. The additional personnel, professional services and bad debt expenses are primarily the result of the growth of our business.

General and administrative expenses increased $365.3 million from the year ended December 31, 2005 to the year ended December 31, 2006. This increase was primarily due to an increase in labor and facilities related costs of $192.7 million, primarily as a result of a 92% increase in headcount from 2005 to 2006, including an increase in stock-based compensation expense of $42.4 million, an increase in professional services fees of $76.3 million and an increase in depreciation and related costs of $43.4 million. We also recognized $30.0 million in plaintiffs' attorneys' expenses related to the settlement of the Lane's Gift class action lawsuit recognized in 2006. The additional personnel, professional services and depreciation expenses are primarily the result of the growth of our business.

As we expand our business and incur additional expenses, we believe general and administrative expenses will increase in dollar amount and may increase as a percentage of revenues in 2008 and future periods. In addition, we expect greater stock-based compensation expenses on a per option basis as a result of our TSO program.

*Stock-Based Compensation Expense.* The following table presents our stock-based compensation and stock-based compensation as a percentage of revenues for the periods presented (dollars in millions):

| | Year Ended December 31, | | | Three Months Ended | |
| | | | | September 30, 2007 | December 31, 2007 |
| | **2005** | **2006** | **2007** | (unaudited) | |
| Stock-based compensation | $200.7 | $458.1 | $868.6 | $    198.0 | $    245.3 |
| Stock-based compensation as a percentage of revenues | 3.3% | 4.3% | 5.2% | 4.7% | 5.1% |

50

Table of Contents

Prior to January 1, 2006, we accounted for employee stock-based compensation using the intrinsic value method under Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25"). Under APB 25, deferred stock-based compensation for options granted to employees is equal to its intrinsic value, determined as the difference between the exercise prices and the values of the underlying stock on the dates of grant.

Prior to our initial public offering we typically granted stock options at exercise prices equal to or less than the value of the underlying stock as determined by our board of directors on the date of option grant. For purposes of financial accounting, we applied hindsight within each year or quarter prior to our initial public offering to arrive at reassessed values for the shares underlying these options. We recognized the difference between the exercise prices and the reassessed values as stock-based compensation over the vesting periods on an accelerated basis.

After the initial public offering, we have generally granted options at exercise prices equal to the fair market value of the underlying stock on the dates of option grant. As a result, only an immaterial amount of stock-based compensation was recognized over the vesting periods on an accelerated basis.

In the fourth quarter of 2004, we began granting restricted stock units ("RSUs") to certain employees under our Founders' Award and other programs (see Note 11 of Notes to Consolidated Financial Statements included as part of this Form 10-K for additional information). Under these programs, the fair values of the underlying stock on the dates of grant are recognized as stock-based compensation over the four year vesting periods on an accelerated basis. In the second quarter of 2005, we began granting RSUs to newly hired employees. These RSUs vest from zero to 37.5 percent of the grant amount at the end of each of the four years from date of hire based on the employee's performance. We recognized compensation expense for these RSUs under the variable method based on the fair market value of the underlying shares at the end of each quarter within the vesting periods.

On January 1, 2006, we adopted Statement of Financial Accounting Standards ("SFAS") No. 123R (revised 2004), *Share-Based Payments* ("SFAS 123R"), using the modified-prospective method. Under this method, we recognize stock-based compensation over the related service periods for any stock-awards issued after December 31, 2005, as well as for all stock awards issued prior to January 1, 2006 for which the requisite service has not been provided as of January 1, 2006 because these awards are unvested. Stock-based compensation is measured based on the fair values of all stock awards on the dates of grant.

We have elected to use the Black-Scholes-Merton ("BSM") option-pricing model to determine the fair value of stock-based awards under SFAS 123R, consistent with that used for pro forma disclosures under SFAS No. 123, *Accounting for Stock-Based Compensation.*

We continue to recognize stock-based compensation using the accelerated method for all stock awards issued prior to January 1, 2006, other than RSUs issued to new employees that vest based on the employee's performance for which we use the straight-line method. We elected to recognize stock-based compensation using the straight-line method for all stock awards issued after January 1, 2006.

As noted above, prior to the adoption of SFAS 123R we accounted for RSUs issued to new employees that vest based on the employee's performance under the variable method, under which stock-based compensation is measured based on the fair value of the underlying shares at the end of each quarter within the vesting periods. As noted above, under SFAS 123R stock-based compensation is measured based on the fair values of the underlying shares on the dates of grant for all such outstanding RSUs. As a result, to the extent the fair value of the underlying shares is greater at the end of each quarter within the vesting periods compared to the fair values on the dates of grant, then we will recognize less stock-based compensation than we would have had we continued to use the variable method.

51

Table of Contents

SFAS 123R requires compensation expense to be recognized based on awards ultimately expected to vest. As a result, forfeitures need to be estimated on the date of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. On January 1, 2006, we began to estimate forfeitures based on our historical experience to determine stock-based compensation to be recognized. For the periods prior to January 1, 2006, we accounted for forfeitures as they occurred.

In addition, we continue to account for stock awards issued to non-employees in accordance with the provisions of SFAS 123R and EITF 96-18 under which we use the BSM method to measure the value of options granted to non-employees at each vesting date to determine the appropriate charge to stock-based compensation.

In April 2007, we launched our TSO program. Under the TSO program, certain employees are able to sell vested options granted after our initial public offering under our 2004 Stock Plan to selected financial institutions in an online auction. All employees may participate in the program other than our executive management group and those who reside in countries where, due to local legal or tax implications, it would not be beneficial to employees or the TSO program would be impractical. At the time of sale, the vested option is automatically amended to create a warrant that is exercisable by the financial institution within two years from the date of issuance. All eligible outstanding options were modified in the second quarter of 2007 to allow them to be sold under the TSO program, and, as a result, we incurred a modification charge of approximately $95 million in 2007 related to vested options as of December 31, 2007, and we expect to incur an additional modification charge of approximately $134 million related to unvested options over their remaining vesting periods through the second quarter of 2011. The modification charge is equal to the difference between the values of those modified stock options on the date of modification and their values immediately prior to modification in accordance with SFAS 123R. Further, to the extent the forfeiture rate is different from what we have anticipated, the modification charge related to the unvested awards will be different from our expectations. The fair value of each option granted under the TSO program will be greater than it would have been otherwise because of a longer expected life, resulting in more stock-based compensation per option.

Stock-based compensation increased $47.3 million from the three months ended September 30, 2007 to the three months ended December 31, 2007. This increase was primarily due to additional stock awards issued during the fourth quarter of 2007 primarily to existing employees.

Stock-based compensation increased $410.5 million from the year ended December 31, 2006 to the year ended December 31, 2007. The increase was primarily due to additional stock-based compensation associated with unvested stock awards issued as a result of our acquisition of YouTube in the fourth quarter of 2006, the modification charge recognized as a result of the launch of our TSO program in the second quarter of 2007, as well as additional awards granted in 2007 to new and existing employees.

Stock-based compensation increased $257.4 million from the year ended December 31, 2005 to the year ended December 31, 2006. This increase was primarily a result of our adoption of SFAS 123R on January 1, 2006 under which stock-based compensation is recognized using the fair-value-based method as compared to the intrinsic value method under APB 25.

We expect stock-based compensation to be approximately $950 million in 2008 and $1.5 billion thereafter. These amounts do not include stock-based compensation related to stock awards that have been and may be granted to employees and directors subsequent to December 31, 2007 and stock awards that have been or may be granted to non-employees. In addition, to the extent forfeiture rates are different than we have anticipated, stock-based compensation related to these awards will be different from our expectations.

52

Table of Contents

**Contribution to Google Foundation**

In the three months ended December 31, 2005, we made a non-recourse, non-refundable $90.0 million cash contribution to the Google Foundation, a nonprofit related party of Google. As a result, this contribution was recorded as an expense in the period made. We do not expect to make further donations to the Google Foundation for the foreseeable future. See Note 10 of Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K for additional information about the Google Foundation.

**Interest Income and Other, Net**

Interest income and other of $167.3 million in the three months ended December 31, 2007 was primarily comprised of $144.6 million of interest income earned on our cash, cash equivalents and marketable securities balances. In addition, we recognized $34.2 million of net gains on sales of marketable securities and $13.9 million of net foreign exchange losses.

Interest income and other of $589.6 million in 2007 was primarily the result of $559.2 million of interest income earned on cash, cash equivalents and marketable securities balances. In addition, we recognized $51.2 million of net gains on sales of marketable securities and $16.2 million of net foreign exchange losses.

Interest income and other of $461.0 million in 2006 was primarily the result of $412.1 million of interest income earned on cash, cash equivalents and marketable securities balances. In addition, we recognized $40.2 million of net gains on sales of marketable securities primarily as a result of the sale of our investment in Baidu and $5.3 million of net foreign exchange gains.

Interest income and other of $124.4 million in 2005 was primarily the result of $121.0 million of interest income earned on our cash, cash equivalents and marketable securities balances.

**Provision for Income Taxes**

The following table presents our provision for income taxes, and effective tax rate for the periods presented (dollars in millions):

| | Year Ended December 31, | | | Three Months Ended | |
| | | | | September 30, 2007 | December 31, 2007 |
| | 2005 | 2006 | 2007 | (unaudited) | |
|---|---|---|---|---|---|
| Provision for income taxes | $676.3 | $933.6 | $1,470.3 | $ 402.3 | $ 401.6 |
| Effective tax rate | 31.6% | 23.3% | 25.9% | 27.3% | 25.0% |

Our provision for income taxes decreased $0.7 million from the three months ended September 30, 2007 to the three months ended December 31, 2007 primarily as a result of certain discrete tax charges and benefits recognized in the three months ended September 30, 2007 and December 31, 2007, partially offset by increases in federal and state income taxes, driven by higher taxable income period over period. Our effective tax rate decreased from the three months ended September 30, 2007 to the three months ended December 31, 2007, primarily as a result of certain discrete tax charges and benefits recognized in the three months ended September 30, 2007 and December 31, 2007.

Our provision for income taxes increased $536.7 million from 2006 to 2007. The increase in our provision for income taxes was primarily due to increases in federal and state income taxes, driven by higher taxable income period over period, partially offset by proportionately more earnings realized in countries where we have lower statutory tax rates in 2007 compared to 2006. Our effective tax rate increased from 2006 to 2007 primarily a result of greater discrete income tax benefits realized in 2006 than in 2007, partially offset by proportionately more earnings realized in countries where we have lower statutory tax rates in 2007 compared to 2006.

53

Table of Contents

Our provision for income taxes increased $257.3 million from 2005 to 2006. The increase in our provision for income taxes was primarily due to increases in federal and state income taxes, driven by higher taxable income period over period, partially offset by the discrete income tax benefit realized in 2006 related to the reduction to certain of our income tax contingency reserves. Our effective tax rate decreased from 2005 to 2006 primarily because proportionately more of our earnings were recognized by our subsidiaries outside of the U.S. compared to in the U.S. in 2006 compared to 2005, and such earnings were taxed at a lower weighted average statutory tax rate than in the U.S.

Our effective tax rate could fluctuate significantly on a quarterly basis and could be adversely affected to the extent earnings are lower than anticipated in countries where we have lower statutory rates and higher than anticipated in countries where we have higher statutory rates, by changes in the valuation of our deferred tax assets or liabilities, or by changes in tax laws, regulations, accounting principles, or interpretations thereof. In addition, we are subject to the continuous examination of our income tax returns by the Internal Revenue Service and other tax authorities. We regularly assess the likelihood of adverse outcomes resulting from these examinations to determine the adequacy of our provision for income taxes.

See Critical Accounting Policies and Estimates included elsewhere in this Form 10-K for additional information about our provision for income taxes.

A reconciliation of the federal statutory income tax rate to our effective tax rate is set forth in Note 13 of Notes to Consolidated Financial Statements included in this Form 10-K.

54

Table of Contents

**Quarterly Results of Operations**

You should read the following tables presenting our quarterly results of operations in conjunction with the consolidated financial statements and related notes contained elsewhere in this Form 10-K. We have prepared the unaudited information on the same basis as our audited consolidated financial statements. You should also keep in mind, as you read the following tables, that our operating results for any quarter are not necessarily indicative of results for any future quarters or for a full year.

The following table presents our unaudited quarterly results of operations for the eight quarters ended December 2007. This table includes all adjustments, consisting only of normal recurring adjustments, that we consider necessary for fair presentation of our financial position and operating results for the quarters presented. Both seasonal fluctuations in internet usage and traditional retail seasonality have affected, and are likely to continue to affect, our business. Internet usage generally slows during the summer months, and commercial queries typically increase significantly in the fourth quarter of each year. These seasonal trends have caused and will likely continue to cause, fluctuations in our quarterly results, including fluctuations in sequential revenue growth rates.

| | Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Mar 31, 2006 | Jun 30, 2006 | Sep 30, 2006 | Dec 31, 2006 | Mar 31, 2007 | Jun 30, 2007 | Sep 30, 2007 | Dec 31, 2007 |
| | (in thousands, except per share amounts) (unaudited) | | | | | | | |
| **Consolidated Statements of Income Data:** | | | | | | | | |
| Revenues | $2,253,755 | $2,455,991 | $2,689,673 | $3,205,498 | $3,663,971 | $3,871,985 | $4,231,351 | $4,826,679 |
| Costs and expenses: | | | | | | | | |
| Cost of revenues | 904,119 | 989,032 | 1,048,728 | 1,283,148 | 1,470,426 | 1,560,255 | 1,662,579 | 1,955,825 |
| Research and development | 246,599 | 282,552 | 312,632 | 386,806 | 408,384 | 532,106 | 548,712 | 630,783 |
| Sales and marketing | 190,943 | 196,397 | 206,972 | 255,206 | 302,552 | 355,604 | 380,820 | 422,291 |
| General and administrative | 169,395 | 172,638 | 190,010 | 219,744 | 261,400 | 319,405 | 321,398 | 377,046 |
| Total costs and expenses | 1,511,056 | 1,640,619 | 1,758,342 | 2,144,904 | 2,442,762 | 2,767,370 | 2,913,509 | 3,385,945 |
| Income from operations | 742,699 | 815,372 | 931,331 | 1,060,594 | 1,221,209 | 1,104,615 | 1,317,842 | 1,440,734 |
| Interest income and other, net | 67,919 | 160,805 | 108,180 | 124,139 | 130,728 | 137,130 | 154,428 | 167,294 |
| Income before income taxes | 810,618 | 976,177 | 1,039,511 | 1,184,733 | 1,351,937 | 1,241,745 | 1,472,270 | 1,608,028 |
| Provision for income taxes (1) | 218,327 | 255,100 | 306,150 | 154,017 | 349,775 | 316,625 | 402,281 | 401,579 |
| Net income | $ 592,291 | $ 721,077 | $ 733,361 | $1,030,716 | $1,002,162 | $ 925,120 | $1,069,989 | $1,206,449 |
| Net income per share of Class A and Class B common stock: | | | | | | | | |
| Basic | $ 2.02 | $ 2.39 | $ 2.42 | $ 3.36 | $ 3.24 | $ 2.98 | $ 3.44 | $ 3.86 |
| Diluted | $ 1.95 | $ 2.33 | $ 2.36 | $ 3.29 | $ 3.18 | $ 2.93 | $ 3.38 | $ 3.79 |

55

Table of Contents

The following table presents our unaudited quarterly results of operations as a percentage of revenues for the eight quarters ended December 31, 2007 (unaudited).

| | Quarter Ended | | | | | | | |
| | Mar 31, 2006 | Jun 30, 2006 | Sep 30, 2006 | Dec 31, 2006 | Mar 31, 2007 | Jun 30, 2007 | Sep 30, 2007 | Dec 31, 2007 |
|---|---|---|---|---|---|---|---|---|
| **As Percentage of Revenues:** | | | | | | | | |
| Revenues | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Costs and expenses: | | | | | | | | |
| Cost of revenues | 40.1 | 40.3 | 39.0 | 40.0 | 40.1 | 40.3 | 39.3 | 40.5 |
| Research and development | 10.9 | 11.5 | 11.6 | 12.1 | 11.1 | 13.7 | 13.0 | 13.1 |
| Sales and marketing | 8.5 | 8.0 | 7.7 | 8.0 | 8.3 | 9.2 | 9.0 | 8.8 |
| General and administrative | 7.5 | 7.0 | 7.1 | 6.8 | 7.2 | 8.2 | 7.6 | 7.8 |
| Total costs and expenses | 67.0 | 66.8 | 65.4 | 66.9 | 66.7 | 71.4 | 68.9 | 70.2 |
| Income from operations | 33.0 | 33.2 | 34.6 | 33.1 | 33.3 | 28.6 | 31.1 | 29.8 |
| Interest income and other, net | 3.0 | 6.6 | 4.0 | 3.9 | 3.6 | 3.5 | 3.6 | 3.5 |
| Income before income taxes | 36.0 | 39.8 | 38.6 | 37.0 | 36.9 | 32.1 | 34.7 | 33.3 |
| Net income | 26.3% | 29.4% | 27.3% | 32.2% | 27.4% | 23.9% | 25.2% | 25.0% |

### Liquidity and Capital Resources

In summary, our cash flows were:

| | Year Ended December 31, | | |
| | 2005 | 2006 | 2007 |
|---|---|---|---|
| | | (in millions) | |
| Net cash provided by operating activities | $ 2,459.4 | $ 3,580.5 | $ 5,775.4 |
| Net cash used in investing activities | (3,358.2) | (6,899.2) | (3,681.6) |
| Net cash provided by financing activities | 4,370.8 | 2,966.4 | 403.1 |

As a result of our initial public offering in August 2004 and our follow-on public stock offerings in September 2005 and April 2006, we raised approximately $7.5 billion of net proceeds. At December 31, 2007, we had $14.2 billion of cash, cash equivalents and marketable securities. Cash equivalents and marketable securities are comprised of highly liquid debt instruments of the U.S. government and its agencies, municipalities in the U.S., time deposits as well as U.S. corporate securities. Note 3 of Notes to Consolidated Financial Statements included in Item 8 of this Annual Report on Form 10-K describes further the composition of our cash, cash equivalents and marketable securities.

Our principal sources of liquidity are our cash, cash equivalents and marketable securities, as well as the cash flow that we generate from our operations. At December 31, 2007 and December 31, 2006, we had unused letters of credit for approximately $20.4 million and $17.7 million. We believe that our existing cash, cash equivalents, marketable securities and cash generated from operations will be sufficient to satisfy our currently anticipated cash requirements through at least the next 12 months. Our liquidity could be negatively affected by a decrease in demand for our products and services. In addition, we may make acquisitions or license products and technologies complementary to our business and may need to raise additional capital through future debt or equity financing to provide for greater flexibility to fund any such acquisitions and licensing activities. Additional financing may not be available at all or on terms favorable to us.

Cash provided by operating activities consisted of net income adjusted for certain non-cash items, including depreciation, amortization, stock-based compensation expense, excess tax benefits from stock-based award activity and deferred income taxes, and the effect of changes in working capital and other activities. Cash provided by operating activities in 2007 was $5,775.4 million and consisted of net income of $4,203.7 million,

56

Table of Contents

adjustments for non-cash items of $1,253.1 million and cash provided by working capital and other activities of $318.6 million. Adjustments for non-cash items primarily consisted of $868.6 million of stock-based compensation and $807.7 million of depreciation expense on property and equipment, partially offset by $379.2 million of excess tax benefits from stock-based award activity (see discussion below). In addition, changes in working capital activities primarily consisted of a net increase in income taxes payable and deferred income taxes of $744.8 million (which includes the same $379.2 million of excess tax benefits from stock-based awards included under adjustments for non-cash items), an increase in accrued expenses and other liabilities of $418.9 million, an increase in accrued revenue share of $150.3 million, an increase in accounts payable of $70.1 million and an increase in deferred revenue of $70.3 million. The increases in accounts payable and accrued expenses are a direct result of the growth of our business and increases in headcount. These increases to working capital activities were partially offset by an increase of $837.2 million in accounts receivable due to the growth in fees billed to our advertisers and an increase of $298.7 million in prepaid revenue shares, expenses and other assets.

Cash provided by operating activities in 2006 was $3,580.5 million and consisted of net income of $3,077.4 million, adjustments for non-cash items of $362.3 million and cash provided by working capital and other activities of $140.8 million. Adjustments for non-cash items primarily consisted of $494.4 million of depreciation expense on property and equipment and $458.1 million of stock-based compensation, partially offset by $581.7 million of excess tax benefits from stock-based award activity (see discussion below). In addition, working capital activities primarily consisted of an increase of $624.0 million in accounts receivable due to the growth in fees billed to our advertisers, partially offset by a net increase in income taxes payable and deferred income taxes of $496.9 million primarily comprised of the same $581.7 million of excess tax benefits from stock-based award activity included under adjustments for non-cash items, an increase of $386.9 million in accounts payable and accrued expenses due to the increase in purchases of property and equipment and other general expenditures, as well as a net increase of $149.9 million in prepaid revenue share, expenses and other assets and accrued revenue share primarily resulted from prepayments associated with AdSense and distribution arrangements.

Beginning January 1, 2006, SFAS 123R requires the benefits of tax deductions in excess of the tax-affected compensation that would have been recognized as if we had always accounted for our stock-based award activity under SFAS 123R to be reported as a cash flow from financing activities, rather than as a cash flow from operating activities, as was prescribed under accounting rules applicable through December 31, 2005. In compliance with the modified prospective transition method under SFAS 123R, these excess tax benefits from stock-based award activity generated in 2006, as well as those previously generated in 2005 under the then applicable accounting rules, are reported as a cash flow from financing activities and a cash flow from operating activities, respectively. The benefits of tax deductions in excess of the tax-affected compensation could fluctuate significantly from period to period based on the number of stock-based awards exercised, sold or vested, the tax benefit realized and the tax-affected compensation recognized.

Cash provided by operating activities in 2005 was $2,459.4 million and consisted of net income of $1,465.4 million, adjustments for non-cash and other items of $971.4 million and cash provided by working capital and other activities of $22.6 million. Adjustments for non-cash and other items primarily consisted of $256.8 million of depreciation and amortization expense on property and equipment and $200.7 million of stock-based compensation, $433.7 million of tax benefits from stock-based award activity, which represents a portion of the $552.5 million reduction to income taxes payable that we realized over 2005 related to the exercise, sale or vesting of these awards. Working capital activities primarily consisted of an increase of $372.3 million in accounts receivable due to growth in fees billed to our advertisers, an increase of $247.4 million in accounts payable and accrued expenses due to the increase in purchases of property and equipment, other general expenditures as well as an increase in compensation as a result of the growth in the number of employees, an increase of $93.3 million in accrued revenue share due to the growth in our AdSense programs and the timing of payments made to our Google Network members and a net decrease in income taxes receivable and deferred income taxes of $66.2 million.

57

Table of Contents

As we expand our business internationally, we have offered payment terms to certain advertisers that are standard in their locales, but longer than terms we would generally offer to our domestic advertisers. This may increase our working capital requirements and may have a negative effect on cash provided by our operating activities. In addition, since we have become a public company our cash-based compensation per employee has increased and will likely continue to increase (primarily in the form of variable bonus awards and other incentive arrangements) in order to retain and attract employees.

Cash used in investing activities in 2007 of $3,681.6 million was attributable to capital expenditures of $2,402.8 million, cash consideration used in acquisitions and other investments of $941.2 million, of which $545.7 million related to the acquisition of Postini in the third quarter of 2007, and net purchases of marketable securities of $337.6 million.

Cash used in investing activities in 2006 of $6,899.2 million was attributable to net purchases of marketable securities of $3,574.8 million primarily driven by the additional cash raised from our follow-on public stock offering in April 2006, cash consideration used in acquisitions and other investments of $1,421.6 million primarily related to our $1.0 billion investment in America Online, Inc. and to a lesser extent, the acquisition of dMarc Broadcasting, Inc. and capital expenditures of $1,902.8 million.

Cash used in investing activities in 2005 of $3,358.2 million was attributable to net purchases of marketable securities of $2,418.7 million, capital expenditures of $838.2 million and cash consideration used in acquisitions and other investments of $101.3 million, net of cash acquired. Capital expenditures are mainly for the purchase of information technology assets. In order to manage expected increases in internet traffic, advertising transactions and new products and services, and to support our overall global business expansion, we will continue to invest heavily in data center operations, technology, corporate facilities and information technology infrastructure in 2008 and thereafter.

In addition, we expect to spend a significant amount of cash on acquisitions and other investments from time to time. These acquisitions generally enhance the breadth and depth of our expertise in engineering and other functional areas, our technologies and our product offerings. In April 2007, we entered into an Agreement and Plan of Merger to acquire DoubleClick, a privately held company, for approximately $3.1 billion in cash. See Note 7 of Notes to Consolidated Financial Statements included as part of this Form 10-K for additional information on the pending DoubleClick acquisition.

In connection with certain acquisitions, we are obligated to make additional cash payments if certain criteria are met. As of December 31, 2007, our remaining contingent obligations related to these acquisitions was approximately $800 million. Since these contingent payments are based on the achievement of performance targets, actual payments may be substantially lower.

Also, as part of our philanthropic program, we expect to make donations as well as investments in for-profit enterprises that aim to alleviate poverty, improve the environment or achieve other socially or economically progressive objectives. We expect these payments to be made primarily in cash and to be approximately $175 million over the three years ending December 31, 2008, with any unallocated amounts to be rolled over into the following year.

58

Table of Contents

Cash provided by financing activities in 2007 of $403.1 million was due primarily to (i) excess tax benefits of $379.2 million from stock-based award activity during the period and (ii) net proceeds from the issuance of common stock pursuant to stock-based award activity of $23.9 million. As a result of our TSO program, proceeds from the exercise of stock options will be deferred and may be less than we would have received had we not adopted the TSO program. This is because the financial institutions that purchase TSOs will likely not exercise the related warrants until the expiration of the contractual term from the date of purchase (generally, two years), and then only if the market value exceeds the exercise price on the expiration date. Cash provided by financing activities in 2006 of $2,966.4 million was due primarily to (i) net proceeds of $2,063.5 million raised from the follow-on stock offering, (ii) excess tax benefits of $581.7 million from stock-based award activity during the period and (iii) net proceeds from the issuance of common stock pursuant to stock-based award activity of $321.1 million. Cash provided by financing activities in 2005 of $4,370.8 million was due primarily to net proceeds from our follow-on stock offering of $4,287.2 million, after consideration of related issuance costs of $66.8 million.

## Contractual Obligations as of December 31, 2007

| | | Payments due by period | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
| | | (unaudited, in millions) | | | |
| Guaranteed minimum revenue share payments | $1,746.4 | $ 671.9 | $ 902.6 | $171.9 | $ — |
| Operating lease obligations | 2,203.7 | 151.6 | 328.7 | 288.7 | 1,434.7 |
| Purchase obligations | 734.0 | 171.6 | 229.5 | 165.2 | 167.7 |
| Other long-term liabilities reflected on our balance sheet under GAAP | 77.6 | 46.7 | 7.8 | 11.1 | 12.0 |
| Total contractual obligations | $4,761.7 | $1,041.8 | $1,468.6 | $636.9 | $1,614.4 |

The above table does not include contingent consideration that may be paid pursuant to asset purchases or business combinations. It also does not include payments related to toolbar and other product distribution arrangements as those arrangements do not include guaranteed obligations.

### Guaranteed Minimum Revenue Share Payments

In connection with our AdSense revenue share agreements, we are periodically required to make non-cancelable guaranteed minimum revenue share payments to a small number of our Google Network members over the term of the respective contracts. Under our contracts, these guaranteed payments can vary based on our Google Network members achieving defined performance terms, such as number of advertisements displayed or search queries. In some cases, certain guaranteed amounts will be adjusted downward if our Google Network members do not meet their performance terms and, in some cases, these amounts will be adjusted upward if they exceed their performance terms. The amounts included in the table above assume that the historical upward performance adjustments with respect to each contract will continue, but do not make a similar assumption with respect to downward adjustments. We believe these amounts best represent a reasonable estimate of the future minimum guaranteed payments. Actual guaranteed payments may differ from the estimates presented above. To date, the aggregate advertiser fees generated under these AdSense agreements have exceeded the aggregate guaranteed minimum revenue share payments.

At December 31, 2007, our aggregate outstanding non-cancelable guaranteed minimum revenue share commitments totaled $1,746.4 million through 2012 compared to $1,165.6 million at December 31, 2006.

59

Table of Contents

### Operating Leases

We have entered into various non-cancelable operating lease agreements for certain of our offices, land and data centers throughout the world with original lease periods expiring between 2008 and 2051. We are committed to pay a portion of the related operating expenses under certain of these lease agreements. These operating expenses are not included in the table above. Certain of these leases have free or escalating rent payment provisions. We recognize rent expense under such leases on a straight-line basis over the term of the lease.

The above minimum payments at December 31, 2007 under operating lease obligations do not include amounts related to certain non-cancelable service contracts for our data centers. The non-cancelable commitments under these service contracts at December 31, 2007 are included under purchase obligations.

### Purchase Obligations

Purchase obligations represent non-cancelable contractual obligations at December 31, 2007. In addition, we had $1,375.8 million of open purchase orders for which we have not received the related services or goods at December 31, 2007. This amount is not included in the above table since we have the right to cancel the purchase orders prior to the date of delivery. The majority of our purchase obligations are related to data center operations and facility build-outs. These non-cancelable contractual obligations and open purchase orders amounts do not include payments we may be obligated to make to vendors upon their attainment of milestones under the related agreements.

### Other Long-Term Liabilities

Other long-term liabilities consist of cash obligations, primarily milestone and royalty payments owed in connection with certain acquisitions and licensing agreements.

In addition, upon adoption of Financial Interpretation No. 48, *Accounting for Uncertainty in Income Taxes,* ("FIN 48") on January 1, 2007, we decreased current taxes payable by $219.4 million and increased long-term taxes payable by the same amount as FIN 48 specifies that tax positions for which the timing of the ultimate resolution is uncertain should be recognized as long-term liabilities. We also recognized additional long-term taxes payable of $259.0 million in the year ended December 31, 2007. At this time, we are unable to make a reasonably reliable estimate of the timing of payments in individual years beyond 12 months due to uncertainties in the timing of tax audit outcomes. As a result, this amount is not included in the table above.

## Off-Balance Sheet Entities

At December 31, 2007 and 2006, we did not have interests in any variable interest entities, as defined by the Financial Accounting Standards Board Interpretation No. 46 (Revised 2003), *Consolidation of Variable Interest Entities—An Interpretation of ARB No. 51*, having a significant effect on the financial statements.

## Critical Accounting Policies and Estimates

We prepare our consolidated financial statements in accordance with accounting principles generally accepted in the U.S. In doing so, we have to make estimates and assumptions that affect our reported amounts of assets, liabilities, revenues and expenses, as well as related disclosure of contingent assets and liabilities. In some cases, we could reasonably have used different accounting policies and estimates. In some cases changes in the accounting estimates are reasonably likely to occur from period to period. Accordingly, actual results could differ materially from our estimates. To the extent that there are material differences between these estimates and actual results, our financial condition or results of operations will be affected. We base our estimates on past experience and other assumptions that we believe are reasonable under the circumstances, and we evaluate

60

Table of Contents

these estimates on an ongoing basis. We refer to accounting estimates of this type as critical accounting policies and estimates, which we discuss further below. We have reviewed our critical accounting policies and estimates with the audit committee of our board of directors.

### Income Taxes

We are subject to income taxes in the U.S. and numerous foreign jurisdictions. Significant judgment is required in evaluating our uncertain tax positions and determining our provision for income taxes. Effective January 1, 2007, we adopted Financial Interpretation No. 48, *Accounting for Uncertainty in Income Taxes-an interpretation of FASB Statement No. 109* ("FIN 48"). FIN 48 contains a two-step approach to recognizing and measuring uncertain tax positions accounted for in accordance with SFAS No. 109, "Accounting for Income Taxes." The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates that it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely of being realized upon settlement.

Although we believe we have adequately reserved for our uncertain tax positions, no assurance can be given that the final tax outcome of these matters will not be different. We adjust these reserves in light of changing facts and circumstances, such as the closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences will impact the provision for income taxes in the period in which such determination is made. The provision for income taxes includes the impact of reserve provisions and changes to reserves that are considered appropriate, as well as the related net interest.

Our effective tax rates have differed from the statutory rate primarily due to the tax impact of foreign operations, research and experimentation tax credits, state taxes, and certain benefits realized related to stock option activity. The effective tax rate was 31.6%, 23.3% and 25.9% for 2005, 2006 and 2007. Our future effective tax rates could be adversely affected by earnings being lower than anticipated in countries where we have lower statutory rates and higher than anticipated in countries where we have higher statutory rates, by changes in the valuation of our deferred tax assets or liabilities, or by changes in tax laws, regulations, accounting principles, or interpretations thereof. In addition, we are subject to the continuous examination of our income tax returns by the Internal Revenue Service and other tax authorities. We regularly assess the likelihood of adverse outcomes resulting from these examinations to determine the adequacy of our provision for income taxes.

### Stock-Based Compensation

We account for stock-based compensation in accordance with SFAS 123R. Under the provisions of SFAS 123R, stock-based compensation cost is estimated at the grant date based on the award's fair value as calculated by the Black-Scholes-Merton ("BSM") option-pricing model and is recognized as expense over the requisite service period. The BSM model requires various highly judgmental assumptions including volatility, forfeiture rates and expected option life. If any of the assumptions used in the BSM model change significantly, stock-based compensation expense may differ materially in the future from that recorded in the current period.

### Traffic Acquisition Costs

We are obligated under certain agreements to make non-cancelable guaranteed minimum revenue share payments to Google Network members based on their achieving defined performance terms, such as number of search queries or advertisements displayed. To the extent we expect revenues generated under such an arrangement to exceed the guaranteed minimum revenue share payments, we recognize traffic acquisition costs on a contractual revenue share basis or on a basis proportionate to forecasted revenues, whichever is greater; if our estimate of revenues under such an arrangement is subsequently revised downward, then the amount of

61

Table of Contents

traffic acquisition costs we would recognize thereafter would be proportionately greater. Otherwise, we recognize the guaranteed revenue share payments as traffic acquisition costs on a straight-line basis over the term of the related agreements.

### Effect of Recent Accounting Pronouncements

In September 2006, the Financial Accounting Standards Board ("FASB") issued SFAS No. 157, *Fair Value Measurements* ("SFAS 157"), which defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. SFAS 157 does not require any new fair value measurements, but provides guidance on how to measure fair value by providing a fair value hierarchy used to classify the source of the information. SFAS 157 is effective for fiscal years beginning after November 15, 2007. However, on December 14, 2007, the FASB issued proposed FSP FAS 157-b which would delay the effective date of SFAS 157 for all nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on a recurring basis (at least annually). This proposed FSP partially defers the effective date of Statement 157 to fiscal years beginning after November 15, 2008, and interim periods within those fiscal years for items within the scope of this FSP. Effective for 2008, we will adopt SFAS 157 except as it applies to those nonfinancial assets and nonfinancial liabilities as noted in proposed FSP FAS 157-b. The partial adoption of SFAS 157 will not have a material impact on our consolidated financial position, results of operations or cash flows.

In February 2007, the FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities- including an Amendment of FASB Statement No. 115* ("SFAS 159"), which allows an entity to choose to measure certain financial instruments and liabilities at fair value. Subsequent measurements for the financial instruments and liabilities an entity elects to fair value will be recognized in earnings. SFAS 159 also establishes additional disclosure requirements. SFAS 159 is effective for us beginning January 1, 2008. We are currently evaluating the potential impact of the adoption of SFAS 159 on our consolidated financial position, results of operations or cash flows.

In December 2007, the FASB issued SFAS No. 141 (revised 2007), *Business Combinations* ("SFAS 141R"). SFAS 141R establishes principles and requirements for how an acquirer recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, any noncontrolling interest in the acquiree and the goodwill acquired. SFAS 141R also establishes disclosure requirements to enable the evaluation of the nature and financial effects of the business combination. This statement is effective for us beginning January 1, 2009. We are currently evaluating the potential impact of the adoption of SFAS 141R on our consolidated financial position, results of operations or cash flows.

In December 2007, the FASB issued SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements—an amendment of Accounting Research Bulletin No. 51* ("SFAS 160"). SFAS 160 establishes accounting and reporting standards for ownership interests in subsidiaries held by parties other than the parent, the amount of consolidated net income attributable to the parent and to the noncontrolling interest, changes in a parent's ownership interest, and the valuation of retained noncontrolling equity investments when a subsidiary is deconsolidated. SFAS 160 also establishes disclosure requirements that clearly identify and distinguish between the interests of the parent and the interests of the noncontrolling owners. This statement is effective for us beginning January 1, 2009. We are currently evaluating the potential impact of the adoption of SFAS 160 on our consolidated financial position, results of operations or cash flows.

62

Table of Contents

## ITEM 7A.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to financial market risks, including changes in currency exchange rates and interest rates.

### Foreign Exchange Risk

Our exposure to foreign currency transaction gains and losses is the result of certain net receivables due from our foreign subsidiaries and customers being denominated in currencies other than the U.S. dollar, primarily the British pound, the euro, the Canadian dollar and the Japanese yen. Our foreign subsidiaries conduct their businesses in local currency. Our board of directors approved a foreign exchange hedging program designed to minimize the future potential impact due to changes in foreign currency exchange rates. The program allows for the hedging of transaction exposures. The types of derivatives that can be used under the policy are forward contracts, options and foreign exchange swaps. We also generate revenue in certain countries in Asia where there are limited forward currency exchange markets, thus making these exposures difficult to hedge. We have entered into forward foreign exchange contracts to offset the foreign exchange risk on certain intercompany assets, as well as cash denominated in currencies other than the local currency of the subsidiary. The notional principal of forward foreign exchange contracts to purchase U.S. dollars with euros and Taiwan dollars was $1,498.6 million at December 31, 2007. The notional principal of forward foreign exchange contracts to purchase euros with British pounds, Japanese yen, Australian dollars and Swedish krona was €296.5 million (or approximately $433.4 million) at December 31, 2007. There were no other forward exchange contracts outstanding at December 31, 2007.

Our exposure to foreign currency translation gains and losses arises from the translation of the assets and liabilities of our subsidiaries to U.S. dollars during consolidation. We recognized translation gains of $61.0 million in 2007 primarily as a result of generally strengthening foreign currencies against the U.S. dollar and the net asset position of most of our subsidiaries.

We considered the historical trends in currency exchange rates and determined that it was reasonably possible that adverse changes in exchange rates of 10% for all currencies could be experienced in the near term. These changes would have resulted in an adverse impact on income before taxes of approximately $11.6 million and $39.7 million at December 31, 2006 and December 31, 2007. The adverse impact at December 31, 2006 and 2007 is after consideration of the offsetting effect of approximately $113.6 million and $163.7 million from forward exchange contracts in place for the months of December 2006 and December 2007. These reasonably possible adverse changes in exchange rates of 10% were applied to total monetary assets denominated in currencies other than the local currencies at the balance sheet dates to compute the adverse impact these changes would have had on our income before taxes in the near term.

### Interest Rate Risk

We invest in a variety of securities, consisting primarily of investments in interest-bearing demand deposit accounts with financial institutions, tax-exempt money market funds and highly liquid debt securities of corporations and municipalities. By policy, we limit the amount of credit exposure to any one issuer.

Investments in both fixed rate and floating rate interest earning products carry a degree of interest rate risk. Fixed rate securities may have their fair market value adversely impacted due to a rise in interest rates, while floating rate securities may produce less income than predicted if interest rates fall. Due in part to these factors, our income from investments may decrease in the future.

We considered the historical volatility of short term interest rates and determined that it was reasonably possible that an adverse change of 100 basis points could be experienced in the near term. A hypothetical 1.00% (100 basis-point) increase in interest rates would have resulted in a decrease in the fair values of our marketable securities of approximately $98.8 million and $86.7 million at December 31, 2006 and December 31, 2007.

63

Table of Contents

ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

**Google Inc.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**Contents**

|  | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firm | 65 |
| Financial Statements |  |
| Consolidated Balance Sheets | 67 |
| Consolidated Statements of Income | 68 |
| Consolidated Statements of Stockholders' Equity | 69 |
| Consolidated Statements of Cash Flows | 70 |
| Notes to Consolidated Financial Statements | 71 |

The supplementary financial information required by this Item 8 is included in Item 7 under the caption "Quarterly Results of Operations."

64

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
Google Inc.

We have audited the accompanying consolidated balance sheets of Google Inc. as of December 31, 2006 and 2007, and the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2007. Our audits also included the financial statement schedule listed in the Index at Item 15(a)2. These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Google Inc. at December 31, 2006 and 2007, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2007, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

As discussed in Note 1 to the consolidated financial statements, in 2006, Google Inc. changed its method of accounting for share-based payments in accordance with the guidance provided in Statement of Financial Accounting Standards No. 123 (R), *Share-Based Payment*. As discussed in Note 13 to the consolidated financial statements, in 2007, the Company adopted Financial Accounting Standards Board Interpretation No. 48, *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No.109.*

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Google Inc.'s internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 14, 2008, expressed an unqualified opinion thereon.

/s/    ERNST & YOUNG LLP

San Jose, California
February 14, 2008

65

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
Google Inc.

We have audited Google Inc.'s internal control over financial reporting as of December 31, 2007, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Google Inc.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Google Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Google Inc. as of December 31, 2006 and 2007, and the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2007, and our report dated February 14, 2008, expressed an unqualified opinion thereon.

                                                          /s/  ERNST & YOUNG LLP

San Jose, California
February 14, 2008

66

Table of Contents

**Google Inc.**
## CONSOLIDATED BALANCE SHEETS
### (In thousands, except par value per share)

| | As of December 31, | |
|---|---|---|
| | 2006 | 2007 |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 3,544,671 | $ 6,081,593 |
| Marketable securities | 7,699,243 | 8,137,020 |
| Accounts receivable, net of allowance of $16,914 and $32,887 | 1,322,340 | 2,162,521 |
| Deferred income taxes, net | 29,713 | 68,538 |
| Income taxes receivable | — | 145,253 |
| Prepaid revenue share, expenses and other assets | 443,880 | 694,213 |
| Total current assets | 13,039,847 | 17,289,138 |
| Prepaid revenue share, expenses and other assets, non-current | 114,455 | 168,530 |
| Deferred income taxes, net, non-current | — | 33,219 |
| Non-marketable equity securities | 1,031,850 | 1,059,694 |
| Property and equipment, net | 2,395,239 | 4,039,261 |
| Intangible assets, net | 346,841 | 446,596 |
| Goodwill | 1,545,119 | 2,299,368 |
| Total assets | $18,473,351 | $25,335,806 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $    211,169 | $    282,106 |
| Accrued compensation and benefits | 351,671 | 588,390 |
| Accrued expenses and other current liabilities | 266,247 | 465,032 |
| Accrued revenue share | 370,364 | 522,001 |
| Deferred revenue | 105,136 | 178,073 |
| Total current liabilities | 1,304,587 | 2,035,602 |
| Deferred revenue, long-term | 20,006 | 30,249 |
| Deferred income taxes, net | 40,421 | — |
| Income taxes payable, long-term | — | 478,372 |
| Other long-term liabilities | 68,497 | 101,904 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Convertible preferred stock, $0.001 par value, 100,000 shares authorized; no shares issued and outstanding | — | — |
| Class A and Class B common stock, $0.001 par value per share: 9,000,000 shares authorized; 308,997 (Class A 227,670, Class B 81,327) and par value of $309 (Class A $228, Class B $81) and 312,917 (Class A 236,097, Class B 76,820) and par value of $313 (Class A $236, Class B $77) shares issued and outstanding, excluding 1,296 (Class A 1,045 Class B 251) and 361 (Class A 336, Class B 25) shares subject to repurchase (see Note 11) at December 31, 2006 and 2007 | 309 | 313 |
| Additional paid-in capital | 11,882,906 | 13,241,221 |
| Accumulated other comprehensive income | 23,311 | 113,373 |
| Retained earnings | 5,133,314 | 9,334,772 |
| Total stockholders' equity | 17,039,840 | 22,689,679 |
| Total liabilities and stockholders' equity | $18,473,351 | $25,335,806 |

See accompanying notes.

67

Table of Contents

**Google Inc.**
## CONSOLIDATED STATEMENTS OF INCOME
### (In thousands, except per share amounts)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2006 | 2007 |
| Revenues | $6,138,560 | $10,604,917 | $16,593,986 |
| Costs and expenses: | | | |
| Cost of revenues (including stock-based compensation expense of $5,579, $17,629, $22,335) | 2,577,088 | 4,225,027 | 6,649,085 |
| Research and development (including stock-based compensation expense of $115,532, $287,485, $569,797) | 599,510 | 1,228,589 | 2,119,985 |
| Sales and marketing (including stock-based compensation expense of $28,411, $59,389, $131,638) | 468,152 | 849,518 | 1,461,266 |
| General and administrative (including stock-based compensation expense of $51,187, $93,597, $144,876) | 386,532 | 751,787 | 1,279,250 |
| Contribution to Google Foundation | 90,000 | — | — |
| Total costs and expenses | 4,121,282 | 7,054,921 | 11,509,586 |
| Income from operations | 2,017,278 | 3,549,996 | 5,084,400 |
| Interest income and other, net | 124,399 | 461,044 | 589,580 |
| Income before income taxes | 2,141,677 | 4,011,040 | 5,673,980 |
| Provision for income taxes | 676,280 | 933,594 | 1,470,260 |
| Net income | $1,465,397 | $ 3,077,446 | $ 4,203,720 |
| Net income per share of Class A and Class B common stock: | | | |
| Basic | $      5.31 | $      10.21 | $      13.53 |
| Diluted | $      5.02 | $      9.94 | $      13.29 |

See accompanying notes.

68

Table of Contents

## Google Inc.
### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
### (In thousands)

| | Class A and Class B Common Stock | | Additional Paid-In Capital Amount | Deferred Stock Based Compensation | Accumulated Other Comprehensive Income | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| Balance at January 1, 2005 | 266,917 | $ 267 | $ 2,582,352 | $ (249,470) | $ 5,436 | $ 590,471 | $ 2,929,056 |
| Issuance of common stock in connection with follow-on public offering and acquisitions, net | 14,869 | 15 | 4,316,022 | (2,036) | — | — | 4,314,001 |
| Stock-based award activity | 11,241 | 11 | 579,418 | 132,491 | — | — | 711,920 |
| Comprehensive income: | | | | | | | |
| Change in unrealized gain (loss) on available-for-sale investments, net of tax effect of $11,404 | — | — | — | — | 16,580 | — | 16,580 |
| Foreign currency translation adjustment | — | — | — | — | (17,997) | — | (17,997) |
| Net income | — | — | — | — | — | 1,465,397 | 1,465,397 |
| Total comprehensive income | — | — | — | — | — | — | 1,463,980 |
| Balance at December 31, 2005 | 293,027 | 293 | 7,477,792 | (119,015) | 4,019 | 2,055,868 | 9,418,957 |
| Issuance of common stock in connection with follow-on public offering and acquisitions, net | 7,689 | 8 | 3,236,778 | — | — | — | 3,236,786 |
| Stock-based award activity | 8,281 | 8 | 1,168,336 | 119,015 | — | — | 1,287,359 |
| Comprehensive income: | | | | | | | |
| Change in unrealized gain (loss) on available-for-sale investments, net of tax effect of $13,280 | — | — | — | — | (19,309) | — | (19,309) |
| Foreign currency translation adjustment | — | — | — | — | 38,601 | — | 38,601 |
| Net income | — | — | — | — | — | 3,077,446 | 3,077,446 |
| Total comprehensive income | — | — | — | — | — | — | 3,096,738 |
| Balance at December 31, 2006 | 308,997 | 309 | 11,882,906 | — | 23,311 | 5,133,314 | 17,039,840 |
| Stock-based award activity | 3,920 | 4 | 1,358,315 | — | | | 1,358,319 |
| Comprehensive income: | | | | | | | |
| Change in unrealized gain (loss) on available-for-sale investments, net of tax effect of $19,963 | — | — | — | — | 29,029 | — | 29,029 |
| Foreign currency translation adjustment | — | — | — | — | 61,033 | — | 61,033 |
| Net income | — | — | — | — | — | 4,203,720 | 4,203,720 |
| Total comprehensive income | — | — | — | — | — | — | 4,293,782 |
| Adjustment to retained earnings upon adoption of FIN 48 | — | — | — | — | — | (2,262) | (2,262) |
| Balance at December 31, 2007 | 312,917 | $ 313 | $13,241,221 | $ — | $ 113,373 | $9,334,772 | $22,689,679 |

See accompanying notes.

69

Table of Contents

**Google Inc.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2005** | **2006** | **2007** |
| **Operating activities** | | | |
| Net income | $ 1,465,397 | $ 3,077,446 | $ 4,203,720 |
| Adjustments: | | | |
| Depreciation and amortization of property and equipment | 256,812 | 494,430 | 807,743 |
| Amortization of intangibles and other | 37,000 | 77,509 | 159,915 |
| Stock-based compensation | 200,709 | 458,100 | 868,646 |
| Excess tax benefits from stock-based award activity | 433,724 | (581,732) | (379,206) |
| Deferred income taxes | 21,163 | (98,468) | (164,212) |
| Other, net | 22,040 | 12,474 | (39,741) |
| Changes in assets and liabilities, net of effects of acquisitions: | | | |
| Accounts receivable | (372,290) | (624,012) | (837,247) |
| Income taxes, net | 66,237 | 496,882 | 744,802 |
| Prepaid revenue share, expenses and other assets | (51,663) | (289,157) | (298,689) |
| Accounts payable | 80,631 | 95,402 | 70,135 |
| Accrued expenses and other liabilities | 166,764 | 291,533 | 418,905 |
| Accrued revenue share | 93,347 | 139,300 | 150,310 |
| Deferred revenue | 39,551 | 30,801 | 70,329 |
| Net cash provided by operating activities | 2,459,422 | 3,580,508 | 5,775,410 |
| **Investing activities** | | | |
| Purchases of property and equipment | (838,217) | (1,902,798) | (2,402,840) |
| Purchase of marketable securities | (12,675,880) | (26,681,891) | (15,997,060) |
| Maturities and sales of marketable securities | 10,257,214 | 23,107,132 | 15,659,473 |
| Investments in non-marketable equity securities | — | (1,019,147) | (34,511) |
| Acquisitions, net of cash acquired and purchases of intangible and other assets | (101,310) | (402,446) | (906,651) |
| Net cash used in investing activities | (3,358,193) | (6,899,150) | (3,681,589) |
| **Financing activities** | | | |
| Net proceeds from stock-based award activity | 85,026 | 321,117 | 23,861 |
| Excess tax benefits from stock-based award activity | — | 581,732 | 379,206 |
| Net proceeds from public offerings | 4,287,229 | 2,063,549 | — |
| Payments of principal on capital leases and equipment loans | (1,425) | — | — |
| Net cash provided by financing activities | 4,370,830 | 2,966,398 | 403,067 |
| Effect of exchange rate changes on cash and cash equivalents | (21,758) | 19,741 | 40,034 |
| Net increase (decrease) in cash and cash equivalents | 3,450,301 | (332,503) | 2,536,922 |
| Cash and cash equivalents at beginning of year | 426,873 | 3,877,174 | 3,544,671 |
| Cash and cash equivalents at end of year | $ 3,877,174 | $ 3,544,671 | $ 6,081,593 |
| **Supplemental disclosures of cash flow information** | | | |
| Cash paid for interest | $ 216 | $ 257 | $ 1,336 |
| Cash paid for taxes | $ 153,628 | $ 537,702 | $ 882,688 |
| Acquisition related activities: | | | |
| Issuance of equity in connection with acquisitions, net | $ 22,407 | $ 1,173,234 | $ — |

See accompanying notes.

70

**Google Inc.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1.    Google Inc. and Summary of Significant Accounting Policies**

*Nature of Operations*

We were incorporated in California in September 1998. We were re-incorporated in the State of Delaware in August 2003. We provide highly targeted advertising and global internet search solutions as well as intranet solutions via an enterprise search appliance.

*Basis of Consolidation*

The consolidated financial statements include the accounts of Google and our wholly-owned subsidiaries. All intercompany balances and transactions have been eliminated.

*Use of Estimates*

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States requires us to make estimates and assumptions that affect the amounts reported and disclosed in the financial statements and the accompanying notes. Actual results could differ materially from these estimates. On an ongoing basis, we evaluate our estimates, including those related to the accounts receivable and sales allowances, fair values of marketable and non-marketable securities, fair values of prepaid revenue share, intangible assets and goodwill, useful lives of intangible assets, property and equipment, fair values of options to purchase our common stock, and income taxes, among others. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable, the results of which form the basis for making judgments about the carrying values of assets and liabilities.

*Revenue Recognition*

The following table presents our revenues:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2005 | 2006 | 2007 |
|  |  | (in thousands) |  |
| Advertising revenues: |  |  |  |
|    Google web sites | $3,377,060 | $ 6,332,797 | $10,624,705 |
|    Google Network web sites | 2,687,942 | 4,159,831 | 5,787,938 |
|      Total advertising revenues | 6,065,002 | 10,492,628 | 16,412,643 |
| Licensing and other revenues | 73,558 | 112,289 | 181,343 |
| Revenues | $6,138,560 | $10,604,917 | $16,593,986 |

In the first quarter of 2000, we introduced our first advertising program through which we offered advertisers the ability to place text-based ads on Google web sites targeted to users' search queries. Advertisers paid us based on the number of times their ads were displayed on users' search results pages, and we recognized revenue at the time these ads appeared. In the fourth quarter of 2000, we launched Google AdWords, an online self-service program that enables advertisers to place text-based ads on Google web sites. Ad Words is also available through our direct sales force. AdWords advertisers originally paid us based on the number of times their ads appeared on users' search results pages. In the first quarter of 2002, we began offering AdWords on a cost-per-click basis, so that an advertiser pays us only when a user clicks on one of its ads. From January 1, 2004, until the end of the first quarter of 2005, the AdWords cost-per-click pricing structure was the only structure

71

Table of Contents

**Google Inc.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

available to our advertisers. However, during the second quarter of 2005, we launched an AdWords program that enables advertisers to pay us based on the number of times their ads appear on Google Network member sites specified by the advertiser.

Google AdSense is the program through which we distribute our advertisers' ads for display on the web sites of our Google Network members.

We recognize as revenues the fees charged advertisers each time a user clicks on one of the text-based ads that are displayed next to the search results pages on our site or on the search results pages or content pages of our Google Network members' web sites and, for those advertisers who use our cost-per impression pricing, the fees charged advertisers each time an ad is displayed on our members' sites. In addition, we recognize as revenues the fees charged advertisers when ads are published in the magazines or broadcasted by the radio stations (or each time a listener responds to that ad) of our Google Network members. We recognize these revenues as such because the services have been provided, and the other criteria set forth under Staff Accounting Bulletin Topic 13: *Revenue Recognition* have been met, namely, the fees we charge are fixed or determinable, we and our advertisers understand the specific nature and terms of the agreed-upon transactions and collectibility is reasonably assured. In accordance with Emerging Issues Task Force ("EITF") Issue No. 99-19, *Reporting Revenue Gross as a Principal Versus Net as an Agent* ("EITF 99-19"), we report our Google AdSense revenues on a gross basis principally because we are the primary obligor to our advertisers.

In the third quarter of 2005, we launched the Google Print Ads Program through which we distribute our advertisers' ads for publication in print media. We recognize as revenue the fees charged advertisers when their ads are published in print media. Also in the first quarter of 2006, we acquired dMarc Broadcasting, Inc. (dMarc), a digital solutions provider for the radio broadcast industry and launched our Google Audio Ads program, which distributes our advertisers' ads for broadcast in radio programs. We recognize as revenue the fees charged advertisers each time an ad is broadcasted or a listener responds to that ad. We consider the magazines and radio stations that participate in these programs to be members of our Google Network.

In the second quarter of 2006, we launched Google Checkout, an online shopping payment processing system for both consumers and merchants. We recognize as revenues any fees charged merchants on transactions processed through Google Checkout. Further, cash ultimately paid to merchants under Google Checkout promotions, including cash paid to merchants as a result of discounts provided to consumers on certain transactions processed through Google Checkout, are accounted for as an offset to revenues in accordance with EITF Issue No. 01-9, *Accounting for Consideration Given by a Vendor to a Customer (Including a Reseller of the Vendor's Products)*.

In the fourth quarter of 2006, we acquired YouTube, a consumer media company for people to watch and share videos worldwide through the web. We recognize as revenue the fees charged advertisers each time an ad is displayed on the YouTube site.

In the second quarter of 2007, we announced our trial to deliver Google TV ads to viewers and help advertisers, operators and programmers buy, schedule, deliver and measure ads on television. We recognize as revenue the fees charged advertisers each time an ad is displayed on TV in accordance with the terms of the related agreements. We consider the TV providers that participate in this program to be members of our Google Network.

In the third quarter of 2007, we acquired Postini, a provider of electronic communications security, compliance, and productivity software. We recognize as revenue the fees we charge customers for hosting enterprise applications and services ratably over the term of the service arrangement.

72

Table of Contents

## Google Inc.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Revenues realized through the Google Print Ads Program, Google Audio Ads, Google TV Ads, Google Checkout, YouTube and Postini were not material in any of the years presented.

We generate fees from search services on a per-query basis. Our policy is to recognize revenues from per-query search fees in the period we provide the search results.

We also generate fees from the sale and license of our Search Appliance, which includes hardware, software and 12 to 24 months of post-contract support. We recognize revenue in accordance with Statement of Position 97-2, *Software Revenue Recognition*, as amended. As the elements are not sold separately, sufficient vendor-specific objective evidence does not exist for the allocation of revenue. As a result, the entire fee is recognized ratably over the term of the post-contract support arrangement.

Deferred revenue is recorded when payments are received in advance of our performance in the underlying agreement on the accompanying Consolidated Balance Sheets.

*Cost of Revenues*

Cost of revenues consists primarily of traffic acquisition costs. Traffic acquisition costs consist of amounts ultimately paid to our Google Network members under AdSense arrangements and to certain other partners (our "distribution partners") who distribute our toolbar and other products (collectively referred to as "access points") or otherwise direct search queries to our web site (collectively referred to as "distribution arrangements"). These amounts are primarily based on the revenue share arrangements with our Google Network members and distribution partners. Certain distribution arrangements require us to pay our partners based on a fee per access point delivered and not exclusively—or at all—based on revenue share. We recognize fees under these arrangements over the estimated useful lives of the access points (two years) to the extent we can reasonably estimate those lives or based on any contractual revenue share, if greater. Otherwise, the fees are charged to expense as incurred.

In addition, certain AdSense agreements obligate us to make guaranteed minimum revenue share payments to Google Network members based on their achieving defined performance terms, such as number of search queries, advertisements displayed. To the extent we expect revenues generated under such an arrangement to exceed the guaranteed minimum revenue share payments, we recognize traffic acquisition costs on a contractual revenue share basis or on a basis proportionate to forecasted revenues, whichever is greater. Otherwise, we recognize the guaranteed revenue share payments as traffic acquisition costs on a straight-line basis over the term of the related agreements. In addition, concurrent with the commencement of a small number of AdSense and other agreements, we have purchased certain items from, or provided other consideration to, our Google Network members and partners. We have determined that certain of these amounts are prepaid traffic acquisition costs and are amortized on a straight-line basis over the terms of the related agreements. Traffic acquisition costs were $2,114.9 million, $3,308.8 million and $4,933.9 million in 2005, 2006 and 2007.

Prepaid revenue share and distribution fees are included in prepaid revenue share, expenses and other assets on the accompanying Consolidated Balance Sheets.

In addition, cost of revenues includes the expenses associated with the operation of our data centers, including depreciation, labor, energy and bandwidth costs, as well as credit card and other transaction fees related to processing customer transactions including Google Checkout transactions, as well as content acquisition costs. We have entered into arrangements with certain content providers under which we distribute or license their video and other content. In a number of these arrangements we display ads on the pages of our

73

Table of Contents

**Google Inc.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

web sites and our Google Network members' web sites from which the content is viewed and share most of the fees these ads generate with the content providers and the Google Network members. To the extent we are obligated to make guaranteed minimum revenue share or other payments to our content providers, we recognize content acquisition costs equal to the greater of the following three amounts: the contractual revenue share amount, if any, based on the number of times the content is displayed, or on a straight-line basis over the terms of the agreements.

*Stock-based Compensation*

Prior to January 1, 2006, we accounted for employee stock-based compensation using the intrinsic value method supplemented by pro forma disclosures in accordance with Accounting Principles Board ("APB") Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25") and Statement of Financial Accounting Standards ("SFAS") No. 123, *Accounting for Stock-Based Compensation* ("SFAS 123"), as amended by SFAS No. 148, *Accounting for Stock-Based Compensation—Transition and Disclosure* ("SFAS 148"). Effective January 1, 2006, we adopted SFAS No. 123R, *Share-Based Payment* ("SFAS 123R") using the modified prospective approach and accordingly prior periods have not been restated to reflect the impact of SFAS 123R.

We have elected to use the Black-Scholes-Merton ("BSM") pricing model to determine the fair value of stock options on the dates of grant, consistent with that used for pro forma disclosures under SFAS No. 123. Restricted Stock Units ("RSUs") are measured based on the fair market values of the underlying stock on the dates of grant. Shares are issued on the dates of vest net of the statutory withholding requirements to be paid by us on behalf of our employees. As a result, the actual number of shares issued will be less than the actual number of RSUs outstanding. Furthermore, in accordance with SFAS 123R, the liability for withholding amounts to be paid by us will be recorded as a reduction to additional paid-in capital when paid.

We recognize stock-based compensation using the straight-line method for all stock awards issued after January 1, 2006. For stock awards issued prior to January 1, 2006, we continue to recognize stock-based compensation using the accelerated method, other than RSUs issued to new employees that vest based on the employee's performance for which we use the straight-line method in accordance with FASB Interpretation No. 28, *Accounting for Stock Appreciation Rights and Other Variable Stock Option or Award Plans*.

In compliance with SFAS 123R, we included as part of cash flows from financing activities the benefits of tax deductions in excess of the tax-effected compensation of the related stock-based awards for the options exercised and RSUs vested during the years ended December 31, 2006 and 2007, whereas the excess tax benefits previously generated in 2005 under the then applicable accounting rules, are reported as a cash flow from operating activities. Total cash flow remains unchanged from what would have been reported under prior accounting rules. During the year ended December 31, 2007, the amount of cash received from exercise of stock options was $137.2 million and the total direct tax benefit realized, including the excess tax benefit, from stock based award activity was $463.2 million. We have elected to account for the indirect effects of stock-based awards—primarily the research and development tax credit—through the income statement.

We account for stock awards issued to non-employees other than members of our board of directors in accordance with the provisions of SFAS 123R and EITF Issue No. 96-18, *Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services* ("EITF 96-18"). Under SFAS 123R and EITF 96-18, we use the BSM method to measure the value of options granted to non-employees at each vesting date to determine the appropriate charge to stock-based compensation.

In the years ended December 31, 2006 and 2007, we recognized stock-based compensation and related tax benefits of $458.1 million and $108.9 million, and $868.6 million and $143.0 million respectively.

74

Table of Contents

## Google Inc.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Prior to the adoption of SFAS 123R, we accounted for our employee stock-based compensation using the intrinsic value method prescribed by APB 25. We applied below the disclosure provisions of SFAS 123, as amended by SFAS No. 148, as if the fair value method had been applied. If this method had been used, our net income and net income per share for the years ended December 31, 2005 would have been adjusted to the pro forma amounts below (in thousands, except per share amounts):

|  | Year Ended December 31, 2005 |
|---|---|
| Net income, as reported | $1,465,397 |
| Add: Stock-based employee compensation expense included in reported net income, net of related tax effects | 117,924 |
| Deduct: Total stock-based employee compensation expense under the fair value based method for all awards, net of related tax effects | (220,525) |
| Net income, pro forma | $1,362,796 |
| Net income per share: |  |
| As reported for prior period—basic | $ 5.31 |
| Pro forma—basic | $ 4.94 |
| As reported for prior period—diluted | $ 5.02 |
| Pro forma—diluted | $ 4.67 |

For purposes of the above pro forma calculation, the value of each option granted through December 31, 2005 was estimated on the date of grant using the BSM pricing model with the following weighted-average assumptions.

|  | Year Ended December 31, 2005 |
|---|---|
| Risk-free interest rate | 3.86% |
| Expected volatility | 36% |
| Expected life (in years) | 3.1 |
| Dividend yield | — |
| Weighted-average estimated fair value of options granted during the year | $ 78.58 |

*Stock Options Exercised Prior to Vesting*

Options granted under plans other than the 2004 Stock Plan may be exercised prior to vesting. Upon the exercise of an option prior to vesting, the exercising optionee is required to enter into a restricted stock purchase agreement with us, which provides that we have a right to repurchase the shares purchased upon exercise of the option at the original exercise price; provided, however, that our right to repurchase these shares will lapse in accordance with the vesting schedule included in the optionee's option agreement. In accordance with EITF 00-23, *Issues Related to Accounting for Stock Compensation under APB Opinion No. 25 and FASB Interpretation No. 44* ("EITF 00-23"), stock options granted or modified after March 21, 2002, which are subsequently exercised for cash prior to vesting are treated differently from prior grants and related exercises. The consideration received for an exercise of an option granted after the effective date of this guidance is considered to be a deposit of the exercise price and the related dollar amount is recorded as a liability. The shares and liability are only reclassified into equity on a ratable basis as the award vests. We have applied this guidance and recorded a liability on the Consolidated Balance Sheets relating to 1,296,155 and 360,679 of options granted subsequent to March 21, 2002 that were exercised and are unvested at December 31, 2006 and 2007. Furthermore, these shares are not presented as outstanding on the accompanying Consolidated Statements of

75

Table of Contents

## Google Inc.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Stockholders' Equity and Consolidated Balance Sheets. Instead, these shares are disclosed as outstanding options in Note 11 to these financial statements.

### Certain Risks and Concentrations

Our revenues are principally derived from online advertising, the market for which is highly competitive and rapidly changing. Significant changes in this industry or changes in customer buying behavior could adversely affect our operating results.

Financial instruments that potentially subject us to concentrations of credit risk consist principally of cash equivalents, marketable securities and accounts receivable. Cash equivalents and marketable securities consist primarily of money market funds and highly liquid debt instruments of municipalities in the U.S. and the U.S. government and its agencies. Accounts receivable are typically unsecured and are derived from revenues earned from customers primarily located in the U.S. In 2005, 2006 and 2007, we generated approximately 61%, 57% and 52% of our revenues from customers based in the U.S. with the majority of customers outside of the U.S. located in Europe and Japan. Many of our Google Network members are in the internet industry. We perform ongoing evaluations to determine customer credit and limit the amount of credit extended, but generally no collateral is required. We maintain reserves for estimated credit losses and these losses have generally been within our expectations.

No advertiser or Google Network member generated greater than 10% of revenues in 2005, 2006 and 2007.

### Fair Value of Financial Instruments

The carrying amounts of our financial instruments, including cash and cash equivalents, marketable securities, accounts receivable, accounts payable and accrued liabilities, approximate fair value because of their generally short maturities.

### Cash and Cash Equivalents and Marketable Securities

We invest our excess cash primarily in money market funds and in highly liquid debt instruments of U.S. municipalities, and the U.S. government and its agencies. All highly liquid investments with stated maturities of three months or less from date of purchase are classified as cash equivalents; all highly liquid investments with stated maturities of greater than three months are classified as marketable securities.

We determine the appropriate classification of our investments in marketable securities at the time of purchase and reevaluate such designation at each balance sheet date. Our marketable securities have been classified and accounted for as available-for-sale. We may or may not hold securities with stated maturities greater than 12 months until maturity. In response to changes in the availability of and the yield on alternative investments as well as liquidity requirements, we occasionally sell these securities prior to their stated maturities. As these securities are viewed by us as available to support current operations, based on the provisions of Accounting Research Bulletin No. 43, Chapter 3A, *Working Capital*-Current Assets and Liabilities, securities with maturities beyond 12 months (such as our auction rate securities) are classified as current assets under the caption marketable securities in the accompanying Consolidated Balance Sheets. These securities are carried at fair value, with the unrealized gains and losses, net of taxes, reported as a component of stockholders' equity, except for unrealized losses determined to be other than temporary which are recorded as interest income and other, net, in accordance with our policy and FASB Staff Position ("FSP") Nos. FAS 115-1 and FAS 124-1, *The Meaning of Other-Than-Temporary Impairment and its Application to Certain Investments*. Any realized gains or

76

**Table of Contents**

**Google Inc.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

losses on the sale of marketable securities are determined on a specific identification method, and such gains and losses are reflected as a component of interest income and other, net.

*Non-Marketable Equity Securities*

We have accounted for non-marketable equity security investments at historical cost because we do not have significant influence over the underlying investees. These investments are subject to a periodic impairment review. To the extent any impairment is considered other-than-temporary, the investment is written down to its fair value and the loss is recorded as interest income and other, net.

*Accounts Receivable*

Accounts receivable are recorded at the invoiced amount and are non-interest bearing. We maintain an allowance for doubtful accounts to reserve for potentially uncollectible receivables. We review the accounts receivable by amounts due by customers which are past due to identify specific customers with known disputes or collectibility issues. In determining the amount of the reserve, we make judgments about the creditworthiness of significant customers based on ongoing credit evaluations. We also maintain a sales allowance to reserve for potential credits issued to customers. The amount of the reserve is determined based on historical credits issued.

*Property and Equipment*

Property and equipment are stated at cost less accumulated depreciation and amortization. Depreciation is computed using the straight-line method over the estimated useful lives of the assets, generally two to five years. Buildings are depreciated over periods up to 25 years. Leasehold improvements are amortized over the shorter of the lease term or the estimated useful lives of the assets. Construction in process is primarily related to the construction or development of property and equipment. Depreciation for equipment commences once it is placed in service and depreciation for buildings and leasehold improvements commences once they are ready for their intended use.

*Software Development Costs*

We account for software development costs, including costs to develop software products or the software component of products to be marketed to external users, as well as software programs to be used solely to meet our internal needs in accordance with SFAS No. 86, *Accounting for Costs of Computer Software to be Sold, Leased, or Otherwise Marketed* and Statement of Position No. 98-1, *Accounting for Costs of Computer Software Developed or Obtained for Internal Use*. We have determined that technological feasibility for our products to be marketed to external users was reached shortly before the release of those products. As a result, the development costs incurred after the establishment of technological feasibility and before the release of those products were not material, and accordingly, were expensed as incurred. In addition, costs incurred during the application development stage for software programs to be used solely to meet our internal needs were not material.

*Long-Lived Assets Including Goodwill and Other Acquired Intangible Assets*

We review property and equipment and intangible assets, excluding goodwill, for impairment whenever events or changes in circumstances indicate the carrying amount of an asset may not be recoverable. Recoverability of these assets is measured by comparison of carrying amounts to the future undiscounted cash flows the assets are expected to generate. If property and equipment and intangible assets are considered to be impaired, the impairment to be recognized equals the amount by which the carrying value of the asset exceeds

77

Table of Contents

## Google Inc.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

its fair market value. We have made no material adjustments to our long-lived assets in any of the years presented. In accordance with SFAS No. 142, *Goodwill and Other Intangible Assets*, we test our goodwill for impairment at least annually or more frequently if events or changes in circumstances indicate that this asset may be impaired. Our tests are based on our single operating segment and reporting unit structure. We found no material impairment in any of the years presented.

SFAS No. 142 also requires that intangible assets with definite lives be amortized over their estimated useful lives and reviewed for impairment whenever events or changes in circumstances indicate an asset's carrying value may not be recoverable in accordance with SFAS No. 144, *Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of.* We are currently amortizing our acquired intangible assets with definite lives over periods ranging primarily from one to seven years.

### Income Taxes

We recognize income taxes under the liability method. Deferred income taxes are recognized for differences between the financial reporting and tax bases of assets and liabilities at enacted statutory tax rates in effect for the years in which differences are expected to reverse. The effect on deferred taxes of a change in tax rates is recognized in income in the period that includes the enactment date.

### Foreign Currency

Generally, the functional currency of our international subsidiaries is the local currency. The financial statements of these subsidiaries are translated to U.S. dollars using month-end rates of exchange for assets and liabilities, and average rates of exchange for revenues, costs and expenses. Translation gains and losses are recorded in accumulated other comprehensive income as a component of stockholders' equity. We recorded $18.0 million of net translation losses, and $38.6 million and $61.0 million of net translation gains in 2005, 2006 and 2007, respectively. Net gains and losses resulting from foreign exchange transactions are recorded as interest income and other, net. These gains and losses are net of those realized on forward foreign exchange contracts. We recorded $6.3 million and $5.3 million of net gains, and $16.2 million of net losses in 2005, 2006 and 2007 from assets and liabilities denominated in a currency other than the local currency.

### Derivative Financial Instruments

We enter into forward foreign exchange contracts with financial institutions to reduce the risk that our cash flows and earnings will be adversely affected by foreign currency exchange rate fluctuations. This program is not designed for trading or speculative purposes.

In accordance with SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, we recognize derivative instruments as either assets or liabilities on the balance sheet at fair value. These forward exchange contracts are not accounted for as hedges and, therefore, changes in the fair value of these instruments are recorded as interest income and other, net. Neither the cost nor the fair value of these forward foreign exchange contracts was material at December 31, 2007. The notional principal of forward foreign exchange contracts to purchase U.S. dollars with foreign currencies was $735.7 million and $1,498.6 million at December 31, 2006 and December 31, 2007. The notional principal of forward foreign exchange contracts to purchase euros with British pounds, Japanese yen, Australian dollars and Swedish Krona was €296.5 million (or approximately $433.4 million) at December 31, 2007. There were no other forward foreign exchange contracts outstanding at December 31, 2006 or December 31, 2007.

78

Table of Contents

# Google Inc.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*Legal Costs*

Legal costs are expensed as incurred.

*Advertising and Promotional Expenses*

We expense advertising and promotional costs in the period in which they are incurred. For the years ended December 31, 2005, 2006 and 2007 promotional and advertising expenses totaled approximately $104.3 million, $188.4 million and $236.7 million.

*Effect of Recent Accounting Pronouncements*

In September 2006, the Financial Accounting Standards Board ("FASB") issued SFAS No. 157, *Fair Value Measurements* ("SFAS 157"), which defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurements. SFAS 157 does not require any new fair value measurements, but provides guidance on how to measure fair value by providing a fair value hierarchy used to classify the source of the information. SFAS 157 is effective for fiscal years beginning after November 15, 2007. However, on December 14, 2007, the FASB issued proposed FSP FAS 157-b which would delay the effective date of SFAS 157 for all nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on a recurring basis (at least annually). This proposed FSP partially defers the effective date of Statement 157 to fiscal years beginning after November 15, 2008, and interim periods within those fiscal years for items within the scope of this FSP. Effective for 2008, we will adopt SFAS 157 except as it applies to those nonfinancial assets and nonfinancial liabilities as noted in proposed FSP FAS 157-b. The partial adoption of SFAS 157 will not have a material impact on our consolidated financial position, results of operations or cash flows.

In February 2007, the FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities- including an Amendment of FASB Statement No. 115* ("SFAS 159"), which allows an entity to choose to measure certain financial instruments and liabilities at fair value. Subsequent measurements for the financial instruments and liabilities an entity elects to fair value will be recognized in earnings. SFAS 159 also establishes additional disclosure requirements. SFAS 159 is effective for us beginning January 1, 2008. We are currently evaluating the potential impact of the adoption of SFAS 159 on our consolidated financial position, results of operations or cash flows.

In December 2007, the FASB issued SFAS No. 141 (revised 2007), *Business Combinations* ("SFAS 141R"). SFAS 141R establishes principles and requirements for how an acquirer recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, any noncontrolling interest in the acquiree and the goodwill acquired. SFAS 141R also establishes disclosure requirements to enable the evaluation of the nature and financial effects of the business combination. This statement is effective for us beginning January 1, 2009. We are currently evaluating the potential impact of the adoption of SFAS 141R on our consolidated financial position, results of operations or cash flows.

In December 2007, the FASB issued SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements—an amendment of Accounting Research Bulletin No. 51* ("SFAS 160"). SFAS 160 establishes accounting and reporting standards for ownership interests in subsidiaries held by parties other than the parent, the amount of consolidated net income attributable to the parent and to the noncontrolling interest, changes in a parent's ownership interest, and the valuation of retained noncontrolling equity investments when a subsidiary is deconsolidated. SFAS 160 also establishes disclosure requirements that clearly identify and distinguish between the interests of the parent and the interests of the noncontrolling owners. This statement is effective for us beginning January 1, 2009. We are currently evaluating the potential impact of the adoption of SFAS 160 on our consolidated financial position, results of operations or cash flows.

79

Table of Contents

**Google Inc.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**Note 2.   Net Income Per Share of Class A and Class B Common Stock**

We compute net income per share of Class A and Class B common stock in accordance with SFAS No. 128, *Earnings per Share* ("SFAS 128") using the two class method. Under the provisions of SFAS 128, basic net income per share is computed using the weighted average number of common shares outstanding during the period except that it does not include unvested common shares subject to repurchase or cancellation, Diluted net income per share is computed using the weighted average number of common shares and, if dilutive, potential common shares outstanding during the period. Potential common shares consist of the incremental common shares issuable upon the exercise of stock options, warrants, restricted shares, restricted stock units and unvested common shares subject to repurchase or cancellation. The dilutive effect of outstanding stock options, restricted shares, restricted stock units and warrants is reflected in diluted earnings per share by application of the treasury stock method. The computation of the diluted net income per share of Class A common stock assumes the conversion of Class B common stock, while the diluted net income per share of Class B common stock does not assume the conversion of those shares.

The rights, including the liquidation and dividend rights, of the holders of our Class A and Class B common stock are identical, except with respect to voting. Further, there are a number of safeguards built into our Certificate of Incorporation, as well as Delaware law, which preclude our board of directors from declaring or paying unequal per share dividends on our Class A and Class B common stock. Specifically, Delaware law provides that amendments to our Certificate of Incorporation which would have the affect of adversely altering the rights, powers or preferences of a given class of stock (in this case the right of our Class A common stock to receive an equal dividend to any declared on our Class B common stock) must be approved by the class of stock adversely affected by the proposed amendment. In addition, our Certificate of Incorporation provides that before any such amendment may be put to a stockholder vote, it must be approved by the unanimous consent of our Board of Directors. As a result, and in accordance with EITF 03-6, *Participating Securities and the Two-Class Method under FASB Statement No. 128,* the undistributed earnings for each year are allocated based on the contractual participation rights of the Class A and Class B common shares as if the earnings for the year had been distributed. As the liquidation and dividend rights are identical, the undistributed earnings are allocated on a proportionate basis. Further, as we assume the conversion of Class B common stock in the computation of the diluted net income per share of Class A common stock, the undistributed earnings are equal to net income for that computation.

80

Table of Contents

Google Inc.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following table sets forth the computation of basic and diluted net income per share of Class A and Class B common stock (in thousands, except per share amounts):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2005 | | 2006 | | 2007 | |
| | Class A | Class B | Class A | Class B | Class A | Class B |
| Basic net income per share: | | | | | | |
| Numerator: | | | | | | |
| Allocation of undistributed earnings | $ 858,184 | $607,213 | $2,197,851 | $879,595 | $3,131,292 | $1,072,428 |
| Denominator: | | | | | | |
| Weighted average common shares outstanding | 165,513 | 117,109 | 216,589 | 86,681 | 232,131 | 79,421 |
| Less: Weighted average unvested common shares subject to repurchase or cancellation | (3,970) | (2,808) | (1,333) | (534) | (616) | (130) |
| Number of shares used in per share computations | 161,543 | 114,301 | 215,256 | 86,147 | 231,515 | 79,291 |
| Basic net income per share | $ 5.31 | $ 5.31 | $ 10.21 | $ 10.21 | $ 13.53 | $ 13.53 |
| Diluted net income per share: | | | | | | |
| Numerator: | | | | | | |
| Allocation of undistributed earnings for basic computation | $ 858,184 | $607,213 | $2,197,851 | $879,595 | $3,131,292 | $1,072,428 |
| Reallocation of undistributed earnings as a result of conversion of Class B to Class A shares | 607,213 | — | 879,595 | — | 1,072,428 | — |
| Reallocation of undistributed earnings to Class B shares | — | (1,823) | — | (3,134) | — | (7,732) |
| Allocation of undistributed earnings | $1,465,397 | $605,390 | $3,077,446 | $876,461 | $4,203,720 | $1,064,696 |
| Denominator: | | | | | | |
| Number of shares used in basic computation | 161,543 | 114,301 | 215,256 | 86,147 | 231,515 | 79,291 |
| Weighted average effect of dilutive securities | | | | | | |
| Add: | | | | | | |
| Conversion of Class B to Class A common shares outstanding | 114,301 | — | 86,147 | — | 79,291 | — |
| Unvested common shares subject to repurchase or cancellation | 6,778 | 2,808 | 1,867 | 534 | 746 | 130 |
| Employee stock options | 8,899 | 3,471 | 5,916 | 1,479 | 3,690 | 667 |
| Restricted shares and restricted stock units | 353 | — | 362 | — | 968 | — |
| Number of shares used in per share computations | 291,874 | 120,580 | 309,548 | 88,160 | 316,210 | 80,088 |
| Diluted net income per share | $ 5.02 | $ 5.02 | $ 9.94 | $ 9.94 | $ 13.29 | $ 13.29 |

81

Table of Contents

## Google Inc.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The net income per share amounts are the same for Class A and Class B because the holders of each class are legally entitled to equal per share distributions whether through dividends or in liquidation.

**Note 3.    Cash, Cash Equivalents and Marketable Securities**

Cash, cash equivalents and marketable securities consists of the following (in thousands):

|  | As of December 31, | |
|---|---|---|
|  | 2006 | 2007 |
| Cash and cash equivalents: | | |
|   Cash | $ 1,579,702 | $ 2,869,528 |
|   Cash equivalents: | | |
|     U.S. government agencies | 323,900 | 110,272 |
|     Time deposits | — | 500,000 |
|     Municipal securities | 216,529 | 232,278 |
|     Money market mutual funds | 1,424,540 | 2,369,515 |
|       Total cash and cash equivalents | 3,544,671 | 6,081,593 |
| Marketable securities: | | |
|   U.S. government notes | 2,697,880 | 475,781 |
|   U.S. government agencies | 2,839,430 | 2,120,972 |
|   Municipal securities | 1,622,570 | 4,991,564 |
|   Time deposits | 500,000 | 500,000 |
|   Auction rate preferred securities | 39,363 | 48,703 |
|     Total marketable securities | 7,699,243 | 8,137,020 |
| Total cash, cash equivalents and marketable securities | $11,243,914 | $14,218,613 |

The following table summarizes unrealized gains and losses related to our investments in marketable securities designated as available-for-sale (in thousands):

|  | As of December 31, 2006 | | | |
|---|---|---|---|---|
|  | Adjusted Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| U.S. government notes | $2,704,753 | $ 1,201 | $ (8,074) | $2,697,880 |
| U.S. government agencies | 2,838,759 | 4,081 | (3,410) | 2,839,430 |
| Municipal securities | 1,627,428 | 197 | (5,055) | 1,622,570 |
| Time deposits | 500,000 | — | — | 500,000 |
| Auction rate preferred securities | 39,363 | — | — | 39,363 |
|   Total marketable securities | $7,710,303 | $ 5,479 | $(16,539) | $7,699,243 |

|  | As of December 31, 2007 | | | |
|---|---|---|---|---|
|  | Adjusted Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| U.S. government notes | $ 472,040 | $ 3,745 | $ (4) | $ 475,781 |
| U.S. government agencies | 2,102,710 | 18,306 | (44) | 2,120,972 |
| Municipal securities | 4,975,587 | 16,308 | (331) | 4,991,564 |
| Time deposits | 500,000 | — | — | 500,000 |
| Auction rate preferred securities | 48,703 | — | — | 48,703 |
|   Total marketable securities | $8,099,040 | $ 38,359 | $ (379) | $8,137,020 |

82

Table of Contents

**Google Inc.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Bank time deposits were held by institutions outside the U.S. in 2006 and 2007.

Gross unrealized gains and losses on cash equivalents were not material at December 31, 2006 and 2007. We did not experience any significant realized gains or losses on our investments in 2005. We recognized a net realized gain of $40.2 million on the sale of marketable securities in 2006 primarily as a result of realized gain of $54.9 million on the sale of one of our equity investments. In 2007, we recognized gross realized gains and losses of $81.7 million and $30.5 million on our marketable securities. There were no other-than-temporary impairments to our marketable securities in 2005, 2006 and 2007. Realized gains and losses are included in interest income and other, net in our accompanying Consolidated Statements of Income.

The following table summarizes the estimated fair value of our investments in marketable debt securities designated as available-for-sale classified by the contractual maturity date of the security (in thousands):

|  | As of December 31, 2007 |
|---|---|
| Due within 1 year | $1,964,325 |
| Due within 1 year through 5 years | 3,359,472 |
| Due within 5 years through 10 years | 310,332 |
| Due after 10 years | 2,454,188 |
| Total marketable debt securities | $8,088,317 |

In accordance with EITF 03-1, *The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments*, the following table shows gross unrealized losses and fair value for those investments that were in an unrealized loss position as of December 31, 2006 and 2007, aggregated by investment category and the length of time that individual securities have been in a continuous loss position (in thousands):

| | As of December 31, 2006 | | | | | |
|---|---|---|---|---|---|---|
| | Less than 12 Months | | 12 Months or Greater | | Total | |
| Security Description | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss |
| U.S. government notes | $ 893,264 | $ (3,339) | $1,138,237 | $ (4,735) | $2,031,501 | $ (8,074) |
| U.S. government agencies | 1,620,106 | (2,603) | 193,178 | (807) | 1,813,284 | (3,410) |
| Municipal securities | 676,089 | (1,473) | 248,953 | (3,582) | 925,042 | (5,055) |
| Total | $3,189,459 | $ (7,415) | $1,580,368 | $ (9,124) | $4,769,827 | $(16,539) |

| | As of December 31, 2007 | | | | | |
|---|---|---|---|---|---|---|
| | Less than 12 Months | | 12 Months or Greater | | Total | |
| Security Description | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss |
| U.S. government notes | $ 30,525 | $ (4) | $ — | $ — | $ 30,525 | $ (4) |
| U.S. government agencies | 98,682 | (41) | 19,993 | (3) | 118,675 | (44) |
| Municipal securities | 270,708 | (227) | 54,832 | (104) | 325,540 | (331) |
| Total | $ 399,915 | $ (272) | $ 74,825 | $ (107) | $ 474,740 | $ (379) |

83

Table of Contents

**Google Inc.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**Note 4.    Non-Marketable Equity Securities**

In April 2006, we completed our $1.0 billion cash purchase of a five percent equity interest in a wholly-owned subsidiary of Time Warner, Inc. that owns all of the outstanding interests of America Online ("AOL"). Our investment in this non-marketable equity security is accounted for at historical cost (see Note 1). In March 2006, we entered into certain commercial arrangements with AOL. We believe that the terms of the investment and commercial agreements are at fair value, and as a result, they are accounted for in accordance with their contractual terms.

Further, we are obligated over a five year term to make up to $100 million of co-marketing payments (but not to exceed $20 million per year plus any amounts not spent in prior years) and issue up to $300 million of AdWords credits (but not to exceed $60 million per year plus any credits not redeemed in prior years). Co-marketing costs are expensed as incurred, and AdWords credits are accounted for as a reduction to revenues in the periods they are redeemed. At December 31, 2007, our remaining co-marketing and AdWords credits commitments were $79 million and $193 million, respectively.

We did not experience any material impairment charges on our non-marketable equity securities in the years presented.

**Note 5.    Interest Income and Other, Net**

The components of interest income and other, net were as follows (in thousands):

|  | Year Ended December 31, | | |
|  | 2005 | 2006 | 2007 |
| --- | --- | --- | --- |
| Interest income | $121,038 | $412,063 | $559,205 |
| Interest expense | (776) | (257) | (1,203) |
| Other | 4,137 | 49,238 | 31,578 |
| Interest income and other, net | $124,399 | $461,044 | $589,580 |

**Note 6.    Property and Equipment**

Property and equipment consist of the following (in thousands):

|  | As of December 31, | |
|  | 2006 | 2007 |
| --- | --- | --- |
| Information technology assets | $1,778,028 | $2,734,916 |
| Construction in process | 850,164 | 1,364,651 |
| Land and buildings | 352,112 | 951,334 |
| Leasehold improvements | 273,262 | 416,884 |
| Furniture and fixtures | 36,028 | 52,127 |
| Total | 3,289,594 | 5,519,912 |
| Less accumulated depreciation and amortization | 894,355 | 1,480,651 |
| Property and equipment, net | $2,395,239 | $4,039,261 |

84

Table of Contents

## Google Inc.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

**Note 7.     Acquisitions**

In September 2007, we completed the acquisition of Postini, Inc., a provider of information security and compliance solutions. This transaction was accounted for as a business combination. The purchase price was $545.7 million, paid in cash, including direct transaction costs of $1.0 million. The following table summarizes the allocation of the purchase price of Postini (in thousands):

| | |
|---|---:|
| Goodwill | $ 446,471 |
| Customer relationships | 104,310 |
| Patents and developed technology | 35,510 |
| Tradenames and other | 5,630 |
| Net assets acquired | 8,240 |
| Deferred tax liabilities | (54,507) |
| Total | $ 545,654 |

Net assets acquired include involuntary termination benefits of $16.6 million that we expect to pay certain Postini employees. In addition, we are obligated to make cash payments of up to $44.8 million through 2011, contingent upon each employee's continued employment with us. These contingent payments will be expensed, when and if earned.

Goodwill is not deductible for tax purposes.

Customer relationships, patents and developed technology, and tradenames and other intangible assets have weighted-average useful lives of 6.8 years, 4.0 years and 2.6 years from the date of acquisition. These assets are not deductible for tax purposes.

Supplemental information on an unaudited pro forma basis, as if the Postini acquisition had been consummated at the beginning of each of the periods presented, is as follows (in millions, except per share amounts):

| | Year Ended December 31, | | |
|---|---:|---:|---:|
| | 2005 | 2006 | 2007 |
| | | (unaudited) | |
| Revenues | $6,180.5 | $10,663.1 | $16,651.1 |
| Net income | $1,423.0 | $ 3,032.0 | $ 4,165.5 |
| Net income per share of Class A and Class B common stock—diluted | $ 4.88 | $ 9.79 | $ 13.17 |

The unaudited pro forma supplemental information is based on estimates and assumptions, which we believe are reasonable; it is not necessarily indicative of our consolidated financial position or results of income in future periods or the results that actually would have been realized had we been a combined company during the periods presented. The unaudited pro forma supplemental information includes incremental intangible asset amortization and other charges as a result of the acquisition, net of the related tax effects.

During the year ended December 31, 2007, we also completed seventeen other acquisitions. Three of these transactions were accounted for as asset purchases in accordance with EITF Issue No. 98-3, *Determining Whether a Nonmonetary Transaction Involves Receipt of Productive Assets or of a Business*, as the acquired companies were considered to be development stage enterprises. The remaining fourteen transactions were accounted for as business combinations. The total initial purchase price for these transactions was $281.6 million and was paid or

85

**Google Inc.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

will be paid in cash. In addition, we are obligated to make additional cash payments of up to $72.4 million if certain performance targets are met through 2010. Since these contingent payments are based on the achievement of performance targets, actual payments may be substantially lower. A portion of these contingent payments will be accounted for as goodwill, and the remaining amounts will be expensed, when and if earned.

In addition, during the year ended December 31, 2007, we capitalized intangible assets of $5.2 million, paid in cash, related to patent purchases.

The following table summarizes the allocation of the purchase price for all of the above acquisitions, excluding Postini (in thousands):

| | |
|---|---|
| Goodwill | $201,067 |
| Patents and developed technology | 81,275 |
| Customer relationships | 13,230 |
| Tradenames and other | 6,200 |
| Net assets acquired | 6,181 |
| Deferred tax liabilities | (25,947) |
| Purchased in-process research and development | 4,790 |
| Total | $286,796 |

Goodwill expected to be deductible for tax purposes is $5.1 million.

Patents and developed technology, customer relationships, and tradenames and other intangible assets have a weighted-average useful life of 3.7 years, 3.8 years and 3.3 years from the date of acquisition. The amount expected to be deductible for tax purposes is $7.6 million.

Purchased in-process research and development was expensed at the time of the acquisitions because technological feasibility had not been established and no future alternative uses existed. This amount was included in research and development expenses on the accompanying Consolidated Statements of Income.

In connection with certain acquisitions in the current and prior years, we are obligated to make additional cash payments if certain criteria are met. As of December 31, 2007, our remaining contingent obligations related to these acquisitions was approximately $800 million. Since these contingent payments are based on the achievement of performance targets, actual payments may be substantially lower.

*Agreement and Plan of Merger with DoubleClick*

In April 2007, we entered into an Agreement and Plan of Merger with DoubleClick to acquire all of the outstanding interests of DoubleClick, a privately held company, for $3.1 billion in cash, plus the cash and cash equivalents of DoubleClick, plus the aggregate exercise price for outstanding options and stock appreciation rights for DoubleClick common stock, as well as certain other adjustments, minus certain unpaid third party expenses incurred by DoubleClick in connection with this transaction and minus all indebtedness for borrowed money of DoubleClick.

In addition, unvested options and stock appreciation rights for DoubleClick common stock will be converted into options to purchase our common stock with economic terms similar to outstanding vested equity interests.

86

Table of Contents

## Google Inc.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Although the transaction has been cleared by the Federal Trade Commission in the U.S., the completion of this transaction is subject to various customary conditions, including receiving antitrust clearance from the European Commission. We and DoubleClick have each agreed to take all actions necessary to obtain the requisite antitrust and other regulatory approvals.

### Note 8.    Goodwill and Other Intangible Assets

The changes in the carrying amount of goodwill for the years ended December 31, 2006 and 2007 are as follows (in thousands):

| | |
|---|---:|
| Balance as of December 31, 2005 | $   194,900 |
| Goodwill acquired | 1,350,219 |
| Balance as of December 31, 2006 | 1,545,119 |
| Goodwill acquired | 647,538 |
| Goodwill adjustment | 106,711 |
| Balance as of December 31, 2007 | $2,299,368 |

The goodwill adjustment of $106.7 million was primarily a result of contingent payments earned upon the achievement of certain performance targets and adjustments for goodwill amounts in connection with the YouTube acquisition.

Information regarding our acquisition-related intangible assets that are being amortized is as follows (in thousands):

| | As of December 31, 2006 | | |
|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Value |
| Patents and developed technology | $241,185 | $   95,927 | $145,258 |
| Customer relationships | 60,636 | 16,359 | 44,277 |
| Tradenames and other | 183,721 | 26,415 | 157,306 |
| Total | $485,542 | $ 138,701 | $346,841 |

| | As of December 31, 2007 | | |
|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Value |
| Patents and developed technology | $364,937 | $ 179,102 | $185,835 |
| Customer relationships | 171,876 | 37,738 | 134,138 |
| Tradenames and other | 196,392 | 69,769 | 126,623 |
| Total | $733,205 | $ 286,609 | $446,596 |

In addition, during the year ended December 31, 2007, we capitalized intangible assets of $11.6 million, paid in cash, related to milestone payments for acquisitions completed prior to 2007.

87

Table of Contents

**Google Inc.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

Patents and developed technology, customer relationships, and tradenames and other have weighted-average useful lives from the date of purchase of 3.4 years, 5.6 years and 4.2 years. Amortization expense of acquisition-related intangible assets for the years ended December 31, 2005, 2006 and 2007 were $37.0 million, $74.2 million and $158.2 million. Expected amortization expense for acquisition-related intangible assets on our December 31, 2007 Consolidated Balance Sheet for each of the next five years is as follows (in thousands):

| | |
|---|---:|
| 2008 | $163,565 |
| 2009 | 111,327 |
| 2010 | 80,244 |
| 2011 | 48,770 |
| 2012 | 15,556 |
| Thereafter | 27,134 |
| | $446,596 |

### Note 9.    Commitments and Contingencies

*Operating Leases*

We have entered into various non-cancelable operating lease agreements for certain of our offices, land and data centers throughout the world with original lease periods expiring between 2008 and 2051. We are committed to pay a portion of the related operating expenses under certain of these lease agreements. These operating expenses are not included in the table below. Certain of these arrangements have free or escalating rent payment provisions. We recognize rent expense under such arrangements on a straight line basis.

At December 31, 2007, future minimum payments under non-cancelable operating leases, along with sublease income amounts, are as follows over each of the next five years and thereafter (in thousands):

| | Operating Leases | Sub-lease Income | Net Operating Leases |
|---|---:|---:|---:|
| 2008 | $   169,574 | $18,001 | $   151,573 |
| 2009 | 185,157 | 16,649 | 168,508 |
| 2010 | 174,194 | 14,038 | 160,156 |
| 2011 | 159,764 | 12,810 | 146,954 |
| 2012 | 149,767 | 7,991 | 141,776 |
| Thereafter | 1,446,525 | 11,853 | 1,434,672 |
| Total minimum payments required | $2,284,981 | $81,342 | $2,203,639 |

Rent expense under operating leases was $41.2 million, $80.7 million and $127.9 million in 2005, 2006, and 2007. Sublease income was not material in any year presented.

The above minimum payments at December 31, 2007 under non-cancelable operating lease commitments and the above rent expense amounts do not include amounts related to certain non-cancelable service contracts for our data centers. The non-cancelable commitments under these service contracts at December 31, 2007 are included below under purchase obligations.

88

Table of Contents

**Google Inc.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Guaranteed Minimum Revenue Share Payments*

In connection with our AdSense revenue share agreements, we are periodically required to make non-cancelable guaranteed minimum revenue share payments to a small number of our Google Network members over the term of the respective contracts. These guaranteed payments can vary based on our Google Network members achieving defined performance terms, such as number of advertisements displayed or search queries. In some cases, certain guaranteed amounts will be adjusted downward if our Google Network members do not meet their performance terms and, in some cases, these amounts will be adjusted upward if they exceed their performance terms. In all of these AdSense agreements, if a Google Network member were unable to perform under the contract, such as being unable to provide search queries, as defined under the terms of that agreement, then we would not be obligated to make any non-cancelable guaranteed minimum revenue share payments to that member. At December 31, 2007, our aggregate outstanding non-cancelable guaranteed minimum revenue share commitments totaled $1,746.4 million through 2012 compared to $1,165.6 million at December 31, 2006.

*Purchase Obligations*

We had $734.0 million of other non-cancelable contractual obligations and $1,375.8 million of open purchase orders for which we had not received the related services or goods at December 31, 2007. We have the right to cancel these open purchase orders prior to the date of delivery. The majority of these purchase obligations are related to data center operations and facility build-outs. These non-cancelable contractual obligations and open purchase orders amounts do not include payments we may be obligated to make based upon vendors achieving certain milestones.

*Letters of Credit*

At December 31, 2007 and associated with several leased facilities, we had unused letters of credit for $20.4 million. At December 31, 2007, we were in compliance with our financial covenants under the letters of credit.

*Indemnifications*

In the normal course of business to facilitate transactions of our services and products, we indemnify certain parties, including advertisers, Google Network members and lessors, with respect to certain matters. We have agreed to hold certain parties harmless against losses arising from a breach of representations or covenants, or out of intellectual property infringement or other claims made against certain parties. These agreements may limit the time within which an indemnification claim can be made and the amount of the claim. In addition, we have entered into indemnification agreements with our officers and directors, and our bylaws contain similar indemnification obligations to our agents.

It is not possible to determine the maximum potential amount under these indemnification agreements due to the limited history of prior indemnification claims and the unique facts and circumstances involved in each particular agreement. Historically, payments made by us under these agreements have not had a material impact on our operating results, financial position, or cash flows.

*Legal Matters*

Companies have filed trademark infringement and related claims against us over the display of ads in response to user queries that include trademark terms. The outcomes of these lawsuits have differed from jurisdiction to jurisdiction. Courts in France have held us liable for allowing advertisers to select certain

89

Table of Contents

## Google Inc.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

trademarked terms as keywords. We are appealing those decisions. We were also subject to two lawsuits in Germany on similar matters where the courts held that we are not liable for the actions of our advertisers prior to notification of trademark rights. We are litigating or have recently litigated similar issues in other cases in the U.S., France, Germany, Israel, Italy, Austria and Australia.

We have also had copyright claims filed against us alleging that features of certain of our products and services, including Google Web Search, Google News, Google Video, Google Image Search, Google Book Search and YouTube, infringe their rights. Adverse results in these lawsuits may include awards of substantial monetary damages, costly royalty or licensing agreements or orders preventing us from offering certain functionalities, and may also result in a change in our business practices, which could result in a loss of revenue for us or otherwise harm our business. In addition, any time one of our products or services links to or hosts material in which others allegedly own copyrights, we face the risk of being sued for copyright infringement or related claims. Because these products and services comprise the majority of our products and services, our business could be harmed in the event of an adverse result in any of these claims.

We are also a party to other litigation and subject to claims incident to the ordinary course of business, including intellectual property claims (in addition to the trademark and copyright matters noted above), labor and employment claims, breach of contract claims, tax and other matters.

Although the results of litigation and claims cannot be predicted with certainty, we believe that the final outcome of the matters discussed above will not have a material adverse effect on our business, consolidated financial position, results of operations or cash flows.

*Income Taxes*

We are currently under audit by the Internal Revenue Service and various other tax authorities. We have reserved for potential adjustments to our provision for income taxes that may result from examinations by, or any negotiated agreements with, these tax authorities, and we believe that the final outcome of these examinations or agreements will not have a material affect on our results of operations. If events occur which indicate payment of these amounts is unnecessary, the reversal of the liabilities would result in the recognition of tax benefits in the period we determine the liabilities are no longer necessary. If our estimates of the federal, state, and foreign income tax liabilities are less than the ultimate assessment, a further charge to expense would result.

Upon adoption of FIN 48 on January 1, 2007, we decreased current taxes payable by $219.4 million and increased long-term taxes payable by the same amount as FIN 48 specifies that tax positions for which the timing of the ultimate resolution is uncertain should be recognized as long-term liabilities. We also recognized additional long-term taxes payable of $181.0 million in the year ended December 31, 2007. At this time, we are unable to make a reasonably reliable estimate of the timing of payments in individual years beyond 12 months due to uncertainties in the timing of tax audit outcomes.

### Note 10.    Google Foundation

The Google Foundation (the "Foundation"), a private foundation, was formed in the third quarter of 2004. The Foundation's mission is to fund and support philanthropic programs focused on poverty and the environment. In the fourth quarter of 2005, we funded the Foundation with non-recourse, non-refundable cash donation of $90.0 million.

90

Table of Contents

## Google Inc.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The Board of Directors of the Foundation currently consists of four members, two of whom are directors and executive officers of Google and one of whom is a vice president of Google. The fourth member is the executive director of the Foundation.

Since the Foundation's inception, we have provided at no charge certain resources to the Foundation such as office space.

### Note 11.  Stockholders' Equity

*Convertible Preferred Stock*

Our Board of Directors has authorized 100,000,000 shares of convertible preferred stock, $0.001 par value, issuable in series. At December 31, 2007 and 2006, there were no shares issued or outstanding.

*Class A and Class B Common Stock*

Our Board of Directors has authorized two classes of common stock, Class A and Class B. At December 31, 2007, there were 6,000,000,000 and 3,000,000,000 shares authorized and there were 236,432,822 and 76,844,348 shares legally outstanding of Class A and Class B common stock. The rights of the holders of Class A and Class B common stock are identical, except with respect to voting. Each share of Class A common stock is entitled to one vote per share. Each share of Class B common stock is entitled to 10 votes per share. Shares of Class B common stock may be converted at any time at the option of the stockholder and automatically convert upon sale or transfer to Class A common stock. We refer to Class A and Class B common stock as common stock throughout the notes to these financial statements, unless otherwise noted.

At December 31, 2006 and December 31, 2007 there were 20,410,337 and 14,553,423 shares of common stock reserved for future issuance.

*Stock Plans*

We maintain the 1998 Stock Plan, the 2000 Stock Plan, the 2003 Stock Plan, the 2003 Stock Plan (No. 2), the 2003 Stock Plan (No. 3), the 2004 Stock Plan and plans assumed through acquisitions, all of which are collectively referred to as the "Stock Plans." Under our Stock Plans, incentive and nonqualified stock options or rights to purchase common stock may be granted to eligible participants. Options are generally granted for a term of 10 years. Options granted under the Stock Plans generally vest 25% after the first year of service and ratably each month over the remaining 36 month period contingent upon employment with us on the date of vest. Options granted under Stock Plans other than the 2004 Stock Plan may be exercised prior to vesting.

Under the stock plans, we have also issued RSUs and restricted shares. An RSU award is an agreement to issue shares of our stock at the time of vest. RSUs issued to new employees vest over four years with a yearly cliff contingent upon employment with us on the dates of vest. These RSUs vest from zero to 37.5 percent of the grant amount at the end of each of the four years from date of hire based on the employee's performance. RSUs under the Founders' Award programs are issued to individuals on teams that have made extraordinary contributions to Google. These awards vest quarterly over four years contingent upon employment with us on the dates of vest.

We estimated the fair value of each option award on the date of grant using the BSM option pricing model. Our assumptions about stock-price volatility have been based exclusively on the implied volatilities of publicly

91

Table of Contents

## Google Inc.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

traded options to buy our stock with contractual terms closest to the expected life of options granted to our employees applying the guidance provided by Staff Accounting Bulletin No. 107, *Share-Based Payment*. Through the third quarter of 2007, our assumptions about the expected term have been based on that of companies that have option vesting and contractual terms, expected stock volatility and employee demographics and physical locations that are similar to ours because we had limited relevant historical information to support the expected sale and exercise behavior of our employees who had been granted options recently. Commencing in the fourth quarter of 2007, we began to estimate the expected term based upon the historical behavior of our employees. The risk-free interest rate for periods within the contractual life of the award is based on the U.S. Treasury yield curve in effect at the time of grant.

The fair value of share-based payment awards was estimated using the BSM option pricing model with following assumptions and weighted average fair values:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2005 | 2006 | 2007 |
| Risk-free interest rate | 3.86% | 4.70% | 4.37% |
| Expected volatility | 36% | 34% | 34% |
| Expected life (in years) | 3.1 | 3.6 | 5.1 |
| Dividend yield | — | — | — |
| Weighted-average estimated fair value of options granted during the year | $78.58 | $158.59 | $213.56 |

The following table summarizes the activity for our options for the twelve months ended December 31, 2007:

|  | Options Outstanding | | | |
|---|---|---|---|---|
|  | Number of Shares | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value (in millions) (1) |
| Balance at December 31, 2006 | 13,424,872 | $ 205.58 |  |  |
| Options granted | 3,408,101 | $ 562.95 |  |  |
| Exercised/vested | (3,572,930) | $ 51.86 |  |  |
| Canceled/forfeited | (367,157) | $ 264.11 |  |  |
| Balance at December 31, 2007 | 12,892,886 | $ 333.62 | 7.5 | $4,483.92 |
| Vested and exercisable as of December 31, 2007 | 4,405,716 | $ 211.10 | 7.0 | $2,116.43 |
| Vested and exercisable as of December 31, 2007 and expected to vest thereafter(2) | 12,001,757 | $ 330.70 | 7.5 | $4,330.04 |

(1) The aggregate intrinsic value is calculated as the difference between the exercise price of the underlying awards and the closing stock price of $691.48 of our common stock on December 31, 2007.

(2) Options expected to vest reflect an estimated forfeiture rate.

92

Table of Contents

## Google Inc.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

The following table summarizes additional information regarding outstanding and exercisable options at December 31, 2007:

| | Options Outstanding | | | | | Options Exercisable | | Options Exercisable and Vested | |
| Range of Exercise Prices | Total Number of Shares | Unvested Options Granted and Exercised Subsequent to March 21, 2002 | Number of Shares | Weighted-Average Remaining Life (Years) | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price |
|---|---|---|---|---|---|---|---|---|---|
| $0.30–$85.00 | 2,639,312 | 360,679 | 2,278,633 | 5.7 | $ 18.07 | 2,230,265 | $ 17.84 | 1,349,487 | $ 15.37 |
| $117.84–$198.41 | 1,678,669 | — | 1,678,669 | 5.9 | $176.42 | 933,713 | $175.27 | 933,367 | $175.27 |
| $205.96–$298.91 | 1,391,439 | — | 1,391,439 | 6.5 | $274.52 | 700,523 | $274.30 | 700,177 | $274.30 |
| $300.97–$399.00 | 1,789,518 | — | 1,789,518 | 7.1 | $329.55 | 813,173 | $326.68 | 811,819 | $326.64 |
| $401.78–$499.07 | 1,469,211 | — | 1,469,211 | 8.5 | $449.90 | 284,533 | $431.24 | 283,671 | $431.24 |
| $500.00–$594.05 | 3,721,507 | — | 3,721,507 | 9.4 | $556.92 | 328,015 | $508.02 | 326,881 | $508.02 |
| $625.39–$699.35 | 150,577 | — | 150,577 | 9.9 | $663.13 | 78 | $664.55 | 78 | $664.55 |
| $707.00–$732.94 | 52,653 | — | 52,653 | 9.9 | $718.16 | 36 | $707.00 | 36 | $707.00 |
| $0.30–$732.94 | 12,892,886 | 360,679 | 12,532,207 | 7.5 | $333.56 | 5,290,336 | $179.70 | 4,405,516 | $211.10 |

Options outstanding at December 31, 2006 and 2007 in the above tables include 1,296,155 and 360,679 of options granted and exercised subsequent to March 21, 2002 that are unvested at December 31, 2006 and 2007, in accordance with EITF 00-23. However, the computations of the weighted-average exercise prices, weighted average remaining contractual term and aggregate intrinsic value for all stock options outstanding and those exercisable do not consider these unvested shares. Further, the above tables include 924,399 warrants held by financial institutions that were options purchased from employees under our TSO program.

The total grant date fair value of stock options vested (including the related incremental fair value resulting from the adoption of our TSO program—see discussion below) during 2005, 2006 and 2007 was $287.5 million, $392.9 million and $635.1 million. The aggregate intrinsic value of all options exercised during 2005, 2006 and 2007 was $1,785.3 million, $1,904.0 million and $1,279.0 million—these amounts do not include the aggregate sales price of options sold under the TSO program (see below).

In April 2007, we launched our TSO program. Under the TSO program, certain employees are able to sell vested options granted after our initial public offering under our 2004 Stock Plan to selected financial institutions in an online auction. All employees may participate in the program other than our executive management group and those who reside in countries where, due to local legal or tax implications, it would not be beneficial to employees or the TSO program would be impractical. At the time of sale, the vested option is automatically amended to create a warrant that is exercisable by the financial institution within two years from the date of issuance. All eligible outstanding options were modified in the second quarter of 2007 to allow them to be sold under the TSO program and, as a result, we incurred a modification charge of $95 million during 2007 related to vested options and expect to incur an additional modification charge of approximately $134 million related to unvested options over their remaining vesting periods through the second quarter of 2011. The modification charge is equal to the difference between the values of those modified stock options on the date of modification and their values immediately prior to modification in accordance with SFAS 123R. Further, to the extent the forfeiture rate is different from what we have anticipated, the modification charge related to the unvested awards will be different from our expectations. The fair value of each option granted under the TSO program will be greater than it would have been otherwise because of a longer expected life, resulting in more stock-based compensation per option.

93

Table of Contents

## Google Inc.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

During 2007, the number of shares underlying TSOs sold to selected financial institutions under the TSO program was 924,399 at a total value of $305.0 million, or an average $329.92 per share, and an average premium of $31.43 per share. The premium is calculated as the difference between (a) the sale price of the TSO and (b) the intrinsic value of the TSO, which we define as the excess, if any, of the price of our Class A common stock at the time of the sale over the exercise price of the TSO. At December 31, 2007, the number of shares underlying TSOs held by financial institutions was 924,399 and the number of options eligible for participation under the TSO program was approximately 8.7 million.

As of December 31, 2007, there was $1,165.1 million of unrecognized compensation cost related to outstanding employee stock options, net of forecasted forfeitures. This amount is expected to be recognized over a weighted average period of 2.97 years. To the extent the forfeiture rate is different than what we have anticipated, stock-based compensation related to these awards will be different from our expectations.

The following table summarizes the activity for our unvested restricted stock units and restricted shares for the twelve months ended December 31, 2007:

|  | Number of Shares | Weighted-Average Grant-Date Fair Value |
|---|---|---|
| Unvested at December 31, 2006 | 1,771,037 | $369.54 |
| Granted | 1,870,558 | $618.61 |
| Vested | (570,863) | $362.81 |
| Forfeited | (80,510) | $396.85 |
| Unvested at December 31, 2007 | 2,990,222 | $526.92 |
| Expected to vest at December 31, 2007 | 2,795,858 | $526.92 |

As of December 31, 2007, there was $1,332.6 million of unrecognized compensation cost related to employee unvested restricted stock units and restricted shares, net of forecasted forfeitures. This amount is expected to be recognized over a weighted average period of 3.42 years. To the extent the actual forfeiture rate is different than what we have anticipated; stock-based compensation related to these awards will be different from our expectations.

At December 31, 2007, there were 2,063 unvested restricted stock units held by a non-employee with a 30 month remaining vesting period.

### Warrants to Purchase Class A Common Stock

We issued warrants to purchase 15,904 shares of Class A common stock in connection with our YouTube acquisition. The warrants have an exercise price of $23.28 and a nine month remaining vesting period at December 31, 2007.

### Note 12.    401(k) Plan

We have a 401(k) Savings Plan (the "401(k) Plan") that qualifies as a deferred salary arrangement under Section 401(k) of the Internal Revenue Code. Under the 401(k) Plan, participating employees may elect to contribute up to 60% of their eligible compensation, subject to certain limitations. We match employee contributions up to $7,750 per year. Employee and our contributions are fully vested when contributed. We contributed approximately $8.4 million, $14.3 million and $51.1 million during 2005, 2006 and 2007, respectively.

Table of Contents

**Google Inc.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**Note 13.  Income Taxes**

Income before income taxes included income from foreign operations of approximately $590.8 million, $1,318.4 million and $2,466.9 million for 2005, 2006 and 2007.

The provision for income taxes consisted of the following (in thousands):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2005 | 2006 | 2007 |
| Current: |  |  |  |
| Federal | $506,322 | $ 812,280 | $1,288,310 |
| State | 141,101 | 191,266 | 294,935 |
| Foreign | 7,694 | 28,516 | 51,227 |
| Total | 655,117 | 1,032,062 | 1,634,472 |
| Deferred: |  |  |  |
| Federal | 14,273 | (80,073) | (135,047) |
| State | 6,890 | (18,395) | (29,165) |
| Total | 21,163 | (98,468) | (164,212) |
| Provision for income taxes | $676,280 | $ 933,594 | $1,470,260 |

The reconciliation of federal statutory income tax rate to our effective income tax rate is as follows (in thousands):

|  | Year ended December 31, | | |
|---|---|---|---|
|  | 2005 | 2006 | 2007 |
| Expected provision at federal statutory rate (35%) | $ 749,588 | $1,403,864 | $1,985,893 |
| State taxes, net of federal benefit | 96,194 | 112,366 | 172,750 |
| Stock-based compensation expense | 25,058 | 26,878 | 123,869 |
| Disqualifying dispositions of incentive stock options | (46,092) | (6,128) | — |
| Foreign rate differential | (134,185) | (505,729) | (705,400) |
| Federal research credit | (12,287) | (77,859) | (81,469) |
| Tax exempt interest | (20,177) | (31,583) | (50,662) |
| Other permanent differences | 18,181 | 11,785 | 25,279 |
| Provision for income taxes | $ 676,280 | $ 933,594 | $1,470,260 |

We provide U.S. income taxes on the earnings of foreign subsidiaries unless the subsidiaries' earnings are considered permanently reinvested outside the U.S. To the extent that the foreign earnings previously treated as permanently reinvested are repatriated, the related U.S. tax liability may be reduced by any foreign income taxes paid on these earnings. As of December 31, 2007, the cumulative amount of earnings upon which U.S. income taxes have not been provided is approximately $3,900.6 million. Determination of the amount of unrecognized deferred tax liability related to these earnings is not practicable.

95

Table of Contents

**Google Inc.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*Deferred Tax Assets*

Deferred income taxes reflect the net effects of temporary differences between the carrying amounts of assets and liabilities for financing reporting purposes and the amounts used for income tax purposes. Significant components of our deferred tax assets and liabilities are as follows (in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | **2006** | **2007** |
| Deferred tax assets: | | |
|     Stock-based compensation | $ 40,772 | $ 118,297 |
|     State taxes | — | 86,256 |
|     Depreciation | 26,009 | 53,900 |
|     Vacation accruals | 11,256 | 18,868 |
|     Deferred Rent | 9,565 | 17,498 |
|     Accruals and reserves not currently deductible | 6,867 | 9,824 |
|     Unrealized losses on investments and other | 1,996 | — |
|     Other | 4,242 | 14,674 |
|       Total deferred tax assets | 100,707 | 319,317 |
| Deferred tax liabilities: | | |
|     Identified intangibles | (107,781) | (127,700) |
|     Undistributed earnings of foreign subsidiaries | — | (55,329) |
|     Unrealized gains on investments and other | — | (30,187) |
|     Other | (3,634) | (4,344) |
|       Total deferred tax liabilities | (111,415) | (217,560) |
| Net deferred tax assets (liabilities) | $ (10,708) | $ 101,757 |

As of December 31, 2007, our federal net operating loss carryforwards for income tax purposes were approximately $22.1 million. If not utilized, the federal net operating loss carryforwards will begin to expire in 2024. The net operating loss carryforwards are subject to various limitations under Section 382 of the Internal Revenue Code.

*Uncertain Tax Positions*

Effective January 1, 2007, we adopted the provisions of FIN 48. This Interpretation clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109 and prescribes a recognition threshold of more-likely-than-not to be sustained upon examination. Upon adoption of FIN 48, our policy to include interest and penalties related to gross unrecognized tax benefits within our provision for income taxes did not change. The adjustment to retained earnings upon adoption to FIN 48 on January 1, 2007 was $2.3 million.

The following table summarizes the activity related to our gross unrecognized tax benefits from January 1, 2007 to December 31, 2007 (in thousands):

| | |
| --- | --- |
| Balance as of January 1, 2007 | $243,588 |
| Increases related to prior year tax positions | 29,854 |
| Decreases related to prior year tax positions | (18,997) |
| Increases related to current year tax positions | 132,742 |
| Decreases related to settlements with taxing authorities | — |
| Decreases related to lapsing of statute of limitations | — |
| Balance as of December 31, 2007 | $387,187 |

96

Table of Contents

## Google Inc.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

Our total unrecognized tax benefits that, if recognized, would affect our effective tax rate were $195.7 million and $283.5 million as of January 1, 2007 and December 31, 2007

As of December 31, 2007, we had accrued $14 million for payment of interest. Interest included in our provision for income taxes was not material in all the periods presented. We have not accrued any penalties related to our uncertain tax positions as we believe that it is more likely than not that there will not be any assessment of penalties.

We and our subsidiaries are routinely examined by various taxing authorities. Although we file U.S. federal, U.S. state, and foreign tax returns, our two major tax jurisdictions are the U.S. and Ireland. During the fourth quarter ended December 31, 2007, IRS completed its examination of our 2003 and 2004 tax years. We have filed an appeal with the IRS for certain issues related to this audit, but we believe we have adequately provided for these items and any adverse results would have an immaterial impact on our unrecognized tax benefit balance within the next twelve months. The IRS will commence its examination of our 2005 and 2006 tax years in early 2008. We do not expect the examination to be completed within the next twelve months, therefore we do not anticipate any significant impact to our unrecognized tax benefit balance in 2008, related to 2005 and 2006 tax years.

Our 2003 through 2007 tax years remain subject to examination by the IRS for U.S. federal tax purposes, and our 2002 through 2007 tax years remain subject to examination by the appropriate governmental agencies for Irish tax purposes. There are various other on-going audits in various other jurisdictions that are not material to our financial statements.

### Note 14.  Information about Geographic Areas

Our chief operating decision-makers (i.e., chief executive officer, certain of his direct reports and our founders) review financial information presented on a consolidated basis, accompanied by disaggregated information about revenues by geographic region for purposes of allocating resources and evaluating financial performance. There are no segment managers who are held accountable by our chief operating decision-makers, or anyone else, for operations, operating results and planning for levels or components below the consolidated unit level. Accordingly, we consider ourselves to be in a single reporting segment and operating unit structure.

Revenues by geography are based on the billing address of the advertiser. The following table sets forth revenues and long-lived assets by geographic area (in thousands):

|  | Year Ended December 31, | | |
|  | 2005 | 2006 | 2007 |
|---|---|---|---|
| Revenues: |  |  |  |
| United States | $3,756,886 | $ 6,030,140 | $ 8,698,021 |
| United Kingdom | 878,110 | 1,603,842 | 2,530,916 |
| Rest of the world | 1,503,564 | 2,970,935 | 5,365,049 |
| Total revenues | $6,138,560 | $10,604,917 | $16,593,986 |

|  | As of December 31, | | |
|  | 2005 | 2006 | 2007 |
|---|---|---|---|
| Long-lived assets: |  |  |  |
| United States | $1,080,236 | $ 5,070,694 | $ 7,334,877 |
| Rest of the world | 190,506 | 362,810 | 711,791 |
| Total long-lived assets | $1,270,742 | $ 5,433,504 | $ 8,046,668 |

97

Table of Contents

## ITEM 9.  CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

Not applicable.

## ITEM 9A.  CONTROLS AND PROCEDURES

### (a) Evaluation of disclosure controls and procedures.

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on management's evaluation, our chief executive officer and chief financial officer concluded that, as of December 31, 2007, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

### (b) Changes in internal control over financial reporting.

We regularly review our system of internal control over financial reporting and make changes to our processes and systems to improve controls and increase efficiency, while ensuring that we maintain an effective internal control environment. Changes may include such activities as implementing new, more efficient systems, consolidating activities, and migrating processes.

There were no changes in our internal control over financial reporting that occurred during the period covered by this Annual Report on Form 10-K that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### (c) Management's report on internal control over financial reporting.

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2007. Management reviewed the results of their assessment with our Audit Committee. The effectiveness of our internal control over financial reporting as of December 31, 2007 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report which is included in Item 8 of this Annual Report on Form 10-K.

## ITEM 9B.  OTHER INFORMATION

Not applicable.

98

Table of Contents

## PART III

### ITEM 10.  DIRECTORSAND EXECUTIVE OFFICERS OF THE REGISTRANT

The information required by this item regarding our directors and corporate governance matters is included under the captions "Corporate Governance and Board of Directors Matters" and "Proposals to be Voted On—Proposal Number 1—Election of Directors" in Google's Proxy Statement for its 2008 Annual Meeting of Stockholders to be filed with the SEC within 120 days after the end of the fiscal year ended December 31, 2007 (the "2008 Proxy Statement") and is incorporated herein by reference. The information required by this item regarding delinquent filers pursuant to Item 405 of Regulation S-K is included under the heading "Section 16(a) Beneficial Ownership Reporting Compliance" in the 2008 Proxy Statement and is incorporated herein by reference.

The information required by this item concerning our executive officers is set forth under the heading "Executive Officers of the Registrant" in Part I of this Annual Report on Form 10-K.

### ITEM 11.  EXECUTIVECOMPENSATION

The information required by this item is included under the captions "Director Compensation" and "Executive Compensation" in the 2008 Proxy Statement and incorporate herein by reference.

### ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND   MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required by this item is included under the captions "Common Stock Ownership of Certain Beneficial Owners and Management" and "Executive Compensation—Equity Compensation Plan Information" in the 2008 Proxy Statement and is incorporated herein by reference.

### ITEM 13.  CERTAINRELATIONSHIPS AND RELATED TRANSACTIONS

The information required by this item is included under the caption "Certain Relationships and Related Party Transactions" in the 2008 Proxy Statement and is incorporated herein by reference.

### ITEM 14.  PRINCIPALACCOUNTING FEES AND SERVICES

The information required by this item is included under the caption "Independent Public Accountants" in the 2008 Proxy Statement and is incorporated herein by reference.

99

Table of Contents

## PART IV

### ITEM 15.   EXHIBITS AND FINANCIAL STATEMENT SCHEDULE

(a) We have filed the following documents as part of this Form 10-K:

### 1. Consolidated Financial Statements

Reports of Independent Registered Public Accounting Firm    65
Financial Statements
    Consolidated Balance Sheets    67
    Consolidated Statements of Income    68
    Consolidated Statements of Stockholders' Equity    69
    Consolidated Statements of Cash Flows    70
    Notes to Consolidated Financial Statements    71

### 2. Financial Statement Schedule

Schedule II: Valuation and Qualifying Accounts

All other schedules have been omitted because they are not required, not applicable, or the required information is otherwise included.

### Schedule II: Valuation and Qualifying Accounts

| Allowance for Doubtful Accounts and Sales Credits | Balance at Beginning of Year | Charged to Expenses/ Against Revenue | Write-Offs Net of Recoveries | Balance at End of Year |
|---|---|---|---|---|
| | | (In thousands) | | |
| Year ended December 31, 2005 | $ 3,962 | $ 18,264 | $ (7,374) | $ 14,852 |
| Year ended December 31, 2006 | $ 14,852 | $ 9,899 | $ (7,837) | $ 16,914 |
| Year ended December 31, 2007 | $ 16,914 | $ 46,001 | $(30,028) | $ 32,887 |

Note:   Additions to the allowance for doubtful accounts are charged to expense. Additions to the allowance for sales credits are charged against revenues.

### 3. Exhibits.

See the Exhibit Index immediately following the signature page of this Annual Report of Form 10-K

100

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized, on February 15, 2008.

GOOGLE INC.

By:      /s/   ERIC E. SCHMIDT
_____
Eric E. Schmidt
Chairman of the Board of Directors and
Chief Executive Officer

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Eric E. Schmidt and George Reyes, jointly and severally, his or her attorney-in-fact, with the power of substitution, for him or her in any and all capacities, to sign any amendments to this Annual Report on Form 10-K and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his or her substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report on Form 10-K has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
| --- | --- | --- |
| /s/   ERIC E. SCHMIDT<br>Eric E. Schmidt | Chairman of the Board of Directors and Chief Executive Officer (Principal Executive Officer) | February 15, 2008 |
| /s/   GEORGE REYES<br>George Reyes | Chief Financial Officer (Principal Financial and Accounting Officer) | February 15, 2008 |
| /s/   SERGEY BRIN<br>Sergey Brin | President of Technology, Assistant Secretary and Director | February 15, 2008 |
| /s/   LARRY PAGE<br>Larry Page | President of Products, Assistant Secretary and Director | February 15, 2008 |
| /s/   L. JOHN DOERR<br>L. John Doerr | Director | February 15, 2008 |
| /s/   K. RAM SHRIRAM<br>K. Ram Shriram | Director | February 15, 2008 |
| /s/   JOHN L. HENNESSY<br>John L. Hennessy | Director | February 15, 2008 |
| /s/   ARTHUR D. LEVINSON<br>Arthur D. Levinson | Director | February 15, 2008 |
| /s/   PAUL S. OTELLINI<br>Paul S. Otellini | Director | February 15, 2008 |
| /s/   SHIRLEY TILGHMAN<br>Shirley Tilghman | Director | February 15, 2008 |

| /s/ ANN MATHER | Director | February 15, 2008 |

Ann Mather

101

## Table of Contents

| Exhibit Number | Description | Incorporated by reference herein | |
| --- | --- | --- | --- |
| | | Form | Date |
| 1.01 | Form of Distribution Agreement dated April 20, 2007 among Google Inc., Morgan Stanley & Co. Incorporated, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC and UBS Securities LLC (the "Distribution Agreement") | Current Report on Form 8-K (File No. 000-50726) | April 23, 2007 |
| 1.01.1 | Amendment No. 1 to the Distribution Agreement among Google Inc. and J.P. Morgan Securities Inc. entered into as of July 20, 2007 | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2007 |
| 1.02 | Form of Bidding Rules Agreement dated April 20, 2007 among Google Inc., Morgan Stanley & Co. Incorporated, as Auction Manager and Bidder, Citigroup Global Markets Inc. as Warrant Agent and Bidder and Credit Suisse Securities (USA) LLC and UBS Securities LLC, as Bidders (the "Bidding Rules Agreement") | Current Report on Form 8-K (File No. 000-50726) | April 23, 2007 |
| 1.02.1 | Amendment No. 1 to the Bidding Rules Agreement among Google Inc. and J.P. Morgan Securities Inc., as Bidder entered into as of July 20, 2007 | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2007 |
| 2.1 | Agreement and Plan of Merger by and among Google Inc., Whopper Acquisition Corp. and Click Holding Corp., dated as of April 13, 2007 | Current Report on Form 8-K (File No. 000-50726) | April 19, 2007 |
| 3.01 | Third Amended and Restated Certificate of Incorporation of Registrant as filed August 24, 2004 | Registration Statement on Form S-1, as amended (File No. 333-114984) | August 9, 2004 |
| 3.02 | Amended and Restated Bylaws of Registrant, effective as of August 24, 2004 | Registration Statement on Form S-1, as amended (File No. 333-114984) | August 9, 2004 |
| 4.01 | Investor Rights Agreement dated May 31, 2002 | Registration Statement on Form S-1, as amended (File No. 333-114984) | April 29, 2004 |
| 4.01.1 | Amendment to Investor Rights Agreement dated August 17, 2004 | Registration Statement on Form S-1, as amended (File No. 333-114984) | August 18, 2004 |
| 4.02 | Specimen Class A Common Stock certificate | Registration Statement on Form S-1, as amended (File No. 333-114984) | August 18, 2004 |
| 4.03 | Specimen Class B Common Stock certificate | Registration Statement on Form S-1, as amended (File No. 333-114984) | August 18, 2004 |
| 4.04 | Registration Rights Agreement dated October 9, 2006 (with stockholders of YouTube, Inc.) | Registration Statement on Form S-3 (File No. 333-140498) | February 7, 2007 |

**Table of Contents**

| Exhibit Number | Description | Incorporated by reference herein | |
|---|---|---|---|
| | | Form | Date |
| 4.05 | Form of Warrant Agreement dated April 20, 2007 among Google Inc., Citigroup Global Markets Inc. as Warrant Agent, and Morgan Stanley & Co. Incorporated, Citigroup Global Markets Inc., Credit Suisse Management LLC, and UBS AG, London Branch, as Warrantholders (the "Warrant Agreement") | Current Report on Form 8-K (File No. 000-50726) | April 23, 2007 |
| 4.05.1 | Amendment No. 1 to the Warrant Agreement among Google Inc. and J.P. Morgan Securities Inc., as Warrantholder entered into as of July 20, 2007 | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2007 |
| 10.01 | Form of Indemnification Agreement entered into between Registrant, its affiliates and its directors and officers | Registration Statement on Form S-1, as amended (File No. 333-114984) | July 12, 2004 |
| 10.02 ♥ | 1998 Stock Plan, as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2006 |
| 10.02.1 ♥ | 1998 Stock Plan—Form of stock option agreement | Registration Statement on Form S-1, as amended (File No. 333-114984) | April 29, 2004 |
| 10.03 ♥ | Applied Semantics, Inc. 1999 Stock Option/Stock Issuance Plan, as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2006 |
| 10.04 ♥ | 2000 Stock Plan, as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2006 |
| 10.04.1 ♥ | 2000 Stock Plan—Form of stock option agreement | Registration Statement on Form S-1, as amended (File No. 333-114984) | April 29, 2004 |
| 10.05 ♥ | 2003 Stock Plan, as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | May 10, 2007 |
| 10.05.1 ♥ | 2003 Stock Plan—Form of stock option agreement | Registration Statement on Form S-1, as amended (File No. 333-114984) | April 29, 2004 |
| 10.06 ♥ | 2003 Stock Plan (No. 2), as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | May 10, 2007 |
| 10.06.1 ♥ | 2003 Stock Plan (No.2)—Form of stock option agreement | Registration Statement on Form S-1, as amended (File No. 333-114984) | April 29, 2004 |
| 10.07 ♥ | 2003 Stock Plan (No.3), as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | May 10, 2007 |
| 10.07.1 ♥ | 2003 Stock Plan (No.3)—Form of stock option agreement | Registration Statement on Form S-1, as amended (File No. 333-114984) | April 29, 2004 |
| 10.08 ♥ | Google Inc. 2004 Stock Plan, as amended | Current Report on Form 8-K (File No. 000-50726) | May 15, 2007 |
| 10.08.1 ♥ | 2004 Stock Plan—Form of stock option agreement | Annual Report on Form 10-K (File No. 000-50726) | March 30, 2005 |
| 10.08.2 ♥ | 2004 Stock Plan—Form of restricted stock unit agreement | Annual Report on Form 10-K (File No. 000-50726) | March 30, 2005 |

## Table of Contents

| Exhibit Number | | Description | Incorporated by reference herein Form | Date |
|---|---|---|---|---|
| 10.08.3 | ♥ | 2004 Stock Plan—Amendment to stock option agreements | Registration Statement on Form S-3 (File No. 333-142243) | April 20, 2007 |
| 10.08.4 | ♥ | 2004 Stock Plan—Form of stock option agreement (TSO Program) | Registration Statement on Form S-3 (File No. 333-142243) | April 20, 2007 |
| 10.09 | ♥ | Ignite Logic, Inc. 2003 Equity Incentive Plan, as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2006 |
| 10.10 | ♥ | Lifescape Solutions, Inc. 2001 Stock Plan, as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2006 |
| 10.11 | ♥ | Keyhole, Inc. 2000 Equity Incentive Plan, as amended | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2006 |
| 10.12 | ♥ | Picasa, Inc. Employee Bonus Plan | Registration Statement on Form S-8 (File No. 333-119378) | September 29, 2004 |
| 10.13 | ♥ | YouTube, Inc. 2005 Stock Plan | Registration Statement on Form S-8 (File No. 333-138848) | November 20, 2006 |
| 10.14 | | Purchase and Sale Agreement dated June 9, 2006 by and among WXIII/Amphitheatre Realty, L.L.C., WXIII/Crittenden Realty A/B, L.L.C., WXIII/Crittenden Realty C, L.L.C., and WXIII/Crittenden Realty D, L.L.C. and Google Inc. | Quarterly Report on Form 10-Q (File No. 000-50726) | August 9, 2006 |
| 10.15 | † | Amended and Restated License Agreement dated October 13, 2003 by and between The Board of Trustees of the Leland Stanford Junior University and Registrant | Registration Statement on Form S-1, as amended (File No. 333-114984) | August 16, 2004 |
| 10.15.1 | | License Agreement dated July 2, 2001 by and between The Board of Trustees of the Leland Stanford Junior University and Registrant | Registration Statement on Form S-1, as amended (File No. 333-114984) | August 18, 2004 |
| 10.16 | ♥ | Google Senior Executive Bonus Plan | Current Report on Form 8-K (File No. 000-50726) | March 28, 2007 |
| 10.17 | ♥ | Letter agreement between the Company and Shirley Tilghman dated August 16, 2005. | Current Report on Form 8-K (File No. 000-50726) | October 6, 2005 |
| 10.18 | | Amended and Restated Limited Liability Company Agreement of AOL Holdings LLC dated March 24, 2006 | Annual Report on Form 10-K (File No. 000-50726) | March 16, 2006 |
| 10.19 | | Contribution Agreement among Time Warner Inc., Google Inc. and America Online, Inc. dated March 24, 2006 | Annual Report on Form 10-K (File No. 000-50726) | March 16, 2006 |

<u>**Table of Contents**</u>

| Exhibit Number | | Description | Incorporated by reference herein | | |
| --- | --- | --- | --- | --- | --- |
| | | | Form | | Date |
| 10.20 | | Google Registration Rights Agreement among Time Warner Inc., AOL Holdings LLC and Google Inc. dated March 24, 2006 | Annual Report on Form 10-K (File No. 000-50726) | | March 16, 2006 |
| 10.21 | † | Agreement and Plan of Merger, dated as of January 16, 2006, by and among Google Inc., Enumclaw, Inc., dMarc Broadcasting, Inc. and certain other parties thereto | Annual Report on Form 10-K (File No. 000-50726) | | March 1, 2007 |
| 10.22 | | Amended and Restated Agreement and Plan of Merger by and among Google Inc., Snowmass Holdings Inc., YouTube, Inc. and certain other parties dated as of November 3, 2006, as amended | Quarterly Report on Form 10-Q/A (File No. 000-50726) | | May 10, 2007 |
| 21.01 | * | List of subsidiaries of Registrant | | | |
| 23.01 | * | Consent of Independent Registered Public Accounting Firm | | | |
| 24.01 | * | Power of Attorney (incorporated by reference to the signature page of this Annual Report on Form 10-K) | | | |
| 31.01 | * | Certification of Chief Executive Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | |
| 31.02 | * | Certification of Chief Financial Officer pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | | | |
| 32.01 | ‡ | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | |

♥   Indicates management compensatory plan, contract or arrangement.
†   Confidential treatment has been requested for portions of this exhibit.
*   Filed herewith.
‡   Furnished herewith.



| Google Inc. | S & P 500 |
| NASDAQ Composite | RDG Internet Composite |

EX-21.01 2 dex2101.htm LIST OF SUBSIDIARIES OF REGISTRANT

**Exhibit 21.01**

### LIST OF SUBSIDIARIES OF REGISTRANT
### GOOGLE INC.
### A DELAWARE CORPORATION

| Subsidiaries | Jurisdiction |
| --- | --- |
| @Last Software, Inc. | Delaware |
| AdScape Media, Inc. | Delaware |
| Android, Inc. | Delaware |
| Applied Semantics, Inc. | California |
| dMarc Broadcasting, Inc. | Delaware |
| FeedBurner, Inc. | Delaware |
| Ganji Inc. | Delaware |
| Google Airwaves Inc. | Delaware |
| Google International LLC | Delaware |
| Google LLC | Delaware |
| Google Payment Corp. | Delaware |
| Google Spectrum Investments Inc. | Delaware |
| GrandCentral Communication, Inc. | Delaware |
| GreenBorder Technologies, Inc. | Delaware |
| Ignite Logic, Inc. | Delaware |
| ImageAmerica, Inc. | Missouri |
| ImageAmerica Aviation, Inc. | Delaware |
| JASS Inc. | Delaware |
| JG Productions Inc. | Washington |
| JotSpot Inc. | Delaware |
| Kaltix Corporation | Delaware |
| Liquid Acquisition Corp. 2 | Delaware |
| Neotonic Software Corporation | California |
| Nevengineering, Inc. | Delaware |
| Orkut.com LLC | Delaware |
| Peakstream, Inc. | Delaware |
| Picasa LLC | Delaware |
| PiFidelity Holding Corporation | Delaware |
| PiFidelity LLC | Delaware |
| Postini, Inc. | Delaware |
| Postini Canada Holding Co. | Delaware |
| Scott Concepts, LLC | Delaware |
| Scott Studios, LLC | Delaware |
| SkillSet LLC | Delaware |
| The Salinger Group LLC | Delaware |

| Subsidiaries | Jurisdiction |
| --- | --- |
| Tonic Systems, Inc. | Delaware |
| Transformic, Inc. | Delaware |
| Upstartle, LLC | Delaware |
| Urchin Software Corporation | Delaware |
| Where2, LLC | Delaware |
| YouTube, LLC | Delaware |
| ZipDash, Inc. | Delaware |
| AdScape Media (Canada), Inc. | Canada |
| Aegino Limited | Ireland |
| @Last Software, Ltd. | United Kingdom |
| At Last Software GmbH | Germany |
| allPAY GmbH | Germany |
| bruNET GmbH | Germany |
| bruNET Holding AG | Germany |
| bruNET Schweiz GmbH | Switzerland |
| Endoxon Ltd. | Switzerland |
| Endoxon (India) Private Ltd. | India |
| Endoxon (Deutchland) GmbH | Germany |
| Google (Hong Kong) Limited | Hong Kong |
| Google Advertising and Marketing Limited | Turkey |
| Google Argentina S.R.L. | Argentina |
| Google Australia Pty Ltd. | Australia |
| Google Belgium NV | Belgium |
| Google Bermuda Limited | Bermuda |
| Google Bermuda Unlimited | Bermuda |
| Google Brasil Internet Ltda. | Brazil |
| Google Canada Corporation | Nova Scotia, Canada |
| Google Chile Limitada | Chile |
| Google Czech Republic s.r.o. | Czech Republic |
| Google Denmark ApS | Denmark |
| Google Finland OY | Finland |
| Google France SarL | France |
| Google Information Technology Services Limited Liability Company | Hungary |
| Google FZ LLC | United Arab Emirates |
| Google Germany GmbH | Germany |
| Google India Private Limited | India |
| Google Austria GmbH | Austria |
| Google Ireland Holdings | Ireland |
| Google Ireland Limited | Ireland |
| Google Israel Ltd. | Israel |

| Subsidiaries | Jurisdiction |
| --- | --- |
| Google Italy s.r.l. | Italy |
| Google Japan Inc. | Japan |
| Google Korea, LLC. | Korea |
| Google Limited Liability Company - Google OOO | Russia |
| Google Mexico S. de R.L. de C.V. | Mexico |
| Google Netherlands B.V. | The Netherlands |
| Google Netherlands Holdings B.V. | The Netherlands |
| Google New Zealand Ltd. | New Zealand |
| Google Norway AS | Norway |
| Google Payment Ltd. | United Kingdom |
| Google Payment Hong Kong Limited | Hong Kong |
| Google Payment Singapore Pte. Ltd. | Singapore |
| Google Poland Sp. z o.o. | Poland |
| Google Holdings Pte. Ltd. | Singapore |
| Google Singapore Pte. Ltd. | Singapore |
| Google South Africa (Proprietary) Limited | South Africa |
| Google Spain, S.L. | Spain |
| Google Sweden AB | Sweden |
| Google Sweden Tecnique AB | Sweden |
| Google Switzerland GmbH | Switzerland |
| Google UK Limited | United Kingdom |
| Jaiku Ltd. | Finland |
| Neven Vision KK | Japan |
| Neven Vision Germany GmbH | Germany |
| Leonberger Holdings B.V. | The Netherlands |
| 3147015 Nova Scotia Company | Canada |
| Postini Switzerland GmbH | Switzerland |
| Postini UK Limited | United Kingdom |
| Skydocks GmbH | Germany |
| Tonic Systems Pty. Ltd. | Australia |

EX-23.01 3 dex2301.htm CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

**Exhibit 23.01**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in the following Registration Statements:

(1) Registration Statement (Form S-3 No. 333-142243) of Google Inc.,

(2) Registration Statement (Form S-8 No. 333-138848) pertaining to the YouTube, Inc. 2005 Stock Plan of Google Inc.,

(3) Registration Statement (Form S-8 No. 333-124350) pertaining to the 1998 Stock Plan, the 2003 Stock Plan, the 2003 Stock Plan (No. 2) and the 2003 Stock Plan (No. 3) of Google Inc.,

(4) Registration Statement (Form S-8 No. 333-120099) pertaining to the Keyhole, Inc. 2000 Equity Incentive Plan of Google Inc.,

(5) Registration Statement (Form S-8 No. 333-119378) pertaining to the Picasa, Inc. Employee Bonus Plan of Google Inc.,

(6) Registration Statement (Form S-8 No. 333-119282) pertaining to the Lifescape Solutions, Inc. 2001 Stock Plan of Google Inc., and

(7) Registration Statement (Form S-8 No. 333-117715) pertaining to the 2004 Stock Plan, the 2003 Stock Plan (No.3), the 2003 Stock Plan (No.2), the 2003 Stock Plan, the 2000 Stock Plan, the 1998 Stock Plan, the 1999 Stock Option / Stock Issuance Plan and the 2003 Equity Incentive Plan of Google Inc.;

of our reports dated February 14, 2008, with respect to the consolidated financial statements and schedule of Google Inc., and the effectiveness of internal control over financial reporting of Google Inc., included in its Annual Report (Form 10-K) for the year ended December 31, 2007.

/s/  ERNST & YOUNG LLP

San Jose, California
February 14, 2008

EX-31.01 4 dex3101.htm CERTIFICATION OF CEO PURSUANT TO EXCHANGE ACT RULES 13A-14(A) AND 15D-14(A)

**Exhibit 31.01**

### CERTIFICATION

I, Eric E. Schmidt, certify that:

1. I have reviewed this annual report on Form 10-K of Google Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 15, 2008

/s/  ERIC E. SCHMIDT

Eric E. Schmidt
Chairman of the Board of Directors and
Chief Executive Officer

EX-31.02 5 dex3102.htm CERTIFICATION OF CFO PURSUANT TO EXCHANGE ACT RULES
13A-14(A) AND 15D-14(A)

**Exhibit 31.02**

## CERTIFICATION

I, George Reyes, certify that:

1. I have reviewed this annual report on Form 10-K of Google Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (c) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 15, 2008

                                             /s/   GEORGE REYES
                                        _____
                                        George Reyes
                                        Chief Financial Officer

EX-32.01 6 dex3201.htm CERTIFICATIONS OF CEO AND CFO PURSUANT TO 18 U.S.C. SECTION 1350

Exhibit 32.01

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER

### PURSUANT TO
### 18 U.S.C. SECTION 1350,
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2003

I, Eric E. Schmidt, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of Google Inc. on Form 10-K for the fiscal year ended December 31, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in this Form 10-K fairly presents in all material respects the financial condition and results of operations of Google Inc.

Date: February 15, 2008

By: /s/ ERIC E. SCHMIDT
Name: Eric E. Schmidt
Title: *Chairman of the Board of Directors and Chief Executive Officer*

I, George Reyes, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of Google Inc. on Form 10-K for the fiscal year ended December 31, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in this Form 10-K fairly presents in all material respects the financial condition and results of operations of Google Inc.

Date: February 15, 2008

By: /s/ GEORGE REYES
Name: George Reyes
Title: *Chief Financial Officer*

# EXHIBIT F

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-Q

(Mark One)

☒    QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2008

OR

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number: 000-50726

# Google Inc.

(Exact name of registrant as specified in its charter)

| Delaware | 77-0493581 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**1600 Amphitheatre Parkway**
**Mountain View, CA 94043**
(Address of principal executive offices)
(Zip Code)

**(650) 253-0000**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒        Accelerated filer ☐

Non-accelerated filer (Do not check if a smaller reporting company) ☐    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

At April 30, 2008, there were 238,581,338 shares of Google's Class A common stock outstanding and 75,511,505 shares of Google's Class B common stock outstanding.

**GOOGLE INC.**
**INDEX**

| | | Page No. |
|---|---|---|

**PART I. FINANCIAL INFORMATION**

| Item 1 | Financial Statements | |
|---|---|---|
| | Consolidated Balance Sheets—December 31, 2007 and March 31, 2008 (unaudited) | 3 |
| | Consolidated Statements of Income—Three Months Ended March 31, 2007 and 2008 (unaudited) | 4 |
| | Consolidated Statements of Cash Flows—Three Months Ended March 31, 2007 and 2008 (unaudited) | 5 |
| | Notes to Consolidated Financial Statements (unaudited) | 6 |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 20 |
| Item 3 | Quantitative and Qualitative Disclosures About Market Risk | 34 |
| Item 4 | Controls and Procedures | 35 |

**PART II. OTHER INFORMATION**

| Item 1 | Legal Proceedings | 36 |
|---|---|---|
| Item 1A | Risk Factors | 36 |
| Item 2 | Unregistered Sales of Equity Securities and Use of Proceeds | 47 |
| Item 6 | Exhibits | 48 |
| | Signatures | 49 |
| | Exhibit Index | 50 |
| | Certifications | |

2

## PART I—FINANCIAL INFORMATION

**ITEM 1.    FINANCIAL STATEMENTS**

### GOOGLE INC.

### CONSOLIDATED BALANCE SHEETS
#### (In thousands, except par value per share)

| | As of December 31, 2007 | As of March 31, 2008 (unaudited) |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 6,081,593 | $ 6,519,749 |
| Marketable securities | 8,137,020 | 5,614,759 |
| Accounts receivable, net of allowance of $32,887 and $50,278 | 2,162,521 | 2,560,909 |
| Deferred income taxes, net | 68,538 | 71,722 |
| Income taxes receivable | 145,253 | — |
| Prepaid revenue share, expenses and other assets | 694,213 | 697,792 |
| Total current assets | 17,289,138 | 15,464,931 |
| Prepaid revenue share, expenses and other assets, non-current | 168,530 | 190,402 |
| Deferred income taxes, net, non-current | 33,219 | 155,588 |
| Non-marketable equity securities | 1,059,694 | 1,056,966 |
| Property and equipment, net | 4,039,261 | 4,741,724 |
| Intangible assets, net | 446,596 | 1,203,972 |
| Goodwill | 2,299,368 | 4,791,399 |
| Total assets | $25,335,806 | $27,604,982 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $    282,106 | $    358,122 |
| Accrued compensation and benefits | 588,390 | 458,188 |
| Accrued expenses and other current liabilities | 465,032 | 746,905 |
| Accrued revenue share | 522,001 | 525,764 |
| Deferred revenue | 178,073 | 194,066 |
| Income taxes payable | — | 177,430 |
| Total current liabilities | 2,035,602 | 2,460,475 |
| Deferred revenue, non-current | 30,249 | 31,748 |
| Income taxes payable, non-current | 478,372 | 633,022 |
| Other long-term liabilities | 101,904 | 142,202 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Convertible preferred stock, $0.001 par value, 100,000 shares authorized; no shares issued and outstanding | — | — |
| Class A and Class B common stock, $0.001 par value: 9,000,000 shares authorized; 312,917 (Class A 236,097, Class B 76,820) and par value of $313 (Class A $236, Class B $77) and 313,724 (Class A 238,142, Class B 75,582) and par value of $314 (Class A $238, Class B $76) shares issued and outstanding, excluding 361 (Class A 336, Class B 25) and 228 (Class A 215, Class B 13) shares subject to repurchase at December 31, 2007 and March 31, 2008 | 313 | 314 |
| Additional paid-in capital | 13,241,221 | 13,561,948 |
| Accumulated other comprehensive income | 113,373 | 133,415 |
| Retained earnings | 9,334,772 | 10,641,858 |
| Total stockholders' equity | 22,689,679 | 24,337,535 |
| Total liabilities and stockholders' equity | $25,335,806 | $27,604,982 |

See accompanying notes.

3

**GOOGLE INC.**

**CONSOLIDATED STATEMENTS OF INCOME**
**(In thousands, except per share amounts)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2007 | 2008 |
| | (unaudited) | |
| Revenues | $3,663,971 | $5,186,043 |
| Costs and expenses: | | |
| Cost of revenues (including stock-based compensation expense of $4,389 and $9,148) | 1,470,426 | 2,110,536 |
| Research and development (including stock-based compensation expense of $120,787 and $193,800) | 408,384 | 673,069 |
| Sales and marketing (including stock-based compensation expense of $27,250 and $42,576) | 302,552 | 446,898 |
| General and administrative (including stock-based compensation expense of $31,440 and $35,255) | 261,400 | 409,305 |
| Total costs and expenses | 2,442,762 | 3,639,808 |
| Income from operations | 1,221,209 | 1,546,235 |
| Interest income and other, net | 130,728 | 167,343 |
| Income before income taxes | 1,351,937 | 1,713,578 |
| Provision for income taxes | 349,775 | 406,492 |
| Net income | $1,002,162 | $1,307,086 |
| Net income per share of Class A and Class B common stock: | | |
| Basic | $    3.24 | $    4.17 |
| Diluted | $    3.18 | $    4.12 |

See accompanying notes.

4

## GOOGLE INC.

### CONSOLIDATED STATEMENTS OF CASH FLOWS
### (In thousands)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2007 | 2008 |
| | (unaudited) | |
| **Operating activities** | | |
| Net income | $ 1,002,162 | $ 1,307,086 |
| Adjustments: | | |
| Depreciation and amortization of property and equipment | 170,289 | 280,564 |
| Amortization of intangibles and other | 34,703 | 55,960 |
| Stock-based compensation | 183,866 | 280,779 |
| Excess tax benefits from stock-based award activity | (74,084) | (51,101) |
| Deferred income taxes | (61,402) | (38,214) |
| Other, net | (6,386) | (44,903) |
| Changes in assets and liabilities, net of effects of acquisitions: | | |
| Accounts receivable | (153,562) | (223,493) |
| Income taxes, net | 399,104 | 438,175 |
| Prepaid revenue share, expenses and other assets | (185,478) | (41,584) |
| Accounts payable | (29,256) | 53,784 |
| Accrued expenses and other liabilities | (139,886) | (234,277) |
| Accrued revenue share | 77,864 | (10,124) |
| Deferred revenue | 1,659 | 6,794 |
| Net cash provided by operating activities | 1,219,593 | 1,779,446 |
| **Investing activities** | | |
| Purchases of property and equipment | (596,893) | (841,597) |
| Purchases of marketable securities | (5,225,160) | (2,819,512) |
| Maturities and sales of marketable securities | 5,079,364 | 5,379,228 |
| Acquisitions, net of cash acquired, and purchases of intangible and other assets | (34,441) | (3,125,113) |
| Net cash used in investing activities | (777,130) | (1,406,994) |
| **Financing activities** | | |
| Net proceeds (payments) related to stock-based award activity | 14,426 | (22,445) |
| Excess tax benefits from stock-based award activity | 74,084 | 51,101 |
| Net cash provided by financing activities | 88,510 | 28,656 |
| Effect of exchange rate changes on cash and cash equivalents | 5,696 | 37,048 |
| Net increase in cash and cash equivalents | 536,669 | 438,156 |
| Cash and cash equivalents at beginning of year | 3,544,671 | 6,081,593 |
| Cash and cash equivalents at end of period | $ 4,081,340 | $ 6,519,749 |
| **Supplemental disclosures of cash flow information** | | |
| Cash paid for interest | $       342 | $       387 |
| Cash paid for income taxes | $    12,774 | $    12,091 |

See accompanying notes.

5

**GOOGLE INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 1. Google Inc. and Summary of Significant Accounting Policies**

*Nature of Operations*

We were incorporated in California in September 1998. We were re-incorporated in the State of Delaware in August 2003. We provide highly targeted advertising and global internet search solutions as well as intranet solutions via an enterprise search appliance.

*Basis of Consolidation*

The Consolidated Financial Statements include the accounts of Google and our wholly-owned subsidiaries. All intercompany balances and transactions have been eliminated.

*Unaudited Interim Financial Information*

The accompanying Consolidated Balance Sheet as of March 31, 2008, the Consolidated Statements of Income for the three months ended March 31, 2007 and 2008, and the Consolidated Statements of Cash Flows for the three months ended March 31, 2007 and 2008 are unaudited. These unaudited interim Consolidated Financial Statements have been prepared in accordance with U.S. generally accepted accounting principles. In our opinion, the unaudited interim Consolidated Financial Statements include all adjustments of a normal recurring nature necessary for the fair presentation of our financial position as of March 31, 2008, our results of operations for the three months ended March 31, 2007 and 2008, and our cash flows for the three months ended March 31, 2007 and 2008. The results of operations for the three months ended March 31, 2008 are not necessarily indicative of the results to be expected for the year ending December 31, 2008.

These unaudited interim Consolidated Financial Statements should be read in conjunction with the Consolidated Financial Statements and related notes included in our 2007 Annual Report on Form 10-K filed on February 15, 2008.

*Use of Estimates*

The preparation of interim Consolidated Financial Statements in conformity with accounting principles generally accepted in the United States requires us to make estimates and assumptions that affect the amounts reported and disclosed in the financial statements and the accompanying notes. Actual results could differ materially from these estimates. On an ongoing basis, we evaluate our estimates, including those related to accounts receivable, bad debt and sales allowances, fair values of marketable and non-marketable securities, fair values of prepaid revenue share, intangible assets and goodwill, useful lives of intangible assets and property and equipment, fair values of options to purchase our common stock, and income taxes, among others. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable, the results of which form the basis for making judgments about the carrying values of assets and liabilities.

*Effect of Recent Accounting Pronouncements*

In December 2007, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 141 (revised 2007), *Business Combinations* ("SFAS 141R"). SFAS 141R establishes principles and requirements for how an acquirer recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, any noncontrolling interest in the acquiree and the goodwill acquired. SFAS 141R also establishes disclosure requirements to enable the evaluation of the nature and financial effects of the business combination. This statement is effective for us beginning January 1, 2009. We are currently evaluating the potential impact of the adoption of SFAS 141R on our consolidated financial position, results of operations and cash flows.

In December 2007, the FASB issued SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements—an amendment of Accounting Research Bulletin No. 51* ("SFAS 160"). SFAS 160 establishes accounting and reporting standards for ownership interests in subsidiaries held by parties other than the parent, the amount of consolidated net income attributable to the parent and to the noncontrolling interest, changes in a parent's ownership interest, and the valuation of retained noncontrolling equity investments when a subsidiary is deconsolidated. SFAS 160 also establishes disclosure requirements that clearly identify and distinguish between the interests of the parent and the interests of the noncontrolling owners. This statement is effective for us beginning January 1, 2009. We are currently evaluating the potential impact of the adoption of SFAS 160 on our consolidated financial position, results of operations and cash flows.

6

In February 2008, the FASB issued Financial Staff Positions ("FSP") FAS 157-2, *Effective Date of FASB Statement No. 157* ("FSP FAS 157-2"), which delays the effective date of SFAS No. 157, *Fair Value Measurement* ("SFAS 157"), for all nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on a recurring basis (at least annually). SFAS 157 establishes a framework for measuring fair value and expands disclosures about fair value measurements. FSP FAS 157-2 partially defers the effective date of SFAS 157 to fiscal years beginning after November 15, 2008, and interim periods within those fiscal years for items within the scope of this FSP. FSP FAS 157-2 is effective for us beginning January 1, 2009. We are currently evaluating the potential impact of the adoption of those provisions of SFAS 157, for which effectiveness was delayed by FSP SFAS 157-2, on our consolidated financial position and results of operations.

7

**Note 2. Net Income per Share of Class A and Class B common stock**

The following table sets forth the computation of basic and diluted net income per share of Class A and Class B common stock (in thousands, except per share amounts, unaudited):

| | For the Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2007 | | 2008 | |
| | (unaudited) | | | |
| | Class A | Class B | Class A | Class B |
| Basic net income per share: | | | | |
| Numerator: | | | | |
| Allocation of undistributed earnings | $ 740,449 | $261,713 | $ 989,006 | $318,080 |
| Denominator: | | | | |
| Weighted average common shares outstanding | 229,432 | 80,994 | 237,185 | 76,219 |
| Less: Weighted average unvested common shares subject to repurchase or cancellation | (894) | (217) | (256) | (19) |
| Number of shares used in per share computations | 228,538 | 80,777 | 236,929 | 76,200 |
| Basic net income per share | $ 3.24 | $ 3.24 | $ 4.17 | $ 4.17 |
| Diluted net income per share: | | | | |
| Numerator: | | | | |
| Allocation of undistributed earnings for basic computation | $ 740,449 | $261,713 | $ 989,006 | $318,080 |
| Reallocation of undistributed earnings as a result of conversion of Class B to Class A shares | 261,713 | — | 318,080 | — |
| Reallocation of undistributed earnings to Class B shares | — | (1,330) | — | (2,868) |
| Allocation of undistributed earnings | $1,002,162 | $260,383 | $1,307,086 | $315,212 |
| Denominator: | | | | |
| Number of shares used in basic computation | 228,538 | 80,777 | 236,929 | 76,200 |
| Weighted average effect of dilutive securities | | | | |
| Add: | | | | |
| Conversion of Class B to Class A common shares outstanding | 80,777 | — | 76,200 | — |
| Unvested common shares subject to repurchase or cancellation | 399 | 217 | 275 | 19 |
| Employee stock options including warrants issued under TSO program | 4,314 | 816 | 3,244 | 322 |
| Restricted shares and restricted stock units | 842 | — | 744 | — |
| Number of shares used in per share computations | 314,870 | 81,810 | 317,392 | 76,541 |
| Diluted net income per share | $ 3.18 | $ 3.18 | $ 4.12 | $ 4.12 |

The net income per share amounts are the same for Class A and Class B because the holders of each class are legally entitled to equal per share distributions whether through dividends or in liquidation.

**Note 3. Cash, Cash Equivalents and Marketable Securities**

Cash, cash equivalents and marketable securities consists of the following (in thousands):

|  | As of December 31, 2007 | As of March 31, 2008 (unaudited) |
|---|---|---|
| Cash and cash equivalents: |  |  |
| Cash | $ 2,869,528 | $ 2,775,402 |
| Cash equivalents: |  |  |
| U.S. government agencies | 110,272 | 576,870 |
| Municipal securities | 232,278 | 87,391 |
| Time deposits | 500,000 | 500,000 |
| Money market mutual funds | 2,369,515 | 2,580,086 |
| Total cash and cash equivalents | 6,081,593 | 6,519,749 |
| Marketable securities: |  |  |
| U.S. government notes | 475,781 | 86,679 |
| U.S. government agencies | 2,120,972 | 516,753 |
| Municipal securities | 4,991,564 | 4,491,167 |
| Time deposits | 500,000 | 500,000 |
| Auction rate preferred securities | 48,703 | 20,160 |
| Total marketable securities | 8,137,020 | 5,614,759 |
| Total cash, cash equivalents and marketable securities | $14,218,613 | $12,134,508 |

The following table summarizes unrealized gains and losses related to our investments in marketable securities designated as available-for-sale (in thousands):

| | As of December 31, 2007 | | | |
|---|---|---|---|---|
| | Adjusted Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| U.S. government notes | $ 472,040 | $ 3,745 | $ (4) | $ 475,781 |
| U.S. government agencies | 2,102,710 | 18,306 | (44) | 2,120,972 |
| Municipal securities | 4,975,587 | 16,308 | (331) | 4,991,564 |
| Time deposits | 500,000 | — | — | 500,000 |
| Auction rate preferred securities | 48,703 | — | — | 48,703 |
| Total marketable securities | $8,099,040 | $ 38,359 | $ (379) | $8,137,020 |

| | As of March 31, 2008 | | | |
|---|---|---|---|---|
| | Adjusted Cost | Gross Unrealized Gains | Gross Unrealized Losses (unaudited) | Fair Value |
| U.S. government notes | $ 86,712 | $ 87 | $ (120) | $ 86,679 |
| U.S. government agencies | 515,597 | 1,307 | (151) | 516,753 |
| Municipal securities | 4,462,630 | 42,422 | (13,885) | 4,491,167 |
| Time deposits | 500,000 | — | — | 500,000 |
| Auction rate preferred securities | 21,000 | — | (840) | 20,160 |
| Total marketable securities | $5,585,939 | $ 43,816 | $(14,996) | $5,614,759 |

9

Bank time deposits were held by institutions outside the U.S. at December 31, 2007 and at March 31, 2008.

Gross unrealized gains and losses on cash equivalents were not material at December 31, 2007 and March 31, 2008. We recognized gross realized gains of $50.8 million and losses of $4.2 million on our marketable securities during the three months ended March 31, 2008. Gross realized gains and losses were not material in the three months ended March 31, 2007. There were no other-than-temporary impairments to our marketable securities in the three months ended March 31, 2007 and 2008. Realized gains and losses are included in interest income and other, net in our accompanying Consolidated Statements of Income.

The following table summarizes the estimated fair value of our investments in marketable debt securities designated as available-for-sale classified by the contractual maturity date of the security (in thousands):

|  | As of December 31, 2007 | As of March 31, 2008 |
|---|---|---|
|  |  | (unaudited) |
| Due within 1 year | $1,964,325 | $1,216,282 |
| Due in 1 to 5 years | 3,359,472 | 2,591,340 |
| Due in 5 to 10 years | 310,332 | 202,496 |
| Due after 10 years | 2,454,188 | 1,584,481 |
| Total marketable debt securities | $8,088,317 | $5,594,599 |

In accordance with EITF 03-1, *The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments*, the following table shows gross unrealized losses and fair value for those investments that were in an unrealized loss position as of December 31, 2007 and March 31, 2008, aggregated by investment category and the length of time that individual securities have been in a continuous loss position (in thousands):

|  | As of December 31, 2007 | | | | | |
|---|---|---|---|---|---|---|
|  | Less than 12 Months | | 12 Months or Greater | | Total | |
| Security Description | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss |
| U.S. government notes | $ 30,525 | $ (4) | $ — | $ — | $ 30,525 | $ (4) |
| U.S. government agencies | 98,682 | (41) | 19,993 | (3) | 118,675 | (44) |
| Municipal securities | 270,708 | (227) | 54,832 | (104) | 325,540 | (331) |
| **Total** | $ 399,915 | $ (272) | $ 74,825 | $ (107) | $474,740 | $ (379) |

|  | As of March 31, 2008 | | | |
|---|---|---|---|---|
|  | Less than 12 Months | | Total | |
| Security Description | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss |
|  |  | (unaudited) |  |  |
| U.S. government notes | $ 50,407 | $ (120) | $ 50,407 | $ (120) |
| U.S. government agencies | 97,468 | (151) | 97,468 | (151) |
| Municipal securities | 930,934 | (13,885) | 930,934 | (13,885) |
| Auction rate preferred securities | 20,160 | (840) | 20,160 | (840) |
| **Total** | $1,098,969 | $(14,996) | $1,098,969 | $(14,996) |

As of March 31, 2008, we did not have any investments in marketable securities that were in an unrealized loss position for 12 months or greater.

*Auction Rate Securities*

At March 31, 2008, we held $259.6 million of auction rate securities which are included under municipal securities and auction rate preferred securities in the above table. The assets underlying these investments are primarily student loans which are

10

substantially guaranteed by the U.S. government. Historically, these securities have provided liquidity through a Dutch auction at pre-determined intervals every 7 to 49 days. However, these auctions began to fail in February 2008. As a result, these securities do not have a readily determinable market value and are not liquid. To determine their estimated fair values at March 31, 2008, we used a discounted cash flow model based on estimated interest rates over the period of time we expect to hold these securities. Based on this analysis, we recorded a temporary impairment of $10.8 million to accumulated other comprehensive income on the accompanying Consolidated Balance Sheet at March 31, 2008 (see Note 5).

To the extent we determine that any impairment is other-than-temporary, we would record a charge to earnings. Also, if we ever determine that it is likely that the auctions for the auction rate securities we hold will continue to fail over the next 12 months or more, we would then reclassify those securities to long-term assets from current assets on our Consolidated Balance Sheets.

## Note 4. Derivative Financial Instruments

We enter into foreign currency contracts with financial institutions to reduce the risk that our cash flows and earnings will be adversely affected by foreign currency exchange rate fluctuations. Our program is not designated for trading or speculative purposes.

In accordance with SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities* ("SFAS 133"), we recognize derivative instruments as either assets or liabilities on the balance sheet at fair value. Changes in the fair value (i.e., gains or losses) of the derivatives are recorded in the accompanying Consolidated Statement of Income as interest income and other, net, or as part of revenues, or on the accompanying Consolidated Balance Sheets as accumulated other comprehensive income.

### Cash Flow Hedges

We use a combination of forward contracts and options designated as cash flow hedges to hedge certain forecasted revenue transactions denominated in currencies other than the U.S. dollar. The gain or loss on the effective portion of a cash flow hedge is initially reported as a component of accumulated other comprehensive income and subsequently reclassified into revenues when the hedged exposure affects revenues or as interest income and other, net if the hedged transaction becomes probable of not occurring. Any gain or loss after a hedge is de-designated because it is no longer probable of occurring or related to an ineffective portion of a hedge, as well as any amount excluded from our assessment of hedge effectiveness, is recognized as interest income and other, net, immediately. These net gains or losses were not material in the quarter ended March 31, 2008.

The notional principal and fair value of foreign exchange contracts to purchase U.S. dollars with Canadian dollars were 154.5 million Canadian dollars (or approximately $151.4 million) and $3.0 million at March 31, 2008. These foreign exchange forward contracts and options have maturities of 18 months or less. There were no other foreign exchange contracts designated as cash flow hedges.

### Other Derivatives

Other derivatives not designated as hedging instruments under SFAS 133 consist primarily of forward contracts which we use to hedge intercompany balances and other monetary assets or liabilities denominated in currencies other than the local currency of a subsidiary. Gains and losses on these contracts are included in interest income and other, net, along with those of the related hedged items. Neither the cost nor the fair value of these foreign exchange contracts was material at March 31, 2008. The notional principal of foreign exchange contracts to purchase U.S. dollars with foreign currencies was $1.5 billion and $2.3 billion at December 31, 2007 and March 31, 2008. The notional principal of foreign exchange contracts to purchase Euros with other currencies was €296.5 million (or approximately $433.4 million) and €411.4 million (or approximately $651.1 million) at December 31, 2007 and March 31, 2008. The notional principal of foreign exchange contracts to sell Euros for Taiwanese dollars was €18.7 million (or approximately $29.6 million) at March 31, 2008.

## Note 5. Fair Value Measurements

Effective January 1, 2008, we adopted SFAS 157, except as it applies to the nonfinancial assets and nonfinancial liabilities subject to FSP SFAS 157-2. SFAS 157 clarifies that fair value is an exit price, representing the amount that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants. As such, fair value is a market-based measurement that should be determined based on assumptions that market participants would use in pricing an asset or a liability. As a basis for considering such assumptions, SFAS 157 establishes a three-tier value hierarchy, which prioritizes the inputs used in the valuation methodologies in measuring fair value:

11

**Level 1** - Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.

**Level 2** - Include other inputs that are directly or indirectly observable in the marketplace.

**Level 3** - Unobservable inputs which are supported by little or no market activity.

The fair value hierarchy also requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value.

In accordance with SFAS 157, we measure our cash equivalents, marketable securities and foreign currency derivative contracts at fair value. Our cash equivalents and marketable securities are primarily classified within Level 1 or Level 2, with the exception of our investments in auction rate securities. This is because our cash equivalents and marketable securities are valued primarily using quoted market prices or alternative pricing sources and models utilizing market observable inputs. Our investments in auction rate securities are classified within Level 3 because they are valued using a discounted cash flow model (see Note 3). Some of the inputs to this model are unobservable in the market and are significant. Our foreign currency derivative contracts are classified within Level 2 as the valuation inputs are based on quoted prices and market observable data of similar instruments in inactive markets.

Assets and liabilities measured at fair value are summarized below (unaudited, in thousands):

| | | Fair value measurement at reporting date using | | |
| Description | March, 31 2008 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash equivalents: | | | | |
| U.S. government agencies | $ 576,870 | $ — | $ 576,870 | $ — |
| Municipal securities | 87,391 | — | 87,391 | — |
| Time deposits | 500,000 | — | 500,000 | — |
| Money market mutual funds | 2,580,086 | 2,580,086 | — | — |
| Marketable securities: | | | | |
| U.S. government notes | 86,679 | — | 86,679 | — |
| U.S. government agencies | 516,753 | — | 516,753 | — |
| Municipal securities | 4,491,167 | — | 4,251,767 | 239,400 |
| Time deposits | 500,000 | — | 500,000 | — |
| Auction rate preferred securities | 20,160 | — | — | 20,160 |
| Foreign currency derivative contracts | 10,007 | — | 10,007 | — |
| **Total assets** | $9,369,113 | $ 2,580,086 | $ 6,529,467 | $ 259,560 |
| **Liabilities** | | | | |
| Foreign currency derivative contracts | $ 6,727 | $ — | $ 6,727 | $ — |
| **Total liabilities** | $ 6,727 | $ — | $ 6,727 | $ — |

The following table presents our assets measured at fair value using significant unobservable inputs (Level 3) as defined in SFAS 157 at March 31, 2008 (unaudited, in thousands):

| | Level 3 |
|---|---|
| Balance at December 31, 2007 | $ — |
| Transfers to Level 3 | 311,225 |
| Unrealized loss included in other comprehensive income | (10,815) |
| Net settlements | (40,850) |
| Balance at March 31, 2008 | $259,560 |

Effective January 1, 2008, we also adopted SFAS 159, *The Fair Value Option for Financial Assets and Financial Liabilities – including an Amendment of FASB Statement No. 115*, which allows an entity to choose to measure certain financial instruments and liabilities at fair value on a contract-by-contract basis. Subsequent fair value measurement for the financial instruments and liabilities an entity chooses to measure will be recognized in earnings. As of March 31, 2008, we did not elect such option for our financial instruments and liabilities.

## Note 6. Property and Equipment

Property and equipment consist of the following (in thousands):

|  | As of December 31, 2007 | As of March 31, 2008 |
|---|---|---|
|  |  | (unaudited) |
| Information technology assets | $2,734,916 | $3,090,650 |
| Construction in process | 1,364,651 | 1,810,637 |
| Land and buildings | 951,334 | 1,014,044 |
| Leasehold improvements | 416,884 | 455,410 |
| Furniture and fixtures | 52,127 | 60,112 |
| Total | 5,519,912 | 6,430,853 |
| Less accumulated depreciation and amortization | 1,480,651 | 1,689,129 |
| Property and equipment, net | $4,039,261 | $4,741,724 |

## Note 7. Acquisitions

In March 2008, we completed our acquisition of Click Holding Corp. ("DoubleClick"), a company that offers online ad serving and management technology to advertisers, ad agencies and web site publishers. We acquired DoubleClick primarily for their customer relationships, as well as patents and developed technology. This transaction was accounted for as a business combination. The total purchase price was $3.2 billion paid in cash, including transaction costs of $52.1 million. In addition, we issued unvested options to purchase 127,320 shares of Class A common stock valued at $50.6 million which will be recognized as stock-based compensation as the awards vest over the related vesting periods of up to 47 months. These unvested awards are earned contingent upon each individual's continued employment with us.

The preliminary allocation of the purchase price was based upon a preliminary valuation and our estimates and assumptions are subject to change. The primary areas of the purchase price allocation that are not yet finalized are related to restructuring costs, income taxes and residual goodwill. The following table summarizes the preliminary allocation of the purchase price of DoubleClick (unaudited, in thousands):

| | |
|---|---|
| Goodwill | $2,312,589 |
| Customer relationships | 637,200 |
| Patents and developed technology | 143,400 |
| Tradenames and other | 28,300 |
| Net assets acquired | 78,868 |
| Deferred tax assets | 312,202 |
| Deferred tax liabilities | (309,137) |
| Total | $3,203,422 |

Goodwill is not deductible for tax purposes.

Customer relationships have a weighted-average useful life of 6.7 years. Patents and developed technology have a weighted-average useful life of 5.0 years. Tradenames and other have a weighted-average useful life of 5.5 years. The majority of these assets are not deductible for tax purposes.

13

Supplemental information on an unaudited pro forma basis, as if the DoubleClick acquisition had been consummated at the beginning of each of the periods presented, is as follows (in millions, except per share amounts):

| | Three Months Ended March 31, | |
| | 2007 | 2008 |
| | (unaudited) | |
|---|---|---|
| Revenues | $3,739.4 | $5,255.3 |
| Net income | $ 983.3 | $1,269.5 |
| Net income per share of Class A and Class B common stock - diluted | $ 3.12 | $ 4.00 |

The unaudited pro forma supplemental information is based on estimates and assumptions, which we believe are reasonable. It is not necessarily indicative of our consolidated financial position or results of income in future periods or the results that actually would have been realized had we been a combined company as of the beginning of the periods presented. The unaudited pro forma supplemental information includes incremental intangible asset amortization and other charges as a result of the acquisition, net of the related tax effects.

In connection with certain acquisitions in the prior periods, we are obligated to make additional cash payments if certain criteria are met. As of March 31, 2008, our remaining contingent obligations related to these acquisitions was approximately $591 million. Since these contingent payments are based on the achievement of performance targets, actual payments may be substantially lower.

## Note 8. Goodwill and Other Intangible Assets

The changes in the carrying amount of goodwill for the three months ended March 31, 2008, are as follows (in thousands):

| | |
|---|---|
| Balance as of December 31, 2007 | $2,299,368 |
| Goodwill acquired | 2,313,623 |
| Goodwill adjustment | 178,408 |
| Balance as of March 31, 2008 | $4,791,399 |

The goodwill adjustment of $178.4 million was primarily a result of contingent payments earned upon the achievement of certain performance targets.

Information regarding our acquisition-related intangible assets that are being amortized is as follows (in thousands):

| | As of December 31, 2007 | | |
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Value |
|---|---|---|---|
| Patents and developed technology | $ 364,937 | $ 179,102 | $ 185,835 |
| Customer relationships | 171,876 | 37,738 | 134,138 |
| Tradenames and other | 196,392 | 69,769 | 126,623 |
| Total | $ 733,205 | $ 286,609 | $ 446,596 |

| | As of March 31, 2008 | | |
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Value |
| | | (unaudited) | |
|---|---|---|---|
| Patents and developed technology | $ 511,494 | $ 205,359 | $ 306,135 |
| Customer relationships | 809,076 | 55,169 | 753,907 |
| Tradenames and other | 225,148 | 81,218 | 143,930 |
| Total | $1,545,718 | $ 341,746 | $1,203,972 |

14

Amortization expense of acquisition-related intangible assets for the three months ended March 31, 2007 and 2008 was $36.3 million and $55.0 million. Expected amortization expense for acquisition-related intangible assets on our March 31, 2008 Consolidated Balance Sheet for the remainder of 2008 and each of the next five years and thereafter is as follows (unaudited, in thousands):

| | |
|---|---:|
| Remainder of 2008 | $ 222,220 |
| 2009 | 246,775 |
| 2010 | 215,871 |
| 2011 | 167,016 |
| 2012 | 129,730 |
| 2013 | 103,671 |
| Thereafter | 110,589 |
| | $1,195,872 |

## Note 9. Interest Income and Other, Net

The components of interest income and other, net were as follows (in thousands):

| | Three Months Ended March 31, | |
|---|---:|---:|
| | 2007 | 2008 |
| | (unaudited) | |
| Interest income | $130,475 | $122,003 |
| Interest expense | (342) | (387) |
| Realized gains on marketable securities, net | 8,053 | 46,571 |
| Other | (7,458) | (844) |
| Interest income and other, net | $130,728 | $167,343 |

## Note 10. Comprehensive Income

The changes in the components of other comprehensive income, net of taxes, were as follows (in thousands):

| | Three Months Ended March 31, | |
|---|---:|---:|
| | 2007 | 2008 |
| | (unaudited) | |
| Net income | $1,002,162 | $1,307,086 |
| Change in unrealized gains (losses) on marketable securities, net | 881 | (9,809) |
| Change in cumulative translation adjustment and other | 12,749 | 29,851 |
| Comprehensive income | $1,015,792 | $1,327,128 |

The components of accumulated other comprehensive income, net of taxes, were as follows (in thousands):

| | As of December 31, 2007 | As of March 31, 2008 |
|---|---:|---:|
| | | (unaudited) |
| Unrealized gains on marketable securities, net | $ 90,872 | $ 12,692 |
| Cumulative translation adjustment and other | 22,501 | 120,723 |
| Accumulated other comprehensive income | $ 113,373 | $133,415 |

## Note 11. Contingencies

### Legal Matters

Companies have filed trademark infringement and related claims against us over the display of ads in response to user queries that include trademark terms. The outcomes of these lawsuits have differed from jurisdiction to jurisdiction. Courts in France have held us liable for allowing advertisers to select certain trademarked terms as keywords. We are appealing those decisions. We were also subject to two lawsuits in Germany on similar matters where the courts held that we are not liable for the actions of our advertisers prior to notification of trademark rights. We are litigating or have recently litigated similar issues in other cases in the U.S., Australia, Austria, Brazil, China, France, Germany, Israel and Italy.

15

We have also had copyright claims filed against us alleging that features of certain of our products and services, including Google Web Search, Google News, Google Video, Google Image Search, Google Book Search and YouTube, infringe their rights. Adverse results in these lawsuits may include awards of substantial monetary damages, costly royalty or licensing agreements or orders preventing us from offering certain functionalities, and may also result in a change in our business practices, which could result in a loss of revenue for us or otherwise harm our business. In addition, any time one of our products or services links to or hosts material in which others allegedly own copyrights, we face the risk of being sued for copyright infringement or related claims. Because these products and services comprise the majority of our products and services, our business could be harmed in the event of an adverse result in any of these claims.

We have also experienced an increase in patent lawsuits filed against us alleging that certain of our products and services, including Google Web Search, Google AdWords, and Google AdSense, infringe another party's patents. Adverse results in these lawsuits may include awards of substantial monetary damages, obligations to pay licensing fees and/or orders preventing us from offering certain features, functionalities, products or services, which could result in a loss of revenue for us or otherwise harm our business.

We are also a party to other litigation and subject to claims incident to the ordinary course of business, including intellectual property claims (in addition to the trademark and copyright matters noted above), labor and employment claims, breach of contract claims, tax and other matters.

Although the results of litigation and claims cannot be predicted with certainty, we believe that the final outcome of the matters discussed above will not have a material adverse effect on our business, consolidated financial position, results of operations or cash flows.

*Income Taxes*

We are currently under audit by the Internal Revenue Service and various other tax authorities. We have reserved for potential adjustments to our provision for income taxes that may result from examinations by, or any negotiated agreements with, these tax authorities, and we believe that the final outcome of these examinations or agreements will not have a material effect on our results of operations. If events occur which indicate payment of these amounts is unnecessary, the reversal of the liabilities would result in the recognition of tax benefits in the period we determine the liabilities are no longer necessary. If our estimates of the federal, state, and foreign income tax liabilities are less than the ultimate assessment, a further charge to expense would result.

## Note 12. Stockholders' Equity

The following table presents the weighted-average assumptions used to estimate the fair values of the stock options granted in the periods presented:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2007 | 2008 |
| | (unaudited) | |
| Risk-free interest rate | 4.6% | 2.7% |
| Expected volatility | 30% | 35% |
| Expected life (in years) | 3.4 | 5.3 |
| Dividend yield | — | — |
| Weighted-average estimated fair value of options granted during the period | $130.77 | $269.79 |

The following table summarizes the activity for our options for the three months ended March 31, 2008:

| | Options Outstanding | | | |
| --- | --- | --- | --- | --- |
| | Number of Shares | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value (in millions) (1) |
| | (unaudited) | | | |
| Balance at December 31, 2007 | 12,892,886 | $ 333.62 | | |
| Options granted | 338,339 | $ 346.11 | | |
| Exercised(2) | (624,514) | $ 28.04 | | |
| Canceled/forfeited | (142,999) | $ 388.38 | | |
| Balance at March 31, 2008 | 12,463,712 | $ 345.49 | 7.3 | $ 1,162.0 |
| Vested and exercisable as of March 31, 2008 | 4,902,442 | $ 235.53 | 7.0 | $ 1,004.7 |
| Vested and exercisable as of March 31, 2008 and expected to vest thereafter (3) | 11,761,690 | $ 342.54 | 7.3 | $ 1,151.8 |

(1)  The aggregate intrinsic value is calculated as the difference between the exercise price of the underlying awards and the closing stock price of $440.47 of our Class A common stock on March 31, 2008.

16

(2)  Includes options vested during the period that were early exercised.

(3)  Options expected to vest reflect an estimated forfeiture rate.

The following table summarizes additional information regarding outstanding, exercisable and exercisable and vested stock options at March 31, 2008:

| Range of Exercise Prices | Options Outstanding | | | | | Options Exercisable | | Options Exercisable and Vested | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Number of Shares | Unvested Options Granted and Exercised Subsequent to March 21, 2002 | Number of Shares | Weighted-Average Remaining Life (Years) | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price |
| $ 0.30–94.80 | 2,147,822 | 228,029 | 1,919,793 | 5.6 | $ 21.12 | 1,757,476 | $ 19.01 | 1,185,220 | $ 18.46 |
| $117.84–$198.41 | 1,655,976 | | 1,655,976 | 5.5 | $176.43 | 1,100,627 | $175.12 | 1,100,514 | $175.12 |
| $205.96–$298.91 | 1,380,939 | | 1,380,939 | 6.2 | $274.48 | 808,224 | $274.09 | 808,170 | $274.09 |
| $300.97–$399.00 | 1,763,894 | | 1,763,894 | 6.7 | $329.63 | 930,789 | $326.92 | 930,506 | $326.90 |
| $401.78–$499.07 | 1,543,774 | | 1,543,774 | 8.3 | $450.09 | 468,924 | $440.47 | 468,783 | $440.48 |
| $500.00–594.05 | 3,710,417 | | 3,710,417 | 9.1 | $556.54 | 409,112 | $507.95 | 409,112 | $507.95 |
| $615.95–$699.35 | 208,207 | | 208,207 | 9.7 | $655.41 | 95 | $664.72 | 95 | $664.72 |
| $707.00–$732.94 | 52,683 | | 52,683 | 9.6 | $718.17 | 42 | $707.00 | 42 | $707.00 |
| $ 0.30–$732.94 | 12,463,712 | 228,029 | 12,235,683 | 7.3 | $345.49 | 5,475,289 | $213.03 | 4,902,442 | $235.53 |

Options outstanding at March 31, 2008 in the above tables include 228,029 options granted and exercised subsequent to March 21, 2002 that are unvested at March 31, 2008, in accordance with EITF Issue No. 00-23, *Issues Related to Accounting for Stock Compensation Under APB Opinion No. 25 and FASB Interpretation No. 44*. However, the computations of the weighted-average exercise prices, weighted-average remaining contractual term and aggregate intrinsic value do not consider these unvested shares. Further, the above tables include 990,799 warrants held by financial institutions that were options purchased from employees under our TSO program.

The total grant date fair value of stock options vested during the three months ended March 31, 2008 was $161.0 million. The aggregate intrinsic value of all options exercised during the period was $228.3 million. These amounts do not include the aggregate sales price of options sold under the TSO program.

During the three months ended March 31, 2008, the number of shares underlying TSOs sold to selected financial institutions under the TSO program was 66,400 at a total value of $16.0 million, or an average of $241.26 per share, and an average premium of $41.52 per share. The premium is calculated as the difference between (a) the sale price of the TSO and (b) the intrinsic value of the TSO, which we define as the excess, if any, of the price of our Class A common stock at the time of the sale over the exercise price of the TSO. At March 31, 2008, the number of options eligible for participation under the TSO program was 8.7 million.

As of March 31, 2008, there was $1,078.5 million of unrecognized compensation cost related to outstanding employee stock options, net of forecasted forfeitures. This amount is expected to be recognized over a weighted average period of 2.8 years. To the extent the forfeiture rate is different from what we have anticipated, stock-based compensation related to these awards will be different from our expectations.

17

The following table summarizes the activity for our unvested restricted stock units and restricted shares for the three months ended March 31, 2008:

| | Unvested Restricted Stock Units and Restricted Shares | | |
|---|---|---|---|
| | Number of Shares | | Weighted-Average Grant-Date Fair Value |
| | (unaudited) | | |
| Unvested at December 31, 2007 | 2,990,222 | $ | 526.92 |
| Granted | 981,483 | $ | 467.42 |
| Vested | (187,113) | $ | 417.49 |
| Forfeited | (125,709) | $ | 508.93 |
| Unvested at March 31, 2008 | 3,658,883 | $ | 516.34 |
| Expected to vest after March 31, 2008 (1) | 3,421,056 | $ | 516.34 |

(1)  Restricted stock units and restricted shares expected to vest reflect an estimated forfeiture rate.

As of March 31, 2008, there was $1,586.3 million of unrecognized compensation cost related to employee unvested restricted stock units and restricted shares, net of forecasted forfeitures. This amount is expected to be recognized over a weighted average period of 3.4 years. To the extent the actual forfeiture rate is different from what we have anticipated, stock-based compensation related to these awards will be different from our expectations.

## Note 13. Income Taxes

We are subject to income taxes in the U.S. and numerous foreign jurisdictions. Significant judgment is required in evaluating our uncertain tax positions and determining our provision for income taxes. Financial Standards Accounting Board Interpretation No. 48, *Accounting for Uncertainty in Income Taxes* (FIN 48) clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with SFAS No. 109, *Accounting for Income Taxes,* and prescribes a recognition threshold of more-likely-than-not to be sustained upon examination. Our total unrecognized tax benefits as of December 31, 2007 and March 31, 2008 were $387.2 million and $524.5 million. Also, our total unrecognized tax benefits that, if recognized, would affect our effective tax rate were $283.5 million and $387.2 million as of December 31, 2007 and March 31, 2008, respectively. The increase in our unrecognized tax benefits during the three months ended March 31, 2008 was primarily related to uncertain tax positions on our international structure.

## Note 14. Information about Geographic Areas

Our chief operating decision-makers (i.e., our chief executive officer, his direct reports and our presidents) review financial information presented on a consolidated basis, accompanied by disaggregated information about revenues by geographic region for purposes of allocating resources and evaluating financial performance. There are no segment managers who are held accountable by our chief operating decision-makers, or anyone else, for operations, operating results and planning for levels or components below the consolidated unit level. Accordingly, we consider ourselves to be in a single reporting segment and operating unit structure.

Revenues by geography are based on the billing addresses of the advertisers. The following table sets forth revenues and long-lived assets by geographic area (in thousands):

| | Three Months Ended | | |
|---|---|---|---|
| | March 31, 2007 | December 31, 2007 | March 31, 2008 |
| | | (Unaudited) | |
| Revenues: | | | |
| United States | $1,958,382 | $2,505,888 | $2,535,474 |
| United Kingdom | 578,359 | 692,027 | 802,973 |
| Rest of the world | 1,127,230 | 1,628,764 | 1,847,596 |
| Total revenues | $3,663,971 | $4,826,679 | $5,186,043 |

|  | As of December 31, 2007 | As of March 31, 2008 |
|---|---|---|
|  |  | (unaudited) |
| Long-lived assets: |  |  |
| United States | $7,334,877 | $11,231,085 |
| International | 711,791 | 908,966 |
| Total long-lived assets | $8,046,668 | $12,140,051 |

**Note 15. Subsequent Event**

In May 2008, Clearwire Corporation and Sprint Nextel Corporation agreed to combine certain businesses to form a wireless communication company, the new Clearwire. In addition, certain other companies have collectively agreed to contribute $3.2 billion in cash to the new Clearwire or its subsidiary, including $500 million from us. The completion of this transaction is subject to customary closing conditions. We expect the transaction to close during the second half of 2008.

This investment will be a marketable equity security and will be classified and accounted for as available for sale. As a result, it will be carried at fair value, with unrealized gains and losses, net of taxes, reported as a component of stockholders' equity, except for unrealized losses determined to be other than temporary which will be recorded as interest income and other, net, in accordance with our policy and FSP Nos. FAS 115-1 and FAS 124-1, *The Meaning of Other-Than-Temporary Impairment and its Application to Certain Investments.*

## ITEM 2.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*In addition to historical information, this report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These statements include, among other things, statements concerning our expectations:*

- *regarding the growth and growth rate of our operations, business, revenues, operating margins, costs and expenses;*
- *that seasonal fluctuations in internet usage and traditional advertising seasonality are likely to affect our business;*
- *that growth in advertising revenues from our web sites will continue to exceed that from our Google Network members' web sites;*
- *regarding our future stock-based compensation charges including charges related to our TSO program;*
- *regarding our dilution related to all equity grants to employees;*
- *regarding the steps we take to improve the relevance of the ads we deliver;*
- *regarding our actions to reduce the number of accidental clicks;*
- *that we will continue to make significant capital expenditure investments;*
- *that the growth rate of our costs and expenses may exceed the growth rate of our revenues;*
- *that our cost of revenues and traffic acquisition costs may increase in dollars and as a percentage of revenues;*
- *regarding the increase of research and development, sales and marketing and general and administrative expenses in the future;*
- *regarding quarterly fluctuations in paid clicks;*
- *that we will continue to make investments and acquisitions;*
- *regarding the sufficiency of our existing cash, cash equivalents, marketable securities and cash generated from operations;*
- *regarding quarterly fluctuations in our effective tax rate;*
- *regarding continued investments in international markets;*
- *regarding the expected closing date of our proposed investment in Clearwire;*

*as well as other statements regarding our future operations, financial condition and prospects and business strategies. These forward-looking statements are subject to certain risks and uncertainties that could cause our actual results to differ materially from those reflected in the forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those discussed in this report, and in particular, the risks discussed under the heading "Risk Factors" in Part II, Item 1A of this report and those discussed in other documents we file with the Securities and Exchange Commission. We undertake no obligation to revise or publicly release the results of any revision to these forward-looking statements. Given these risks and uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements.*

The following discussion and analysis of our financial condition and results of operations should be read together with our Consolidated Financial Statements and related notes included elsewhere in this report.

### Overview

Google is a global technology leader focused on improving the ways people connect with information. Our innovations in web search and advertising have made our web site a top internet destination and our brand one of the most recognized in the world. Our mission is to organize the world's information and make it universally accessible and useful. We serve three primary constituencies:

- *Users.* We provide users with products and services that enable people to more quickly and easily find, create and organize information that is useful to them.
- *Advertisers.* We provide advertisers with cost-effective ways to deliver online ads, as well as ads on offline media such as TV, print and radio, to customers across Google sites and through the Google Network, which is the network of online and offline third parties that use our advertising programs to deliver relevant ads with their search results and content. These advertising programs provide advertisers with a cost-effective way to deliver ads to customers across Google sites and through the Google Network, which is the network of online and offline third parties that use our advertising programs to deliver relevant ads with the search results and content they provide.

• *Google Network Members and Other Content Providers.* We provide the online and offline members of our Google Network with our Google AdSense programs. These include programs through which we distribute our advertisers' AdWords ads for display on the web sites of our Google Network members as well as programs to deliver audio ads on radio broadcasts, print ads for display in newspapers and magazines, and ads on television. We share most of the fees these ads generate with our Google Network members, thereby creating an important revenue stream for them. In addition, we have entered into arrangements with other content providers under which we distribute or license their video and other content, and we may display ads next to or as part of this content on the pages of our web sites and our Google Network members' web sites. We share most of the fees these ads generate with these content providers and our Google Network members, thereby creating an important revenue stream for these partners.

## How We Generate Revenue

Advertising revenues made up 98% of our revenues for the three months ended March 31, 2008 and 99% for the three months ended March 31, 2007. We derive the balance of our revenues from the license of our web search technology, the license of our search solutions to enterprises and the sale and license of other products and services.

Google AdWords is our automated online program that enables advertisers to place targeted text-based and display ads on our web sites and the web sites of our Google Network members. Most of our AdWords customers pay us on a cost-per-click basis, which means that an advertiser pays us only when a user clicks on one of its ads. We also offer AdWords on a cost-per-impression basis that enables advertisers to pay us based on the number of times their ads appear on Google Network members' sites specified by the advertiser. For advertisers using our AdWords cost-per-click pricing, we recognize as revenue the fees charged advertisers each time a user clicks on one of the ads that appears next to the search results on our web sites or next to the search results or content on Google Network members' sites. For advertisers using our AdWords cost-per-impression pricing, we recognize as revenue the fees charged advertisers each time their ads are displayed on the Google Network members' sites. Our AdWords agreements are generally terminable at any time by our advertisers.

Google AdSense refers to the online and offline programs through which we distribute our advertisers' AdWords ads for display on the web sites of our Google Network members as well as programs to deliver audio ads on radio broadcasts, print ads for display in newspapers and magazines, and ads on television broadcasts. Our AdSense programs include AdSense for search and AdSense for content.

AdSense for search is our online service for distributing relevant ads from our advertisers for display with search results on our Google Network members' sites. To use AdSense for search, most of our AdSense for search partners add Google search functionality to their web pages in the form of customizable Google search boxes. When visitors of these web sites search either the web site or the internet using these customizable search boxes, we display relevant ads on the search results pages, targeted to match user search queries. Ads shown through AdSense for search are generally text ads.

AdSense for content is our online service for distributing ads from our advertisers that are relevant to content on our Google Network members' sites. Under this program, we use automated technology to analyze the meaning of the content on the web site and serve relevant ads based on the meaning of such content. For example, a web page on an automotive blog that contains an entry about vintage cars might display ads for vintage car parts or vintage car shows. These ads are displayed in spaces that our AdSense for content partners have set aside on their web sites for our AdWords content. AdSense for content allows a variety of ad types to be shown, including text ads, image ads, Google Video Ads, link units (which are sets of clickable links to topic pages related to page content), themed units (which are regular text ads with graphic treatments that change seasonally and by geography) and gadget ads (which are customized "mini-sites" that run as ads on AdSense publisher web sites).

For our online AdSense program, our advertisers pay us a fee each time a user clicks on one of our advertisers' ads displayed on Google Network members' web sites or, for those advertisers who choose our cost-per-impression pricing, as their ads are displayed. To date, we have paid most of these advertiser fees to the members of the Google Network, and we expect to continue doing so for the foreseeable future. We recognize these advertiser fees as revenue and the portion of the advertiser fee we pay to our Google Network members as traffic acquisition costs under cost of revenues. In some cases, we guarantee our Google Network members minimum revenue share payments based on their achieving defined performance terms, such as number of search queries or advertisements displayed. Members of the Google Network do not pay any fees associated with the use of our AdSense program on their web sites.

Our agreements with Google Network members consist largely of uniform online "click-wrap" agreements that members enter into by interacting with our registration web sites. The standard agreements have no stated term and are terminable at will. Agreements with our larger members are individually negotiated. Both the standard agreements and the negotiated agreements contain provisions requiring us to share with the Google Network member most of the advertiser fees generated by users clicking on ads on the Google Network member's web site or, for advertisers who choose our cost-per-impression pricing, as the ads are displayed on the Google Network member's web site.

21

We have entered into arrangements with certain content providers under which we distribute or license their video and other content. In a number of these arrangements we display ads on the pages of our web sites and our Google Network members' web sites from which the content is viewed and share most of the fees these ads generate with the content providers and Google Network members. We recognize these advertiser fees as revenue and the portion of the advertiser fee we pay to our content providers as content acquisition costs under cost of revenues. In some cases, we guarantee our content providers minimum revenue share or other payments.

Our agreements with content providers are typically standard agreements with no stated term and are terminable at will. Agreements with our larger members are individually negotiated. Both the standard agreements and the negotiated agreements contain provisions requiring us to pay the content providers for the content we license or share, and the content providers receive most of the advertiser fees generated by ads displayed on our web sites and our Google Network members' web sites.

We also distribute our advertisers' ads for publication in print media through our Google Print Ads program, and we recognize as revenue the fees charged advertisers when their ads are published in print media. Additionally, we distribute advertisers' audio ads for broadcast in radio programs through our Google Audio Ads program, and we recognize as revenue the fees charged advertisers each time an ad is broadcasted or a listener responds to that ad.

In the fourth quarter of 2006, we acquired YouTube, a consumer media company for people to watch and share videos worldwide through the web. We recognize as revenue the fees charged advertisers each time an ad or a promoted video is displayed on the YouTube site.

In the second quarter of 2007, we began delivering Google TV ads to viewers and helping advertisers, operators and programmers buy, schedule, deliver and measure ads on television. We recognize as revenue the fees charged advertisers each time an ad is displayed on TV in accordance with the terms of the related agreements.

We believe the factors that influence the success of our advertising programs include the following:

- The relevance, objectivity and quality of our search results.

- The number and type of searches initiated at our web sites.

- The number and type of searches initiated at, as well as the number of visits to and the content of, our Google Network members' web sites.

- The advertisers' return on investment (ad cost per sale or cost per conversion) from advertising campaigns on our web sites or our Google Network members' web sites or other media compared to other forms of advertising.

- The number of advertisers and the breadth of items advertised.

- The total and per click or per impression advertising spending budgets of each advertiser.

- The amount we ultimately pay our Google Network members and our content providers for traffic and content compared to the amount of revenue we generate.

- The monetization of (or generation of revenue from) traffic on our web sites and our Google Network members' web sites.

We believe that the monetization of traffic on our web sites, and our Google Network members' web sites is affected by the following factors:

- The relevance and quality of ads displayed with each search results page on our web sites and our Google Network members' web sites, as well as with each content page on our Google Network members' web sites, including the relevance and quality of an ad's "landing page" or page a user views after an ad is clicked.

- The number and prominence of ads displayed, if any, with each search results page on our web sites and our Google Network members' web sites, as well as with each content page on our Google Network members' web sites.

- The rate at which our users and users of our Google Network members' web sites click on advertisements.

- Our minimum fee per click.

**Trends in Our Business**

Our business has grown rapidly since inception, resulting in substantially increased revenues, and we expect that our business will continue to grow. However, our revenue growth rate has generally declined over time, and we expect it will continue to do so as a result of increasing competition and the difficulty of maintaining growth rates as our revenues increase to higher levels. In addition, the main focus of our advertising programs is to provide relevant and useful advertising to our users, reflecting our commitment to constantly improve their overall web experience. As a result, we may continue to take steps to improve the relevance of the ads displayed on our web sites and our Google Network members' web sites. These steps include removing ads that generate low click-

through rates or that send users to irrelevant or otherwise low quality sites and terminating Google Network members whose web sites do not meet our quality requirements. In addition, we may continue to take steps to reduce the number of accidental clicks. These steps could negatively affect our near-term advertising revenues.

Both seasonal fluctuations in internet usage and traditional retail seasonality have affected, and are likely to continue to affect, our business. Internet usage generally slows during the summer months, and commercial queries typically increase significantly in the fourth quarter of each year. These seasonal trends have caused and will likely continue to cause, fluctuations in our quarterly results, including fluctuations in sequential revenue and paid click growth rates.

From the inception of the Google Network in 2002 through the first quarter of 2004, the growth in advertising revenues from our Google Network members' web sites exceeded that from our web sites, which had a negative impact on our operating margins. The operating margin we realize on revenues generated from ads placed on our Google Network members' web sites through our AdSense program is significantly lower than the operating margin we realize from revenues generated from ads placed on our web sites because most of the advertiser fees from ads served on Google Network member web sites are shared with our Google Network members. However, beginning in the second quarter of 2004, growth in advertising revenues from our web sites has exceeded that from our Google Network members' web sites. This trend has had a positive impact on our operating margins, and we expect that this will continue for the foreseeable future, although the relative rate of growth in revenues from our web sites compared to the rate of growth in revenues from our Google Network members' web sites may vary over time.

We are heavily investing in building the necessary employee and systems infrastructures required to manage our growth and develop and promote our products and services, and this may cause our operating margins to decrease. We have experienced and expect to continue to experience substantial growth in our operations as we build our research and development programs, expand our base of users, advertisers, Google Network members and content providers and increase our presence in international markets. Also, we have acquired and expect to continue to acquire businesses and other assets from time to time. These acquisitions generally enhance the breadth and depth of our expertise in engineering and other functional areas, our technologies and our product offerings. In addition, we are incurring significant costs and expenses to support our Google Checkout product and promote its adoption by merchants and consumers, as well as promote the distribution of certain other products, including the Google Toolbar. Our full-time employee headcount has significantly increased over the last 12 months, growing from 12,238 at March 31, 2007 to 19,156 at March 31, 2008, including approximately 1,500 new employees as a result of our acquisition of DoubleClick. We also utilize a significant number of temporary employees. We also expect to continue to make significant capital expenditure investments in, among other things, information and technology infrastructure and corporate facilities. In April 2007, we launched our TSO program. We modified employee options at that time to allow them to participate in this program, and as a result we incurred a modification charge of approximately $104 million through March 31, 2008 related to vested options, and we expect to incur an additional modification charge of approximately $125 million related to unvested options over their remaining vesting periods through the second quarter of 2011. In addition, the fair value of each option granted under the TSO program will be greater than it would have been otherwise because of a longer expected life, resulting in more stock-based compensation per option. As a result of all of the above, the growth rate of our costs and expenses may exceed the growth rate of our revenues.

We expect our cost of revenues to continue to increase in dollars and may increase as a percentage of revenues in 2008 and in future periods, primarily as a result of forecasted increases in traffic acquisition costs, data center costs and credit card and other transaction fees, including transaction processing fees related to Google Checkout, as well as content acquisition costs. In particular, traffic acquisition costs as a percentage of advertising revenues may increase in the future if we are unable to continue to improve the monetization of traffic on our web sites and our Google Network members' web sites, particularly with those members to whom we have guaranteed minimum revenue share payments.

Our international revenues grew as a percentage of our total revenues to 51% in the three months ended March 31, 2008 from 48% in the three months ended December 31, 2007 and from 47% in the three months ended March 31, 2007. This increase in the portion of our revenues derived from international markets results largely from increased acceptance of our advertising programs, increases in our direct sales resources and customer support operations and our continued progress in developing localized versions of our products in these international markets, as well as an increase in the value of the Euro, the British pound and other foreign currencies compared to the U.S. dollar over these periods. The increase in the proportion of international revenues derived from international markets increases our exposure to fluctuations in foreign currency to U.S. dollar exchange rates.

**Results of Operations**

The following table presents our historical operating results as a percentage of revenues for the periods indicated (unaudited):

23

**Consolidated Statements of Income Data:**

| | Three Months Ended | | |
|---|---|---|---|
| | March 31, 2007 | December 31, 2007 | March 31, 2008 |
| Revenues | 100.0% | 100.0% | 100.0% |
| Costs and expenses: | | | |
| Cost of revenues | 40.1 | 40.5 | 40.7 |
| Research and development | 11.1 | 13.1 | 13.0 |
| Sales and marketing | 8.3 | 8.8 | 8.6 |
| General and administrative | 7.2 | 7.8 | 7.9 |
| Total costs and expenses | 66.7 | 70.2 | 70.2 |
| Income from operations | 33.3 | 29.8 | 29.8 |
| Interest income and other, net | 3.6 | 3.5 | 3.2 |
| Income before income taxes | 36.9 | 33.3 | 33.0 |
| Provision for income taxes | 9.5 | 8.3 | 7.8 |
| Net income | 27.4% | 25.0% | 25.2% |

**Revenues**

The following table presents our revenues, by revenue source, for the periods presented (in millions, unaudited):

| | Three Months Ended | | |
|---|---|---|---|
| | March 31, 2007 | December 31, 2007 | March 31, 2008 |
| Advertising revenues: | | | |
| Google web sites | $2,282.1 | $ 3,121.6 | $3,400.4 |
| Google Network web sites | 1,345.4 | 1,635.8 | 1,686.1 |
| Total advertising revenues | 3,627.5 | 4,757.4 | 5,086.5 |
| Licensing and other revenues | 36.5 | 69.3 | 99.5 |
| Revenues | $3,664.0 | $ 4,826.7 | $5,186.0 |

24

The following table presents our revenues, by revenue source, as a percentage of total revenues for the periods presented (unaudited):

| | Three Months Ended | | |
| --- | --- | --- | --- |
| | March 31, 2007 | December, 31, 2007 | March 31, 2008 |
| Advertising revenues: | | | |
| Google web sites | 62% | 65% | 66% |
| Google Network web sites | 37 | 34 | 32 |
| Total advertising revenues | 99 | 99 | 98 |
| *Google web sites as % of advertising revenues* | 63 | 66 | 67 |
| *Google Network web sites as % of advertising revenues* | 37 | 34 | 33 |
| Licensing and other revenues | 1% | 1% | 2% |

Growth in our revenues in the three months ended March 31, 2008 compared to the three months ended December 31, 2007 resulted primarily from growth in advertising revenues for Google web sites, and to a lesser extent, Google Network web sites. Our advertising revenue growth for Google web sites and Google Network web sites resulted primarily from an increase in the total number of paid clicks and ads displayed through our programs, rather than from changes in the average fees paid by our advertisers. The increase in the number of paid clicks and ads displayed through our programs was due to an increase in aggregate traffic on our web sites, certain monetization improvements and the continued global expansion of our products, our advertiser base and our user base, as well as an increase in the number of Google Network members and distribution partners.

Growth in our revenues in the three months ended March 31, 2008 compared to the three months ended March 31, 2007 resulted primarily from growth in advertising revenues for Google web sites and Google Network web sites. Our advertising revenue growth for Google web sites and Google Network web sites resulted primarily from increases in the total number of paid clicks and ads displayed through our programs, rather than from changes in the average fees paid by our advertisers. The increase in the number of paid clicks and ads displayed through our programs was due to an increase in aggregate traffic on both our web sites and those of our Google Network members, certain improvements in the monetization of increased traffic on our web sites and our Google Network member sites, the continued global expansion of our products, our advertiser base and our user base, and an increase in the number of Google Network members and distribution partners.

Improvements in our ability to ultimately monetize this increased traffic primarily relate to enhancing the end user experience, including providing end users with ads that are more relevant to their search queries or to the content on the Google Network members' sites they visit. These improvements have included, for instance, a change to the formula used to determine which ads appear at the top of our search results pages, a change to consider not only a user's current search query, but also their immediately preceding query, to determine the ads displayed on our search results pages, and a change to the clickable area around our AdSense for content text-based ads to only the title and URL to reduce the number of accidental clicks.

Our sequential quarterly revenue growth rate decreased from 14.1% for the three months ended December 31, 2007, to 7.5% for the three months ended March 31, 2008.

The sequential quarterly revenue growth rate from Google web sites decreased from 14.1% for the three months ended December 31, 2007, to 8.9% for the three months ended March 31, 2008. The sequential quarterly revenue growth rate from our Google Network members' web sites decreased from 12.5% for the three months ended December 31, 2007, to 3.1% for the three months ended March 31, 2008. These decreases in the sequential quarterly revenue growth rates are primarily the result of our higher revenue levels and seasonal slowdowns in internet usage and commercial queries. In addition, during the three months ended March 31, 2008, we terminated relationships with certain Google Network members who did not comply with our AdSense policies, which adversely affected our revenues. The sequential quarterly revenue growth from our web sites has been greater than that from our Google Network members' web sites primarily as a result of a greater increase in the total number of paid clicks on our web sites, which was largely due to higher traffic growth and monetization improvements. We expect that our revenue growth rates will generally decline in the future as a result of increasing competition and the difficulty of maintaining growth rates as our revenues increase to higher levels.

Aggregate paid clicks on our web sites and our Google Network members' web sites increased approximately 4% from the three months ended December 31, 2007 to the three months ended March 31, 2008, and increased approximately 20% from the three months ended March 31, 2007 to the three months ended March 31, 2008. In general, the increase in paid clicks has historically correlated with increases in our revenues. However, the rate of increase in paid clicks, and its correlation with the rate of increase in revenues, may fluctuate from quarter to quarter based on various factors including seasonality, advertiser competition for keywords

25

and the revenue growth rates on our web sites compared to those of our Google Network members. In addition, traffic growth in emerging markets compared to more mature markets and across various advertising verticals also contributes to these fluctuations.

We believe that the increase in the number of paid clicks and ads displayed through our programs is substantially the result of our commitment to improving the relevance and quality of both our search results and the advertisements displayed, which we believe results in a better user experience, which in turn results in more searches, advertisers, and Google Network members and other partners. Revenues realized through the Google Print Ads Program, Google Audio Ads, Google TV Ads, Google Checkout, YouTube, Postini and DoubleClick were not material in any of the periods presented.

**Revenues by Geography**

Domestic and international revenues as a percentage of consolidated revenues, determined based on the billing addresses of our advertisers, are set forth below (unaudited):

| | Three Months Ended | | |
|---|---|---|---|
| | March 31, 2007 | December 31, 2007 | March 31, 2008 |
| | | (unaudited) | |
| United States | 53% | 52% | 49% |
| United Kingdom | 16% | 14% | 15% |
| Rest of the world | 31% | 34% | 36% |

The growth in international revenues in the three months ended March 31, 2008 compared to the three months ended December 31, 2007 and the three months ended March 31, 2007 resulted largely from increased acceptance of our advertising programs, increases in our direct sales resources and customer support operations in international markets and our continued progress in developing localized versions of our products for these international markets. Furthermore, the growth in international revenues from the three months ended December 31, 2007 to the three months ended March 31, 2008 resulted from seasonally stronger traffic and monetization in certain advertising verticals, such as travel and finance in the United Kingdom and certain other countries compared to the U.S.

In addition, the weakening of the U.S. dollar relative to other foreign currencies (primarily the Euro and the British pound) in the three months ended March 31, 2008 compared to the three months ended December 31, 2007 had a favorable impact on our international revenues, which increased $329.8 million. Had foreign exchange rates remained constant in these periods, our total revenues would have been approximately $18.1 million, or 0.3%, lower. The weakening of the U.S. dollar relative to other foreign currencies (primarily the Euro and the British pound) in the three months ended March 31, 2008 compared to the three months ended March 31, 2007 had a favorable impact on our international revenues, which increased $945.0 million. Had foreign exchange rates remained constant in these periods, our total revenues would have been approximately $202.0 million, or 3.9%, lower.

Although we expect to continue to make investments in international markets, they may not result in an increase in our international revenues as a percentage of total revenues in 2008 or thereafter. See Note 14 of Notes to Consolidated Financial Statements included as part of this Form 10-Q for additional information about geographic areas.

**Costs and Expenses**

*Cost of Revenues.*

Cost of revenues consists primarily of traffic acquisition costs. Traffic acquisition costs consist of amounts ultimately paid to our Google Network members under AdSense arrangements and to certain other partners (our "distribution partners") who distribute our toolbar and other products (collectively referred to as "access points") or otherwise direct search queries to our web site (collectively referred to as "distribution arrangements"). These amounts are primarily based on the revenue share arrangements with our Google Network members and distribution partners. Certain distribution arrangements require us to pay our partners based on a fee per access point delivered and not exclusively—or at all—based on revenue share. The fees are paid when the access points are delivered or based on revenue share and are non-refundable. Further, the arrangements are terminable at will, although under the terms of certain contracts we or our distribution partners may be subject to penalties in the event of early termination. We recognize fees under these arrangements over the estimated useful lives of the access points (two years) to the extent we can reasonably estimate those lives and they are longer than one year, or based on any contractual revenue share, if greater. Otherwise, the fees are charged to expense as incurred. The estimated useful life of the access points is based on the historical average period of time they generate traffic and revenue.

In addition, certain AdSense agreements obligate us to make guaranteed minimum revenue share payments to Google Network members based on their achieving defined performance terms, such as number of search queries or advertisements displayed. These fees may be paid in advance or in arrears and are non-refundable but are subject to adjustment based on the achievement of the

26

defined performance terms. In addition, the arrangements are terminable at will, although under the terms of certain contracts we or our Google Network members may be subject to penalties in the event of early termination. To the extent we expect revenues generated under an arrangement to exceed the guaranteed minimum revenue share payments, we recognize traffic acquisition costs on a contractual revenue share basis or on a basis proportionate to forecasted revenues, whichever is greater. Otherwise, we recognize the guaranteed revenue share payments as traffic acquisition costs on a straight-line basis over the term of the related agreements. In addition, concurrent with the commencement of a small number of AdSense and other agreements, we have purchased certain items from, or provided other consideration to, our Google Network members and partners. We have determined that certain of these amounts are prepaid traffic acquisition costs and are amortized on a straight-line basis over the terms of the related agreements.

Cost of revenues also includes the expenses associated with the operation of our data centers, including depreciation, labor, energy and bandwidth costs, credit card and other transaction fees related to processing customer transactions as well as content acquisition costs. We have entered into arrangements with certain content providers under which we distribute or license their video and other content. In a number of these arrangements we display ads on the pages of our web sites and our Google Network members' web sites from which the content is viewed and share most of the fees these ads generate with the content providers and the Google Network members. To the extent we are obligated to make guaranteed minimum revenue share or other payments to our content providers, we recognize content acquisition costs equal to the greater of the following three amounts: the contractual revenue share amount, if any, based on the number of times the content is displayed, or on a straight-line basis over the terms of the agreements. The following tables present our cost of revenues and cost of revenues as a percentage of revenues, and our traffic acquisition costs and traffic acquisition costs as a percentage of advertising revenues for the periods presented (dollars in millions, unaudited):

| | Three Months Ended | | |
| | March 31, 2007 | December 31, 2007 | March 31, 2008 |
| | | (unaudited) | |
|---|---|---|---|
| Cost of revenues | $1,470.4 | $  1,955.8 | $2,110.5 |
| Cost of revenues as a percentage of revenues | 40.7% | 40.5% | 40.7% |

| | Three Months Ended | | |
| | March 31, 2007 | December 31, 2007 | March 31, 2008 |
|---|---|---|---|
| Traffic acquisition costs | $1,125.0 | $  1,439.8 | $1,486.4 |
| Traffic acquisition costs as a percentage of advertising revenues | 31.0% | 30.3% | 29.2% |

Cost of revenues increased $154.7 million from the three months ended December 31, 2007 to the three months ended March 31, 2008. There was an increase in data center costs of $66.0 million primarily as a result of the depreciation of additional information technology assets and data center buildings as well as additional personnel required to manage the data centers. Over this same period there was an increase in traffic acquisition costs of $46.6 million, which includes an increase of $17.9 million in fees related to distribution arrangements. In addition, there was an increase in content acquisition costs of $27.0 million and an increase in amortization of intangible assets of $10.0 million primarily as a result of our acquisition of DoubleClick. The decrease in traffic acquisition costs as a percentage of advertising revenues was primarily due to an increase in the proportion of advertising revenues coming from our web sites rather than from our Google Network members' web sites. The traffic acquisition costs associated with revenues generated from ads placed on our web sites is considerably lower than the traffic acquisition costs associated with revenues generated from ads placed on our Google Network members' web sites.

Cost of revenues increased $640.1 million from the three months ended March 31, 2007 to the three months ended March 31, 2008. Over the same period there was an increase in traffic acquisition costs of $361.4 million primarily resulting from more advertiser fees generated through our AdSense program, and to a lesser extent, an increase of $70.0 million in fees related to distribution arrangements, and an increase in data center costs of $196.8 million primarily resulting from the depreciation of additional information technology assets as well as additional labor required to manage the data centers. In addition, there was an increase in content acquisition costs of $31.7 million and an increase in the amortization of intangible assets of $24.3 million primarily resulting from acquisitions in the current and prior periods, and an increase in credit card and other transaction processing fees of $13.4 million resulting from more advertiser fees being generated through AdWords. The decrease in traffic acquisition costs as a percentage of advertising revenues was primarily due to an increase in the proportion of advertising revenues coming from our web sites rather than from our Google Network members' web sites.

We expect cost of revenues to continue to increase in dollars and may increase as a percentage of revenues in 2008 and in future periods, primarily as a result of forecasted increases in traffic acquisition costs, data center costs, credit card and other transaction fees,

including transaction processing fees related to Google Checkout, content acquisition and other costs. Traffic acquisition costs as a percentage of advertising revenues may fluctuate in the future based on a number of factors, including:

- the relative growth rates of revenues from our web sites and from our Google Network members' web sites.

- whether we are able to enter into more AdSense arrangements that provide for lower revenue share obligations or whether increased competition for arrangements with existing and potential Google Network members results in less favorable revenue share arrangements, including arrangements with guaranteed minimum payments.

- whether we are able to continue to improve the monetization of traffic on our web sites and our Google Network members' web sites, particularly with those members to whom we have guaranteed minimum revenue share payments.

- whether we share with existing and new partners proportionately more of the aggregate advertising fees that we earn from paid clicks derived from search queries these partners direct to our web sites.

- the relative growth rates of expenses associated with distribution arrangements and the related revenues generated.

*Research and Development.*

The following table presents our research and development expenses, and research and development expenses as a percentage of revenues for the periods presented (dollars in millions, unaudited):

| | Three Months Ended | | |
| | March 31, 2007 | December 31, 2007 (unaudited) | March 31, 2008 |
|---|---|---|---|
| Research and development expenses | $ 408.4 | $ 630.8 | $ 673.1 |
| Research and development expenses as a percentage of revenues | 11.1% | 13.1% | 13.0% |

Research and development expenses consist primarily of compensation and related costs for personnel responsible for the research and development of new products and services, as well as significant improvements to existing products and services. We expense research and development costs as they are incurred.

Research and development expenses increased $42.3 million from the three months ended December 31, 2007 to the three months ended March 31, 2008. This increase was primarily due to an increase in stock-based compensation of $32.4 million. In addition, labor and facilities related costs increased $20.7 million as a result of a 13% increase in research and development headcount which also includes the increased headcount resulting from our acquisition of DoubleClick.

Research and development expenses increased $264.7 million from the three months ended March 31, 2007 to the three months ended March 31, 2008. This increase was primarily due to an increase in labor and facilities related costs of $149.2 million as a result of a 60% increase in research and development headcount. In addition, there was an increase in stock-based compensation expense of $73.0 million, an increase in fees for professional services of $22.7 million and an increase in depreciation and related expenses of $11.4 million due to our increased capital expenditures.

We anticipate that research and development expenses will increase in dollar amount and may increase as a percentage of revenues in 2008 and future periods because we expect to hire more research and development personnel and build the infrastructure required to support the development of new, and improve existing, products and services.

*Sales and Marketing.*

The following table presents our sales and marketing expenses, and sales and marketing expenses as a percentage of revenues for the periods presented (dollars in millions, unaudited):

| | Three Months Ended | | |
| | March 31, 2007 | December 31, 2007 (unaudited) | March 31, 2008 |
|---|---|---|---|
| Sales and marketing expenses | $ 302.6 | $ 422.3 | $ 446.9 |
| Sales and marketing expenses as a percentage of revenues | 8.3% | 8.8% | 8.6% |

Sales and marketing expenses consist primarily of compensation and related costs for personnel engaged in customer service and sales and sales support functions, as well as advertising and promotional expenditures.

28

Sales and marketing expenses increased $24.6 million from the three months ended December 31, 2007 to the three months ended March 31, 2008. This increase was primarily due to an increase in labor and facilities related costs of $29.4 million mostly as a result of a 16% increase in sales and marketing headcount which also includes the increased headcount resulting from our acquisition of DoubleClick. This increase was partially offset by a decrease in advertising and promotional activities.

Sales and marketing expenses increased $144.3 million from the three months ended March 31, 2007 to the three months ended March 31, 2008. This increase was primarily due to an increase in labor and facilities related costs of $106.3 million mostly as a result of a 54% increase in sales and marketing headcount, as well as an increase in stock-based compensation expense of $15.3 million.

We anticipate sales and marketing expenses will continue to increase in dollar amount and may increase as a percentage of revenues in 2008 and future periods as we continue to expand our business on a worldwide basis. A significant portion of these increases relate to our plan to hire additional personnel and increase advertising and promotional expenditures to increase the level of service we provide to our advertisers and Google Network members. We also plan to add more international sales personnel to support our worldwide expansion.

*General and Administrative.*

The following table presents our general and administrative expenses, and general and administrative expenses as a percentage of revenues for the periods presented (dollars in millions, unaudited):

| | Three Months Ended | | |
| --- | --- | --- | --- |
| | March 31, 2007 | December 31, 2007 | March 31, 2008 |
| | | (unaudited) | |
| General and administrative expenses | $ 261.4 | $ 377.0 | $ 409.3 |
| General and administrative expenses as a percentage of revenues | 7.2% | 7.8% | 7.9% |

General and administrative expenses consist primarily of compensation and related costs for personnel and facilities related to our finance, human resources, facilities, information technology and legal organizations, and fees for professional services. Professional services are principally comprised of outside legal, audit, information technology consulting and outsourcing services.

General and administrative expenses increased $32.3 million from the three months ended December 31, 2007 to the three months ended March 31, 2008, primarily due to an increase in bad debt expense of $21.2 million as a result of increased risk in this area. In addition, there was an increase in fees for professional services of $14.7 million.

General and administrative expenses increased $147.9 million from the three months ended March 31, 2007 to the three months ended March 31, 2008. This increase was primarily due to an increase in labor and facilities related costs of $47.2 million primarily as a result of a 59% increase in headcount. In addition, there was an increase in fees for professional services of $40.3 million and an increase in depreciation related expense of $10.5 million.

As we expand our business and incur additional expenses, we believe general and administrative expenses will increase in dollar amount and may increase as a percentage of revenues in 2008 and future periods.

*Stock-Based Compensation.*

The following table presents our stock-based compensation, and stock-based compensation as a percentage of revenues for the periods presented (dollars in millions, unaudited):

| | Three Months Ended | | |
| --- | --- | --- | --- |
| | March 31, 2007 | December 31, 2007 | March 31, 2008 |
| | | (unaudited) | |
| Stock-based compensation | $ 183.9 | $ 245.3 | $ 280.8 |
| Stock-based compensation as a percentage of revenues | 5.0% | 5.1% | 5.4% |

Stock-based compensation increased $35.5 million from the three months ended December 31, 2007 to the three months ended March 31, 2008, and $96.9 million from the three months ended March 31, 2007 to the three months ended March 31, 2008. These increases were primarily due to additional stock awards issued to existing and new employees.

29

We expect stock-based compensation to be approximately $1.1 billion in 2008 and $1.9 billion thereafter. These amounts do not include stock-based compensation related to stock awards that have been and may be granted to employees and directors subsequent to March 31, 2008 and stock awards that have been or may be granted to non-employees. In addition, to the extent forfeiture rates are different from what we have anticipated, stock-based compensation related to these awards will be different from our expectations. We currently anticipate that dilution related to all equity grants to employees will be at or below 2% this year.

**Interest Income and Other, Net**

Interest income and other of $167.3 million in the three months ended March 31, 2008 primarily consisted of $122.0 million of interest income earned on our cash, cash equivalents and marketable securities balances. In addition, we recognized $46.6 million of realized gains on sales of marketable securities.

Interest income and other of $130.7 million in the three months ended March 31, 2007 primarily consisted of $130.5 million of interest income earned on our cash, cash equivalents and marketable securities balances.

**Provision for Income Taxes**

The following table presents our provision for income taxes, and effective tax rate for the periods presented (dollars in millions, unaudited):

|  | Three Months Ended | | |
|  | March 31, 2007 | December 31, 2007 (unaudited) | March 31, 2008 |
| --- | --- | --- | --- |
| Provision for income taxes | $ 349.8 | $ 401.6 | $ 406.5 |
| Effective tax rate | 25.9% | 25.0% | 23.7% |

Our effective tax rate decreased from the three months ended December 31, 2007 to the three months ended March 31, 2008, primarily as a result of proportionately more of our annual earnings expected to be realized in countries where we have lower statutory tax rates in 2008 compared to 2007.

Our provision for income taxes increased from the three months ended March 31, 2007 to the three months ended March 31, 2008, primarily as a result of increases in federal and state income taxes, driven by higher taxable income period over period. Our effective tax rate decreased from the three months ended March 31, 2007 to the three months ended March 31, 2008, primarily as a result of proportionately more of our annual earnings expected to be realized in countries where we have lower statutory tax rates in 2008 compared to 2007.

Our effective tax rate could fluctuate significantly on a quarterly basis and could be adversely affected to the extent earnings are lower than anticipated in countries where we have lower statutory rates and higher than anticipated in countries where we have higher statutory rates, by changes in the valuation of our deferred tax assets or liabilities, or by changes in tax laws, regulations, accounting principles, or interpretations thereof. In addition, we are subject to the continuous examination of our income tax returns by the Internal Revenue Service and other tax authorities. We regularly assess the likelihood of adverse outcomes resulting from these examinations to determine the adequacy of our provision for income taxes.

**Liquidity and Capital Resources**

In summary, our cash flows were (in millions, unaudited):

|  | Three Months Ended March 31, | |
|  | 2007 | 2008 (unaudited) |
| --- | --- | --- |
| Net cash provided by operating activities | $1,219.6 | $ 1,779.4 |
| Net cash used in investing activities | (777.1) | (1,407.0) |
| Net cash provided by financing activities | 88.5 | 28.7 |

At March 31, 2008, we had $12.1 billion of cash, cash equivalents and marketable securities. Cash equivalents and marketable securities are comprised of debt instruments of the U.S. government and its agencies, municipalities in the U.S., time deposits as well as U.S. corporate securities. Marketable securities also include auction rate securities ("ARS") of $259.6 million. The related auctions began to fail in February 2008. As a result, these securities are currently illiquid. Note 3 of Notes to Consolidated Financial Statements included as part of this report provides further discussion on ARS and the composition of our cash, cash equivalents and marketable securities.

Our principal sources of liquidity are our cash, cash equivalents and marketable securities, as well as the cash flow that we generate from our operations. At December 31, 2007 and March 31, 2008, we had unused letters of credit for approximately $20.4 million and $54.8 million. We believe that our existing cash, cash equivalents, marketable securities and cash generated from operations will be sufficient to satisfy our currently anticipated cash requirements through at least the next 12 months. Our liquidity could be negatively affected by a decrease in demand for our products and services. In addition, we may make acquisitions or license products and technologies complementary to our business and may need to raise additional capital through future debt or equity financing to provide for greater flexibility to fund any such acquisitions and licensing activities. Additional financing may not be available at all or on terms favorable to us.

Cash provided by operating activities consisted of net income adjusted for certain non-cash items including depreciation, amortization, in-process research and development, stock-based compensation, excess tax benefits from stock-based award activity, and the effect of changes in working capital and other activities. Cash provided by operating activities in the three months ended March 31, 2008 was $1,779.4 million and consisted of net income of $1,307.1 million, adjustments for non-cash items of $483.1 million and cash used in working capital and other activities of $10.8 million. Adjustments for non-cash items primarily consisted of $280.8 million of stock-based compensation, $280.6 million of depreciation and amortization expense on property and equipment and $56.0 million of amortization of intangibles and other, partially offset by $51.1 million of excess tax benefits from stock-based award activity. In addition, changes in working capital activities primarily consisted of a decrease of $234.3 million in accrued expenses and other liabilities primarily as a result of employee bonuses for the year ended December 31, 2007 paid in the first quarter of 2008, and an increase of $223.5 million in accounts receivable due to the growth in fees billed to our advertisers and an increase of $41.6 million in prepaid revenue share, expenses and other assets, partially offset by a net increase in income taxes payable and deferred income taxes of $438.2 million (which includes the same $51.1 million of excess tax benefits from stock-based awards included under adjustments for non-cash items) and to a lesser extent by an increase in accounts payable of $53.8 million. The increase in income taxes payable and deferred income taxes was primarily a result of additional tax obligations accrued, as well as less estimated income taxes paid, in the first quarter of 2008 compared to the fourth quarter of 2007.

Cash provided by operating activities in the three months ended March 31, 2007 was $1,219.6 million and consisted of net income of $1,002.2 million, adjustments for non-cash items of $247.0 million and cash used in working capital and other activities of $29.6 million. Adjustments for non-cash items primarily consisted of $183.9 million of stock-based compensation and $170.3 million of depreciation expense on property and equipment, partially offset by $74.1 million of excess tax benefits from stock-based award activity. In addition, working capital activities primarily consisted of an increase of $185.5 million in prepaid revenue share, expenses and other assets, an increase of $153.6 million in accounts receivable due to the growth in fees billed to our advertisers, a decrease of $169.1 million in accrued expenses and other liabilities and accounts payable primarily as a result of employee bonuses for the year ended December 31, 2006 paid in the first quarter of 2007, partially offset by a net increase in income taxes payable and deferred income taxes of $399.1 million which includes the same $74.1 million of excess tax benefits from stock-based award included under adjustments for non-cash items. The increase in income taxes payable and deferred income taxes was primarily a result of additional tax obligations accrued, as well as less estimated income taxes paid, in the first quarter of 2007 compared to the fourth quarter of 2006.

As we expand our business internationally, we have offered payment terms to certain advertisers that are standard in their locales, but longer than terms we would generally offer to our domestic advertisers. This may increase our working capital requirements and may have a negative effect on cash provided by our operating activities. In addition, since we have become a public company our cash-based compensation per employee has increased and will likely continue to increase in order to attract and retain employees.

Cash used in investing activities in the three months ended March 31, 2008 of $1,407.0 million was attributable to cash consideration used in acquisitions of $3,125.1 million, primarily related to the DoubleClick acquisition and capital expenditures of $841.6 million, partially offset by net proceeds received from the sales and maturities of marketable securities of $2,559.7 million. Cash used in investing activities in the three months ended March 31, 2007 of $777.1 million was attributable to net purchases of marketable securities of $145.8 million, capital expenditures of $596.9 million and cash consideration used in acquisitions and other investments of $34.4 million. Capital expenditures are mainly for the purchase of information technology assets. In order to manage expected increases in internet traffic, advertising transactions and new products and services, and to support our overall global business expansion, we will continue to invest heavily in data center operations, technology, corporate facilities and information technology infrastructure in 2008 and thereafter.

In addition, we expect to spend a significant amount of cash on acquisitions and other investments from time to time. These acquisitions generally enhance the breadth and depth of our expertise in engineering and other functional areas, our technologies and our product offerings. In connection with certain acquisitions, we are obligated to make additional cash payments if certain criteria are met. As of March 31, 2008, our remaining contingent obligations related to these acquisitions was approximately $591 million. Since these contingent payments are based on the achievement of performance targets, actual payments may be substantially lower. In May 2008, Clearwire Corporation and Sprint Nextel Corporation agreed to combine certain businesses to form a wireless communication company,

the new Clearwire. In addition, certain other companies have collectively agreed to contribute $3.2 billion in cash to the new Clearwire or its subsidiary, including $500 million from us. The completion of this transaction is subject to customary closing conditions. We expect the transaction to close during the second half of 2008.

Also, as part of our philanthropic program, we expect to make donations as well as investments in for-profit enterprises that aim to alleviate poverty, improve the environment or achieve other socially or economically progressive objectives. We expect these payments to be made primarily in cash. We have authorized up to $175 million of such payments over the three years ending December 31, 2008, with any unallocated amounts to be rolled over into the following year. The majority of this authorized amount has not been spent or committed.

Cash provided by financing activities in the three months ended March 31, 2008 of $28.7 million was primarily due to excess tax benefits of $51.1 million from stock-based award activities during the period which represents a portion of the $70.3 million reduction to income taxes payable that we recorded in the first quarter of 2008 related to the total direct tax benefit realized from the exercise, sale or vesting of these awards, as well as net payments related to stock-based award activity of $22.4 million. Net payments result when the tax withholding payments we make on behalf of our employees upon the net settlement of their vested restricted stock units exceeds the cash we receive upon the exercise of stock options. Cash provided by financing activities in the three months ended March 31, 2007 of $88.5 million was primarily due to excess tax benefits of $74.1 million from stock-based award activity during the period which represents a portion of the $107.1 million reduction to income taxes payable that we recorded in the first quarter of 2007 related to the total direct tax benefit realized from the exercise, sale or vesting of these awards. In addition, we received net proceeds from the issuance of common stock pursuant to stock-based award activity of $14.4 million.

### Contractual Obligations

We are obligated under certain agreements to make non-cancelable guaranteed minimum revenue share payments to Google Network members based on their achieving defined performance terms, such as number of search queries or advertisements displayed. At March 31, 2008, our aggregate outstanding non-cancelable guaranteed minimum revenue share commitments totaled $1,598.7 million through 2012 compared to $1,746.4 million at December 31, 2007.

In addition, as of a result of having adopted FIN 48 (discussed below under Income Taxes) in January 2007, we increased long-term taxes payable by $400.4 million in the year ended December 31, 2007 as FIN 48 specifies that tax positions for which the timing of the ultimate resolution is uncertain should be recognized as long-term liabilities. We also recognized additional long-term taxes payable of $140.3 million in the quarter ended March 31, 2008. At this time, we are unable to make a reasonably reliable estimate of the timing of payments in individual years beyond 12 months due to uncertainties in the timing of tax audit outcomes.

## Critical Accounting Policies and Estimates

We prepare our Consolidated Financial Statements in accordance with accounting principles generally accepted in the U.S. In doing so, we have to make estimates and assumptions that affect our reported amounts of assets, liabilities, revenues and expenses, as well as related disclosure of contingent assets and liabilities. In some cases, we could reasonably have used different accounting policies and estimates. In some cases changes in the accounting estimates are reasonably likely to occur from period to period. Accordingly, actual results could differ materially from our estimates. To the extent that there are material differences between these estimates and actual results, our financial condition or results of operations will be affected. We base our estimates on past experience and other assumptions that we believe are reasonable under the circumstances, and we evaluate these estimates on an ongoing basis. We refer to accounting estimates of this type as critical accounting policies and estimates, which we discuss further below. We have reviewed our critical accounting policies and estimates with the audit committee of our board of directors.

### Income Taxes

We are subject to income taxes in the U.S. and numerous foreign jurisdictions. Significant judgment is required in evaluating our uncertain tax positions and determining our provision for income taxes. Effective January 1, 2007, we adopted Financial Interpretation No. 48, *Accounting for Uncertainty in Income Taxes-an interpretation of FASB Statement No. 109* ("FIN 48"). FIN 48 contains a two-step approach to recognizing and measuring uncertain tax positions accounted for in accordance with SFAS No. 109, *Accounting for Income Taxes*. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates that it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely of being realized upon settlement.

Although we believe we have adequately reserved for our uncertain tax positions, no assurance can be given that the final tax outcome of these matters will not be different. We adjust these reserves in light of changing facts and circumstances, such as the

closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences will impact the provision for income taxes in the period in which such determination is made. The provision for income taxes includes the impact of reserve provisions and changes to reserves that are considered appropriate, as well as the related net interest.

Our effective tax rates have differed from the statutory rate primarily due to the tax impact of foreign operations, research and experimentation tax credits, state taxes, and certain benefits realized related to stock option activity. The effective tax rate was 25.0% and 23.7% for the three months ended December 31, 2007 and March 31, 2008, respectively. Our future effective tax rates could be adversely affected by earnings being lower than anticipated in countries where we have lower statutory rates and higher than anticipated in countries where we have higher statutory rates, by changes in the valuation of our deferred tax assets or liabilities, or by changes in tax laws, regulations, accounting principles, or interpretations thereof. In addition, we are subject to the continuous examination of our income tax returns by the Internal Revenue Service and other tax authorities. We regularly assess the likelihood of adverse outcomes resulting from these examinations to determine the adequacy of our provision for income taxes.

### Stock-Based Compensation

We account for stock-based compensation in accordance with SFAS 123R. Under the provisions of SFAS 123R, stock-based compensation cost is estimated at the grant date based on the award's fair value as calculated by the Black-Scholes-Merton ("BSM") option-pricing model and is recognized as expense over the requisite service period. The BSM model requires various highly judgmental assumptions including volatility, forfeiture rates and expected option life. If any of the assumptions used in the BSM model change significantly, stock-based compensation expense may differ materially in the future from that recorded in the current period.

### Traffic Acquisition Costs

We are obligated under certain agreements to make non-cancelable guaranteed minimum revenue share payments to Google Network members based on their achieving defined performance terms, such as number of search queries or advertisements displayed. To the extent we expect revenues generated under such an arrangement to exceed the guaranteed minimum revenue share payments, we recognize traffic acquisition costs on a contractual revenue share basis or on a basis proportionate to forecasted revenues, whichever is greater; if our estimate of revenues under such an arrangement is subsequently revised downward, then the amount of traffic acquisition costs we would recognize thereafter would be proportionately greater. Otherwise, we recognize the guaranteed revenue share payments as traffic acquisition costs on a straight-line basis over the term of the related agreements.

### Effect of Recent Accounting Pronouncements

In December 2007, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 141 (revised 2007), *Business Combinations* ("SFAS 141R"). SFAS 141R establishes principles and requirements for how an acquirer recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, any noncontrolling interest in the acquiree and the goodwill acquired. SFAS 141R also establishes disclosure requirements to enable the evaluation of the nature and financial effects of the business combination. This statement is effective for us beginning January 1, 2009. We are currently evaluating the potential impact of the adoption of SFAS 141R on our consolidated financial position, results of operations and cash flows.

In December 2007, the FASB issued SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements—an amendment of Accounting Research Bulletin No. 51* ("SFAS 160"). SFAS 160 establishes accounting and reporting standards for ownership interests in subsidiaries held by parties other than the parent, the amount of consolidated net income attributable to the parent and to the noncontrolling interest, changes in a parent's ownership interest, and the valuation of retained noncontrolling equity investments when a subsidiary is deconsolidated. SFAS 160 also establishes disclosure requirements that clearly identify and distinguish between the interests of the parent and the interests of the noncontrolling owners. This statement is effective for us beginning January 1, 2009. We are currently evaluating the potential impact of the adoption of SFAS 160 on our consolidated financial position, results of operations and cash flows.

In February 2008, the FASB issued Financial Staff Positions ("FSP") FAS 157-2, *Effective Date of FASB Statement No. 157* ("FSP FAS 157-2"), which delays the effective date of SFAS No. 157, *Fair Value Measurement* ("SFAS 157"), for all nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on a recurring basis (at least annually). SFAS 157 establishes a framework for measuring fair value and expands disclosures about fair value measurements. FSP FAS 157-2 partially defers the effective date of SFAS 157 to fiscal years beginning after November 15, 2008, and interim periods within those fiscal years for items within the scope of this FSP. FSP FAS 157-2 is effective for us beginning January 1,

2009. We are currently evaluating the potential impact of the adoption of those provisions of SFAS 157, for which effectiveness was delayed by FSP SFAS 157-2, on our consolidated financial position and results of operations.

## ITEM 3.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are exposed to financial market risks, including changes in currency exchange rates and interest rates.

### Foreign Exchange Risk

*Economic Exposure*

We transact business in various foreign currencies and have significant international revenues as well as costs denominated in foreign currencies, subjecting us to foreign currency risk. We purchase foreign exchange forward and option contracts to reduce the volatility of cash flows primarily related to forecasted revenue denominated in certain foreign currencies. The objective of the foreign exchange contracts is to better ensure that the U.S. dollar-equivalent cash flows are not adversely affected by changes in the U.S. dollar/foreign currency exchange rate. In accordance with SFAS No. 133, *Accounting for Derivative Instruments and Hedge Activities* ("SFAS 133"), these contracts are designated as cash flow hedges. The gain or loss on a cash flow hedge is initially reported as a component of accumulated other comprehensive income and subsequently reclassified into earnings when the hedged exposure affects earnings or when the hedged transaction is no longer probable of occurring. The gain or loss on the ineffective portion, if any, of a hedge is recognized in earnings immediately. At March 31, 2008, the notional principal and fair value of foreign exchange contracts to purchase U.S. dollars with Canadian dollars were 154.5 million Canadian dollars (or approximately $151.4 million) and $3.0 million. These foreign exchange forward contracts and options have maturities of 18 months or less. There are no other foreign exchange contracts designated as cash flow hedges, however, we may enter into similar contracts in other foreign currencies in the future. The net gains or losses on the effective and ineffective portions of these cash flow hedges were not material at March 31, 2008 and in the quarter ended March 31, 2008.

We considered the historical trends in currency exchange rates and determined that it was reasonably possible that adverse changes in exchange rates of 10% for our foreign currencies instruments could be experienced in the near term. These changes would have resulted in a decrease of $4.0 million in the fair values of our foreign currency instruments designated as cash flow hedges.

*Transaction Exposure*

Our exposure to foreign currency transaction gains and losses is the result of certain net receivables due from our foreign subsidiaries and customers being denominated in currencies other than the U.S. dollar, primarily the British pound, the Euro, the Canadian dollar and the Japanese yen. Our foreign subsidiaries conduct their businesses in local currency. We have entered into foreign exchange contracts to offset the foreign exchange risk on certain monetary assets and liabilities denominated in currencies other than the local currency of the subsidiary. The notional principal of foreign exchange contracts to purchase U.S. dollars with foreign currencies was $1.5 billion and $2.3 billion at December 31, 2007 and March 31, 2008. The notional principal of foreign exchange contracts to purchase Euros with other currencies was €296.5 million (or approximately $433.4 million) and €411.4 million (or approximately $651.1 million) at December 31, 2007 and March 31, 2008. The notional principal of foreign exchange contracts to sell Euros for Taiwanese dollars was €18.7 million (or approximately $29.6 million) at March 31, 2008.

We considered the historical trends in currency exchange rates and determined that it was reasonably possible that adverse changes in exchange rates of 10% for all currencies could be experienced in the near term. These changes would have resulted in an adverse impact on income before income taxes of approximately $39.7 million and $14.7 million at December 31, 2007 and March 31, 2008. The adverse impact at December 31, 2007 and March 31, 2008 is after consideration of the offsetting effect of approximately $163.7 million and $244.2 million from forward exchange contracts in place for the months of December 2007 and March 2008. These reasonably possible adverse changes in exchange rates of 10% were applied to total monetary assets denominated in currencies other than the local currencies at the balance sheet dates to compute the adverse impact these changes would have had on our income before taxes in the near term.

### Interest Rate Risk

We invest in a variety of securities, consisting primarily of investments in interest-bearing demand deposit accounts with financial institutions, tax-exempt money market funds and debt securities of corporations and municipalities. By policy, we limit the amount of credit exposure to any one issuer.

Investments in both fixed rate and floating rate interest earning products carry a degree of interest rate risk. Fixed rate securities may have their fair market value adversely impacted due to a rise in interest rates, while floating rate securities may produce less income than predicted if interest rates fall. Due in part to these factors, our income from investments may decrease in the future.

We considered the historical volatility of short term interest rates and determined that it was reasonably possible that an adverse change of 100 basis points could be experienced in the near term. A hypothetical 1.00% (100 basis-point) increase in interest rates would have resulted in a decrease in the fair values of our marketable securities of approximately $86.7 million and $74.2 million at December 31, 2007 and March 31, 2008.

## ITEM 4.    CONTROLS AND PROCEDURES

*(a) Evaluation of disclosure controls and procedures.*

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15 under the Securities Exchange Act of 1934 as of the end of the period covered by this Quarterly Report on Form 10-Q. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on our evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

*(b) Changes in internal control over financial reporting.*

We regularly review our system of internal control over financial reporting to ensure we maintain an effective internal control environment. As we grow geographically and with new product offerings, we continue to create new processes and controls as well as improve our existing environment to increase efficiencies. Improvements may include such activities as implementing new, more efficient systems, consolidating activities, and migrating processes.

There were no changes in our internal control over financial reporting that occurred during the period covered by this Quarterly Report on Form 10-Q that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## PART II—OTHER INFORMATION

## ITEM 1.   LEGAL PROCEEDINGS

From time to time, we are involved in a variety of claims, suits, investigations and proceedings arising from the ordinary course of our business, including actions with respect to intellectual property claims, breach of contract claims, labor and employment claims, tax and other matters. Although claims, suits, investigations and proceedings are inherently uncertain and their results cannot be predicted with certainty, we believe that the resolution of our current pending matters will not have a material adverse effect on our business, consolidated financial position, results of operations or cash flow. Regardless of the outcome, litigation can have an adverse impact on us because of defense costs, diversion of management resources and other factors. In addition, it is possible that an unfavorable resolution of one or more such proceedings could in the future materially and adversely affect our financial position, results of operations or cash flows in a particular period. See the risk factors "*We are, and may in the future be, subject to intellectual property rights claims, which are costly to defend, could require us to pay damages and could limit our ability to use certain technologies in the future*" and "*Our intellectual property rights are valuable, and any inability to protect them could reduce the value of our products, services and brand*" in the "Risks Related to Our Business and Industry" section of Item 1A of this Quarterly Report on Form 10-Q.

## ITEM 1A. RISK FACTORS

### Risks Related to Our Business and Industry

#### We face significant competition from Microsoft and Yahoo.

We face formidable competition in every aspect of our business, and particularly from other companies that seek to connect people with information on the web and provide them with relevant advertising. Currently, we consider our primary competitors to be Microsoft Corporation and Yahoo! Inc. Microsoft has developed features that make web search a more integrated part of its Windows operating system and other desktop software products. We expect that Microsoft will increasingly use its financial and engineering resources to compete with us. Microsoft has more employees and cash resources than we do. Also, both Microsoft and Yahoo have longer operating histories and more established relationships with customers and end users. They can use their experience and resources against us in a variety of competitive ways, including by making acquisitions, investing more aggressively in research and development and competing more aggressively for advertisers and web sites. Microsoft and Yahoo also may have a greater ability to attract and retain users than we do because they operate internet portals with a broad range of content products and services. If Microsoft or Yahoo are successful in providing similar or better web search results or more relevant advertisements, or in leveraging their platforms or products to make their web search or advertising services easier to access, we could experience a significant decline in user traffic or the size of the Google Network. Any such decline could negatively affect our revenues.

#### We face competition from other internet companies, including web search providers, internet access providers, internet advertising companies and destination web sites.

In addition to Microsoft and Yahoo, we face competition from other web search providers, including start-ups as well as developed companies that are enhancing or developing search technologies. We compete with internet advertising companies, particularly in the areas of pay-for-performance and keyword-targeted internet advertising. Also, we may compete with companies that sell products and services online because these companies, like us, are trying to attract users to their web sites to search for information about products and services. We also provide a number of online products and services, including Google Checkout, YouTube and our communications tools such as Google Docs, that compete directly with new and established companies that offer communication, information and entertainment services integrated into their products or media properties.

We also compete with web sites that provide their own or user-generated content and provide advertising to their users. These destination web sites include those operated by internet access providers, such as cable and DSL service providers. Because our users need to access our services through internet access providers, they have direct relationships with these providers. If an access provider or a computer or computing device manufacturer offers online services that compete with ours, the user may find it more convenient to use the services of the access provider or manufacturer. In addition, the access provider or manufacturer may make it hard to access our services by not listing them in the access provider's or manufacturer's own menu of offerings, or may charge users to access our web sites or the web sites of our Google Network members. Also, because the access provider gathers information from the user in connection with the establishment of a billing relationship, the access provider may be more effective than we are in tailoring services and advertisements to the specific tastes of the user.

There has been a trend toward industry consolidation among our competitors, and so smaller competitors today may become larger competitors in the future. If our competitors are more successful than we are at generating traffic, our revenues may decline.

36

***We face competition from traditional media companies, and we may not be included in the advertising budgets of large advertisers, which could harm our operating results.***

In addition to internet companies, we face competition from companies that offer traditional media advertising opportunities. Most large advertisers have fixed advertising budgets, a small portion of which is allocated to internet advertising. We expect that large advertisers will continue to focus most of their advertising efforts on traditional media. If we fail to convince these companies to spend a portion of their advertising budgets with us, or if our existing advertisers reduce the amount they spend on our programs, our operating results would be harmed.

***We expect our revenue growth rate to decline and anticipate downward pressure on our operating margin in the future.***

We expect that our revenue growth rate will decline over time and anticipate that there will be downward pressure on our operating margin. We believe our revenue growth rate will generally decline as a result of increasing competition and the inevitable decline in growth rates as our revenues increase to higher levels. We believe our operating margin will experience downward pressure as a result of increasing competition and increased expenditures for many aspects of our business. Our operating margin will also experience downward pressure if a greater percentage of our revenues comes from ads placed on our Google Network members' sites compared to revenues generated through ads placed on our own sites or if we spend a proportionately larger amount to promote the distribution of certain products, including Google Toolbar. The margin on revenue we generate from our Google Network members is significantly less than the margin on revenue we generate from advertising on our web sites. Additionally, the margin we earn on revenue generated from our Google Network members could decrease in the future if we pay an even larger percentage of advertising fees to our Google Network members.

***Our operating results may fluctuate, which makes our results difficult to predict and could cause our results to fall short of expectations.***

Our operating results may fluctuate as a result of a number of factors, many outside of our control. As a result, comparing our operating results on a period-to-period basis may not be meaningful, and you should not rely on our past results as an indication of our future performance. Our quarterly, year-to-date and annual expenses as a percentage of our revenues may differ significantly from our historical or projected rates. Our operating results in future quarters may fall below expectations. Any of these events could cause our stock price to fall. Each of the risk factors listed in this Item 1A and the following factors may affect our operating results:

- Our ability to continue to attract users to our web sites.
- Our ability to monetize (or generate revenue from) traffic on our web sites and our Google Network members' web sites.
- Our ability to attract advertisers to our AdWords program.
- Our ability to attract web sites to our AdSense program.
- The mix in our revenues between those generated on our web sites and those generated through our Google Network.
- The amount and timing of operating costs and capital expenditures related to the maintenance and expansion of our businesses, operations and infrastructure.
- Our focus on long-term goals over short-term results.
- The results of our investments in risky projects.
- Our ability to keep our web sites operational at a reasonable cost and without service interruptions.
- Our ability to achieve revenue goals for partners to whom we guarantee minimum payments or pay distribution fees.
- Our ability to generate revenue from services in which we have invested considerable time and resources, such as YouTube, Gmail, orkut and Google Checkout.

Because our business is changing and evolving, our historical operating results may not be useful to you in predicting our future operating results. In addition, advertising spending has historically been cyclical in nature, reflecting overall economic conditions as well as budgeting and buying patterns. For example, in 1999, advertisers spent heavily on internet advertising. This was followed by a lengthy downturn in ad spending on the web. Also, user traffic tends to be seasonal. Our rapid growth has tended to mask the cyclicality and seasonality of our business. As our growth rate has slowed, the cyclicality and seasonality in our business has become more pronounced and caused our operating results to fluctuate.

***If we do not continue to innovate and provide products and services that are useful to users, we may not remain competitive, and our revenues and operating results could suffer.***

Our success depends on providing products and services that make using the internet a more useful and enjoyable experience for our users. Our competitors are constantly developing innovations in web search, online advertising and web based products and services. As a result, we must continue to invest significant resources in research and development in order to enhance our web search

technology and our existing products and services and introduce new products and services that people can easily and effectively use. If we are unable to provide quality products and services, then our users may become dissatisfied and move to a competitor's products and services. Our operating results would also suffer if our innovations are not responsive to the needs of our users, advertisers and Google Network members, are not appropriately timed with market opportunities or are not effectively brought to market. As search technology continues to develop, our competitors may be able to offer search results that are, or that are seen to be, substantially similar to or better than ours. This may force us to compete in different ways and expend significant resources in order to remain competitive.

*We generate our revenue almost entirely from advertising, and the reduction in spending by or loss of advertisers could seriously harm our business.*

We generated 99% of our revenues in 2007 and 98% of our revenues for the first three months of 2008 from our advertisers. Our advertisers can generally terminate their contracts with us at any time. Advertisers will not continue to do business with us if their investment in advertising with us does not generate sales leads, and ultimately customers, or if we do not deliver their advertisements in an appropriate and effective manner. If we are unable to remain competitive and provide value to our advertisers, they may stop placing ads with us, which would negatively harm our revenues and business. In addition, expenditures by advertisers tend to be cyclical, reflecting overall economic conditions and budgeting and buying patterns. Any decreases in or delays in advertising spending due to general economic conditions could reduce our revenues or negatively impact our ability to grow our revenues.

*We rely on our Google Network members for a significant portion of our revenues, and we benefit from our association with them. The loss of these members could adversely affect our business.*

We provide advertising, web search and other services to members of our Google Network, which accounted for 35% of our revenues in 2007 and 32% of our revenues in the three months ended March 31, 2008. Some of the participants in this network may compete with us in one or more areas. They may decide in the future to terminate their agreements with us. If our Google Network members decide to use a competitor's or their own web search or advertising services, our revenues would decline. Our agreements with a few of the largest Google Network members account for a significant portion of revenues derived from our AdSense program. If our relationship with one or more large Google Network members were terminated or renegotiated on terms less favorable to us, our business could be adversely affected.

Also, certain of our key network members operate high-profile web sites, and we derive tangible and intangible benefits from this affiliation. If one or more of these key relationships is terminated or not renewed, and is not replaced with a comparable relationship, our business would be adversely affected.

*Our business and operations are experiencing rapid growth. If we fail to effectively manage our growth, our business and operating results could be harmed.*

We have experienced, and continue to experience, rapid growth in our headcount and operations, which has placed, and will continue to place, significant demands on our management, operational and financial infrastructure. If we do not effectively manage our growth, the quality of our products and services could suffer, which could negatively affect our brand and operating results. Our expansion and growth in international markets heightens these risks as a result of the particular challenges of supporting a rapidly growing business in an environment of multiple languages, cultures, customs, legal systems, alternative dispute systems, regulatory systems and commercial infrastructures. To effectively manage this growth, we will need to continue to improve our operational, financial and management controls and our reporting systems and procedures. These systems enhancements and improvements will require significant capital expenditures and management resources. Failure to implement these improvements could hurt our ability to manage our growth and our financial position.

*Our business depends on a strong brand, and failing to maintain and enhance our brand would hurt our ability to expand our base of users, advertisers and Google Network members.*

The brand identity that we have developed has significantly contributed to the success of our business. Maintaining and enhancing the "Google" brand is critical to expanding our base of users, advertisers, Google Network members, and other partners. We believe that the importance of brand recognition will increase due to the relatively low barriers to entry in the internet market. If we fail to maintain and enhance the "Google" brand, or if we incur excessive expenses in this effort, our business, operating results and financial condition will be materially and adversely affected. Maintaining and enhancing our brand will depend largely on our ability to be a technology leader and continue to provide high-quality products and services, which we may not do successfully.

*Acquisitions could result in operating difficulties, dilution and other harmful consequences.*

We do not have a great deal of experience acquiring companies, and the companies we have acquired have typically been small. However, recently, we have closed a number of larger acquisitions, including our acquisitions of DoubleClick, Postini and YouTube, and are in the process of integrating these businesses into our own. We also expect to continue to evaluate and enter into discussions

regarding a wide array of potential strategic transactions. These transactions could be material to our financial condition and results of operations. The process of integrating an acquired company, business or technology has created, and will continue to create unforeseen operating difficulties and expenditures. The areas where we face risks include:

- Implementation or remediation of controls, procedures and policies at the acquired company.

- Diversion of management time and focus from operating our business to acquisition integration challenges.

- Coordination of product, engineering and sales and marketing functions.

- Cultural challenges associated with integrating employees from the acquired company into our organization.

- Retention of employees from the businesses we acquire.

- Integration of the acquired company's accounting, management information, human resource and other administrative systems.

- Liability for activities of the acquired company before the acquisition, including violations of laws, commercial disputes, tax liabilities and other known and unknown liabilities.

In addition, foreign acquisitions involve unique risks in addition to those mentioned above, including those related to integration of operations across different cultures and languages, currency risks and the particular economic, political and regulatory risks associated with specific countries.

Our failure to address these risks or other problems encountered in connection with our past or future acquisitions and strategic investments could cause us to fail to realize the anticipated benefits of such acquisitions or investments, incur unanticipated liabilities and harm our business generally.

Future acquisitions or dispositions could also result in dilutive issuances of our equity securities, the incurrence of debt, contingent liabilities or amortization expenses, or write-offs of goodwill, any of which could harm our financial condition. Future acquisitions may require us to obtain additional equity or debt financing, which may not be available on favorable terms or at all. Also, the anticipated benefit of many of our acquisitions may not materialize. For example, we have yet to realize significant revenue benefits from our acquisitions of dMarc Broadcasting (Audio Ads), YouTube or Postini.

***Our international operations are subject to increased risks which could harm our business, operating results and financial condition.***

International revenues accounted for approximately 51% of our total revenues in the first three months of 2008, and more than half of our user traffic came from outside the U.S. during this period. We have limited experience with operations outside the U.S. and our ability to manage our business and conduct our operations internationally requires considerable management attention and resources and is subject to a number of risks, including the following:

- Challenges caused by distance, language and cultural differences and by doing business with foreign agencies and governments.

- Difficulties in developing products and services in different languages and for different cultures.

- Longer payment cycles in some countries.

- Credit risk and higher levels of payment fraud.

- Currency exchange rate fluctuations.

- Foreign exchange controls that might prevent us from repatriating cash earned in countries outside the U.S.

- Import and export requirements that may prevent us from shipping products or providing services to a particular market and may increase our operating costs.

- Political and economic instability.

- Potentially adverse tax consequences.

- Higher costs associated with doing business internationally.

In addition, compliance with complex foreign and U.S. laws and regulations that apply to our international operations increases our cost of doing business in international jurisdictions and could expose us or our employees to fines and penalties. These numerous and sometimes conflicting laws and regulations include import and export requirements, content requirements, trade restrictions, tax laws, sanctions, internal and disclosure control rules, data privacy requirements, labor relations laws, U.S. laws such as the Foreign Corrupt Practices Act, and local laws prohibiting corrupt payments to governmental officials. Violations of these laws and regulations could result in fines, criminal sanctions against us, our officers or our employees, prohibitions on the conduct of our business and damage to our reputation. Although we have implemented policies and procedures designed to ensure compliance with these laws,

there can be no assurance that our employees, contractors or agents will not violate our policies. Any such violations could include prohibitions on our ability to offer our products and services to one or more countries, and could also materially damage our reputation, our brand, our international expansion efforts, our ability to attract and retain employees, our business and our operating results.

***Our corporate culture has contributed to our success, and if we cannot maintain this culture as we grow, we could lose the innovation, creativity and teamwork fostered by our culture, and our business may be harmed.***

We believe that a critical contributor to our success has been our corporate culture, which we believe fosters innovation, creativity and teamwork. As our organization grows, and we are required to implement more complex organizational management structures, we may find it increasingly difficult to maintain the beneficial aspects of our corporate culture. This could negatively impact our future success.

***Our intellectual property rights are valuable, and any inability to protect them could reduce the value of our products, services and brand.***

Our patents, trademarks, trade secrets, copyrights and other intellectual property rights are important assets for us. Various events outside of our control pose a threat to our intellectual property rights as well as to our products and services. For example, effective intellectual property protection may not be available in every country in which our products and services are distributed or made available through the internet. Also, the efforts we have taken to protect our proprietary rights may not be sufficient or effective. Any significant impairment of our intellectual property rights could harm our business or our ability to compete. Also, protecting our intellectual property rights is costly and time consuming. Any increase in the unauthorized use of our intellectual property could make it more expensive to do business and harm our operating results.

Although we seek to obtain patent protection for our innovations, it is possible we may not be able to protect some of these innovations. In addition, given the costs of obtaining patent protection, we may choose not to protect certain innovations that later turn out to be important. Furthermore, there is always the possibility, despite our efforts, that the scope of the protection gained will be insufficient or that an issued patent may be deemed invalid or unenforceable.

We also face risks associated with our trademarks. For example, there is a risk that the word "Google" could become so commonly used that it becomes synonymous with the word "search." If this happens, we could lose protection for this trademark, which could result in other people using the word "Google" to refer to their own products, thus diminishing our brand.

We also seek to maintain certain intellectual property as trade secrets. The secrecy could be compromised by outside parties, or intentionally or accidentally by our employees, which would cause us to lose the competitive advantage resulting from these trade secrets.

***We are, and may in the future be, subject to intellectual property rights claims, which are costly to defend, could require us to pay damages and could limit our ability to use certain technologies in the future.***

Companies in the internet, technology and media industries own large numbers of patents, copyrights, trademarks and trade secrets and frequently enter into litigation based on allegations of infringement or other violations of intellectual property rights. As we have grown, the intellectual property rights claims against us have increased. Our products, services and technologies may not be able to withstand any third-party claims and regardless of the merits of the claim, intellectual property claims are often time-consuming and expensive to litigate or settle. In addition, to the extent claims against us are successful, we may have to pay substantial monetary damages or discontinue any of our services or practices that are found to be in violation of another party's rights. We also may have to seek a license to continue such practices, which may significantly increase our operating expenses. In addition, many of our agreements with members of our Google Network and other partners require us to indemnify these members for certain third-party intellectual property infringement claims, which would increase our costs as a result of defending such claims and may require that we pay damages if there were an adverse ruling in any such claims.

Companies have filed trademark infringement and related claims against us over the display of ads in response to user queries that include trademark terms. The outcomes of these lawsuits have differed from jurisdiction to jurisdiction. Courts in France have held us liable for allowing advertisers to select certain trademarked terms as keywords. We are appealing those decisions. We were also subject to two lawsuits in Germany on similar matters where the courts held that we are not liable for the actions of our advertisers prior to notification of trademark rights. We are litigating or have recently litigated similar issues in other cases in the U.S., Australia, Austria, Brazil, China, France, Germany, Israel and Italy.

We have also had copyright claims filed against us alleging that features of certain of our products and services, including Google Web Search, Google News, Google Video, Google Image Search, Google Book Search and YouTube, infringe another party's rights. Adverse results in these lawsuits may include awards of substantial monetary damages, costly royalty or licensing agreements or orders preventing us from offering certain functionalities, and may also result in a change in our business practices, which could

result in a loss of revenue for us or otherwise harm our business. In addition, any time one of our products or services links to or hosts material in which others allegedly own copyrights, we face the risk of being sued for copyright infringement or related claims. Because these products and services comprise the majority of our products and services, the risk of harm from such lawsuits could be substantial.

We have also experienced an increase in patent lawsuits filed against us alleging that certain of our products and services, including Google Web Search, Google AdWords, and Google AdSense, infringe another party's patents. Adverse results in these lawsuits may include awards of substantial monetary damages, obligations to pay licensing fees and/or orders preventing us from offering certain features, functionalities, products or services, which could result in a loss of revenue for us or otherwise harm our business.

***Privacy concerns relating to our technology could damage our reputation and deter current and potential users from using our products and services.***

From time to time, concerns have been expressed about whether our products and services compromise the privacy of users and others. Concerns about our practices with regard to the collection, use, disclosure or security of personal information or other privacy-related matters, even if unfounded, could damage our reputation and operating results. While we strive to comply with all applicable data protection laws and regulations, as well as our own posted privacy policies, any failure or perceived failure to comply may result in proceedings or actions against us by government entities or others, which could potentially have an adverse effect on our business.

In addition, as nearly all of our products and services are web based, the amount of data we store for our users on our servers (including personal information) has been increasing. Any systems failure or compromise of our security that results in the release of our users' data could seriously limit the adoption of our products and services as well as harm our reputation and brand and, therefore, our business. We may also need to expend significant resources to protect against security breaches. The risk that these types of events could seriously harm our business is likely to increase as we expand the number of web based products and services we offer as well as increase the number of countries where we operate.

A number of legislative proposals pending before the U.S. Congress, various state legislative bodies and foreign governments concern data protection. In addition, the interpretation and application of data protection laws in Europe and elsewhere are still uncertain and in flux. It is possible that these laws may be interpreted and applied in a manner that is inconsistent with our data practices. If so, in addition to the possibility of fines, this could result in an order requiring that we change our data practices, which could have an adverse effect on our business. Complying with these various laws could cause us to incur substantial costs or require us to change our business practices in a manner adverse to our business.

***Our business is subject to a variety of U.S. and foreign laws that could subject us to claims or otherwise harm our business.***

We are subject to a variety of laws in the U.S. and abroad that are costly to comply with, can result in negative publicity and diversion of management time and effort, and can subject us to claims or other remedies. For example, the laws relating to the liability of providers of online services are currently unsettled both within the U.S. and abroad. Claims have been threatened and filed under both U.S. and foreign law for defamation, libel, slander, invasion of privacy and other tort claims, unlawful activity, copyright and trademark infringement, or other theories based on the nature and content of the materials searched and the ads posted by our users, our products and services, or content generated by our users.

In addition, the Digital Millennium Copyright Act has provisions that limit, but do not necessarily eliminate, our liability for listing or linking to third-party web sites that include materials that infringe copyrights or other rights, so long as we comply with the statutory requirements of this act. The Child Online Protection Act and the Children's Online Privacy Protection Act restrict the distribution of materials considered harmful to children and impose additional restrictions on the ability of online services to collect information from minors. In the area of data protection, many states have passed laws requiring notification to users when there is a security breach for personal data, such as California's Information Practices Act. We face similar risks and costs as our products and services are offered in international markets and may be subject to additional regulations.

Any failure on our part to comply with these laws and regulations may subject us to additional liabilities.

***We compete internationally with local information providers and with U.S. competitors who are currently more successful than we are in various markets, and if we fail to compete effectively in international markets, our business will be harmed.***

We face different market characteristics and competition outside the U.S. In certain markets, other web search, advertising services and internet companies have greater brand recognition, more users and more search traffic than we have. Even in countries where we have a significant user following, we may not be as successful in generating advertising revenue due to slower market development, our inability to provide attractive local advertising services or other factors. In order to compete, we need to improve our brand recognition and our selling efforts internationally and build stronger relationships with advertisers. We also need to better

41

understand our international users and their preferences. If we fail to do so, our global expansion efforts may be more costly and less profitable than we expect.

### *Our business may be adversely affected by malicious applications that interfere with, or exploit security flaws in, our products and services.*

Our business may be adversely affected by malicious applications that make changes to our users' computers and interfere with the Google experience. These applications have in the past attempted, and may in the future attempt, to change our users' internet experience, including hijacking queries to Google.com, altering or replacing Google search results, or otherwise interfering with our ability to connect with our users. The interference often occurs without disclosure to or consent from users, resulting in a negative experience that users may associate with Google. These applications may be difficult or impossible to uninstall or disable, may reinstall themselves and may circumvent other applications' efforts to block or remove them. In addition, we offer a number of products and services that our users download to their computers or that they rely on to store information and transmit information to others over the internet. These products and services are subject to attack by viruses, worms and other malicious software programs, which could jeopardize the security of information stored in a user's computer or in our computer systems and networks. The ability to reach users and provide them with a superior experience is critical to our success. If our efforts to combat these malicious applications are unsuccessful, or if our products and services have actual or perceived vulnerabilities, our reputation may be harmed and our user traffic could decline, which would damage our business.

### *Proprietary document formats may limit the effectiveness of our search technology by preventing our technology from accessing the content of documents in such formats, which could limit the effectiveness of our products and services.*

A large amount of information on the internet is provided in proprietary document formats such as Microsoft Word. The providers of the software application used to create these documents could engineer the document format to prevent or interfere with our ability to access the document contents with our search technology. This would mean that the document contents would not be included in our search results even if the contents were directly relevant to a search. The software providers may also seek to require us to pay them royalties in exchange for giving us the ability to search documents in their format. If the software provider also competes with us in the search business, they may give their search technology a preferential ability to search documents in their proprietary format. Any of these results could harm our brand and our operating results.

### *New technologies could block our ads, which would harm our business.*

Technologies may be developed that can block the display of our ads. Most of our revenues are derived from fees paid to us by advertisers in connection with the display of ads on web pages. As a result, ad-blocking technology could, in the future, adversely affect our operating results.

### *If we fail to detect click fraud or other invalid clicks, we could face additional litigation as well as lose the confidence of our advertisers, which would cause our business to suffer.*

We are exposed to the risk of fraudulent clicks and other invalid clicks on our ads from a variety of potential sources. We have regularly refunded fees that our advertisers have paid to us that were later attributed to click fraud and other invalid clicks, and we expect to do so in the future. Invalid clicks are clicks that we have determined are not intended by the user to link to the underlying content, such as inadvertent clicks on the same ad twice and clicks resulting from click fraud. Click fraud occurs when a user intentionally clicks on a Google AdWords ad displayed on a web site for a reason other than to view the underlying content. If we are unable to stop these invalid clicks, these refunds may increase. If we find new evidence of past invalid clicks we may issue refunds retroactively of amounts previously paid to our Google Network members. This would negatively affect our profitability, and these invalid clicks could hurt our brand. If invalid clicks are not detected, the affected advertisers may experience a reduced return on their investment in our advertising programs because the invalid clicks will not lead to potential revenue for the advertisers. This could lead the advertisers to become dissatisfied with our advertising programs, which has led to litigation alleging click fraud and could lead to further litigation, as well as to a loss of advertisers and revenues.

### *Index spammers could harm the integrity of our web search results, which could damage our reputation and cause our users to be dissatisfied with our products and services.*

There is an ongoing and increasing effort by "index spammers" to develop ways to manipulate our web search results. For example, because our web search technology ranks a web page's relevance based in part on the importance of the web sites that link to it, people have attempted to link a group of web sites together to manipulate web search results. We take this problem very seriously because providing relevant information to users is critical to our success. If our efforts to combat these and other types of index spamming are unsuccessful, our reputation for delivering relevant information could be diminished. This could result in a decline in user traffic, which would damage our business.

*If we were to lose the services of Eric, Larry, Sergey or other members of our senior management team, we may not be able to execute our business strategy.*

Our future success depends in a large part upon the continued service of key members of our senior management team. In particular, our CEO, Eric Schmidt, and our founders, Larry Page and Sergey Brin, are critical to the overall management of Google as well as the development of our technology, our culture and our strategic direction. All of our executive officers and key employees are at-will employees, and we do not maintain any key-person life insurance policies. The loss of any of our management or key personnel could seriously harm our business.

*We rely on highly skilled personnel and, if we are unable to retain or motivate key personnel or hire qualified personnel, we may not be able to grow effectively.*

Our performance largely depends on the talents and efforts of highly skilled individuals. Our future success depends on our continuing ability to identify, hire, develop, motivate and retain highly skilled personnel for all areas of our organization. Competition in our industry for qualified employees is intense, and certain of our competitors have directly targeted our employees. Our continued ability to compete effectively depends on our ability to attract new employees and to retain and motivate our existing employees.

We have in the past maintained a rigorous, highly selective and time-consuming hiring process. We believe that our approach to hiring has significantly contributed to our success to date. As we grow, our hiring process may prevent us from hiring the personnel we need in a timely manner. In addition, as we become a more mature company, we may find our recruiting efforts more challenging. The incentives to attract, retain and motivate employees provided by our equity award grants may not be as effective as in the past. In addition, our other current and future compensation arrangements, which include cash bonuses and our TSO program, may not be successful in attracting new employees and retaining and motivating our existing employees. If we do not succeed in attracting excellent personnel or retaining or motivating existing personnel, we may be unable to grow effectively.

*We have a short operating history and a relatively new business model in an emerging and rapidly evolving market. This makes it difficult to evaluate our future prospects and may increase the risk that we will not continue to be successful.*

We first derived revenue from our online search business in 1999 and from our advertising services in 2000, and we have only a short operating history with our cost-per-click advertising model, which we launched in 2002 and our cost-per-impression advertising model which we launched in the second quarter of 2005. As a result, we have little operating history to aid in assessing our future prospects. Also, we derive nearly all of our revenues from online advertising, which is an immature industry that has undergone rapid and dramatic changes in its short history. We will encounter risks and difficulties as a company operating in a new and rapidly evolving market. We may not be able to successfully address these risks and difficulties, which could materially harm our business and operating results.

*More individuals are using non-PC devices to access the internet. If users of these devices do not widely adopt versions of our web search technology developed for these devices, our business could be adversely affected.*

The number of people who access the internet through devices other than personal computers, including mobile telephones, personal digital assistants (PDAs), smart phones and handheld computers and video game consoles, as well as television set-top devices, has increased dramatically in the past few years. The lower resolution, functionality and memory associated with alternative devices make the use of our products and services through such devices more difficult. If we are unable to attract and retain a substantial number of alternative device users to our web search services or if we are slow to develop products and technologies that are more compatible with non-PC communications devices, we will fail to capture a significant share of an increasingly important portion of the market for online services, which could adversely affect our business.

*We may have difficulty scaling and adapting our existing architecture to accommodate increased traffic and technology advances or changing business requirements, which could lead to the loss of users, advertisers and Google Network members, and cause us to incur expenses to make architectural changes.*

To be successful, our network infrastructure has to perform well and be reliable. The greater the user traffic and the greater the complexity of our products and services, the more computing power we will need. We have spent and expect to continue to spend substantial amounts on the purchase and lease of data centers and equipment and the upgrade of our technology and network infrastructure to handle increased traffic on our web sites and to roll out new products and services. This expansion is expensive and complex and could result in inefficiencies or operational failures. If we do not expand successfully, or if we experience inefficiencies and operational failures, the quality of our products and services and our users' experience could decline. This could damage our reputation and lead us to lose current and potential users, advertisers and Google Network members. Cost increases, loss of traffic or failure to accommodate new technologies or changing business requirements could harm our operating results and financial condition.

*We rely on bandwidth providers, data centers and others in providing products and services to our users, and any failure or interruption in the services and products provided by these third parties could damage our reputation and harm our ability to operate our business.*

We rely on vendors, including data center and bandwidth providers in providing products and services to our users. Any disruption in the network access or colocation services provided by these providers or any failure of these providers to handle current or higher volumes of use could significantly harm our business. Any financial or other difficulties our providers face may have negative effects on our business. We exercise little control over these vendors, which increases our vulnerability to problems with the services they provide. We license technology and related databases to facilitate aspects of our data center and connectivity operations including internet traffic management services. We have experienced and expect to continue to experience interruptions and delays in service and availability for such elements. Any errors, failures, interruptions or delays in connection with these technologies and information services could harm our relationship with users, adversely affect our brand and expose us to liabilities.

Our systems are also heavily reliant on the availability of electricity. If we were to experience a major power outage, we would have to rely on back-up generators. These back-up generators may not operate properly and their fuel supply could be inadequate during a major power outage. This could result in a disruption of our business.

*Our business depends on continued and unimpeded access to the internet by us and our users. Internet access providers may be able to block, degrade or charge for access to certain of our products and services, which could lead to additional expenses and the loss of users and advertisers.*

Our products and services depend on the ability of our users to access the internet, and certain of our products require significant bandwidth to work effectively. Currently, this access is provided by companies that have significant and increasing market power in the broadband and internet access marketplace, including incumbent telephone companies, cable companies and mobile communications companies. Some of these providers have stated that they may take measures that could degrade, disrupt or increase the cost of user access to certain of our products by restricting or prohibiting the use of their infrastructure to support or facilitate our offerings, or by charging increased fees to us or our users to provide our offerings. These activities may be permitted in the U.S. after recent regulatory changes, including recent decisions by the U.S. Supreme Court and Federal Communications Commission. While interference with access to our popular products and services seems unlikely, such carrier interference could result in a loss of existing users and advertisers and increased costs, and could impair our ability to attract new users and advertisers, thereby harming our revenue and growth.

*Interruption or failure of our information technology and communications systems could hurt our ability to effectively provide our products and services, which could damage our reputation and harm our operating results.*

The availability of our products and services depends on the continuing operation of our information technology and communications systems. Any damage to or failure of our systems could result in interruptions in our service, which could reduce our revenues and profits, and damage our brand. Our systems are vulnerable to damage or interruption from earthquakes, terrorist attacks, floods, fires, power loss, telecommunications failures, computer viruses, computer denial of service attacks or other attempts to harm our systems. Some of our data centers are located in areas with a high risk of major earthquakes. Our data centers are also subject to break-ins, sabotage and intentional acts of vandalism, and to potential disruptions if the operators of these facilities have financial difficulties. Some of our systems are not fully redundant, and our disaster recovery planning cannot account for all eventualities. The occurrence of a natural disaster, a decision to close a facility we are using without adequate notice for financial reasons or other unanticipated problems at our data centers could result in lengthy interruptions in our service.

*Our business depends on increasing use of the internet by users searching for information, advertisers marketing products and services and web sites seeking to earn revenue to support their web content. If the internet infrastructure does not grow and is not maintained to support these activities, our business will be harmed.*

Our success will depend on the continued growth and maintenance of the internet infrastructure. This includes maintenance of a reliable network backbone with the necessary speed, data capacity and security for providing reliable internet services. Internet infrastructure may be unable to support the demands placed on it if the number of internet users continues to increase, or if existing or future internet users access the internet more often or increase their bandwidth requirements. In addition, viruses, worms and similar programs may harm the performance of the internet. The internet has experienced a variety of outages and other delays as a result of damage to portions of its infrastructure, and could face outages and delays in the future. These outages and delays could reduce the level of internet usage as well as our ability to provide our solutions.

*Payments to certain of our Google Network members have exceeded the related fees we receive from our advertisers.*

We are obligated under certain agreements to make non-cancelable guaranteed minimum revenue share payments to Google Network members based on their achieving defined performance terms, such as number of search queries or advertisements displayed. In these agreements, we promise to make these minimum payments to the Google Network member for a pre-negotiated period of

44

time. At March 31, 2008, our aggregate outstanding non-cancelable guaranteed minimum revenue share commitments totaled $1.60 billion through 2012 compared to $1.75 billion at December 31, 2007. It is difficult to forecast with certainty the fees that we will earn under agreements with guarantees, and sometimes the fees we earn fall short of the guaranteed minimum payment amounts.

*We rely on outside providers for our worldwide billing, collection, payment processing and payroll. If these outside service providers are not able to fulfill their service obligations, our business and operations could be disrupted, and our operating results could be harmed.*

Outside providers perform various functions for us, such as worldwide billing, collection, payment processing and payroll. These functions are critical to our operations and involve sensitive interactions between us and our advertisers, partners (e.g., Google Network members) and employees. Although we have implemented service level agreements and have established monitoring controls, if we do not successfully manage our service providers or if the service providers do not perform satisfactorily to agreed-upon service levels, our operations could be disrupted resulting in advertiser, partner or employee dissatisfaction. In addition, our business, reputation and operating results could be adversely affected.

*To the extent our revenues are paid in foreign currencies, and currency exchange rates become unfavorable, we may lose some of the economic value of the revenues in U.S. dollar terms.*

As we expand our international operations, more of our customers may pay us in foreign currencies. Conducting business in currencies other than U.S. dollars subjects us to fluctuations in currency exchange rates. If the currency exchange rates were to change unfavorably, the value of net receivables we receive in foreign currencies and later convert to U.S. dollars after the unfavorable change would be diminished. This could have a negative impact on our reported operating results. Hedging strategies, such as forward contracts, options and foreign exchange swaps related to transaction exposures, that we have implemented or may implement to mitigate this risk may not eliminate our exposure to foreign exchange fluctuations. Additionally, hedging programs expose us to risks that could adversely affect our operating results, including the following:

- We have limited experience in implementing or operating hedging programs. Hedging programs are inherently risky and we could lose money as a result of poor trades.

- We may be unable to hedge currency risk for some transactions or match the accounting for the hedge with the exposure because of a high level of uncertainty or the inability to reasonably estimate our foreign exchange exposures.

- We may be unable to acquire foreign exchange hedging instruments in some of the geographic areas where we do business, or, where these derivatives are available, we may not be able to acquire enough of them to fully offset our exposure.

- We may determine that the cost of acquiring a foreign exchange hedging instrument outweighs the benefit we expect to derive from the derivative, in which case we would not purchase the derivative and be exposed to unfavorable changes in currency exchange rates.

*We may have exposure to greater than anticipated tax liabilities.*

Our future income taxes could be adversely affected by earnings being lower than anticipated in jurisdictions where we have lower statutory rates and higher than anticipated in jurisdictions where we have higher statutory rates, by changes in the valuation of our deferred tax assets and liabilities or by changes in tax laws, regulations, accounting principles or interpretations thereof. Our determination of our tax liability is always subject to review by applicable tax authorities. Any adverse outcome of such a review could have a negative effect on our operating results and financial condition. In addition, the determination of our worldwide provision for income taxes and other tax liabilities requires significant judgment, and there are many transactions and calculations where the ultimate tax determination is uncertain. Although we believe our estimates are reasonable, the ultimate tax outcome may differ from the amounts recorded in our financial statements and may materially affect our financial results in the period or periods for which such determination is made.

## Risks Related to Ownership of our Common Stock

*The trading price for our Class A common stock has been and may continue to be volatile.*

The trading price of our Class A common stock has been volatile since our initial public offering and will likely continue to be volatile. The trading price of our Class A common stock may fluctuate widely in response to various factors, some of which are beyond our control. These factors include:

- Quarterly variations in our results of operations or those of our competitors.

- Announcements by us or our competitors of acquisitions, new products, significant contracts, commercial relationships or capital commitments.

- Recommendations by securities analysts or changes in earnings estimates.
- Announcements about our earnings that are not in line with analyst expectations, the risk of which is enhanced because it is our policy not to give guidance on earnings.
- Announcements by our competitors of their earnings that are not in line with analyst expectations.
- The volume of shares of Class A common stock available for public sale.
- Sales of stock by us or by our stockholders.
- Short sales, hedging and other derivative transactions on shares of our Class A common stock (including derivative transactions under our TSO program).

In addition, the stock market in general, and the market for technology companies in particular, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of those companies. These broad market and industry factors may seriously harm the market price of our Class A common stock, regardless of our actual operating performance. In the past, following periods of volatility in the overall market and the market price of a company's securities, securities class action litigation has often been instituted against these companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

### *We do not intend to pay dividends on our common stock.*

We have never declared or paid any cash dividend on our capital stock. We currently intend to retain any future earnings and do not expect to pay any dividends in the foreseeable future.

### *The concentration of our capital stock ownership with our founders, executive officers and our directors and their affiliates will limit our stockholders' ability to influence corporate matters.*

Our Class B common stock has 10 votes per share and our Class A common stock has one vote per share. As of March 31, 2008, our founders, executive officers and directors (and their affiliates) together owned shares of Class A common stock, Class B common stock and other equity interests representing approximately 71% of the voting power of our outstanding capital stock. In particular, as of March 31, 2008, our two founders and our CEO, Larry, Sergey and Eric, owned approximately 89% of our outstanding Class B common stock, representing approximately 68% of the voting power of our outstanding capital stock. Larry, Sergey and Eric therefore have significant influence over management and affairs and over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets, for the foreseeable future. This concentrated control limits our stockholders' ability to influence corporate matters and, as a result, we may take actions that our stockholders do not view as beneficial. As a result, the market price of our Class A common stock could be adversely affected.

### *Provisions in our charter documents and under Delaware law could discourage a takeover that stockholders may consider favorable.*

Provisions in our certificate of incorporation and bylaws may have the effect of delaying or preventing a change of control or changes in our management. These provisions include the following:

- Our certificate of incorporation provides for a dual class common stock structure. As a result of this structure our founders, executives and employees have significant influence over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets. This concentrated control could discourage others from initiating any potential merger, takeover or other change of control transaction that other stockholders may view as beneficial.
- Our board of directors has the right to elect directors to fill a vacancy created by the expansion of the board of directors or the resignation, death or removal of a director, which prevents stockholders from being able to fill vacancies on our board of directors.
- Our stockholders may not act by written consent. As a result, a holder, or holders, controlling a majority of our capital stock would not be able to take certain actions without holding a stockholders' meeting.
- Our certificate of incorporation prohibits cumulative voting in the election of directors. This limits the ability of minority stockholders to elect director candidates.
- Stockholders must provide advance notice to nominate individuals for election to the board of directors or to propose matters that can be acted upon at a stockholders' meeting. These provisions may discourage or deter a potential acquiror from conducting a solicitation of proxies to elect the acquiror's own slate of directors or otherwise attempting to obtain control of our company.

- Our board of directors may issue, without stockholder approval, shares of undesignated preferred stock. The ability to issue undesignated preferred stock makes it possible for our board of directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to acquire us.

As a Delaware corporation, we are also subject to certain Delaware anti-takeover provisions. Under Delaware law, a corporation may not engage in a business combination with any holder of 15% or more of its capital stock unless the holder has held the stock for three years or, among other things, the board of directors has approved the transaction. Our board of directors could rely on Delaware law to prevent or delay an acquisition of us.

## ITEM 2.    UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

### Results of Google's Transferable Stock Option Program

Under our TSO program, which we launched in April 2007, eligible employees are able to sell vested stock options to participating financial institutions in an online auction as an alternative to exercising options in the traditional method and selling the underlying shares. The following table provides information with respect to sales by our employees of TSOs during the three month period ended March 31, 2008:

| | Aggregate Amounts | | | Weighted-Average Per Share Amounts | | |
| Period (1) | Number of Shares Underlying TSOs Sold | Sale Price of TSOs Sold (in thousands) | TSO Premium (2) (in thousands) | Exercise Price of TSOs Sold | Sale Price of TSOs Sold | TSO Premium (2) |
| --- | --- | --- | --- | --- | --- | --- |
| January 1-31 | — | — | — | — | — | — |
| February 1-29 | 66,400 | $ 19,789 | $ 2,756 | $ 298.10 | $ 241.26 | $ 41.52 |
| March 1-31 | — | — | — | — | — | — |
| Total (except weighted-average amounts) | 66,400 | $ 19,789 | $ 2,756 | $ 298.10 | $ 241.26 | $ 41.52 |

(1) The TSO program is generally active during regular NASDAQ trading hours when Google's trading window is open. However, we have the right to suspend the TSO program at any time for any reason, including for maintenance and other technical reasons.

(2) TSO premium is calculated as the difference between (a) the sale price of the TSO and (b) the intrinsic value of the TSO, which we define as the excess, if any, of the price of our Class A common stock at the time of the sale over the exercise price of the TSO.

47

**ITEM 6.   EXHIBITS**

| Exhibit Number | | Description |
|---|---|---|
| 31.01 | * | Certification of Chief Executive Officer pursuant to Exchange Act Rules 13a-14 (a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2003 |
| 31.02 | * | Certification of Chief Financial Officer pursuant to Exchange Act Rules 13a-14 (a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2003 |
| 32.01 | ‡ | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2003 |

\*    Filed herewith.

‡    Furnished herewith.

48

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**GOOGLE INC.**

Date: May 12, 2008

By: _____ /s/   GEORGE REYES _____

**George Reyes**
**Senior Vice President and Chief Financial Officer**
**(Principal Financial Officer and duly authorized signatory)**

49

**EXHIBIT INDEX**

| Exhibit Number | | Description |
|---|---|---|
| 31.01 | * | Certification of Chief Executive Officer pursuant to Exchange Act Rules 13a-14 (a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2003 |
| 31.02 | * | Certification of Chief Financial Officer pursuant to Exchange Act Rules 13a-14 (a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2003 |
| 32.01 | ‡ | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2003 |

\*    Filed herewith.

‡    Furnished herewith.

50

Exhibit 31.01

# CERTIFICATION OF CHIEF EXECUTIVE OFFICER
## PURSUANT TO
## SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Eric Schmidt, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Google Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 12, 2008

/s/   ERIC SCHMIDT
**Eric Schmidt**
**Chief Executive Officer**

Exhibit 31.02

## CERTIFICATION OF CHIEF FINANCIAL OFFICER
### PURSUANT TO
### SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, George Reyes, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Google Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 12, 2008

/s/   GEORGE REYES
**George Reyes**
**Chief Financial Officer**

Exhibit 32.01

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER
PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Eric Schmidt, certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report of Google Inc. on Form 10-Q for the quarterly period ended March 31, 2008, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of Google Inc.

Date: May 12, 2008

By: _____ /s/   ERIC SCHMIDT

Name:          Eric Schmidt

Title:          Chief Executive Officer

I, George Reyes, certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report of Google Inc. on Form 10-Q for the quarterly period ended March 31, 2008, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of Google Inc.

Date: May 12, 2008

By: _____ /s/   GEORGE REYES

Name:          George Reyes

Title:          Chief Financial Officer

# EXHIBIT G

# Civil Docket

Fulton County Superior Court
Cathelene Robinson, Clerk

Case No. 2008CV151322
Fulton County

August 28th, 2008
11:50am

TRACIE MCFERREN INDIVIDUALLY AND ON
BEHALF OF CLASS OF SIMILARLY SITUATED
INDIVIDUALS vs AT&T MOBILITY LLC
DELAWARE LIMITED LIABILITY COMPANY

Filed : 05/29/2008
Status: Filed
Type: TRANSFER/CIVIL

Judge:
ALICE D. BONNER

Court Reporter:

| Date | | Volume | Page |
|---|---|---|---|

### Plaintiff Information

PLAINTIFF NAME                    ATTORNEY NAME
  MCFERREN, TRACIE                  Stone, William Sims

### Events & Orders of the Court

| | |
|---|---|
| 05/21/08 | CONSENT ORDER (E13) |
| | ZYD-EXTENDING DEADLINE TO NOTICE PENDECY OF CLASS ACTION |
| | SETTLEMENT BY PUBLICATION |
| 08/18/08 | ORDER (E12) |
| | LG - JUDGES BONNER AND MILLER WILL CONDUCT A TELEPHONIC STATUS |
| | CONFERENCE |
| 07/24/08 | ORDER (E9) |
| | RO-ORDER ADMITTING PRO HAC VICE COUNSEL (MYLES MCGUIRE) |
| 07/24/08 | ORDER (E10) |
| | RO-ORDER ADMITTING PRO HAC VICE COUNSEL (JAY EDELSON) . |
| 07/24/08 | ORDER (E11) |
| | RO-ORDER ADMITTING PRO HAC VICE COUNSEL (SCOTT KAMBER) . |
| 07/11/08 | TRANSCRIPT (E8) |
| | LF-TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS HEARD BEFORE |
| | SENIOR JUDGE ALICE D. BONNER |
| 05/30/08 | APPLICATION (E2) |
| | TV-PLAINTIFF APPLICATION FOR ADMISSION TO APPEAR PRO HAC VICE |
| | ON BEHALF OF PLAINTIFF |
| 05/30/08 | APPLICATION (E3) |
| | TV-APPLICATION FOR ADMISSION TO APPEAR PRO HAC VICE ON BEHALF |
| | OF PLAINTIFF |
| 05/30/08 | APPLICATION (E4) |
| | TV-APPLICATION FOR ADMISSION TO APPEAR PRO HAC VICE ON BEHALF |
| | OF PLAINTIFF |
| 05/30/08 | MEMORANDUM (E5) |

08/28/08  THU 14:51  [TX/RX NO 5892]

# Civil Docket

**Fulton County Superior Court**
Cathelene Robinson, Clerk

Case No. 2008CV151322
Fulton County

August 28th, 2008
11:50am

| Date | | Volume | Page |
|------|---|--------|------|

Events & Orders of the Court (cont.)

TV-PLAINTIFF'S MEMORANDUM IN SUPPORT OF PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT
05/30/08    MOTION (E6)
TV-PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION
SETTLEMENT
05/30/08    ORDER (E7)
TV-ORDER ON CLASS CERTIFICATION & PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT AGREEMENT
05/29/08    PLAINTIFF'S ORIGINAL PETITION (E1)
KA- PETITION

Page 2

# EXHIBIT H



CTIA is the International Association for the Wireless Telecommunications
Industry, Dedicated to Expanding the Wireless Frontier.

## Wireless Quick Facts
### Year End Figures

| Topic | Dec-07 | Dec-05 | Dec-00 | Dec-95 |
|---|---|---|---|---|
| Wireless Subscribers | 255.4M | 207.9M | 109.5M | 33.8M |
| Wireless Penetration % of total U.S. population | 84% | 69% | 38% | 13% |
| Wireless-Only Households[1] % of U.S. Households | 15.8% | 8.4% | N/A | N/A |
| Direct Carrier Jobs | 267,000 | 233,000 | 184,000 | 68,000 |
| Wireless Carrier Payroll[2] Direct Carrier Wages | $13B | $12.2B | $1.8B | $1.7B |
| AnnualizedTotal Wireless Revenues | $138.9B | $113.5B | $45.3B | $19B |
| Annualized Wireless Data Revenues | $23.2B | $8.5B | $211.2M | N/A |
| Annualized Incremental Capital Investment | $21.1B | $25.2B | $18.4B | $5.1B |
| Minutes of Use | 2.1T | 1.5T | 533.8B | 431.9M |
| Monthly SMS Messages | 48.1B | 9.8B | 14.4M | N/A |
| Annualized Yearly SMS Messages | 363B | 81B | N/A | N/A |
| Cell Sites | 213,299 | 183,689 | 104,288 | 22,663 |
| E-911 Calls[3] Per Day | 291K | 260K | 139K | 55K |

| K=Thousand | M=Million | B=Billion | T=Trillion |
|---|---|---|---|

[1]Wireless Substitution: Early Release of Estimates from the National
Health Interview Survey, July-December 2007, National Center for Health
Statistics, May 14, 2008.

[2]BLS Series data.

[3]CTIA Wireless 9-1-1 and Distress Calls.

CTIA 1400 16th Street, NW, Suite 600, Washington, D.C. 20036  202.785.0081

# EXHIBIT I

FOR IMMEDIATE RELEASE

**FOR MORE INFORMATION:**

**Lee Graham**
The NPD Group, Inc.
212-333-4983
lee@leegraham.biz

The NPD Group, Inc.
900 West Shore Road
Port Washington, NY 11050

☆ BOOKMARK ▪ ◝ ⸬ ⚛ ...

# The NPD Group: U.S. Consumer Mobile Phone Unit-Sales Declined 13 Percent Year-over-Year in Q2 2008

*Q2 2008 U.S. revenues from consumer handset sales fell below $2.4 billion – a decrease of 2 percent from the same quarter last year*

**PORT WASHINGTON, NEW YORK, August 19, 2008** – According to The NPD Group, the leader in market research for the wireless industry, mobile phone handset sales to consumers in the U.S. totaled 28 million units in the second quarter (Q2) of 2008, which is a 13 percent decline since the same period a year ago. NPD estimates total second quarter 2008 consumer sales of nearly $2.4 billion, down 2 percent since Q2 last year.

Among handset manufacturers, Motorola managed to just barely maintain its lead in the U.S. market during the first quarter; however, the company's unit-sales share fell 6 percentage points from Q1 (27 percent) and 11 percentage points (from 32 percent in Q2 2007 to 21 percent this year). LG, RIM, and Samsung all gained market share, as Motorola's declined.

"Quarterly unit-sales of handsets fell to their lowest level, since NPD begin tracking the category in 2005," said Ross Rubin, director of industry analysis for NPD. "Even so, most major manufacturers picked up market share that was lost by Motorola."

Following is the breakdown of the top five manufacturers' share of units sold to U.S. consumers in Q2 2008:

| | |
|---|---|
| Motorola | 21% |
| Samsung | 20% |
| LG | 20% |
| Nokia | 9% |
| RIM Blackberry | 7% |

As in previous quarters, phones sold in Q2 2008 were, by and large, more feature-rich than those sold the year prior. Handsets sold with a QWERTY keyboard saw the greatest year-over-year rise, with 28 percent of handsets sold with this feature in Q2 2008, versus just 12 percent the year prior. Smartphone sales comprised 19 percent of all mobile phone sales in Q2 2008, an increase of 9 percentage points since the same period a year ago. Also this quarter 81 percent of phones purchased were Bluetooth enabled (up from just 69 percent from last year), and 65 percent of phones purchased in Q2 2008 were music enabled (versus 45 percent last year).

The average selling prices (ASPs) paid by U.S. consumers reached $84, an increase of 14 percent in Q2 2008 versus the same period a year ago; however, Q2 2008 ASP declined nearly 4 percent when compared to Q1 2008 ($87) due to price declines seen on brands like LG, Motorola, Nokia and RIM.

Carrier stores continue to lead all retail channels when it comes to handset sales, maintaining their collective

share of 63 percent of unit sales in Q2 2008, compared to just 8 percent for mass merchandisers and 6 percent for electronic specialty stores. Among specific carriers, AT&T expanded its unit-sales lead posting a 29 percent share, versus 26 percent for Verizon Wireless, and 11 percent for both T-Mobile and Sprint. ATT's gain was owed to an increase in sales for pre-paid as well as post-paid handsets. NPD noted stable consumer sales from Samsung and Nokia and a jump in sales for Sony Ericsson and RIM.

*Methodology: NPD compiles and analyzes mobile device sales data based on more than 150,000 completed online consumer research surveys each month. Surveys are based on a nationally balanced and demographically representative sample. Results are projected to represent the entire population of U.S. consumers. Note: NPD does not track corporate/enterprise handset purchases.*

**About The NPD Group, Inc.**
The NPD Group is the leading provider of reliable and comprehensive consumer and retail information for a wide range of industries. Today, more than 1,600 manufacturers, retailers, and service companies rely on NPD to help them drive critical business decisions at the global, national, and local market levels. NPD helps our clients to identify new business opportunities and guide product development, marketing, sales, merchandising, and other functions. Information is available for the following industry sectors: automotive, beauty, commercial technology, consumer technology, entertainment, fashion, food and beverage, foodservice, home, office supplies, software, sports, toys, and wireless. For more information, contact us or visit http://www.npd.com.

# EXHIBIT J

Cars  Auto Financing  Event Tickets  Jobs  Real Estate  Online Degrees  Business Opportunities  Shopping

Search                                    How do I find it?


Get Comcast High-Speed Internet
$19.99
Includes PowerBoost



 USA TODAY.    Home    News    Travel    Money    Sports    Life    Tech    Weather

## Technology » Wi-Fi center

# AT&T eager to wield its iWeapon

Updated 5/23/2007 8:38 PM | Comments    40 | Recommend    23    E-mail | Save | Print | Reprints & Permissions | RSS



⊕ Enlarge                                   Apple

The iPhone combines three products — a revolutionary mobile phone, a widescreen iPod with touch controls, and a breakthrough Internet communications device with desktop-class email, web browsing, searching and maps — into one small and lightweight handheld device.

### WIRELESS MARKET SHARE

Wireless provider AT&T is the leading carrier in current wireless communication market share.

| | |
|---|---|
| AT&T | 27.1% |
| Verizon | 26.3% |
| Sprint Nextel (2) | 23.6% |
| Others | 11.9% |
| T-Mobile | 11.1% |

Note: Market share values are calculated as if they always have been combined

**By Leslie Cauley, USA TODAY**

The Apple iPhone, due out next month, has been breathlessly hailed as offering consumers the ultimate wireless experience.

It also could give AT&T, its exclusive U.S. distributor, the ultimate experience for a wireless carrier: an easy way to handcuff rivals and steal customers.

AT&T has exclusive U.S. distribution rights for five years — an eternity in the go-go cellphone world. And Apple is barred for that time from developing a version of the iPhone for CDMA wireless networks.

That ban is no small thing. AT&T rivals Verizon Wireless and Sprint are both CDMA shops. AT&T uses GSM, a global standard incompatible with CDMA.

Bottom line: If you want an iPhone anytime soon, you'll have to take your business to AT&T.

**FIND MORE STORIES IN:** Verizon Wireless | Forrester Research | Cingular | Sprint Nextel | Apple iPhone | Charles Golvin | IAG Research | We're No | Denny Strigl

Stan Sigman, CEO of wireless at AT&T, makes no apologies for his tough approach.

"I'm glad we have (the iPhone) in our bag," he says. "Others will try to match it, but for a period of time, they're going to be playing catch-up."

Hardball is nothing new in the cellphone industry. But as

○ Mixx it
Other ways to share:
Digg
del.icio.us
Newsvine
Reddit
Facebook
What's this?

**Related Advertising**

"Teeth Whiteners Expo
7 Teeth Whitening Prod
www.Best-Teeth-Whitening

"Your Credit Score Sti
A good credit score is 7
www.CreditReportAmerica


Today
make
conn
easie

See ho

1 - AT&T acquired Cingular in 2004

2 - Sprint and Nextel merged

*Source: Forrester Research*



⊕ Enlarge    By Terry Renna, AP

Joey Eastridge apples the finishing touches to an AT&T logo on an equipment box before Saturday's NASCAR Nextel All-Star Challenge race at Lowe's Motor Speedway in Concord, N.C. AT&T and Sprint Nextel have been feuding over NASCAR naming rights.

## ALLTEL ACCEPTS TAKEOVER BID

Shares in wireless carrier Alltel surged nearly 7% Monday after it accepted a $25 billion takeover offer from TPG Capital and the buyout arm of Goldman Sachs.

The deal ended months of speculation about a possible buyout of Alltel, the top rural wireless provider with about 12 million customers. Alltel provides services in parts of 35 states, and offers coverage across the country through roaming agreements.

TPG Capital, formerly Texas Pacific Group, and GS Capital Partners will acquire Alltel for $71.50 per share in cash, the company said late Sunday.

Alltel shares rose $4.39 to $69.60 on Monday and have gained about 20% since speculation about a buyout arose in December.

Analyst reports had estimated Alltel could be sold for $25 billion to $30 billion, with other potential buyers including Verizon Wireless, AT&amp;T and Sprint Nextel.

*Reuters*

white-hot growth finally begins to slow, it's getting downright desperate out there.

To keep the momentum, big carriers such as AT&T are rapidly expanding their stable of devices, a proven way to draw people into stores. They're also piling on features — media downloading and photo-sharing are hot — and tweaking calling plans.

Their common goal: add new customers and get them to stay put.

"It's guerrilla warfare," says Jane Zweig, CEO of market researcher The Shosteck Group. "They all want to say 'We're No. 1.' "

Roger Entner, a senior vice president at IAG Research, agrees. "They're battling for every customer."

Wall Street is the driver. Carriers are valued, in large part, on how many subscribers they add each month. That was a lot easier a few years ago, when it wasn't uncommon for cellphone companies to add 25% a *quarter*.

Now that the major carriers are elephantine in size, that's a lot harder to do. AT&T currently claims about 62.2 million customers. Verizon and Sprint have 60.7 million and 53.6 million, respectively.

About 78% of U.S. households have a mobile phone, says Charles Golvin, a wireless industry analyst at Forrester Research, vs. 53% five years ago. Total subscribers: about 210 million.

For the most part, Golvin says, anybody who wants a cellphone has one. Those who don't, he says, "are the very young, the very old and the economically challenged." Those groups are not particularly attractive to the big carriers, which also are valued on how much revenue per subscriber they generate.

**Rustling up revenue**

That leaves the carriers with one option, basically, for adding customers: steal them.

"Today's market is not about finding new opportunities," Golvin says. "It's about stealing somebody else's customers."

The AT&T and Verizon Wireless rivalry is particularly fierce. AT&T has slightly more customers; Verizon has more revenue. Both claim to be No. 1.

They also sparred over the iPhone. As previously

reported by USA TODAY, Verizon passed on the opportunity to become the exclusive U.S. distributor, balking at Apple's demand for control over distribution, pricing, marketing and more. That left an opening for AT&T — then called Cingular — to cement a deal. (AT&T on Monday officially dumped the Cingular name and store signs now are being switched. The move came slightly ahead of schedule.)

Denny Strigl, Verizon's chief operating officer, decided to pass on the iPhone deal and says he has no regrets: "Time will tell" if he made the right call, he says.

Strigl doesn't think the iPhone will be that hard to compete against. Why? Because, he says, for five long years it will be tied to AT&T's wireless network. His point: A phone is only as good as the network it runs on, and he thinks Verizon's is better.

"The issue is not the Apple-ness of the iPhone itself, but with the cellular network that it is running on," Strigl says, picking his words carefully. "That will be the true test of the iPhone: What will the iPhone experience be?"

Given Apple's cultlike following, however, Verizon isn't taking any chances. Strigl says Verizon is already working with a manufacturer — he declines to say which one — on an answer to the iPhone.

"We do have a very good response in the mill," he says. "You'll see that from us in the late summer."

**Sprint names names**

Sprint Nextel is also getting down and dirty.

In recent full-page newspaper ads, Sprint has lately been dumping on AT&T by name, taking swipes at the quality of its wireless network. Sprint also has derided AT&T's "fewest dropped calls" claim, saying it — not AT&T or even Verizon — has that title.

AT&T came back swinging. In full-page ads, including one in USA TODAY, AT&T shot back that "15 times more people choose AT&T than Sprint."

The ad also took a whack at Sprint's CDMA technology, saying "only AT&T keeps you connected in over 190 countries on the GSM network, the one used by 84% of wireless customers worldwide." As for "fewest dropped calls," "only AT&T" has that distinction, the ad claims. Sigman says the attacks on Sprint were deliberate — and unavoidable. "I don't like calling my competitors out by name. But I'd just had enough of it."

Gary Forsee, CEO of Sprint Nextel, says his ads weren't intended to embarrass AT&T. They were crafted, he says, to call attention to the quality and performance of the Sprint Nextel networks. (Sprint and Nextel have merged but for now have separate networks.)

"These are facts," he says. "We are calling (AT&T) out to call attention to customers and to the marketplace that we do have superior capability in our network."

Verizon, meantime, is trying to reel in customers using one of the oldest ploys in advertising: freebies.

In a splashy series of ads, the carrier has been inviting consumers to "test drive" its network for 30 days, with no obligation. If consumers aren't happy, Verizon will cover the cost of their calls.

Strigl says the ad showcases the quality of Verizon's wireless network, while driving home the point that it is confident people will like their experience. Figuring out ways to entice consumers is a constant concern for carriers, he says. Given the crush of choices consumers have, "It becomes increasingly important ... to give customers a reason to switch to us."

That's critical, according to Strigl, because so many customers jump from carrier to carrier. Currently, he says, about 50% of Verizon's new wireless customers come from other carriers. He says Verizon can track their migration habits because people bring their cellphone numbers with them. (Federal rules require carriers to let wireless customers keep their numbers.)

In today's heated environment, carriers are quick to exploit any edge they can get. Or force.

Consider the barroom brawl between Sprint and AT&T over NASCAR. At the crux: a paint job on a race car. AT&T, thanks to buying BellSouth, now owns 100% of Cingular and has changed the name to AT&T. (BellSouth had a 40% stake.) So it wanted to change the logos on the No. 31 NASCAR race car that Cingular had sponsored for years. The car was emblazoned with Cingular's jacks logos; AT&T wanted to replace them with its blue-and-white globe.

Under AT&T's proposed paint scheme, the main color of the car — orange — wouldn't change.

AT&T contended the changes were permitted under its sponsorship contract — on which Cingular has spent $150 million since 2001 — with Richard Childress Racing, a company that operates NASCAR race teams. AT&T last year inherited the contract when it acquired the 40% of Cingular that it didn't already own.

Sprint Nextel cried foul. Nextel has a 10-year, $750 million deal with NASCAR to back the championship Nextel Cup Series, which kicks off each February with the Daytona 500.

Sprint said its NASCAR contract, which it inherited when it bought Nextel, called for it to be the racing circuit's sole telecom sponsor. The only exception: telecom companies that were sponsors prior to Nextel's arrival. They were grandfathered in by NASCAR.

One of those was Cingular, then owned by SBC (AT&T) and BellSouth.

Sprint argued that Cingular's change in ownership structure and new name negated its sponsorship deal. As a result, Sprint said, AT&T should not be permitted to rebrand the car. NASCAR agreed. Unable to work out a compromise, AT&T last month sued NASCAR.

**Racing to court**

The courtroom battle was bitter. AT&T's lawyer introduced an internal Sprint e-mail that suggested NASCAR was amenable to a compromise. But the same e-mail also suggested Sprint executives weren't, concluding "no benefit would be superior to having AT&T booted out of the sport," according to a story posted on NASCAR.com.

NASCAR countered with an internal memo from AT&T. Attorney David Gelfand insisted the document showed that AT&T hoped to force its way into the sport, with the goal of muscling in on Sprint's ad turf.

Sprint wasn't a party to the case, which was heard in U.S. District Court in Atlanta. Even so, it filed briefs supporting NASCAR.

On Friday, the judge ruled in AT&T's favor. AT&T promptly issued a press release saying it looked forward "to the debut of the new paint scheme." On Saturday, the judge rejected NASCAR's request for a stay of the ruling during an appeal. The car raced with the AT&T logo and name Saturday night.

Forsee, the Sprint chief, says the fight is about much more than a paint job: "NASCAR would have chaos in the (sponsorship) categories if they didn't enforce contracts." "It's not fair to minimize" the impact of AT&T's plans, he says. "We paid hundreds of millions of dollars (to become a sponsor), and we signed a contract. All we're asking is that NASCAR enforce the contract."

Sigman says he's looking forward to getting the fight back to where he thinks it belongs. "We'd much prefer to compete against Sprint in the marketplace rather than competing over the brand of a car."

**READERS: How do you choose your cellphone? For style or substance? Tell us what you think is more important.**

**Share this story:**

Mixx it      Digg      del.icio.us      Newsvine      Reddit      Facebook  What's this?

Posted 5/21/2007 10:29 PM

Updated 5/23/2007 8:38 PM                    E-mail | Save | Print | Reprints & Permissions | RSS

*To report corrections and clarifications, contact Reader Editor **Brent Jones**. For publication consideration in the newspaper, send comments to letters@usatoday.com. Include name, phone number, city and state for verification.*

**Conversation guidelines:** USA TODAY welcomes your thoughts, stories and information related to this article. Please stay on topic and be respectful of others. Keep the conversation appropriate for interested readers across the map.

**You must be logged in to leave a comment. Log in | Register**

**Comments: (40)**  Showing:  Newest first



Jimm Grimm wrote: 2/3/2008 11:25:41 PM
This is in response to jimr1233 who wrote:

There are two camps in life . . .

A = Ferrari B = Chevy Malibu
A = Breitling B = Timex
A = Mac B = PC
A = iPhone B = Razr

There's room enough for all of us and valid arguments for both camps. The Ferrari can't hold many groceries, the Timex will certainly give you the correct time, and the Mac won't run "Grand Theft Auto." Pick either camp and you could argue all night why you're there.

But make no mistake the people in camp "A" do not for a minute wish they were back in camp "B" no matter what Camp "B" thinks.

When people in Camp "B" complain, everyone chalks it up to sour grapes.

jimr123: you are a fool. Yes, Ferrari represents the pinnacle of automotive art. Breitling watches are some of the finest made. Macs are way better than PC's and the iPhone is hot stuff. But when all you type "A's" out there have your Ferrari in the shop (again), your watch being

serviced because your slipery-fingered kid dropped it on the floor, and your iPhone dropping
calls and looking for the AT&T network, while youre riding in a Chevy Malibu Taxi, listening to
the driver yammer into his RAZR phone, (no doubt on a CDMA network), while glancing at his
Timex, it may occur to you that maybe, just maybe, having all that aint really "All 'dat". As for
your Mac: I am writing this on a 7 year old mac G4 that has Took a lickin' and kept on
ticking...youre 1 for 4, PC's really do suck.

http://www.washingtonpost.com/wp-dyn/content/article/2008/02/01/AR2008020100034.html

                                                    Recommend    |  Report Abuse



**Robre wrote:** 5/23/2007 10:02:14 PM

Verizon must be in damage control mode?! First, I'm with Verizon for about 10 years. I'm paying
about $95 a month. Last month they offered me a free month if I would sign up for another 2
years. Never happened before!! They launched this as a pre-emptive strike so people would not
defect. Here is why I will:
1. Verizon thinks every user is a thief and would send dial tones via Bluetooth to everybody who
wants it. So while everybody else had Bluetooth for almost 2 years they crippled it when they
finally got a phone released with it !!!
2. I have to use their pix service to get the shots to my pc. Pay per shot !
3. Voice quality: "Can you hear me now - yeah, I just don't understand a word" - do I need to say
more.
4. The Verizon/RAZR software, well - sucks.
Yes - their network was one reason I stayed with them 2 years ago. Since then ATT got a lot
better. And the changes ATT made on their servers to deliver voice mail to the iPhone (?) - just
that feature alone is fantastic. The Verizon "guy" still doesn't get it.

                                                    Recommend    |  Report Abuse



**jimr123 wrote:** 5/23/2007 9:31:40 PM

There are two camps in life . . .

A = Ferrari B = Chevy Malibu
A = Breitling B = Timex
A = Mac B = PC
A = iPhone B = Razr

There's room enough for all of us and valid arguments for both
camps. The Ferrari can't hold many groceries, the Timex will
certainly give you the correct time, and the Mac won't run
"Grand Theft Auto." Pick either camp and you could argue all
night why you're there.

But make no mistake the people in camp "A" do not for
a minute wish they were back in camp "B" no matter what Camp
"B" thinks.

When people in Camp "B" complain, everyone chalks it up to
sour grapes.

                                                Recommend    1 |  Report Abuse



**skintero wrote:** 5/23/2007 3:52:44 AM

candyman2007 wrote: Maybe this phone going to be nice but by the 1st month so one going to
unlock it and then sell it for t mobile sprint and all other cell phone compnay

That's not going to happen. The iPhone isn't made for a CDMA network.

Recommend   1 |  Report Abuse



candyman2007 wrote:  5/22/2007 11:36:51 PM
I have I pod Phones after 5 months the I tunes got droped I wasn't the only one to I found out from another person that they had to send there phone back to motarola to get there I tune put back on the phone I have sprint now Haven't lost a call yet lost more from at&t and the deposits for cinguler were way to high same for at&t . Maybe this phone going to be nice but by the 1st month so one going to unlock it and then sell it for t moble sprint and all other cell phone compnay

Recommend   |  Report Abuse



chicherro wrote:  5/22/2007 8:25:55 PM
Personally, I am extremely excited about the iPhone...all tho it's not a phone that I would be able to take full advantage of (unfortunatly I'm not that important to have such an exssesive phone). I think a majority of consumers who are familiar/comfortable with Apples products will find this the iPhone nothing short of whats expected of it, if not, more (I've had a chance to mess around with it a little bit, tho not as long as I would have liked)...but then again, my opnion is kind of swayed because I work for AT&T.....but on a serious note: AT&T IS # 1!!!!!

Recommend   2 |  Report Abuse



CompMan wrote:  5/22/2007 7:54:43 PM
Maybe cutting edge is $240 for a 338W power supply. Sure.

Recommend   2 |  Report Abuse



skintero wrote:  5/22/2007 7:28:09 PM
texel2000 wrote: 7h 52m ago
John Doe - you are wrong. The iPhone is light years ahead of the competition and so is Apple. Earlier comments about Apple's PC which is an oxymoron because Mac's are far and above Window's PC's, are not informed individuals. Any Mac is superior to the average pc and the iPhone will blow all other units away. Live long and prosper! And use the best technology.

Light years ahead? So why are they pointing and laughing at the iPhone in S. Korea and Japan? Heck, China already has a clone of the iPhone on the market for cheap there. The only thing special about this phone is the buzz Apple has created. Steve Jobs is a master at creating buzz about Apple products.

As far as their computers go, I have five PC's. I considered buying a Mac earlier this year, but just couldn't see ponying up that much money to do something I can already do on my PC. Yes it probably would have been a much easier process on a Mac, but I'll stick with my PC for the prices Apple is asking. And to the guy who says someone else will buy it if you don't want to pay the money, that's the exact attitude that has kept Mac in the back of the line for decades. Some of their products are innovative, but a magnetic cord that breaks away? I have one of those on my deep fryer at home. Last time I checked, Apple doesn't make deep fryers. That's hardly cutting edge technology. I think you could have come up with a better example if you really wanted to show how cutting edge Apple is.

Recommend    | Report Abuse



**CompMan wrote:** 5/22/2007 5:24:51 PM
Hey texel2000, want to send me some of whatever you're taking so I can escape reality, too?

Recommend    | Report Abuse

**More comments on this story:** 1 2 3 4 Next ▶

Sponsored Links

**"Teeth Whiteners Exposed"**
7 Teeth Whitening Products Tested, Rated, and Reviewed. A Must Read!
www.Best-Teeth-Whitening.com

**"Your Credit Score Stinks!"**
A good credit score is 700+. View yours online instantly now, FREE.
www.CreditReportAmerica.com

**"How I Lost 42 Pounds With Acai Berry!"**
Finally, A Diet That Really Works! Seen On CNN, NBC, CBS & Fox News.
MyDietSuccess.net

Get listed here



**Newspaper Home Delivery - Subscribe Today**

Home • News • Travel • Money • Sports • Life • Tech • Weather

**About USATODAY.com:** Site Map | FAQ | Contact Us | Jobs with Us | Terms of Service
Privacy Policy/Your California Privacy Right | Media Kit | Press Room | Reprints and Permissions

**News Your Way:**    Mobile News |    Email News |    IM Alerts |    Add USATODAY.com RSS feeds |    Podcasts |

**Partners:** USA WEEKEND | Sports Weekly | Education | Space com

Copyright 2008 USA TODAY, a division of Gannett Co. Inc.

# EXHIBIT K



About Us  •  Client Solutions  •  Measurement Technology  •  Research Findings

**Research Findings**

- ••• **Latest Research Findings**
- ••• **Market Sector**
  - ••• **Connectivity**
  - ••• **Devices**
  - ••• **Content**
- ••• **Geographic Region**
  - ••• **North America**
  - ••• **Europe**

### OFF-PORTAL PREMIUM SMS TRANSACTIONS GENERATED NEARLY $215 MILLION IN DOWNLOAD PURCHASES AND $35 MILLION IN VOTING/SWEEPSTAKES REVENUES DURING Q1 2007

*Telephia Launches Mobile Industry's First Ever Comprehensive Measurement of Off-Portal Transaction Volumes and Revenues, Showing Premium SMS Revenues Hitting $273 Million*

**SAN FRANCISCO--June 1, 2007**--Telephia today launched the industry's first ever Premium SMS Report. The report provides a detailed look at the US market for off-portal content purchased via premium SMS from off-portal storefronts as well as premium text messaging services, like voting/sweepstakes and chat. Premium SMS revenues totaled more than $273 million, making up 32 percent of mobile content revenue in Q1 2007, according to Telephia, the world's largest provider of syndicated consumer research to the telecom and mobile media markets.

Download purchases paid for via premium SMS (at off-portal storefronts) totaled nearly $215 million, accounting for 79 percent of premium SMS revenue (see Table 1). These off-portal storefront purchases include content such as ringtones and horoscopes. Voting/sweepstakes entries generated more than $35 million. While voting/sweepstakes entries generated only 13 percent of total revenues for premium SMS transactions, they represented 47 percent of premium SMS volume, equaling more than 34 million transactions.

"Premium text messaging continues to be an additional way to reach consumers directly--off the carrier decks. Premium SMS has grabbed a healthy slice of the mobile content market, accounting for an off-portal share of 32 percent," said Kanishka Agarwal , vice president of mobile media, Telephia. "Moreover, marketers are experimenting beyond the standard rate SMS voting pioneered by *American Idol* and tapping into premium SMS with voting/sweepstakes campaigns. NBC's *Deal or No Deal* has translated into a premium SMS hit, generating nearly half of the volume and revenue of voting/sweepstakes entries in the first quarter of 2007."

**Table 1: Premium SMS Transaction Volume and Revenue Share ( U.S. )**

| Category Type | Volume Share (%) | # of Transactions (000) | Revenue Share (%) | Total Q1 2007 Revenue |
|---|---|---|---|---|
| Off-portal Storefront Purchases | 40% | 29,544 | 79% | $214.9M |
| Voting/Sweepstakes Entries | 47% | 34,716 | 13% | $35.4M |
| Other* | 6% | 4,208 | 6% | $17.4M |
| Chat/Community | 7% | 5,497 | 2% | $5.7M |

*Source: Telephia Premium SMS Report and Telephia Attitudes and Behavior Survey, Q1 2007*
*\*Represents unclassified premium SMS short codes*

### About Telephia

Telephia is the world's largest provider of syndicated consumer research to the telecom and mobile media markets. Telephia is your connection to the digital consumer. Since 1998, executives at service providers, device manufacturers, content providers, and retailers have relied on Telephia data to make confident competitive strategy, marketing and resource allocation decisions. Telephia uses its unique measurement tools and large-scale consumer panels to completely understand the digital consumer's behavior, attitudes and experience.

To learn how Telephia data can help you understand the digital consumer and track your competitive performance, please contact us at (415) 395-0500 or **www.telephia.com** .

###

Press Contact Telephia: Maria Bumatay
email: mbumatay@telephia.com
phone: +1 415.637.4904

© 2006-2007 The Nielsen Company