KAREN JOHNSON-MCKEWAN (STATE BAR NO. 121570)
kjohnson-mckewan@orrick.com

NANCY E. HARRIS (STATE BAR NO. 197042)
nharris@orrick.com

NIKKA N. RAPKIN (STATE BAR NO. 244207)
nrapkin@orrick.com

ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    (415) 773-5700
Facsimile:    (415) 773-5759

Attorneys for Defendant
GOOGLE INC.

**FILED**

2008 AUG 29 P 2: 46

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JENNA GODDARD, on her own behalf and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>GOOGLE, INC., a Delaware corporation,<br><br>        Defendant. | CASE NO.  C 08-02738 (JF)<br><br>**DEFENDANT GOOGLE INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**<br><br>**REDACTED VERSION**<br><br>**Date:  September 19, 2008**<br>**Time:  10:30 a.m.**<br>**Judge:  The Honorable Jeremy Fogel**<br><br>**Date Action Filed: May 30, 2008**<br>**No Trial Date Set** |

OHS West:260495622.3

1

## **TABLE OF AUTHORITIES**

2

**Page**

3

## **FEDERAL CASES**

4

*Batzel v. Smith,*
   333 F.3d 1018 (9th Cir. 2003) ............................................................................3, 4

5

*Brady v. Mercedes-Benz USA, Inc.,*

6
   243 F. Supp. 2d 1004 (N.D. Cal. 2002) ..............................................................14, 15

7

*Carafano v. Metrosplash.com,*
   339 F.3d 1119 (9th Cir. 2003) ...................................................................................3

8

*Cohn v. Petsmart, Inc.,*

9
   281 F.3d 837 (9th Cir. 2002) ...........................................................................5, 8, 9

10

*Faulkner v. Astro-Med, Inc.,*
   No. C 99-2562 SI, 1999 WL 820198 (N.D. Cal. Oct. 4, 1999) ...............................14

11

*Fiddler v. AT&T Mobility, LLC,*

12
   2008 WL 2130436, No. 08 C 416 (N.D. Ill. May 20, 2008) ...................................15

13

*Galt G/S v. JSS Scandinavia,*
   142 F.3d 1150 (9th Cir. 1998) .................................................................................14

14

*Guglielmino v. McKee Foods Corp.,*

15
   506 F.3d 696 (9th Cir. 2007) .........................................................................4, 5, 11

16

*Kenneth Rothschild Trust v. Morgan Stanley Dean Witter,*
   199 F. Supp. 2d 993 (C.D. Cal. 2002) ..........................................................5, 6, 9, 11

17

*Lowdermilk v. United States Bank Natl. Ass'n,*

18
   479 F.3d 994 (9th Cir. 2007) ............................................................................13, 14

19

*Muniz v. Pilot Travel Centers LLC,*
   2007 WL 1302504, *2, Case No. S-07-0325- (FCD) (E.D. Cal. May 1, 2007)...................4, 9

20

*Ridder Bros. v. Blethen,*

21
   142 F.2d 395 (9th Cir. 1944) .....................................................................................5

22

*Rodgers v. Cent. Locating Svc.,*
   412 F. Supp. 2d 1171 (W.D. Wash. 2006)..................................................................5

23

*Sanchez v. Monumental Life Ins. Co.,*

24
   102 F.3d 398 (9th Cir. 1996) .....................................................................................5

25

*Simmons v. PCR Technology,*
   209 F. Supp. 2d 1029 (N.D. Cal. 2002).................................................................14, 15

26

*Tompkins v. Basic Research LL,*

27
   2008 WL 1808316, No. 08-244 (LKK) (E.D. Cal. Apr. 22, 2008) ............................5

28

## TABLE OF CONTENTS

                                                                                    **Page**

I.      INTRODUCTION ................................................................................................1

II.     LEGAL STANDARD FOR REMOVAL JURISDICTION UNDER CAFA ....................4

III.    STATEMENT OF RELEVANT FACTS ...............................................................6

        A.      The Complaint .......................................................................................6

        B.      Plaintiff's Counsel's Other Class Actions and Google's Revenues .......................7

                1.      Other KamberEdelson Litigation.............................................8

                2.      Google Revenue Data ...............................................................10

IV.     THE PREPONDERANCE OF THE EVIDENCE DEMONSTRATES THAT THE
        AMOUNT IN CONTROVERSY EXCEEDS THE CAFA MINIMUM...........................11

        A.      Equitable Recovery...............................................................................11

        B.      Compensatory Damages ........................................................................12

        C.      Attorneys' Fees......................................................................................13

V.      PLAINTIFF'S REMAND MOTION RELIES ON IRRELEVANT
        AUTHORITIES............................................................................................15

VI.     CONCLUSION............................................................................................16

OHS West:260495622.3

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ..................................................................................15

## STATE CASES

*MBNA America Bank v. Gorman*,
   147 Cal. App. 4th Supp. 1 (Cal. App. 2006) ...........................................................14

*Serrano v. Priest*,
   20 Cal. 3d 25 (1997) ...........................................................................................14, 15

## FEDERAL STATUTES

28 U.S.C. § 1332(d)...................................................................................................4

47 U.S.C. § 230(c)(1)...............................................................................................3

## STATE STATUTES

California Business and Professions Code § 17200 *et seq.* .........................................12

California Code of Civil Procedure § 1021.5 ...............................................................14

## MISCELLANEOUS

Senate Report No. 109-14 S. REP. 109-14, 42, 2005 U.S.C.C.A.N. 3, 40 (2005).........................5

