1   Alan Himmelfarb (Cal. Bar. No. 90480)
    KAMBEREDELSON LLC
2   2757 Leonis Blvd.
    Los Angeles, CA 90058
3   (323) 585-8696
    ahimmelfarb@kamberedelson.com
4
    Jay Edelson
5   Myles McGuire
    Ethan Preston (*pro hac vice*)
6   KAMBEREDELSON LLC
    350 North LaSalle
7   Suite 1300
    Chicago, IL 60654
8   jedelson@kamberedelson.com
    mmcguire@kamberedelson.com
9   epreston@kamberedelson.com

10  *Counsel for Plaintiff Jenna Goddard*

11              **IN THE UNITED STATES DISTRICT COURT**
             **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
12                      **SAN JOSE DIVISION**

13  JENNA GODDARD, an individual, on her own      No. 08-02738 (JF)
    behalf and on behalf of all others similarly
14  situated,                                     Judge Jeremy Fogel

15                 Plaintiff                      **PLAINTIFF JENNA GODDARD'S**
                                                  **OPPOSITION TO DEFENDANT**
16          v.                                    **GOOGLE, INC.'S MOTION TO**
                                                  **DISMISS**
17  GOOGLE, INC., a Delaware corporation,

18                 Defendant.

19

20

21

22

23

24

25

26

27

28

---

Opposition to Motion to Dismiss                              No. 08-02738 (JF)

Dockets.Justia.com

# Table of Contents

Page

I.   Introduction .................................................................................................1

II.  The CDA Does Not Act to Bar Goddard's Claims ...................................3

    A.   Immunity Under the CDA Does Not Shield Google from Goddard's Claims ....4

    B.   Section 230(c)(2)(A) Does Not Protect Google From Its Failure to Enforce Its Own Agreements ........................................................................................6

    C.   The CDA Does Not Apply to Goddard's UCL Claim, Because It Does Not Hold Google Liable As a Publisher of Information .......................................7

    D.   Goddard's UCL Claims Stands Because the CDA Does Not Apply to Enforcement of Federal Criminal Statutes .............................................8

    E.   The CDA Does Not Apply to Aiding and Abetting Claims .............................11

III. Goddard Properly Stated Her Claims ........................................................12

    A.   Goddard States a UCL Claim .......................................................................12

        1.   Goddard Alleges Violations of the CFAA Under 18 U.S.C. § 1030(a)(4) and 18 U.S.C. § 1030(a)(5)..........................................................14

        2.   Goddard Alleges That Google Has Engaged in Monetary Transactions in Property Derived from Unlawful Activity in Violation of 18 U.S.C. § 1957(a) ........................................................................................16

        3.   Goddard Has Standing Under the UCL .................................................18

    B.   As an Intended Third-Party Beneficiary of Google's Agreement, Goddard Stated a Claim for Breach of Contract..........................................................19

    C.   Goddard Stated a Claim For Negligence ..........................................................21

    D.   Goddard Stated a Claim For Aiding and Abetting ............................................23

IV.  Conclusion ...................................................................................................24

**Table of Authorities**

**Federal Cases**            **Page**

*800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273 (D.N.J. 2006) ........................8

*Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851 (E.D. Va. 1999) ................................6 n.2

*Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257 (N.D. Cal. 2006) ........................5

*Antoninetti v. Chipotle Mexican Grill, Inc.*,
    No. 05-1660, 2007 WL 2456223 (S.D. Cal. Aug. 23, 2007)........................16 n.9

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ........................10

*Ass'n of Irritated Residents v. C & R Vanderham Dairy*,
    435 F. Supp. 2d 1078 (E.D. Cal. 2006) ........................16 n.9

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003)........................4-5, 6, 9

*Carafano v. Metrosplash.com. Inc.*, 339 F.3d 1119 (9th Cir. 2003)........................7

*Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008)........................10 n.4

*Connecticut Nat. Bank v. Germain*, 503 U.S. 249 (1992)........................9

*Continental Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059 (E.D. Cal. 2006) ...........17

*Creative Computing v. Getloaded.com LLC*, 386 F.3d 930 (9th Cir. 2004) ........................16 n.8

*In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098 (N.D. Cal. 2007) ........................18

*e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605 (N.D. Ill. 2008) ........................6 n.2

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008)........................3-4, 5, 9, 12

*FTC v. Accusearch, Inc.*, No. 06-105, 2007 WL 4356786 (D. Wyo. Sept. 28, 2007) ................8, 12

*G & C Auto Body Inc. v. Geico General Ins. Co.*,
    No. 06-04898, 2007 WL 4350907 (N.D. Cal. Dec. 12, 2007)........................19 n.10

*Hartless v. Clorox Co.*, No. 06-2705, 2007 WL 3245260 (S.D. Cal. Nov. 2, 2007) ........................11

*Hempstead v. General Fire Extinguisher Corp.*, 269 F. Supp. 109 (D. Del. 1967)................21 n.13

*Henry v. Lehman Commercial Paper, Inc.*, 471 F.3d 977 (9th Cir. 2006) ........................11-12, 24

*Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116 (9th Cir. 2008) ........................15

*Langdon v. Google, Inc.*, 474 F. Supp. 2d 622 (D. Del. 2007) ........................6 n.2

*Lou v. Belzberg*, 834 F.2d 730 (9th Cir. 1987)........................11

*Mazur v. eBay Inc.*,
    No. 07-03967, 2008 WL 618988, (N.D. Cal. Mar. 4, 2008) ....................5, 7, 20 n.12, 21, 23

**Table of Authorities**

**Federal Cases**                                                                                        **Page**

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ...........................9 n.3

*Molski v. M.J. Cable, Inc.*, 481 F.3d 724 (9th Cir. 2007) .................................................................9

*Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978 (9th Cir. 2006) ...........................11

*Perrin v. United States*, 444 U.S. 37 (1979) .....................................................................................9

*Rutherford v. United States*, 365 F.2d 353 (9th Cir. 1966) .............................................................10

*Sanbrook v. Office Depot, Inc.*,
    No. 07-05938, 2008 WL 1994884 (N.D. Cal. May 5, 2008).................................................19 n.10

*Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*,
    119 F. Supp. 2d 1121 (W.D. Wash. 2000) ........................................................................16 n.8

*S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*,
    426 F. Supp. 2d 1061 (C.D. Cal. 2005) ...................................................................................19

*State of Wa., Dept. of Revenue v. www.dirtcheapcig.com, Inc.*,
    260 F. Supp. 2d 1048 (W.D. Wash. 2003) ..............................................................................10

*Summit Tech., Inc. v. High-Line Med. Instruments Co., Inc.*,
    922 F. Supp. 299 (C.D. Cal. 1996) .........................................................................................10

*Tafflin v. Levitt*, 493 U.S. 455 (1990) ...............................................................................................11

*United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997) ........................................................15 n.7

*United States v. Gabriele*, 63 F.3d 61 (1st Cir. 1995) ......................................................................17

*United States v. Hanley*, 190 F.3d 1017 (9th Cir. 1999) ..................................................................17

*United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007)....................................................................17

*United States v. Flores*, 454 F.3d 149 (3d Cir. 2006) ................................................................16, 17

*United States v. Johnson*, 971 F.2d 562 (10th Cir. 1992) .................................................................13

*United States v. Lo*, 231 F.3d 471 (9th Cir. 2000)............................................................................15

*United States v. Mitra*, 405 F.3d 492 (7th Cir. 2005)..................................................................12 n.6

*United States v. Nguyen*, 493 F.3d 613 (5th Cir. 2007) ...................................................................17

*United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997) ...........................................................13, 17

*United States v. Taylor*, 239 F.3d 994 (9th Cir. 2001) ....................................................................18

*United States v. Ward*, 448 U.S. 242 (1980) ...................................................................................10

*United States v. Wilson*, 591 F.2d 546 (9th Cir. 1979) .................................................................9-10

**Table of Authorities**

**Federal Cases**                                                                 **Page**

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
    No. 05-11172, 2005 WL 5250032 (D. Mass. Dec. 21, 2005) ........................10-11

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007)...................6-7

*Voicenet Commc'ns, Inc. v. Corbett*,
    No. 04-1318, 2006 WL 2506318 (E.D. Pa. Aug. 30, 2006) ...........................11 n.5

*Webb v. Smart Document Solutions, LLC*, 499 F.3d 1078 (9th Cir. 2007) ....................11

