**E-Filed 12/17/08**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| JENNA GODDARD, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>    v.<br><br>GOOGLE, INC., a Delaware corporation,<br><br>                Defendant. | Case Number C 08-2738 JF (PVT)<br><br>**ORDER[1] GRANTING MOTION TO DISMISS**<br><br>RE: Docket No. 43. |

## I. BACKGROUND

Plaintiff Jenna Goddard ("Plaintiff") alleges that she and a class of similarly situated individuals were injured as a result of clicking on web-based advertisements created by allegedly fraudulent providers of services for various mobile devices. These so-called mobile service subscription providers ("MSSPs") sell consumer products such as ring tones, sports score reports, weather alerts, stock tips, direct payment services, and interactive radio over the Internet for use on mobile devices such as cellular phones. As alleged in detail in the complaint, MSSPs transmit

---

[1] This disposition is not designated for publication in the official reports.

Case No. C 08-2738 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC3)

their products directly to consumers' mobile devices and apparently are able to bill the consumer merely by providing the consumer's cellular telephone number to a billing aggregator. The aggregator in turn instructs the relevant cellular carrier to add the charges to the consumer's cellular telephone bill. Complaint ¶ 10. Plaintiff alleges that the largely unverifiable nature of MSSP billing has resulted in a high incidence of fraud in the mobile content subscription industry. Complaint ¶¶ 8-11.

Plaintiff seeks to hold Defendant Google, Inc. ("Google") liable for its alleged complicity in this scheme. According to the complaint, Google "operates the most widely-used Internet search engine in the world . . . . [and] generates revenue primarily by online advertising." Complaint ¶ 2. A focus of Google's advertising efforts is its "AdWords" program, which allows advertisers to draft short advertisements known as "AdWords" and to select keywords that correspond to the advertisements. When a user's Google search matches the selected keywords, Google displays the AdWords alongside the search results. Plaintiff alleges that Google has a Content Policy designed to exclude advertisements by fraudulent MSSPs, but that Google "intentionally refuses to enforce its policies with respect to mobile subscription services." Complaint ¶ 26. Plaintiff does not disclose the identity of any specific MSSP in her complaint, but she does allege that she clicked on an AdWords advertisement linked to an allegedly fraudulent MSSP website where she entered her cellular telephone number, causing charges to appear on her cellular telephone bill for "unwanted mobile content services." Complaint ¶¶ 35-38.

Plaintiff asserts the following claims: (1) that Google's receipt of payments from the allegedly fraudulent MSSPs constitutes "money laundering," as defined by 18 U.S.C. § 1957, which in turn constitutes an "unlawful business practice and unfair competition" that violates California Business and Professions Code § 17200; (2) that Google breached its own Content Policy–an agreement between Google and its AdWords advertisers, of which Plaintiff allegedly is an intended third-party beneficiary–with respect to mobile services subscriptions; (3) that Google was negligent in protecting consumers from fraudulent MSSPs by failing to enforce its Content Policy; and (4) that Google aided and abetted the MSSPs in committing various other

2

statutory and common law violations. Complaint ¶¶ 47-83. In response, Google argues that each of Plaintiff's claims is barred by § 230 of the Communications Decency Act of 1996 ("CDA"), which immunizes providers of "interactive computer services" against liability arising from content created by third parties. Google also argues that Plaintiff otherwise has failed in each instance to state a claim upon which relief may be granted. After considering the papers and hearing oral argument, the Court agrees with Google that the claims, as pled, are barred by § 230 of the CDA. Accordingly, Google's motion to dismiss will be granted. However, because the Court is not convinced that Plaintiff could not legitimately plead around § 230, leave to amend also will be granted.

## II. LEGAL STANDARD FOR DISMISSAL UNDER RULE 12(b)(6)

A complaint may be dismissed for failure to state a claim upon which relief may be granted for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984). For purposes of a motion to dismiss, all allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994). A complaint should not be dismissed "unless it appears beyond doubt the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Clegg*, 18 F.3d at 754. However, a plaintiff is required to provide "more than labels and conclusions," *Bell Atl. Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955, 1964 (2007), and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id*. at 1965.

