1   Alan Himmelfarb
    KAMBEREDELSON LLC
2   2757 Leonis Blvd.
    Los Angeles, CA 90058
3   (323) 585-8696
    ahimmelfarb@kamberedelson.com
4
    COUNSEL FOR PLAINTIFFS
5

6           **IN THE UNITED STATES DISTRICT COURT**

7         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

8                   **SAN JOSE DIVISION**

9   JENNA GODDARD, on her own behalf and        Case No. C 08-2738 JF (PVT)
    on behalf of all others similarly situated,
10                                               **PLAINTIFF'S OPPOSITION TO**
                Plaintiff,                       **GOOGLE'S MOTION TO DISMISS**
11                                               **THE FIRST AMENDED COMPLAINT**
           v.
12                                               Date:  April 3, 2009
    GOOGLE, INC., a Delaware corporation,        Time:  9:00 a.m.
13                                               Judge:  The Hon. Jeremy Fogel
                Defendant.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **Table of Contents**

I.    Google Cannot Assert Section 230 Immunity Because it Aided in
      Development and Itself Participated in the Wrongful Conduct
      Defrauding Consumers ..................................................................................................2

      A.    The Development of an AdWords Campaign is a Collaborative Effort
            Between Google and its Advertiser Partners.......................................................3

      B.    Google is Not Entitled to Section 230 Immunity for Its Own Actions Of
            Knowingly Steering Consumers to Wrongful Content........................................8

II.   Goddard Has Properly Pleaded Each Cause of Action in her Amended Complaint ....10

      A.    Goddard States a UCL Claim ..........................................................................10

            1.    Goddard Alleges CFAA Violations Under 18 U.S.C. § 1030(a)(4)
                  and 18 U.S.C. § 1030(a)(5) ...................................................................12

            2.    Goddard Alleges That Google Has Engaged in Monetary Transactions
                  in Property Derived from Unlawful Activity in Violation of
                  18 U.S.C. § 1957(a) ..............................................................................14

            3.    Goddard Has Standing Under the UCL.................................................16

      B.    As an Intended Third-Party Beneficiary of Google's Agreement, Goddard
            Stated a Claim for Breach of Contract..............................................................17

      C.    Goddard Stated a Claim for Negligence ...........................................................19

      D.    Goddard Stated a Claim for Aiding and Abetting.............................................22

IV.   Conclusion ...................................................................................................................23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **Table of Authorities**

**United States Circuit Court of Appeals Cases**

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ......................................................................5

*Ben Ezra, Weinstein, and Co. v. Am. Online, Inc.*, 206 F.3d 980 (10th Cir. 2000) .............4 n.3

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003).........................................5

*Continental Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059 (E.D. Cal. 2006)....15

*Creative Computing v. Getloaded.com, LLC*, 386 F.3d 930 (9th Cir. 2004) ..................14 n. 10

*Chicago Lawyers' Comm. for Civil Rights Under Law v. Craigslist, Inc.*,
   519 F.3d 666 (7th Cir. 2008) ...................................................................................5

*Green v. Am. Online, Inc.*, 318 F.3d 465 (3d Cir. 2003) ....................................................4 n. 3

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ....................................................................... 2-6, 8

*In re First Alliance Mortgage*, 471 F.3d 977, 995 (9th Cir. 2006).........................................22

*United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997)..............................................13 n. 9

*United States v. Lo*, 231 F.3d 471 (9th Cir. 2000)..................................................................13

*United States v. Flores*, 454 F.3d 149 (3d Cir. 2006)....................................................... 14-15

*United States v. Gabriele*, 63 F.3d 61 (1st Cir. 1995) ...........................................................15

*United States v. Hanley*, 190 F.3d 1017 (9th Cir. 1999) .......................................................16

*United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) ........................................................15

*United States v. Jewel*, 532 F. 2d 697 (9th Cir. 1976)............................................................15

*United States v. Johnson*, 971 F.2d 562 (10th Cir. 1992)..................................................11, 13

*United States v. Mitra*, 405 F.3d 492 (7th Cir. 2005).....................................................10 n. 8

*United States v. Nguyen*, 493 F.3d 613 (5th Cir. 2007)..........................................................15

*United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997)................................................11, 16

*United States v. Taylor*, 239 F.3d 994 (9th Cir. 2001) ............................................................16

*Univ. Comm'n Sys. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007)........................................4 n. 3

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)......................................................4 n. 3

**United States District Court Cases:**

*Anthony v. Yahoo!, Inc.*, 421 F. Supp. 2d 1257 (N.D. Cal. 2006) .........................................2, 8

*Antoninetti v. Chipotle Mexican Grill, Inc.*, No. 05-1660,
                 2007 WL 2456223 (S.D. Cal. Aug. 23, 2007) .............................14 n. 11

*Ass'n of Irritated Residents v. C & R Vanderham Dairy*,
                 435 F. Supp. 2d 1078, 1089 (E.D. Cal. 2006).............................14 n. 10

*G & C Auto Body, Inc. v. Geico General Ins. Co.*, No. 06-04898,
                 2007 WL 4350907 (N.D. Cal. Dec. 12, 2007) .............................17 n. 13

*GW Equity, LLC v. Xcentric Ventures, LLC*, No. 07-cv-976-0,
                 2009 WL 62173 (N.D. Tex. Jan. 9, 2009) ................................................5

*Hempstead v. General Fire Extinguisher Corp.*, 269 F. Supp. 109 (D. Del. 1967)........19 n. 16

*HyCite Corp. v. Badbusinessbureau.com, LLC*, 418 F. Supp. 2d 1142 (D. Ariz. 2005)....3, 4, 6

*In re Ditropan XL Antitrust Litig*, 529 F. Supp. 2d 1098 (N.D. Cal. 2007)............................16

*Mazur v. Ebay, Inc.*, No. C 0703967, 2008 WL 618988 (N.D. Cal. March 4, 2008) ........19, 21

*Sanbrook v. Office Depot, Inc.*, No. 07-05938,
                 2008 WL 1994884 (N.D. Cal. May 5, 2008) ...............................17 n. 13

*S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*,
                 426 F. Supp. 2d 1061 (C.D. Cal. 2005) .................................................17

*Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*,
                 119 F. Supp. 2d 1121 (W.D. Wash. 2000)...................................14 n. 10

*White v. Trans Union, LLC*, 462 F. Supp.2d 1079 (C.D. Cal. 2006) .......................................17

*Witriol v. LexisNexis Group*, No. 05-02392,
                 2006 WL 4725713 (N.D. Cal. Feb. 10, 2006)............................17 n. 13

*800-JR Cigar, Inc. v. Goto.com, Inc.*, 437 F. Supp. 2d 273 (D. N.J. 2008)..............................9

**California State Court Cases:**

*Aas v. Superior Court*, 24 Cal. 4th 627, 12 P.3d 1125 (2000)..............................................21

*Adams v. City of Fremont*, 68 Cal. App. 4th 243,
     80 Cal. Rptr. 2d 196 (Cal. Ct. App. 1998)............................................20

*Artiglio v. Corning, Inc.*, 18 Cal. 4th 604, 957 P.2d 1313 (1998) .............................................19

*Aron v. U-Haul Co. of Cal.*, 143 Cal. App. 4th 796,
     49 Cal. Rptr. 3d 555 (Cal. Ct. App. 2006)....................................17 n. 14

*Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1145,
     26 Cal. Rptr. 3d 401, 406 (Cal. Ct. App. 2005)....................................22

*Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.*,
     20 Cal. 4th 163, 973 P.2d 527 (1999)....................................................12

*FNS Mortgage Serv. Corp. v. Pacific Gen. Group, Inc.*, 24 Cal. App. 4th 1564,
     29 Cal. Rptr. 2d 916 (Cal. Ct. App. 1994)........................ 19 n. 16, 20-21

*Genrty v. eBay, Inc.*, 99 Cal. App. 4th 816 (Cal. Ct. App. 2002) ...............................................2

*Hooker v. Dep't of Transp.*, 27 Cal. 4th 198, 38 P.3d 1081 (2002)................................20 n.17

*Hanberry v. Hearst Corp.*, 276 Cal. App. 2d 680,
     81 Cal. Rptr. 519 (Cal. Ct. App. 1969)...................................................21

*Johnson v. Superior Court*, 80 Cal. App. 4th 1050,
     95 Cal. Rptr. 2d 864 (Cal. Ct. App. 2000) .................................7 n.5, 18

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 63 P.3d 937 (2003).........12, 16

*Mukthar v. Latin Am. Sec. Serv.*, 139 Cal. App. 4th 284,
     42 Cal. Rptr. 3d 563 (Cal. Ct. App. 2006)............................................20

*Orser v. Vierra*, 252 Cal. App. 2d 660, 60 Cal. Rptr. 708 (Cal. Ct. App. 1967) ....................22

