1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DESIGNATED FOR PUBLICATION

**E-Filed 7/30/09**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

JENNA GODDARD, individually and on behalf of all others similarly situated,

Plaintiff,

v.

GOOGLE, INC., a Delaware corporation,

Defendant.

Case Number C 08-2738 JF (PVT)

**ORDER[1] GRANTING MOTION TO DISMISS**

RE: Docket No. 50.

## I. BACKGROUND

Plaintiff Jenna Goddard ("Plaintiff") alleges that she and a class of similarly situated individuals were harmed as a result of clicking on allegedly fraudulent web-based advertisements for mobile subscription services. She alleges that Defendant Google, Inc. ("Google") illegally furthered this scheme. The facts are set forth more fully in this Court's previous order granting Google's motion to dismiss. *See Goddard v. Google*, No. C 08-2738 JF (PVT), 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008). In support of its prior motion to dismiss, Google asserted

---

[1] This disposition is not designated for publication in the official reports.

Case No. C 08-2738 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC3)

that each of Plaintiff's claims was barred by § 230(c)(1) of the Communications Decency Act ("CDA"), which prevents a website from being treated as the "publisher or speaker" of third-party content, and thus typically immunizes website operators from liability arising from the transmission of such content.[2]  As Google argued, claims that seek to impose liability on a website operator as the speaker or publisher of third-party content–or to impose liability that is "merely a rephrasing of" such speaker or publisher liability, *Barnes v. Yahoo, Inc.*, __ F.3d __, 2009 WL 1740755, at *8 (9th Cir. 2009) –are barred by the CDA unless the website also is an "information content provider," meaning that it "is 'responsible, in whole or in part, for the creation or development of' the offending content." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC* (*Roommates*), 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc) (quoting 47 U.S.C. § 230(f)(3)).

Faced with the implications of this clear analytic framework, which was articulated in the Ninth Circuit's 2008 *en banc* decision in *Roommates*, Plaintiff resorted to creative argument in an attempt to show that her claims did not seek to hold Google liable for the dissemination of online content at all.  The Court rejected Plaintiff's artful pleading and dismissed the complaint. *See Goddard*, 2008 WL 5245490, at *4-7.  Plaintiff was granted leave to amend, with express

---

[2] Although "[c]ourts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content," *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008), the Ninth Circuit recently noted in *Barnes* that "neither . . . subsection [(c)(1)] nor any other declares a general immunity from liability deriving from third-party content," *Barnes*, 2009 WL 1740755, at *2-3 (referring to "the so-called immunity" provided by § 230). Nonetheless, immunity is defined as an "exemption from . . . liability," Black's Law Dictionary (8th ed. 2004), and that is what § 230(c) provides, albeit not in every case.  Thus, with the recognition that cases involving the application of § 230 require a "careful exegesis of the statutory language," *Barnes*, 2009 WL 1740755, at *3, courts consistently have used the term "immunity" to describe the effect of the CDA's provisions. *See, e.g.*, *Zeran*, 129 F.3d at 330 ("By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service."); *see also Roommates*, 521 F.3d at 1164-65; *Doe*, 528 F.3d at 418; *Green v. America Online*, 318 F.3d 465, 471 (3d Cir. 2003); *Carafano v. Metrosplash*, 339 F.3d 1123-24 (9th Cir. 2003); *Batzel v. Smith*, 333 F.3d 1018, 1029-35 (9th Cir. 2003); *Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980, 984-86 (10th Cir. 2000).  This Court also will refer to the CDA's protections as a form of "immunity."

