William H. Manning (*pro hac vice*)
E-mail: WHManning@rkmc.com
Andrew M. Kepper (*pro hac vice*)
E-mail: AMKepper@rkmc.com
**Robins, Kaplan, Miller & Ciresi L.L.P.**
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Telephone: 612-349-8500
Facsimile: 612-339-4181

John P. Bovich (SBN 150688)
E-mail: JBovich@reedsmith.com
**Reed Smith LLP**
Two Embarcadero Center, Suite 2000
San Francisco, CA 94111
Telephone: 415-543-8700
Facsimile: 415-391-8269

Attorneys for Plaintiffs
Advanced Micro Devices, Inc., and ATI
Technologies, ULC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADVANCED MICRO DEVICES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., et al.,<br><br>Defendants. | Case No. CV-08-0986-SI<br><br>**DECLARATION OF ANDREW M. KEPPER IN SUPPORT OF PLAINTIFFS' OPPOSITION TO SAMSUNG'S MOTION FOR LEAVE TO AMEND ITS PRELIMINARY INVALIDITY CONTENTIONS**<br><br>Date: April 3, 2009<br>Time: 9:00 a.m.<br>Courtroom: 10, 19th Floor<br>Judge: The Honorable Susan Illston |

I, ANDREW M. KEPPER, declare as follows:

1. I am an attorney with the law firm of Robins, Kaplan, Miller & Ciresi L.L.P., counsel to Plaintiffs Advanced Micro Devices, Inc. et al. in the above-captioned matter. I make this Declaration pursuant to Civil Local Rule 7-5. I have personal

Case No. CV-08-0986-SI

DECLARATION OF ANDREW M. KEPPER IN
SUPPORT OF PLAINTIFFS' OPPOSITION TO
SAMSUNG'S MOTION FOR LEAVE TO AMEND ITS
PRELIMINARY INVALIDITY CONTENTIONS

1  knowledge of the facts set forth in this declaration, and if called as a witness, I could and

2  would testify thereto.

3      2.    Attached hereto as **Exhibit 1** is a true and correct copy of PC Guardian's

4  Notice of Motion and Motion for Leave to Amend Its Preliminary Invalidity Contentions

5  filed in *Acco Brands, Inc. v. PC Guardian Anti-Theft Prod., Inc.*, No. 02-03526, 2008 WL

6  2168379 (N.D. Cal. May 22, 2008).

7      3.    Attached hereto as **Exhibit 2** is a true and correct copy of CashEdge, Inc.'s

8  Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of

9  Defendant CashEdge's Motion for Leave to Amend Final Invalidity Contentions filed in

10  *Yodlee, Inc. v. CashEdge, Inc.*, No. 05-01550, 2007 WL 1454259 (N.D. Cal. May 17,

11  2007).

12      4.    Attached hereto as **Exhibit 3** is a true and correct copy of excerpts of the

13  John Iacoponi Deposition Transcript dated November 18, 2008.

14      I declare under penalty of perjury under the laws of the United States that the

15  foregoing is true and correct to the best of my knowledge.

16

17  Executed on March 13, 2009, in Minneapolis, Minnesota.

18

19

20      Andrew M. Kepper

21

22

23

24

25

26

27

28

# EXHIBIT 1

John M. McCormack (State Bar No. 143194)
Elizabeth A. Tedesco (State Bar No. 221162)
KOLISCH HARTWELL, P.C.
260 Sheridan Avenue, Suite 200
Palo Alto, California 94306
Telephone: (650) 325-8673
Facsimile: (650) 325-5076

Attorneys for Defendants
PC Guardian Anti-Theft Products, Inc. and Fellowes, Inc.

## IN THE UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACCO BRANDS, INC.,<br>　　　　　　Plaintiff,<br>　　　v.<br>PC GUARDIAN ANTI-THEFT<br>PRODUCTS, INC. and FELLOWES, INC.,<br>　　　　　　Defendants. | No. 04-03526 SI<br><br>**PC GUARDIAN'S NOTICE OF MOTION AND MOTION FOR LEAVE TO AMEND ITS PRELIMINARY INVALIDITY CONTENTIONS**<br><br>Date:　　May 23, 2008<br>Time:　　9:00 a.m.<br>Place:　　Courtroom 10, 19th Floor<br><br>Hon. Susan Illston |

# <u>TABLE OF CONTENTS</u>

NOTICE OF MOTION ...................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 1

I.  ISSUE TO BE DECIDED ......................................................................................1

II. INTRODUCTION ................................................................................................. 1

III. FACTUAL BACKGROUND ...............................................................................5

IV. LEGAL ANALYSIS ...........................................................................................13

A.  There is Good Cause for PC Guardian to Serve its First Amended
    Invalidity Contentions....................................................................................13

1.  The subject prior art is highly material to the validity of the '794 patent ........... 14

2.  PC Guardian has proceeded diligently and did not sandbag Kensington ............. 15

3.  The subject prior art was difficult to obtain ......................................... 16

4.  Kensington has not been prejudiced ................................................... 17

B.  Public Policy Supports the Allowance of PC Guardian's First Amended
    Invalidity Contentions ...................................................................................18

V.  CONCLUSION ................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313 (1971) .............................. 18

*Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83 (1993) ............................................... 18

*KSR Intern. Co. v. Teleflex Inc.*,127 S.Ct. 1727 (2007).......................................................... 2

*Pope Mfg. Co. v. Gormully*, 144 U.S. 224 (1892)................................................................... 18

*SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331 (Fed. Cir. 2005)..................... 18

*The Board of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc*,
     2008 WL 624771 (N.D. Cal. March 4, 2008) ............................................................. 13, 14

*Trimble Navigation Ltd. v. RHS, Inc.*, 2007 WL 2457512 (N.D. Cal. Aug. 27, 2007)............. 17

*United States v. Glaxo Group, Ltd.*, 410 U.S. 52 (1973)....................................................... 18

*Yodlee, Inc. v. CashEdge, Inc.*, 2007 WL 2261566 (N.D. Cal. Aug. 6, 2007) ............. 13, 14, 15

**Statutes**

35 U.S.C. § 103............................................................................................................. 5, 9

**Other Authorities**

Manual of Patent Examining Procedure § 2658 ..................................................................... 8

**Rules**

Patent Local Rules 3-4 ............................................................................................................. 12

Patent Local Rule 3-6 ................................................................................................. 3, 8, 11, 12

Patent Local Rule 3-7................................................................................ 1, 2, 7, 8, 10, 12, 13, 14

## NOTICE OF MOTION

TO PLAINTIFF ACCO BRANDS, INC. D/B/A KENSINGTON TECHNOLOGY GROUP ("KENSINGTON") AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT defendant PC Guardian Anti-Theft Products, Inc. ("PC Guardian") files this Motion for Leave to Amend its Preliminary Invalidity Contentions. By this Motion, pursuant to Patent Local Rule 3-7, PC Guardian requests that the Court allow PC Guardian to Serve the First Amended Preliminary Invalidity Contentions appended hereto as "Appendix A." These updated contentions include prior art that is highly relevant to the validity of the patent-in-suit, and about which PC Guardian diligently attempted to notify Kensington, such that no prejudice has resulted to Kensington.

This motion is based on this Notice of Motion, the following Memorandum and Points of Authorities, the declaration of Elizabeth A. Tedesco in Support of PC Guardian's Motion for Leave to Amend its Preliminary Invalidity Contentions, filed concurrently herewith, and such other materials or oral argument as the Court may permit.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    ISSUE TO BE DECIDED

- Pursuant to Patent Local Rule 3-7, is there good cause for PC Guardian to file its First Amended Preliminary Invalidity Contentions?

### II.    INTRODUCTION

PC Guardian files this Motion following the Court's ruling on Kensington's Motion to Strike PC Guardian's Final Invalidity Contentions, where the Court observed that "the proper course would have been for defendant to file its motion for leave to amend its invalidity contentions, as it had intended to do in November 2007," rather than filing Final Invalidity Contentions following the claim construction ruling. As PC Guardian detailed in

1   response to the motion to strike, PC Guardian's amended invalidity contentions were based

2   on the discovery—after much time and expense—of three Apple computers, each having

3   differently sized generally rectangular security slots and all constituting prior art to U.S.

4   Patent No. 6,553,794 ("the '794 patent"), and of the locking devices that engaged those

5   slots.   One of the newly discovered security slots has the same "about 3mm x 7mm"

6   dimensions as those claimed in the patent, which, according to the examiner in the

7   reexamination of the '794 patent, provided the basis for patentability of the claims.

