

1   William H. Manning (*pro hac vice*)
    E-mail: WHManning@rkmc.com
2   Brad P. Engdahl (*pro hac vice*)
    E-mail: BPEngdahl@rkmc.com
3   Jacob S. Zimmerman (*pro hac vice*)
    E-mail: JSZimmerman@rkmc.com
4   Aaron R. Fahrenkrog (*pro hac vice*)
    E-mail: ARFahrenkrog@rkmc.com
5   **Robins, Kaplan, Miller & Ciresi L.L.P.**
    2800 LaSalle Plaza
6   800 LaSalle Avenue
    Minneapolis, MN  55402
7   Telephone:  612-349-8500
    Facsimile:  612-339-4181
8
    David E. Marder (*pro hac vice*)
9   E-mail: DEMarder@rkmc.com
    **Robins, Kaplan, Miller & Ciresi L.L.P.**
10  800 Boylston Street, 25th Floor
    Boston, MA 02199
11  Telephone:  617-267-2300
    Facsimile:  617-267-8288
12
    John P. Bovich (SBN 150688)
13  E-mail: JBovich@reedsmith.com
    **Reed Smith LLP**
14  Two Embarcadero Center, Suite 2000
    San Francisco, CA 94111
15  Telephone:  415-543-8700

16  Attorneys for Plaintiffs Advanced Micro
    Devices, Inc. and ATI Technologies ULC
17

18              UNITED STATES DISTRICT COURT

19              NORTHERN DISTRICT OF CALIFORNIA

20              SAN FRANCISCO DIVISION

21

22  ADVANCED MICRO DEVICES, INC.,          Case No.  CV-08-0986-SI
    et al.,
23                                          **DECLARATION OF ANDREW WOLFE,**
                    Plaintiffs,             **PH.D. IN SUPPORT OF PLAINTIFFS'**
24                                          **OPENING CLAIM CONSTRUCTION**
            v.                              **BRIEF**
25
    SAMSUNG ELECTRONICS CO., LTD.,
26  et al.,

27                  Defendants.

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

Dockets.Justia.com

1.     I make all of the statements in this Declaration of my own personal knowledge and in accord with 28 U.S.C. § 1746.

## I.     INTRODUCTION AND QUALIFICATIONS

2.     My qualifications for presenting the opinions in this declaration are as follows:  I have more than 25 years of experience as a computer architect, computer system designer, educator, and as an executive in the PC and electronics business.

3.     In 1985, I earned the B.S.E.E. degree in Electrical Engineering and Computer Science from The Johns Hopkins University.  In 1987, I received the M.S. degree in Electrical and Computer Engineering from Carnegie Mellon University and then in 1992, I received the Ph.D. degree in Computer Engineering from Carnegie Mellon University.  My doctoral dissertation proposed a new approach for the architecture of a computer processor.  In 1988 and 1989 I was a visiting graduate student in the IC testing and fault tolerance group at Stanford University.

4.     In 1983, I began designing microprocessor -based computer and memory systems and I/O cards for personal computers as a senior design engineer for Touch Technology, Inc.  In some of these design projects, I designed I/O cards for PC-compatible computer systems to interface interactive touch-based computer terminals that I designed for use in public information systems. I also developed user interface software for Apple and IBM-compatible computers.  In 1985, Touch Technology was acquired.  I continued as a technology development consultant working on special projects.  These included developing the company's first custom integrated circuit and continued development of microprocessor-based systems and I/O controllers. I also developed new sensor and controller technologies for military use.

5.     From 1986 through 1987, I designed and built a high-performance computer system at Carnegie Mellon University.  I led the design team and personally designed the processor, bus, and memory.  I led the assembly and debugging of the prototype system, developed and implemented the test plan, developed the first application program, and conducted the performance analysis.  At the time, this was one of the fastest computers ever built in a

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

workstation form factor. From 1986 through 1988, I also developed the curriculum and supervised the teaching lab for the advanced digital system design courses.

6. In 1989, I worked as a senior design engineer for ESL-TRW Advanced Technology Division. I designed and built a bus interface and memory system for a workstation-based computer system and worked on the design of a multiprocessor system.

7. At the end of 1989, along with some partners, I founded The Graphics Technology Company. As an officer and a consultant, I managed engineering development activities at that company and personally developed dozens of microprocessor-based computer systems over the next seven years.

8. I have consulted, formally and informally, for a number of processor design companies. In particular, I have served on the technical advisory boards for two processor design companies, BOPS, Inc., where I chaired the board, and Siroyan Ltd. I served in a similar role for three networking chip companies, Intellon, Inc., Comsilica, Inc, and Entridia, Inc and one 3D game accelerator company, Ageia, Inc. I have also served as a technology advisor to Motorola and to several venture capital funds in the U.S. and Europe.

9. From 1991 through 1997, I served on the Faculty of Princeton University as an Assistant Professor of Electrical Engineering. At Princeton, I taught undergraduate and graduate-level courses in Computer Architecture, Advanced Computer Architecture, and Microprocessor Systems courses as well as conducting sponsored research in the area of computer systems, multimedia, optoelectronic displays and related topics. From 1999 through 2002, I also taught the Computer Architecture course to both undergraduates and graduate students at Stanford University several times as a Consulting Professor. At Princeton, I received several teaching awards, both from students and from the School of Engineering. I have also taught advanced microprocessor architecture to industry professionals in IEEE and ACM sponsored seminars.

