1   William H. Manning (*pro hac vice*)
    E-mail: WHManning@rkmc.com
2   Cole M. Fauver (*pro hac vice*)
    E-mail: CMFauver@rkmc.com
3   Anthony G. Beasley (*pro hac vice*)
    E-mail: AGBeasley@rkmc.com
4   **Robins, Kaplan, Miller & Ciresi L.L.P.**
    2800 LaSalle Plaza
5   800 LaSalle Avenue
    Minneapolis, MN 55402-2015
6   Telephone:    612-349-8500
    Facsimile:    612-339-4181
7
    John P. Bovich (SBN 150688)
8   E-mail: JBovich@reedsmith.com
    **Reed Smith LLP**
9   Two Embarcadero Center, Suite 2000
    San Francisco, CA 94111
10  Telephone:    415-543-8700
    Facsimile:    415-391-8269
11
    Attorneys for Plaintiffs and Counterclaim-Defendants
12  Advanced Micro Devices, Inc. and ATI Technologies,
    ULC
13
                    UNITED STATES DISTRICT COURT
14
                  NORTHERN DISTRICT OF CALIFORNIA
15
                      SAN FRANCISCO DIVISION
16

17
    SAMSUNG ELECTRONICS CO., LTD.,          Case No. CV-08-0986-SI
18
                    Counterclaim-Plaintiff,
19
    v.                                       **COUNTERCLAIM-DEFENDANTS'**
20                                           **RESPONSIVE CLAIM CONSTRUCTION**
    ADVANCED MICRO DEVICES, INC., et        **BRIEF**
21  al.,
                                             DATE:  May 6-7, 2009
22                  Counterclaim-Defendants. TIME:  3:30 p.m.
                                             COURTROOM:  10, 19th Floor
23                                           JUDGE:  The Honorable Susan Illston
24
25
26
27
28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................. 1

I.    CLAIM CONSTRUCTION PRINCIPLES ............................................ 1

II.   THE BLOMGREN '750 PATENT .................................................... 3

      A.    Background of the Technology ............................................ 3

      B.    "Separate Instruction Sets" ................................................ 4

            1.    The applicants relied on "separate instruction sets" from the
                  preamble to distinguish prior art. ............................................ 5

            2.    The '750 patent explicitly ties "separate instruction sets" to
                  independent CISC (x86) and RISC (PowerPC) instruction set
                  encodings. ........................................................................ 7

            3.    "Instruction sets" are architectures ...................................... 8

            4.    The applicant expressly disclaimed "mere extensions" of
                  instruction sets during prosecution ........................................ 9

III.  THE JANG '065 PATENT ............................................................ 11

      A.    Background of the Technology .......................................... 11

      B.    Construction of Terms at Issue ......................................... 12

            1.    "Accumulatively Averaging Working Conditions" ................... 13

                  a.    "Accumulatively" is an important limitation. ................ 13

                  b.    "Accumulative averaging" is a specific mathematical
                        operation ................................................................ 14

                  c.    "Working conditions" are groups of settable parameters. ........... 15

            2.    "Extracting a Correction Condition" .................................... 16

            3.    "Corresponding to an Alignment State" ............................... 17

CONCLUSION ................................................................................... 20

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

# TABLE OF AUTHORITIES

**Page**

**Cases**

*800 Adept, Inc. v. Murex Secs., Ltd.,*
539 F.3d 1354 (Fed. Cir. 2008)............................................................................... 11

*Andersen Corp. v. Fiber Composites, LLC,*
474 F.3d 1361 (Fed. Cir. 2007)................................................................................. 8

*Bass Pro Trademarks, L.L.C. v. Cabela's, Inc.,*
485 F.3d 1364 (Fed. Cir. 2007)................................................................................. 6

*Bicon, Inc. v. Straumann Co.,*
441 F.3d 945 (Fed. Cir. 2006)................................................................................. 13

*Boston Scientific Scimed, Inc. v. Cordis Corp.,*
554 F.3d 982 (Fed. Cir. 2009)................................................................................... 3

*Catalina Mktg. v. Coolsavings.com, Inc.,*
289 F.3d 801 (Fed. Cir. 2002)................................................................................... 6

*Chimie v. PPG Indus.,*
402 F.3d 1371 (Fed. Cir. 2005)......................................................................... 10, 11

*Computer Docking Station Corp. v. Dell, Inc.,*
519 F.3d 1366 (Fed. Cir. 2008)...................................................................... 2, 9, 10

*Corning Glass Works v. Sumitomo Electrics U.S.A., Inc.,*
868 F.2d 1251 (Fed. Cir. 1989)................................................................................. 5

*Digital Biometrics, Inc. v. Identix, Inc.,*
149 F.3d 1335 (Fed. Cir. 1998)................................................................................. 5

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.,*
540 F.3d 1337 (Fed. Cir. 2008)................................................................................. 3

*ICU Med., Inc. v. Alaris Med. Sys., Inc.,*
Slip Op. No. 2008-1077 (Fed. Cir. Mar. 13, 2009)........................................ 1, 2, 20

*Irdeto Access, Inc. v. Echostar Satellite Corp.,*
383 F.3d 1295 (Fed. Cir. 2004)......................................................................... 15, 16

*Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.,*
Nos. 2007-1340, 2009 WL 223733 (Fed. Cir. Feb. 2, 2009)............................. 1, 12

*Kyocera Wireless Corp. v. Int'l Trade Comm'n,*
545 F.3d 1340 (Fed. Cir. 2008)................................................................................. 2

*Markman v. Westview Instruments, Inc.,*
517 U.S. 370 (1996).................................................................................................. 1

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
   357 F.3d 1340 (Fed. Cir. 2004).................................................................. 2, 9

*Nystrom v. TREX Co., Inc.*,
   424 F.3d 1136 (Fed. Cir. 2005).................................................................. 2

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003).......................................................... 2, 5, 7

*Ormco Corp. v. Align Tech., Inc.*,
   498 F.3d 1307 (Fed. Cir. 2007)................................................................ 13

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005).............................................. 1, 2, 3, 8, 9, 12, 15

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
   182 F.3d 1298 (Fed. Cir. 1999)................................................................. 6

*Purdue Pharma L.P. v. Endo Pharms., Inc.*,
   438 F.3d 1123 (Fed. Cir. 2006)................................................................. 9

*Regents of the Univ. of Calif. v. Dakocytomation Calif., Inc.*,
   517 F.3d 1364 (Fed. Cir. 2008)................................................................. 2

