1  William H. Manning (*pro hac vice*)
   E-Mail: WHManning@rkmc.com
2  Cole M. Fauver (*pro hac vice*)
   E-Mail: CMFauver@rkmc.com
3  Anthony G. Beasley (*pro hac vice*)
   E-Mail: AGBeasley@rkmc.com
4  **Robins, Kaplan, Miller & Ciresi L.L.P.**
   2800 LaSalle Plaza
5  800 LaSalle Avenue
   Minneapolis, MN 55402-2015
6  Telephone:   612-349-8500
   Facsimile:   612-339-4181
7
   John P. Bovich (SBN 150688)
8  E-mail: JBovich@reedsmith.com
   **Reed Smith LLP**
9  Two Embarcadero Center, Suite 2000
   San Francisco, CA 94111
10 Telephone:   415-543-87000

11 Attorneys for Plaintiffs and Counterclaim-
   Defendants Advanced Micro Devices, Inc.
12 and ATI Technologies ULC

13

14                    UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16                      SAN FRANCISCO DIVISION

17

18 SAMSUNG ELECTRONICS CO., LTD.        Case No. CV-08-0986-SI

19                 Counterclaim-Plaintiff,   **DECLARATION OF THOMAS A.**
                                             **GAFFORD IN SUPPORT OF**
20 v.                                        **COUNTERCLAIM-DEFENDANTS'**
                                             **RESPONSIVE CLAIM CONSTRUCTION**
21 ADVANCED MICRO DEVICES, INC., et        **BRIEF**
   al.,
22
23                 Counterclaim-
                   Defendants.
24

25

26

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1.     I make all of the statements in this Declaration of my own personal knowledge and in accord with 28 U.S.C. § 1746.

## I.     INTRODUCTION AND QUALIFICATIONS

2.     My name is Thomas A. Gafford.  I am an expert in computer technology and I write this report in support of AMD's position in claim construction proceedings regarding the Blomgren patent in this matter.  I have not authored any publications within the past 10 years.  A list of cases I have been involved in within the past four years are attached as Exhibit A.  My full CV is attached as Exhibit B.  I began studying computer architecture in 1971, earning a bachelor's degree in electrical engineering, and my graduate studies also included work in computer architecture.  I began designing computer I/O equipment in 1976 and I helped design a mainframe computer in the 1980 time frame, and I have continued to remain abreast of developments in computer design.  In 2004, I supervised and participated in the analysis of the detailed design of a portion of Intel x86 class computers.  I have 4 patents in the field of computer data bus design.

## II.     BASIS FOR OPINIONS

3.     In preparation for writing this declaration, I have read the patent in suit, its prosecution history, the prior art references of Agnew (Ex. T)[1], Onishi (Ex. R), Bullions, Iwata, Lee (Ex. S), Ueda (Ex. U), Portanova (Ex. V) and de Nicolas (Ex. W), as well as the IBM Technical Disclosure Bulletin, the parties' joint statement on claim construction for the Blomgren patent, Samsungs opening brief on claim construction, and its counterclaim for infringement of this patent.  In addition I have reviewed portions of the Intel Architecture Software Developer's manual, the Microsoft Computer Dictionary, the Merriam-Webster dictionary, and of "Computer Structures:  Readings and Examples," by Bell and Newell, 1971.

## III.     BACKGROUND OF THE TECHNOLOGY

### A.     Computer Execution of Instructions

4.     A digital computer is an electronic device that manipulates information in the form

---

[1]     Citations to "Ex. __" refer to exhibits attached to the Declaration of Anthony G. Beasley in Support of Counterclaim-Defendants' Responsive Claim Construction Brief.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

of numbers. By agreements among designers and builders and users of computers, numbers represent all kinds of information, as well as instructions to manipulate that information, and locations in the computer where information and instructions are stored.

5. A computer stores numbers in storage locations. Storage locations have addresses. Each address for storing information is represented by a number, not unlike the number of an apartment in an apartment building. Information such as the letter "A" is represented, according to one commonly used convention, as the number decimal 65. Information such as the instruction, "move the contents of register one into register two," is represented as the Octal number 10102 (or 4162 decimal), in one computer that was popular a few years ago.

6. The basic structure of a digital computer can be represented as three "boxes" that are connected to each other. One box is called a memory because it contains the numbered storage locations where information and instructions are stored ("written") and from which they may be recalled ("read"). A common term for memory is RAM. Another box is called the central processing unit, or CPU, because it can read instructions from the memory and carry out those instructions to, e.g., read information in the memory and perform operations using that information, such as addition and comparison, and then write the results of these operations back to memory. The third box is called Input/Output or I/O (the slash is silent). This box in turn connects to external devices such as a keyboard, mouse, video display, hard disk drive, network and the like that are used by the CPU as a source of data and instructions to be written to memory, and as the destination of data to be presented to users of the computer.

7. An instruction set is the set of machine instructions that a processor recognizes and can execute. It is important to understand that this definition means all of the instructions, not just some of them. This meaning comes from mathematics and logic, which are foundations of computer design. The reason that this phrase means "all" is that a "set" is a collection of members that satisfy a rule. The rule in this case is that every member of the set must be an instruction that a processor recognizes and can execute. For any particular processor, all of the instructions it is designed to recognize and execute satisfy this rule, therefore the set contains all such instructions. Each instruction represents some particular operation that a computer

- 3 -

performs, and nearly all instructions also designate data on which the operation is to be performed, usually by giving the address (also a number) of that data.

8.     When a computer is running, we say that the CPU is executing a program.  A program is a list of instructions stored in RAM (as numbers).  In order to execute the program, the CPU possesses a counter, which is a specialized storage device that holds one number, and that can quickly increase or decrease that number in response to a command, hence the name "counter."  This particular counter keeps track of the location (again, a numbered address) in storage of the instruction that is to be executed next.  This counter is called the Program Counter (PC).  The execution of each instruction can be broken into three steps.  First, the CPU must read the instruction from memory.  This is called the "fetch" step.  Then the CPU must determine which instruction the number fetched from memory represents, so that it knows what operation to perform (addition or comparison or something else).  This is called the "decode" step.  Once the CPU has decoded the instruction, it must carry out the operations required by that instruction, and this is called the "execute" step.  This cycle of fetch-decode-execute is repeated as long as the CPU is running and is how the CPU gets the work done that it was assigned to do.