## I.    INTRODUCTION

Plaintiff's sole argument challenging the jurisdiction of this Court is *not* that the amount in controversy is insufficient to reach the $5 million threshold required by the Class Action Fairness Act, but that *Google has not demonstrated* that the amount in controversy crosses that threshold. Indeed, nowhere in the Motion to Remand ("Motion") does Plaintiff commit to an amount in controversy that is less than $5 million, preferring instead to use the occasion of the Motion to suggest that Google's burden on removal requires it to concede the factual allegations of the complaint and provide free evidence in support of Plaintiff's damages theory. Plaintiff's Motion turns the legal burden for establishing federal jurisdiction on its head and fails for at least the following reasons:

*First,* Google's burden in this matter requires only that it show that it is *more likely than not* that Plaintiff's claims—which are assumed valid for purposes of the Motion—involve a total amount in controversy greater than $5 million.[1] While Plaintiff does not herself "do the math," she does plead facts sufficient to establish the requisite amount in controversy on the face of her Complaint. Plaintiff contends that a portion of Google's advertisers are so-called Fraudulent Mobile Subscription Services whose ad revenues are "ill-gotten gains" for which Plaintiff demands remedies of disgorgement and restitution.[2] She also alleges that "*[m]any if not all* of the Fraudulent Mobile Subscription Services *monthly* or periodic payments to Google for the AdWords services *exceed $10,000.*" *Id.,* ¶ 54.[3] The logical conclusion from these allegations is that Plaintiff has pled facts sufficient to establish the jurisdictional minimum. If only eleven of the 250 mobile subscription service advertisers who are the target of the Complaint (*id.,* ¶ 29) fall within Plaintiff's definition of "fraudulent," then Plaintiff seeks an amount in excess of the jurisdictional minimum ($120,000 per year per advertiser x 11 advertisers x four years covered by the Complaint = $5,280,000). Plaintiff has already identified seven Google advertisers that she

---

[1]  Google denies Plaintiff's allegations and is confident that when the merits of this case are considered those allegations will be proven to be factually and legally devoid of substance. At this point, however, those merits are not at issue.

[2]  Complaint (hereafter, "Compl."), ¶ 29 and Prayer for Relief.

[3]  All emphasis herein is added unless otherwise indicated.

OHS West:260495622.3

1    contends are "fraudulent." *Id.*, ¶ 36, Ex. B.  Given Plaintiff's allegation that Google is "the most

2    widely-used Internet search engine in the world, (Compl., ¶ 2), it requires no willing suspension

3    of disbelief to expect Plaintiff to identify at least four other offending advertisers.  These

4    allegations, and the reasonable inferences to be drawn from them, are sufficient to establish that it

5    is more likely than not that the amount in controversy exceeds $5 million for Plaintiff's

6    disgorgement and restitution prayer alone.

7         ***Second***, as set forth in the accompanying declaration,

8                           **REDACTED**                        *See* Declaration of

9    Matthew Hudson in Support of Google Inc.'s Opposition to Motion to Remand ("Hudson Decl."),

10   ¶ 6.  Although Plaintiff is not clear precisely how many advertisers for which she seeks to hold

11   Google responsible, her complaint expressly covers cell phone "ring tone" subscription providers.

12   Compl. ¶ 7.

13                           **REDACTED**

14

15                                          Plaintiff makes clear that ring tone

16   subscription providers are only a slice of the total Google revenue she contends should be

17   subjected to disgorgement and restitution.  *See* Compl. ¶ 7 (mobile subscription services defined

18   to include "customized ring tones for use with cell phones, sports score reports, weather alerts,

19   stock tips, horoscope services and the like").

20         ***Third***, Plaintiff seeks multiple remedies in this action, including breach of contract

21   damages, "restitution and disgorgement of all ill-gotten gains unjustly obtained," injunctive relief,

22   and attorneys' fees and costs.  The facts establish that *any one* of these remedies has the potential

23   to exceed the jurisdictional minimum.  For instance, Plaintiff seeks damages on behalf of every

24   person in the United States who was charged without authorization for mobile content service by

25   *any* cellular telephone company or service provider (*e.g.*, AT&T Mobility, Verizon, Sprint, T-

26   Mobile), if that cellular customer used the Google search engine to locate an AdWords

27   advertisement for mobile content.  With more than 255 million mobile customers in the U.S. and

28   a nationwide annual market for mobile premium content in excess of $1.1 billion, it is more likely

OHS West:260495622.3

than not that the damages component alone pushes this case beyond the jurisdictional threshold. *See* Compl. ¶ 8 (mobile subscription industry is a "multi-billion dollar marketplace").[4]    Taken together with disgorgement, the costs of an injunction and attorneys' fees in a complex case, it cannot reasonably be disputed that Plaintiff has placed substantially more than $5 million at issue.

*Fourth*, Plaintiff's counsel's results in similar (but more narrowly drawn) cases demonstrate beyond reasonable dispute that the amount in controversy far exceeds the threshold amount. A proposed settlement in one such case proposes class notification be delivered to more than 70 million AT&T customers and would reward Class Counsel, including KamberEdelson— Plaintiff's counsel in that case *and* this one— $4.3 million in attorneys' fees. *See* RJN, Ex. A (*McFerren* settlement memorandum at 6, 11, 16 n.7). In a second KamberEdelson case against a billing aggregator, Plaintiff's counsel obtained a $12 million settlement fund and a $1.2 million fee award. *See* RJN, Ex. B (*Gray v. Mobile Messenger* settlement agreement at 6, 12, 27). In yet another lawsuit, KamberEdelson sought more than $5 million in attorneys fees after settling just three months after filing the complaint, on the theory that Plaintiff's counsel was entitled to 25% of the value of the settlement benefits. *See* RJN, Ex. C (*Abrams v. Facebook, Inc.* Application for Attorneys' Fees at 2). Plaintiff's counsel's history of big money demands in these cases is persuasive evidence that the amount in controversy here far exceeds $5 million.