*White v. Trans Union, LLC*, 462 F. Supp.2d 1079 (C.D. Cal. 2006)................................19

*Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277 (11th Cir. 2006)..........................10 n.4

*Witriol v. LexisNexis Group*,
    No. 05-02392, 2006 WL 4725713 (N.D. Cal. Feb. 10, 2006) ....................19 n.11

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    No. C07-080, 2007 WL 5189857 (W.D. Wash. Aug. 28, 2007) ....................6 n.2

**Federal Rules**                                                                 **Page**

Fed. R. Civ. P. 9(b) ..................................................................................................17

**Federal Statutes**                                                              **Page**

18 U.S.C. § 1030 (2008) .............................................................1, 2, 7, 11, 12, 14, 15

18 U.S.C. § 1957 (2008) .......................................1, 2, 7, 8, 11, 13, 14, 16, 17, 19

47 U.S.C. § 230 (2008) ................................................................1-2, 3, 4, 5, 6, 7, 8

**California Cases**                                                               **Page**

*Adams v. City of Fremont*, 68 Cal. App. 4th 243, 80 Cal. Rptr. 2d 196 (Cal. Ct. App. 1998) ........22

*Aron v. U-Haul Co. of Cal.*,
    143 Cal. App. 4th 796, 49 Cal. Rptr. 3d 555 (Cal. Ct. App. 2006) .............................19 n. 11

*Artiglio v. Corning Inc.*, 18 Cal. 4th 604, 957 P.2d 1313 (1998) ...................................21

*Casey v. U.S. Bank Nat'l Ass'n*,
    127 Cal. App. 4th 1138, 26 Cal. Rptr. 3d 401 (Cal. Ct. App. 2005) ......................12, 24

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
    20 Cal. 4th 163, 973 P.2d 527 (1999)................................................................13-14

*FNS Mortgage Serv. Corp. v. Pacific Gen. Group, Inc.*,
    24 Cal. App. 4th 1564, 29 Cal. Rptr. 2d 916 (Cal. Ct. App. 1994) ........................22, 23

*Hanberry v. Hearst Corp.*, 276 Cal. App. 2d 680, 81 Cal. Rptr. 519 (Cal. Ct. App. 1969) .....23

## Table of Authorities

**California Cases**                                                                                     **Page**

*Hooker v. Dep't of Transp.*, 27 Cal. 4th 198, 38 P.3d 1081 (2002)...................................22 n.14

*Johnson v. Superior Court,*
    80 Cal. App. 4th 1050, 95 Cal. Rptr. 2d 864 (Cal. Ct. App. 2000) ............................20

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 63 P.3d 937 (2003) .........14, 18

*Mukhtar v. Latin American Security Serv.,*
    139 Cal. App. 4th 284, 42 Cal. Rptr. 3d 563 (Cal. Ct. App. 2006)...........................22

*Orser v. Vierra*, 252 Cal. App. 2d 660, 60 Cal. Rptr. 708 (Cal. Ct. App. 1967)....................24

*Paz v. State of Cal.*, 22 Cal. 4th 550, 994 P.2d 975 (2000).......................................22-23 n.15

*Schauer v. Mandarin Gems of Cal., Inc.,*
    125 Cal. App. 4th 949, 23 Cal. Rptr. 3d 233 (Cal. Ct. App. 2005) ...........................19

*Shersher v. Superior Court,*
    154 Cal. App. 4th 1491, 65 Cal. Rptr. 3d 634 (Cal. Ct. App. 2007) ...........................18

*Wang v. Massey Chevrolet,*
    97 Cal. App. 4th 856, 118 Cal. Rptr. 2d 770 (Cal. Ct. App. 2002) ...........................14

**California Statutes**                                                                                  **Page**

Cal. Bus. & Prof. Code § 17203 (2008) ...........................................................................1

Cal. Bus. & Prof. Code § 17204 (2008) ..........................................................................18

**Miscellaneous**                                                                                        **Page**

H.R. Rep. No. 99-855 (1985)..........................................................................................13

Black's Law Dictionary (7th ed. 1999) ............................................................................9

Department of Justice, Prosecuting Computer Crimes (2007), at
    http://www.cybercrime.gov/ccmanual/ccmanual.pdf.............................................15 n.7

## PLAINTIFF JENNA GODDARD'S OPPOSITION TO
## DEFENDANT GOOGLE, INC.'S MOTION TO DISMISS

In her Complaint, Plaintiff Jenna Goddard ("Goddard") explains the rise of mobile content transmitted to cellular phones and the corresponding increase in fraudulent charges for this mobile content. (Pl.'s Compl. ¶¶ 7-12.) As Goddard alleges, Defendant Google, Inc. ("Google") plays an "essential" role in mobile content providers' schemes to assess fraudulent charges for this mobile content. (*Id.* ¶ 13.) Google accepts payments from fraudulent mobile content providers for advertising services, displays the mobile content providers' ads (called AdWords) on its search engine in response to particular searches, and provides links that send users to landing pages on the fraudulent mobile content providers' websites. (*Id.* ¶¶ 15-16, 37.) These landing pages use false and misleading representations to charge and collect subscription fees from Internet users' cellular phone numbers. (*Id.* ¶¶ 11-12, 37-38.) These misrepresentations violate certain terms of Google's Content Policy that were specifically geared to address (or to create the appearance of addressing) endemic fraud amongst mobile content providers, affiliate marketers and others operating in the mobile content industry, and expressly incorporated by Google into Google's contract with its advertisers (i.e., Advertising Program Terms), (*Id.* ¶¶ 21-22.) contractually binding Google itself under its own volition to enforce. (*Id.* ¶¶ 24.)

Goddard's Complaint states claims against Google for (1) violation of the Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17203) predicated on a violation of 18 U.S.C. § 1957 (prohibiting monetary transactions from unlawful activity); (2) breach of contract as an intended third-party beneficiary; (3) negligence; and (4) aiding and abetting the mobile content provider's trespass to chattels and violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030) ("CFAA") and the UCL.

## I.    Introduction

Google's Motion to Dismiss relies on two sets of misplaced arguments. First, Google asserts that the Communications Decency Act (namely, 47 U.S.C. § 230) (the "CDA") shields it from any liability stemming from selling advertising to fraudulent mobile content providers. The CDA protects Google from liability for "any information provided by another information

content provider," such as the mobile content providers. 47 U.S.C. § 230(c)(1) (2008). Contrary to Google's suggestion, CDA immunity is broad but not limitless – it does not exempt Google from civil litigation altogether. Goddard's claims hinge on information Google *created* – such as the terms of Google's Content Policy concerning mobile content providers' fraudulent or misleading landing pages. (Pl.'s Compl. ¶¶ 19, 21-22, 30-32.) The CDA does not immunize Google against liability for content whose "creation or development" it is "responsible" for. 47 U.S.C. § 230(f)(3) (2008). Likewise, liability on Goddard's UCL claim stems from Google's acceptance of tainted funds from fraudulent mobile content providers; it is ***separate from and independent*** of Google's display of the fraudulent mobile content providers' AdWords.

Second, Google incorrectly argues that the underlying claims asserted Goddard's Complaint are defective on their own terms. Goddard properly alleged the predicate violations of 18 U.S.C. § 1030(a) and 18 U.S.C. § 1957(a) that lay the basis for her UCL claim. Google also misstates both the UCL's standing requirements and provision for restitution.

Likewise, Goddard specifically alleges she is an intended third-party beneficiary of the terms in Google's Content Policy. (Pl.'s Compl. ¶62.) California law does not require the Content Policy to explicitly name Goddard as a third-party beneficiary for her to have standing, and Google is liable as a promisor given the plain language of the Advertising Program Terms.

Similarly, Google's argument against Goddard's negligence claim also misstates California law. Google's contention that Goddard "must allege the Advertising Terms [themselves] somehow increased her risk of injury" blurs the distinction between a self-imposed undertaking and the *performance* of that undertaking. It was Google's failure to perform a duty it imposed on itself when it drafted the contract at issue – to enforce the terms of the Content Policy – that caused Goddard's injuries. Moreover, California law does not require Goddard to have read the Content Terms themselves – it is enough that Google lent its name to the fraudulent mobile content providers under the AdWords program and drafted a contract that imposed a duty on itself under such Content Policy.