## III. DISCUSSION

Congress passed § 230 of the CDA in response to concerns that providers of Internet-based services could be held liable for unlawful content provided by third parties. *See, e.g.*, *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163-64 (9th Cir. 2008) (en banc) (explaining congressional intent to allow Internet-based companies to "edit" offensive or unlawful user-generated content without risking liability for failure to eliminate all such content). Section 230(c)(1) states that "[n]o provider . . . of an interactive computer service

3

Case No. C 08-2738 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC3)

shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).[2] Courts consistently have held that § 230 provides a "robust" immunity, *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003), and that all doubts "must be resolved in favor of immunity," *Fair Housing Council*, 521 F.3d at 1174. Indeed, § 230's "broad immunity" extends to "*all claims stemming from* [an interactive service provider's] publication of information created by third parties." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) (emphasis added). The result is that "[p]arties complaining that they were harmed by a Web site's publication of user-generated content . . . may sue the third-party user who generated the content, but not the interactive computer service that enabled them to publish the content online." *MySpace*, 528 F.3d at 419 (citing *Zeran v. America Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997)). Conversely, CDA immunity generally "applies only if the interactive computer service provider is not also an 'information content provider,' which is defined as someone who is 'responsible, in whole or in part, for the creation or development of' the offending content." *Fair Housing Council*, 521 F.3d at 1162 (quoting 47 U.S.C. § 230(f)(3)). Thus, even where a third party "creates" the allegedly unlawful content, an interactive computer service provider may be liable for its publication if it "helps to develop [the] unlawful content," meaning that it "contributes materially to the alleged illegality of the conduct." *Id*. at 1168.

The Ninth Circuit provided an extensive discussion of § 230 in *Fair Housing Council v. Roommates.com*. In an *en banc* opinion, the court granted a website operator immunity with

---

[2] Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). "Today, the most common interactive computer services are websites," *Fair Housing Council*, 521 F.3d at 1162 n.6, and a number of courts already have determined that Google is an interactive computer service provider. *See, e.g.*, *Langdon v. Google*, 474 F. Supp. 2d 622, 631 (D. Del. 2007) (dismissing claims against Google and other interactive computer service providers under § 230); *Parker v. Google*, 422 F. Supp. 2d 492, 500-01 (E.D. Pa. 2006) ("[T]here is no doubt that Google qualifies as an 'interactive computer service.'"); *Novak v. Overture Svcs.*, Inc., 309 F. Supp. 2d 446, 452 (E.D.N.Y. 2004) (noting that Google is a "provider or user of an interactive computer service" and eligible for § 230 immunity).

4

respect to allegedly discriminatory content provided voluntarily by its users, and denied immunity only as to content that the website *required* its users to provide as a condition of use. *See Fair Housing Council*, 521 F.3d at 1165, 1166 & n.19, 1169-70 & n.26, 1173-74. The court emphasized repeatedly that the website lost immunity only by *forcing* its users to provide the allegedly discriminatory information as a condition of access. *Id*. In explaining why the website *was* immune from liability based on voluntarily contributed third-party content, the court stated that "[w]ithout reviewing every [posting], [the website] would have no way to distinguish unlawful discriminatory preferences from perfectly legitimate statements . . . . This is precisely the kind of situation for which section 230 was designed to provide immunity." *Id*. at 1174. Because the website did not "encourage or enhance any discriminatory content created by users," it did not qualify as a "developer of the information posted." *Id*.; *accord Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671-72 (7th Cir. 2008) (finding that § 230 provided immunity to online classified ads website for discriminatory housing advertisements posted by users because "[n]othing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination").

      The broad scope of § 230 extends to multiple forms of putative "involvement" by an interactive service provider in generating online content. Thus, providing third parties with neutral tools to create web content is considered to be squarely within the protections of § 230. *See, e.g.*, *Fair Housing Council*, 521 F.3d at 1169 & n.24, 1171, 1174 n.37, 1175. Moreover, even if a service provider knows that third parties are using such tools to create illegal content, the service's provider's failure to intervene is immunized. *See, e.g.*, *Fair Housing Council*, 521 F.3d at 1169 n. 24 (noting that where a plaintiff brings a claim "based on a website operator's passive acquiescence in the misconduct of its users," the website operator would be immune "even if the users committed their misconduct using tools of general availability provided by the website operator"); *Zeran*, 129 F.3d at 333 (holding that provider is shielded from liability despite receiving notification of objectionable content on its website and failing to remove it); *Barrett v. Rosenthal*, 40 Cal. 4th 33, 47 (2006) (same); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 822, 835 (2002) (same); *Mazur v. eBay*, No. C 07-03967 MHP, 2008 WL 618988, at *9