*Paz v. State of California*, 22 Cal. 4th 550, 994 P.2d 975 (2000) ................................21 n.18

*Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949,
     23 Cal. Rptr. 3d 233 (Cal. Ct. App. 2005)............................................18

*Shersher v. Superior Court*, 154 Cal. App. 4th 1491,
     65 Cal. Rptr. 3d 634 (Cal. Ct. App. 2007)............................................12

*Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856,
            118 Cal. Rptr. 2d 770 (Cal. Ct. App. 2002) ...........................................12

**United States Statutes:**

18 U.S.C. § 1030 (2008) ............................................................................... 10-14

18 U.S.C. § 1956 (2008) .....................................................................................11

18 U.S.C. § 1957 (2008) ...............................................................................11, 14

47 U.S.C. § 230 (1998) ....................................................................................3, 4

Fed. R. Civ. P. 9(b) (2007)................................................................................15

**California Statutes:**

Cal. Bus. & Prof. Code § 17204 (2008) ...........................................................17

**United States Congressional Reports:**

H.R. Rep. No. 99-855 (1985) ............................................................................11

S. Rep. 99-433 (1985) .......................................................................................15

**Miscellaneous:**

Department of Justice, Prosecuting Computer Crimes 25 (2007), at
            http://www.cybercrime.gov/ccmanual/ccmanual.pdf ...................13 n. 9

In the infancy of the Internet, Congress sought to preserve the flow of commerce and

ideas on this new technology, and passed Section 230 of the Communications Decency Act of

1996 (the "CDA" or "Section 230"). The CDA provides computer services robust protection against liability premised on the crimes and torts of its users, but that immunity does not extend to computer services that help to create and develop the offensive content.

Google is a premier Internet site because of its comprehensive search engine that enables consumers to quickly find almost any content on the Internet, and it derives considerable value from the advertising opportunities that accompany the enormous amount of web traffic on its site. But Google's derivation of profit from its web traffic has driven it to become too involved in the creation and development of its AdWords Program, and in the steering of traffic to particular AdWords, to credibly claim the immunity of Section 230.

In an attempt to assert the CDA immunity that its own actions have removed, Google moves to dismiss Goddard's claims, labeling them "conclusory," "without foundation," "outlandish," and "ludicrous."[1] Google's attempt to divert the Court's focus ignores the facts demonstrating that Google both participated in the development of the offending AdWords campaigns and itself created the functions that allow its advertising partners to defraud consumers. Google cannot regain its Section 230 immunity through mislabeling,

---

[1] Several developments since the filing of Google's Motion to Dismiss bear directly on this case and the overarching question of Google's complicity in the fraudulent advertising it promotes. Shortly after the filing of Plaintiff's initial Complaint, and arguably in response to that filing, the Florida Attorney General began an expanded investigation into Google's involvement in the fraudulent mobile content advertising endemic to its search site. After filing its Motion to Dismiss, Google reached an agreement with the Florida Attorney General to require Google's advertisers to disclose pricing information in any AdWords advertisements for mobile content. Google sent a letter to its mobile content advertisers requiring all "text and image ads for these services to display the price and billing interval (such as per week or per month) in the ad text" and stating that Google "will no longer accept text or image ads that don't contain the price and billing interval when promoting mobile content services." Google admitted to its advertisers that its new content requirements "incorporate[e] concerns raised by users and discussions with the Florida Attorney General's office." A true and accurate copy of that letter is attached hereto as Exhibit A. Google also posted the changed policy on its site, a copy of which is attached hereto as Exhibit B, and explicitly states in that policy that Google will "stop your ad from running" unless the advertiser makes the changes required by Google. On information and belief, most or all of Google's AdWord advertisements for mobile content immediately made the changes demanded by Google and now prominently display the pricing information demanded by Google.
These new facts will not control the Court's consideration of this Motion, inasmuch as they are not (and could not have been) pled in the Amended Complaint. But they do show Google's power and willingness to dictate actual ad content to its advertisers, which is relevant to this Motion. And as these facts obviously show that Google continues to control and dictate the content of advertisements to its advertisers, and show Google's acknowledgement of the fraudulent nature of the mobile content advertising on its site, Plaintiff will seek leave to add such allegations to a Second Amended Complaint, regardless of the outcome of this motion.

1  misconstruing, and ignoring the allegations of the Amended Complaint, and it is unable to

2  show that Goddard's claims are otherwise defective or improperly plead.

**I.  Google Cannot Assert Section 230 Immunity Because it Aided in Development and Itself Participated in the Wrongful Conduct Defrauding Consumers.**

5  Google's Motion to Dismiss asserts that it is protected by the Section 230(c)

6  immunity given to interactive computer services from wrongful content created by third

7  parties.  *See* 47 U.S.C. § 230(c).  However, Google loses any Section 230 immunity both by:

8  (a) its actions in participating in, and encouraging the creation of, AdWords campaigns that

9  have defrauded consumers, and (b) manipulating its search engine to steer consumers to

10  AdWords campaigns it knows are fraudulent and in violation of its own Content Policy.  *See*

11  Amended Complaint ¶¶ 18-26.

13  Section 230's "grant of immunity applies only if the interactive computer service

14  provider is also not an 'information content provider,' which is defined as someone who is

15  'responsible, in whole or in part, for the creation or development of' the offending content."

16  *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162

17  (9th Cir. 2008) (*en banc*) ("Roommates II") (quoting 47 U.S.C. § 230(f)(3)).  Google "may

18  simultaneously be both an information content provider and an interactive computer service

19  provider as these categories are not mutually exclusive.  *Anthony v. Yahoo!, Inc.*, 421 F.

20  Supp. 2d 1257, 1263 fn. 6 (N.D. Cal. 2006) (citing *Genrty v. eBay, Inc.*, 99 Cal. App. 4th 816,

21  833 (2002)).  For example, if Google "passively displays content that is created entirely by

22  third parties, then it is only a service provider with respect to that content.  But as to content

23  that it creates itself, or is responsible, in whole or in part for creating or developing, [Google]

24  is also a content provider."  *Roommates II*, 521 F.3d at 1162.  As alleged in the First

25  Amended Complaint, Google collaborates with its advertisers to create AdWords

advertisements which it knows are misleading, and manipulates the results of its search engine to steer consumer traffic towards those misleading advertisements.

**A.    The Development of an AdWords Campaign is a Collaborative Effort Between Google and its Advertiser Partners.**

Google argues that it is entitled to Section 230 immunity because the Amended Complaint asserts no facts showing it contributed directly in developing the wrongful content at issue, because it merely provides "neutral tools" to others that use them to commit the wrongs complained of in this case.  Google's argument fails, both because it presumes a factual finding that its Keyword Tool is "neutral," and also because it ignores the allegations in the Amended Complaint that show that Google directly participated in the development of offending AdWords campaigns.  Certainly, "providing *neutral* tools to carry out what may be unlawful or illicit does not amount to 'development' for the purposes of the immunity exception."  *Roommates II*, 521 F.3d at 1169.  However, "[p]roviding immunity every time a website uses data initially obtained from third parties would eviscerate the exception to section 230 for 'develop[ing]' unlawful content 'in whole or in part.'" *Id.* (citing 47 U.S.C. § 230(f)(3)).  Accordingly, "the pertinent question is whether users posting on [Google]'s website are the sole providers of the allegedly wrongful content, or whether [Google] can be considered to have created or developed any of the allegedly wrongful content . . ." at issue in this case. *HyCite Corp. v. Badbusinessbureau.com, LLC*, 418 F. Supp. 2d 1142, 1148 (D. Ariz. 2005).

To ascertain whether someone is a developer of wrongful content, or merely the provider of a neutral tool, it is necessary to determine what is—and particularly relevant for that matter, what is not—a neutral tool.  This is not a determination that can be made in a Rule 12(b)(6) motion,[2] but even if it were, the allegations of the Amended Complaint show

---

[2] Google relies heavily on two Ninth Circuit decisions – *Roommates* and *Carafano* – for its conclusion that it "cannot be liable for the neutral tools it allegedly provides to its advertiser customers."  Br. at 8.  Google conveniently ignores a basic procedural footing of those cases, however – they were both decided on summary judgment, not a Rule 12(b)(6) motion to dismiss.  Google here attempts to sidestep fact development and asks the court to assume the truth of its oft-repeated representation that it does no more than provide "neutral tools." Whether Google's "tools" are in fact "neutral" cannot be determined in Google's favor without further factual development.

that Google has gone well beyond the provision of "neutral tools" and become a developer, in part, of the misleading mobile content advertisements at issue in this case.