2

1   instructions that she attempt to "establish Google's involvement in 'creating or developing' the

2   AdWords, either 'in whole or in part,'" so as to avoid CDA immunity.  *Id*. at *7.

3        In her amended complaint, Plaintiff now alleges that "Google's involvement [in creating

4   the allegedly fraudulent advertisements] was so pervasive that the company controlled much of

5   the underlying commercial activity engaged in by the third-party advertisers."  Amended

6   Complaint ¶ 21.  Plaintiff alleges that Google "not only encourages illegal conduct, [but]

7   collaborates in the development of the illegal content and, effectively, requires its advertiser

8   customers to engage in it."  *Id*.[3]  These allegations, if supported by other specific allegations of

9   fact, clearly would remove Plaintiff's action from the scope of CDA immunity.  The quoted

10  allegations, however, are mere "labels and conclusions" amounting to a "formulaic recitation of

11  the elements" of CDA developer liability, and as such, they "will not do."  *Bell Atl. Corp. v.*

12  *Twombly*, 550 U.S. 544, 555 (2007).  Rather, the Court must examine the pleading to determine

13  whether Plaintiff alleges mechanisms that plausibly suggest the collaboration, control, or

14  compulsion that she ascribes to Google's role in the creation of the offending AdWords.  Having

15  undertaken such an examination, the Court concludes that Plaintiff has not come close to

16  substantiating the "labels and conclusions" by which she attempts to evade the reach of the CDA.

17  Accordingly, her complaint once again must be dismissed.

18        **II. LEGAL STANDARD FOR DISMISSAL PURSUANT TO RULE 12(b)(6)**

19        A complaint may be dismissed for failure to state a claim upon which relief may be

20  granted for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts

21  under a cognizable legal theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34

22  (9th Cir. 1984).  For purposes of a motion to dismiss, all allegations of material fact in the

23  complaint are taken as true and construed in the light most favorable to the nonmoving party.

24  *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994).  A complaint should not be

25  dismissed "unless it appears beyond doubt the plaintiff can prove no set of facts in support of his

26  _____

27        [3] On the basis of recent Ninth Circuit authority, Plaintiff also asks the Court to revisit its
    holding that her breach of contract claim impermissibly would treat Google as the speaker or
28  publisher of third-party content.  The Court addresses Plaintiff's contentions to that effect in
    Section III.B.

3

1   claim that would entitle him to relief." *Clegg*, 18 F.3d at 754.  However, a plaintiff is required to

2   provide "more than labels and conclusions," and the "[f]actual allegations must be enough to

3   raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

4                              **III. DISCUSSION**

5          As explained at length in this Court's earlier order, the CDA has been interpreted to

6   provide a "robust" immunity for internet service providers and websites, with courts "adopting a

7   relatively expansive definition of 'interactive computer service' and a relatively restrictive

8   definition of 'information content provider.'" *Carafano v. Metrosplash.com, Inc.*, 339 F.3d

9   1119, 1123 (9th Cir. 2003).  Thus, a website operator does not become liable as an "information

10  content provider" merely by "augmenting the content [of online material] generally."

11  *Roommates*, 521 F.3d at 1167-68.  Rather, the website must contribute "materially . . . to its

12  alleged unlawfulness." *Id*. at 1167-68.  A website does not so "contribute" when it merely

13  provides third parties with neutral tools to create web content, even if the website knows that the

14  third parties are using such tools to create illegal content. *See, e.g.*, *id* at 1169 & n.24 (noting that

15  where a plaintiff brings a claim "based on a website operator's passive acquiescence in the

16  misconduct of its users," the website operator generally will be immune "even if the users

17  committed their misconduct using tools of general availability provided by the website

18  operator"); *see also Zeran v. Am. Online, Inc.*, 129 F.3d 327, 333 (4th Cir. 1997) (holding that

19  provider is shielded from liability despite receiving notification of objectionable content on its

20  website and failing to remove it).

21  **A.      Developer liability**

22         Plaintiff identifies several mechanisms by which Google allegedly contributes to the

23  illegality of the offending advertisements, or even "requires" the inclusion of illegal content in

24  such advertisements.  Each of these mechanisms involves Google's "Keyword Tool," which

25  Plaintiff describes as a "suggestion tool" employing an algorithm to suggest specific keywords to

26  advertisers.  Amended Complaint ¶ 22.[4]  To demonstrate that the Keyword Tool is not a "neutral

27

28         [4] Plaintiff also alleges that Google representatives meet with certain advertisers in order
    to assist them with the creation of AdWords, but she does not allege that these representatives