8        PC Guardian obtained these computers and devices while this action was stayed

9   pending reexamination.  When the stay was lifted, and it appeared that the reexamination

10  proceeding would not dispose of this lawsuit, PC Guardian proceeded to take a new look at

11  the more than 200 patents and other references listed on the face of the '794 patent, and the

12  additional references listed on the face of related patents, to evaluate which of these

13  references, in combination with the newly discovered Apple security systems, invalidates

14  the '794 patent, particularly in light of the more lenient standard for obviousness adopted

15  by the Supreme Court in the 2007 *KSR v. Teleflex* case.  *KSR Intern. Co. v. Teleflex*

16  *Inc.*,127 S.Ct. 1727 (2007).  PC Guardian chose the most pertinent references—fourteen

17  patents—to include in an amended set of invalidity contentions.  These patents did not

18  appear in PC Guardian's initial Preliminary Invalidity Contentions, served in 2005, because

19  without the Apple security systems, these patents did not combine to show every element

20  of the '794 patent claims.

21       Also in light of the newly discovered "about 3mm x 7mm" slot, and the *KSR* case,

22  PC Guardian re-reviewed the more than 7,000 pages of prosecution history of the '794

23  patent and related patents for evidence of prosecution history estoppel, subject matter

24  disclaimers, or prosecution laches that would potentially affect the scope or validity of the

25  '794 patent claims.  While conducting this lengthy study, PC Guardian discovered that,

26  during prosecution of the grandparent application to the '794 patent, subject matter claimed

27  in the '794 patent was disclaimed to an inventive entity other than the one named on the

28

1    '794 patent, and that this disclaimed subject matter is invalidating prior art to the '794

2    patent.  PC Guardian's validity study was diligent, but thorough, and it was not until

3    November 2007 that PC Guardian was able to provide Kensington with a highly detailed

4    15-page draft of PC Guardian's First Amended Invalidity Contentions.  PC Guardian's

5    amended contentions make a very compelling case that the '794 patent is, in fact, invalid.

6        Pursuant to Patent Local Rule 3-7, which permits parties to amend their

7    infringement or invalidity contentions, "by order of the Court...upon a showing of good

8    cause," PC Guardian planned to file a motion for leave to serve its First Amended

9    Invalidity Contentions, but first sought Kensington's concurrence.  After PC Guardian

10   presented these contentions to Kensington in November 2007 (appended hereto as

11   "Appendix A"), the parties held a meet and confer telephone conference and it is

12   undisputed that Kensington asked PC Guardian to hold off filing a motion under Patent

13   Local Rule 3-7 until after PC Guardian received a letter stating whether Kensington would

14   agree to the motion.  By the time PC Guardian received the letter, after more than two

15   weeks, the Court had already issued a claim construction order in this action.  PC Guardian

16   looked to the Patent Local Rules and determined, in good faith, that because it was Patent

17   Local Rule 3-6 that addressed the filing of Final Invalidity Contentions "50 days after

18   service by the Court of its Claim Construction Ruling," and because the Court had adopted

19   broader claim constructions that left the door open for a wider range of invalidity argument,

20   the appropriate course of action was to file its invalidity contentions as Final Invalidity

21   Contentions.  PC Guardian served Final Invalidity Contentions on January 9, 2008.

22       Although Kensington asserted as early as January 17, 2008 that PC Guardian's

23   service of Final Invalidity Contentions violated the Patent Local Rules, it waited almost

24   two months to file its motion to strike the contentions.  Likely because discovery had

25   barely begun when the contentions were served, Kensington's motion did not contend that

26   it had been prejudiced by PC Guardian's Final Invalidity Contentions.  That Motion was

27   briefed by the parties and, on April 1, 2008, the Court ordered that the Final Invalidity

28

Page 3 –   PC GUARDIAN'S MOTION FOR LEAVE TO AMEND ITS PRELIMINARY
            INVALIDITY CONTENTIONS; Case No. 04-03526 SI

1   Contentions be dismissed "without prejudice to defendant filing a motion for leave to

2   amend."

3       The parties met and conferred following the Court's order, between April 2, 2008

4   and April 9, 2008, and ultimately, Kensington has agreed to stipulate that there is good

5   cause for including the Apple security systems in PC Guardian's First Amended Invalidity

6   Contentions. These security systems are listed under Section I.B. on page 2 of Appendix

7   A. Kensington has not agreed that there is good cause, however, to include the additional

8   14 patents listed under Section I.A. (the "Prior Art Patents"), which combine with the

9   Apple security systems to show that the claims of the '794 patent are obvious, in PC

10  Guardian's invalidity contentions. Kensington has likewise not agreed that there is good

11  cause for the inclusion of the disclaimed subject matter discussed under Section I.C. As to

12  the Prior Art Patents, PC Guardian did not include these in its invalidity contentions until

13  recently because the discovery of a security slot with dimensions of "about 3mm x 7mm" is

14  what made these references relevant. Before the discovery of the Apple security systems,

15  the Prior Art Patents were, on their own, insufficient to invalidate the '794 patent, and were

16  therefore could not, in good faith, be included in PC Guardian's 2005 Preliminary

17  Invalidity Contentions. Moreover, as Kensington is likely aware, the inclusion of the

18  Apple security systems in PC Guardian's invalidity contentions is *of no use* to PC Guardian

19  without the ability to combine these references with the other elements shown in the Prior

20  Art Patents. On their own, the Apple security systems are insufficient to invalidate the

21  '794 patent. For PC Guardian to make an effective invalidity argument, it is therefore

22  necessary that both the Apple security systems *and* the Prior Art Patents be included.

23      Because the prior art at issue here is highly relevant to validity, because it was

24  difficult for PC Guardian to obtain, because PC Guardian has diligently tried to notify

25  Kensington of these contentions, and because, significantly, no harm has resulted to

26  Kensington, PC Guardian respectfully requests that the Court allow PC Guardian to serve

27  the document attached as "Appendix A" as their First Amended Invalidity Contentions. PC

28

Page 4 –   PC GUARDIAN'S MOTION FOR LEAVE TO AMEND ITS PRELIMINARY
           INVALIDITY CONTENTIONS; Case No. 04-03526 SI

1  Guardian also asks the Court, in making its determination, to consider the long-standing

2  and "significant public policy interest in removing invalid patents from the public arena."

## III.  FACTUAL BACKGROUND

5  The Complaint initiating this action was filed in the Eastern District of Texas on

6  November 26, 2003.  [Declaration of Elizabeth A. Tedesco in Support of PC Guardian's

7  Motion for Leave to Amend its Preliminary Invalidity Contentions ("Tedesco Decl.") at

8  ¶ 1].  From that time, until the case was reassigned to this Court over a year later, this case

9  involved only jurisdictional issues. [Dkt No. 8]. PC Guardian answered the Complaint and

10 filed its Counterclaims on March 2, 2005. [Dkt No. 15].  PC Guardian did not even learn

11 which claims Kensington believes are infringed until March 2, 2005, when it served its

12 Preliminary Infringement Contentions. [Tedesco Decl. at ¶ 3].  In response, PC Guardian

13 filed its Preliminary Infringement Contentions on March 13, 2005.  [*Id.*]  At that time,

14 before the seminal Supreme Court case of *KSR Intern. Co. v. Teleflex Inc.*,127  S.Ct.

15 1727 (2007), in order for more than one patent or other reference to combine to render the

16 claims of the patent "obvious" under 35 U.S.C. § 103, there needed to be a specific

17 "motivation" or "suggestion" in the prior art to combine such references.  Although there

18 are more than 200 references cited on the face of the '794 patent, none disclosed "a

19 generally rectangular security slot, having dimensions of about 3mm x 7mm," and there

20 was little motivation or suggestion to combine these references.    Accordingly, PC

21 Guardian's Preliminary Invalidity Contentions were sparse.

22 On June 24, 2005, PC Guardian filed a motion for summary judgment of

23 inequitable conduct due to Kensington's failure to disclose U.S. Patent No. 2,530,560 to

24 Young during prosecution of the '794 patent when Kensington knew of previous findings

25 by the United States Patent and Trademark Office (PTO) and other courts limiting the

26 scope of claims in patents related to the '794 patent. [Dkt No. 24]. After the Court held

27 that there were issues of fact relating to inequitable conduct, PC Guardian filed a motion to

1   stay this action pending an inter parties reexamination of the '794 patent. [Dkt No. 58

2   (November 16, 2005)]. That motion was granted January 19, 2006. [Dkt No. 66]. At the

3   time this action was stayed, no written discovery responses had been provided, no

4   documents had been exchanged, no depositions had been taken, and no claim construction

5   ruling had issued. [Tedesco Decl. at ¶ 3]. The PTO agreed to reexamine the '794 patent,

6   finding that PC Guardian's petition presented substantial questions of patentability.