10. From 1997 through 2002, I held a variety of executive positions at a publicly-held electronics company originally called S3, Inc. and later called Sonicblue Inc. These included Chief Technology Officer, Vice President of Systems Integration Products, Senior Vice President

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

of Business Development, and Director of Technology. At the time I joined S3, it supplied graphics and multimedia accelerators for more than 50% of the PCs sold in the United States.

11.     In these roles, I managed teams of engineers developing complex semiconductor chips for use in personal computers. I supervised several engineering design teams that developed 3D graphics chips for notebook PCs. At various times, I supervised the development of embedded memory graphics products and SDRAM memory controllers as well as the video research lab. I was involved in every aspect of the relationship with PC manufacturers ranging from discussions of product requirements, testing and qualification procedures, and competitive analysis, to market segmentation and pricing discussions.

12.     I have published more than 50 peer-reviewed papers in computer architecture and computer systems design. I have also chaired IEEE and ACM conferences in microarchitecture and integrated circuit design. I hold 7 U.S. patents.

13.     I have been the invited keynote speaker at the ACM/IEEE International Symposium on Microarchitecture and at the International Conference on Multimedia. I have also been an invited speaker on various aspects of technology or the PC industry at numerous industry events including the Intel Developer's Forum, Microsoft Windows Hardware Engineering Conference, Microprocessor Forum, Embedded Systems Conference, Comdex, and Consumer Electronics Show as well as at the Harvard Business School, the University of Illinois Law School, and Stanford Law School. I have been interviewed on subjects related to technology and the electronics industry by publications such as the Wall Street Journal, New York Times, LA Times, Time, Newsweek, Forbes, and Fortune as well as CNN, NPR, and the BBC. I have also spoken at dozens of universities including MIT, Stanford, University of Texas, Carnegie Mellon, UCLA, University of Michigan, Rice, and Duke.

14.     My experience is also detailed in my curriculum vitae, attached to this Declaration.

15.     I am being compensated for my time working on this case at my customary rate of $395 per hour for work performed on the case. My compensation is not in any way related to the outcome of the case.

## II.   BASIS FOR OPINIONS

16.     In preparing for and writing this declaration and forming the opinions expressed herewith, I have reviewed the asserted patents 5,559,990 (the Cheng '990 patent), 5,623,434 (the Purcell '434 patent), 5,377,200 (the Pedneau '200 patent), and 6,784,879 (the Orr '879 patent) as well as their respective file histories. I have also reviewed the documents cited in this declaration and extrinsic evidence cited by Samsung in the parties' Joint Claim Construction and Prehearing Statement. In forming these opinions, I have also relied on more than 25 years of personal experience in the research and practice of computer systems and integrated circuit design and testing.

## III.   REBUTTAL/CRITIQUE OF UNDISCLOSED CLAIM CONSTRUCTION POSITIONS AND TESTIMONY OF SAMSUNG'S CLAIM CONSTRUCTION WITNESSES

17.     I have reviewed the parties' Joint Claim Construction and Prehearing Statement pursuant to Patent L.R. 4-3. In my opinion, many of Samsung's proposed constructions are vague, confusing, and lack sufficient detail to allow me to determine Samsung's claim construction positions. As such, I have not been able to formulate specific responses to any positions that Samsung may put forth that are not apparent from the text of its constructions nor any testimony that may be offered by Samsung's experts. If Samsung provides modified constructions, additional information, or additional testimony which I am asked to review, I will study any such submissions by Samsung and may comment on those submissions.

## IV.   INTRODUCTORY SUMMARY

18.     The Cheng '990 patent relates to computer memory. Memory in a computer stores and provides data to a processor or other device that requests it. Generally memory is comprised of an array of memory locations divided into rows and columns, and circuitry for accessing these locations. The registers and decoders are responsible for processing the address of a data request to identify its location in the array. The sense amplifiers "amplify" the contents of that location for output from the sense amplifier, and for eventual output to the requesting device. The array and the circuitry can be formed as a single integrated circuit, or as a plurality of integrated

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

circuits. The Cheng '990 patent improves computer memory by setting forth a memory with dedicated circuitry for each of its subarrays that enhances the performance of memory by providing for (1) high-performance burst modes, and (2) selective enabling of sense amplifiers.

19. The Purcell '434 patent relates to methods and apparatus for multiplying values in a processor using an arithmetic and logic unit for part of the operation. The '434 invention saves space and power in a processor by eliminating a carry propagate adder that was required to complete multiplication operations in prior art processors. The '434 patent describes connections between a "carry save stage," which performs one step in a multiplication operation, and an "arithmetic and logic unit" ("ALU") so that the ALU can complete the final step in the multiplication operation. Prior art processors contained both a "carry propagate adder" and an ALU, and the "carry propagate adder" performed the final multiplication step. The '434 invention also describes multiplexers that allow the ALU to either be used to complete multiplication operations or to be used to perform its standard arithmetic and logic operations.