*Schriber-Schroth Co. v. Cleveland Trust Co.*,
   311 U.S. 211 (1940)............................................................................... 5

*Shire Labs., Inc. v. Corepharma, LLC*,
   2008 WL 819996 (D.N.J. Mar. 26, 2008).................................................. 19

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
   473 F.3d 1173 (Fed. Cir. 2006)............................................................... 20

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)................................................................. 1

**Statutes**

35 U.S.C. § 112................................................................................... 16

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1             **INTRODUCTION**

2        Samsung is facing potential liability for infringement of seven AMD patents. In response,

3  Samsung gathered six counterclaim patents, hoping to partially offset its large exposure. But

4  Samsung cannot succeed with its patents as they exist. Therefore, Samsung has proposed hopelessly

5  overbroad constructions for the terms at issue. For U.S. Patent No. 5,781,750 (Blomgren), Samsung

6  wholly ignores the extensive prosecution history and the repeated limiting arguments made to secure

7  allowance. For U.S. Patent No. 5,740,065 (Jang), Samsung ignores key claim terms and essentially

8  asks for constructions covering *any* calculations using *any* information in process control, rather than

9  the specific methods taught and claimed. Samsung's positions are unsupported and should be

10  rejected.

11  **I.**    **CLAIM CONSTRUCTION PRINCIPLES**

12        Disputed claim terms are to be interpreted by the Court as a matter of law. *Markman v.*

13  *Westview Instruments, Inc.*, 517 U.S. 370, 389-90 (1996). Claim terms should be given "the meaning

14  that the term would have to a person of ordinary skill in the art in question at the time of the

15  invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). This meaning

16  can be derived from several sources, including "the words of the claims themselves, the remainder of

17  the specification, the prosecution history, and extrinsic evidence concerning relevant scientific

18  principles, the meaning of technical terms, and the state of the art." *Id.* at 1314.

19        The "single best guide to the meaning of a disputed term" among these sources is the patent

20  specification. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The

21  specification is always "highly relevant" to the claim construction analysis, and indeed "it is usually

22  dispositive." *Phillips*, 415 F.3d at 1315. Although one should not import limitations from the

23  specification into the claim, the Federal Circuit has held repeatedly that "the court should focus on

24  how [one skilled in the art] would understand the claim term 'after reading the entire patent.'" *ICU*

25  *Med., Inc. v. Alaris Med. Sys., Inc.*, No. 2008-1077, Slip Op. at *6 (Fed. Cir. Mar. 13, 2009) (quoting

26  *Phillips*, 415 F.3d at 1321); *see also Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d

27  1010, 1018-19 (Fed. Cir. 2009) (construing "wound" based on examples in the specification

28  describing only skin wounds, and rejecting a construction reaching outside these examples as being

"beyond anything described in the specification"); *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1400 (Fed. Cir. 2008) (upholding the district court's claim construction based on a reading of the claims in light of the entire specification).

Under the doctrine of claim differentiation, different words or phrases used in separate claims are presumed to have a different scope. *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005). Claim differentiation, however, "is not a rigid rule but rather is one of several claim construction tools." *ICU Med.*, No. 2008-1077, Slip. Op. at *8. The presumption is overcome where "the written description and prosecution history indicate that such a reading of the terms or phrases is proper." *Nystrom*, 424 F.3d at 1143; *see also Regents of the Univ. of Calif. v. Dakocytomation Calif., Inc.*, 517 F.3d 1364, 1375 (Fed. Cir. 2008) (holding that statements made in the prosecution history overcame the presumption that the different claims had different scopes); *Netcraft*, 549 F.3d at 1400 n.1 ("[E]ven if we agreed with Netcraft that the district court's claim construction led to some redundancy, that alone would not necessarily warrant a different result"). "If a claim will bear only one interpretation, similarity will have to be tolerated." *ICU Med.*, No. 2008-1077, Slip. Op. at *8.

Patent file histories provide further context to determine the meaning of claim terms. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. Under the doctrine of prosecution disclaimer, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent," the ordinary meaning of the claim is narrowed to be "congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). This doctrine "protects the public's reliance on definitive statements made during prosecution" by preventing patentees from "recapturing through claim interpretation specific meanings [clearly and unmistakably] disclaimed during prosecution." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-75 (Fed. Cir. 2008) (quoting *Omega Eng'g*, 334 F.3d at 1323-24). Further, an applicant can make a binding disavowal of claim scope over the course of prosecution through arguments made to distinguish prior art references. *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) ("We cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO").

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

Extrinsic evidence, such as dictionaries and expert testimony, can provide additional evidence of a claim's ordinary meaning. *Phillips*, 415 F.3d at 1322. Courts may rely on dictionary definitions in construing claim terms, so long as the definition does not "contradict any definition found in or ascertained by a reading of the patent documents." *Boston Scientific Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 987 (Fed. Cir. 2009) (quoting *Phillips*, 415 F.3d at 1322-23). Additionally, extrinsic evidence "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand the claim term to mean." *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008) (quoting *Phillips*, 415 F.3d at 1319).

## II.   THE BLOMGREN '750 PATENT

### A.   Background of the Technology

The '750 patent relates to a certain type of central processing unit (CPU) on a personal computer. '750 at Abstract (Ex. A).[1] The basic manner in which all CPUs operate is as follows: 1) the CPU fetches an instruction from the computer's memory; 2) the instruction is decoded to determine what to do; 3) the instruction is executed by the arithmetic and logic unit (ALU) on the CPU; and 4) the results are written to the computer's register or memory. Gafford Decl. ¶ 6.[2] Operation of CPUs is governed by instruction sets, which are lists of instructions that the CPU is capable of executing, and CPUs are thus generally classified by the different types of instruction sets. Gafford Decl. ¶ 7. The two predominant CPU categories are CISC (complex instruction set computer) and RISC (reduced instruction set computer). *Id.* at 1:27-31 (Ex. A).