**B.     Instruction Sets**

9.     The architecture of a computer is, as the word suggests, its grand design.  An architecture is the manner in which the components of a computer or computer system are organized and integrated.  The basic components from which computers are built are arithmetic elements consisting of circuits that perform addition, subtraction and the like, registers and memories (groups of registers) that store values on which arithmetic is performed, and switches that connect registers and arithmetic elements to each other.  These elements are controlled by instructions that move information among the elements a step at a time.

10.     Consistent with what is well known to one skilled in the art of computer design, the patent states that an instruction set is an architecture.  That means all of the instructions, taken as a whole, are part of the architecture.  That is why the word "set," is important, because instruction set means all of the instructions, not some arbitrary group.  Further, for one instruction set to be separate from another, its design must be neither restricted nor enabled by another's

DECLARATION OF THOMAS A. GAFFORD

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1   design. Consistent with statements made by Applicants during prosecution (see below), and of
2   common knowledge to those skilled in the art of computer design, the fact that the instruction sets
3   of the Intel 386 and 486 processors are different does not mean that they are separate instruction
4   sets. All of the instructions of either of these processors are part of an architecture that Intel calls
5   "Intel Architecture," and that is why they are not separate instruction sets. Because they share a
6   common architecture, most of the instructions of the 386 and 486 processors are the same, and all
7   of these common instructions have the same encoding. Such computers serve as an example of
8   CISC computers in the Blomgren disclosure, where CISC stands for Complex Instruction Set
9   Computer. The Blomgren disclosure also describes another architecture called RISC (Reduced
10  Instruction Set Computer) as having a single instruction set, and that is also consistent with how
11  such computers are viewed by others skilled in the art of computer design. The purpose and
12  arrangement and addressing design of instructions in a RISC set are quite different from those
13  aspects of a CISC set, and the designers, for example, of the IBM PowerPC RISC instruction set
14  chose the encoding of the set with no regard, and no need for any regard, of the way that the Intel
15  CISC instruction set is designed and encoded. It is important to understand that a RISC
16  architecture isn't just a CISC architecture with a few instructions left out, it is a completely
17  different design philosophy with a completely different approach to accomplishing work with
18  each instruction, and a completely different approach to addressing memory using instructions.

19          **C.    Instruction Format**

20          11.     When engineers take on the task of designing a computer, one of the questions
21  they must answer is, "What instructions do we want this computer to be able to execute?" For
22  example, while nearly all digital computers can perform the operations of adding and subtracting,
23  there are many choices to be made about how each instruction addresses memory to read and
24  write the information in RAM that is to be manipulated, whether or not to add the carry from a
25  previous addition, and so on. Each such piece of information is called an "operand." Instructions
26  typically specify the address of one or more "source" operands which contain the information to
27  be, for example, added, and a destination operand, which is the address where the result is stored.
28  Numeric values are then assigned to each operation, and to each operand address. The

Case No. CV-08-0986-SI          - 5 -          DECLARATION OF THOMAS A.
                                                        GAFFORD

1    arrangement of digits representing these values is called the "format" of the instruction, and is

2    part of the design of the instruction set. Once these questions are answered, we say that an

3    "instruction set" has been defined. The choice of which number represents which instruction is

4    called the "encoding" of the instruction set. The selection of a particular number for a particular

5    instruction depends on that number not being used for any other instruction in the same set.

6    Therefore the encoding of instructions within one instruction set is interdependent. Conversely, if

7    two instruction sets are separate and independently encoded, then a number used to encode a

8    particular instruction set may be used without restriction in the other instruction set.

9    **D.   Decoders**

10    12.    In the preceding paragraph, I said the instructions are encoded into numbers. As I

11    also said above, a program is a list of instructions stored in computer memory, in the form of

12    numbers, according to this encoding. When a computer executes a program, it reads these

13    instructions from memory in form of numbers. This process is called "instruction fetch." Once

14    an instruction is fetched, it must be decoded. A circuit called, not surprisingly, a "decoder," does

15    this job. The decoder receives the number representing the particular instruction, and interprets it

16    to find out what instruction it is. Based on that interpretation, the decoder sends signals to the

17    units in the computer that will execute the instruction. Each instruction in an instruction set has a

18    different numerical value, or code. If a computer is executing, for example, the Intel x86

19    instruction set, and fetches an instruction code of 0, the x86 decoder determines that an ADD

20    operation is called for by the present instruction, and that decoder then controls the circuits of the

21    computer to perform this ADD operation on the values to be added together, which are indicated

22    by other parts (the address portions) of the instruction. If on the other hand a computer is

23    executing the IBM PowerPC RISC instruction set, in order to perform an ADD, it would need to

24    receive the instruction code 14 decimal. If that same RISC decoder received 0 for an instruction

25    code, it would signal an error, because 0 in the RISC instruction set is not the encoding of any

26    instruction. While there may be instances in the history of computer design where the same code

27    meant the same instruction in two different instruction sets, in general, this is not the case. A

28    single decoder is enough for decoding one instruction set, and each separate instruction set must

have a separate decoder, because the behavior of the decoder must, in general, be different for each instruction set when presented with the same code. Again, 0 in CISC means ADD, 0 in RISC means error. The same decoder circuit cannot produce both results. On the other hand, while a single decoder mechanism is sufficient to decode one instruction set, a designer might choose to use more than one decoder in order to improve performance. This is the thrust of several prior art references distinguished during the Blomgren prosecution, such as the Onishi patent (Ex. R), which adds a second decoder to deal with a subset of instructions from the same instruction set, in the interests of faster operation.

13. The option to use more than one decoder for a single instruction set is purely a design choice, and does not imply independence of one part of an instruction set from another. The encodings for different instructions within a particular instruction set are necessarily interdependent, because the choice of a particular number to represent one instruction in a set precludes the use of that same number to represent a different instruction. Thus the term "independent" is consistent with how instructions for a single instruction set are encoded.