*Finally*, although Plaintiff has asserted no federal claims against Google in this action, this Court will be asked at the outset to resolve a question of federal law. As a provider of an interactive computer service, Google has federal immunity from Plaintiff's claims; this litigation is an ill-concealed attempt to circumvent the federal law immunizing interactive service providers such as Google against liability for the alleged wrongdoing of third-parties who use its platform.[5]

---

[4]    *See also* Request for Judicial Notice ("RJN"), Exhibit H (CTIA Wireless Quick Facts at 1).

[5]    Specifically, Google intends to move for dismissal of this action pursuant to Section 230 of the Communications Decency Act. 47 U.S.C. § 230(c)(1) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."). Section 230(c)(1) provides immunity from liability for providers and users of an "interactive computer service" who publish information provided by others and provides Google with complete immunity from the claims asserted here. The Ninth Circuit has consistently held that providers of interactive computer services such as Google are entitled to protection from the precise types of claims asserted in this lawsuit – that is, wrongdoing committed by third-parties that makes some use of the Google platform. *See Carafano v. Metrosplash.com*, 339 F.3d 1119 (9th Cir. 2003); *Batzel v. Smith*, 333

OHS West:260495622.3

1  That Plaintiff's claims are legally and factually doomed does not affect this Court's jurisdictional

2  analysis however, because it is required as a matter of law for purposes of this Motion to assume

3  the claims are valid and that liability will result. Plaintiff's demands for restitution and

4  disgorgement, injunctive relief, damages, and attorneys' fees are sufficient to establish the

5  jurisdictional threshold required by CAFA. Plaintiff's motion to remand should be denied.

6  ## II.    LEGAL STANDARD FOR REMOVAL JURISDICTION UNDER CAFA

7      The Class Action Fairness Act vests district courts with "original jurisdiction of any civil

8  action in which, *inter alia*, the amount in controversy exceeds the sum or value of $5,000,000."

9  28 U.S.C. § 1332(d). Plaintiff's sole argument challenging jurisdiction is *not* that her complaint

10  does not exceed CAFA's $5 million amount in controversy threshold, but that Google's removal

11  petition did not sufficiently demonstrate an amount in controversy greater than $5 million.[6]

12      Where a removed complaint "alleges on its face an amount in controversy sufficient to

13  meet the federal jurisdictional threshold, such requirement is presumptively satisfied, unless it

14  appears to a 'legal certainty' that the plaintiff cannot actually recover that amount." *Guglielmino*

15  *v. McKee Foods Corp.*, 506 F.3d 696, 699 (9th Cir. 2007).

16      Where the "complaint fails to allege a sufficiently specific total amount in controversy,"

17  the removing party need only show that the amount in controversy more likely than not exceeds

18  the jurisdictional amount. *Id.* at 701. This "burden is not 'daunting,' as courts recognize that

19  under this standard, a removing defendant is *not* obligated to 'research, state, and prove the

20  plaintiff's claims for damages.'" *Muniz v. Pilot Travel Centers LLC*, 2007 WL 1302504, *2, Case

21  No. S-07-0325 (FCD) (E.D. Cal. May 1, 2007) (citations omitted).[7] "In measuring the amount in

22  ---

F.3d 1018 (9th Cir. 2003). Google does not contend that the CDA provides a basis for federal jurisdiction
23  in this action, but that the ramifications of Plaintiff's artful pleading around the CAFA jurisdictional
requirements should be considered with the backdrop of the CDA.

24  [6] Plaintiff's Complaint provides explicitly that the putative class size exceeds 1000 members, Compl. ¶
25  41, and therefore presumptively meets the jurisdictional requirement. *See Guglielmino*, 506 F.3d at 699.

26  [7] Plaintiff argues that to defeat remand, Google was *"require[d] at a minimum"* to identify "(1) the 250
largest advertisers of mobile subscription services (ranked by monies paid to Google) on or through
27  Google; (2) the number of such advertisers operating landing pages in violation of the Google Content
Policy; (3) the money Google received from the percentage of such advertisers operating landing pages in
28  violation of the Google Content Policy; (4) the number of visitors Google referred to such rogue landing
pages; and (5) the monies such visitors were ultimately charge for unauthorized mobile subscription
OHS West:260495622.3

1   controversy, a court must 'assum[e] that the allegations of the complaint are true and assum[e

2   that] a jury [will] return[ ] a verdict for the plaintiff on all claims made in the complaint.'"

3   *Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F. Supp. 2d 993, 1001 (C.D. Cal.

4   2002) (citations omitted; brackets in original).

5       Calculation of the amount in controversy can be from the perspective of either the plaintiff

6   or the defendant. *Guglielmino*, 506 F.3d at 700 (quoting *Ridder Bros. v. Blethen*, 142 F.2d 395,

7   399 (9th Cir. 1944)). This "either viewpoint" rule applies to putative class actions brought under

8   CAFA, as well as to single-plaintiff suits. *Tompkins v. Basic Research LL*, 2008 WL 1808316,

9   No. 08-244 (LKK) (E.D. Cal. Apr. 22, 2008); *Rodgers v. Cent. Locating Svc.*, 412 F. Supp. 2d

10  1171, 1179-80 (W.D. Wash. 2006); *see also* Senate Report No. 109-14  S. REP. 109-14, 42, 2005

11  U.S.C.C.A.N. 3, 40 (2005) (noting that CAFA intended to adopt either viewpoint rule). Thus, the

12  amount in controversy "requirement is satisfied if either party can gain or lose the jurisdictional

13  amount." *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 405 (9th Cir. 1996).