Lastly, Google's argument against Goddard's aiding and abetting claim simply contradicts Goddard's explicit allegations. Google asserts that Goddard "failed . . . to allege that Google provided 'substantial assistance,' as required to state a claim for aiding and abetting." (Def.'s Mem. 19.) To the contrary, Goddard alleges that the AdWords service Google supplies to fraudulent mobile content providers is "***an essential part*** of [fraudulent mobile content providers'] scheme [to defraud cellular users], because [the mobile content providers] could not collect unwitting users' cellular numbers without Google driving Internet traffic towards their landing pages." (Pl.'s Compl. ¶ 80) (emphasis added). These arguments are explained in further detail below.

## II. The CDA Does Not Act to Bar Goddard's Claims

The CDA does not apply to Goddard's claims because those claims arise from content created by Google (such as its Content Policy) and Google's conduct (such as its acceptance of tainted funds) which was (and remains) unrelated to content created by the mobile content providers. The CDA's protections are broad, but "[a]ny immunity provision, including section 230, has its limits." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1175 n. 39 (9th Cir. 2008) ("*FHC*"). Google urges that the Goddard has "artfully plead around Section 230," suggesting that the Court should err on the side of extending CDA immunity. (Def.'s Mem. 9.) The Ninth Circuit has already rejected this reasoning:

> It's no surprise that defendants want to extend immunity as broadly as possible. ... many defendants argue that the risk of getting a close case wrong is a justification for broader immunity. Accepting such an argument would inevitably lead to an endless broadening of immunity, as every new holding creates its own borderline cases.

*Id*. at 1175. Google cannot stretch the CDA to apply in this case: Goddard's claims fall outside the CDA's scope of immunity. Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1) (2008). Courts have kept the scope of CDA immunity within the limits of this language:

> When Congress passed section 230 it didn't intend to prevent the enforcement

of all laws online; rather, it sought to encourage interactive computer services that provide users neutral tools to post content online to police that content without fear that through their "good samaritan . . . screening of offensive material," 47 U.S.C. § 230(c), they would become liable for every single message posted by third parties on their website.

*FHC*, 521 F.3d at 1175. For the sake of this Motion, Goddard concedes Google is generally an "interactive computer service" under the definition in 47 U.S.C. § 230(f)(2). The question remains, then, is whether Google may be liable on Goddard's claims because it is being "treated as the publisher or speaker of any information provided by another information content provider."[1]

### A. Immunity Under the CDA Does Not Shield Google from Goddard's Claims

Google's Advertising Program Terms state that "***Google* and Customer *hereby agree***[s] ***and acknowledge***[s]" that the consumer protections found in the Content Policy are incorporated into the contract between Google and its AdWords advertisers. (Pl.'s Compl. ¶ 21) (emphasis added). This language cannot be explained away as merely accidental or superfluous: Google drafted its advertising agreement with the intent to promote the perception that the search engine and its AdWords are safe to use. (*Id*. ¶ 30-31.) Nothing in the CDA prevents Google from imposing obligations on itself which remove its actions from the scope of CDA immunity.

CDA immunity only extends to information "provided by another information content provider." 47 U.S.C. § 230(c)(1) (2008). When claims against interactive computer services hinge on content they created, the interactive computer services fall out of the scope of this immunity. "The reference to '*another* interactive computer service' [in section 230(c)(1)]

---

[1]  Thus, in *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003), the Ninth Circuit found that a claim against an operator of an email listserv might survive because the publication of an allegedly defamatory email could have been inconsistent with the term "provided by" in the CDA. *Id*. at 1132. The Ninth Circuit remanded the case to determine whether the email's author could "be said to have 'provided' his e-mail in the sense intended by § 230(c). If the defamatory information [was] not 'provided by another information content provider,' then § 230(c) [would] not confer immunity" on the listserv operator. *Id*. at 1132. Absent "some active role by the 'provider' in supplying" the actionable information, "users and providers of interactive computer services could with impunity intentionally post material they knew was never meant to be put on the Internet. . . . ***The result would be nearly limitless immunity for speech never meant to be broadcast over the Internet.***" *Id*. at 1132, 1133 (emphasis added).

distinguishes the circumstance in which the [interactive computer service] itself meets the definition of 'information content provider' with respect to the information in question." *Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003). An interactive computer service acts as an "information content provider" when it is "responsible, in whole or in part, for the creation or development of [actionable] information . . ." 47 U.S.C. § 230(f)(3) (2008). "The pertinent question" is whether fraudulent mobile content providers are "the sole content provider[s]" of the content on which Google is held to be liable, or whether Google "can also be considered to have 'creat[ed]' or 'develop[ed]'" that content. *Batzel*, 333 F.3d at 1031.

Goddard's breach of contract and negligence claims are based on the contractual language quoted above and the incorporated terms of the Content Policy which affirmatively prohibit fraudulent and misleading mobile content provider landing pages. (Pl.'s Compl. ¶¶ 21-22.) This prohibition is repeatedly defined by Google with categorical language:

> ***We allow*** the advertisement of mobile subscription advertisements ***only when*** the site [the third-party landing page] clearly and accurately displays price, subscription and cancellation information. . . . If your site [the third-party landing page] promotes mobile subscription services ..., **your site *must* meet the following criteria** . . .

(Pl.'s Compl. ¶ 22.) There is no CDA immunity for claims such as these that arise from Google's own terms of service. Hence, a defendant had no immunity under the CDA for claims arising from its statements that its "live auctions were 'safe' and involved 'floor bidders' and 'international' auction houses," which "create[d] an expectation regarding the procedures and manner in which . . . auction[s] [were] conducted." *Mazur v. eBay Inc.*, No. 07-03967, 2008 WL 618988, at *10, 12 (N.D. Cal. Mar. 4, 2008). *See also FHC*, 521 F.3d at 1166 (housing rental website could not ask questions which allow its users to screen potential renters in a discriminatory manner); *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257, 1262 (N.D. Cal. 2006) (dating website has no CDA immunity against claims that it created fictitious online profiles to attract more business). Similarly, an interactive computer services does not have CDA immunity when it presents third-party content in a misleading way. *Id*. at 1263 (even where third parties created outdated profiles, dating website can be liable for the "manner of presenting the profiles," if not "underlying profiles themselves.").

**B.    Section 230(c)(2)(A) Does Not Protect Google From Its Failure to Enforce Its Own Agreements**

Perhaps aware that subsection 230(c)(1) does not reach claims based on its own Advertising Program Terms, Google mistakenly seeks protection under subsection 230(c)(2) of the CDA. (Def.'s Mem. 11-12.) Subsection 230(c)(2) reads:

> No provider or user of an interactive computer service shall be held liable on account of . . . any *action* voluntarily *taken* in good faith *to restrict* access to or availability of material that the provider or user considers to be . . .objectionable, whether or not such material is constitutionally protected . . .

47 U.S.C. § 230(c)(2) (2008) (emphasis added). By its plain language, subsection 230(c)(2) limits immunity to *completed courses of actions which result in the removal of online material*. Given the italicized language above, this is the only interpretation of subsection 230(c)(2) that is consistent with its intended purpose. Subsection 230(c)(2) "insulates service providers from claims premised on the taking down of a customer's posting such as breach of contract or unfair business practices." *Batzel*, 333 F.3d at 1030 n.9. Consequently, as Google knows, authorities applying subsection 230(c)(2) have consistently applied its plain language to bar claims against the defendant's *removal* of objectionable material or refusal to make such material *available*.[2]

Goddard's claims do not impose liability because Google took any action to *remove* material – on the contrary, her claims stem from Google's refusal to enforce its own Content Policy and Google's acceptance of tainted money from fraudulent mobile content providers. It is telling that Google does not focus on subsection 230(c)(2)(A)'s actual language, and that the two authorities it cites to support its argument do not relate to claims for the improper removal of content, and do not analyze, quote, or even cite 47 U.S.C. § 230(c)(2), but instead concern immunity to claims against the transmission of content under 47 U.S.C. § 230(c)(1). (*Cf.* Def.'s Mem. 11-12 with *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st

---

[2]    *See Langdon v. Google, Inc.*, 474 F. Supp. 2d 622 (D. Del. 2007) (Google's refusal to run ads had immunity under subsection 230(c)(2)). *See also Zango, Inc. v. Kaspersky Lab, Inc.*, No. C07-080, 2007 WL 5189857 (W.D. Wash. Aug. 28, 2007) (antivirus company immune under subsection 230(c)(2)(B) for distributing software that blocked operations of malware); *e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605 (N.D. Ill. 2008) (immunity under subsection 230(c)(2) for blocking spam); *Am. Online, Inc. v. GreatDeals.Net*, 49 F. Supp. 2d 851, 855 -857 (E.D. Va. 1999) (same).