5

(N.D. Cal. Mar. 4, 2008) (same). Finally, the fact that a website elicits online content for profit is immaterial; the only relevant inquiry is whether the interactive service provider "creates" or "develops" that content. *See Blumenthal v. Drudge*, 992 F. Supp. 44, 52 (D.D.C. 1998) (holding that an interactive computer service provider was immune from defamation liability based on its hosting of a gossip column, even though the service provider had contracted with the gossip columnist to provide the column for a monthly compensation of $3000, had retained considerable editorial rights, and affirmatively had promoted the columnist as a new source of unverified instant gossip); *see also Gentry*, 99 Cal. App. 4th at 822, 828-31(immunizing eBay from allegedly fraudulent postings on its auction website despite the fact that eBay received placement fees from dealers listing an item for auction); *Fair Housing Council*, 521 F.3d at 1161, 1174-75 (partially immunizing website "which seeks to profit by collecting revenue from advertisers and subscribers" from liability for user-generated postings). In short, for § 230 *not* to apply, it must be "*very* clear that the website *directly* participates in developing the illegality" at issue. *Fair Housing Council*, 521 F.3d at 1174 (emphasis added). Otherwise, "[t]he message to website operators is clear: If you don't encourage illegal content, or design your website to require users to input illegal content, you will be immune."

A. **California Unfair Competition Law ("UCL") claims**

Plaintiff's UCL claim is based on an intricate series of alleged statutory violations. Plaintiff alleges that certain fraudulent MSSPs, in providing her with unwanted mobile subscription content, "accessed" her mobile phone in violation of § 1030 of the Computer Fraud and Abuse Act, and that this conduct constitutes a "specified unlawful activity" under the federal money laundering statute, 18 U.S.C. § 1957. Plaintiff alleges that Google violated § 1957 by receiving funds generated by this "specified unlawful activity," and that this violation constitutes an "unfair business practice" under California law. *See* Cal. Bus. & Profs. Code § 17200 et seq.

In the absence of any argument that Google created or developed the offending content,[3]

---

[3] Plaintiff does allege that Google "assists its customers in drafting AdWords and selecting keywords through both live support from its AdWords Specialists and its advertising campaign optimization services," Complaint ¶ 15. However, Plaintiff provides no details to

6

Plaintiff seeks to avoid the application of § 230 by arguing that her UCL claim does not seek to treat Google as the publisher of third-party content. Plaintiff contends that her claim "is independent of the fraudulent mobile content providers' AdWords . . . . [and] stems from Google's acceptance of tainted funds from fraudulent mobile content providers." Pl.'s Opp. at 2:8-11. Google counters that the claim still would result in its being held liable for third-party content, and that Plaintiff is engaging in mere "artful pleading" in an attempt to avoid the proper application of § 230. Google points out that courts repeatedly have rejected attempts to recharacterize claims fundamentally based on the posting of online information in order to avoid §230's prohibition on "treat[ing] [the defendant] as a 'publisher' of information." As explained below, this Court agrees with Google that Plaintiff's UCL claim is just such an impermissible recharacterization.[4]

In *Gentry v. eBay*, the plaintiffs brought a claim under California's autographed sports memorabilia statute, Cal. Civ. Code § 1739.7, seeking to hold eBay liable for its alleged failure to furnish certificates of authenticity in connection with the sale of autographed merchandise offered by users of its website. 99 Cal. App. 4th at 820-24. To avoid the application of § 230, the plaintiffs argued that they merely were "seek[ing] to enforce eBay's independent duty under the statute to furnish a warranty as the 'provider of descriptions,' not as a publisher." *Id*. at 831.

---

substantiate this allegation, and fails even to argue the point in her opposition. This allegation falls far short of making it "very clear that [Google] directly participates in developing the alleged illegality." *Fair Housing Council*, 521 F.3d at 1174. Indeed, there is no suggestion in the current record that Google "encouraged" the MSSPs to create the allegedly fraudulent content, or that the creation of such content was anything less than voluntary.

[4] At oral argument, Plaintiff appeared to argue that § 230 does not apply because Google "caused" the alleged harm by receiving the allegedly tainted funds. This argument is foreclosed by the line of cases holding that a website's act of eliciting online content for profit is immaterial, and that the only relevant inquiry is whether the interactive service provider "creates" or "develops" that content. See *Blumenthal v. Drudge*, 992 F. Supp. 44, 52 (D.D.C. 1998) (holding interactive computer service provider immune despite active solicitation and payment for online column); see also *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 822, 828-31 (2002) (immunizing eBay from liability for allegedly fraudulent postings despite its receipt of placement fees for use of auction services); *Fair Housing Council*, 521 F.3d at 1161, 1174-75 (partially immunizing website "which seeks to profit by collecting revenue from advertisers and subscribers").