While websites that passively transmit information provided by others retain Section 230 immunity, those that do more become developers, at least in part, of that information. Several actions and characteristics alleged in the Amended Complaint have resulted in website operators being found "developers" of content, and unable to assert immunity under Section 230: The editing of a third party submission in a manner that contributes to alleged illegality, such as altering the meaning so as to become libelous, is not neutral and not entitled to immunity. *Roommates II*, 521 F.3d at 1169.  Requiring the input of wrongful content as a condition of access or condition of doing business is equally not neutral or protected by Section 230.  *Id.* at 1166. A program or tool that "does more than provides options," but offers a "limited set of pre-populated answers" that have the effect of soliciting unlawful content results in a loss of neutrality and Section 230 immunity.  *Id.*  Further, eliciting wrongful content for a specific use in conducting one's business goes beyond providing a neutral framework that can be used for both proper and improper purposes and is properly considering involvement in the development of that content.  *Id.* at 1172.  Finally, a website's prompting, encouragement, or solicitation of wrongful content from third parties can be sufficient to remove Section 230 immunity.  *Id.* fn. 33;[3] *see also HyCite*, 418 F. Supp. 2d at 1148-49 (considering allegations that a defendant solicited wrongful content with promises of monetary compensation sufficient to support a finding that the defendant was responsible, in part, for the development of the information submitted in response to the solicitation).

---

[3] The *Roommates II* Court's analysis of decisions of other circuits supports its statements that encouragement, prompting, and solicitation may be sufficient for revoking Section 230 liability.  *See Univ. Comm'n Sys. v. Lycos, Inc.*, 478 F.3d 413, 420 (1st Cir. 2007) (finding the owner of a message board immune for defamatory postings made without any prompting or encouragement); *Green v. Am. Online, Inc.*, 318 F.3d 465 (3d Cir. 2003) (finding AOL immune comments and malicious software transmitted by third parties through its chat room because there were no allegations that AOL solicited or encouraged the posting of the harmful content); *Ben Ezra, Weinstein, and Co. v. Am. Online, Inc.*, 206 F.3d 980, 985 (10th Cir. 2000) (finding AOL immune for posting inaccurate stock prices where it did not encourage or solicit others to provide inaccurate data); *Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) (finding AOL immune from defamatory message board posting were it did not solicit or encourage others to post the offending content).

1    In contrast, the actions and website characteristics that have been found "neutral" and

2  subject to immunity, are materially different than what is alleged in the Amended Complaint.

3  In each instance, a third party initiated an exchange with an interactive computer service and

4  transmitted or created wrongful conduct without any aid, encouragement, or solicitation from

5  the website.  Examples include:  the editing of user submitted content for spelling, obscenity,

6  and trimming for length (*Roommates II*, 521 F.3d at 1169 (citing *Batzel v. Smith*, 333 F.3d

7  1018 (9th Cir. 2003)); providing an open text prompt on a topic without any imposed

8  structure, (*Id.* at 1172 f. 33, 1173-74 (granting immunity for statements displayed in the

9  "Additional Comments" section because the defendant did not "provide guidance" or what

10  answers should contain or urge submitting of wrongful content); *see also Chicago Lawyers'*

11  *Comm. for Civil Rights Under Law v. Craigslist, Inc.*, 519 F.3d 666, 671-72 (7th Cir. 2008)

12  (finding that nothing Craigslist offers posters induces third parties to submit actionable

13  content); a program that allows a third party to create content through multiple questions

14  with menu answers, "without prompting or help," (*Roommates II*, at 1171 (discussing

15  *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003))); and finally, a website

16  that requires users submitting content to choose a category for their submission from a wide

17  range of categories, some negative, provides a neutral tool and retains Section 230 immunity

18  (*GW Equity, LLC v. Xcentric Ventures, LLC*, No. 07-cv-976-0, 2009 WL 62173, *5 (N.D.

19  Tex. Jan. 9, 2009)).  What has been found in these cases to be a "neutral tool," stands in stark

20  contrast to situations where a website has been found a partial developer of offending

21  content, as Google is alleged to be.

22    Google's reliance on *Carafano* for its "neutral tools" analysis conveniently ignores

23  the Ninth Circuit's discussion in *Roommates II* that demonstrates Google's participation in

24  the AdWords program goes far beyond what is permitted to retain immunity under Section

25  230.  In *Carafano*, the Ninth Circuit found that a website's solicitation of data through a

26  sixty-two-question questionnaire with drop-down menu responses did not constitute "a

27  significant role in creating developing, or transforming the relevant information."  *Carafano*,

28  339 F.3d at 1125.  However, the dating website there only retained its Section 230 immunity

1  because the wrongful content "was created and developed entirely by the malevolent user,

2  without prompting or help from the website operator."  *Roommates II*, 521 F.3d at 1171; *see*

3  *also HyCite*, 418 F. Supp. 2d at 1148 (stating that the website in *Carafano* was immune from

4  liability for the false content in a dating profile posted on its website because "the critical

5  information was provided by a third party and the defendant transmitted the information

6  without alteration.")  Further, the website in *Carafano* did nothing to "enhance" or

7  "encourage" the wrongful content or make providing such content any easier for the user.

8  *Roommates II*, 521 F.3d at 1172.

9         The facts alleged in the Amended Complaint demonstrate that Google has never been

10  a passive transmitter of its AdWords advertisers' information, but has always maintained

11  considerable involvement in selecting, promoting, and encouraging its partners to develop

12  misleading ads.  (*See generally* Am. Comp. ¶¶ 14-42, Dkt. No. 49.)  At the inception of the

13  AdWords program, Google charged a monthly fee to develop and manage all aspects of an

14  advertiser's account.  (Am. Compl. ¶ 17.)  Later, in 2005, Google's "Jumpstart" program

15  offered AdWords participants a service where Google would draft the ads, choose the

16  keywords, and set cost-per-click budgets for a flat fee.  (Am. Compl. ¶ 18.)  Further, Google

17  personally meets with major advertisers—such as AzoogleAds US, Inc. a/k/a Epic

18  Advertising, Inc., which has settled governmental investigations about the same deceptive

19  practices at issue here—to offer advice on ad budgeting, keyword selection, and development

20  of ad copy.  (Am Compl. ¶¶ 20, 26, 30.)[4]

21        At the time Google was meeting with offending mobile content advertisers to provide

22  tailored advice on what keywords would return bigger profits, the clear majority of all search

23  volume on Google associated with the word "ringtone" became associated with the word

24  "free." (Am. Compl. ¶¶ 20, 24.)  And, Google was simultaneously steering search traffic to

25  these very keywords, increasing their cost to advertisers and their profitability for Google.

26  (Am. Compl., ¶¶ 16, 24.)  These facts alone are sufficient to demonstrate (or at least infer)

27  _____

[4] And, as discussed in fn.1, supra, Google has now begun to dictate advertising content directly to its

28  advertisers, in response to a settlement of its own governmental investigation.

1   that Google directly participated in the alleged wrongs, and show that Google's fraudulently

2   suggestive Keyword Tool and manipulation of search results render its ability to claim

3   Section 230 immunity unsustainable.[5]

4          Although Google attempts to cloak its Keyword Tool with the appearance of

5   neutrality, its use and function demonstrate the bias in its application.  Instead of offering a

6   blank slate for advertisers to develop their own ads, Google offers its assistance with the

7   inclusion of suggestion tools.  (Am. Compl. ¶¶ 21-22.)  Google's tool requires advertisers to

8   enter words or phrases describing the good or service to be promoted via AdWords, or to

9   provide Google with a link to the website to which consumers will be directed.  (Am. Compl.

10  ¶ 22.)  Next, Google takes the information or web address solicited from its advertising

11  partners and unilaterally "suggests" alternate keywords that will trigger the appearance of the

12  ad when searched by consumers.  (Am. Compl. ¶ 23.)  Google also "suggests" these same

13  keywords to consumers using its search engine. (Am. Compl. ¶¶ 16, 24)  Despite Google's

14  knowledge of the magnitude of problems stemming from the lack of disclosure of billing

15  terms and failure to obtain consumer authorization that is rampant in the mobile content

16  industry, most of the Keyword Tool's "suggestions" to advertisers who want to include the

17  term "ringtone" also include the word "free" – including the overwhelmingly dominant first

18  suggestion.   (Am. Compl. ¶ 23, 30.)  Given Google's knowledge of the mobile content

19  industry's unauthorized charge problems, its suggestion of terms known to result in consumer

20  fraud is neither innocuous nor neutral.

21         The Keyword Tool's lack of neutrality is further evidenced by the fact that the clear

22  majority of all search volume on Google associated with the word "ringtone" also is

23  associated with the word "free." (Am. Compl. ¶ 24, Ex D.)  Although the advertiser must

24  _____

25  [5] Google claims that Goddard's claims must fail because the Amended Complaint lacks specific allegations
    stating that Google met with advertisers to develop misleading AdWords campaigns or that such a meeting
    resulted in the ad that caused Goddard's injury.  However, given Google's meeting with such advertisers to

26  draft ad copy and suggest keywords corresponding directly with the increase in the use of the keyword "free" in
    conjunction with "ringtone," Goddard is certainly entitled to such an inference at the pleading stage. *See*

27  *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008) (all well-pleaded factual
    allegations are accepted as true, "as well as any reasonable inferences drawn from them.").