                                        4

tool" of the kind uniformly permitted within the scope of CDA immunity, Plaintiff alleges that when a potential advertiser enters the word "ringtone" into Google's Keyword Tool, the tool suggests the phrase "free ringtone," and that this suggestion is more prevalent than others that may appear. Amended Complaint ¶ 22. Plaintiff contends that the suggestion of the word "free," when combined with Google's knowledge "of the mobile content industry's unauthorized charge problems," makes the Keyword Tool "neither innocuous nor neutral." Pl.'s Opp. at 7. Plaintiff also alleges that Google disproportionately suggests the use of the term "free ringtone" to ordinary users of Google's web search function, causing them to view the allegedly fraudulent MSSPs' AdWords with greater frequency.

Even assuming that Google is aware of fraud in the mobile subscription service industry and yet disproportionately suggests the term "free ringtone" in response to an advertiser's entry of the term "ringtone," Plaintiff's argument that the Keyword Tool "materially contributes" to the alleged illegality does not establish developer liability. The argument is nearly identical to that rejected by the Ninth Circuit in *Carafano v. Metrosplash*, 339 F.3d 1119 (9th Cir. 2003). There, the defendant website provided its users with a "detailed questionnaire" that included multiple-choice questions wherein "members select[ed] answers . . . from menus providing between four and nineteen options." *Id.* at 1121. Although they included sexually suggestive phrases that might facilitate the development of libelous profiles, the menus of pre-prepared responses were considered neutral tools because "the selection of the content was left exclusively to the user." *Id.* at 1124-25 (rejecting argument that website's sixty-two questions and menu of "pre-prepared responses" was so extensive as to render it an information content provider, since quantitative scope of contribution was "a distinction of degree rather than of kind").

Under *Carafano*, even if a particular tool "facilitate[s] the expression of information," *id.* at 1124, it generally will be considered "neutral" so long as users ultimately determine what content to post, such that the tool merely provides "a framework that could be utilized for proper or improper purposes," *Roommates*, 521 F.3d at 1172 (interpreting *Carafano*). Indeed, as already

---

have contributed in any way to the allegedly illegal MSSP AdWords that give rise to this action.

noted, the provision of neutral tools generally will not affect the availability of CDA immunity "even if a service provider *knows* that third parties are using such tools to create illegal content." *Goddard*, 2008 WL 5245490, at *3 (emphasis added). As a result, a plaintiff may not establish developer liability merely by alleging that the operator of a website should have known that the availability of certain tools might facilitate the posting of improper content. Substantially greater involvement is required, such as the situation in which the website "elicits the allegedly illegal content and makes aggressive use of it in conducting its business." *Roommates*, 521 F.3d at 1172.

Like the menus in *Carafano*, Google's Keyword Tool is a neutral tool. It does nothing more than provide options that advertisers may adopt or reject at their discretion. *See* Pl.'s Opp. at 6 (conceding that advertisers' use of keywords is discretionary). "[T]he selection of the content [is] left exclusively to the user." *Carafano*, 339 F.3d at 1124-25. While a website clearly will not "*automatically* [enjoy] immun[ity] so long as the content originated with another information content provider," *Roommates*, 521 F.3d at 1171 n.31 (citing *Carafano*, 339 F.3d at 1125), Plaintiff's allegations, if true, would not establish that Google did anything to encourage the posting of false or misleading AdWords, *cf. id.* at 1171-72, much less that Google "elicit[ed] . . . [or] ma[de] aggressive use of [them] in conducting its business," *id.* at 1172. As in *Carafano*, where the dating website easily could have been expected to know that the inclusion of sexually suggestive options in its "pre-prepared" user profile responses might well encourage libelous impersonations or pranks, *see Carafano*, 339 F.3d at 1121,[5] Plaintiff's suggestion that Google should have been aware of the danger of combining the words "free" and "ringtone" does not make Google a co-developer of the offending AdWords. Indeed, "the [allegedly misleading] posting[s] w[ere] contrary to [Google's] express polic[y]," *cf. Roommates*, 521 F.3d at 1171, which warns advertisers that they "are responsible for the keywords [they] select and for ensuring that [their] use of the keywords does not violate any applicable laws." *See* Amended Complaint,

---

[5] For example, "pre-prepared responses" to a question regarding the poster's "main source of current events" apparently included the phrase "Playboy/Playgirl," while the question "why did you call" included the response "looking for a one-night stand." *Carafano*, 339 F.3d at 1121.