7        In the first Office Action of the reexamination, the examiner asserted his belief that

8   the "about 3mm x 7mm" slot was the primary point of novelty in the alleged invention, and

9   that it was not shown in the prior art. [*Id.* at ¶ 4, Exh. B ("Claims 1-14 are patentable over

10  the prior art patent and printed publications because of the recitation of a specific security

11  slot used in performing the locking method set forth... More specifically, there is no

12  suggestion in the prior art for practicing the method steps of claim 1...with a particular slot

13  defined in a portable electronic device and defined by a generally rectangular shape and by

14  dimensions of about 3mm x 7mm.")]. Kensington's own statements confirm this view as

15  well, stating, for instance, the following at the November 14, 2007 hearing on claim

16  construction:

17  ■  As to the prosecution of the '794 patent, "The Patent Office says, 'Okay, I'm
       going to allow claim 75, 76 and 79, but 75 is a dependent claim,' so the patent
18     examiner says, 'If you write it in independent form I'll allow it.' So, and in
       doing so, the patent examiner states that there is no teaching or suggestion in
19     the prior art of record to locate the pin within the slot along with the locking
       member. Keep in mind, your honor, we're talking about a particular slot, *a 3*
20     *millimeter by 7 millimeter slot*. So independent claim 1 of the patent in suit is
21     that same dependent claim 75 written in independent form."

22  ■  As to the re-examination of the '794 patent, "This case is about a small slot, *a*
23     *3 millimeter by 7 millimeter slot* and the things that happen in that slot, [the
       prior art Young reference] has nothing to do with it. That's what I told, I
24     should have said it more artfully but I didn't. Turns out what I told you is
       correct. Because back comes the reexamination in that first pass with those 16
25     grounds, looked at -- it's obvious, your honor, Young was about the barrel of a
26     gun. They stood up here and told you all about Young, and I told you had
       nothing to do with nothing because we're talking about *a slot, 3 millimeter by*
27     *7 millimeter slot.*
28

Page 6 –   PC GUARDIAN'S MOTION FOR LEAVE TO AMEND ITS PRELIMINARY
           INVALIDITY CONTENTIONS; Case No. 04-03526 SI

[Tedesco Decl., Exh. A at 7:13-23, 9:5-16 (emphasis and punctuation added)].

After reviewing the first Office Action, PC Guardian began to ask around the industry and talk to other companies that had been sued by Kensington about whether there was prior art showing an "about 3mm x 7mm" rectangular security slot. [*Id.* at ¶ 4]. PC Guardian learned that Apple had manufactured computers having different sized security slots, namely the original Mac, Mac II, keyboards for the Mac and Mac II, and that ACCO had not disclosed the dimensions of these variously sized security slots to the PTO. PC Guardian also learned that Apple manufactured a computer having a generally rectangular security slot with dimensions of about 3mm x 7mm, namely, the Macintosh Portable computer. [*Id.* at ¶ 5]. After considerable effort, PC Guardian eventually located a Macintosh Portable computer on display at a technical bookstore in Portland, Oregon in early 2006. [*Id.*] Although the bookstore would not allow PC Guardian to purchase the computer, PC Guardian was allowed to measure the security slot, and determined that the dimensions of that slot were indeed about 3mm x 7mm. [*Id.*] On March 22, 2006, counsel for PC Guardian wrote counsel for Kensington pointing out that, although Kensington had disclosed to the PTO that Kensington manufactured security devices for various Macintosh computers, Kensington had failed to inform the PTO examiner of the dimensions of the security slots of those computers. [*Id.*, Exh. C]. PC Guardian wrote,

> Acco has provided only partial and effectively misleading disclosure. The '794 patent describes prior art Apple computers merely as having "slots and internal brackets designed to capture a specifically designed tab inserted through the slot so that the tab is not removable." Col. 1, lines 45-47. Thus, there is no doubt that the inventors were aware of the prior art Apple Mac, Mac II, keyboard, and Mac Portable disclosure of rectangular security slots in various sizes including 3mm x 7mm. Acco to date has failed to fully disclose these slots… *As you know, the Examiner in the reexam is under the misimpression that the prior art did not include a 3mm x 7mm rectangular security slot in an electronic device.*
>
> The inventors and their attorneys have a continuing duty to disclose not only the material prior art that is in the form of printed publications, but also the other prior art of which they had knowledge. Whether or not you

are aware personally of this other prior art and the specifics of the Apple
security slots, the inventors are. This is to place you on notice of your
duty to correct this failure of disclosure.

[*Id.* (emphasis added)].

In response, counsel for Kensington stated, "We believe that we have disclosed all
prior art that we are aware of to the U.S.P.T.O. in the above reexamination application…
There is no need to notify us of any alleged prior art, when you can submit it to the
U.S.P.T.O. yourself." [*Id.*, Exh. D]. Contrary to Kensington's assertions, however, PC
Guardian was not free to submit prior art to the PTO during the reexamination unless it was
a patent or a "printed publication." [*Id.*, Exh. E (Manual of Patent Examining Procedure §
2658 ("Rejections on art in reexamination proceedings may only be made on the basis of
prior art patents or printed publications"))].

In a district court proceeding, however, prior art physical devices are equally as
admissible as printed publications. PC Guardian knew that the dimensions of the security
slots in the various Macintosh Computers, and especially the about 3mm x 7mm slot in the
Macintosh Portable computer, would be highly relevant in this action, if the claims of the
'794 patent were allowed after the reexamination. At the beginning of 2007, after hiring a
professional searcher and spending between 35-40 hours of their own time, the principals
of PC Guardian successfully obtained two additional computers with security slots: the
Macintosh SE and Macintosh 512k computers, both of which were ultimately found on the
eBay online auction website. [*Id.* at ¶ 9]. PC Guardian also obtained a 1988 version of the
Kensington Apple Security System, which includes various locking devices that engage the
security slots on the Macintosh 512k and Macintosh SE computers, and on keyboards for
use with those computers. [*Id.*] On February 13, 2007, PC Guardian provided these
devices to their counsel. [*Id.*] Likewise, in March of 2007, PC Guardian finally located
and was able to purchase the Macintosh Portable computer through eBay. [*Id.*, Exh. F].
PC Guardian was also able to find additional references confirming that the Macintosh
Portable computer is, indeed, prior art, and that the prior art Security Loop from the

1  Kensington Apple Security System is used to secure a cable to the about 3mm x 7mm

2  security slot in the Macintosh Portable computer. [*Id.* at ¶ 9].

3        Knowing that the "about 3mm x 7mm" security slot was shown in the prior art,

4  once the stay was lifted, and it appeared the reexamination proceeding would not dispose of

5  this action, PC Guardian undertook the expense of going back through each of the more

6  than 200 patents and other references listed on the face of the '794 patent, as well as the

7  references listed on the face of related patents, to determine which combinations of prior art

8  were likely to invalidate the '794 patent. [*Id.* at ¶ 10]. In April of 2007, the Supreme Court

9  decided *KSR v. Teleflex*, which significantly expanded the standard for obviousness under

10  35 U.S.C. § 103, holding that a combination of elements from certain references may be

11  obvious if it does no more than lead to a predictable result. Accordingly, whereas many of

12  the references had not been relevant prior to *KSR* and the location of the Apple security

13  systems, PC Guardian had new reason to combine these references to invalidate the '794

14  patent. PC Guardian selected 14 of the most relevant patents on the face of the '794 patent

15  and a related patent ("the Prior Art Patents") to combine with the Apple security systems.

16        Furthermore, through the fall of 2007, PC Guardian combed back through the more

17  than 7,000 dense pages of prosecution history of the patents and patent applications related

18  to the '794 patent for evidence of prosecution history estoppel, subject matter disclaimers

19  and/or prosecution laches that would potentially affect the scope or the claims in the '794

20  patent. [*Id.* at ¶ 11]. Notably, PC Guardian discovered that, during prosecution of Patent

21  Application No. 07/824,964 (the grandparent application to the '794 patent), subject matter

22  claimed in the '794 patent was disclaimed to an inventive entity other than the one named

23  on the '794 patent, and that this disclaimed subject matter is invalidating prior art to the

24  '794 patent. [*Id.* at ¶ 12].