20. The Pedneau '200 patent relates to methods and apparatus for controlling the power consumed by testing logic. It teaches "key logic" that controls the power consumed by testing logic based on a "key signal" and a "reset signal." "Testing logic" is used in a processor to determine whether the processor is working correctly. It is found in nearly all processors on the market today. Processors might contain many pieces of testing logic. Testing logic can be used during the manufacturing process, in order to identify defective parts, or it can be used once the processor has been incorporated into a functioning device, like a cell phone. Those electronic devices often use the testing logic to run tests upon power-up to check the operations of the processor.

21. The Orr '879 patent relates to methods and apparatus for controlling background video on an electronic device while keeping an application in focus. It describes a graphical user interface with a "video control icon" that the user can select to bring up a control panel that includes controls for video displayed in the background. At the same time, an application remains in focus in the foreground, and so is not obscured by the background video. The invention improves the user experience for working with multiple applications including video.

## V.   LEVEL OF ORDINARY SKILL IN THE ART

22.     It is my opinion that a person with the level of skill needed to implement and use the inventions in the Cheng '990 patent and the Pedneau '200 patent would have a bachelor degree in electrical or computer engineering or computer science, and at least two years experience working in integrated circuit development, or an equivalent combination of education and experience.  It is my opinion that a person with the level of skill needed to implement and use the inventions in the Orr '879 patent would have a bachelor degree in electrical or computer engineering or computer science or an equivalent combination of education and experience.  It is my opinion that a person with the level of skill needed to implement and use the inventions in the Purcell '434 patent would have a bachelor degree in electrical or computer engineering or computer science and a basic working knowledge of computer architecture or an equivalent combination of education and experience.

## VI.   HOW ONE OF ORDINARY SKILL IN THE ART WOULD VIEW THE PATENTS-IN-SUIT

23.     The intended audience for the disclosures of the Cheng '990, Purcell '434, Pedneau '200, and Orr '879 patents is one of ordinary skill in the art (*i.e.*, a skilled artisan).  A skilled artisan would be knowledgeable about the history of innovation in computer systems and digital circuits, the operation of prior art systems, and the usage of terminology within the field.  A patentee will often use a term of art without providing a specific definition or explanation as to its meaning.  In this case, a skilled artisan would apply the ordinary meaning within the art in order to interpret such a term in the patent claims.  However, where a patentee specifically defines a term or explains the usage or meaning of the term within the written description of the invention, the patentee's own definition would be understood by a skilled artisan to take precedence within the scope of this patent.  This is particularly important when the usage of a term in the claims would otherwise be ambiguous or vague.  This does not involve reading characteristics of any described embodiment into the claim language, but rather relying on explicit limitations placed on the patentee's use of specific claim terms within the specification or prosecution history or implicit limitations that are clear to a skilled artisan through context and

usage within the patent.  The patents at issue in this case require the use of both practices.  As described below, some terms are clearly defined or explained in these patents to be more specific than they may have been used elsewhere in the art while numerous other terms are not specifically defined and rely on their ordinary meaning to a skilled artisan.

24.     It is my understanding that the Court has been asked to construe the meaning of several terms from the claims of the patents at issue.  For some of these claim terms, it may be of assistance to the Court to consider the understanding of a skilled artisan in reading these terms in light of the specification.  As such, I have provided my understanding of the meaning of these claim terms below in the context of the patents, as well as highlighting portions of the patent specifications that are particularly useful to a skilled artisan in understanding the patentee's usage of these claim terms.

## VII.    CLAIM TERMS AT ISSUE IN THE CHENG '990 PATENT

### A.    "Integrated Memory"

25.     The claim term "integrated memory" appears in the preamble of claim 20 in the Cheng '990 patent and thus also is incorporated into dependent claims 22-23.  The patent specification clearly contemplated embodiments of disclosed inventions which are fabricated in a single integrated circuit and embodiments which are not limited to a single integrated circuit, for example, explaining that "[m]emory 810 is fabricated in an integrated circuit in some embodiments," '990 at 7:9-10, further explaining that, "the physical column number represents the physical position of the column in the integrated circuit." '990 at 7:16-7:18.  At the same time, it is made clear that "some embodiments are not integrated into one integrated circuit." '990 at 13:8-9.

26.     The structure of other claims also supports the inclusion of both forms of the inventions in the patent.  Dependent claim 6 includes the limitation "the memory of claim 1 wherein said memory is fabricated in an integrated circuit."  Similarly, dependent claim 14 includes the limitation "the memory of claim 8 wherein said memory is fabricated in an integrated circuit."  This clearly limits claims 6 and 14 to embodiments in which the claimed elements are fabricated in a single integrated circuit while claims 1 and 8 encompasses the broader scope of

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

embodiments in which this limitation is not necessarily present. In light of these teachings, one of ordinary skill would unquestionably understand that some claims in this patent apply to embodiments where the memory is fabricated in a single integrated circuit and some claims are broader in scope and apply to memories in general.