A CISC microprocessor, the Intel "x86" processor family, was developed in the late 1960's and early 1970's. *Id.* at 1:31-33; 1:55-64 (Ex. A). The design philosophy behind CISC processing was to reduce the overall number of instructions needed to execute a given task by allowing for instructions that are long and complex. *Id.* at 1:33-37 (Ex. A). Because of this complexity, however, the CPU clock had to be slowed down to allow longer instructions to be completely processed. *Id.* at

---

[1]        Citations to "Ex. __" refer to exhibits attached to the Declaration of Anthony G. Beasley in Support of Counterclaim-Defendants' Responsive Claim Construction Brief.
[2]        Citations to "Gafford Decl." refer to the Declaration of Thomas A. Gafford in Support of Counterclaim-Defendants' Responsive Claim Construction Brief.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1:43-46 (Ex. A). RISC developed as an alternative to CISC as smaller microprocessors gained

popularity. *Id.* at 1:39-40 (Ex. A). An early RISC processor is IBM's PowerPC, which was later

adopted for Apple's Macintosh line of computers. *Id.* at 3:4-7 (Ex. A).

Because a great number of programs were written for the x86 instruction set, it became

desirable for newer RISC architectures to be compatible with older CISC software. *Id.* at 3:11-14

(Ex. A). One approach to this problem involved the use of emulators, which parsed x86 code and

converted the CISC instructions into RISC code. *Id.* at 3:14-15 (Ex. A). Emulators, however,

required large amounts of time to complete this process, severely degrading the performance of the

computer. *Id.* at 3:18-20 (Ex. A). Building a processor with execution hardware capable of decoding

both the entire RISC and CISC instruction sets was also problematic, because this processor would be

large, complex and expensive. *Id.* at 3:38-41 (Ex. A).

The '750 invention purportedly addresses this issue by describing and claiming a middle way

between the all-emulation and all-hardware approach. The '750 patent discloses a CPU that first

determines whether a computer program is written with a RISC or CISC instruction set. *Id.* at

Abstract (Ex. A). The CPU then directly processes RISC instructions through one instruction set

decoder and simpler CISC instructions through a separate instruction set decoder, while sending the

longer and less frequently used CISC instructions to a software emulation driver. *Id.* at 4:34-60

(Ex. A). This approach aims to provide flexibility for the CPU to run programs written for either the

CISC architecture or the RISC architecture.

## B. "Separate Instruction Sets"

| AMD's Construction | Samsung's Construction |
| --- | --- |
| One complex instruction set computer (CISC) x86 instruction set architecture and one reduced instruction set computer (RISC) PowerPC instruction set architecture. These instruction sets have independent encodings of instructions. Mere extensions of instruction sets do not constitute separate instruction sets because they have dependent encodings of instructions. | This term appears in the preamble of Claim 14 and therefore, is not limiting.<br><br>Were a construction required, the proposed construction is:<br><br>Distinct groups of instructions. |

AMD's construction of "separate instruction sets" reflects the specific meaning given to this

term during prosecution to distinguish anticipatory prior art. Samsung, meanwhile, completely

ignores the prosecution history, making no mention of it in its Opening Brief. This is improper, because public notice requires that claims be construed in light of the entire intrinsic record, including the prosecution history. *Phillips*, 415 F.3d at 1317. The '750 applicants relied on "separate instruction sets" as a distinguishing claim limitation five separate times: in response to three rejections, and in two briefs on appeal

"The doctrine of prosecution history disclaimer is well established in Supreme Court precedent." *Omega Eng'g*, 334 F.3d at 1323 (citing *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-21 (1940) ("[T]he claims allowed cannot by construction be read to cover what was thus eliminated from the patent.") This doctrine is important because it "promotes the public notice function of the intrinsic evidence" and therefore protects the public's reliance on "definitive statements made during prosecution." *Omega Eng'g*, 334 F.3d at 1324 (citing *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998)). Because of the applicant's repeated statements to the PTO during prosecution of the Blomgren patent, the public is entitled to rely on the fact that the '750 patent covers a specific class of microprocessors operating in a specific manner.

**1.      The applicants relied on "separate instruction sets" from the preamble to distinguish prior art.**

The Federal Circuit has held that determining whether a preamble is limiting is "resolved only on review of the entire[] . . . patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Corning Glass Works v. Sumitomo Elecs. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). A preamble can be limiting in many circumstances. For example, a preamble will limit an invention when it recites essential structure or steps or if it is "necessary to give life, meaning, and vitality" to the claim. *Catalina Mktg. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). A preamble must be limiting where the applicant placed clear reliance on the term during prosecution to distinguish prior art. *Catalina Mktg.*, 289 F.3d at 808; *see also Bass Pro Trademarks, L.L.C. v. Cabela's, Inc.*, 485 F.3d 1364, 1369 (Fed. Cir. 2007) (holding a claim term appearing in the preamble was a material limitation because it was "clear that [the] patentee procured the patent based on [the term as] stressed in the prosecution history").

COUNTERCLAIM-DEFENDANTS' RESPONSIVE
CLAIM CONSTRUCTION BRIEF

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1         Here, "separate instruction sets" must be a limitation because the applicant identified it as a

2    key distinction over prior art at several stages of the prosecution process. *See* Beasley Decl., Ex. N.

3    In its response to the examiner's first rejection, the applicant distinguished the Ueda reference by

4    arguing that Ueda is directed towards separate execution units (or coprocessors) while the '750 patent

5    "has the new result of having a single execute unit that can execute instructions from *two separate*

6    *instruction sets*." Amendment and Response, Sep. 20, 1994, at 13 (Ex. D) (emphasis added). The

7    applicant distinguished the Onishi reference in its response to a second rejection by arguing that

8    Onishi did "not pertain to dual-instruction set processors," and that the inventions solved different

9    problems: "[The '750 patent] solves the problem of flexibility *by decoding two separate instruction*

10   *sets*, while Onishi solves the different problem of speed of decoding branch instructions in a single

11   instruction set." Amendment and Response, Feb. 14, 1995, at 11 (Ex. F) (emphasis added). The

12   applicant later distinguished the Lee reference, arguing that "Lee et al. is clearly directed to an

13   <u>extension</u> of a single instruction set *rather than a separate <u>second</u> instruction set*," and also Agnew,

14   which disclosed a single instruction set partitioned into two subsets, arguing "[in] contrast,

15   Applicant's claim 1 recites '*two separate instruction sets*.'" Amendment and Response, May 22,

16   1995, at 6-7 (Ex. H) (emphasis added).