14. On the other hand, the choice of a particular number to represent an instruction in the x86 set has no impact whatsoever on the choice of numbers to represent instructions in the Power RISC set. That is what independence means.

## IV.   LEVEL OF ORDINARY SKILL IN THE ART

15. The level of skill in the art of computer design, and particularly in the art of computer architecture design, is high. A successful computer architect must have at least a thorough knowledge of computer programming, computer logic design, and comparative computer architectures. With my graduate studies nearly completed, I was offered a job only in a memory circuit design group of the Amdahl Computer corporation. I was seven years out of my graduate studies before I joined a computer processor design team, and the architect for whom I worked had over ten years' experience. This level of experience and education is typical.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

## V.   HOW ONE OF ORDINARY SKILL IN THE ART WOULD VIEW THE BLOMGREN '750 PATENT AND TERM "SEPARATE INSTRUCTION SETS"

### A.   The '750 Patent and Prosecution History

16.     Applicants describe the existing x86 type processor and the newer PowerPC RISC processor. These separate processors each can execute only one instruction set. Applicants state that it would be an advantage for a single RISC processor to be able to execute both instruction sets. Applicants disclose a RISC processor with a second decoder for x86 instructions that shares all the other resources of the RISC processor. In short, the disclosure replaces two complete computer processors with one that shares all processor elements except the decoder in order to execute two separate instruction sets.

17.     The Blomgren disclosure identifies two separate instruction sets: the set used by all IBM-compatible PCs, the Intel "x86" set, and the PowerPC RISC set, used by a rival type of computer chip made by IBM and used for a time in Apple Macintoshes and many commercial computers. The two instruction sets were designed according to very different design principles and goals.

18.     All of the instructions of an x86 processor are a single architecture. All of the instructions of an IBM Power RISC processor are another architecture, separate from the x86 architecture. No decision made in the design of one architecture placed any limitation whatsoever on the design of the other. Applicants told the patent examiner that RISC and CISC were two separate instruction sets and that extensions or partitioning of a single instruction set did not result in a separate instruction set.

19.     Claims 1 and 14 of the Blomgren patent include multiple instances of the limitation "instruction set." The word "separate" is an important and meaningful modifier for the term "instruction set," because it defines the relationship between the "first" instruction set and the "second instruction set, and because it draws a bright line between instructions that may be members of the same set and instructions that must be members of different sets.

20.     Samsung urges construing the limitation "separate instruction sets" to be "distinct groups of instructions." I believe this is wrong for several reasons. "Distinct" and "separate" are

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

synonyms. Replacing one of these words with the other provides little guidance. Replacing "set" with "group," however, changes drastically, rather than clarifies, the meaning of the allowed claim. The substitution of "group" ignores and abandons the meaning of the term "instruction sets." An instruction set is not just any group of instructions. It is all of the instructions of a particular architecture, which is a strategy for creating a computer. In the sense that computer architecture is the manner in which the components of a computer or computer system are organized and integrated, the instruction set of a computer is an organized and integral whole. One instruction set is a different design strategy from another just as a suspension bridge is a different design strategy from a girder bridge. RISC and CISC specifically show the different design strategies required by the limitation "separate instruction sets." An instruction set is all of the instructions for a particular architecture, and is like an alphabet because instructions and letters are each a set of symbols with which a language is written. A program is like words or sentences in a language.

21.     Using this analogy, "abc" and "def" are distinct groups of letters of the Roman alphabet. They meet the definition "distinct groups of letters," but they do not meet the definition "separate alphabets." On the other hand, "separate alphabets" would be met by the Roman and Greek alphabets. CISC and RISC are like Roman and Greek in the sense that they are separate alphabets. Just as CISC and RISC sets both have an ADD instruction, the two alphabets both have a symbol for a letter whose sound is the sound of the Roman "R," but they are different symbols. Different letters must have different shapes, and each shape must mean exactly one letter. Otherwise the alphabet would be unintelligible. On the other hand independent encoding of the separate alphabets Greek and Roman means that Greek can use the shape "P" to encode a completely different sound (the Roman "R" sound) than this shape encodes in the Roman alphabet.

23.     In the separate instruction sets identified in the Blomgren disclosure, the particular RISC instruction set uses the operation codes 12 through 15 for a variety of ADD instructions, whereas the CISC instruction set uses the operation codes 0 through 5, also for a variety of ADD instructions. Conversely, the CISC instruction set uses the codes 12 and 13 for an OR (an

1   instruction used to in logic rather than arithmetic). If the CISC instruction set were not separate

2   from the RISC set, it could not use the code 12 for OR. In fact, because the two sets are separate,

3   either set can use any code it wishes to use.

4       24.    Applicants told the patent examiner that Intel computer models 386 and 486 did

5   not have separate instruction sets and that the 486 set is a mere extension of the 386 set, having

6   most opcodes in common. Brief on Appeal at 4, Aug. 29, 1995 (Ex. I). I agree with applicants.

7   The Intel document "Intel Architecture Software Developer's Manual Volume 3: System

8   Programming," dated 1999, shows on page 18-5 that the Intel 486 computer had 6 instructions

9   that the 386 did not. Intel and those skilled in this art, including the inventors, all describe the

10  386 and 486 as sharing the same instruction set and architecture, generally referred to as the x86

11  architecture and instruction set. Applicants also told the examiner that "mere extensions of

12  instruction sets must have dependent encodings since otherwise one opcode could be used for two

13  instructions." Amendment and Response at 7, May 22, 1995 (Ex. H). I agree with applicants'

14  statement that "386 and 486 instruction sets do not meet claim limitations for separate instruction

15  sets." Brief on Appeal at 4, Aug. 29, 1995 (Ex. I). Since the 386 set is only a portion of the 486

16  set, it follows that no instruction set can be partitioned into two portions that can be regarded as

17  separate from each other within the meaning of the claims. It doesn't matter if the partition is

18  based on a difference in instructions, or in addressing modes, or any other criteria. Such portions

19  are not separate, and they are not independently encoded within the meaning of the claims.