14      In determining whether the removal jurisdiction requirements are met, the court may

15  consider evidence submitted subsequent to the notice of removal, including evidence submitted in

16  conjunction with an opposition to a motion to remand. *Cohn v. Petsmart, Inc.*, 281 F.3d 837,

17  840 n.1 (9th Cir. 2002).

18      If the Court finds that Google has met its "more likely than not" burden in this Opposition,

19  "it then becomes plaintiff's burden to show, *as a matter of law*, that it is *certain* [she] will not

20  recover the jurisdictional amount." *Kenneth Rothschild Trust*, 199 F. Supp. 2d at 1001.

21      With that legal backdrop in mind, we next review the allegations of the Complaint, as well

22  as supplemental factual material, which demonstrates by at least a preponderance of the evidence

23  that the amount in controversy here satisfies CAFA.

24

25

26  services." Motion at 2:10-18. In other words, Plaintiff contends Google can only defeat the remand
    motion by (a) conceding the merits of Plaintiff's claims; and (b) producing the evidence Plaintiff requires
27  to make out her case. This, of course, is not what the law requires. As noted, the law simply assumes for
    the sake of argument that Plaintiff's claims have merit, and call on the defendant resisting remand to show
28  only by a preponderance of the evidence that the potential damages in such circumstances *could* (not
    would) exceed $5 million. *See Muniz*, 2007 WL 1302504, *2.
    OHS West:260495622.3

III.    **STATEMENT OF RELEVANT FACTS**

    A.    **The Complaint.**

As noted above, for purposes of measuring the amount in controversy in a remand motion, the court must assume the allegations of the complaint are true. *Kenneth Rothschild Trust,* 199 F. Supp. 2d at 1001. The gravamen of the Complaint is that Google allegedly permitted third parties to advertise deceptive cell phone subscription services through its "AdWords" program in violation of corporate advertising policies which should have foreclosed the advertisements altogether. Compl. ¶¶ 13, 26. More specifically, Plaintiff claims she and other members of the proposed class were victimized by the so-called Fraudulent Mobile Subscription Services' Google ads; clicking on ads for, *e.g.*, free ring tones, they provided their cell phone numbers to the advertisers, only to discover thereafter that they were being charged $9.99 per month by the service provider or mobile telephone company. *Id.*, ¶¶ 33-39. Plaintiff does not allege that she purchased anything from Google, that Google imposed unauthorized charges upon her, or that Google sold her some service or product she did not want. *Id.*, ¶ 13-29. Instead, she has attempted to connect Google to the alleged wrongdoing by mobile content providers by contending that Google knew or had reason to know that some of its advertisers were not in compliance with its AdWords program terms and that such non-compliance resulted in her being charged without authorization by third-parties such as Verizon, Sprint and other cellular providers. *Id.*, ¶¶ 29, 37, Ex. B.

On these facts, Plaintiff alleges class claims for Violation of the California Unfair Competition Law, Breach of Contract, Negligence and Aiding and Abetting others' violations of the Computer Fraud and Abuse Act and California's Unfair Competition Law.

The allegations in the Complaint relevant to assessing the amount in controversy are these:

- "Defendant Google, Inc. operates the most widely-used Internet search engine in the world. Google's search engine is a top Internet destination, and Google claims publicly that it maintains the largest, most comprehensive index of websites and other online content. Google generates revenue primarily by online advertising." *Id.*, ¶ 2.

OHS West:260495622.3

1
2
3
4
5
6
7
8
9
10
11
12

- "A portion of Google's top 250 AdWords customers who are mobile content purveyors utilize landing pages that are not in compliance with Google's Advertising Program Terms." *Id.*, ¶ 29.
- "[M]any if not all of the Fraudulent Mobile Subscription Services['] monthly or periodic payments to Google for the AdWords services exceed $10,000." *Id.*, ¶ 54.
- Plaintiff identifies seven mobile subscription service advertisers in Exhibit B to the Complaint, which she characterizes as examples, not an exhaustive list. *Id.*, ¶ 36, Ex. B.
- Plaintiff prays for relief on behalf of the proposed class in the form of equitable and injunctive relief "including a constructive trust, an accounting, and an injunction prohibiting the continued unlawful business practices," damages, "restitution and disgorgement of all ill-gotten gains," and attorneys' fees and costs. *Id.*, ¶ 18.

13    Taken together, these allegations support federal jurisdiction under CAFA. Accepting
14  Plaintiff's allegations as true, and assuming liability will result, Google could be required to
15  disgorge revenues received from the fraudulent mobile subscription services advertisers at the
16  rate of $10,000 per month per advertiser throughout the period covered by the Complaint (in this
17  case, the four-year statute of limitations period for the Unfair Competition Law claim). Thus, for
18  each advertiser, Google allegedly collected $10,000 x 12 months/year x 4 years, or $480,000.
19  Plaintiff has already alleged the identities of seven such advertisers, bringing the alleged total
20  amount of potential disgorgement to $3,360,000. Plaintiff also alleges, however, that those seven
21  advertisers are a mere sampling from a group of as many as 250 Google advertisers engaged in
22  the alleged fraud. If we accept Plaintiff's allegations as true, Plaintiff need only show that eleven
23  Google advertisers are engaged in the alleged fraud to cross the $5 million CAFA amount in
24  controversy threshold.[8]

25    **B.    Plaintiff's Counsel's Other Class Actions and Google's Revenues.**

26    The Court may also consider evidence beyond the allegations of the Complaint in

27

28  [8] $5,000,000 ÷ $480,000 = 10.417. Eleven advertisers would thus put Plaintiff's disgorgement claim over $5 million.
OHS West:260495622.3

1    assessing the amount in controversy. *Cohn,* 281 F.3d at 840, n. 1. In this case, that other

2    evidence includes: (a) Plaintiff's counsel's demands and recent track record in other class action

3    litigation concerning mobile content providers; and (b) Google's own advertising revenue data.