Cir. 2007) (claim for defamatory postings); *Carafano v. Metrosplash.com. Inc.*, 339 F.3d 1119 (9th Cir. 2003) (claims related to publication of private information).)

Google may have intended to argue that its Content Policy somehow qualifies as an "action" protected under section 230(c)(2). If this is Google's construction of section 230(c)(2), it is contrary to authorities which hold interactive computer services liable for failing to provide their users consumer protections promised in their terms of service. *Cf., e.g., Mazur*, 2008 WL 618988, at *10, 12. Even if Google's Content Policy qualified as an action, it cannot qualify as being "in good faith." 47 U.S.C. § 230(c)(2) (2008). As Goddard alleges, Google's awareness of endemic mobile content fraud led to Content Policy; Google's motivation behind Content Policy was to create the appearance to the public and to regulators that it is acting to prevent that fraud. (Pl.'s Compl. ¶¶ 21-22, 26, 30-32.)

## C. The CDA Does Not Apply to Goddard's UCL Claim, Because It Does Not Hold Google Liable As a Publisher of Information

Goddard's UCL claim does not hold Google liable as a publisher of information. Google's liability on Goddard's UCL claim arises from its financial transactions with fraudulent mobile content providers, not its publication of mobile content providers' AdWords. Goddard alleges that mobile content providers obtained funds from her and the rest of the Class after obtaining their cellular numbers and fraudulently charging them for mobile content services, in violation of 18 U.S.C. § 1030(a). (Pl.'s Compl. ¶¶ 11-12, 37-38, 50-51.) The revenue from this conduct therefore derived from a "specified unlawful activity," as defined in 18 U.S.C. § 1957(f)(3). (*Id.* ¶ 53.) Goddard alleges that Google knows (or consciously avoids knowing) that certain mobile content providers derive their revenue from such fraudulent charges, but nonetheless accepts AdWords payments from these tainted funds. (*Id.* ¶ 55.) Google may be liable under 18 U.S.C. § 1957(a) for "knowingly engag[ing] in a monetary transaction in criminally derived property," that is, knowingly accepting tainted funds from fraudulent mobile content providers – not for any advertising services it provides in exchange for those funds. 18 U.S.C. § 1957(a) (2008). Goddard's UCL claim against Google stems from its violation of 18 U.S.C. § 1957(a). Even if Google were entitled to

absolute immunity under the CDA with respect to its AdWords, it would still be liable under 18 U.S.C. § 1957(a) and the UCL for taking tainted funds. ***Google's liability on Goddard's UCL claim is independent of the fraudulent mobile content providers' AdWords: Goddard's UCL claim does not seek to treat Google "as the publisher or speaker" of the AdWords created by mobile content providers.***

Goddard's UCL claim finds support in the reasoning of *FTC v. Accusearch, Inc.*, No. 06-105, 2007 WL 4356786 (D. Wyo. Sept. 28, 2007). In *Accusearch*, the defendant's alleged liability arose its practice of buying confidential phone records from independent researchers and selling them online. *Accusearch* rejected the defendant's argument that it was immune under the CDA to the FTC's claims, which supposedly arose from "actions that [were] fundamentally in the nature of publication and distribution" of confidential telephone records. *Id*. at *5. Rather, *Accusearch* agreed with FTC's position that the defendants were not held liable "for 'publishing' anything, but instead for committing acts in the course of trade or commerce, i.e., buying and selling." *Id*. at *4. "Defendants . . . purchased the records from third-party sources for a fee, and then resold them to the end-consumers. . . . [T]he present lawsuit does not seek to 'treat' Defendants as a publisher within the meaning of the CDA." *Id*. at *6. *See also 800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 295 (D.N.J. 2006) (CDA does not "shield entities from claims of fraud and abuse arising from their own pay-for-priority advertising business, rather than from the actions of third parties"). The same reasoning and result apply to Goddard's UCL claim.

**D.  Goddard's UCL Claims Stands Because the CDA Does Not Apply to Enforcement of Federal Criminal Statutes**

Even if Goddard's UCL claim did treat Google as a "publisher," the CDA would still not foreclose the claim. The CDA expressly provides that section 230(c)(1) "shall [not] be construed to impair the enforcement of . . . any . . . Federal criminal statute." 47 U.S.C. § 230(e)(1) (2008). Goddard's UCL claim is additionally exempt from the CDA because it enforces a federal money-laundering statute, 18 U.S.C. § 1957(a), under the UCL's "unlawful" prong. Because the Internet is such an entrenched fixture in modern life, it is

essential to hold CDA immunity to its proper limits:

> [The Internet] has become a dominant – perhaps the preeminent – means through which commerce is conducted. And its vast reach into the lives of millions is exactly why we must be careful not to exceed the scope of the immunity provided by Congress . . .

*FHC*, 521 F.3d at 1164 n.5. The Ninth Circuit has noted "the broad immunity created by § 230 can sometimes lead to troubling results" and has cited the proposition that if courts "'were writing on a clean slate,'" they would not foreclose some of the claims the CDA forecloses. *Batzel*, 333 F.3d at 1031 n.19 (citing and quoting *Blumenthal v. Drudge*, 992 F. Supp. 44, 51-52 (D.D.C. 1998)). Fortunately, subsection 230(e)(1) balances the CDA's broad grant of immunity by preserving injured plaintiffs' right to relief on a narrow set of claims.

Subsection 230(e)(1)'s plain language cannot support the argument that it only preserves the *government*'s right to prosecute federal crimes.[3] "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). *See also Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 732 (9th Cir. 2007) ("Statutory interpretation begins with the plain meaning of the statute's language."). The ordinary definition of enforcement is "[t]o give force or effect to (a law, etc.)" and plainly encompasses civil litigation. Black's Law Dictionary 549 (7th ed. 1999). Nothing in the plain and ordinary meaning of the word "enforcement" limits it to enforcement by the government, and it would violate basic statutory construction principles to infer qualifying language in statute that Congress did not see fit to include. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992). *Cf. United States v. Wilson*, 591 F.2d 546, 547 (9th Cir. 1979) ("the plain meaning of the [statute] leads to the logical

---

[3] The task of construing the scope of the exception to immunity in subsection 230(e)(1) is not equivalent to determining whether an implied private right of action exists under a federal statute:

> When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, however, the inquiry logically is different. Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the pre-existing remedy.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 378-79 (1982).

conclusion that bribery of state as well as federal officials should be covered. Congress said 'any official,' not 'any federal official.'"). If Congress had wanted to restrict the meaning of the word "enforcement" under subsection 230(e)(1) to prosecutions by the federal government, it knew how to do so explicitly. *Cf.*, *e.g.*, *Summit Tech., Inc. v. High-Line Med. Instruments Co., Inc.*, 922 F. Supp. 299, 305 (C.D. Cal. 1996) (21 U.S.C. § 337(a), which reads "all such proceedings for the enforcement, or to restrain violations, of [the Act] shall be by and in the name of the United States," forecloses private rights of action under the UCL).

Conversely, federal plaintiffs can enforce a variety of federal criminal statutes through civil litigation. *Cf. United States v. Ward*, 448 U.S. 242, 248-51 (1980). Civil litigation can be used to enforce criminal statutes whenever there are civil remedies available. *See State of Wa., Dept. of Revenue v. www.dirtcheapcig.com, Inc.*, 260 F. Supp. 2d 1048, 1053-55 (W.D. Wash. 2003) (while Jenkins Act was criminal statute, presence of injunctive remedy provided for a civil right of action). The most prominent example of this is the Racketeer Influenced and Corrupt Organizations Act, whose "enforcement mechanisms [includes] a private right of action." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006).[4] Similarly, the Ninth Circuit has found, as a matter of statutory construction, that "civil antitrust damage action[s,] [as well as criminal prosecutions,] constitute[] enforcement of the antitrust laws." *Rutherford v. United States*, 365 F.2d 353, 356 (9th Cir. 1966). Narrowing the meaning of the word "enforcement" to criminal prosecution would be inconsistent with the meaning that federal courts have regularly given the word "enforcement" in other contexts. Thus, the broad meaning of the word enforcement does not dwindle to "prosecution by the federal government" simply because subsection 230(e)(1) refers to "Federal criminal statutes." *Cf., e.g., Universal Commc'n Sys., Inc. v. Lycos, Inc.*, No. 05-11172, 2005 WL 5250032, at *4 (D. Mass. Dec. 21, 2005) (claim under 47 U.S.C. § 223 fit under 47 U.S.C. § 230(e)(1) but failed