7

The court rejected this argument, holding that "the substance of [plaintiffs'] allegations reveal they ultimately seek to hold eBay responsible for . . . eBay's dissemination of representations made by the individual defendants, or the posting and compilations of information generated by those defendants and other third parties." *Id*. The court concluded that if it "*ultimately h[eld] eBay responsible* for content originating from other parties, [it] would be treating [eBay] as the publisher" of the information. *Id*. (emphasis added).

The Fifth Circuit addressed a similar attempt at recharacterization in *Doe v. MySpace*. There, the plaintiffs sued the online social utility website MySpace for its alleged failure to implement safety measures that purportedly would have prevented an assault on one of the plaintiffs, a thirteen-year-old girl, by another MySpace user whom she encountered online. *MySpace*, 528 F.3d at 419. To avoid § 230, the plaintiffs argued that their claims were "predicated solely on MySpace's failure to implement basic safety measures," and therefore did "not attempt to treat [MySpace] as a 'publisher' of information." *Id*. Rejecting this contention, the Fifth Circuit held that the allegations, no matter how they were characterized, were "merely another way of claiming that MySpace was liable for publishing the communications." *Id*. The court emphasized that "[i]f MySpace had not published communications between Julie Doe and [the attacker], . . . Plaintiffs assert they never would have met and the sexual encounter never would have occurred." *Id*.

Here, despite Plaintiff's efforts to characterize her UCL claim as one merely arising from Google's receipt of "tainted funds," *Gentry* and *MySpace* support the application of § 230. Plaintiff alleges repeatedly that "[a]bsent Google's provision of AdWords services to the Fraudulent Mobile Subscription Services, the Class members would never have been damaged by the Fraudulent Mobile Subscription Services." Complaint ¶¶ 58, 64, 70. Indeed, the sole basis for each of Plaintiff's claims is that she "suffered damages as a result of clicking on a Google AdWords advertisement for mobile subscription services which linked to a Fraudulent Mobile Subscription Services website." Complaint ¶ 40. Like the plaintiffs in *MySpace* and *Gentry*, Plaintiff claims in essence that she was harmed because Google hosted certain online content, and her UCL claim effectively would hold Google liable for its publication of third-party content

8

in contravention of § 230.[5]

**B.    Breach of contract and negligence claims**

Plaintiff next asserts that her contract and negligence claims hinge not on content created by the allegedly fraudulent MSSPs, but "on information Google *created*–such as the terms of Google's Content Policy." Pl.'s Opp. at 2. Plaintiff focuses largely on a single clause in Google's Advertising Program Terms stating that "Google and Customer hereby agree and acknowledge" that the consumer protections found in the Content Policy are incorporated into the contract between Google and its AdWords advertisers. Pl.'s Opp. at 10-14. However, the fact that Google requires advertisers to agree to certain terms–terms designed to *protect* Plaintiff from the conduct of which she now complains–does not lead to the conclusion that Google is responsible for the content the advertisers ultimately created. Indeed, Plaintiff's argument is fundamentally inconsistent with her complaint, which asserts repeatedly that "[a]bsent Google's provision of AdWords services to the Fraudulent Mobile Subscription Services, the Class members would never have been damaged by the Fraudulent Mobile Subscription Services." Complaint ¶¶ 64, 70. Based on the allegations in the complaint, the breach of contract and negligence claims only can be read to assert (1) that Google breached its Content Policy by failing to remove advertisements by MSSPs whose websites did not comply with the Policy, and

---

[5] Plaintiff argues that because her UCL claim is based on § 1957, a criminal statute, it falls within a narrow exception to § 230 providing that "[n]othing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute." 47 U.S.C. § 230(e)(1). Plaintiff argues that she "seeks to enforce 18 U.S.C. § 1957 under the UCL's 'unlawful' prong, which 'borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.'" Pl.'s Opp. at 13:26-28. Plaintiff has provided no authority for such a potentially vast expansion of § 230 to include criminal provisions that are enforceable privately only through state law. Congress enacted § 230(e)(1) in order to "ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." 47 U.S.C. § 230(b)(5). The broad "unlawful" prong of California's UCL, which applies to any practice "forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made," *Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 871 (2002), would appear to expand the narrow exception created by Congress well beyond its intended scope. More importantly, because the UCL claim is an impermissible recharacterization of allegations that ultimately turn on Google's hosting of the fraudulent AdWords, § 230(e)(1) is inapplicable.