28

Case No. C 08-2738 JF (PVT)                    7
OPPOSITION TO MOTION TO DISMISS
FIRST AMENDED COMPLAINT

ultimately approve Google's suggestions, mobile content advertisers, almost none of whom provide genuinely "free" ringtones, have little incentive to disregard Google's suggestions and forego advertising on as much as two-thirds of all "ringtone" searches on Google.  (Am. Compl. ¶ 25.)  Facing the Hobson's choice of accepting either Google's "suggestions" or drastically reduced revenue, mobile content advertisers have accepted Google's "suggestions" to include the keyword "free" along with the keyword "ringtone" in order to advertise to the majority of "ringtone" searches, whether their products are free or not.  (Am. Compl. ¶ 26.)  Accordingly, "[b]y any reasonable use of the English language, [Google] is 'responsible' at least 'in part' for each [AdWords campaign], because every such [AdWords campaign] is a collaborative effort between [Google] and the [advertiser].  *Roommates II,* 521 F.3d at 1167.

      **B.**      **Google is Not Entitled to Section 230 Immunity for Its Own Actions Of Knowingly Steering Consumers to Wrongful Content.**

      Although Google loses Section 230 immunity for aiding in the development of the offending AdWords campaigns, its latest motion to dismiss ignores the allegations in the Amended Complaint that Google's lone act of manipulating its search engine to drive consumers to the very offending content it "suggests" to its advertisers creates a separate basis sufficient to strip Google of Section 230 immunity.  In *Anthony v. Yahoo!*, the court found that although Yahoo! was immune for the content of the profiles created entirely by third parties, it was not absolved from liability for falsely misrepresenting the dating profiles of former subscribers to current customers as potential love interests.  421 F. Supp. 2d at 1263.  There, Yahoo! was held liable for its use of information given to it by third parties that it knew as false.  *Id.*  The Court in *Roommates II* applied this same logic to Internet search engines and found that there is no Section 230 immunity for a search function that is designed to achieve illegal ends. *Roommates II*, 521 F.3d at 1167.  There, the defendant was "not entitled to CDA immunity for the operation of its search system" because it was "designed to steer users based on" the wrongful content at issue, it used wrongful content to "limit the scope of searches," and it limited the results of the search based on the wrongful content.  *Id.*

And, in *800-JR Cigar, Inc. v. Goto.com, Inc.*, 437 F. Supp. 2d 273 (D. N.J. 2008), the court denied Section 230 immunity against consumer fraud claims for a pay-for-priority advertising service nearly identical to Google's AdWords program.  The court found that immunity did "not seem to fit" because the alleged fraud in that case was in the bidding process designed by the defendant, "and not solely the information from third parties that appears on the search results page."  437 F. Supp. 2d at 295.  The allegations in the Amended Complaint here go even farther than the facts of *Goto.com*: here, Plaintiff alleges not only that Google designed and operates the bidding process that leads to the misleading mobile content ads, but also that Google works directly with the advertisers themselves to develop those ads.  As the *Goto.com* Court stated, "it is not the purpose of the [CDA] to shield entities from claims of fraud and abuse arising from their own pay-for-priority advertising business, rather than from the actions of third parties."  *Id.*   Based on these cases, Section 230 does not afford Google immunity if it knowingly used wrongful content in its search function and/or steered consumers to that wrongful content.[6]

In this matter, Google not only "suggests" keywords to advertisers it knows are associated with rampant fraud, it also suggests those same keywords to unsuspecting consumers, leading them directly to these AdWords campaigns where they, like Goddard, are deceived.  (Am. Compl. ¶ 24, 45-46.)  As alleged in the Amended Complaint, when the search term "ringtone" is entered on Google.com, Google automatically suggests in its drop down menu numerous variations of the term "ringtone," several of which contain the word "free," such as "ringtones free" and "ringtones free download." (Am. Compl. ¶ 24.)  In addition, when consumers enter the search term "free," or even the letters "fr," one of Google's top automatic "suggestions" is "free ringtones." (Am. Compl. ¶ 24.)  These keyword suggestions to consumers, by driving search traffic to the deceptive AdWord campaigns, undoubtedly increase the value (in terms of Cost-Per-Click or "CPC" - *see*

---

[6] To clarify, Goddard is not seeking to hold Google liable for the provision of the main search results returned when a consumer performs a search on Google.  The allegation of the Amended Complaint, and Google's liability are directed specifically at the AdWords displayed based on certain search terms and Google's "suggesting" of terms to consumers to lead them to the wrongful content.

1   Amended Complaint, Ex. A, at 1, 6) of those keywords to advertisers; as a result, it is

2   reasonable to infer that the reason Google suggests these keywords to consumers is to

3   increase its own advertising revenue from those keywords.  Google silence regarding these

4   allegations of the Amended Complaint in its Motion to Dismiss is a telling concession that

5   the Amended Complaint makes very clear that Google directly participated in the alleged

6   illegality.

7        Google's suggestion of certain keywords to advertisers and corresponding search

8   suggestions to consumers are especially insidious given the restrictions in its Content Policy

9   and Advertising Program Terms governing advertising for mobile subscription services.  (*See*

10  Am. Compl. ¶¶ 27-28.)  Google makes public representations that it will not allow

11  advertising for mobile subscription services which do not, *inter alia*, "clearly and accurately"

12  disclose relevant pricing and related information.  (Am. Compl. ¶¶ 28-36.)  Then, in clear

13  breach of the terms of its contract, Google substantially aids in developing ads promoting the

14  very pages it prohibits and steers consumers to those pages ensuring both it and its

15  advertisers are handsomely compensated.  Google cannot hide behind Section 230 to escape

16  liability for this conduct and its motion seeking immunity should be denied.

17  **II.   Goddard Has Properly Pleaded Each Cause of Action in her Amended Complaint.**

18       Recognizing that its Section 230 argument now strains credibility in light of the

19  Amended Complaint, Google nearly[7] repeats its scattershot set of arguments from its initial

20  Motion to Dismiss that Goddard's claims are substantively defective.  Despite Google's

21  misstatements of the law and its failure to acknowledge Goddard's allegations, it is apparent

22  that Goddard properly pleaded each cause of action set forth in her Amended Complaint.

23       **A.     Goddard States a UCL Claim**

24       Goddard alleges that her cellular phone (and those of the rest of the putative class) is a

25  computer, protected by the CFAA.  *Cf.* 18 U.S.C. § 1030(e)(1) (2008).[8]  Goddard alleges that

---

[7] Although Google's instant Motion to Dismiss states that it has repeated verbatim the text from its initial motion; it has made numerous modifications.

[8] *See United States v. Mitra*, 405 F.3d 492, 495 (7th Cir. 2005) (18 U.S.C. § 1030(e)(1) expressly excludes "automatic typewriters, typesetters, and handheld calculators"; this demonstrates that CFAA applies to "other

1   mobile content providers accessed her and other class members' cellular phones by sending

2   her unauthorized mobile content as part of a scheme to fraudulently charge for that content

3   and to collect such charges as revenue. (Am. Compl. ¶¶ 60-61.) Additionally, these fraudulent

4   charges forced Goddard and other class members' to "pay additional fees to maintain their

5   cellular service, these charges impair the availability of Class members' access to and

6   communication with their cellular service." (Am. Compl. ¶ 62.) Thus, the revenue mobile

7   content providers derive from these fraudulent mobile content charges are derived from a

8   "specified unlawful activity." *See* 18 U.S.C. § 1957(f)(3) (2008) (same definition from 18

9   U.S.C. § 1956); 18 U.S.C. § 1957(c)(7)(D) (2008) (definition of "specified unlawful activity"

10  includes violations of 18 U.S.C. § 1030).

11          Goddard alleges that Google knows (or consciously avoids knowing) that certain

12  mobile content providers derived all or substantially all of their revenue from fraudulent

13  mobile content charges, and that payments to Google from these mobile content providers for

14  advertising services "necessarily represent[s] criminally derived property." (Am. Compl. ¶¶

15  64, 66.)  Consequently, Google violates 18 U.S.C. § 1957(a) by accepting payments for

16  advertising services over $10,000 from mobile content providers that are derived from

17  fraudulent mobile content charges.  18 U.S.C. § 1957(a) prohibits "knowingly engag[ing] in a

18  monetary transaction in criminally derived property of a value greater than $10,000 [which]

19  is derived from specified unlawful activity . . ." 18 U.S.C. § 1957(a) (2008). (*Cf.* Am. Compl.