6

1   Ex. A.

2          The insufficiency of Plaintiff's theory becomes even more apparent in the context of her

3   attempted analogy to the facts of *Roommates*, in which a housing website *required* potential

4   subscribers to identify their sex, sexual orientation, and family status, and to indicate their

5   preferred sex, sexual orientation, and family status in a potential roommate.  The Ninth Circuit's

6   partial denial of immunity to the website turned entirely on the website's decision to *force*

7   subscribers to divulge the protected characteristics and discriminatory preferences "as a condition

8   of using its services." *Id.* at 1164.  Thus, while the court retreated from *Carafano*'s earlier

9   suggestion in dicta that a website consisting of user-generated content "could *never* be liable

10  because 'no [user] profile has any content until a user actively creates it,'" *Roommates*, 521 F.3d

11  at 1171 (quoting *Carafano*, 339 F.3d at 1124) (emphasis added), it carved out only a narrow

12  exception to that rule.  *See Goddard*, 2008 WL 5245490, at *3; *see also Doe v. MySpace, Inc*., __

13  F. Supp. 2d __, 2009 WL 1457170, at *2 (E.D. Tex. 2009) (finding *Roommates* "not applicable"

14  to an action against the social utility website MySpace.com, because, whereas "[t]he Ninth

15  Circuit repeatedly stated throughout its *en banc* opinion that the Roommates.com website

16  *required* its users to provide certain information as a condition of its use . . . ., users of

17  MySpace.com are not *required* to provide any additional information to their profiles" (emphasis

18  in original)); *Atlantic Recording Corp. v. Project Playlist, Inc*., 603 F. Supp. 2d 690, 701

19  (S.D.N.Y. 2009) (noting that the *Roommates* decision "was based solely on the fact that . . . .

20  Roommates.com . . . , in violation of federal and California state housing law, *required* potential

21  subscribers" to engage in discriminatory conduct (emphasis in original)).

22         Recognizing the narrowness of the *Roommates* holding, Plaintiff alleges that Google

23  effectively "requires" advertisers to engage in illegal conduct.  Yet Plaintiff's use of the word

24  "requires" is inconsistent with the facts that Plaintiff herself alleges.  The purported

25  "requirement" flows from Google's alleged "suggestion" of the phrase "free ringtone" through its

26  Keyword Tool, and from the MSSPs' purported knowledge that only "free ringtones" generate

27  substantial revenue-producing internet traffic.  According to Plaintiff, MSSPs "[f]acing the

28  Hobson's choice of accepting either Google's 'suggestions' or drastically reduced revenue . . .

7

have accepted Google's 'suggestions' to include the keyword 'free' along with the keyword 'ringtone' in order to advertise to the majority of 'ringtone' searches, whether their products are free or not." Opp. at 8:4-8 (citing Amended Complaint ¶ 26).

In Google's apt paraphrase, Plaintiff is alleging "that Google's mathematical algorithm 'suggests' the use of the word 'free' in relation to 'ringtone' as a means of attracting more visitors to [the MSSPs'] sites, and that MSSPs whose offerings are not actually free are literally powerless to resist." This reasoning fails to disclose a "requirement" of any kind, nor does it suggest the type of "direct and palpable" involvement that otherwise is required to avoid CDA immunity. *Cf. Roommates*, 521 F.3d at 1169-70. Such involvement might occur where a website "remov[es] the word 'not' from a user's message reading '[Name] did *not* steal the artwork' in order to transform an innocent message into a libelous one." *Id*. at 1169. Even accepting Plaintiff's factual allegations as true, the allegations do not come close to suggesting involvement at such a level, or, indeed, that Google's AdWords program was anything other than "a framework that could be utilized for proper or improper purposes." *Id*. at 1172.