25        PC Guardian was diligent but thorough, given the sheer volume of information

26  involved, and, by late 2007, was ultimately able to synthesize its theories into a detailed

27  15-page document containing its updated invalidity contentions. Pursuant to Patent Local

28

1    Rule 3-7, PC Guardian planned to move the Court for leave to file amended preliminary

2    invalidity contentions.  On November 16, 2007, PC Guardian contacted Kensington to ask

3    if Kensington would oppose the motion. [Tedesco Decl., Exh. G].  Kensington responded

4    by leaving a voicemail for counsel for PC Guardian, asking PC Guardian to provide a copy

5    of the amended contentions and to state why there is good cause for amendment.  [Tedesco

6    Decl. at ¶ 13].  On November 27, 2007, PC Guardian sent Kensington its draft First

7    Amended Preliminary Invalidity Contentions, and stated the following with respect to good

8    cause:

9            Per your voicemail from last week, here is PC Guardian's First Amended
10           Preliminary Invalidity Contentions.  These are amended to include new
             contentions based on the prior art Mac SE, Mac 512K and Mac Portable
11           computers.  We obtained these devices after we filed our initial Preliminary
             Invalidity Contentions, and after Judge Illston stayed this action.  For this
12           case and for ACCO's suit against PC Guardian in Illinois, we have also
13           studied the voluminous prosecution histories of ACCO's patents more
             extensively, and discovered that during prosecution of Patent Application
14           No. 07/84,964 (the grandparent application to the '794 patent), Stewart Carl
             and Arthur Zarnowitz disclaimed subject matter to an inventive entity that
15           must include Gary L. Myers.  This disclaimed subject matter, which is prior
16           art to the '794 patent under § 102(f) and/or § 102(g), forms the basis of
             other new invalidity contentions.  Finally, our amended contentions are
17           based on the new standard for obviousness recently adopted by the Supreme
             Court in *KSR v. Teleflex*.  For all of these reasons, there is good cause to
18           amend our preliminary invalidity contentions.  Please let us know if
             Kensington opposes the amendment.
19

20   [*Id.*, Exh. H].

21           Thereafter, the parties met and conferred, and Kensington stated that it was likely to

22   oppose the motion but expressly asked PC Guardian to hold off filing the motion until after

23   PC Guardian received a confirming letter from Kensington. [Tedesco Decl. at ¶¶ 14, 15].

24   During the call, Kensington promised that its confirming letter would arrive shortly.  [*Id.*]

25   Almost two weeks later, on December 17, 2007, PC Guardian emailed counsel for

26   Kensington, stating, "Can you let us know when you will provide the letter we discussed,

27   which will follow on our meet and confer discussion of December 4, 2007, and give PC

28

Page 10 –  PC GUARDIAN'S MOTION FOR LEAVE TO AMEND ITS PRELIMINARY
            INVALIDITY CONTENTIONS; Case No. 04-03526 SI

Guardian the final word on whether Kensington will...consent to the filing of PC Guardian's Amended Preliminary Invalidity Contentions." [Tedesco Decl., Exh. I]. Finally, on December 21, 2007, PC Guardian received a letter from Kensington stating that it did not agree to the filing of PC Guardian's motion for leave to amend its invalidity contentions. [*Id.*, Exh. J].

After receiving word from Kensington, PC Guardian looked to the Patent Local Rules to determine how to proceed. The Court's claim construction ruling had issued on December 5, 2007. PC Guardian noted that, under the framework of these rules, amending a party's "preliminary infringement contentions" appears only to be appropriate before a claim construction order has issued. The period "50 days after service by the Court of its Claim Construction Ruling" is addressed by Patent Local Rule 3-6, which states that a party may file its "Final Invalidity Contentions" if either the patentee has filed Final Infringement Contentions or the accused infringer "believes in good faith that the Court's Claim Construction Ruling so requires." Because the Court's claim construction ruling adopted Kensington's broader proposed constructions, leaving open questions about what is a "locked position" and how distinct the locking member and pin must be, PC Guardian felt, in good faith, that the Court's claim construction ruling was yet another reason for PC Guardian to update its invalidity contentions. [Tedesco Decl. at ¶ 18]. Accordingly, on January 9, 2008, PC Guardian served Final Invalidity Contentions on Kensington. [*Id.*, Exh. K].

Kensington asserted as early as January 17, 2008 that PC Guardian's service of Final Invalidity Contentions violated the Patent Local Rules. [*Id.*] During a meet and confer telephone call on January 24, 2008, PC Guardian made clear that it disagreed with Kensington, and the parties reached an impasse on the issue that day. [*Id.*]

On January 23, 2008, PC Guardian served requests for admission on Kensington, attaching materials relating to the Macintosh Portable and the Kensington Apple Security Systems used with the Macintosh Portable and other Macintosh computers. [*Id.*, Exh. L].

1    PC Guardian asked Kensington to admit authenticating information about a brochure

2    connected with the Kensington Apple Security Systems, and to admit that it was aware of

3    the dimensions of the security slot in the Macintosh SE, Macintosh 512k and Macintosh

4    Portable computers (collectively, "the Macintosh Computers"). [*Id.*] Although Kensington

5    objected to these requests due to what it alleged were violations of Patent Local Rules 3-4,

6    3-6, and 3-7, it eventually admitted that it sold Kensington Apple Security Systems, and

7    that it was aware of the Macintosh Computers. [*Id.*, Exh. M].

8    Almost two months after being served with PC Guardian's Final Invalidity

9    Contentions, on March 7, 2008, Kensington brought a motion to strike the contentions,

10    with the noticed hearing date coming only one week before fact discovery is set to close.

11    [Dkt No. 128]. In that Motion, Kensington did not allege that it had been prejudiced in any

12    way by the service of the Final Invalidity Contentions. After briefing of that Motion was

13    complete, the Court determined that "the proper course would have been for defendant to

14    file its motion for leave to amend its invalidity contentions, as it had intended to do in

15    November 2007," and granted Kensington's motion "without prejudice to defendant filing

16    a motion for leave to amend." [Dkt No. 147]. Accordingly, because there is, and has been,

17    good cause under Patent Local Rule 3-7, PC Guardian files such motion now.

18    The day after receiving the Court's April 1, 2008 Order on Kensington's Motion to

19    Strike, PC Guardian contacted counsel for Kensington to confer, as the Court requested,

20    about whether Kensington would agree to PC Guardian's amendments. [Tedesco Decl. at ¶

21    23]. The parties exchanged emails and held several meet and confer telephone

22    conferences between April 2, 2008 and April 9, 2008. [*Id.*] Ultimately, Kensington agreed

23    that there was good cause for PC Guardian's inclusion of the Apple security systems (the

24    devices listed in Section I.B. of "Appendix A"), but not for the inclusion of any of the Prior

25    Art Patents, and not for the inclusion of the anticipating prosecution history disclaimer

26    described in Section I.C. [*Id.*] Although PC Guardian pointed out that, for an obviousness

27    combination, the Prior Art Patents supplied limitations that were missing from the Apple

28

Page 12 – PC GUARDIAN'S MOTION FOR LEAVE TO AMEND ITS PRELIMINARY
INVALIDITY CONTENTIONS; Case No. 04-03526 SI

1    security systems alone, and that PC Guardian's invalidity contentions would be ineffective

2    without the full scope of this prior art, Kensington maintained that—even though the Prior

3    Art Patents do not disclose an "about 3mm x 7mm" slot and could not have been

4    combined, pre-*KSR*, to invalidate the '794 patent—they should nonetheless have been

5    included in PC Guardian's 2005 Preliminary Invalidity Contentions. [*Id.*] Because there is

6    simply no merit to this position and PC Guardian has diligently located and disclosed

7    relevant prior art, PC Guardian brings this motion, asking the Court to allow PC Guardian

8    to serve its complete First Amended Invalidity Contentions, attached as "Appendix A."

9
10   ## IV.   LEGAL ANALYSIS

     ### A.   There is Good Cause for PC Guardian to Serve its First Amended Invalidity
11          Contentions

12       Patent Local Rule 3-7 provides that a party's infringement or invalidity contentions

13   may be amended "by order of the Court, which shall be entered only upon a showing of

14   good cause."  Pat. L. R. 3-7.  As one court very recently noted, "the 'good cause'

15   requirement disallows infringement contentions from becoming moving targets throughout

16   the lawsuit." *The Board of Trustees of the Leland Stanford Junior Univ. v. Roche*

17   *Molecular Sys., Inc*, 2008 WL 624771, *2 (N.D. Cal. March 4, 2008).  The rule is meant to

18   avoid the "eleventh hour 'discovery' of facts" and the "shifting sands approach to claim

19   construction."  *Id.*  The inquiry turns on several factors: (1) the materiality of the

20   information that provides a basis for amendment, (2) the party's diligence in seeking to

21   amend its contentions, (3) the relative difficulty of obtaining the information that provides

22   a basis for amendment, and (4) prejudice to the party opposing amendment.  *See Id.*;

23   *Yodlee, Inc. v. CashEdge, Inc.*, 2007 WL 2261566 (N.D. Cal. Aug. 6, 2007).