27.     In this context, one of ordinary skill would read the preamble of claim 20, "[a]n integrated memory comprising," to be a limitation instructive of the scope of the claim. The use of the term "integrated memory" as opposed to the use of the broader term "memory" in claims 1, 8, 15, and 19 clearly indicates that claim 20 and its dependents are directed towards the single integrated circuit embodiments disclosed in the specification. Furthermore, a single integrated circuit is not inherent to the remaining claim elements of claim 20. Integrated appears nowhere in claim 20 other than the preamble. The patentee's use of "integrated" in the preamble to claim 20, therefore, signifies to one of ordinary skill that claim 20 requires the memory to be fabricated in an integrated circuit.

28.     The patent also provides specific teachings as to what "integrated memory" means in the claims. As I have explained, the limitation refers back to the disclosed embodiments that are "fabricated in an integrated circuit." '990 at 7:9-10. The word "an" is explicitly singular in this context to one of ordinary skill in the art, differentiating an embodiment that is fabricated in one integrated circuit from embodiments that are comprised of multiple integrated circuits. As such, "integrated memory" means "a memory fabricated in a single integrated circuit" in these claims. This is consistent with ordinary use of this term in the field at the time of the patent filing.

29.     The file history contains an explicit example of what integrated memory meant to one of ordinary skill at the time of the invention. Patent No. 4,636,986, awarded to Raymond Pinkham in 1987 was cited and considered by the examiner during prosecution. Office Action, June 13, 1994 at 3. Pinkham describes an integrated memory as being a memory on a single semiconductor chip. Pinkham '986 at 2:11-22. This is consistent with the understanding of one of ordinary skill in the art at the time of the invention that an integrated memory refers to a

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1   memory on a single semiconductor chip, as opposed to a memory that requires multiple

2   semiconductor chips.

3         **B.**    **"Burst Mode;" "Burst Mode Operation;" "Burst Mode Read Operation"**

4         30.      The term "burst mode" appears alone in asserted claims 1-7.  The similar term

5   "burst mode operation" appears in asserted claims 8-14 and the similar term "burst mode read

6   operation" appears in claims 20 and 22-23.  "Burst mode" is a term of art in memory devices and

7   systems.  A "burst mode operation" in the context of this patent is a serial transfer in which the

8   contents of a plurality of locations are provided in response to the address of one location.  As

9   such, a burst mode read operation has the same meaning as a burst mode operation.  Similarly,

10  burst mode is a serial transfer mode in which a memory transfers the contents of a plurality of

11  locations in response to the address of one location.

12        31.      A burst mode operation differs from a serial transfer, which is a transfer involving

13  several memory locations where the memory locations are output one at a time.  A serial transfer

14  also differs from a block transfer, in which several memory locations are output simultaneously.

15        32.      The patent clearly differentiates burst mode from "random (non-burst)" mode.

16  '990 at 4:5-6.  It also teaches that a burst mode operation occurs in response to a single address.

17  '990 at 7:58-59.  Most convincingly, however, the applicant clearly defines burst mode with

18  respect to this patent to one of ordinary skill in the art by distinguishing the invention from the

19  prior art disclosures by Kobayashi, Pinkham, and Rao.

20

21          `Claim 2 is supported by Applicants' Figs. 3 and 8.  In the`

22      `embodiments of Figs. 3 and 8, the burst mode provides a fast`

23      `sequential memory access because contents of several locations`

24      `are provided in response to one address.  Specification,`

25      `page 2, lines 27-28.`

26  Amendment, Mar. 21, 1994, at 14.

27

28

The Office Action erroneously states in page 3:

> A burst mode transfer is nothing more than
> a beginning mode address and an ending
> address which is equivalent to serial
> transfer ... .

This is incorrect. A burst mode transfer as claimed in
Claim 2 is not any serial transfer but a serial transfer in
which the contents of a plurality of locations are provided in
response to the address of one location. The contents of a
plurality of locations could be provided in response to the
addresses of the plurality of locations in a serial transfer.
Each location could be read out in response to its respective
address. Such a serial transfer would not be a burst mode
transfer as claimed in Claim 2.

Amendment, Apr. 27, 1995, at 4.

> Claim 2 distinguishes from Pinkham and Rao, taken singly
> or together, by reciting a burst mode in which a memory
> receives an address of one location and provides in response
>
> contents of a plurality of locations in rows having different
> row addresses.

Amendment, Apr. 27, 1995, at 3-4.

33.     The patent specification refers to a specific type of burst mode access to be
provided in some embodiments in which "a memory is read sequentially (that is, consecutive
reads access memory locations at consecutive addresses) . . . ." '990 at 1:37-44. The patent uses
the term "consecutive locations" to refer to the consecutive addresses in this operation. This is
unrelated to the physical location of the memory cells. As this is only exemplary, one of ordinary
skill would prefer a definition of burst mode that does not depend on this specific type of burst

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

mode access. However, if this specific characteristic from the specification is incorporated into the claim construction, it should be incorporated as consecutive addresses, and not consecutive locations.