17        The applicant expressly stated that "separate instruction sets" is a claim limitation on appeal

18   to the Board, stating that prior art processors "do not meet claim limitations for separate instruction

19   sets." Amendment and Response at 9, May 22, 1995 (Ex. H). It distinguished its processor from a

20   486 processor by arguing that "[s]ince *two separate instruction sets* are used [in the invention], a

21   fetched instruction word could output two different but seemingly valid decoded instructions." Brief

22   on Appeal, Aug. 29, 1995, at 4 (Ex. I). Because the applicant placed "clear reliance" on "separate

23   instruction sets" to distinguish prior art, it is a claim limitation because "such reliance indicate[d] use

24   of the preamble to define, in part, the claimed invention." *Catalina Mktg.*, 289 F.3d at 808. In other

25   words, "separate instruction sets" played a key role in the issuance of the '750 patent, so it must be

26   limiting.

27

28

**2.** **The '750 patent explicitly ties "separate instruction sets" to independent CISC (x86) and RISC (PowerPC) instruction set encodings.**

AMD's proposed construction reflects the understanding of one skilled in the art, in view of the entire patent, that "separate instruction sets" means two different instruction set architectures—one CISC (or x86) instruction set and one RISC (or PowerPC) instruction set—with encodings entirely independent from one another. One of skill in the art would understand that RISC and CISC instruction sets are entirely separate architectures. Gafford Decl. ¶ 18. AMD's construction is supported by the specification and prosecution history, each limiting the '750 invention to a processor that can distinguish specifically between CISC and RISC instruction set architectures.

The '750 patent does not teach processing of *any* two instruction sets, but instead two specific and different instruction sets: RISC and CISC. "The claims of the patent must be read in light of the specification's consistent emphasis on this fundamental feature of the invention." *Praxair*, 543 F.3d at 1324. In fact, RISC and CISC are the only disclosed instruction sets in the '750 specification. *See, e.g.,* '750 Abstract (Ex. A) ("A dual-instruction-set CPU is able to execute x86 CISC (complex instruction set computer) code or PowerPC RISC (reduced instruction set computer) code"); *Id.* at 3:51-56 (Ex. A) (". . . what is desired is a CPU that can execute both PowerPC RISC code and x86 CISC code, but without the performance degradation of emulating all x86 instructions in software"); *Id.* at 6:15-16 (Ex. A) ("FIG. 2 shows a simplified block diagram of a CPU that can execute both CISC and RISC instructions"); *Id.* at 7:1-4 (Ex. A) ("Execute unit 48 is designed to execute the simpler CISC and RISC instructions, and thus has reduced complexity relative to traditional execute units on CISC and even RISC CPU's").

The claimed invention is limited to one that processes specifically a CISC instruction set and a RISC instruction set by the applicant's express disclosures to the PTO. *Omega Eng'g*, 334 F.3d at 1324; *see also* Beasley Decl., Ex. O. The examiner rejected all claims (1-20) in each of the office actions, and the applicant's responses were thus directed towards all claims in the application. When statements to the PTO refer to the patent generally, instead of specific claims, they limit all of the claims of the patent. *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369 (Fed. Cir.

2007) (Holding that the applicants' global statements to the examiner about pelletizing "applied to all the claims of the patent—and thus they served to limit all the claims.")

Here, the applicant made several global statements to the PTO limiting the claims to RISC and CISC instruction sets. The PTO's first rejection stated that de Nicolas rendered claim 1 obvious because it directly executed RISC instructions while emulating CISC instructions. Examiner's Action, Jun. 16, 1994, at 5 (Ex. C). In response, the applicant distinguished the '750 invention from de Nicolas by arguing that the '750 invention "execute[s] both CISC and RISC instruction sets in hardware." Amendment and Response, Sep. 20, 1994, at 12 (Ex. D). Later, in response to the examiner's third rejection, the applicant argued that Portanova only emulates CISC instructions with RISC instruction sets and discloses neither a CISC instruction decoder nor an execution unit that "executes both RISC and CISC instructions." Amendment and Response, May 22, 1995, at 9 (Ex. H); *see also id.* at 8 (Ex. H) ("Applicant's definition of dual-instruction set processor is one that <u>executes both</u> CISC and RISC"). The applicant also stated in this response that the claimed processor was unique because it could decode separate instruction sets that were specifically RISC and CISC:

> Applicant disagrees that Applicant is merely claiming a 'processor capable of executing dual instruction sets,' regardless of whether the second instruction set is wholly or partially implemented in hardware. That is not what the claims state. *The claims recite at least a RISC and a CISC instruction decoder*, and an execute unit that receives decoded RISC and decoded CISC instructions and executes both RISC and CISC instructions.

*Id.* at 9 (Ex. H) (emphasis added). On appeal to the Board, the applicant again stated that "[t]he claims recite at least a RISC and a CISC instruction decoder." Brief on Appeal, Aug. 29, 1995, at 15 (Ex. I). The applicant further reiterated in its reply brief the issue driving "to the heart of [the] appeal: the complete, total absence of prior art showing both RISC and CISC hardware execution." Reply Brief, Nov. 29, 1995, at 2 (Ex. J). These exchanges show that the applicant and the PTO understood the '750 invention to disclose processing of a RISC instruction set and a CISC instruction set.

**3.   "Instruction sets" are architectures.**

The '750 patent explicitly defines an "instruction set" as an "architecture" in the specification and prosecution history, which shows that the terms are meant to be used interchangeably. For

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

example, the specification explains that "[a]s more and more programs were written for PC's, including the DOS and Windows operating systems by Microsoft Corp. of Redmond, WA., x86 became the most popular instruction set, *or architecture*." '750 at 1:64-2:1 (Ex. A) (emphasis added). Additionally, the specification makes clear that x86 is a single architecture, while PowerPC is a separate architecture:

> Since PowerPC may become the next standard *architecture*, yet the existing software base of x86 code is immense, what is desired is a CPU that can execute both PowerPC RISC code and x86 CISC code, but without the performance degradation of emulating all x86 instructions in software.

'750 at 3:51-56 (Ex. A) (emphasis added). The applicant also distinguished prior art on appeal to the Board, arguing that "Bullions uses the word 'architecture' to mean something other than 'instruction set' . . . . These plural architectures refer to address translation architectures, not to instruction set architectures." Brief on Appeal at 24, Aug. 29, 1995 (Ex. I). Further, one of skill in the art would consider all of the instructions in an instruction set, taken as a whole, to be an architecture. Gafford Decl. ¶¶ 9-10. AMD's construction is consistent with the '750 patent in describing the separate RISC and CISC instruction sets as architectures.