20  Within the same instruction set, opcodes must be encoded dependently of each other, so that a

21  particular opcode has only one valid decoding. When instruction sets are separate, they are

22  independently encoded, and an instruction in one set may have the same encoding but a

23  completely different function than an instruction in the other set.

24      **B.**    **The Prior Art References**

25      25.    The Onishi (Ex. R), Lee (Ex. S), Ueda (Ex. U) and Agnew (Ex. T) references

26  disclose designs in which multiple decoders are used.

27      26.    Onishi discloses replacing a single decoder for all instructions of a single

28  instruction set with two decoders. One decodes a portion of the instructions, the other decodes

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1   the remainder. Onishi describes certain inefficiencies that arise when decoding all the
2   instructions in one instruction set with a single decoder. '988 at 1:22-38 (Ex. R). He discloses a
3   second decoder to allow some of the instructions in the set to be executed faster. '988 at Cl. 2
4   (Ex. R). These instructions are called "branch" instructions. '988 at Cl. 2 (Ex. R). The Program
5   Counter, described above, provides the address of the next instruction to be executed most of the
6   time, but not in all cases in a digital computer. Sometimes it is necessary for the next instruction
7   to be chosen out of sequence. Instructions that cause the execution sequence to be changed are
8   called "branch" instructions. Such instructions store a new value in the Program Counter, so that
9   the next instruction to be executed comes from an address that is not located immediately after
10  the present instruction. The Onishi patent discloses an improvement to computer design in which
11  branch instructions are processed by a different decoder than the one used to process instructions
12  that do not branch.

13      27.    Element 14 of Fig. 5 is Onishi's second decoder 9 of Fig. 3:



FIG . 3

25  '988 at Fig. 3 (Ex. R). Decoder 14 has output 31 that indicates instruction is not a branch
26  instruction. '988 at 4:48-50 (Ex. R). Details of the 1st decoder are not shown in Fig. 5, but since
27  the first decoder is in the prior art, none are needed. Fig. 3 is sufficient to show that there are two
28  decoders, one for branches and one for non-branches. Branches are separately decoded in order

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1    to improve the speed of execution of the computer. '988 at 6:39-44 (Ex. R). There is no mention

2    of multiple instruction sets, so there must be only one instruction set, consisting of branch and

3    non-branch instructions. Onishi does not suggest that branch instructions constitute a separate

4    instruction set from non-branch instructions, and applicants emphasized that both types are part of

5    a single instruction set, during prosecution. Amendment and Response at 11, Feb. 14, 1995 (Ex.

6    F). Onishi attains faster execution of branch instructions by sending them to a second decoder.

7    Applicants attain execution of instructions from a separate instruction set by sending them to a

8    second decoder, and obtained their claims by emphasizing this difference to the examiner.

9        28.    Even though Onishi's structure of two decoders with one execution element is

10   nearly identical to applicant's, applicants stressed that their invention required not just two

11   decoders, but also required two separate instruction sets, which Onishi did not disclose.

12       29.    Lee discloses adding instructions to extend an existing single instruction set

13   computer (to give it more capabilities without altering the original architecture), and adds one or

14   more additional decoders and execution units for the new instructions. '242 at 1:9-21 (Ex. S).

15   The disclosure has as its basis, one computer with one decoder and one instruction set. '242 at

16   2:30-35 (Ex. S). The improvement is to add instructions to the set, and for each group of new

17   instructions, add a processor (Lee calls this an "assist") to execute the new instructions. '242 at

18   2:40-45 (Ex. S). Lee starts with one instruction set, one processor, and one decoder, and changes

19   that to one extended instruction set, multiple processors, and multiple decoders. Applicants

20   distinguished Lee as having extensions to an instruction set with dependent encodings, not

21   separate instruction sets. Amendment and Response at 7, May 22, 1995 (Ex. H). The result of

22   Lee's invention is flexibility in that one can extend an instruction set with instructions that were

23   not designed or even contemplated at the time the base computer was designed. '242 at 4:3-13

24   (Ex. S).

25       30.    Agnew addresses the problem of building a large computer with small elements.

26   '803 at 4:39-52 (Ex. T). He starts with a known mainframe (a single large computer) design and

27   divides its instruction set into subsets (partitions). '803 at Abstract (Ex. T). He then implements

28   on individual integrated circuits ("chips" in common parlance) a decoder and an execution unit

Case No. CV-08-0986-SI          - 12 -          DECLARATION OF THOMAS A.
                                                GAFFORD

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

for each subset. '803 at 4:61-66 (Ex. T). He states that this provides the advantage that the element that executes the most commonly encountered instructions can be made smaller, preferably on one integrated circuit, and is thus faster than a circuit that must execute all the instructions in the set. '803 at 13:6-13 (Ex. T). The result of the Agnew invention is improved speed for an economical design. As with Lee, the result is a structure with multiple computing elements, having one decoder per computing element. Applicants characterized Agnew as being similar to Lee and different from their own invention because Agnew taught a single instruction set. Amendment and Response at 7, May 22, 1995 (Ex. H).

31. Ueda starts with a computer that has a single instruction set, partitioned into two subsets, each of which is executed by a separate decoder, control and execution unit, and in which each execution unit must wait for the other to finish its work before proceeding. '187 at Abstract (Ex. U). The improvement he discloses is a mode in which the second control unit controls the second execution unit independently of the first control unit, permitting two programs to be executed at one time, which produces higher performance. '187 at 9:24-32 (Ex. U). Here is yet another computer with multiple decoders, distinguished by applicants because it has only a single instruction set, even though that set is divided into first and second instructions that may be decoded by multiple decoders. Amendment and Response at 13, Sept. 20, 1994 (Ex. D).

32. Portanova discloses a RISC computer with a single instruction set and a single decoder that may be programmed to emulate a separate instruction set. '934 at Abstract (Ex. V). When a computer emulates the instruction set of another computer, it does not directly execute the new instruction set in its hardware, rather it uses instructions written in its own instruction set to read, decode and execute the other instruction set. Such a computer has a single decoder and execution unit, and was distinguished by applicants because it is not a dual-instruction set processor such as disclosed by applicants. Amendment and Response at 8, May 22, 1995 (Ex. H).