4              **1.    Other KamberEdelson Litigation.**

5              Together with its liaison counsel in the *McFerren v. AT&T Mobility* case, Plaintiff's

6    counsel in this case has filed no fewer than 15 class action lawsuits in multiple jurisdictions

7    nationwide, most against the leading cellular telephone companies (including AT&T Mobility

8    and Verizon), against cellular telephone billing aggregators (the middlemen responsible for

9    ensuring that mobile content charges reach customers' cellular telephone bills), and against

10   mobile content companies that sell ring tones and other mobile services. *See* RJN, Ex. D

11   (Declaration of Myles McGuire at ¶ 3). These "mobile content" lawsuits all seek damages and

12   restitution for allegedly unauthorized charges imposed by mobile service content providers

13   through consumer cellular telephone bills. The challenged practices include the recycling of

14   "dirty numbers" (a practice by which cellular telephone numbers are passed to new subscribers,

15   along with the costs of any mobile subscription services subscribed to by the telephone number's

16   prior owner), the sale of mobile subscription services to minors, and solicitation by allegedly

17   deceptive websites that promise free ring tones, wallpaper, games, horoscopes and similar

18   services.

19             As broadly-stated as these lawsuits may be, they are actually more limited in reach than

20   the case against Google, which potentially includes as a class member *every* mobile device user in

21   America who also uses the internet. Moreover, the cases are also potentially overlapping, since a

22   recovery by, *e.g.,* an AT&T cellular subscriber for injuries resulting from being charged

23   improperly for a free ring tone subscription cannot be duplicated in a recovery from Google.

24   Thus, while the *named* Plaintiffs may differ from one KamberEdelson lawsuit to the next, the

25   proposed classes appear to have substantial common membership.

26             Given the commonality among the putative real parties in interest, the other

27   KamberEdelson litigation is appropriately considered here in evaluating whether the CAFA

28   amount in controversy requirement is met. In the *McFerren* action, plaintiffs alleged that AT&T
     OHS West:260495622.3

1   Mobility had included charges for mobile content on its consumers' cellular telephone bills

2   without their authorization. The parties have reached a tentative settlement of that matter which,

3   if approved, will reimburse a class of "tens of millions" of consumers and will award Class

4   Counsel, including KamberEdelson, $4.3 million in attorneys' fees. *See* RJN, Ex. A at 6, 11, 18.

5   A second settlement, with billing aggregator Mobile Messenger Americas, Inc., provides for a

6   settlement fund of $12 million and a fee award of $1,225,000 (again, to the same lawyers). *Gray*

7   *v. Mobile Messenger Americas, Inc.*, Case No. 88-61089 (CMA) (S.D. Fl. Aug. 5, 2008). *See*

8   RJN, Ex. B at 6, 12, 27.[9]  To the extent these cases represent subsets of the litigation against

9   Google, these proposed settlements dispel any doubt about the amount in controversy in this case.

10  *See, e.g., Cohn,* 281 F.3d 837 at 840 (holding a "settlement letter relevant evidence of amount in

11  controversy if it appears to reflect a reasonable estimate of the plaintiff's claim").

12          Further illustrating the amount at stake in mobile content litigation (particularly that

13  originating from popular online websites such as Google) is a recent settlement in *Abrams v.*

14  *Facebook, Inc.*, No. 07-05378 (PVT) (N.D. Cal.). Abrams's suit—brought, once again, by the

15  KamberEdelson firm—was a class action on behalf of cellular telephone users who received

16  unauthorized text messages from Facebook because their phone numbers previously belonged to

17  Facebooks users who had authorized such messages. Although Abrams settled that case just

18  *three months* after filing, her attorneys' fee application demanded $5,033,000, estimating that this

19  figure reflected only "25% of the most conservative valuation of the settlement benefits." RJN,

20  Ex. C at 2 (Abrams' Application for Attorneys' Fees). Abrams stated that her request could have

21  been as high as $14.3 million dollars but that, "in keeping with …[her] cautious temperament,"

---

[9]  Plaintiff may contend that these settlements eliminate a subsection of the putative class and therefore
reduce the amount in controversy against Google. The relevant inquiry, however, is "what amount is 'put
in controversy' by the plaintiff's complaint, not what a defendant will *actually* owe." *Muniz,* 2007 WL
1302504 at *3 (emphasis in original). Moreover, the amount in controversy is measured "at the instant of
removal," not thereafter. *Kenneth Rothschild Trust,* 199 F. Supp. 2d at 1001. Furthermore, the AT&T
Mobility settlement is only tentative and has not yet been approved. *See* RJN, Ex. G (AT&T Docket at 1).
Accordingly, AT&T Mobility customers remain members of the putative class for purposes of determining
the amount in controversy here. These settlements cover only a portion of the mobile market and mobile
consumers, *e.g.,* AT&T Mobility represents only about 27.1 percent of the mobile market. *See* RJN, Ex. J
(USA Today Article, May 23, 2007 at 1). Even if the AT&T Mobility settlement is approved, the majority
of cellular consumers are potential class members in this action (including customers of other wireless
carriers, such as Verizon, Sprint and T-Mobile).