---

[4]   *See also Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (referencing "RICO's civil enforcement mechanism")."It is consistent with civil RICO's purposes – to expand enforcement beyond federal prosecutors with limited public resources – to turn victims . . . into prosecutors as private attorneys general . . ." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1290 (11th Cir. 2006).

because 47 U.S.C. § 223 did not provide private right of action).[5]

Moreover, Goddard's UCL claim does not fall out of subsection 230(e)(1) simply because she seeks to enforce 18 U.S.C. § 1957(a) via California law. While 18 U.S.C. § 1957 does not provide for a direct right of action, the Ninth Circuit has recognized that "a private plaintiff may bring [an UCL] action even when the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action." *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 986 (9th Cir. 2006) (quoting *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950, 45 P.3d 243, 249 (2002), punctuation omitted). The "unlawful" prong of the UCL includes federal statutes that do not otherwise provide for a private right of action. *See Webb v. Smart Document Solutions, LLC*, 499 F.3d 1078, 1082-83 (9th Cir. 2007) (HIPAA). Certainly, federal statutes can foreclose private rights of action and preempt UCL claims, but such statutes contain express language to that effect. *Cf. Hartless v. Clorox Co.*, No. 06-2705, 2007 WL 3245260, at *4 (S.D. Cal. Nov. 2, 2007) ("plaintiff is precluded from enforcing FIFRA privately by using it as a predicate for her UCL claim based on Congress' express rejection of private actions to enforce it"). No such language exists in either 18 U.S.C. § 1030 or 18 U.S.C. § 1957, so there is no barrier to Goddard enforcing those laws under the UCL. State involvement in the enforcement of federal criminal statutes does not frustrate or impinge on federal interests. For instance, federal courts have found that it is entirely appropriate state court jurisdiction over RICO claims. "[F]ar from disabling or frustrating federal interests, permitting state courts to entertain federal causes of action facilitates the enforcement of federal rights." *Tafflin v. Levitt*, 493 U.S. 455, 467 (1990). *See also Lou v. Belzberg*, 834 F.2d 730, 737-39 (9th Cir. 1987).

### E.     The CDA Does Not Apply to Aiding and Abetting Claims

Finally, Goddard's aiding and abetting falls outside the scope of the CDA. Aiding and abetting liability requires a demonstration of 1) knowledge that the primary actor's conduct

---

[5] Indeed, other terms in the CDA have been found apply to both criminal prosecutions and civil litigation. *Voicenet Commc'ns, Inc. v. Corbett*, No. 04-1318, 2006 WL 2506318, at *3-4 (E.D. Pa. Aug. 30, 2006) (terms "'liability' and 'cause of action' encompass criminal as well as civil actions").

constitutes a breach of a duty and 2) "substantial *assistance* or *encouragement* to the other to so act." *Henry v. Lehman Commercial Paper, Inc.*, 471 F.3d 977, 993 (9th Cir. 2006) (emphasis added). *See also Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144, 26 Cal. Rptr. 3d 401, 405 (Cal. Ct. App. 2005) (elements for aiding and abetting liability are: 1) knowledge the primary actor's conduct constitutes a breach of duty and 2) "substantial *assistance* or *encouragement*" to such conduct) (emphasis added). Aiding and abetting liability dovetails with the limits of CDA immunity. The scope of CDA immunity for "website operators is clear: If you don't *encourage* illegal content . . . you will be immune. " *FHC*, 521 F.3d at 1175 (emphasis added). The converse proposition is also true: where website operators encourage and assist actionable content, they may be held liable. *Cf. id*. at 1171 (distinguishing result in other case that found CDA immunity based on defendant which did not "*encourage defamation or . . . make defamation easier*") (emphasis added). *See also Accusearch*, 2007 WL 4356786, at *6 (defendants participated in the creation or development of information and were not immune under the CDA, where they solicited requests for confidential phone records and purchased them from independent researchers for resale).

### III.   Goddard Has Properly Stated Her Claims

Unwilling to stand on its fatally flawed CDA argument, Google makes a scattershot set of arguments that Goddard's claims are substantively defective. The only common feature of these varied arguments is that they either misstate the law or ignore Goddard's allegations.

#### A.   Goddard States a UCL Claim

Goddard alleges that her cellular phone (and those of the rest of the class) are computers, protected by the CFAA. *Cf.* 18 U.S.C. § 1030(e)(1) (2008).[6] Goddard alleges that mobile content providers accessed her and other class members' cellular phones by sending her unauthorized mobile content to part of a scheme to fraudulently charge for that content and to collect such charges as revenue. (Pl.'s Compl. ¶¶ 49-50.) Additionally, these fraudulent

---

[6]   *See United States v. Mitra*, 405 F.3d 492, 495 (7th Cir. 2005) (18 U.S.C. § 1030(e)(1) expressly excludes "automatic typewriters, typesetters, and handheld calculators"; this demonstrates that CFAA applies to "other devices with embedded processors and software are covered;" "[a]s more devices come to have built-in intelligence, the effective scope of the statute grows").

charges forced Goddard and other class members' to "pay additional fees to maintain their cellular service, these charges impair the availability of Class members' access to and communication with their cellular service." (*Id.* ¶ 51.) Thus, the revenue mobile content providers derive from these fraudulent mobile content charges are derived from a "specified unlawful activity." *See* 18 U.S.C. § 1957(f)(3) (2008) (same definition from 18 U.S.C. § 1956); 18 U.S.C. § 1957(c)(7)(D) (2008) (definition of "specified unlawful activity" includes violations of 18 U.S.C. § 1030).

Goddard alleges that Google knows (or consciously avoids knowing) that certain mobile content providers derived all or substantially all of their revenue from fraudulent mobile content charges, and that payments to Google from these mobile content providers for advertising services "necessarily represent[s] criminally derived property." (Pl.'s Compl. ¶¶ 53, 55.) Consequently, Google violates 18 U.S.C. § 1957(a) by accepting payments for advertising services over $10,000 from mobile content providers which are derived from fraudulent mobile content charges. 18 U.S.C. § 1957(a) prohibits "knowingly engag[ing] in a monetary transaction in criminally derived property of a value greater than $10,000 [which] is derived from specified unlawful activity . . ." 18 U.S.C. § 1957(a) (2008). (*Cf.* Pl.'s Compl. ¶¶ 54, 55 (alleging many if not all of the payments by fraudulent mobile content providers for advertising services exceed $10,000).)

The legislative history indicates that 18 U.S.C. § 1957(a) was intended to deter crime by prohibiting legitimate businesses from taking criminal proceeds, thereby making criminal profits "worthless." H.R. Rep. No. 99-855, at 13 (1985). *See also United States v. Rutgard*, 116 F.3d 1270, 1291 (9th Cir. 1997) (18 U.S.C. § 1957 "freezes the proceeds of specific crimes out of the banking system"); *United States v. Johnson*, 971 F.2d 562, 568 (10th Cir. 1992) (18 U.S.C. § 1957 "criminalize[s] the conduct of those third persons . . . who have aided [criminals] by allowing them to dispose of the profits of [criminal] activity"). Goddard seeks to enforce 18 U.S.C. § 1957 here under the UCL's "unlawful" prong, which "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co..*

20 Cal. 4th 163, 180, 973 P.2d 527, 539-540 (1999) (citation, punctuation omitted). The UCL's "unlawful" prong applies to any practice "forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made," *Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 871, 118 Cal. Rptr. 2d 770, 780 (Cal. Ct. App. 2002) (citation, punctuation omitted). The UCL's broad scope has been counterbalanced with limited remedies: injunctive relief and restitution. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1152, 63 P.3d 937, 949 (2003) (UCL reflects a "balance struck . . . between broad liability and limited relief."). While the 18 U.S.C. § 1957 may reach into commercial practices, the UCL self-checks this reach with its limited remedies.

### 1. Goddard Alleges CFAA Violations Under 18 U.S.C. § 1030(a)(4) and 18 U.S.C. § 1030(a)(5)

Google argues that Goddard does not allege violations of 18 U.S.C. § 1030(a)(4) or 18 U.S.C. § 1030(a)(5). Google contends that Goddard does not allege "that she was damaged, harmed, or defrauded by [fraudulent mobile content providers'] alleged access to her cell phone" but only that "she was injured because the [mobile content providers] *charged for that access*." (Def.'s Mem. 14) (emphasis added). Thus, Google argues, "there is no nexus between the alleged fraud and damage, on the one hand, and the alleged access to Plaintiff's cell phone, on the other." (*Id*.)