9

(2) that Google negligently undertook to prevent fraudulent MSSP content by failing to enforce the Content Policy. Complaint ¶¶ 63, 69.

Plaintiff's contract and negligence claims, as pled in the complaint, are barred because they would hold Google responsible for third-party content, in violation of § 230(c)(1). The claims are virtually indistinguishable from those rejected by the Third Circuit in *Green v. AOL*. In that case, the plaintiff alleged that "AOL negligently failed to live up to . . . contractual obligations" in its member agreement by failing to ban AOL users who harassed him and transmitted a virus to his computer through AOL chatrooms. 318 F.3d 465, 468 (3d Cir. 2002). In dismissing the claims, the court concluded that to hold "AOL liable for its alleged negligent failure to properly police its network for content transmitted by its users . . . would 'treat' AOL 'as the publisher or speaker' of that content." *Id*. at 470. In the instant case, Plaintiff's negligence and contract claims seek to hold Google liable for failing to enforce its Content Policy.

Plaintiff cites *Mazur v. eBay*, No. C 07-03967 MHP, 2008 WL 618988 (N.D. Cal. Mar. 4, 2008), for the proposition that an interactive service provider may be held liable for "creat[ing] an expectation" of certain online conditions but failing to enforce them. However, in *Mazur*, which involved allegedly fraudulent seller activities in eBay's online auction forums, the court held explicitly that "plaintiff's assertion that eBay knew of the seller's illegal conduct and failed to prevent it is . . . . 'the classic kind of claim that [is] preempted by section 230.'" *Mazur*, 2008 WL 618988, at *9 (quoting *Barrett v. Rosenthal*, 40 Cal. 4th 33, 47 (2006)). The only allegations that the *Mazur* court allowed to proceed in the face of § 230 were those based on eBay's *affirmative representations* to users that its live auctions were "safe." Plaintiff in the instant case relies solely on her alleged status as a third-party beneficiary of Google's Advertising Terms–an agreement exclusively between Google and its advertisers. Plaintiff does not–and apparently cannot–allege that Google made any affirmative representations of the kind alleged in *Mazur*.

Google argues that even if Plaintiff could avoid the application of § 230(c)(1) by alleging that Google drafted or "developed" the advertisements "in part," *Fair Housing Council*, 521 F.3d at 1167, her contract and negligence claims would be barred independently by § 230(c)(2), which

10

provides that no interactive computer service "shall be held liable on account of any action voluntarily taken in good faith to restrict access or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." The intent of Congress in enacting § 230(c)(2) was to encourage efforts by Internet service providers to eliminate such material by immunizing them from liability where those efforts failed. *See Carafano*, 339 F.3d at 1122. Plaintiff argues that § 230(c)(2) applies only to "completed courses of action which result in the removal of online material." Pl.'s Opp. at 6:9-10. However, while it is true that § 230(c)(2) "insulates service providers and users from claims premised on the taking down of a customer's posting[,] such as [claims for] breach of contract or unfair business practices," *Batzel v. Smith*, 333 F.3d 1018, 1030 n.14 (9th Cir. 2003), it also "allows [an interactive service provider] to establish *standards* of decency without risking liability for doing so." *Green*, 318 F.3d at 472 (emphasis added). Plaintiff has not alleged that Google adopted its Policy in bad faith, and the Policy would appear to fall squarely within § 230(c)(2)'s authorization to establish standards for online content.

Ultimately, however, the Court concludes that the relevant portions of Google's Content Policy fall outside of the statute for a more basic reason. In *National Numismatic Certification, LLC. v. eBay, Inc.*, No. 6:08-cv-42-Orl-19GJK, 2008 WL 2704404, at *25 (M.D. Fla. July 8, 2008), the plaintiffs sued eBay for reputational harm allegedly inflicted when eBay removed their coin auction items for violations of eBay's Counterfeit Currency and Stamp Policy. eBay argued that it was immune from liability based on its policy of removing "objectionable" material under § 230(c)(2). The district court noted the vagueness of the word "objectionable," and observed that "[i]n the context of section 230, 'objectionable' is preceded by the words 'obscene, lewd, lascivious, filthy, excessively violent, [and] harassing.'" *Id*. Applying the canon of ejusdem generis, the court concluded that "[i]t is difficult to accept . . . that Congress intended the general term 'objectionable' to encompass an auction of potentially-counterfeit coins when the word is preceded by seven other words that describe pornography, graphic violence, obscenity, and harassment." In the instant case, the relevant portions of Google's Content Policy require that MSSPs provide pricing and cancellation information regarding their services. These