20  ¶¶ 65-66) (alleging many if not all of the payments by fraudulent mobile content providers

21  for advertising services exceed $10,000).)

22          The legislative history indicates that 18 U.S.C. § 1957(a) was intended to deter crime

23  by prohibiting legitimate businesses from taking criminal proceeds, thereby making criminal

24  profits "worthless." H.R. Rep. No. 99-855, at 13 (1985). *See also United States v. Rutgard*,

25  116 F.3d 1270, 1291 (9th Cir. 1997) (18 U.S.C. § 1957 "freezes the proceeds of specific

26  crimes out of the banking system"); *United States v. Johnson*, 971 F.2d 562, 568 (10th Cir.

27

28  devices with embedded processors and software are covered;" "[a]s more devices come to have built-in
    intelligence, the effective scope of the statute grows").

1992) (18 U.S.C. § 1957 "criminalize[s] the conduct of those third persons . . . who have

aided [criminals] by allowing them to dispose of the profits of [criminal] activity"). Goddard

seeks to enforce 18 U.S.C. § 1957 here under the UCL's "unlawful" prong, which "borrows

violations of other laws and treats them as unlawful practices that the unfair competition law

makes independently actionable." *Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.*, 20

Cal. 4th 163, 180, 973 P.2d 527, 539-540 (1999) (citation, punctuation omitted). The UCL's

"unlawful" prong applies to any practice "forbidden by law, be it civil or criminal, federal,

state, or municipal, statutory, regulatory, or court-made," *Wang v. Massey Chevrolet*, 97 Cal.

App. 4th 856, 871, 118 Cal. Rptr. 2d 770, 780 (Cal. Ct. App. 2002) (citation, punctuation

omitted). The UCL's broad scope has been counterbalanced with limited remedies:

injunctive relief and restitution. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th

1134, 1152, 63 P.3d 937, 949 (2003) (UCL reflects a "balance struck . . . between broad

liability and limited relief."). While the 18 U.S.C. § 1957 may reach into commercial

practices, the UCL self-checks this reach with its limited remedies.  Despite Goddard having

clearly set forth the basis for her UCL claim, Google nonetheless argues three separate bases

for dismissal.  Each of Google's arguments for dismissal fails for the reasons detailed below.

### 1.    Goddard Alleges CFAA Violations Under 18 U.S.C. § 1030(a)(4) and 18 U.S.C. § 1030(a)(5)

Google argues that Goddard does not allege violations of 18 U.S.C. § 1030(a)(4) or 18

U.S.C. § 1030(a)(5).  Google contends that Goddard does not allege "that she was damaged,

harmed, or defrauded by [fraudulent mobile content providers'] alleged access to her cell

phone," but only that "she was injured because the [mobile content providers] *charged for*

*that access*." (Def.'s Mem. 14)  Thus, Google argues, "there is no nexus between the alleged

fraud and damage, on the one hand, and the alleged access to Plaintiff's cell phone, on the

other." (*Id.*)

The infrastructure for mobile content allows mobile content providers to

simultaneously transmit mobile content and assess charges against consumers without any

information except a telephone number. (Am. Compl. ¶ 10-11.)

> Given the manner in which mobile content is billed to customers, [fraudulent charges for mobile content are] easy to achieve and difficult to detect. . . . [A mobile content provider can transmit mobile content to a telephone number without any other authorization information and] cause that consumer to be billed for services and products irrespective of whether the consumer actually agreed to purchase them *and, in the process*, cause text messages containing "premium" content to be sent to the "subscriber's" cell phone . . .

(A. Compl. ¶ 10) (emphasis added). It is reasonable to infer from the Amended Complaint (and it is the case) that the design of the infrastructure for mobile content also *requires* mobile content providers' transmissions to aggregators (the middlemen between mobile content providers and cellular carriers) to include *both* the mobile content which accesses consumers' cellular phones *and* the instructions necessary to charge consumers for the mobile content. *See Johnson*, 534 F.3d at 1121-22 (requiring that all well-pleaded factual allegations be accepted as true, "as well as any reasonable inferences drawn from them.").  Given the design of the mobile content's billing infrastructure, the transmission of mobile content to consumers' cell phones is a necessary precondition to charging consumers for that mobile content—making it part and parcel of the fraud.

The mobile content providers' transmission of mobile content to Goddard's phones thus plainly violated 18 U.S.C. § 1030(a)(4), which prohibits accessing a computer "and by means of such conduct *furthers the intended fraud* and obtains anything of value . . ." 18 U.S.C. § 1030(a)(4) (2008) (emphasis added). Analogizing to mail fraud, computer access "must occur in the execution of the scheme—that is, as a step in the plot . . . [but] the [access] need not be an essential element of the scheme. Rather, it is sufficient if the [access] is incident to an essential part of the scheme."  *United States v. Lo*, 231 F.3d 471, 478 (9th Cir. 2000).  Given mobile content's billing and transmission infrastructure, the access alleged is surely incident to an essential part of the scheme (i.e., passing unauthorized charges to consumers) if not an essential part of the scheme itself.[9]  Even in the absence of the billing

---

[9] *United States v. Czubinski*, 106 F.3d 1069, 1078 (1st Cir. 1997) (violation of 18 U.S.C. § 1030(a)(4) requires that access to computer "was valuable [to] a fraudulent scheme"); Department of Justice, Prosecuting Computer Crimes 25 (2007), at http://www.cybercrime.gov/ccmanual/ccmanual.pdf ("furthers the intended fraud" element of 1030(a)(4) is met "if a defendant alters . . . records on a computer, and then receives something of value from an individual who relied on the accuracy of those . . . records").

1   infrastructure for mobile content, the access alleged in the Complaint furthers the fraud

2   alleged by providing (to aggregators, carriers, regulators, or any other interested third party)

3   corroboration that Goddard and other class members got the mobile content they purportedly

4   paid for. Secondly, Goddard's allegation that she had to pay fraudulent mobile content

5   charges to maintain cellular service is sufficient to allege "damage" in violation of 18 U.S.C.

6   § 1030(a)(5).  Again, Goddard's allegations establish that fraudulent charges for mobile

7   content were "a result of" the transmission of mobile content.  18 U.S.C. § 1030(a)(5) (2008).

8   (Am. Compl. ¶ 10.) Moreover, Google's argument depends on a blinkered construction of the

9   term "damages" and discards consequential damages—it is not consistent with prior

10  interpretations of the CFAA in this Circuit.[10]

11                  **2.      Goddard Alleges That Google Has Engaged in Monetary**
                              **Transactions in Property Derived from Unlawful Activity in**
12                            **Violation of 18 U.S.C. § 1957(a)**

13          Google's second argument against Goddard's UCL claim is that Goddard has not

14  alleged "any facts by which Google could reasonably have possessed the requisite knowledge

15  that the payments from the [fraudulent mobile content providers] constituted property derived

16  from a statutorily proscribed act as alleged by Plaintiff." (Def.'s Mem. 15.)  Under the

17  statute's plain language, Goddard does not to prove that Google "knew that the offense from

18  which the criminally derived property was derived was specified unlawful activity."  18

19  U.S.C. § 1957(c) (2008). Goddard does not have to show that Google knew that the

20  fraudulent mobile content providers' payments were specifically derived from violations of

21  18 U.S.C. § 1030, only that they were "criminally derived." 18 U.S.C. § 1957(a) (2008). *See*,

22  *e.g.*, *United States v. Flores*, 454 F.3d 149, 155 (3d Cir. 2006) (defendant's liability under 18

23  U.S.C. § 1957(a) only required knowledge that funds originated in some form of unlawful

24  activity, not that funds specifically originated from narcotics trafficking).

---

25  [10] *Cf. Creative Computing v. Getloaded.com, LLC*, 386 F.3d 930, 935 (9th Cir. 2004) ("money [which] must be
        spent to restore or maintain some aspect of a business affected by a [CFAA] violation" constitutes "damages");
26      *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1127 (W.D. Wash. 2000)
        (CFAA's definition of "damages" covers "subsequent corrective measures the rightful computer owner must
27      take to prevent" harms from the CFAA violation).

28

Case No. C 08-2738 JF (PVT)                    14
OPPOSITION TO MOTION TO DISMISS
FIRST AMENDED COMPLAINT

1          Google makes two other assertions that suggest, but do not actually advance,

2  arguments for dismissal.[11]  Google asserts that unlawful funds commingled with lawful funds

3  cannot support liability under section 1957, and that Goddard's supposedly "unfounded and

4  overblown [allegation] that 'all or substantially all' of [fraudulent mobile content providers']

5  revenue . . . was criminally derived" did not adequately state a claim that "Google could have

6  known that the particular funds it received in payment for advertising space were criminally

7  derived." (Def.'s Mem. 15.)  First, Goddard is not required to make detailed allegations about

8  Google's state of mind. "[K]nowledge . . . and other conditions of a person's mind may be

9  alleged generally." Fed. R. Civ. P. 9(b); *see Continental Airlines, Inc. v. Mundo Travel Corp.*,

10  412 F. Supp. 2d 1059, 1068 (E.D. Cal. 2006) (under Rule 9(b), plaintiff did not need to

11  "plead a basis for its averment regarding [third parties'] states of mind or [defendant's]

12  knowledge thereof"). Second, Goddard does allege facts indicating that Google knew that

13  fraud was endemic in the mobile content industry—such as Google's perceived need for the

14  Content Policy and state actions against its largest advertisers.[12] (Am. Compl. ¶¶ 22-27-32.)

15  Third, Goddard need not prove Google had positive knowledge. Legislative history indicates

16  that the knowledge element of money-laundering statutes was "intended to be construed . . .