## B.    Contract claims in light of *Barnes v. Yahoo!*

As in her original complaint, Plaintiff alleges that she and similarly situated individuals were intended third-party beneficiaries of Google's Advertising Terms, which in turn incorporate a Content Policy requiring that mobile subscription service advertisers display certain information about their products, including whether downloading the products will result in charges to the consumer. *See* First Amended Complaint, Ex. F. Plaintiff alleges that Google "breached" its Content Policy, and she urges the Court to reconsider the rationale for its prior dismissal of her breach of contract claim in light of the Ninth Circuit's recent decision in *Barnes v. Yahoo!*, __ F.3d __, 2009 WL 1740755 (9th Cir. 2009).[6] In *Barnes*, the court addressed

---

[6] Plaintiff also urges the Court to deny the instant motion on the ground that CDA immunity is an affirmative defense that must be raised by the defendant in a responsive pleading. Plaintiff relies exclusively on *Barnes v. Yahoo!, Inc*., 565 F.3d 560 (9th Cir. 2009), in which the court stated that because "[t]he assertion of an affirmative defense does not mean that the plaintiff has failed to state a claim, [it] does not by itself justify dismissal under Rule 12(b)(6)." *Id*. at 563 (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). The court observed that Yahoo!, the defendant, "ought to have asserted its affirmative defense by responsive pleading, which is

8

whether Yahoo! enjoyed immunity against the plaintiff's claims that it either was negligent in

undertaking to remove, or breached an oral contract to remove, offensive and unauthorized

content posted about the plaintiff by her ex-boyfriend on one of Yahoo!'s public profile pages.

*Id*. at *1-2.  The court reasoned that claims that a website negligently undertook to remove

harmful or offensive content are barred by the CDA, since the action of removing or screening

content "is quintessentially that of a publisher," and because "to impose liability on the basis of

such conduct necessarily involves treating the liable party as a publisher of the content it failed to

remove."  *Id*. at *5.  However, the court held that certain promissory conduct by a defendant may

remove it from the protections of the CDA even where the alleged promise was to remove or

screen third-party content, since "one can, and often does, promise to do something without

actually doing it at the same time," thus giving rise to "a legal duty distinct from the conduct . . .

of a publisher.  *Id.* at *9.

Read as broadly as possible, *Barnes* stands for the proposition that when a party engages

in conduct giving rise to an independent and enforceable contractual obligation, that party may be

"h[eld] . . . liable [not] as a publisher or speaker of third-party content, but rather as a counter-

party to a contract, as a promisor who has breached."  *Id.*  Theoretically, intended third-party

beneficiaries–whose rights under a contract are different from those of the contracting parties but

still are legally cognizable–could invoke the distinction drawn in *Barnes* between liability for

acts that are coextensive with publishing or speaking and liability for breach of an independent

contractual duty.  In a third-party-beneficiary case, "as in any other contract case, the duty the

--------------------------------------------------

the normal method of presenting defenses except for those specifically enumerated in Rule
12(b)."  *Id.*

Beyond the fact that (1) *Barnes* held only that "section 230 is an affirmative defense and
[is] to [be] treat[ed] . . . as such," *id.* (emphasis removed), and (2) affirmative defenses routinely
serve as a basis for granting Rule 12(b)(6) motions where the defense is "apparent from the face
of the [c]omplaint," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 564 F. Supp. 2d 544,
550 (E.D. Va. 2008) (granting Rule 12(b)(6) motion on the basis of CDA immunity); *see also*
*Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007) (affirming Rule
12(b)(6) dismissal on the basis of CDA immunity); *Green*, 318 F.3d at 468 (same), the Ninth
Circuit later deleted the entire relevant portion of its original *Barnes* opinion, *see Barnes*, 2009
WL 1740755, at *1.