24       For instance, in *Yodlee*, this Court allowed a party to amend its Final Invalidity

25   Contentions where (1) the newly discovered prior art "may be highly material to the merits of

26   the case," (2) the defendant's "quest to amend does not appear to be motivated by

27   gamesmanship" and the concern of sandbagging was not at issue, (3) the Court was more

28

Page 13 –  PC GUARDIAN'S MOTION FOR LEAVE TO AMEND ITS PRELIMINARY
         INVALIDITY CONTENTIONS; Case No. 04-03526 SI

1   sympathetic because of the difficulty in obtaining the kind of prior art involved, which were

2   archived websites, and (4) "most importantly," the plaintiff was not substantially prejudiced

3   by the proposed amendment. *Yodlee,* 2007 WL 2261566 at *3. Likewise, in *Stanford,* the

4   court allowed the plaintiff to amend its infringement contentions five months after the

5   plaintiff served amended contentions on defendant without first seeking leave of the court.

6   *Stanford,* 2008 WL 624771 at *2. There, the court found that the plaintiff had been diligent

7   in notifying the defendant about its contentions, even if it had arguably not been diligent in

8   seeking leave of the court to serve amended contentions. *Id.* at *3. Furthermore, because the

9   defendant had been duly notified of the plaintiff's contentions through discovery, the

10  defendant was not deprived of the opportunity to address plaintiff's contentions and was not

11  prejudiced. *Id.* at *4. Here, the relevant factors are discussed in turn below.

### 1.    The subject prior art is highly material to the validity of the '794 patent

12

13          According to the examiner involved in the reexamination of the '794 patent, and by

14  Kensington's own admission, the claim element of the "about 3mm x 7mm" security slot was

15  critical to the patentability of the claims in the '794 patent over the existing prior art

16  considered by the PTO during prosecution and reexamination. [*See* Tedesco Decl., Exhs. A,

17  B]. As Kensington has emphasized, "This case is about a small slot, *a 3 millimeter by 7*

18  *millimeter slot* and the things that happen in that slot." [*See* Tedesco Decl., Exh. A

19  (emphasis added)]. The Prior Art Patents are highly material to the validity of the '794

20  patent. Collectively, the security systems of the Macintosh Computers, which include at least

21  three differently sized security slots show that selecting a particularly sized security slot is a

22  highly predictable matter of design choice, and thus is *per se* obvious, particularly in light of

23  the *KSR* decision. Further, the security system for the Macintosh Portable computer includes

24  an "about 3mm x 7mm" slot as recited in the claims. These security systems disclose

25  elements that were missing from combinations of the patents listed on the face of the '794

26  patent, but *they must combine* with these patents to effectively render the claims of the '794

27  patent obvious. The inclusion of the Prior Art Patents is therefore vital to PC Guardian's

28

1    invalidity position.  Moreover, the disclaimed subject matter from Patent Application No.

2    07/824,964 (the grandparent application to the '794 patent), discovered by PC Guardian

3    during the fall of 2007, includes *all* of the claimed elements of the '794 patent and is, on its

4    own, invalidating prior art.  [*Id.* at ¶12, *See Also* Appendix A).].  Therefore, the prior art

5    described in both Sections I.A. and I.C. of Appendix A is highly material to the validity of

6    the claims in the '794 patent.

7            **2.    PC Guardian has proceeded diligently and did not sandbag Kensington**

8            As is clear from the recitation of facts that after the stay was lifted, PC Guardian

9    proceeded diligently—but thoroughly—to comb back through the more than 200 references

10   on the face of the '794 patent, and even more references on the faces of related patents, and

11   the more than 7,000 pages of prosecution histories.  [*Id.* at ¶¶ 10, 11].  Literally, *several*

12   *hundred hours* of attorney time were required to undertake this analysis, at tremendous

13   expense to PC Guardian, and this was not expense PC Guardian wanted to incur until after it

14   was certain the case would proceed.  [*Id.* at ¶ 11].  PC Guardian sought to arrive at a

15   complete picture of its invalidity contentions before moving the Court and, by November

16   2007, PC Guardian put together a detailed 15-page document outlining these contentions.  At

17   the time PC Guardian came to Kensington with these contentions on November 16, 2007,

18   and at the time it attempted to serve Final Invalidity Contentions on January 9, 2008, no

19   documents had been exchanged between the parties and not a single deposition had been

20   taken.  [*Id.* at ¶ 21].  PC Guardian never tried to hide its invalidity contentions, and certainly

21   did not bring them to Kensington at "the eleventh hour."  Quite to the contrary, even before

22   the stay of this case had been lifted, and even before PC Guardian actually had a Macintosh

23   Portable device in its possession, it notified Kensington by letter of March 22, 2006 of PC

24   Guardian's belief—having measured one at a technical bookstore—that the Macintosh

25   Portable computer was prior art that included an "about 3mm x 7mm" generally rectangular

26   security slot.  [Tedesco Decl. at ¶ 5, Exh. C].  Kensington has not, and cannot, claim to have

27   been surprised that PC Guardian contends the Macintosh Computers are the basis of the bulk

28

1    of its invalidity contentions, nor that patents shown on the very face of '794 patent are

2    included. As noted above, PC Guardian could not—in good faith—have included the Prior

3    Art Patents in its 2005 Preliminary Invalidity Contentions because the essential claim

4    element of the "about 3mm x 7mm" security slot was missing. Although PC Guardian now

5    includes these patents in its claim chart next to the first step of Claim 1 of the '794 patent, it

6    does so because these references disclose holes or "generally rectangular security slot[s];" on

7    their own, they do not combine to disclose the entire step. [*See* Appendix A at 7-8]. As soon

8    as the stay of this case was lifted, however, PC Guardian went back through these patents to

9    combine them with the Apple security systems and disclose them to Kensington. There is

10   simply no sandbagging here, where PC Guardian has made every effort to notify Kensington

11   of its contentions, and has even served considerable discovery directed to them, at a time

12   when discovery was still in its early stages.

13        **3.    The subject prior art was difficult to obtain**

14        Locating physical units of the Macintosh Computers, and the Kensington Apple

15   Security Kit,co nfirming that these devices were prior art, reviewing the hundreds of prior art

16   references on the face of the '794 patent and related patents, reviewing the lengthy

17   prosecution histories, finding the disclaimed subject matter, and formulating invalidity

18   positions in light of the recent *KSR* case, were each difficult and time-consuming,

19   particularly where the computer devices sought had been obsolete for at least 15 years, and

20   the prosecution histories include over 7,000 pages. [*See* Tedesco Decl. at ¶¶ 5, 9-11]. PC

21   Guardian ultimately had to employ an independent, professional searcher to locate the

22   Macintosh SE and Macintosh 512k computers, and the principals of PC Guardian spent

23   between 35-40 hours of their own time over the course of months to locate the computers.

24   [*Id.* at ¶ 5]. Each of the Macintosh Computers eventually had to turn up on eBay before it

25   could be purchased. [*Id.* at ¶ 9]. Although many of the Prior Art Patents are listed on the

26   face of the '794 patent, as noted above, these references alone did not show the "about 3mm

27   x 7mm" security slot, and therefore did not become relevant until PC Guardian located the

28

1   Macintosh Computers and studied the references in light of the *KSR* case.  Also as noted,

2   above, several hundred hours were spent by PC Guardian's counsel to determine the best

3   combinations of prior art, and to review the more than 7,000 pages of prosecution history.

4   [*Id.* at ¶ 11].

5       **4.    Kensington has not been prejudiced**

6       Finally, and perhaps most importantly, there has been absolutely no prejudice to

7   Kensington where discovery only began in earnest after PC Guardian presented its proposed

8   amended invalidity contentions in November 2007.  In fact, Kensington has—properly—

9   never contended that any prejudice has resulted from PC Guardian's actions.  Notably,

10  neither Kensington's moving papers for its Motion to Strike PC Guardian's Final Invalidity

11  Contentions, nor its supporting Reply, even mentions the word "prejudice."  As noted above,

12  Kensington felt comfortable waiting almost two months to bring that motion after PC

13  Guardian attempted to serve its Final Invalidity Contentions.  Even now, Kensington has yet

14  to take the bulk of the depositions it has scheduled, so there is ample discovery left to be had.

15  [Tedesco Decl. at ¶ 21].