### C. "Consecutive Addresses;" "Consecutively Addressed Memory Locations L1 . . . Ln;" "The Locations L1 and L2, in the Sequence of Consecutive Addresses"

34.     The term "consecutive addresses" appears in asserted claims 1-14, 20, and 22-23. The phrase "the locations L1 and L2, in the sequence of consecutive addresses" appears in asserted claims 1-7 and the phrase "consecutively addressed memory locations L1…Ln" appears in asserted claims 8-14. The term "consecutive addresses" has no special meaning in the patent or in the art other than the normal use of the word "address" in the art as the identifier of a memory location. The word "consecutive" indicates some order or sequence.

35.     The ordinary meaning of "consecutive addresses" is "addresses following one after the other in order." The ordinary meaning of the phrase "consecutively addressed memory locations L1…Ln" is "locations corresponding to addresses following one after the other in order." The ordinary meaning of the phrase "the locations L1 and L2, in the sequence of consecutive addresses" is "two locations corresponding to addresses following one after the other in order."

36.     Clearly, the claim terms Samsung has identified for construction cannot be limited to sequences in which each memory output corresponding to a given sequential address will contain data from only a single memory cell. The patent clearly states that "in some embodiments, each memory location M-i includes several memory cells, for example, 8 cells as in Fig. 5." '990 at 6:10-12. In the context of this patent, a cell is only one bit of memory. Figures 8-28 and the accompanying text ('990 at 7:5 – 12:67) disclose an embodiment where each memory output corresponding to a given sequential address contains data from eight memory cells.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

**D.    "Sense Amplifiers . . . Are Enabled;" "Sense Amplifiers . . . Are Disabled;" "A Control Circuit for Selectively Enabling Said Sense Amplifier Circuits;" "The Control Circuit Enables Said Sense Amplifier Circuit"**

37.    Sense amplifiers are a term of art in memory circuits. The term describes a specific class of amplifiers that is used to increase the speed and reliability of memory arrays, particularly when performing a read operation. Digital circuits, including memories, are most commonly enabled or disabled based on an input signal that controls their functionality. This type of an enable signal is disclosed in Figure 25A/25B of the patent for each of the sense amplifiers in the embodiment presented. This input to the sense amplifier is labeled EN which represents a control signal (produced by the logic circuit in Figures 25 and 26). The patent describes the control function of these signals as "enabling" and "disabling" the sense amplifiers:

> Cells SHL-0 through SHL-3 generate, on the respective lines 350.L-0 through 350.L-3, enable signals SAENBL0-SAENBL3 to respective sense amplifier circuits 330.L-0 through 330.L-3. When line 350.L-i is low, the sense amplifier circuit 330.L-i is enabled to develop the signal on its output. When the line 350.L-i is high, sense amplifier 330.L-i is disabled.

> Similarly, cells SHR-0 through SHR-3 provide on the respective lines 350.R-0 through 350.R-3 the enable signals SAENBR0-SAENBR3 to the respective sense amplifier circuits 330.R-0 through 330.R-1.

'990 at 11:20-31.

38.    This passage clearly provides the applicant's definition of "enabled" and "disabled" with respect to the sense amplifiers. Because the disclosed sense amplifiers, as is typical for sense amplifiers, only have two states, sense amplifiers are enabled when they are selected to develop a signal on their outputs, and are disabled when they are not selected to develop a signal on their outputs. The claimed control circuit, which is disclosed in one embodiment as cells SHL-0 through SHL-3 and SHR-0 through SHR-3, is a circuit that selects sense amplifier circuits to develop a signal on their outputs.

39.    The applicant further explained the function of enabling and disabling the sense amplifiers in differentiating the invention from Pinkham and Rao by explaining that enabled

sense amplifiers amplify the contents of a location and disabled sense amplifiers do not. This is the same as developing a signal on the output of a sense amplifier.

> Claim 4 dependent from Claim 2 further distinguishes from Pinkham and Rao, taken singly or together, by reciting that when the contents of a location L1 are being transferred in burst mode from one or more sense amplifiers to the memory output and the contents of another location L2 are being transferred from L2 to one or more sense amplifiers, the sense amplifiers from which the contents of L1 are being transferred are enabled and the sense amplifiers to which the contents of L2 are being transferred are disabled, but these latter sense amplifiers become enabled subsequently for amplifying the contents of L2.

Amendment, Apr. 27, 1995, at 5.

40.    Samsung's proposed construction for claims 3, 8 and 23 does not correspond to the claim language, and is not consistent with the operation of a sense amplifier as presented in the patent, or as understood by one of ordinary skill. Neither claims 3, 8 nor 23 indicate that each sense amplifier must be disabled when data is being transferred from a memory location to the sense amplifier. In fact, the normal operation of a sense amplifier is that it would be enabled to develop a signal on its output when data is being transferred from a memory location to the sense amplifier. Furthermore, neither claims 3, 8 nor 23 indicate that each sense amplifier must be enabled when data is being transferred from the sense amplifier output to the memory output. Additionally, the claims to not require that any sense amplifier be enabled during the *entire* time that data is being transferred to the memory output. In fact, the normal operation of a sense amplifier is that it need not be enabled to develop a signal on its output for the entire duration of when data is being transferred from the sense amplifier output to the memory output.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