### 4. The applicant expressly disclaimed "mere extensions" of instruction sets during prosecution.

The '750 patent is limited by the applicant's express disclaimer of "mere extensions" during prosecution. Through the prosecution history, one of ordinary skill would understand that "mere extensions" of one instruction set do not qualify as "separate instruction sets." The person of ordinary skill "is deemed to read the claim terms in context of the entire patent, including the specification and prosecution history." *Computer Docking Station*, 519 F.3d at 1374 (quoting *Phillips*, 415 F.3d at 1313). As AMD's construction reflects, the term "separate instruction sets," when construed in light of the prosecution history, clearly and unambiguously requires the processing of instruction sets with entirely independent encodings.

The scope of claims is controlled by statements made during prosecution where the patentee makes "a clear and unmistakable disavowal of scope." *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). Such disavowal can occur where the patentee "clearly

COUNTERCLAIM-DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1  characterize[s] the invention in a way to try to overcome rejections based on prior art." *Computer*

2  *Docking Station*, 519 F.3d at 1374 (citing *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340,

3  1349 (Fed. Cir. 2004)). "Claims should not be construed 'one way in order to obtain their allowance

4  and in a different way against accused infringers.'" *Id.* at 1375 (quoting *Chimie v. PPG Indus.*, 402

5  F.3d 1371, 1384 (Fed. Cir. 2005)).

6        Here, the prosecution history is replete with examples of the patentee's clear characterization

7  of the invention as one that processes instruction sets with independent encodings and not "mere

8  extensions" of instruction sets. *See* Beasley Decl., Ex. P. The applicant argued in its third response

9  that "Claim 1 clearly disallows a *mere extension* of a single instruction set. . . . *Mere extensions* of

10  instruction sets must have dependent encodings since otherwise one opcode could be used for two

11  instructions." Amendment and Response, May 22, 1995, at 7 (Ex. H). The applicant further

12  distinguished the prior art cited by the examiner by stating that it disclosed "mere extensions to a

13  single instruction set, such as for floating point instructions." *Id.* (Ex. H). Later, on appeal to the

14  Board of Patent Appeals and Interferences, the applicant stated that the 486 processor is a "mere

15  extension" of the 386, as both run the same x86 instruction set, while in contrast the Blomgren

16  invention runs *separate* CISC and RISC instruction sets:

17          ***What are Separate Instruction Sets?***
        Since two separate instruction sets are used, a fetched instruction

18          word could output two different but seemingly valid decoded
        instructions. The RISC decoder and the CISC decoder could each

19          output a seemingly valid decoded instruction. This is not true for
        a single instruction set or extensions to a single instruction set.

20          The 386 and 486 instruction sets do not meet <u>claim limitations for</u>
        <u>separate instruction sets</u> since the 486 set is a *mere extension* of

21          the 386 set, having most opcode in common.

22  Brief on Appeal, Aug. 29, 1995, at 4 (Ex. I) (emphasis added).

23        Samsung's proposed construction—"distinct groups of instructions"—contradicts the

24  prosecution history arguments that the applicant relied on for patentability. It would improperly

25  broaden the claims to cover "mere extensions" of instruction sets that were expressly disclaimed. *See*

26  *Computer Docking Station*, 519 F.3d at 1374. Indeed, the applicant distinguished several prior art

27  references that could be considered to disclose "distinct groups of instructions." For example, the

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1  distinguished Onishi reference discloses separate decoding of normal and branch instructions.

2  Examiner's Action, Nov. 16, 1994, at 4 (Ex. E); Gafford Decl. ¶¶ 25-28. These normal and branch

3  instructions would fall within Samsung's proposed construction, since they are "distinct groups of

4  instructions." The distinguished Lee reference discloses an extension of a single instruction set.

5  Amendment and Response, May 22, 1995, at 6 (Ex. H); Gafford Decl. ¶ 29. The original instruction

6  set and its subsequent extension would also fall within Samsung's proposed construction, since they

7  are "distinct groups of instructions." The distinguished Agnew reference discloses a single

8  instruction set partitioned into subsets and implemented in a different chip or emulated in software.

9  *Id.* at 6-7 (Ex. H); Gafford Decl. ¶ 30. The instruction subsets would also fall within Samsung's

10  proposed construction, since they are "distinct groups of instructions." Finally, the distinguished

11  Portanova reference discloses processing of floating-point instructions, which the patentee contended

12  were "mere extensions" of integer instructions. *Id.* at 7 (Ex. H); Gafford Decl. ¶ 32. Floating-point

13  and integer instructions would also fall within Samsung's proposed construction, since they are

14  "distinct groups of instructions."

15  Samsung's construction, if adopted, would allow Samsung to recapture claim scope that was

16  disavowed in order to overcome numerous prior art references. Under the doctrine of prosecution

17  disclaimer, this is improper. *See 800 Adept, Inc. v. Murex Secs., Ltd.*, 539 F.3d 1354, 1364 (Fed. Cir.

18  2008). "Separate instruction sets" cannot be read as requiring only "distinct groups of instructions"

19  for infringement purposes when "mere extensions" were expressly disclaimed in order to obtain the

20  patent. *Chimie*, 402 F.3d at 1384.

21  **III.  THE JANG '065 PATENT**

22      **A.    Background of the Technology**

23  The '065 patent concerns process control for manufacturing semiconductor devices.

24  Generally, manufacturing semiconductor devices involves the performance of many steps, including

25  alignment, exposure, etching, and polishing, on a single silicon wafer that is later cut into many

26  individual chips. '065 at 1:12-18 (Ex. B). Because the scale of work performed on the wafers is so

27  small—usually on the order of tens of nanometers—wafers are sensitive to variations in process

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

conditions. '065 at 1:20-23 (Ex. B). Different kinds of process control, aiming to maintain wafer properties at or near a target for each step, arose in response. Edgar Decl. ¶¶ 10-12.[3] Process control historically has used the basic principle of measuring a wafer feature, comparing it to a set point, and then adjusting machine settings to correct any error. Edgar Decl. ¶ 10.

The photolithography phase of semiconductor fabrication includes the steps of deposition of the photoresist on a wafer, alignment of the layers of each device, and exposure of the photoresist using a light source. Edgar Decl. ¶ 15. These steps are performed multiple times to build a device consisting of multiple layers. Edgar Decl. ¶ 15. After alignment and exposure, the wafer is moved to different machines for etching, polishing, etc.