33. The de Nicolas disclosure describes a computer that, similar to Portanova, simulates (a synonym for emulates) an instruction set other than its own using software, the particular improvement being a way to do so faster than was known in the prior art. '023 at Abstract (Ex. W). Applicants distinguished this reference by emphasizing that the hardware

disclosed did not execute both a RISC and a CISC instruction set. Amendment and Response at 12, Sept. 20, 1994 (Ex. D). The result disclosed for the de Nicolas invention is the ability to efficiently execute an older computer's instruction set on a newer computer that possesses a single, and different, instruction set.

34. In summary, applicants made clear that multiple decoders for extensions to an instruction set do not result in a new instruction set, that multiple decoders for the partition of one instruction set does not create two instruction sets, that execution of a second instruction set by emulation without a second hardware decoder is not their invention, and that the definition of what constitutes a separate instruction set is vitally important to the expression of their invention in the claims.

The statements made in this declaration are made based on my personal knowledge and on my years of experience in the field of computer design. I declare under oath and under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. Executed on this 30th day of March, 2009, at Minneapolis, Minnesota.

Thomas A. Gafford

# GAFFORD
# EXHIBIT A

Thomas A. Gafford
March 11, 2009

Pursuant to FRCP 26(a)(2)(B), this is a list of all cases in which I have given testimony at trial (T), hearing (H) or at deposition (D) in the last four years. All are Federal District Courts, date given is date of most recent testimony if known, or date of start of involvement in case. I am the author of no publications within the last 10 years, other than being a named inventor on US patents nos. 5,684,966, 5,621,899, 5,758,109 and 6,154,799:

| date & type of test. | parties | client | case number | subject matter |
|---|---|---|---|---|
| 10/08 (D) | Positive v. LG Displays | Positive | Eastern Dist. Of TX, Marshall Div. 2:07-CV-67-TJW | Control of LCD displays |
| 12/07 (D) | Kodak v. St. Clair | St. Clair | CA Sup. Ct., County of Santa Clara 1-05-CV-039164 | Digital camera control and data recording formats |
| 03/07 (D) | Midtronics v. WEL | Midtronics | E. Div., N Dist. of IL 06-CV-1685 | Control of battery testers |
| 09/06 (D) | FortuNet v. Planet Bingo | FortuNet | Dist. of Nevada CV-S-04-0556-RCJ-RJJ | Control of gaming console |

# GAFFORD
# EXHIBIT B

848 N. Rainbow Blvd. #2628 • LAS VEGAS, NV 89107-1103
PHONE 702.736.8660 • FAX 310.464.3046 • EMAIL TOM@GAFFORD.COM

# THOMAS A. GAFFORD
# Gafford Technology

February 4, 2009

## SUMMARY OF QUALIFICATIONS

- Extensive knowledge of analog and digital electronic circuitry, digital computer technology, computer peripherals and computer system design, control systems, operating systems, and transaction processing software.

- Skilled articulation of technical material for both non-technical and technical audiences, with special attention to claim construction issues.

- In-depth analysis of electronic and computer apparatus and functionality.

## EDUCATION

**University of Washington**                                          Seattle, Washington
*Earned Bachelor of Science in Electrical Engineering, 1972*
Key areas of concentration included digital and analog circuit analysis and electromagnetics.

**Stanford University**                                              Palo Alto, California
*Enrolled in Master of Science in Electrical Engineering, 1972-73.*
Coursework included logic, circuit and computer design, computer architecture, LISP and ALGOL programming, software algorithm design, and system programming.

## PROFESSIONAL EXPERIENCE

1986-   **Gafford Technology**                                       Harbor City, California
Now     *Founder and Owner*
        Firm undertakes R&D projects, provides computer system-related services, and offers analysis and
        presentation services that clearly and concisely explain computer and electronic technology to
        assist clients in litigation efforts.

        Specific services include consulting in computer system design, software selection, and network
        configuration; providing expert factual analysis, claim interpretation assistance, prior art
        investigation and testimony in patent and hardware / software systems litigation; conducting R&D
        projects in peripheral switch design and application of hardware design language tools to
        peripheral interconnection design. Firm has manufactured and sold peripheral switching
        equipment.

1983-   **Softix, In corporated**                                    Campbell, California
1986    *Co-Founder and Head of Engineering*
        Firm designed and produced reliable and easily maintained systems to control and sell
        entertainment tickets by ticket agencies and large arena complexes in the United States, Canada,
        Australia, and Hong Kong. The firm was sold in 1987.

Responsibilities included co-managing software development efforts; developing architecture, design, sales, contracting, production, and field support of large-scale software and hardware systems; analyzing, debugging, and writing software application and driver programs for feature enhancements and system integration.

Also responsible for selection, evaluation, integration, installation, customer staff training, and repair support of all hardware components of dual minicomputer systems; for research into graphic printing systems suitable for ticket sales; for development of peripheral switch equipment for evolving system requirements; for the manufacture and sale of peripheral switching equipment.

| | | |
|---|---|---|
| 1976-<br>1983 | **G Systems**<br>*Founder and Owner* | Santa Clara, California |

Firm managed hardware and software design and development of computer transaction processing systems for a variety of applications and customers, as well as consulting in other hardware design projects.

Projects included design of hardware and software interfaces for disk controller; co-design of mainframe computer and design of mainframe computer elements; design of replacement printer which substituted all traditionally hard-wired functions with software functionality in communication and mechanism controls; design of peripheral switches incorporated into system product; writing of communications software and device drivers. Assisted legal team in patent litigation as technical expert in disk control systems.

| | | |
|---|---|---|
| 1973-<br>1976 | **Stanford University Artificial Intelligence Laboratory**<br>*Engineer* | Palo Alto, California |

Position was responsible for computer engineering projects including support of robotics research.