1    she reduced her request to a "conservative" $5 million. *Id.* at 13:8-15.

2        2.    **Google Revenue Data.**

3        Having brought suits against defendants actually involved in selling, distributing, or

4    billing for mobile content, Plaintiff's counsel has now (unjustifiably) targeted Google.  Google's

5    primary source of revenue is its online advertising programs, including Google AdWords, an

6    auction-based advertising program that lets advertisers deliver relevant ads targeted to search

7    queries or web content across Google sites and through the Google Network.  RJN, Ex. E (2007

8    10-K at 39-42).  Google's revenue from its advertising programs was more than $16 billion in

9    2007 and reached $5 billion in the first quarter of 2008.  RJN, Ex. E (2007 10-K at 44); RJN, Ex.

10    F (May 12, 2008 10-Q at 24).

11

12

13                          **REDACTED**

14

15

16

17        Although Google's relationship with the mobile content industry is by far the most

18    attenuated compared with the defendants in the other actions, the class at issue in this litigation

19    promises to be one of the largest in size, involving the customers of every cellular service

20    provider and aggregator in the United States, and any mobile subscription service that uses the

21    Internet to advertise.  Compl. ¶ 40 (defining class without limitation by any mobile carrier).

22    Plaintiff acknowledges that the market for mobile subscription services and mobile content is an

23    expanding market that has grown in recent years "to a multi-billion dollar marketplace."  Compl.

24    ¶ 8.  Nielsen Mobile, the leading provider of consumer research for the telecom and mobile media

25    markets, calculated that the U.S. market for premium mobile content resulted in total revenues of

26    $273 million for the first quarter of 2007.[10]  Assuming straight-line growth since 2007, the annual

27    _____

28    [10]   *See* RJN, Ex. K (Nielsen Mobile Press Release at 1).

1  market for mobile content is more than $1.1 billion. Even if only the two most recent years are

2  taken into account, the market data strongly suggest that hundreds of millions of dollars are at

3  stake. If five percent of that market is the result of unauthorized charges, more than $100 million

4  is implicated over two years. If only one-quarter of one percent of the $2.2 billion in revenue was

5  the result of unauthorized charges imposed by mobile content providers who were reached via a

6  Google AdWords advertisement—a tiny fraction given Plaintiff's allegation that Google is "the

7  most widely-used Internet search engine in the world"—the jurisdictional minimum would be

8  satisfied.[11]

9  **IV.    THE PREPONDERANCE OF THE EVIDENCE DEMONSTRATES THAT THE AMOUNT IN CONTROVERSY EXCEEDS THE CAFA MINIMUM**

10

11       **A.    Equitable Recovery**

12         Despite Plaintiff's efforts to conceal the amount at stake in this litigation, the Complaint,

13  taken on its face, alleges an amount in controversy sufficiently in excess of the jurisdictional

14  minimum.[12] Reasonably construed, the Complaint demands disgorgement and restitution of all

15  revenue Google received from all of the allegedly fraudulent mobile subscription services,

16  defined as all of Google's largest 250 mobile content advertisers that "utilize a landing page that

17  is not in compliance with Google's Advertising Program Terms."[13] Compl. ¶ 29. With its four-

18  year statute of limitations, Plaintiff's Business and Professions Code Section 17200 claim places

19  _____

20  [11] $2,200,000,000 x 0.0025 = $5,500,000.

21  [12] Plaintiff is correct that the Complaint's "Prayer for Relief" does not allege an exact amount in controversy. However, the Court is not limited to an examination of the specific prayer, but may look to the entirety of the allegations asserted by plaintiff to determine if the complaint "on its face" alleges a sufficient amount. *Guglielmino*, 506 F.3d at 699; *Kenneth Rothschild Trust*, 199 F. Supp. 2d at 1001.

22

23  [13] Because Plaintiff's definition of "fraudulent" includes actions that do not actually amount to fraud, the number of mobile content advertisers at issue is considerably larger than it would be if limited only to those who committed legal fraud. Google's Advertising Program Terms are detailed and particular. As alleged by Plaintiff, such terms include, for example, that mobile content service advertisers "clearly and accurately display[] price, subscription and cancellation information," "prominently display identification of the service as a subscription, the price of the service, and the billing interval," "provide an opt-in checkbox or other clear mechanism on the first page where users enter personal data," and "display cancellation information" on the ad's landing page. Compl. ¶ 22 (quoting Google's Content Policy). Plaintiff's complaint contends that any lack of compliance with these terms by mobile subscription service customers subjects Google to possible disgorgement.

24

25

26

27

28

1   into controversy all such revenue since April 30, 2004.[14]

2       Plaintiff alleges that a portion of Google's mobile content advertisers are so-called

3   "Fraudulent Mobile Subscription Services" because they do not comply with Google's

4   Advertising Program Terms and that "many, if not all," of these advertisers pay Google at least

5   $10,000 a month in revenue. Compl. ¶¶ 29, 54. If Plaintiff's allegations are accepted as true,

6   which they must be for this limited purpose, it takes only eleven of these advertisers to surmount

7   the jurisdictional hurdle ($120,000 per year x 11 advertisers x 4 years = $5,280,000). Given that

8   Plaintiff identified seven advertisers that she claims are not in compliance with Google's

9   Advertising Program Terms (id., Ex. B), it is a reasonable inference that an additional four of the

10  thousands of Google advertisers fail Plaintiff's test.

11      The large number of Google "ring tone" advertisers and the substantial revenue generated

12  by such advertisers supports this conclusion.