The infrastructure for mobile content allows mobile content providers to simultaneously transmit mobile content and assess charges against consumers without any information except a telephone number. (Pl.'s Compl. ¶ 9.)

> Given the manner in which mobile content is billed to customers, [fraudulent charges for mobile content are] unfortunately an easy goal to achieve. . . . [An mobile content provider can transmit mobile content to a telephone number without any other authorization information and] cause that consumer to be billed for services and products irrespective of whether the consumer actually agreed to purchase them *and, in the process*, cause text messages containing "premium" content to be sent to the "subscriber's" cell phone . . .

(*Id*. ¶ 9) (emphasis added). It is reasonable to infer from the Complaint (and it is the case) that the design of the infrastructure for mobile content also *requires* mobile content providers' transmissions to aggregators (the middlemen between mobile content providers and cellular

carriers) to include *both* the mobile content which accesses consumers' cellular phones *and* the instructions necessary to charge consumers for the mobile content. *See Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008) (all well-pleaded factual allegations are accepted as true, "as well as any reasonable inferences drawn from them."). Given the design of the mobile content's billing infrastructure, the transmission of mobile content to consumers' cell phones is a necessary precondition to charging consumers for that mobile content – making it part and parcel of the fraud.

The mobile content providers' transmission of mobile content to Goddard's phones thus plainly violated 18 U.S.C. § 1030(a)(4), which prohibits accessing a computer "and by means of such conduct *furthers the intended fraud* and obtains anything of value . . ." 18 U.S.C. § 1030(a)(4) (2008) (emphasis added). Analogizing to mail fraud, computer access "must occur in the execution of the scheme – that is, as a step in the plot . . . [but] the [access] need not be an essential element of the scheme. Rather, it is sufficient if the [access] is incident to an essential part of the scheme." *United States v. Lo*, 231 F.3d 471, 478 (9th Cir. 2000). Given mobile content's billing and transmission infrastructure, the access alleged is surely incident to an essential part of the scheme (i.e., passing unauthorized charges to consumers) if not an essential part of the scheme itself.[7] Even in the absence of the billing infrastructure for mobile content, the access alleged in the Complaint furthers the fraud alleged by providing (to aggregators, carriers, regulators, or any other interested third party) corroboration that Goddard and other class members got the mobile content they purportedly paid for. Secondly, Goddard's allegation that she had to pay fraudulent mobile content charges to maintain cellular service is sufficient to allege "damage" in violation of 18 U.S.C. § 1030(a)(5). Again, Goddard's allegations establish that fraudulent charges for mobile content were "a result of" the transmission of mobile content. 18 U.S.C. § 1030(a)(5) (2008). (Pl.'s

---

[7]  *United States v. Czubinski*, 106 F.3d 1069, 1078 (1st Cir. 1997) (violation of 18 U.S.C. § 1030(a)(4) requires that access to computer "was valuable [to] a fraudulent scheme"); Department of Justice, Prosecuting Computer Crimes 25 (2007), at http://www.cybercrime.gov/ccmanual/ccmanual.pdf ("furthers the intended fraud" element of 1030(a)(4) is met "if a defendant alters . . . records on a computer, and then receives something of value from an individual who relied on the accuracy of those . . . records").

Compl. ¶ 9.) Moreover, Google's argument depends on a blinkered construction of the term

"damages" and discards consequential damages – it is not consistent with prior interpretations

of the CFAA in this Circuit.[8]

**2. Goddard Alleges That Google Has Engaged in Monetary Transactions in Property Derived from Unlawful Activity in Violation of 18 U.S.C. § 1957(a)**

Google's second argument against Goddard's UCL claim is that Goddard has not

alleged "any facts by which Google could reasonably have possessed the requisite knowledge

that the payments from the [fraudulent mobile content providers] constituted property derived

from a statutorily proscribed act as alleged by Plaintiff." (Def.'s Mem. 15.) Under the statute's

plain language, Goddard does not to prove that Google "knew that the offense from which the

criminally derived property was derived was specified unlawful activity." 18 U.S.C. § 1957(c)

(2008). Goddard does not have to show that Google knew that the fraudulent mobile content

providers' payments were specifically derived from violations of 18 U.S.C. § 1030, only that

they were "criminally derived." 18 U.S.C. § 1957(a) (2008). *See, e.g.*, *United States v. Flores*,

454 F.3d 149, 155 (3d Cir. 2006) (defendant's liability under 18 U.S.C. § 1957(a) only

required knowledge that funds originated in some form of unlawful activity, not that funds

specifically originated from narcotics trafficking).

Google makes two other assertions which suggest, but do not actually advance,

arguments for dismissal.[9] Google asserts that unlawful funds commingled with lawful funds

cannot support liability under section 1957, and that Goddard's supposedly "unfounded and

---

[8] *Cf. Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 935 (9th Cir. 2004) ("money [which] must be spent to restore or maintain some aspect of a business affected by a [CFAA] violation" constitutes "damages"); *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1127 (W.D. Wash. 2000) (CFAA's definition of "damages" covers "subsequent corrective measures the rightful computer owner must take to prevent" harms from the CFAA violation).

[9] It would be unfair for Google to develop these assertions into substantive arguments in its reply, after Goddard had lost the opportunity to respond. *Ass'n of Irritated Residents v. C & R Vanderham Dairy*, 435 F. Supp. 2d 1078, 1089 (E.D. Cal. 2006) (where arguments in moving brief are "inadequately developed," it is inappropriate for the Court to consider expansions on those arguments in the movant's reply brief). *See also Antoninetti v. Chipotle Mexican Grill, Inc.*, No. 05-1660, 2007 WL 2456223, at *3 (S.D. Cal. Aug. 23, 2007) (applying maxim that "arguments not raised by a party in its opening brief are deemed waived").

overblown [allegation] that 'all or substantially all' of [fraudulent mobile content providers'] revenue . . .was criminally derived" did not adequately state a claim that "Google could have known that the particular funds it received in payment for advertising space were criminally derived." (Def.'s Mem. 15.) First, Goddard is not required to make detailed allegations about Google's state of mind. "[K]nowledge . . . and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). *See Continental Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059, 1068 (E.D. Cal. 2006) (under Rule 9(b), plaintiff did not need to "plead a basis for its averment regarding [third parties'] states of mind or [defendant's] knowledge thereof"). Second, Goddard does allege facts indicating that Google knew that fraud was endemic in the mobile content industry – such as Google's perceived need for the Content Policy and state actions against its largest advertisers. (Pl.'s Compl. ¶¶ 18-20.) Third, Goddard need not prove Google had positive knowledge. Legislative history indicates that the knowledge element of money-laundering statutes was "intended to be construed . . . to include instances of 'willful blindness.'" S. Rep. 99-433, at 9-10 (1985) (citing *United States v. Jewel*, 532 F. 2d 697 (9th Cir. 1976)). The Ninth Circuit continues to recognizes *Jewel*'s willful blindness doctrine, and many other courts have applied that doctrine to 18 U.S.C. § 1957(a) violations. *See, e.g., United States v. Heredia*, 483 F.3d 913, 918-21 (9th Cir. 2007); *United States v. Nguyen*, 493 F.3d 613, 618-19 (5th Cir. 2007); *Flores*, 454 F.3d at 154-55; *United States v. Gabriele*, 63 F.3d 61, 64-67 (1st Cir. 1995).

Google's second assertion also fails, as commingling of lawful and unlawful funds only presents an evidentiary matter, not a definitive defense to liability under 18 U.S.C. § 1957(a). Google's authority only rejected an evidentiary presumption (employed by other courts) that unlawful proceeds are the first to be withdrawn from a particular account holding commingled funds. *See Rutgard*, 116 F.3d at 1192. However, 18 U.S.C. § 1957(a) "cannot be made wholly ineffective by commingling." *Id*. Violations can be proved by "tracing funds," proving that an "entire business was a fraud" so that all its funds were unlawful, or showing that a transaction exhausted all the implicated funds (both lawful and unlawful). *United States v. Hanley*, 190 F.3d 1017, 1025 (9th Cir. 1999). The law provides that Goddard can prove a

violation of 18 U.S.C. § 1957(a) by showing that the fraudulent mobile content providers' revenue was entirely illicit. *See United States v. Taylor*, 239 F.3d 994, 998-99 (9th Cir. 2001) (defendant had no lawful revenue to purchase money order or cashier's check).