11

Case No. C 08-2738 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC3)

requirements relate to business norms of fair play and transparency and are beyond the scope of § 230(c)(2).[6]

C. **Aiding and abetting claims**

Plaintiff also alleges that Google aided and abetted the MSSPs in violating various statutory and common law rules. Plaintiff does not dispute that her aiding and abetting claims would hold Google liable for publication of the MSSPs' advertisements, but she argues that aiding and abetting liability is beyond the scope of § 230. Plaintiff supports her argument with a creative reading of a single line in *Fair Housing Council*, in which the Ninth Circuit stated that "if [website operators] don't encourage illegal content . . . [,] [they] will be immune." 521 F.3d at 1175. Plaintiff thus attempts to draw a connection between the word "encourage" in *Fair Housing Authority* and the requirement of "substantial assistance or encouragement" under aiding and abetting law. Beyond the fact that the court in *Fair Housing Council* was addressing the scope of a website's liability as a "developer . . . in part" of third-party content, and that there are no allegations here that Google "developed" the offending ads in any respect, Plaintiff's aiding and abetting claims are simply inconsistent with § 230. Neither *Fair Housing Council* nor any other case supports Plaintiff's proposed exception to § 230, which provides "broad immunity . . . for *all claims stemming from* [an interactive service provider's] *publication of information*

---

[6] Notably, § 230(c)(1) contains no such limitations. As the Seventh Circuit recently explained,
> [s]ection 230(c)(1) is general. Although the impetus for the enactment of § 230(c) as a whole was a court's opinion holding an information content provider liable, as a publisher, because it had exercised some selectivity with respect to the sexually oriented material it would host for customers, a law's scope often differs from its genesis . . . . Congress could have written something like: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any sexually oriented material provided by another information content provider." That is not, however, what it enacted. Where the phrase "sexually oriented material" appears in our rephrasing, the actual statute has the word "information." That covers ads for housing, auctions of paintings that may have been stolen by Nazis, biting comments about steroids in baseball, efforts to verify the truth of politicians' promises, and everything else that third parties may post on a web site; "information" is the stock in trade of online service providers.

*Chicago Lawyers' Committee*, 519 F.3d at 671 (7th Cir. 2008).

12

*created by third parties.*" *MySpace*, 528 F.3d at 418 (emphasis added).

## IV. CONCLUSION

Each of Plaintiff's claims, as currently pled, is premised fundamentally on Google's publication of the AdWords advertisements. While Plaintiff might avoid § 230 immunity by alleging that Google, in addition to acting as an "internet content provider," also is an "information content provider," she has failed to do so in her complaint. While she does allege that Google "assists its customers in drafting AdWords and selecting keywords through both live support from its AdWords Specialists and its advertising campaign optimization services," Complaint ¶ 15, Plaintiff does not articulate this relationship in her complaint and fails even to argue the point in her opposition. *See supra* note 3. This bare allegation is insufficient to overcome the "robust" protections of the CDA. *Id.*

Nonetheless, there may be instances in which an internet content provider will be considered "'responsible' at least 'in part' for [posted third-party content] because every [posting] is a collaborative effort" between the internet provider and the third-party content provider. *Fair Housing Council*, 521 F.3d at 1167. If Plaintiff could establish Google's involvement in "creating or developing" the AdWords, either "in whole or in part," she might avoid the statutory immunity created by § 230. In light of that possibility, Plaintiff will be given an opportunity to amend her complaint in order to allege such involvement.[7] Any amended pleading shall be filed not later than thirty days from the date of this Order.

**IT IS SO ORDERED.**

DATED: 12/17/08

_____
JEREMY FOGEL
United States District Judge

---

[7] Since at present it appears unlikely that Plaintiff can do so, the Court will defer further consideration of the sufficiency of Plaintiff's underlying claims.

13

This Order has been served electronically upon the following persons:

| | |
|---|---|
| Alan Himmelfarb | Consumerlaw1@earthlink.net |
| Ethan Mark Preston | epreston@kamberedelson.com |
| Karen Johnson-McKewan | kjohnson-mckewan@orrick.com |
| Nancy E. Harris | nharris@orrick.com |
| Nikka Noel Rapkin | nrapkin@orrick.com |

This Order has been served by other means upon the following persons:

Kikka N. Rapkin
Orrick Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669

14
Case No. C 08-2738 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC3)