17  to include instances of 'willful blindness.'" S. Rep. 99-433, at 9-10 (1985) (citing *United

18  States v. Jewel*, 532 F. 2d 697 (9th Cir. 1976)). The Ninth Circuit continues to recognize

19  *Jewel*'s willful blindness doctrine, and many other courts have applied that doctrine to 18

20  U.S.C. § 1957(a) violations. *See, e.g., United States v. Heredia*, 483 F.3d 913, 918-21 (9th

21  Cir. 2007); *United States v. Nguyen*, 493 F.3d 613, 618-19 (5th Cir. 2007); *Flores*, 454 F.3d

22  at 154-55; *United States v. Gabriele*, 63 F.3d 61, 64-67 (1st Cir. 1995).

---

23  [11] It would be unfair for Google to develop these assertions into substantive arguments in its reply, after
24  Goddard had lost the opportunity to respond. *Ass'n of Irritated Residents v. C & R Vanderham Dairy*, 435 F.
Supp. 2d 1078, 1089 (E.D. Cal. 2006) (where arguments in moving brief are "inadequately developed," it is
25  inappropriate for the Court to consider expansions on those arguments in the movant's reply brief). *See also
Antoninetti v. Chipotle Mexican Grill, Inc.*, No. 05-1660, 2007 WL 2456223, at *3 (S.D. Cal. Aug. 23, 2007)
26  (applying maxim that "arguments not raised by a party in its opening brief are deemed waived").

27  [12] Google's recent settlement with the Florida Attorney General's Office, and its related changes to its Mobile
Ad Policies, will obviously impact these allegations as they provide additional evidence that Google is aware of
28  the extent of the endemic fraud by its mobile content advertisers.  *See* Ex. A, B.

1    Google's second assertion also fails, as commingling of lawful and unlawful funds

2    only presents an evidentiary matter, not a definitive defense to liability under 18 U.S.C. §

3    1957(a).  Google's authority only rejected an evidentiary presumption (employed by other

4    courts) that unlawful proceeds are the first to be withdrawn from a particular account holding

5    commingled funds.  *See Rutgard*, 116 F.3d at 1192.  However, 18 U.S.C. § 1957(a) "cannot

6    be made wholly ineffective by commingling." *Id*.  Violations can be proved by "tracing

7    funds," proving that an "entire business was a fraud" so that all its funds were unlawful, or

8    showing that a transaction exhausted all the implicated funds (both lawful and unlawful).

9    *United States v. Hanley*, 190 F.3d 1017, 1025 (9th Cir. 1999).  The law provides that

10   Goddard can prove a violation of 18 U.S.C. § 1957(a) by showing that the fraudulent mobile

11   content providers' revenue was entirely illicit. *See United States v. Taylor*, 239 F.3d 994,

12   998-99 (9th Cir. 2001) (defendant had no lawful revenue to purchase money order or

13   cashier's check).

14              **3.      Goddard Has Standing Under the UCL**

15   Finally, Google argues in a stray footnote that Goddard cannot assert a claim for

16   restitution because she alleged that she paid the mobile content providers and not Google, so

17   that "her failure to allege that Google caused any injury deprives her of standing to assert a

18   Section 17200 claim against Google." (Def.'s Mem. 15 n. 10.)

19   Goddard can recover money from Google as restitution under the UCL if she can trace

20   funds fraudulently taken from her by mobile content providers and paid to Google in

21   exchange for AdWords. *Cf. Korea Supply*, 29 Cal. 4th at 1150, 63 P.3d at 947 (finding that

22   restitution under UCL permits plaintiff to recovered funds if they can be traced to specific

23   funds in defendant's possession). "The object of restitution is to restore the status quo by

24   returning to the plaintiff funds in which he or she has an ownership interest." *Id*., 29 Cal. 4th

25   at 1149, 63 P.3d at 947.  However, restitution under the UCL "is not limited only to the

26   return of money or property that was once in the possession of that person" but is "broad

27   enough to allow a plaintiff to recover money or property in which he or she has a vested

28   interest." *Id*. (restitution under UCL applies to property obtained through unfair competition

1   from plaintiff who "had an ownership interest in the property or those claiming through that

2   person"). Restitution's flexibility – namely, its ability to trace funds through multiple parties

3   – is borne out in *Shersher v. Superior Court*, 154 Cal. App. 4th 1491, 65 Cal. Rptr. 3d 634

4   (Cal. Ct. App. 2007) and *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098 (N.D. Cal.

5   2007).

6           Secondly, Google's argument is not consistent with the plain language of the

7   provisions of the UCL on which it depends. "Actions for any relief pursuant to this chapter

8   shall be prosecuted exclusively in a court of competent jurisdiction by . . . any person who

9   has suffered injury in fact and *has lost money or property as a result of the unfair*

10  *competition*." Cal. Bus. & Prof. Code § 17204 (2008) (emphasis added). Goddard does not

11  need to state a claim for restitution to have standing under the UCL.[13]  Standing under the

12  UCL "does not require that the [claimed] losses . . . were the product of the defendant's

13  wrongful acquisition of the plaintiff's property." *White v. Trans Union, LLC*, 462 F. Supp.2d

14  1079, 1084 (C.D. Cal. 2006).  Rather, standing under the UCL extends to plaintiffs who have

15  "lost money or property" due to a defendant's UCL violation, even if the money is lost to

16  someone other than the defendant.[14]  Goddard alleges that she lost money because Google

17  permitted fraudulent mobile content providers to place AdWords on its website and that

18  Google would not have permitted fraudulent mobile content providers to place AdWords

19  unless it accepted their tainted funds as payment for advertising, in violation of 18 U.S.C. §

20  1957(a). (Am. Compl. ¶ 69.) Even if Goddard could not make a claim for restitution under the

21  UCL, she would still standing for injunctive relief. *S. Cal. Housing Rights Ctr. v. Los Feliz*

22  *Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1069 (C.D. Cal. 2005) (standing where

23  _____

24  [13]  *See, e.g., Sanbrook v. Office Depot, Inc.*, No. 07-05938, 2008 WL 1994884, at *5 (N.D. Cal. May 5, 2008)
    (plaintiff without claim for restitution under UCL still had standing for injunctive remedy under UCL); *G & C
    Auto Body, Inc. v. Geico General Ins. Co.*, No. 06-04898, 2007 WL 4350907, at *3-4  (N.D. Cal. Dec. 12,

25  2007) (same; explicitly rejecting argument that claim for restitution is prerequisite for standing under UCL).
    [14]  *See Aron v. U-Haul Co. of Cal.*, 143 Cal. App. 4th 796, 802-03, 49 Cal. Rptr. 3d 555, 559 (Cal. Ct. App.

26  2006) (plaintiff who alleged "actual economic injury as a result of an unfair and illegal business practice" had
    standing for UCL claim, even though injury was required purchase from  non-defendant third party); *Witriol v.*

27  *LexisNexis Group*, No. 05-02392, 2006 WL 4725713, at *6 (N.D. Cal. Feb. 10, 2006) (plaintiff had standing
    under UCL because defendant's unauthorized release of his information caused him to incur costs associated
    with monitoring and repairing credit paid to third parties).

28

UCL violations require plaintiff to divert its resources to investigating claim).

**B.     As an Intended Third-Party Beneficiary of Google's Agreement, Goddard Stated a Claim for Breach of Contract**

Google makes two arguments against Goddard's breach of contract claim. First, Google argues that Goddard cannot be an intended third party beneficiary of Google's Content Policy unless "the Advertising Terms would have to reflect, on their face, an intent to benefit Plaintiff." (Def.'s Mem. 17.) This misstates the law: "[n]o specific manifestation by the promisor of an intent to benefit the third person is required." *Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 958, 23 Cal. Rptr. 3d 233, 239 (Cal. Ct. App. 2005) (punctuation, citation omitted).

> [Third-party beneficiaries] need not be identified by name. It is sufficient if [they] belong[] to a class of persons for whose benefit the contract was made. . . . It is not necessary . . . that the contract be exclusively for the benefit of the third party; he need not be the sole or primary beneficiary.