Case No. C 08-2738 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC3)

1    defendant allegedly violated [would] spring[] from a contract–an enforceable promise–not from

2    any non-contractual conduct or capacity of the defendant." *Id.*  A court thus would be able to

3    infer that the defendant had "implicitly agreed to an alteration" in the baseline rule that there is

4    "no liability for publishing or speaking the content of other information service providers." *Id.* at

5    *10.

6          In the instant case, there is no allegation that Google ever promised Plaintiff or anyone

7    else, in any form or manner, that it would enforce its Content Policy.  Under California law, "[i]f

8    a contract is to be a basis of liability for the [defendant's] violation of [its own terms and

9    conditions] . . . [,] it must be a contract in which the [defendant] promises to abide by [these

10   terms]." *Souza v. Westlands Water Dist.*, 135 Cal. App. 4th 879, 892 (2006); *see also Barnes*,

11   2009 WL 1740755, at *10 ("[A] . . . condition of the enforceability of a promise . . . . is that [it]

12   be worded consistently with its being intended to be enforceable." (quoting *Workman v. United*

13   *Parcel Serv. Inc.*, 234 F.3d 998, 1001 (7th Cir. 2000)).  Google's Advertising Terms and

14   incorporated Content Policy constituted a promise by Google's advertising customers to Google

15   in exchange for participation in Google's advertising service.  Neither agreement contains any

16   promise *by Google* to enforce its terms of use or otherwise to remove noncompliant

17   advertisements.  *Cf. Green v. America Online*, 318 F.3d 465, 472 (3d Cir. 2003) (holding that

18   "Green failed to state a claim for breach of contract because . . . by their terms, the Member

19   Agreement and Community Guidelines were not intended to confer any rights on Green and AOL

20   did not promise to protect Green from the acts of other subscribers").

21          Moreover, even if Google had promised to enforce its Advertising Terms and

22   incorporated Content Policy–and it did not–Plaintiff would not be a third-party beneficiary of

23   that promise.  In that scenario, Google would be the promisor under the agreement and each

24   allegedly fraudulent MSSP would be a promisee.  But a third party is not an intended beneficiary

25   of an agreement unless the *promisee* intends the agreement to benefit the third party.  *Souza*, 135

26   Cal. App. 4th at 893.  For Plaintiff to be an intended third-party beneficiary of Google's alleged

27   promise, the Advertising Terms would have to reflect an intent by each allegedly fraudulent

28   MSSP to benefit Plaintiff.  That proposition simply is illogical, and this Court, like the court in

                                          10

1   *Souza*, is "aware of no case in which a third-party-beneficiary contract was formed when a

2   promisee bargained for and obtained a promisor's engagement to force the promisee to satisfy its

3   own obligation to the third party." *Id.* at 894.

4        Undoubtedly, the allegedly fraudulent MSSPs *did* promise to abide by the Content Policy,

5   and Plaintiff might well sue *them* as an intended third-party beneficiary of their contract with

6   Google. But Plaintiff's claim against Google rests not on any promise, but on a "general

7   [content] policy. . . on the part of [Google]," *Barnes*, 2009 WL 1740755, at *10, a theory of

8   liability that *Barnes* expressly precludes. Plaintiff's inability to point to any promise by Google,

9   and her ultimate reliance on Google's Content Policy, reveals that unlike the claim in *Barnes*,

10  which rested on a promise that scarcely could have been clearer or more direct,[7] Plaintiff's

11  contract claim alleges liability that "is [not] different from, and [is] merely a rephrasing of,"

12  liability for negligent undertaking." *Id.* at *8. This Court already has rejected Plaintiff's contract

13  claim on that very ground, *see Goddard*, 2008 WL 5245490, at *5 (holding that breach of

14  contract and negligent undertaking claims would treat Google as the publisher or speaker of

15  third-party content, and dismissing both claims as indistinguishable), and now does so again.