16      PC Guardian has also made it known for almost five months that Kensington was

17  welcome to come and inspect the Macintosh Computers, and, as emphasized above,

18  Kensington has known since March 2006 that PC Guardian knew of a computer with an

19  about 3mm x 7mm generally rectangular security slot.  [*Id.* at ¶ 21, Exh. C].  PC Guardian

20  believes that Kensington knew of the about 3mm x 7mm dimensions of the security slot in

21  the Macintosh Portable, as well as the dimensions of the security slots in the Macintosh 512k

22  and SE computers, long before 2006 as well, because it sold the Kensington Apple Security

23  Kit, which includes various locking devices that were used to engage the slots of the

24  Macintosh Computers long before the parent application for the '794 patent was filed.  [*See*

25  Tedesco Decl., Exh. L].  *See also Trimble Navigation Ltd. v. RHS, Inc.*, 2007 WL 2457512

26  (N.D. Cal. Aug. 27, 2007) (allowing service of second supplemental preliminary invalidity

27  contentions where "plaintiff's possession and knowledge of the relevant…documents ensures

28

1  that plaintiff will suffer no undue prejudice"). Kensington was plainly aware of the Prior Art

2  Patents as well, since they were listed for the PTO during prosecution of this family of

3  patents. There is simply no prejudice to Kensington, and no basis to exclude PC Guardian's

4  best arguments of invalidity where PC Guardian has acted diligently and in good faith and

5  where its First Amended Invalidity Contentions will not disrupt the litigation in any way.

6      **B. Public Policy Supports the Allowance of PC Guardian's First Amended**
7          **Invalidity Contentions**

8      PC Guardian's First Amended Invalidity Contentions should also be allowed in light of

9  the long-standing and "significant public policy interest in removing invalid patents from the

10  public arena." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1354 (Fed. Cir.

11  2005) *citing Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83 (1993), *United States v.*

12  *Glaxo Group, Ltd.*, 410 U.S. 52 (1973), *and Blonder-Tongue Labs., Inc. v. Univ. of Ill.*

13  *Found.*, 402 U.S. 313 (1971),*among others*. Indeed, as the foundational U.S. Supreme Court

14  decision states, "It is as important to the public that competition should not be repressed by

15  worthless patents, as that the patentee of a really valuable invention should be protected in his

16  monopoly." *Pope Mfg. Co. v. Gormully*, 144 U.S. 224 (1892).

17      Taken together, PC Guardian's discovery of the disclaimed subject matter, the prior art

18  security systems for the Macintosh Computers, the Prior Art Patents, and the less restrictive

19  standard for obviousness under *KSR v. Teleflex*, provide overwhelming evidence that the '794

20  patent is indeed worthless and should not be used to repress competition. Considering that

21  Kensington has aggressively sued almost every single one of its competitors around the nation

22  for infringement of related patents (this is one of three lawsuits and four patents asserted

23  against PC Guardian alone, the first of which PC Guardian was found not to infringe, and the

24  other three of which issued primarily on the basis of the novelty of the "about 3mm x 7mm"

25  security slot), there is too much at stake to block strong evidence of invalidity on procedural

26  grounds when it is clear that Kensington has not been prejudiced and that PC Guardian has

27  tried to proceed correctly under the Patent Local Rules. [Tedesco Decl. at ¶ 22]. For this

28

1    reason as well, PC Guardian asks that the Court allow PC Guardian to serve its First Amended

2    Invalidity Contentions.

3

4    **V.    <u>CONCLUSION</u>**

5    For all of the foregoing reasons, PC Guardian respectfully requests that the Court

6    grant PC Guardian's Motion for Leave to Amend its Preliminary Invalidity Contentions.

7

8

9    DATED: April 15, 2008

10    Respectfully,

11    KOLISCH HARTWELL, P.C.

12

13    By:   /s/ Elizabeth A. Tedesco
            of Attorneys for Defendant

14          PC Guardian Anti-Theft Products, Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 2



LEXSEE 2005 U.S. DIST. CT. MOTIONS 78773

View U.S. District Court Opinion

View Original Source Image of This Document

YODLEE, INC., Plaintiff, v. CASHEDGE, INC., Defendant.

Case No. C 05-01550 (SI)

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA, SAN FRANCISCO DIVISION

*2005 U.S. Dist. Ct. Motions 78773; 2007 U.S. Dist. Ct. Motions LEXIS 43034*

April 25, 2007

Motion to Amend

**VIEW OTHER AVAILABLE CONTENT RELATED TO THIS DOCUMENT: U.S. District Court:** Motion(s)

**COUNSEL:** [**1] GIBSON, DUNN & CRUTCHER LLP, Josh A. Krevitt, SBN 208552, 200 Park Avenue, New York, NY 10166-0193, Telephone: (212) 351-4000, Facsimile: (212) 351-4035, jkrevitt@gibsondunn.com.

GIBSON, DUNN & CRUTCHER LLP, Wayne M. Barsky, SBN 116731, Sarah E. Piepmeier, SBN 227094, One Montgomery Street, Suite 3100, San Francisco, California 94104, Telephone: (415) 393-8200, Facsimile: (415) 374-8404, wbarsky@gibsondunn.com, spiepmeier@gibsondunn.com.

Attorneys for Defendant CASHEDGE, INC.

**JUDGES:** Honorable Susan Illston

**TITLE: NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT CASHEDGE, INC.'S MOTION FOR LEAVE TO AMEND FINAL INVALIDITY CONTENTIONS**

**TEXT:** Date: June 8, 2007

Time: 9:00 a.m.

Courtroom: 10, 19th Floor

Judge: Honorable Susan Illston

[*1] **NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Page 2

2005 U.S. Dist. Ct. Motions 78773, *1; 2007 U.S. Dist. Ct. Motions LEXIS 43034, **1

PLEASE TAKE NOTICE that at 9:00 a.m. on June 8, 2007, or as soon thereafter as the matter may be heard in the above-entitled Court located at 450 Golden Gate Avenue, San Francisco, California, Defendant CashEdge, Inc. ("CashEdge") will and hereby does move this Court, pursuant to Patent Local Rule [**2] 3-7, for leave to amend its Final Invalidity Contentions. n1

> n1
>
> > CashEdge has noticed this motion for the earliest available date on the Court's calendar, which is June 8, 2007. The parties have, however, agreed to expedite the briefing schedule and hearing date, and they intend to shortly propose a stipulated expedited briefing and hearing schedule for the Court's consideration.

This motion is made on the grounds that the prior art recently discovered by CashEdge's counsel was not disclosed to the Patent Office during the prosecution of the '077 and '783 patents, and it is far more material to the validity of those patents than any of the prior art that the Patent Office actually considered at the time. CashEdge's counsel notified Yodlee's counsel of its discoveries immediately, and there are several months of discovery left before the July 13, 2007 discovery cutoff, so Yodlee will have ample opportunity to explore CashEdge's invalidity claims to ensure that these late-breaking developments do not [**3] unfairly prejudice Yodlee in any way.

CashEdge bases its motion on this Notice of Motion and Motion, the Memorandum of Points and Authorities in Support of Motion, the Declaration of Wayne Barsky, the [Proposed] Order Granting Leave to Amend, any oral argument heard by the Court, and such other matters as the Court deems proper.

[*2] Dated: April 25, 2007

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP
Josh A. Krevitt, SBN 208552
Wayne M. Barsky, SBN 116731
Sarah E. Piepmeier, SBN 227094

Sarah E. Piepmeier
Attorneys for Defendant CASHEDGE, INC.

[*1] **MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION AND FACTUAL BACKGROUND**

On February 12, 2007, defendant CashEdge, Inc. ("CashEdge") served its Final Invalidity Contentions in this matter. On March 13, 2007, CashEdge changed counsel. On March 30, 2007, the undersigned counsel for CashEdge discovered significant new prior art that CashEdge contends invalidates in their entirety the two patents that form the core of plaintiff Yodlee, Inc.'s ("Yodlee") patent infringement claims: the '077 and '783 patents.

The prior art discovered by CashEdge's counsel on March 30, 2007-which [**4] is discussed in detail below-was not disclosed to the Patent Office during the prosecution of the '077 and '783 patents, and it is far more material to the validity of those patents than any of the prior art that the Patent Office actually considered at the time.

Page 3

2005 U.S. Dist. Ct. Motions 78773, *1; 2007 U.S. Dist. Ct. Motions LEXIS 43034, **4

A patent is invalid if the invention claimed therein was offered for sale, sold, or in public use more than one year before the filing date of the patent application. *35 U.S.C. § 102*(b). The '077 patent application was filed on June 1, 1999, but it claims priority to an earlier application that was filed on December 9, 1998. The '783 patent was filed on October 27, 1999, but it claims priority to provisional applications filed as early as October 28, 1998. In this action, CashEdge will prove, among other grounds for invalidity, that the inventions claimed by the '077 and '783 patents were offered for sale, sold, and in public use before *October 28, 1997*, thus rendering those inventions invalid as a matter of law under Section 102(b). n2

> n2
>
> > While CashEdge focuses on § 102(b) in this Motion, it does not intend to limit its arguments to that section. Indeed, the prior art discussed herein may in fact invalidate under numerous other sections.