# VIII. CLAIM TERMS AT ISSUE IN THE PURCELL '434 PATENT

## A. "Arithmetic and Logic Unit"

41.     In the context of digital electronics, where a reference discusses both arithmetic and logic operations, the arithmetic operations refer to traditional arithmetic operations like add, subtract, multiply, and divide, while the logic operations refer to those that are unique to Boolean logic, such as bitwise AND, OR, and NOT.  Complex processor operations are performed through combinations of these basic arithmetic and logic operations.  This would have been the understanding of one of ordinary skill in the art in 1994, when the '434 patent was filed.  The term "arithmetic and logic unit" in the '434 claims and specification refers to both arithmetic and logic operations and would necessarily include operations from each of these categories.  Therefore, the proper construction of "arithmetic and logic unit" is a unit that can perform both arithmetic and logic operations.

42.     Boolean logic operations like AND and OR perform decision functions on binary input values.  "Binary" values are made up of either zeroes (0s) or ones (1s).

43.     The OR logic operation evaluates whether either of two input values equals 1.  If so, the circuit performing the OR operation outputs the value 1.  If neither value equals 1, the circuit outputs the value 0.  The AND logic operation evaluates whether both of two input values equal 1.  If so, the circuit performing the AND operation outputs a 1.  If both values do not equal 1, the circuit outputs the value 0.

## B. "Bus Coupling Said Carry Save Stage to Said ALU"

44.     The ordinary meaning of "coupling" to one of skill in the art in 1994 when the '434 patent was filed would have been "capable of transferring information."  The 1993 edition of the New IEEE Standard Dictionary of Electrical and Electronics Terms is consistent with this understanding, defining "coupling" in the data transmission context as "the association of two or more circuits or systems in such a way that power or signal information may be transferred from one to another."  This definition is appropriate for the '434 patent because the patent describes buses for transferring information between circuits that perform operations on the information.

45.     All disclosed embodiments of the '434 patent, as shown in Figures 2 and 3, incorporate indirect connections between the carry save stage 210 and the ALU 230, in which intervening structures, including multiplexers and registers, are present.  Multiplexers 242 and 243 each select one of the two input values to pass on to registers 231 and 232, which store the values passed by multiplexers 242 and 243.  '434 at Fig. 2, Fig. 3.   These intervening structures are consistent with AMD's proposed construction, "bus that can transfer information between the carry save stage and the ALU," and inconsistent with Samsung's proposed construction, "direct physical path between the carry save stage and ALU that does not modify the value from the carry save stage."  Samsung's "direct physical path" would exclude indirect connections with intervening structures, and would exclude all disclosed embodiments from claims 1-4.

46.     Claims 1 and 3 confirm that the "bus coupling said carry save stage to said ALU" does not require a direct physical path between the carry save stage and ALU.  Consistent with the embodiments disclosed in the patent, claim 1 recites first and second multiplexers "coupled between" each bus and the ALU.  Claim 3, which depends from claim 1, further recites first and second registers "coupled between" the multiplexers and the ALU.  These structures "coupled between" the buses and the ALU show that a "direct physical path" is not required.

47.     Based on the intrinsic evidence, one of ordinary skill would understand "bus coupling said carry save stage to said ALU" to mean "bus that can transfer information between the carry save stage and the ALU," without requiring a direct physical path or any additional limitations.

## IX.     CLAIM TERMS AT ISSUE IN THE PEDNEAU `200 PATENT

### A.     Data Pattern

48.     "Data pattern" is a very broad term of art referring to a bit sequence or pattern of bits.  The term would have been used this way in 1992, when the '200 patent was filed.  The word "data" is in itself broad, and refers to general information.  The term does not exclude a bit sequence that represents an instruction or a bit sequence that represents an address.  The dictionaries cited by Samsung support this as their primary definition of "data."  Those dictionary

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

definitions explicitly explain that the term "data" can be used multiple ways, but that the term is presumed to have a very general meaning.

49.     There are specific instances in the art where one names specific categories of information, such as addresses and instructions, and casually refers to remaining categories of information as "data," meaning general information.  This is not one of those instances, since the patentee never specifically identifies any categories of information as unique.  In the '200 patent, the data is important because of its effect as a "key signal" on the key logic, not because it does or does not represent an address or instruction.  The '200 patent has no reason to exclude any kind of "data" and so uses the term "data" generally and consistently with its ordinary, inclusive meaning.

## X.     CLAIM TERMS AT ISSUE IN THE ORR `879 PATENT

### A.     Control Panel

50.      "Control panel" is a commonly used word that has entered the general vocabulary, and would have by 1997 when the '879 patent was filed.  In my opinion, an ordinary juror would understand what a "control panel" is through a variety of everyday life experiences using electronic devices.  The meaning of "control panel" in the '879 patent is in no way more limiting than the ordinary meaning, so the term needs no construction.

51.     Samsung has taken the position that the term "control panel" should be limited to something that appears on a personal computer display.  In my opinion as one of ordinary skill reading the patent, the specification does not support such a narrow construction.  Nothing in the intrinsic record suggests that "control panel" should exclude any kind of electronic device.