The '065 patent, filed in the U.S. in 1995, concerns a method for processing silicon wafers in "lots" and using process control to set fabrication parameters for an entire "lot." '065 at 1:6-10 (Ex. B). In the '065 patent, groups of settable parameters (such as exposure time and alignment settings) are referred to as "working conditions." An "optimal working condition" is calculated by accumulatively averaging working conditions from previous lots and applying the result to the next lot coming up for processing. '065 at 2:31-40 (Ex. B). A "current working condition" is then calculated by adding the optimal working condition to a "correction condition." '065 at 2:31-40 (Ex. B). The '065 patent thus aims to further enhance fabrication accuracy.

### B.   Construction of Terms at Issue

AMD's proposed constructions of the '065 terms at issue reflect how one of ordinary skill would understand the words of the claims in light of the entire patent. *Phillips*, 415 F.3d at 1321. Samsung's broad constructions, on the other hand, ignore the actual claim language and also go beyond what is disclosed in the specification. *Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d 1010, 1018-19 (Fed. Cir. 2009).

---

[3]     Citations to "Edgar Decl." refer to the Declaration of Thomas F. Edgar, Ph.D, in Support of Counterclaim-Defendants' Responsive Claim Construction Brief.

### 1. "Accumulatively Averaging Working Conditions"

| AMD's Construction | Samsung's Construction |
|---|---|
| For each parameter comprising a working condition, individually summing over previous values of that parameter and dividing the result by the total number of terms in the summation. In an accumulative average, the number of terms in the average grows by one as each new value is calculated. A working condition is a group of settable parameter values that control alignment and exposure in a semiconductor manufacturing process. | Performing a mathematical operation on a set of working conditions to determine a value representative of the set. |

#### a. "Accumulatively" is an important limitation.

The '065 patent describes and claims a specific kind of calculation: accumulatively averaging. Notably, the sources cited by Samsung actually support AMD's proposed definition of "accumulatively." In fact, the parties cite as extrinsic evidence nearly identical dictionary definitions. In AMD's extrinsic source, "accumulation" is defined as "increase or growth by addition esp. when continuous or repeated," and "cumulative" is defined as "increasing in size or strength by successive additions without corresponding loss."[4] Samsung's extrinsic source defines "accumulate" as "to gather or pile up esp. little by little . . . to increase gradually in quantity or number."[5]

Despite offering an extrinsic definition of the word, Samsung impermissibly reads "accumulatively" out of its construction. Samsung instead asks that the term be construed to cover *any* kind of "mathematical operation" that determines a "representative value." This is wrong. "Claims are interpreted with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). The word "averaging" cannot be construed in isolation. Instead, the patentee expressly required in the claims that all averaging of working conditions was to be performed *accumulatively*. The invention and the patentee's right to exclude, therefore, are both limited by the use of the word "accumulatively." *See Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1313 (Fed. Cir. 2007). AMD's construction respects the patentee's limitation of averaging processes to those done "accumulatively," and Samsung's construction does not.

Samsung cites two extrinsic sources to show that an "exponentially weighted moving

---

[4] Webster's Third New International Dictionary, pp. 13, 553 (2002) (Ex. K) (produced at AMD001989856-1989859). In this dictionary, the definition of "accumulative" directly refers the reader to the definition of "cumulative."
[5] Merriam-Webster's Collegiate Dictionary, p. 8 (10th Ed. 1994) (Ex. L).

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

average," or EWMA, is one type of average. This argument is not relevant. The Court does not need to construe the full scope of "averaging" or decide whether it includes all possible averages, such as weighted averages, moving averages, accumulative averages, or others. The '065 patent teaches and expressly claims only one: an accumulative average.

### b. "Accumulative averaging" is a specific mathematical operation.

AMD's proposed construction reflects the mathematical process of "averaging" as one of ordinary skill in the art would understand it. The '065 specification teaches that previous parameter values used in exposure and alignment processes are added together and then divided by the number of processes already performed through the following equation and explanation thereof:

$$X_{tn} = \frac{1}{n-1} \sum_{i=1}^{n-1} (X_{ti} \pm \mathscr{E})$$

(*n* is a natural number of over 1)

Therefore, the parameter value Xtn of the n-th process is determined by *accumulatively averaging the parameter values* Xti $\pm \mathscr{E}$ (i=1~n-1) as corrected by the normal (n-1) process which had been previously performed, the normal processes being those which have values within the standard deviation.

'065 at 3:38-54 (Ex. B) (emphasis added). One of skill in the art would interpret this equation as performing an averaging process. AMD's construction reflects that "accumulatively averaging" means "individually summing over previous values of that parameter," which is represented by the $\sum_{i=1}^{n-1} (X_{ti} \pm \mathscr{E})$ part of the equation, and "dividing the result by the total number of terms in the summation," which is represented by the $\frac{1}{n-1}$ part of the equation. This interpretation of "accumulative average" is supported by AMD's extrinsic evidence, describing a "cumulative average" as "an unweighted average of the sequence of *i* values $x_1, ..., x_i$ up to the current time."[6]

Samsung's proposed construction, on the other hand, requires only that "a mathematical operation" be performed "on a set of working conditions." The claim cannot be broadly read to include any and all mathematical operations that could possibly be performed on a set of numbers. Samsung's construction would potentially include hundreds of operations in use by technologies far and wide. A "value representative of [a] set" of numbers goes far beyond an accumulative average

---

[6] Wikipedia, "Moving average," http://en.wikipedia.org/wiki/Moving_average, retrieved Dec. 18, 2008 (Ex. M) (produced at AMD001989798-1989804).

1    and would include many other values representing a set, such as that set's minimum, maximum, sum,

2    standard deviation, or skewness.

3         AMD's proposed construction is consistent with the '065 patent teachings. It does not

4    "exclude" the preferred embodiment, as Samsung argues; it defines "accumulative averaging" to

5    specifically allow for—but not require—the added complexity of the patent's preferred embodiment.

6    Further, AMD's construction is fully supported by the extrinsic definitions. In contrast, Samsung has

7    offered no definition of "accumulative average," either from the patent specification or any other

8    source, that supports its unbounded proposal.