Duties included design, construction, and debugging motor controls and sensor electronics for a robotic arm and its computer interfaces; maintenance and enhancement of large assembly-language software system used for logic design and PC board layout; maintenance of hardware for mainframe timesharing system for lab staff, including ARPANET connection and Xerographic printing equipment.

| | | |
|---|---|---|
| 1967-<br>1970 | **United States Air Force**<br>**McChord Air Force Base**<br>*Sergeant and Instructor* | Tacoma, Washington |

Maintenance technician for air defense computer system; electronics instructor in on-the-job training programs; specialist in analysis and repair of problems in areas beyond standard training and documentation.

## PATENTS

United States Patent #5,621,899          August 15, 1997
*Method for Operating a Repeater for Distributed Arbitration Digital Data Buses*

United States Patent #5,684,966          November 4, 1997
*Switch for Distributed Arbitration Digital Data Buses*

United States Patent #5,758,109          May 26, 1998
*Repeater/Switch for Distributed Arbitration Digital Data Buses*

United States Patent #6,154,799          November 11, 2000
*Repeater/Switch for Distributed Arbitration Digital Data Buses*

## ADDITIONAL PROFESSIONAL ACTIVITIES

*Institute of Electrical and Electronic Engineers* Member

# CASE EXPERIENCE

Cases are grouped into four areas. All cases listed required extensive research and technical analysis. Where expert testimony at trial also occurred, it is noted. The party who is my client is underlined.

## CIRCUIT DESIGN
Experience in this area involves low-level analysis of electronic circuits, usually without regard for any larger system in which the circuits might be used.

| *Date* | *Case* | |
|---|---|---|
| 01/94 to 07/94 | **Wang v. <u>Mitsubishi</u>**<br>Patent litigation relating to memory modules. | *trial testimony* |
| 11/95 to 03/96 | **Waffer v. <u>Fritz Forwarding</u>**<br>Litigation involving value of computer monitors based on service history and construction quality. | *arbitration hearing testimony* |
| 11/96 to 12/97 | **<u>United Technology Automotive</u> v. National Semiconductor**<br>Patent litigation relating to power control integrated circuits. | |
| 05/97 to 09/98 | **Oneac v. <u>Raychem</u>**<br>Patent litigation relating to circuits for telephone line surge suppression. | |
| 06/97 to 06/97 | **<u>Harris Semiconductor</u> v. Hyundai**<br>Patent litigation involving static ram IC circuitry. | |
| 12/98 to 03/00 | **<u>Xerox</u> v. Hewlett-Packard**<br>Patent litigation relating to electrical circuitry of thermal inkjet printheads. | |
| 02/01 to 09/02 | **<u>ICS</u> v. Realtek, <u>ICS</u> v. Cypress, Cypress v. <u>ICS</u>**<br>Patent litigation involving clock generator IC circuits. | |
| 05/01 to 07/01 | **<u>Altera</u> v. Xilinx, Xilinx v. <u>Altera</u>**<br>Patent litigation involving FPGA circuitry. | |

# CASE EXPERIENCE

<u>CONTROL OF SYSTEMS</u>
Case experience in this area involves design of electronics that control other systems; the electronics may or may not include computers or software, since the emphasis is on the control design.

| *Dates* | *Case* |
|---------|--------|
| 11/85 to 01/87 | **IJR v. Colt Industries**<br>Patent litigation relating to circuitry controlling Electrical Discharge Machining equipment. |
| 06/87 to 01/90 | **BRC v. Shoup**<br>Patent litigation relating to control of electronic voting machines. |
| 02/88 to 10/89 | **IJR v. Sodick**<br>Further patent infringement litigation involving same technology as above, with emphasis on extensive analysis of software. |
| 03/88 to 10/88 | **Westek v. Tri-Lite**                                    *trial testimony*<br>Patent infringement litigation relating to touch sensitive lamp dimmer modules. Managed creation of animated model of patented invention and accused infringing circuit. |
| 02/90 to 01/93 | **FMC v. Hennessy**<br>Trade secret litigation involving technology of automotive wheel service equipment and associated electronics and optics. |
| 09/90 to 02/93 | **Telepanel v. Pricelink, ERS v. Telepanel**<br>Patent infringement litigation involving retail shelf price electronic display systems. |
| 11/90 to 03/91 | **Astro Med. v. Western Graphtec**<br>Patent infringement litigation in the area of thermal printing chart recorders. |
| 07/91 to 01/93 | **IGT v. Bally**<br>Patent infringement litigation involving microcomputer-controlled gaming machines. |
| 08/91 to 07/92 | **Intermedics v. Ventritex**<br>Trade secret litigation involving analog and digital circuitry used in pacemaker and defibrillation devices. |
| 01/92 to 05/92 | **Qume v. Ultra-Stor**<br>Trade secret litigation involving microcomputer disk drive controllers. |
| 01/92 to 11/92 | **Eswaran v. AT&T**<br>Patent infringement litigation involving microcomputer controlled telephone answering machines. |
| 03/92 to 12/92 | **Honeywell v. Seatt**<br>Patent infringement case involving microcomputer-controlled thermostats. |
| 11/92 to 04/95 | **Lemelson v. Mitsubishi**<br>Patent litigation relating to machine vision and computer information storage and retrieval. |

02/93 to 08/94      **Lockwood v. American Airlines**
Patent infringement litigation involving transaction processing systems and terminals.

08/93 to 06/94      **Maxtor v. NEC**
Patent litigation relating to disk drive electronics.

10/93 to 09/94      **Octel et al. v. Theis**      *trial testimony*
Patent litigation relating to voice message storage and retrieval.

04/94 to 01/95      **A&L Technologies v. Resound**      *trial testimony*
Patent litigation involving electronics for the control of hearing aid amplifiers.

05/94 to 05/95      **Fonar v. General Electric**      *trial testimony*
Patent litigation involving the control of magnetic resonance imaging (MRI) equipment.

7/94 to 12/94      **Golden Enterprises v. AT&T**
Trade secret litigation involving the control of voice prompting systems.

10/94 to 04/96      **Golden Enterprises v. Rockwell**
Patent litigation relating to the control of telephone announcement systems.

12/94 to 02/95      **Midtronics v. Telecom Assistance Group**
Patent litigation involving control electronics for battery chargers.

03/95 to 11/95      **Worldtronics v. Black & Decker**
Patent litigation relating to appliance timing and control.