13

14          **REDACTED**

15      This evidence, which only

16  represents a fraction of the advertisements placed at issue by Plaintiff, demonstrates that it is

17  more likely than not that Plaintiff's disgorgement and restitution claims surmount the

18  jurisdictional threshold.

19      **B.    Compensatory Damages**

20      Plaintiff also demands compensatory damages in the amount of all charges paid by

21  putative class members for unauthorized mobile content services. Id., ¶¶ 64 -5. Plaintiff alleges

22  that each class member paid "amounts not less than $9.99" in unauthorized fees (id., ¶ 39), and

23  contends that Google is liable for such damages under a third-party beneficiary breach of contract

24  theory. Id., ¶¶ 60-65.

25      The putative class consists of all persons and entities that "suffered damages as a result of

26  [14] Google does not concede that this is an accurate calculation. But for present purposes, all that is relevant
27  is that Plaintiff *alleges* that all or nearly all revenue from a "fraudulent mobile subscription service" is
    "derived from a 'specific unlawful activity,'" Compl. ¶ 53, and that all acceptance of such revenue is
28  therefore "unfair competition" subject to disgorgement under California Business and Professions Code §
    17200, *et seq.*
    OHS West:260495622.3

1   clicking on a Google AdWords advertisement for mobile subscription services which linked to a

2   Fraudulent Mobile Subscription Services website." *Id.*, ¶ 40. A reasonable estimate of the

3   putative plaintiff class size, based on plaintiff's counsel's allegations in this and previous cases

4   (which Google does not concede are accurate), number in the tens of millions. *See* RJN, Ex. H

5   (CTIA Wireless Quick Fact at 1) (255.4 million users of mobile subscriptions services in the

6   United States); RJN, Ex. A (AT&T Mobility settlement memorandum at 16, n. 7; stating that

7   more than 70 million AT&T Mobility subscribers will be provided with class notice). Indeed,

8   Plaintiff's counsel has estimated that there are "tens of millions" of putative class members in the

9   AT&T Mobility class *alone*, a class which, by its own definition, overlaps with the putative class

10  in this case. *See* RJN, Ex. A (AT&T Mobility settlement memorandum at 18). If the allegedly

11  aggrieved customers of *all* cellular providers are factored into counsel's calculation (Verizon,

12  Cingular, Sprint/Nextel, and T-Mobile, for example), the number of consumers nationwide likely

13  exceeds 50 million. *See* RJN, Exs. I, J (AT&T market share of 27%). Plaintiff herself attributes

14  (albeit mistakenly) a significant portion of the claimed injuries of this overall class to consumers'

15  contact with Google ads. Compl. ¶ 13 ("Absent advertising through Google, the fraudulent

16  mobile subscription services would have significantly fewer visitors to their websites and their

17  illegal revenues would drop dramatically."). It will take only a very small fraction of the overall

18  class to place $ 5 million in controversy in the case against Google (500,000 x $10 = $5 million).

19  Plaintiff's counsel's familiarity with the size of the allegedly aggrieved class should be given

20  substantial weight by the Court in its analysis of the amount in controversy (particularly since

21  there is no way Google could ascertain with certainty how many consumers have been charged

22  for mobile content without their authorization). This data demonstrates that it is more likely than

23  not that Plaintiff has breached the CAFA threshold.

24          **C.    Attorneys' Fees.**

25          The amount in controversy in this matter also includes a reasonable estimate of attorney

26  fees Plaintiff may be entitled to recover in this litigation. In the Ninth Circuit, "where an

27  underlying statute authorizes an award of attorneys' fees, either with mandatory or discretionary

28  language, such fees may be included in the amount in controversy." *Lowdermilk v. United States*

OHS West:260495622.3

GOOGLE'S MEMO IN OPP. TO PLAINTIFF'S MOTION TO
REMAND CASE NO. C08-02738 (JF)

1   *Bank Natl. Ass'n*, 479 F.3d 994, 1000 (9th Cir. 2007) (including aggregated attorneys' fees to

2   calculate amount in controversy in CAFA case but remanding because amount in controversy was

3   specified in complaint) (quoting *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1155-56 (9th Cir.

4   1998) (holding that potential for discretionary award of fees under California Code of Civil

5   Procedure § 1021.5 should be included as part of the amount in controversy)). Courts look to

6   state law "to determine whether attorneys' fees are statutorily authorized." *Id.*

7         In calculating the attorneys' fees to factor into the amount in controversy, fees should be

8   projected through the termination of the suit since "a reasonable estimate of fees likely to be

9   incurred to resolution is part of the benefit permissibly sought by the plaintiff and thus contributes

10  to the amount in controversy." *Brady v. Mercedes-Benz USA, Inc.*, 243 F. Supp. 2d 1004, 1011

11  (N.D. Cal. 2002). In other words, just as a plaintiff's entitlement to damages and future costs is

12  projected for purposes of calculating the amount in controversy, [t]he measure of fees should be

13  the amount that can reasonably be anticipated at the time of removal, not merely those already

14  incurred." *Simmons v. PCR Technology*, 209 F. Supp. 2d 1029, 1034-35 (N.D. Cal. 2002)

15  ("Thus, the Ninth Circuit must have anticipated that district courts would project fees beyond

16  removal."); *but see Faulkner v. Astro-Med, Inc.*, No. C 99-2562 SI, 1999 WL 820198 (N.D. Cal.