### 3. Goddard Has Standing Under the UCL

Finally, Google argues in a stray footnote that Goddard cannot assert a claim for restitution because she alleged that she paid the mobile content providers and not Google, so that "her failure to allege that Google caused any injury deprives her of standing to assert a Section 17200 claim against Google." (Def.'s Mem. 15 n.5.)

Goddard can recover money from Google as restitution under the UCL if she can trace funds fraudulently taken from her by mobile content providers and paid to Google in exchange for AdWords. *Cf. Korea Supply*, 29 Cal.4th at 1150, 63 P.3d at 947 (restitution under UCL permits plaintiff to recovered funds if they can be traced to specific funds in defendant's possession). "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Id*., 29 Cal.4th at 1149, 63 P.3d at 947. However, restitution under the UCL "is not limited only to the return of money or property that was once in the possession of that person" but is "broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest." *Id*. (restitution under UCL applies to property obtained through unfair competition from plaintiff who "had an ownership interest in the property or those claiming through that person"). Restitution's flexibility – namely, its ability to trace funds through multiple parties – is borne out in *Shersher v. Superior Court*, 154 Cal. App. 4th 1491, 65 Cal. Rptr. 3d 634 (Cal. Ct. App. 2007) and *In re Ditropan XL Antitrust Litigation*, 529 F. Supp. 2d 1098 (N.D. Cal. 2007).

Secondly, Google's argument is not consistent with the plain language of the provisions of the UCL on which it depends. "Actions for any relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by . . . any person who has suffered injury in fact and ***has lost money or property as a result of the unfair competition***." Cal. Bus. & Prof. Code § 17204 (2008) (emphasis added). Goddard does not need to state a

claim for restitution to have standing under the UCL.[10] Standing under the UCL "does not require that the [claimed] losses . . . were the product of the defendant's wrongful acquisition of the plaintiff's property." *White v. Trans Union, LLC*, 462 F. Supp.2d 1079, 1084 (C.D. Cal. 2006). Rather, standing under the UCL extends to plaintiffs who have "lost money or property" due to a defendant's UCL violation, even if the money is lost to someone other than the defendant.[11] Goddard alleges that she lost money because Google permitted fraudulent mobile content providers to place AdWords on its website and that Google would not have permitted fraudulent mobile content providers to place AdWords unless it accepted their tainted funds as payment for advertising, in violation of 18 U.S.C. § 1957(a). (Pl.'s Compl. ¶ 58.) Even if Goddard could not make a claim for restitution under the UCL, she would still standing for injunctive relief. *S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1069 (C.D. Cal. 2005) (standing where UCL violations require plaintiff to divert its resources to investigating claim).

**B.      As an Intended Third-Party Beneficiary of Google's Agreement, Goddard Stated a Claim for Breach of Contract**

Google makes two arguments against Goddard's breach of contract claim. First, Google argues that Goddard cannot be an intended third party beneficiary of Google's Content Policy unless "the Advertising Terms would have to reflect, on their face, an intent to benefit Plaintiff." (Def.'s Mem. 17.) This misstates the law: "[n]o specific manifestation by the promisor of an intent to benefit the third person is required." *Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 958, 23 Cal. Rptr. 3d 233, 239 (Cal. Ct. App. 2005) (punctuation, citation omitted).

---

[10] *See, e.g., Sanbrook v. Office Depot, Inc.*, No. 07-05938, 2008 WL 1994884, at *5 (N.D. Cal. May 5, 2008) (plaintiff without claim for restitution under UCL still had standing for injunctive remedy under UCL); *G & C Auto Body Inc. v. Geico General Ins. Co.*, No. 06-04898, 2007 WL 4350907, at *3-4  (N.D. Cal. Dec. 12, 2007) (same; explicitly rejecting argument that claim for restitution is prerequisite for standing under UCL).

[11] *See Aron v. U-Haul Co. of Cal.*, 143 Cal. App. 4th 796, 802-03, 49 Cal. Rptr. 3d 555, 559 (Cal. Ct. App. 2006) (plaintiff who alleged "actual economic injury as a result of an unfair and illegal business practice" had standing for UCL claim, even though injury was required purchase from  non-defendant third party); *Witriol v. LexisNexis Group*, No. 05-02392, 2006 WL 4725713, at *6 (N.D. Cal. Feb. 10, 2006) (plaintiff had standing under UCL because defendant's unauthorized release of his information caused him to incur costs associated with monitoring and repairing credit paid to third parties).

> [Third-party beneficiaries] need not be identified by name. It is sufficient if
> [they] belong[] to a class of persons for whose benefit the contract was made. . .
> . It is not necessary . . . that the contract be exclusively for the benefit of the
> third party; he need not be the sole or primary beneficiary.

*Johnson v. Superior Court*, 80 Cal. App. 4th 1050, 1064, 95 Cal. Rptr. 2d 864, 873 (Cal. Ct.

App. 2000). The provisions of the Content Policy at issue are clearly intended to protect users

of the mobile content providers' websites against fraud; the Content Policy requires landing

pages to "clearly and accurately display[] price, subscription, and cancellation information,"

"[p]rominent[] display" of subscription and cancellation information, and explicit measures to

ensure affirmative asset to the Content Policy. (Pl.'s Compl. ¶ 22.) Goddard plainly "belongs

to the class of people for whose benefit" the Content Policy was drafted.

Second, Google argues that Goddard cannot bring a claim as a third-party beneficiary

because Google is the promisee (that the mobile content providers will abide by the Content

Policy) while the mobile content providers are the promisors. (Def.'s Mem. 17-18.) The

Advertising Program Terms (which incorporate the Content Policy) do not allow for such a

characterization:

> Google's Editorial Guidelines are incorporated by reference into its Advertising
> Program Terms:
> ***Google and Customer hereby agree and acknowledge***:
> 1. Policies. Program use is subject to all applicable Google and Partner policies,
> including without limitation the Editorial Guidelines
> (adwords.google.com/select/guidelines.html).
> Google, Inc. Advertising Program Terms (Aug. 22, 2006).

(Pl.'s Compl. ¶ 21) (emphasis added). In turn, the Editorial Guidelines include Google's

Content Policy, which contains the language imposing consumer protections against mobile

content fraud. (*Id.* ¶ 22.) By their own terms, Advertising Program Terms places obligations

on both Google and its advertisers.[12] Google is a promisor as to the Content Policy just as

much as the mobile content providers are – and its failure to enforce the Content Policy is a

breach of the Advertising Program Terms to the detriment of the Policy's intended

beneficiary, Goddard.

---

[12] Even if Google argues a different interpretation of the bolded language, it "has far superior
bargaining power and made both of these representations, [so] any ambiguities ought to be
construed against it." *Mazur*, 2008 WL 618988, at *13.

## C. Goddard Stated a Claim for Negligence

Google argues that "Google can not be found to have assumed a duty to Plaintiff unless (1) the Advertising Terms themselves increased the risk of harm or (2) Plaintiff actually relied upon the Advertising Terms." (Def.'s Mem. 17-18.) This argument does not square with California law. Indeed, this Court has found a claim for negligence on virtually the same set of facts alleged by Goddard: "Plaintiff claims that since eBay guaranteed safety [in online auctions], they owed a duty of care and were consequently in breach of that duty when they allowed shill bidding practices to occur. This is sufficient to state a valid claim [for negligence]." *Mazur*, 2008 WL 618988, at *14.