*Johnson v. Superior Court*, 80 Cal. App. 4th 1050, 1064, 95 Cal. Rptr. 2d 864, 873 (Cal. Ct. App. 2000). The provisions of the Content Policy at issue are clearly intended to protect users of the mobile content providers' websites against fraud; the Content Policy requires landing pages to "clearly and accurately display[] price, subscription, and cancellation information," "[p]rominent[] display" of subscription and cancellation information, and explicit measures to ensure affirmative asset to the Content Policy. (Am. Compl. ¶ 32.)  Goddard plainly "belongs to the class of people for whose benefit" the Content Policy was drafted.

Second, Google argues that Goddard cannot bring a claim as a third-party beneficiary because Google is the promisee (that the mobile content providers will abide by the Content Policy) while the mobile content providers are the promisors. (Def.'s Mem. 17.) The Advertising Program Terms (which incorporate the Content Policy) do not allow for such a characterization:

> Google's Editorial Guidelines are incorporated by reference into its Advertising Program Terms:
> ***Google and Customer hereby agree and acknowledge***:
> 1. Policies. Program use is subject to all applicable Google and Partner policies, including without limitation the Editorial Guidelines (adwords.google.com/select/guidelines.html).
> Google, Inc. Advertising Program Terms (Aug. 22, 2006).

(Am. Compl. ¶ 31) (emphasis added). In turn, the Editorial Guidelines include Google's

Content Policy, which contains the language imposing consumer protections against mobile

content fraud. (Am. Compl. ¶ 32.) By their own terms, Advertising Program Terms places

obligations on both Google and its advertisers.[15]   Google is a promisor as to the Content

Policy just as much as the mobile content providers are—and its failure to enforce the

Content Policy is a breach of the Advertising Program Terms to the detriment of the Policy's

intended beneficiary, Goddard.

### C.      Goddard Stated a Claim for Negligence

Google argues that "Google can not be found to have assumed a duty to Plaintiff

unless (1) the Advertising Terms themselves increased the risk of harm or (2) Plaintiff

actually relied upon the Advertising Terms." (Def.'s Mem. 17-18.)  This argument does not

square with California law.  Indeed, this Court has found a claim for negligence on virtually

the same set of facts alleged by Goddard: "Plaintiff claims that since eBay guaranteed safety

[in online auctions], they owed a duty of care and were consequently in breach of that duty

when they allowed shill bidding practices to occur. This is sufficient to state a valid claim

[for negligence]." *Mazur v. Ebay, Inc.*, No. C 07 03967, 2008 WL 618988, at *14 (N.D. Cal.

March 4, 2008).

Google does not argue that preventing the fraud which harmed Goddard fell outside

the scope of duty created by the Content Policy. Rather, Google contends no duty arises at all

unless "the Advertising Terms themselves increased the risk of harm" to Goddard. (Def.'s

Mem. 18.) This contention reflects an apparent misunderstanding of the law.  No one (least of

all California courts) expects the terms of a contract to jump off the page and to start

enforcing themselves (negligently or otherwise).  Google blurs the distinction between the

voluntary undertaking manifested by the Content Policy (which triggered Google's duty of

care) and the subsequent negligent performance of that undertaking (which gave rise to

---

[15]  Even if Google argues a different interpretation of the bolded language, it "has far superior bargaining
power and made both of these representations, [so] any ambiguities ought to be construed against it." *Mazur*,
2008 WL 618988, at *13.

1   Google's liability). *Cf. Artiglio v. Corning, Inc.*, 18 Cal. 4th 604, 613-18, 957 P.2d 1313,

2   1318-21 (1998) (defendant's undertaking to conduct and report silicone toxicology research

3   in 1940s and 1950s was distinct from sales of silicon medical products beginning in 1962).

4   Goddard plainly alleges that it is Google's failure to perform—its failure to enforce the terms

5   of the Content Policy—caused her injuries.[16]

6          While it is not readily apparent from Google's brief, it may be that Google *meant* to

7   argue that its *failure to enforce* the Content Policy must have increased Goddard's risk for

8   Goddard to have state a negligent undertaking claim. But when a defendant altogether fails to

9   perform its undertaking, the risk to the plaintiff will always be "the same [as] it would have

10  been" if the defendant had not assumed the undertaking in the first place. (Def.'s Mem. 19.)

11  Google's implicit argument is tantamount claiming that California law does not support

12  negligent undertaking claims against defendants for nonfeasance.

13         If this was the argument Google intended, it is contrary to California law.  Negligent

14  undertaking can take the form of either misfeasance *or* "an omission or failure to act."

15  *Adams v. City of Fremont*, 68 Cal. App. 4th 243, 293, 80 Cal. Rptr. 2d 196, 228 (Cal. Ct.

16  App. 1998).[17]  In *Mukthar v. Latin Am. Sec. Serv.*, 139 Cal. App. 4th 284, 42 Cal. Rptr. 3d

17  563 (Cal. Ct. App. 2006), the court found that the plaintiff had a viable negligent undertaking

18  claim against defendant security guard service which assumed the duty of providing a

19  security guard but simply failed to do so, which allegedly led to an assault on the plaintiff.

20  *Id.*, 139 Cal. App. 4th at 290-91, 42 Cal. Rptr. 3d at 567-68. The defendant in *Mukthar* was

21  liable even though the plaintiff's risk was the same as though the defendant had never

22  assumed a duty to protect the plaintiff. *Cf. id.*, 139 Cal. App. 4th at 292, 42 Cal. Rptr. 3d at

---

[16]  Likewise, in *Hempstead v. General Fire Extinguisher Corp.*, 269 F. Supp. 109 (D. Del. 1967), the defendant's "failure . . . to exercise reasonable care in approving the design of the extinguisher has obviously increased the risk of harm to plaintiff over that which would have existed if reasonable care had been exercised." *Id.* at 118 (cited and relied on California cases, including *FNS Mortgage Serv. Corp. v. Pacific Gen. Group, Inc.*, 24 Cal. App. 4th 1564, 1572-73, 29 Cal. Rptr. 2d 916, 921-22 (Cal. Ct. App. 1994)).

[17]  "There will be times when a [defendant] will be liable for its omissions. For example, if the [defendant] promises to undertake a particular safety measure, then the [defendant's] negligent failure to do so should result in liability if such negligence leads to an . . . injury." *Hooker v. Dep't of Transp.*, 27 Cal. 4th 198, 212 n.3, 38 P.3d 1081, 1090 n.3 (2002).

568-69 ("it [was] a reasonable inference that the presence of an armed guard in close

proximity to [the plaintiff] would have prevented the assault.").

Likewise, when a defendant undertakes "to render the service of inspecting pipe

manufacturers and delisting those who are unwilling or unable to adhere to [certain]

standards[,] . . . [its] failure to exercise reasonable care [by delisting non-compliant

manufacturers]. . . increases the risk of harm to such consumers from defective pipe that

otherwise would have been removed from the stream of commerce." *FNS Mortgage Serv.*

*Corp. v. Pacific Gen. Group, Inc.,* 24 Cal. App. 4th 1564, 1571, 29 Cal. Rptr. 2d 916, 921

(Cal. Ct. App. 1994).[18]  Again, the *FNS Mortgage* defendant was liable even though the

plaintiffs' risk was the same as though the defendant had never assumed a duty to evaluate

pipe manufacturers.  Likewise, Google may be liable on a negligent undertaking claim even if

the risk to Goddard from its failure to enforce the Content Policy is the same as if Google had

never put the Content Policy in place. *See also Mazur*, 2008 WL 618988, at *14 (also holding

economic loss rule did not apply under *Aas v. Superior Court*, 24 Cal. 4th 627, 12 P.3d 1125

(2000)).  Goddard properly states a negligent undertaking claim by alleging that her injury

arose because Google failed to enforce the Content Policy.

California law gives no support to Google's argument that Goddard cannot state a

negligent undertaking claim without alleging she "relied on—or even read—Google's

Advertising Terms and Content Policy." (Def.'s Mem. 18.)  Rather, California law supports a

much broader understanding of reliance in this context. Reliance, at least as to a negligent

undertaking claim, can arise from a business relationship between a defendant and a third

party, where the defendant "voluntarily involve[s] itself into the marketing process [and]

---

[18]  In Google's primary supporting authority, *Paz v. State of California*, 22 Cal. 4th 550, 994 P.2d 975 (2000), only concerns the *timing* of when a duty of care arises from an undertaking. In Paz, the alleged negligence fell outside the scope of the duty imposed by the defendant's undertaking because the "defendants simply did not succeed in completing – before plaintiff's collision – a project that might have reduced [a] preexisting hazard . . ." *Id.*, 22 Cal. 4th at 560, 994 P.2d at 981. The result in *Paz* only means that the duty imposed by a defendant's undertaking does not include instantaneously eliminating any preexisting risks of harm the moment the undertaking begins. *See id.*, 22 Cal. 4th at 561, 994 P.2d at 982 (relying on case which declined to "charge [defendants] with responsibility for preexisting defects [that] would expose them to potential liability for . . . the entire project area from the moment they undertook the work").