### IV. CONCLUSION

17       As in the original complaint, each of Plaintiff's claims would treat Google as the

18  publisher or speaker of third-party content. Yet Plaintiff has failed to allege facts that plausibly

19  would support a conclusion that Google created or developed, in whole or in part, any of the

20  allegedly fraudulent AdWords advertisements. Plaintiff offers numerous theories of such

21  involvement, but these theories merely lend truth to the Ninth Circuit's observation that there

22  almost always will be *some* "argu[ment] that *something* the website operator did encouraged the

23  illegality." *Roommates*, 521 F.3d at 1174. As the *en banc* court cautioned in *Roommates*, only

24       [w]here it is *very clear* that the website directly participates in developing the
         alleged illegality . . . [will] immunity . . . be lost. . . . [I]n cases of enhancement
25       by implication or development by inference[,] . . . section 230 must be interpreted

27  [7] The promise in *Barnes*–to remove the falsified and harmful profile page–was made by
    Yahoo!'s Director of Communications, who assured Barnes that she would "personally walk
28  [Barnes'] statements over to the division responsible for stopping unauthorized profiles and
    [that] they would take care of [the problem]." *Barnes*, 2009 WL 1740755, at *2.

11

1   to protect websites not merely from ultimate liability, but from having to fight
2   costly and protracted legal battles.

*Id*. at 1174-75 (emphasis added). Here, Plaintiff's theory is at best one of "enhancement by implication or development by inference." These "implications" and "inferences" fall well short of making it "very clear" that Google contributed to any alleged illegality, and Plaintiff's complaint clearly must be dismissed.

In assessing whether Plaintiff once again should be given leave to amend, the Court must consider "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party[,] and futility of the proposed amendment." *United States v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001) (quoting *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989)); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (providing factors constraining district court's discretion to deny leave to amend). At least two of the relevant factors compel denial of leave to amend in this case.

First, amendment almost certainly would be futile. In her original complaint and supporting arguments in opposition to Google's motion to dismiss, Plaintiff largely ignored the analytic framework provided by *Roommates* and other cases. While she did allege in conclusory fashion that Google assisted its AdWords customers in drafting their advertisements, she offered no allegations to support this claim and failed even to argue it in her papers. Now having been directed explicitly to do so, Plaintiff makes sweeping allegations of Google's involvement in the AdWords process but offers no more than tenuous "implications" and "inferences" that fail to explain how Google "controlled" or "collaborated" with any MSSP in the creation of any allegedly fraudulent advertisement. This minimally persuasive response to the Court's clear directive strongly suggests that amendment would be futile.

Second, the Ninth Circuit implicitly has identified a special form of "prejudice" to defendants who improperly are denied early dismissal of claims falling within the zone of CDA immunity. As the court stated in *Roommates*, "close cases . . . . must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to . . . fight[] off claims

12

1    that they promoted or encouraged–or at least tacitly assented to–the illegality of third parties."

2    *Roommates*, 521 F.3d at 1174.  Because the CDA "must be interpreted to protect websites not

3    merely from ultimate liability, but from having to fight costly and protracted legal battles," *id.* at

4    1175, this Court's conclusion that Plaintiff almost certainly will be unable to state a claim

5    compels the additional conclusion that Google must be extricated from this lawsuit now lest the

6    CDA's "robust" protections be eroded by further litigation.  For these reasons, Plaintiff's

7    complaint will be dismissed without leave to amend.

8

9    **IT IS SO ORDERED.**

10

     DATED: 7/30/09

11

12                                          _____
                                            JEREMY FOGEL
13                                          United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 08-2738 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC3)

1    This Order has been served electronically upon the following persons:

2    Alan Himmelfarb Consumerlaw1@earthlink.net

3    Karen Johnson-McKewan kjohnson-mckewan@orrick.com, cfleetwood@orrick.com,

4    gjohnson@orrick.com

5    Nancy E. Harris nharris@orrick.com, vsweet@orrick.com

6    Nikka Noel Rapkin nrapkin@orrick.com, jknight@orrick.com

7    This Order has NOT been served upon the following persons:

8    Kikka N Rapkin
9    Orrick Herrington & Sutcliffe LLP
     The Orrick Building
     405 Howard Street
10    San Francisco, CA 94105-2669

11    Michael McMorrow
     350 N. LaSalle Ste. 1300
12    Chicago, IL 60654

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 08-2738 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC3)