[**5]

Specifically, on March 30, 2007, CashEdge's counsel first identified the web-based travel service called "MileageManager," located at the web address www.mileagemanager.com, as potentially including each and every element of each and every independent claim (and most if not all [*2] dependent claims) of the '077 and '783 patents, and that the website was "live" on the internet before October 1997. Declaration of Wayne M. Barsky ("Barsky Decl."), PP 2-3.

Within hours of learning this information on March 30, 2007, CashEdge brought this website, and the name and address of its proprietor (Randy Petersen), to the attention of Yodlee. Barsky Decl., P 4, Exh. A. CashEdge immediately sought documents from Mr. Petersen, and on April 18, after Mr. Petersen returned from a two-week trip abroad, certain MileageManager documents were produced to CashEdge, made available to Yodlee's counsel for inspection, and then copied and shipped to Yodlee the following day. Barsky Decl., P 16.

Among the documents unearthed by Mr. Petersen were documents pertaining not only to the MileageManager website, but to a related website called "MaxMiles," located at the web address www.maxmiles.com [**6] . Barsky Decl., P 17, Exh. L. This was a company that appears to have been established no later than the first calendar quarter of 1997 by an individual named Mark Jamison. *Id.* CashEdge contends, and the documents produced by Mr. Petersen on April 18 make clear, that the MaxMiles website-as well as the MileageManager website-included each and every element of each and every independent claim (and many if not all of the dependent claims) of the '077 and '783 patents, and that the MaxMiles website was also "live" no later than September 1997. Barsky Decl., PP 3, 17, Exh. L.

On April 23, 2007, immediately after reviewing the MaxMiles documents produced by Mr. Petersen and interviewing Mr. Jamison, CashEdge notified Yodlee of its intention to include the MaxMiles prior art in any amended invalidity contentions. Barsky Decl., P 17, Exh. L. On April 24, CashEdge produced documents received that same day from Mr. Jamison. Barsky Decl., P 20.

**II.**

**CASHEDGE'S ONGOING DILIGENCE**

CashEdge believes that there are additional documents of significance that will further substantiate its claim that the MileageManager and MaxMiles prior art invalidates the '783 and '077 patents under [**7] at least Section 102(b)-including source code, technical documentation, archival web pages, and business plans-and it is vigorously pursuing the recovery of those documents from third-parties [*3] for immediate analysis, as well as production to Yodlee. Barsky Decl., P 18, Exh. M. Moreover, CashEdge believes, based on its ongoing investigation, that it will find documents substantiating the existence of additional, travel-related aggregation websites in the same period of time. *Id.*

Page 4

2005 U.S. Dist. Ct. Motions 78773, *3; 2007 U.S. Dist. Ct. Motions LEXIS 43034, **7

One such website, for example is www.status.com, which appears to also have been in the business of aggregating travel-related information on an internet website as early as 1997. CashEdge is diligently pursuing additional information regarding this and other web-based prior art. *Id.*

There are several months of discovery left before the July 13, 2007 discovery cutoff. Accordingly, Yodlee will have ample opportunity to explore CashEdge's invalidity claims through discovery in this action, and CashEdge's counsel will, as is its practice, extend every professional courtesy to Yodlee's counsel to ensure that these late-breaking developments do not unfairly prejudice Yodlee in any way.

Indeed, [**8] ever since CashEdge's counsel notified Yodlee's counsel of the MileageManager prior art on March 30, 2007, the parties have been discussing logistics for the depositions of Messrs. Jamison and Petersen (assuming the Court permits the amendment requested herein), such as service of Rule 45 subpoenae and possible deposition dates. Barsky Decl., PP 10- 12, 18-19, Exh. G-I, M-N.

III.

**GOOD CAUSE EXISTS TO PERMIT THE REQUESTED AMENDMENT**

By this motion, and pursuant to Patent Local Rule 3-7, CashEdge seeks leave to amend its invalidity contentions to include the newly-discovered, highly material prior art discussed above, and any additional prior art discovered before the amended filing date. Good cause to permit this requested amendment exists for several reasons, as described below.

**A. MileageManager and MaxMiles Are Highly Material References.**

As the Court has noted, each of Yodlee's patents "[b]roadly speaking ... all deal with systems and methods to deliver personal information culled from multiple Internet sources to one central web site." July 7, 2006 Order on Claim Construction, 1:22-23. This is precisely what MileageManager and MaxMiles were doing long [**9] before the applications for the '783 and '077 were filed.

[*4] CashEdge will prove in this action that, more than one year before the applications for the '783 and '077 patents were filed, each of these prior art websites, *inter alia*: 1) required user authentication (such as a user name and password) for access to the portal; 2) collected and stored the user's login information (account number and PIN) for third-party websites (airline frequent flyer and hotel frequent guest programs); 3) used that login information to gain access, as the user, to such third-party websites by means of an automated software program; 4) retrieved the user's personal, password-protected information (accumulated frequent flyer miles or hotel points); and 5) aggregated such information from multiple third-party websites on the prior art website.

These references are not only more material than *any* reference considered by the Patent Office when it examined the '783 and '077 patent applications, they are also more material to the validity of those patents than any one of the dozens of prior art references discussed in CashEdge's Final Invalidity Contentions served on February 12, 2007. Indeed, [**10] CashEdge will prove in this action that the claims of the '783 and '077 patents read directly upon the MileageManager and MaxMiles prior art, and are therefore invalid under Section 102(b) (as well as numerous other provisions) of the Patent Act.

**B. Yodlee Will Not Be Unfairly Prejudiced By The Requested Amendment.**

As noted above, CashEdge served its Final Invalidity Contentions on February 12, 2007, before any expert reports were prepared or served by either party, and just *six weeks* before Yodlee was alerted to the existence of newly-discovered prior art. Indeed, at no time during the extensive meet and confer discussions preceding the filing of this motion did Yodlee ever even claim, let alone substantiate, that it would be unfairly prejudiced by the requested amendment. *See, e.g.*, Barsky Decl., PP 5-19, Exh. B-N.

Page 5

2005 U.S. Dist. Ct. Motions 78773, *4; 2007 U.S. Dist. Ct. Motions LEXIS 43034, **10

And Yodlee could not claim any unfair prejudice. The discovery cut-off date is now July 13, 2007, and Yodlee will have ample time to conduct whatever discovery of this prior art that is necessary and appropriate, and more than ample time for its experts to analyze this prior art before expert reports are exchanged. By contrast, if the requested amendment [**11] were not permitted, CashEdge [*5] would be deprived of its most powerful invalidity arguments, and it would be exposed to a finding of liability on the basis of patents that are demonstrably invalid.

## C. CashEdge Has Acted Diligently.

As noted above, with respect to both the MileageManager and MaxMiles prior art, CashEdge's counsel notified Yodlee's counsel of its discoveries immediately. Barsky Decl., PP 4, 17, 20, Exh. A, L. Indeed, CashEdge's diligence contrasts markedly with the situation in O2 *Micro Int'l Ltd. v. Monolithic Power Systems, Inc.*, where the plaintiff waited three months after its discovery that its infringement theory was flawed to seek leave of the court to amend its Final Infringement Contentions, CashEdge has diligently pursued all leads and immediately turned over all information and documents to Yodlee. *See O2 Micro Int'l Ltd. v. Monolithic Power Systems, Inc., 467 F.3d 1355, 1366-67 (Fed. Cir. 2006)* (noting that the 'good cause' requires a showing of diligence" and finding that O2 Micro did not display the appropriate diligence in waiting "almost three months ... to serve its proposed amended contentions and two more weeks [**12] to formally move to amend.") CashEdge has also timely sought leave to amend its contentions.

Yodlee will no doubt ask why this prior art was not discovered sooner. In all candor, CashEdge does not have a completely satisfactory answer to this question, but notes that, according to Yodlee's counsel, Yodlee and its counsel were completely unaware of this prior art before it was brought to Yodlee's counsel's attention on March 30, 2007. Barsky Decl., PP 7, 9, Exh. D, F. Indeed, although the validity of the Yodlee patents have been litigated in previous lawsuits, Yodlee's counsel advises that this prior art has never previously surfaced in any of that litigation: "I have been working with Yodlee for over six years now, and have litigated four cases for them and this is the first I have heard of mileage manager." Barsky Decl., P 7, Exh. D.