52.     The asserted claims 11-24 of the '879 patent do not recite a "personal computer" or "computer."  They do not recite all aspects of a complete system that displays video.  They recite only the "video graphics processor" subsystem or "digital storage device" subsystem and the user interface functions each provides.  The claims recite that those subsystems must contain a "processing unit" that reads "programming instructions."  Televisions and cell phones, for example, contain processing units and provide user interface operations using programming instructions.  Those kinds of subsystems would be useful in many types of electronic devices,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1    such as televisions, cell phones, computers, camcorders, or digital cameras.  The kind of

2    electronic device where the "video graphics processor" or "digital storage device" may be used is

3    not claimed in asserted claims 11-24.

4        53.      Figure 2 of the '879 patent illustrates a display connected to processing system 40.

5    Processing system 40 is shown to be a generic digital video system with no indication that it is

6    limited to a personal computer.  The discussion of Figure 2 at column 2, lines 49-60 indicates that

7    "central processing unit 42 may include a microprocessor, microcontroller, a digital signal

8    processor, a microcomputer, or any other means for processing digital information based on

9    programming instructions."  Many of these disclosed central processing units, particularly a

10   digital signal processor, would not have been characteristic of a personal computer at the time of

11   the invention.  Instead, they may have represented a processor used in a television, cellular phone,

12   or other electronic device.

13       54.      The specification shows that the claimed display is not limited to a personal

14   computer display.  The description of Figure 3 at column 3, lines 4-14 specifically teaches that

15   "live video may be displayed on a computer display, a television, or a monitor."  One of ordinary

16   skill would thus understand that this invention is not limited to a personal computer, but includes

17   televisions and other devices that display on a monitor.

18       55.      Claim differentiation shows that in fact, the term display as used in the claims is

19   even broader than the computer display, television, or monitor described in column 3 of the

20   specification.   Claim 1 recites "live video that is being presented as a background on a display."

21   Claim 5 is a dependent claim that further limits claim 1 to "providing the live video as the

22   background on a computer display, a television, or a monitor."  Claim 10 limits a step in claim 6

23   using the same language.  Claim 1 and claim 6 therefore incorporate a display which may have a

24   scope broader than the computer display, television, or monitor limitation of claims 5 and 10.

25   Independent claims 11, 14, 17, and 21 recite the same "live video that is being presented as a

26   background on a display" as claims 1 and 6.  One of ordinary skill would therefore understand

27   that the word "display" is used the same way throughout the claims.

28

56.     I have further reviewed additional portions of the intrinsic record, including U.S. Patent No. 5,761,417 to Henley et al., which was cited and considered by the examiner in reviewing the '879 patent for allowance.  At column 19, lines 10-19, Henley discusses a "control panel" as part of a "media streamer" device.  Henley's media streamer device would not be understood to be a personal computer to one of ordinary skill, and in fact Henley separately defines a "personal computer" as something different than his media streamer.  '417 at col. 5, ll. 57-58.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 15th day of March, 2009, at Los Gatos, California.

Andrew Wolfe, Ph.D.

# Andrew Wolfe Ph.D.

108 Leewood Ct.
Los Gatos, CA 95032
(408) 394-1096
Email: awolfe@awolfe.org

**Education:**

Ph.D. in Computer Engineering, Carnegie Mellon University, 1992
Visiting Graduate Student, Center for Reliable Computing, Stanford University, 1988-1989
M.S. in Electrical and Computer Engineering, Carnegie Mellon University, 1987
B.S.E.E. in Electrical Engineering and Computer Science, The Johns Hopkins University, 1985

**Recent Employment:**

Consultant, [October 2002-]

Consultant on processor technology, computer systems, consumer electronics, software, design tools, and intellectual property issues.

Chief Technical Officer & Founder, [May 2003- Nov. 2003]

**RGB Inc,** Los Altos, CA

Responsible for detailed architecture of a complex video SOC for a pre-funding fabless semiconductor company. Responsibilities include developing detailed architectural specifications for programmable video signal processors as well as all other signal processing, control, communications, and memory interface circuits as well as defining development processes for hardware and software and managing the development of simulation and programming tools. Also responsible for product definition and financing along with the CEO.

Chief Technical Officer, [1999-2002]
Sr. VP of Business Development, [2001-2002]
VP, Systems Integration, S3 Fellow , [1998 – 1999]
Director of Technology, S3 Fellow , [1997 - 1998]
**SONIC|blue, Inc**, Santa Clara, CA  (formerly S3 Inc.)

**Strategic Business Development:**
Developed and implemented strategy to reposition S3 from PC graphics into the leading networked consumer electronics company.
- Acquired Diamond Multimedia and coordinated integration of communications, Rio digital music, and workstation graphics divisions into S3.
- Identified and negotiated acquisitions to grow digital media businesses including Empeg, ReplayTV, and Sensory Science.
- Identified and negotiated strategic investments including Comsilica, Intellon, KBGear Interactive, Entridia, DataPlay and others.
- Developed strategy for integrated graphics/core-logic products and established a joint venture with Via Technologies to design and market these products.
- Negotiated divestiture of graphics chip business to Via and the workstation graphics division to ATI.