9              c.    **"Working conditions" are groups of settable parameters.**

10        The '065 claims are also specific about what values are accumulatively averaged. The patent

11   defines "working conditions" as groups of settable parameters controlling alignment and exposure in

12   a semiconductor manufacturing process. '065 at 3:21-25 (Ex. B). Samsung has not proposed a

13   construction for this term outside of repeating it, verbatim, as it is used in the claims of the '065

14   patent. The phrase "working conditions" by itself, however, would have no meaning to one skilled in

15   the art outside of its use in the '065 patent. "[A]bsent such an accepted meaning, we construe a claim

16   term only as broadly as provided for by the patent itself. . . . The duty falls on the patent applicant to

17   provide a precise definition for the disputed term." *Irdeto Access, Inc. v. Echostar Satellite Corp.*,

18   383 F.3d 1295, 1300 (Fed. Cir. 2004).

19        "Working conditions" are defined as settable parameters. The Abstract and the Summary of

20   the Invention say that working conditions are "set." The specification repeats that "a working

21   condition is set." '065 at 3:5 (Ex. B). The claims recite "setting a current working condition" by

22   adding a correction condition to an optimal working condition. *Id.* at 6:14-16 (Ex. B). The term

23   "working condition" must have the same meaning throughout the patent. *Phillips*, 415 F.3d at 1314.

24        While Samsung has not offered a construction of "working condition," it is apparent that it is

25   pursuing an open-ended interpretation of this phrase. For example, Samsung states in its brief at

26   p. 17, n. 8 that working conditions "refer to the measurements *and* corresponding machine settings."

27   This is wrong. Measurements are measured, settings are set, and "working conditions" cannot be

28   both. In its example about the arrow (Samsung Brief at 5-6), Samsung equates "working condition"

with the distance by which an arrow missed the target. The distance from the target, however, is something that would be measured and then used for correction, not a "working condition" that would be "set" as required by the claims. Samsung's example illustrates the ambiguity in the patent about what exactly is the "correction condition." It also illustrates that Samsung needs to have the claim terms read to cover all forms of "information" even if the terms will then overlap each other.

### 2. "Extracting a Correction Condition"

| AMD's Construction | Samsung's Construction |
| --- | --- |
| Subtracting an objective value from a resultant value so that, when this difference value is added to the optimal working condition, a process can be performed without error. | Creating a value or data set to be used to affect the determination of a current working condition. |

Claim 1 recites "extracting a correction condition," which is then added to the optimal working condition to set a current working condition under which the fabrication machinery will operate. '065 at Cl. 1 (Ex. B). The '065 claims and specification indicate that "extracting a correction condition" means subtracting an objective value from a resultant value, and then adding this difference to the optimal working condition so that a fabrication process can be performed without error. *Id.* at 3:43-48 (Ex. B).

AMD's construction is supported by the plain language of the claim. "Correction condition" implies a value that is calculated in order to "correct" or improve something, in this case the fabrication process. The '065 specification indicates further that in equation (1), the "$\mathscr{E}$" term indicates a *correction element* obtained by subtracting an objective value from a resultant value" and further "[i]f a process is performed with the *correction value* applied, the process can be performed without error." '065 at 3:38-48 (Ex. B). The "correction condition" thus *corrects* the process.

"Correction condition" has no ordinary and accepted meaning to one skilled in the art. Edgar Decl. ¶ 23. Samsung has offered none, so the specification must "provide a precise definition for the disputed term." *Irdeto Access*, 383 F.3d at 1300. The specification, however, fails to provide a precise definition. The '065 specification references a "correction element," a "correction value" ('065 at 3:43-48 (Ex. B)), "correction data," and a "correction operation" ('065 at 4:45-60 (Ex. B)) in the context of calculating optimal parameter values, but it never explains which if any of these is a "correction condition" or how to calculate the "correction condition." 35 U.S.C. § 112, ¶ 2 requires a

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

patent to "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." "This requirement serves a public notice function, ensuring that the patent specification adequately notifies the public of the scope of the patentee's right to exclude." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008).

Samsung's argument and proposed construction illustrate the problem. The patent does not distinctly point out what a correction condition is. Samsung broadly proposes a "value or data set" (i.e., anything) that is "used to affect" (i.e., in any way) a current working condition (undefined). The brief cautions that "correction element" should not be confused with "correction condition." Samsung Brief at 6 n.1. However, the portion of the specification that Samsung points to as support for "correction condition"—3:55 to 4:12—does not say anything about a correction condition and indeed does not even use the word "correction" or "condition." Further, the equation recited there includes a term $E$ that is not defined or explained. Edgar Decl. ¶ 25.

One thing that is clear is that, whatever a correction condition is, it must be something that can be added to an optimal working condition to set a current working condition. '065 at Cl. 1 (Ex. B). Samsung's construction fails even this requirement because you cannot add a "data set" to a "working condition." Similarly, you cannot add an identification of equipment to a working condition. These are mathematically impossible, and the '065 patent contains no teaching about how these types of "information" could be used. Edgar Decl. ¶ 29.

AMD is not presently seeking judgment of invalidity of indefiniteness. AMD has proposed a construction that finds support in the specification, and that is consistent with the use of "correction condition" as recited in the claims. Samsung's proposal does neither.[7]

### 3. "Corresponding to an Alignment State"

| AMD's Construction | Samsung's Construction |
|---|---|
| Relating to the relative position of one layer on a semiconductor wafer as compared to another layer on the same wafer in a photolithography application. | Relating to a lower layer or a reference layer formed during the manufacturing process of a semiconductor device. |

The method of claim 1 includes the element "extracting a correction condition by extracting

---

[7]    If Samsung's constructions are adopted, AMD reserves its right to challenge the patent under 35 U.S.C. § 112, ¶ 2 as indefinite, or under § 112, ¶ 1, as the specification does not enable the full claim scope that Samsung now seeks.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1  information corresponding to an alignment state." One of ordinary skill, informed by the '065

2  specification, would understand "corresponding to an alignment state" as relating to the relative

3  positioning between two layers on the same wafer in a photolithography application.

4      The '065 claim language and specification supports AMD's construction. The patent teaches

5  that "the correlation between the reference layer and the layer expected to be currently performed" is

6  used to calculate alignment parameters. '065 at 4:9-12 (Ex. B). The patent thus directs one to

7  compare the relative positions of the reference layer and next layer in the process (i.e., their

8  "correlation"). Edgar Decl. ¶ 30. One of ordinary skill would understand this as precisely the type of

9  "extracting" of "information corresponding to an alignment state" that is claimed. Edgar Decl. ¶ 30.