03/95 to 10/95      **Tidel v. Mallory**
Litigation relating to remote sensing of fluid storage and delivery systems.

07/95 to 09/96      **Global Gaming v. IGT**      *trial testimony*
Patent litigation involving computerized slot machine control technology.

07/95 to 07/00      **Quantum Group v. American Sensors et al.**
Patent litigation involving carbon monoxide detector control technology.

07/95 to 06/01      **Sudbury Systems v. Dictaphone**
Patent litigation involving voice storage and retrieval control technology.

07/95 to 01/96      **Alevy v. Fairplan**
Litigation relating to the value of appliance monitoring computers.

06/96 to 08/00      **IMS v. Haas, et al.**      *trial testimony*
Patent litigation in technology relating to machine tool controls.

02/97 to 11/98      **Foxboro v. Honeywell**
Patent and contract litigation in technology relating to industrial process control communication systems.

06/97 to 09/05      **Fulhorst v. UTA et al.**
Patent litigation in technology relating to automobile alarm control circuits.

06/97 to 01/98      **Card-Monroe v. Tuftco**
Patent litigation in technology for carpet tufting machine controls.

| | |
|---|---|
| 07/97 to 03/99 | **Worldtronics v. <u>High Performance Appliances</u>**<br>Patent litigation in technology relating to appliance timing and control. |
| 01/98 to 08/98 | **Quorum v. <u>Emerson Electric</u>**<br>Patent litigation brought against Quorum International in technology relating to AC motor control. |
| 01/98 to 11/98 | **<u>Honeywell</u> v. Foxboro** *trial testimony*<br>Patent litigation in technology relating to industrial process control sensor systems. |
| 01/99 to 05/99 | **<u>Relume</u> v. Philips et al.**<br>Patent litigation relating to control of LED traffic signal lamp power supplies. |
| 06/99 to 11/99 | **<u>Regent Lighting</u> v. DESA**<br>Patent litigation relating to control of motion sensitive outdoor lighting. |
| 03/99 to 03/00 | **<u>Midtronics</u> v. Actron**<br>Patent litigation relating to electronic control of automobile battery testing equipment. |
| 01/00 to 06/00 | **UTA v. <u>Praxair</u> et al.**<br>Insurance litigation involving value of instrumentation electronics. |
| 01/00 to 05/00 | **<u>Fonar</u> v. Healthsouth**<br>Patent litigation involving the control electronics of magnetic resonance imaging (MRI) equipment. |
| 03/00 to 07/00 | **<u>Dark Horse</u> v. Sega**<br>Patent litigation involving control of arcade game machines. |
| 03/00 to 06/00 | **Lemelson v. <u>Maxim</u>**<br>Patent litigation involving control of semiconductor process equipment. |
| 04/00 to 08/03 | **Chamberlain v. <u>Lynx</u>**<br>Patent litigation involving garage door controls. |
| 04/00 to 03/01 | **<u>Calabrese</u> v. Bosch, et al.**<br>Patent litigation involving industrial data communication system. |
| 05/00 to 06/03 | **<u>Snap-On</u> v. Hunter, Hunter v. <u>Snap-On</u>**<br>Patent litigation involving controls for automotive repair instruments. |
| 10/00 to 10/01 | **SSK v. <u>Clapper Industries</u>**<br>Trade secret litigation involving gaming machine controls. |
| 11/00 to 04/02 | **<u>Beery</u> v. Thomson C.F.**<br>Patent litigation involving television channel selection systems. |
| 02/01 to 06/01 | **<u>Laser Sight</u> v. Visx, Visx v.<u>Laser Sight</u>**<br>Patent litigation involving vision correction machine controls. |
| 03/01 to 10/02 | **<u>Digi</u> v. Stallion**<br>Patent litigation involving serial communications controllers. |
| 06/01 to 06/01 | **<u>Phone-Tel</u>**<br>Negotiations over telecommunication system control patents with Verizon. |

| | |
|---|---|
| 06/01 to 06/02 | **Soundview v. Sony et al.**<br>Patent litigation involving parental control circuit for TV. |
| 06/01 to 06/03 | **Lear Automotive**<br>Consulting for patent enforcement in automotive electronics related portfolio. |
| 09/01 to 05/03 | **Schneider Automation v. Opto-22 Corp.**<br>Patent litigation involving web accessible programmable controllers. |
| 01/02 to 08/02 | **Cacheflow et al. v. NCT**<br>Patent litigation involving web caching system controls. |
| 01/02 to 04/02 | **Emhart v. Bottero**<br>Patent litigation involving control of glass bottle making machinery. |
| 01/02 to 03/03 | **St. Clair v. Sony Corp.**            *trial testimony*<br>Patent litigation involving digital camera software and hardware control apparatus. |
| 03/02 to 09/02 | **Advanced Communication v. Premiere Retail**<br>Patent litigation involving store promotion display media control systems. |
| 09/02 to 09/03 | **Jackson v. Nortel et al.**<br>Patent litigation involving telephone line remote control apparatus. |
| 02/03 to 04/03 | **Catalina v. Coolsavings**<br>Patent litigation involving an automated sales coupon dispensing control system. |
| 03/03 to 10/04 | **St. Clair v. Casio et al.**            *trial testimony*<br>Patent litigation involving digital camera software and hardware control apparatus. |
| 04/05 to 04/05 | **Solaia v. Rockwell et al.**<br>Patent litigation relating to interface between spreadsheet programs and industrial control systems. |
| 08/05 to 09/05 | **Guidant v. St. Jude**<br>Patent litigation relating to control of cardiac pacemakers. |
| 09/05 to present | **Midtronics v. DHC, WEL, Argus**<br>Patent litigation relating to electronic control of automobile battery testing equipment. |
| 10/05 to 10/06 | **Fortunet v. Planet Bingo and Melange**<br>Patent litigation relating to control of gambling terminals. |
| 01/06 to 05/06 | **EMD v. Wi-Tronix**<br>Trade secret litigation relating to control of locomotive data systems. |
| 04/06 to 10/08 | **Positive Technologies vs. Benq, et al.**<br>Investigation as to infringement of claims relating to flat panel display control. |
| 04/06 to 12/06 | **In re NCT**<br>Patent re-exam proceedings for claims involving web caching system controls. |
| 11/06 to 11/07 | **NCT**<br>Study patents and related industry in field of web caching system controls. |