17  Oct. 4, 1999) (explicitly distinguished by *Brady* and *Simmons*).

18        The amount of attorneys' fees that Plaintiffs' counsel could demand after trial in this

19  matter can be reasonably extrapolated from the fees they have already sought and/or obtained in

20  similar cases. Both the *McFerren* and the *Gray* settlements resulted in substantial sums to be paid

21  to plaintiffs' counsel: $4.3 million in the *McFerren* case and $1.225 million in the *Gray* case. *See*

22  RJN, Ex. A at 6, 11 ; Ex. B at 6, 12, 27. Notably, these cases were settled *before* any discovery or

23  trial. Similarly, KamberEdelson's settlement and demand for attorneys' fees of more than $5

24  million in the Facebook case before any discovery or motion practice, let alone trial, is substantial

25  evidence that Plaintiff and her attorneys are eyeing more than that in this case. It is reasonable to

26  infer that plaintiffs demanded more attorneys' fees than ultimately obtained through a

27  compromise settlement and that these same attorneys will demand even more from Google in the

28  event they were to prevail after trial. *See MBNA America Bank v. Gorman*, 147 Cal. App. 4th

OHS West:260495622.3

1   Supp. 1, 12 (Cal. App. 2006) (quoting *Serrano v. Priest*, 20 Cal. 3d 25, 48 (1997)) (allowing fee

2   awards to be calculated using the lodestar method and through application of a multiplier

3   depending upon the complexity of the issues involved); *Vizcaino v. Microsoft Corp.*, 290 F.3d

4   1043, 1047 (9th Cir. 2002) (recognizing a benchmark fee award of 25%).

5   **V.     PLAINTIFF'S REMAND MOTION RELIES ON IRRELEVANT AUTHORITIES.**

6         In support of her motion to remand, Plaintiff cites three mobile content cases in which the

7   district court remanded the action back to state court. *See* Remand Motion at 6-8. Plaintiff's

8   reliance on these cases is misplaced. Each is readily distinguished, involving removal by only a

9   single cellular telephone service defendant and a putative class limited to residents of a single

10  state. Moreover, none of these cases demand both disgorgement *and* damages as Plaintiff does

11  here. *See* Remand Motion Ex. B *(Gray v. Cellco Partnership*, Order on Motion to Remand at 2

12  (defining class "consisting of all Verizon wireless telephone subscribers in Florida who suffered

13  losses or damages . . .")); *Id.* Ex. A *(Paluzzi v. Cellco Partnership*, Order at 2 (considering

14  Verizon's "evidence of its 400,000 wireless customers in Illinois")); *Fiddler v. AT&T Mobility,*

15  *LLC*, 2008 WL 2130436, No. 08 C 416 (N.D. Ill. May 20, 2008) (noting that "the amount Fiddler

16  seeks to recover against M-Qube consists of a substantial portion of the retail value of the content

17  provided to Illinois customers"). None of those trial courts had before it the facts available here,

18  facts that plainly make apparent the stakes of mobile content litigation: the $4.3 million attorney

19  fee provision in the *McFerren* settlement and over "tens of millions" of AT&T class members or

20  the $12 million settlement fund and $1.2 million fee award by Mobile Messenger in the *Gray*

21  litigation. Plaintiff's suggestion that the *Gray* case supports a remand of its case against Google

22  is particularly disingenuous. Only five weeks after it filed its motion to remand here, Plaintiff's

23  counsel settled that case against only *one* of the named defendants (Mobile Messenger) on behalf

24  of the impacted consumers for amounts well in excess of the jurisdictional minimum. *See* RJN,

25  Ex. B (*Gray* settlement agreement at 6, 12, 27).[15] The very large sums at issue in these related

26  ───────────────
    [15] Notably, Judge Gettleman in the *Paluzzi* case followed a Northern District of Illinois District Court case

27  in holding that the amount of attorneys' fees to be considered in the removal calculus was the "amount of
    fees incurred at the time jurisdiction is invoked." Remand Motion, Ex. A at 3. The Northern District of

28  California has adopted a different rule and considers what fees will be at issue at the conclusion of the
    litigation. *Brady*, 243 F. Supp. 2d at 1011; *Simmons*, 209 F. Supp. 2d at 1034-35.
    OHS West:260495622.3

1  cases is persuasive evidence that the case asserted by Plaintiff against Google, involving a

2  putative nationwide class of customers of *all* cellular services (Verizon, T-Mobile, AT&T,

3  Sprint/Nextel, to name a few) from *all* fifty states, presents an amount in controversy clearly in

4  excess of $5 million.

5  **VI.    CONCLUSION**

6        As discussed above, Plaintiff's complaint demands (1) restitution and disgorgement of all

7  "ill-gotten gains" since April 30, 2004, from the largest mobile content advertisers whose landing

8  pages did not fully comply with Google's Advertising Program Terms; (2) damages for every

9  individual nationwide who was charged without authorization by a mobile content service located

10  through Google AdWords; (3) an injunction to prohibit future revenue from such advertisers; and

11  (4) attorneys' fees for costs of litigating a nationwide class action. The weight of the evidence

12  establishes that any one of these demands, in isolation, exceeds the $5 million jurisdictional

13  threshold. Taken together, it is certain (let alone "more likely than not") that the amount in

14  controversy exceeds the CAFA threshold.

15        The Court should not reward Plaintiff's artful (but transparent), attempt to avoid federal

16  jurisdiction while maintaining her ability to seek more than $5 million in relief, particularly when

17  the threshold legal issue is whether federal law bars her claims. For the reasons set forth above,

18  Google respectfully requests the Court deny Plaintiff's motion to remand.

19

20  Dated: August 29, 2008

     KAREN JOHNSON-MCKEWAN

21       NANCY E. HARRIS

     NIKKA N. RAPKIN

22       ORRICK, HERRINGTON & SUTCLIFFE LLP

23

24       _____

     Karen Johnson-McKewan

25       Attorneys for Defendant

     GOOGLE INC.

26

27

28