Google does not argue that preventing the fraud which harmed Goddard fell outside the scope of duty created by the Content Policy. Rather, Google contends no duty arises at all unless "the Advertising Terms themselves increased the risk of harm" to Goddard. (Def.'s Mem. 16.) This contention reflects an apparent misunderstanding of the law. No one (least of all California courts) expects the terms of a contract to jump off the page and to start enforcing themselves (negligently or otherwise). Google blurs the distinction between the voluntary undertaking manifested by the Content Policy (which triggered Google's duty of care) and the subsequent negligent performance of that undertaking (which gave rise to Google's liability). *Cf. Artiglio v. Corning Inc.*, 18 Cal. 4th 604, 613-18, 957 P.2d 1313, 1318-21 (1998) (defendant's undertaking to conduct and report silicone toxicology research in 1940s and 1950s was distinct from sales of silicon medical products beginning in 1962). Goddard plainly alleges that it is Google's failure to perform – its failure to enforce the terms of the Content Policy – caused her injuries.[13]

While it is not readily apparent from Google's brief, it may be that Google *meant* to argue that its *failure to enforce* the Content Policy must have increased Goddard's risk for Goddard to have state a negligent undertaking claim. But when a defendant altogether fails to

---

[13] Likewise, in *Hempstead v. General Fire Extinguisher Corp.*, 269 F. Supp. 109 (D. Del. 1967), the defendant's "failure . . .to exercise reasonable care in approving the design of the extinguisher has obviously increased the risk of harm to plaintiff over that which would have existed if reasonable care had been exercised." *Id.* at 118 (cited and relied on California cases, including *FNS Mortgage Serv. Corp. v. Pacific Gen. Group, Inc.*, 24 Cal. App. 4th 1564, 1572-73, 29 Cal. Rptr. 2d 916, 921-22 (Cal. Ct. App. 1994)).

perform its undertaking, the risk to the plaintiff will always be "the same [as] it would have

been" if the defendant had not assumed the undertaking in the first place. (Def.'s Mem. 16.)

Google's implicit argument is tantamount claiming that California law does not support

negligent undertaking claims against defendants for nonfeasance.

If this was the argument Google intended, it is contrary to California law. Negligent

undertaking can take the form of either misfeasance *or* "an omission or failure to act." *Adams

v. City of Fremont*, 68 Cal. App. 4th 243, 293, 80 Cal. Rptr. 2d 196, 228 (Cal. Ct. App.

1998).[14] In *Mukthar v. Latin American Security Service*, 139 Cal. App. 4th 284, 42 Cal. Rptr.

3d 563 (Cal. Ct. App. 2006), the court found that the plaintiff had a viable negligent

undertaking claim against defendant security guard service which assumed the duty of

providing a security guard but simply failed to do so, which allegedly led to an assault on the

plaintiff. *Id.*, 139 Cal. App. 4th at 290-91, 42 Cal. Rptr. 3d at 567-68. The defendant in

*Mukthar* was liable even though the plaintiff's risk was the same as though the defendant had

never assumed a duty to protect the plaintiff. *Cf. id.*, 139 Cal. App. 4th at 292, 42 Cal. Rptr.

3d at 568-69 ("it [was] a reasonable inference that the presence of an armed guard in close

proximity to [the plaintiff] would have prevented the assault.").

Likewise, when a defendant undertakes "to render the service of inspecting pipe

manufacturers and delisting those who are unwilling or unable to adhere to [certain]

standards[,] . . . [its] failure to exercise reasonable care [by delisting non-compliant

manufacturers]. . . increases the risk of harm to such consumers from defective pipe that

otherwise would have been removed from the stream of commerce." *FNS Mortgage Serv.

Corp. v. Pacific Gen. Group, Inc.,* 24 Cal. App. 4th 1564, 1571, 29 Cal. Rptr. 2d 916, 921

(Cal. Ct. App. 1994).[15] Again, the *FNS Mortgage* defendant was liable even though the

---

[14] "There will be times when a [defendant] will be liable for its omissions. For example, if the [defendant] promises to undertake a particular safety measure, then the [defendant's] negligent failure to do so should result in liability if such negligence leads to an . . . injury." *Hooker v. Dep't of Transp.*, 27 Cal. 4th 198, 212 n.3, 38 P.3d 1081, 1090 n.3 (2002).

[15] In Google's primary supporting authority, *Paz v. State of California*, 22 Cal. 4th 550, 994 P.2d 975 (2000), only concerns the ***timing*** of when a duty of care arises from an undertaking. In Paz, the alleged negligence fell outside the scope of the duty imposed by the defendant's undertaking because the "defendants simply did not succeed in completing – before plaintiff's collision – a project that might have reduced [a] preexisting hazard . . ."

plaintiffs' risk was the same as though the defendant had never assumed a duty to evaluate pipe manufacturers. Likewise, Google may be liable on a negligent undertaking claim even if the risk to Goddard from its failure to enforce the Content Policy is the same as if Google had never put the Content Policy in place. *See also Mazur*, 2008 WL 618988, at *14 (also holding economic loss rule did not apply under *Aas v. Superior Court*, 24 Cal. 4th 627, 12 P.3d 1125 (2000)). Goddard properly states a negligent undertaking claim by alleging that her injury arose because Google failed to enforce the Content Policy.

California law gives no support to Google's argument that Goddard cannot state a negligent undertaking claim without alleging she "relied on – or even read – Google's Advertising Terms and Content Policy." (Def.'s Mem. 16.) Rather, California law supports a much broader understanding of reliance in this context. Reliance, at least as to a negligent undertaking claim, can arise from a business relationship between a defendant and a third party, where the defendant "voluntarily involve[s] itself into the marketing process [and] loan[s] its reputation to promote and induce the sale of [the third party's services." *Hanberry v. Hearst Corp.*, 276 Cal. App. 2d 680, 684, 81 Cal. Rptr. 519, 522 (Cal. Ct. App. 1969). "In voluntarily assuming this business relationship, [a defendant] place[s] itself in the position where public policy imposes upon it the duty to use ordinary care . . . so that members of the consuming public who rely on its endorsement are not unreasonably exposed to the risk of harm." *Id*. A plaintiff does not *personally* rely on an undertaking when the overall market for the third party's goods hinges on the third party's affiliation with the defendant. *FNS Mortgage*, 24 Cal. App. 4th at 1571, 29 Cal. Rptr. 2d at 921 ("consumers . . . suffered harm because of the reliance of local building officials upon [defendant's] undertakings"). Goddard states a claim under the negligent undertaking's reliance prong because she alleges that the relevant terms of Google's Content Policy "create[d] the appearance that its search engine is

_____

*Id*., 22 Cal. 4th at 560, 994 P.2d at 981. The result in *Paz* only means that the duty imposed by a defendant's undertaking does not include instantaneously eliminating any preexisting risks of harm the moment the undertaking begins. *See id*., 22 Cal. 4th at 561, 994 P.2d at 982 (relying on case which declined to "charge [defendants] with responsibility for preexisting defects [that] would expose them to potential liability for . . . the entire project area from the moment they undertook the work").

protecting users' interests" and "lull[ed] governmental agencies into falsely believing that Google [was] acting responsibly to prevent rampant fraud and abuse." (Pl.'s Compl. ¶¶ 31-32.)

### D.    Goddard Stated a Claim for Aiding and Abetting

Google asserts that Goddard's aiding and abetting claim is defective because Goddard "failed . . . to allege that Google provided 'substantial assistance' . . ." (Def.'s Mem. 19.) The Complaint flatly contradicts this assertion. Goddard alleges that the AdWords service Google supplies to fraudulent mobile content providers is "***an essential part*** of [fraudulent mobile content providers'] scheme [to defraud cellular users], because [the mobile content providers] could not collect unwitting users' cellular numbers without Google driving Internet traffic towards their landing pages." (Pl.'s Compl. ¶ 80) (emphasis added).

If Google meant to argue that the AdWord services do not, as a matter of law, constitute "substantial assistance," it is mistaken. "[C]ommon sense tells us that even 'ordinary business transactions' a [defendant] performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the [defendant] actually knew those transactions were assisting the customer in committing a specific tort." *Casey*, 127 Cal. App. 4th at 1145, 26 Cal. Rptr. 3d at 406. *See also Henry*, 471 F.3d at 995 (financing by investment bank constituted "substantial assistance"). Google's own case is distinguishable, because the relevant defendants there escaped liability only because there was no evidence to support the knowledge element of aiding and abetting. *Orser v. Vierra*, 252 Cal. App. 2d 660, 669, 60 Cal. Rptr. 708, 715 (Cal. Ct. App. 1967) ("no evidence [that] even suggests [the aiding and abetting defendants] knew that [the primary defendants] were shooting firearms in the direction where their shots could hit anyone . . ."). Goddard adequately alleges both the knowledge and substantial assistance elements of aiding and abetting.

## IV.    Conclusion

For the reasons stated above, Google's Motion to Dismiss should be denied.

Dated: November 14, 2008

By: s/Ethan Preston
    Jay Edelson
    Myles McGuire
    Ethan Preston (*pro hac vice*)
    KAMBEREDELSON LLC
    350 North LaSalle
    Suite 1300
    Chicago, IL 60654

    *Counsel for Plaintiff Jenna Goddard*