1   loan[s] its reputation to promote and induce the sale of [the third party's services." *Hanberry*

2   *v. Hearst Corp.*, 276 Cal. App. 2d 680, 684, 81 Cal. Rptr. 519, 522 (Cal. Ct. App. 1969). "In

3   voluntarily assuming this business relationship, [a defendant] place[s] itself in the position

4   where public policy imposes upon it the duty to use ordinary care . . . so that members of the

5   consuming public who rely on its endorsement are not unreasonably exposed to the risk of

6   harm." *Id*. A plaintiff does not *personally* rely on an undertaking when the overall market for

7   the third party's goods hinges on the third party's affiliation with the defendant. *FNS*

8   *Mortgage*, 24 Cal. App. 4th at 1571, 29 Cal. Rptr. 2d at 921 ("consumers . . . suffered harm

9   because of the reliance of local building officials upon [defendant's] undertakings"). Goddard

10  states a claim under the negligent undertaking's reliance prong because she alleges that the

11  relevant terms of Google's Content Policy "create[d] the appearance that its search engine is

12  protecting users' interests" and "lull[ed] governmental agencies into falsely believing that

13  Google [was] acting responsibly to prevent rampant fraud and abuse." (Am. Compl. ¶¶ 41-42.)

14          **D.      Goddard Stated a Claim for Aiding and Abetting**

15          Google asserts that Goddard's aiding and abetting claim is defective because Goddard

16  "failed . . . to allege that Google provided 'substantial assistance' . . ." (Def.'s Mem. 19.) The

17  Complaint flatly contradicts this assertion.  Goddard alleges that the AdWords service

18  Google supplies to fraudulent mobile content providers is "*an essential part* of [fraudulent

19  mobile content providers'] scheme [to defraud cellular users], because [the mobile content

20  providers] could not collect unwitting users' cellular numbers without Google driving

21  Internet traffic towards their landing pages." (Am. Compl. ¶ 91) (emphasis added).

22          If Google meant to argue that the AdWord services do not, as a matter of law,

23  constitute "substantial assistance," it is mistaken. "[C]ommon sense tells us that even

24  'ordinary business transactions' a [defendant] performs for a customer can satisfy the

25  substantial assistance element of an aiding and abetting claim if the [defendant] actually

26  knew those transactions were assisting the customer in committing a specific tort." *Casey v.*

27  *U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1145, 26 Cal. Rptr. 3d 401, 406 (Cal. Ct.

28  App. 2005); *see also In re First Alliance Mortgage*, 471 F.3d 977, 995 (9th Cir. 2006)

1  (financing by investment bank constituted "substantial assistance").  Google's own case is

2  distinguishable, because the relevant defendants there escaped liability only because there

3  was no evidence to support the knowledge element of aiding and abetting. *Orser v. Vierra*,

4  252 Cal. App. 2d 660, 669, 60 Cal. Rptr. 708, 715 (Cal. Ct. App. 1967) ("no evidence [that]

5  even suggests [the aiding and abetting defendants] knew that [the primary defendants] were

6  shooting firearms in the direction where their shots could hit anyone . . ."). Goddard

7  adequately alleges both the knowledge and substantial assistance elements of aiding and

8  abetting.

9  **IV.      Conclusion**

10        For the reasons stated above, Plaintiff Jenna Goddard respectfully requests that this

11  court deny Google's Motion to Dismiss in its entirety.

12

13

14

15

16

17  Dated: March 13, 2009

18                                        By: /s/ Alan Himmelfarb

19                                            Alan Himmelfarb
                                             KAMBEREDELSON LLC
20                                            2757 Leonis Boulevard
                                             Los Angeles, California 90058
21                                            (323) 585-8696
                                             ahimmelfarb@kamberedelson.com
22
                                             Jay Edelson
23                                            Myles McGuire
                                             KAMBEREDELSON LLC
24                                            350 North LaSalle, Ste 1300
                                             Chicago, Illinois 60654
25                                            (312) 589-6370
                                             jedelson@kamberedelson.com
26                                            mmcguire@kamberedelson.com

27

28

# EXHIBIT A

From: Mike McMorrow <mjmcmorrow@kamberedelson.com>
Subject: **Fwd: Google service announcement re mobile content adv**
Date: March 13, 2009 2:06:19 PM CDT

Dear AdWords Advertiser,

We're writing to let you know about a change to Google's advertising policies that might affect your AdWords account.

In the coming weeks, we'll be expanding our mobile content services policy. In addition to the current requirements at http://adwords.google.com/support/bin/static.py?page=guidelines.cs&answer=74334 , we will require text and image ads for these services to display the price and billing interval (such as per week or per month) in the ad text, e.g., '$5.99/month.' We will no longer accept text or image ads that don't contain the price and billing interval when promoting mobile content services.

When we make this change, Google will suspend all campaigns identified as being in violation of our revised policy. Our system identified your account as potentially affected. We ask that you make any necessary changes to your ad text to comply with the change, so that your campaigns can continue to run.

For directions on how to modify your text ads, please visit http://adwords.google.com/support/bin/answer.py?answer=6269. Find instructions on uploading a new image ad at http://adwords.google.com/support/bin/answer.py?answer=7679.

We have given much consideration to our stance on the advertising of this content, incorporating concerns raised by users and discussions with the Florida Attorney General's office, and the potential effect our policy decision could have on AdWords advertisers. However as a business, Google must make decisions about the advertising that we accept. We've given much thought to our policy, as well as the potential effect our policy change could have on AdWords advertisers, and we apologize for any inconvenience it may cause you.

Sincerely,

The Google AdWords Team

# EXHIBIT B

# Google   AdWords Help

## Advertising Policies

**Targeted Location:**

All other locations

**Language:**

English (US)

**Select your ad type:**

Mobile ads

**Editorial & Format »**

**Content »**

**Link »**

**Images »**

**View all policies »**

Double Serving

AdWords Terms & Conditions

Advertising in China

Google Privacy Policy

Invalid Clicks

Google Advertising Cookies

YouTube: Ads Content Policy

YouTube: Ads Specs and Policies

YouTube: Contest Platform Rules

Requirements for third-party ad serving

Policy Home > Mobile ads

# Mobile Ad Policies

Your mobile ads must adhere to these guidelines and be approved before they can appear on Google mobile searches or on our mobile content network.

← Search our policies or use the navigation links to the left to browse the policies that apply to mobile ads.

### View all mobile ad policies

Editorial & Format (style and technical requirements for your ad text and keywords)

Content (what you can and can't advertise or promote)

Link (guidelines for your URLs and the website you're advertising)

Images (specific guidelines applicable to mobile image ads, in addition to the PC-based image ad guidelines)

If an ad doesn't meet our policies, we'll stop your ad from running, and you'll see the ad labeled as 'Disapproved' in your account. Once you've made the appropriate edits, simply save your changes and your ad will be automatically resubmitted to us for review.

Application of our policies will always involve an element of discretion and we reserve the right to reject or approve any ads.

**Mobile content services ads are restricted.**

We allow the advertisement of mobile content services only upon certain conditions noted below. Mobile content services include, but are not limited to, sites that promote downloading ringtones, wallpaper, or text messages for predictions, love life advice, news, personality quizzes, or other entertainment services.

The ad's landing page must clearly and accurately display the pricing. Subscription services must also include the billing interval on the landing page.

If your site promotes mobile content services and requires users to submit personal information, your site must prominently display the price and billing interval (such as per week or once per month) on the page where users first enter personal information (such as a name or phone number).

If users sign up to your service by transmitting a code by text message, the price and billing interval must be clearly and prominently displayed beside the code.

If your service is a subscription, you must provide a prominent opt-in checkbox or other clear mechanism indicating that the user knowingly accepts the price and subscription service. This should be on the first page users enter personal data, and the user should not be able to proceed without opting in.

All of the items above should be located in a prominent place on your webpage and should be easy to find, read, and understand.

---

©2009 Google

1

## **PROOF OF SERVICE**

2      I, Alan Himmelfarb, an attorney, certify that on March 13, 2009, I served the attached

by causing true and accurate copies of such paper to be filed and transmitted to the persons

3   shown below via the Court's CM/ECF electronic filing system on this day.

4

5                           Karen Johnson-McKewan

                              Kikka N Rapkin

6                            Nancy E. Harris

                       Orrick Herrington & Sutcliffe LLP

7                           405 Howard Street

                          San Francisco, CA 94105

8                       kjohnson-mckewan@orrick.com

                           nrapkin@orrick.com

9                          nharris@orrick.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28