Part of the problem may be due to the fact that web-based prior art, unlike published patents, scholarly articles, and other more traditional prior art, has never been catalogued scrupulously. Barsky Decl., PP 21-23, Exh. O-Q. Indeed, the '783 and '077 patents issued at a time when there was an intense public debate over the many shortfalls in the Patent [**13] Office's procedures for examining Internet-related patents. *See, e.g., Patent Office To Change Its Tune* (March 28, 2000) (*Wall St.* [*6] *Journal Online* report on overhaul of Internet-related patent examining procedures in the Patent Office following "criticism that some patents may choke off innovation in electronic commerce by granting exclusive rights to practices that aren't unique or new"); n3 *Net-Patent Boom Forces Patent Office To Seek Help* (September 20, 1999) (CNN report that "[o]ne of the primary criticisms leveled at the Patent Office is its alleged cursory searches of so-called "prior art," or previous inventions...," and noting that the Patent Office hired numerous additional examiners with computer science degrees to review Internet-related patent applications); n4 *Net Overloads U.S. Patent Agency* (May 4, 1999) (*WIRED* magazine report that a "growing problem" is the fact that the Patent Office "just doesn't *get* the Internet") (emphasis in original). n5 Barsky Decl., PP 21-23, Exh. O-Q.

n3

Accessible at http://news.zdnet.com/2100-9595_22-519541.html; *see also* Barsky Decl., P 21, Exh. O.

[**14]

n4

Accessible at http://www.cnn.com/TECH/computing/9909/20/net.patents.idg/index.html; *see also*

Page 6

2005 U.S. Dist. Ct. Motions 78773, *6; 2007 U.S. Dist. Ct. Motions LEXIS 43034, **14

Barsky Decl., P 22, Exh. P.

n5

Accessible at http://www.wired.com/politics/law/news/1999/05/19473; *see also* Barsky Decl., P 23, Exh. Q.

In sum, research of web-based prior art remains a difficult challenge, even to this day, and a successful search often turns-as it did in this case-on sheer luck.

**D. Public Policy Favors The Requested Amendment.**

The U.S. Supreme Court has, for decades, recognized the "strong federal policy favoring free competition in ideas which do not merit patent protection." *Lear v. Adkins, 395 U.S. 653, 656 (1969)*. In *Lear*, relying upon a strong public policy of eliminating invalid patents, the Supreme Court ruled that the taking of a license does not estop the licensee from challenging the validity of a patent. *See id. at 677.*

Here, given the national policy in favor of eliminating invalid patents, the fact that Yodlee cannot claim any unfair prejudice, and the extraordinary injustice [**15] that would arise if CashEdge were exposed to a risk of private liability on the basis of technology that is squarely within the public domain, the Court should grant the requested amendment. CashEdge is mindful of, and fully endorses, the fact that this Court's patent local rules-including the deadlines for invalidity [*7] contentions set by such rules-are integral to the proper management of patent litigation by the Court. At the same time, however, such procedural rules are typically *not* applied in such a way as to work a substantial injustice because of a procedural defect. Further, this motion falls squarely within Patent Local Rule 3-7 since good cause exists to permit CashEdge leave to amend.

**IV.**

**THE REQUESTED RELIEF & CONCLUSION**

As detailed above, the discovery of the MileageManager website has led to a cascade of material prior art that includes not only MaxMiles, but additional websites (such as www.status.com) as to which CashEdge is conducting an ongoing and vigorous investigation. CashEdge fully expects that, in the next few weeks, it will identify not only additional prior art, but that it will obtain (and immediately produce to Yodlee) additional [**16] documents substantiating such new art, as well as documents further corroborating the functionality of the MileageManager and MaxMiles websites. CashEdge will fully cooperate with Yodlee to ensure that Yodlee has ample time to conduct discovery relevant to all such prior art.

Dated: April 25, 2007

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP
Josh A. Krevitt, SBN 208552
Wayne M. Barsky, SBN 116731
Sarah E. Piepmeier, SBN 227094

Sarah E. Piepmeier
Attorneys for Defendant CASHEDGE, INC.

Page 7

2005 U.S. Dist. Ct. Motions 78773, *7; 2007 U.S. Dist. Ct. Motions LEXIS 43034, **16

[SEE [PROPOSED] ORDER GRANTING MOTION FOR LEAVE TO AMEND FINAL INVALIDITY CONTENTIONS IN ORIGINAL]

# EXHIBIT 3

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
--------------------------------x
ADVANCED MICRO DEVICES, INC.,
et al,

        Plaintiffs and
        CounterDefendants

        -against-         Case No.
                      3:08-CV-0986-SI
SAMSUNG ELECTRONICS CO., LTD.,
et al,

        Defendants and
        Counterclaimants.

--------------------------------x


(HIGHLY CONFIDENTIAL-OUTSIDE COUNSEL'S EYES

ONLY PORTIONS ARE ON THE FOLLOWING PAGES:

96-106; 112-113; 178; 180-192)



                CONFIDENTIAL


    VIDEOTAPE DEPOSITION of JOHN IACOPONI,

taken by the Defendants at the offices of

Covington & Burling, 620 Eighth Avenue, New York,

New York, on November 18, 2008, at 9:00 o'clock

a.m., before Catherine M. Donahue, a Certified

Court Reporter and Notary Public within and for

the State of New York.

140

1    prosecution of the '592 patent, would you have

2    thought it important to give it to the attorney

3    who was prosecuting that patent?

4         A.    I don't know.  I haven't read

5    through the entire article.  I do not know.

6         Q.    Based on that sentence, you can't

7    answer that?

8         A.    Based on that sentence, I cannot

9    answer that.

10         Q.    At the time of the prosecution of

11    the '592 patent, did you think it important to

12    give to the prosecuting attorney any references

13    that you knew of that referred to nitrogen

14    plasmas used to make contacts?

15         A.    I don't recall.

16         Q.    Do you think you would have thought

17    that was important?

18         A.    Again, I don't know, reflecting back

19    14 years, if I would have at that time thought

20    it important, no.  I do not know if I would have

21    thought it important.

22         Q.    Okay.

23               All right.  Let's turn to the page in

24    this Exhibit 1006, with 277, at the bottom.

25    This looks like it is the first page of an

1    article by Kazuyoshi Kamoshida.

2                Do you see that?

3        A.    Yes, I do.

4        Q.    Have you heard of Kazuyoshi

5    Kamoshida before?

6        A.    No, I have not.

7        Q.    Do you know if you have ever seen

8    this article before?

9        A.    I don't recall seeing this article

10   before, no.

11       Q.    Looking at the first paragraph under

12   Extended Abstract, on page 277 of Exhibit 1006,

13   the last sentence says, "The advantage of

14   nitrogen plasma bias treatment over thermal

15   nitriding treatment is that the Ti nitrite

16   formation can occur at a considerably lower

17   substrate temperature."

18                Do you see that?

19       A.    Yes, I see that sentence, yes.

20       Q.    I'm sorry?

21       A.    I see that.

22       Q.    That's the same point that you were

23   making earlier about one of the benefits of your

24   invention of the '592 patent?

25                MR. MARDER:  Again, I object to

1            the question as going into the specifics

2            of prior art language that AMD was not

3            aware, and it is beyond the scope of the

4            deposition.

5                    THE WITNESS:  Repeat your

6            question, please.

7                    MS. HASKETT:  Sure.

8    BY MS. HASKETT:

9        Q.   The point that's made in that

10   sentence about the advantage of using a nitrogen

11   plasma is that the temperature can be lower,

12   that's the same point that you were referring to

13   earlier about lower temperatures, right?

14       A.   I haven't seen this document before.

15   I don't know the context of the entire, entire

16   body; therefore, I do not know.

17       Q.   I would like you to turn just now to

18   the last page of Exhibit 1006.

19       A.   Okay.

20       Q.   There's some figures on that last

21   page.

22            Looking at those figures, does that

23   refresh your recollection as to whether you have

24   ever seen this article before?

25       A.   No, it does not.

143

1          Q.   So you still don't know if you have

2     seen this before?

3          A.   I still don't know if I have seen it

4     before.

5          Q.   All right.

6               MS. HASKETT:  I have another

7          document here that I would like to have

8          marked as Exhibit 1007, please.

9               (Document entitled 1993

10          Proceedings, Tenth International

11          VSLI Multilevel Interconnection

12          Conference, VMIC, dated June 8 to 9,

13          1993 was marked as Deposition

14          Exhibit 1007 for identification, as

15          of this date.)

16               MS. HASKETT:  For the record,

17          Exhibit 1007 says on the front 1993

18          Proceedings, Tenth International VSLI

19          Multilevel Interconnection Conference,

20          VMIC, and it has a date at the top left

21          of June 8 to June 9, 1993.

22     BY MS. HASKETT:

23          Q.   Mr. Iacoponi, do you recognize any

24     portion of Exhibit 1007?

25          A.   I haven't seen it before, so let me