**Product Planning and Development:**
- Drove roadmap development within SONICblue product divisions.
- Managed Business Development for all product lines.
- Led New Product Development and Corporate Vision processes.
- Acting co-General Manager of Rio digital music business in 2nd half of 2001. Responsible for all areas of product development, business development, and cost management.

- Managed development of the Savage/MX and Savage/IX mobile 3D graphics accelerators and Savage/NB system logic products.

**Public Relations, Public Policy and Investor Relations:**
- Present company products and strategy at industry events such as CES, Comdex, and Microprocessor Forum.
- Discuss new products and initiatives with the press.
- Promote issues of interest to SONICblue to industry groups and in Washington.
- Brief analysts, and investors on company progress. Participate in quarterly conference calls.

**IP Management and Licensing:**
- Negotiated and managed partnership agreements including a critical cross-licensing agreement with Intel.
- Renegotiated technology-licensing agreements with IBM for workstation graphics products.
- Evaluated outside technology opportunities, managed video research and development, and managed corporate IP strategy with legal staff including patent filings, cross licensing, and litigation.

Consulting Professor , [1999-2002]
**Stanford University**, Stanford, CA

Teaching computer architecture and microprocessor design.

Assistant Professor  [1991 - 1997]
**Princeton University**, Princeton, NJ

Teaching and research in the Electrical Engineering department. Research in embedded computing systems, multimedia, video signal processors, compiler optimization, and high performance computer architecture. Principal investigator or project manager for ~$6M in funded research.

Visiting Assistant Professor , [1992]
**Carnegie Mellon University**, Pittsburgh, PA

Research and preparation of teaching materials on advanced microprocessor designs including new superscalar and superpipelined processor architectures.

Founder and Vice President and Consultant, [1989 - 1995]
**The Graphics Technology Company, Inc.**, Austin, TX

Founded company to develop touch-sensitive components and systems for the first generation of PDA devices and interactive public systems. Obtained financing from Gunze Corp., Osaka, Japan. Company is now part of 3M.

Senior Electrical Engineer, [1989]
**ESL - TRW, Advanced Technology Division**, Sunnyvale, CA

Designed the architecture for an Intel i860-based multiple-processor digital signal processing system for advanced military applications. Designed several FPGA interface chips for VME-bus systems.

Design Consultant, [1986 -1987]
**Carroll Touch Division, AMP Inc.**, Round Rock, TX

Developed several new technologies for touch-screen systems. Designed the first ASIC produced for AMP, a mixed-signal interface chip for controlling touch-screen sensors. Developed the system electronics, system firmware, and customer utility software for numerous products including those based on the new ASIC.

Senior Design Engineer, [1983 -1985]
**Touch Technology Inc.**, Annapolis, MD

**Advisory Boards:**

Director, KBGear Interactive, Inc., Comsilica, Inc., Rioport.com, various S3 subsidiaries.

Technical Advisory Board, Ageia, Inc., Intellon, Inc., Comsilica, Inc., Entridia, Inc., Siroyan, Ltd., BOPS, Inc, Quester Venture Funds

Carnegie Mellon University Silicon Valley Advisory Board

**Awards:**

Business 2.0 "20 Young Executives You Need to Know", 2002
Walter C. Johnson Prize for Teaching Excellence, 1997.
Princeton University Engineering Council Excellence in Teaching Award, Spring 1996
AT&T/Lucent Foundation Research Award, 1996.
Walter C. Johnson Prize for Teaching Excellence, 1995
IEEE Certificate of Appreciation, 1995, 2001.
AT&T Foundation Research Award, 1993.
Semiconductor Research Corporation Fellow, 1986 - 1991.
Burroughs Corporation Fellowship in Engineering, 1985 - 1986.

**Patents:**

U. S. Pat. 5,041,701 - *Edge Linearization Device for a Contact Input System*, Aug. 20, 1991.
U. S. Pat. 5,438,168 - *Touch Panel*, Aug. 1, 1995.
U. S. Pat. 5,736,688 - *Curvilinear Linearization Device for Touch Systems*, Apr. 7, 1998.
U. S. Pat. 6,037,930 - *Multimodal touch sensitive peripheral device*, March 14, 2000.
U. S. Pat. 6,408,421 - *High-speed asynchronous decoder circuit for variable-length coded data*, June 18, 2002.
U. S. Pat. 6,865,668 - *Variable-length, high-speed, asynchronous decoder circuit*, March 8, 2005
U. S. Pat. 7,079,133 - *Superscalar 3D Graphics Engine*, July 18, 2006
Various foreign equivalents submitted.

**Professional Activities:**

Program Chair:  Micro-24, 1991, Hot Chips 13, 2001.

General Chair:  Micro-26, 1993, Micro-33, 2000.

Associate Editor:  IEEE Computer Architecture Letters; ACM Transactions in Embedded Computing Systems

Speaker at CES, WinHec, Comdex, Intel Dev. Forum, Digital Media Summit, Microprocessor Forum, etc.

Keynote speaker at Micro-34, ICME 2002

**Over 50 refereed publications.**