10      Samsung proposes broadly that the term can include *any* information about a single layer at

11  any point during manufacture. This is incorrect. The '065 claim language alone refutes Samsung's

12  overreaching construction. While the term "information" is broad, "information corresponding to an

13  alignment state" has specific meaning. A layer's "alignment state" is synonymous with its "state of

14  alignment." Further, one of ordinary skill would understand "alignment" to be relative concept—a

15  layer can be aligned into a certain position only by referencing the position of some other layer.

16  Edgar Decl. ¶ 30. Thus, in order to perform the alignment, one would need to obtain information

17  about the position of the different layer.

18      Samsung repeatedly places heavy and misleading emphasis on the following portion of the

19  '065 specification:

20          When the parameters are added for processing using the same

21          equipment, it is possible to set more precise optimal parameters.
        Thereby, it is also possible to minimize errors generated in the

22          alignment & exposure process.

23  '065 at 5:54-57 (Ex. B). This passage, according to Samsung, shows an example of the "broad range

24  of information" that can correspond to an alignment state. However, this passage says nothing about

25  alignment or layer positions. This passage does not suggest to one skilled in the art that information

26  corresponding to an alignment state can refer to anything but the position of one layer relative to

27  another layer. Edgar Decl. ¶ 31. The patent does not teach how identification of particular tools or

28  equipment could be used in the claimed process control technique. Edgar Decl. ¶ 31.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1    Additionally, the record shows that the patentees intended the passage at 5:54-57 to indicate

2    that the device controlling manufacture *also* computes average working conditions—not that

3    equipment identity itself is used to calculate the current working condition. Figure 2 of the '065

4    patent indicates that a CPU is part of the "alignment and exposure device," while the flowchart in

5    Figure 4 shows that this same CPU "reads the various kinds of parameter values" and "perform[s] a

6    step 117 of producing the optimal value for each parameter from the read value." '065 at Figs. 2, 4,

7    4:19-21, 5:38-41 (Ex. B). Step 117 in Figure 4 (performed by the CPU) contains Equation (1), which

8    calculates the accumulative average. '065 at Fig. 4 (Ex. B). This feature of the '065 invention was

9    specifically claimed in a related application to the Japanese Patent Office (JPO) in Claim 3: "The

10   operating condition setting method described in Claim 1 or 2 characterized by the fact that the

11   average value of the operating condition is computed using the manufacturing device of the

12   operation." Translation of Amendment to Japanese Patent No. 2662377, Nov. 12, 1998 (produced at

13   SAMAMD0038787) (Ex. Q).[8] The specification in the JPO application goes on to state that "the

14   operating conditions of lots up to and including the preceding lot are accumulated in the

15   manufacturing device of the operation, and the device performs average computing," and later "[f]or

16   computing said alignment correction value and corrected value . . . operation is performed using CPU

17   (18) as the same device. As a result, . . . error in the operation can be further minimized." *Id.* at

18   SAMAMD0038789, 38794-95 (Ex. Q). In the U.S. '065 patent, the passage at 5:54-57 reflects the

19   Figures and what is explained clearly to the JPO: the fabrication tool also performs the averaging.

20       Samsung broadly contends that "information" can relate to any aspect of the manufacturing

21   process and cites the patent specification in support. Even a cursory review of the citations, however,

22   reveals the lack of support. Process steps such as etching and chemical vapor deposition are

23   mentioned only in the "Related Art" portion of the patent, not in the description of the invention.

24   Other steps and parameters listed by Samsung—such as doping, chemical mechanical polish,

---

25       [8]    Admissions to foreign patent offices such as this are relevant in determining how
     those skilled in the art would construe asserted claims. *See Gillette Co. v. Energizer Holdings,*
26   *Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) ("This blatant admission by this same defendant
     before the EPO clearly supports this court's holding that those skilled in the art would construe
27   the claims of the '777 patent to encompass razors with more than three blades"); *see also Shire*
     *Labs., Inc. v. Corepharma, LLC*, 2008 WL 819996, at *8 (D.N.J. Mar. 26, 2008) (Courts may
28   consider admissions by a party to the European Patent Office).

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1    reflectivity, and accelerating voltage—are not in the patent at all. One skilled in the art would

2    recognize that the correction methods taught in the patent would not be applicable outside of the

3    alignment and exposure steps. Edgar Decl. ¶ 30. Samsung itself made that representation. During

4    prosecution of the Japanese application related to the '065 patent, Samsung stated its understanding

5    that alignment is irrelevant to other stages of the fabrication process: "Clearly, said alignment

6    relationship setting is not needed in etching and other operations that do not require alignment

7    precision." Translation of Amendment to Japanese Patent No. 2662377 (Nov. 12, 1998) at

8    SAMAMD0038792 (Ex. Q). Therefore, information "corresponding to an alignment state," and the

9    related "correction condition," are only used during the photolithography phase.

10        Finally, Samsung cites *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173 (Fed.

11    Cir. 2006). *Ventana* does not control. There, the court found that the claimed "dispensing" should

12    not be restricted to "direct dispensing" where the specification contemplated alternate types and

13    where there was no express disclaimer. 473 F.3d at 1180. Here, there is no suggestion that

14    information about "alignment state" can be something other than alignment information, or used for a

15    purpose other than alignment. *Compare ICU Med., Inc. v. Alaris Med. Sys., Inc.*, No. 2008-1077,

16    Slip Op. at *6 (holding that the district court properly relied on the specification to construe the term

17    "spike" to include the function of "piercing" because the specification "repeatedly and uniformly

18    describe[d] the spike as a pointed instrument for the purpose of piercing a seal inside the valve").

19    Like *ICU*, and unlike *Ventana*, it is appropriate to look to the '065 specification when determining

20    what information "correspond[s] to an alignment state."

21                                           **CONCLUSION**

22        AMD's proposed constructions of the claim terms at issue reflect the understanding of one of

23    ordinary skill in the art and closely correspond to the intrinsic records of the '750 and '065 patents.

24    Samsung's proposed constructions, on the other hand, are overly broad and seek to recapture claim

25    scope surrendered in prosecution or ignore the claim language itself. AMD's constructions should be

26    adopted and Samsung's should be rejected.

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

DATED: March 30, 2009

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By: _/s/ Cole M. Fauver_____
       Cole M. Fauver (*pro hac vice*)

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
(612) 349-8500

**ATTORNEY FOR PLAINTIFFS AND
COUNTERCLAIM-DEFENDANTS
ADVANCED MICRO DEVICES, INC. AND ATI
TECHNOLOGIES, ULC**