| | |
|---|---|
| 12/06 to 05/08 | **St. Clair v. Kodak**<br>Patent litigation involving digital camera software and hardware control apparatus. |
| 02/07 to 03/08 | **Visto Corporation v. Good Technology, Research In Motion, Microsoft**<br>Patent litigation involving network synchronization of handheld computers to servers |
| 06/08 to present | **Copper v. Sony, Nintendo**<br>Patent litigation involving wireless control of apparatus |
| 07/08 to present | **Beery v. DirecTV**<br>Patent litigation involving television channel selection systems. |
| 07/08 to 09/08 | **Cisco**<br>Patent litigation involving control of power delivery over Ethernet |
| 07/08 to present | **AMD v. Samsung, Samsung v. AMD**<br>Patent litigation involving various system and circuit issues |
| 11/08 | **Robins Kaplan**<br>Study patent involving music player technology |
| 11/08 to present | **St. Clair v. Samsung, et al.**<br>Patent litigation involving digital camera software and hardware control apparatus. |

# CASE EXPERIENCE

<u>COMPUTER DESIGN</u>
Case experience in this area involves design of the computer itself, usually without regard to how the computer may be used.

| *Dates* | *Case* |
|---|---|
| 01/81 to 02/82 | **<u>Microcomputer Systems</u> v. DEC** *trial testimony*<br>Patent infringement litigation involving computer disk storage control apparatus. |
| 06/89 to 09/90 | **<u>Motorola</u> v. Hitachi** *trial testimony*<br>Patent and contract litigation involving microcomputer design. Assistance in preparation of industry leaders as testifying experts in issues involving microprocessor architecture and circuit design. |
| 08/91 to 02/93 | **T.I. v. <u>Daewoo</u>**<br>Patent infringement litigation involving personal computer and microprocessor design. |
| 03/93 to 12/94 | **Lemelson v. <u>Apple Computer</u>**<br>Patent litigation relating to computer image storage and retrieval apparatus. |
| 06/94 to 01/95 | **T.I. v. <u>AST</u>**<br>Patent litigation involving design of personal computers. |
| 06/95 to 03/96 | **<u>MTI</u> v. CMD, et al.**<br>Patent litigation involving RAID storage system design. |
| 08/95 to 08/98 | **ACM v. <u>LADWP</u>**<br>Litigation relating to the value of used computer equipment. |
| 04/97 to 07/98 | **Zeny v. <u>Acer</u>**<br>Trade secret litigation in technology of PC motherboard design. |
| 04/97 to 12/97 | **<u>Matra</u> v. IBM**<br>Contract litigation in technology relating to PC motherboard design and manufacturing. |
| 06/00 to 07/03 | **<u>Orbsak</u> v. General Instrument**<br>Patent litigation involving digital broadcast multiplexing apparatus. |
| 06/02 to 01/05 | **<u>Intergraph</u> v. Hewlett Packard, et al.**<br>Patent litigation relating to computer cache memory system design. |
| 05/05 to 04/06 | **<u>Ampex</u> v. Kodak**<br>Patent litigation relating to an image manipulation system. |
| 07/05 to 06/06 | **<u>Optima</u> v. Sonic Solutions, et al.**<br>Patent litigation relating to a CD writing system. |
| 10/05 to 10/07 | **TPL v. <u>NEC</u>, et al.**<br>Patent litigation relating to microprocessor design. |
| 01/06 to 03/06 | **<u>Microlinc</u> v. Intel et al.**<br>Patent investigation as to infringement of claims involving high speed bus design. |

01/06 to 01/07      **Orbsak**
Prior art investigation involving digital broadcast multiplexing apparatus.

# CASE EXPERIENCE

## COMPUTER SOFTWARE
Case experience in this area emphasizes large software systems without regard to the computer on which they may run.

| *Dates* | *Case* |
|---------|--------|

**02/89 to 11/92** — **U.S. v. Anthony Fairchild** *trial testimony*
Issues related to destruction of data as a result of software installation and operation.

**10/91 to 07/92** — **Maho v. Banner Aeronautical**
Wrongful termination defense in issues related to shift from batch-type system design and operation procedures to current generation software system design and operational procedures.

**01/93 to 01/94** — **CHA v. PCC**
Issues relating to computer media discovery.

**03/93 to 12/94** — **Qantel v. Signature Systems, et al.**
Trade secret litigation relating to operating system, communication protocol design, and compiler development.

**11/93 to 01/94** — **FMC v. Cowart**
Trade secret litigation relating to image processing and database analysis systems.

**06/96 to 12/97** — **Crane v. Durametallic, et al.**
Trade secret litigation involving gas seal analysis software.

**01/98 to 01/99** — **Robertson Machine v. Serpa**
Trade secret litigation in matters relating to NC programming information.

**05/98 to 07/99** — **Retrac v. ETM** *trial testimony*
Trade secret litigation in matters relating to transaction processing software.

**05/98 to 10/03** — **Power Quest v. V-Communications**
Patent litigation in matters relating to disk partitioning software.

**07/98 to 08/98** — **Interactive Systems v. DSL Transportation**
Contract litigation in matters relating to software development practices.

**03/99 to 04/99** — **Soft Art v. Microsoft**
Trade secret litigation relating to accessibility of spell checking software.

**07/99 to 06/01** — **GEAC v. HCL**
Software contract relating to completion and quality of a large commercial software project.

**10/00 to 12/00** — **OAS v. Design Collection**
Software performance litigation.

**01/02 to 12/02** — **Newport v. Warenet**
Trade secret litigation relating to web site software.

| | |
|---|---|
| 12/03 to 07/04 | **Default Proof v. Home Depot, et al.**<br>Patent litigation relating to transaction processing and debit card systems |
| 12/05 to 10/07 | **Premier International v. Apple Computer**<br>Patent litigation relating to electronic media organization, purchase and presentation |