ROBERT T. HASLAM (Bar No. 71134)
rhaslam@cov.com
MICHAEL K. PLIMACK (Bar No. 133869)
mplimack@cov.com
CHRISTINE SAUNDERS HASKETT (Bar No. 188053)
chaskett@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone:    (415) 591-6000
Facsimile:     (415) 591-6091

ALAN H. BLANKENHEIMER (Bar No. 218713)
ablankenheimer@cov.com
LAURA E. MUSCHAMP (Bar No. 228717)
lmuschamp@cov.com
JO DALE CAROTHERS (Bar No. 228703)
jcarothers@cov.com
COVINGTON & BURLING LLP
9191 Towne Centre Drive, 6th Floor
San Diego, CA 92122-1225
Telephone:   (858) 678-1800
Facsimile:    (858) 678-1600

Attorneys for Defendants and Counterclaimants SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG SEMICONDUCTOR, INC., SAMSUNG AUSTIN SEMICONDUCTOR, LLC,
SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS
AMERICA, LLC, SAMSUNG TECHWIN CO., LTD., and SAMSUNG OPTO-ELECTRONICS
AMERICA, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADVANCED MICRO DEVICES, INC., et al., <br><br> Plaintiffs and Counterdefendants, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., et al., <br><br> Defendants and Counterclaimants. | Case No. 3:08-CV-0986-SI <br><br> **DEFENDANTS AND COUNTERCLAIMANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF** <br><br> **PUBLIC REDACTED VERSION** <br><br> DATE: May 6-7, 2009 <br> TIME: 3:30 p.m. <br> COURTROOM: 10, 19th Floor <br> JUDGE: The Hon. Susan Illston |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   ARGUMENT .............................................................................................................. 1

      A.    U.S. PATENT NO. 6,784,879 .................................................................... 1

            1.    Background of the Technology ........................................................ 2

            2.    The Court Should Adopt Samsung's Proposed Construction of
                  "Control Panel." .............................................................................. 3

      B.    U.S. PATENT NO. 5,559,990 .................................................................... 9

            1.    Background of the Technology ........................................................ 9

            2.    "Integrated Memory" Is Not a Limitation, But If It Were, It Is
                  Not Synonymous with "Integrated Circuit." ................................ 10

            3.    Samsung's Proposed Construction of "Burst mode…" Is
                  Taken Directly from the Appeal Brief AMD Submitted to the
                  Patent Office. ................................................................................ 12

            4.    Each of the Asserted Claims Recites a Sequence of Memory
                  Locations, Comprised of a Memory Cell or Cells Sharing a
                  Single Address, Which Are Consecutively Addressed. ............... 13

            5.    The Specification, Prosecution History and Claims all Specify
                  Which Sense Amplifiers are Enabled/Disabled. ......................... 15

      C.    U.S. PATENT NO. 5,248,893 .................................................................. 17

            1.    Background of the Technology ...................................................... 17

            2.    "Channel-Free Region" and "Channel-Free Zone" Mean
                  "Area Without a Channel and Through Which Current Flows
                  Between the Channel and the Drain." ........................................... 19

      D.    U.S. PATENT NO. 5,377,200 .................................................................. 21

            1.    Background of the Technology ...................................................... 21

            2.    "Data Pattern" Means "a Pattern of Bits Representing
                  Information and Not Representing an Address or an
                  Instruction." .................................................................................. 21

      E.    U.S. PATENT NO. 4,737,830 .................................................................. 24

            1.    Background of the Technology ...................................................... 24

            2.    AMD Impermissibly Extends Its Construction Regarding the
                  Structure of the *Top* Gate of a Capacitor ("Gate Electrode") to
                  Preclude Segmented *Bottom* Plates. ........................................... 24

i

3. The Court Should Adopt Samsung's Construction of "Electrically Connected Directly" and Reject AMD's Proposed Construction That Impermissibly Reads in Limitations from the File History ................................................ 26

4. The Court Should Adopt Samsung's Construction of "Vcc Current Bus" and Reject AMD's Proposed Construction. ...................... 27

5. The Court Should Adopt Samsung's Construction of "Independently Connected Electrically" and Reject AMD's Proposed Construction That Impermissibly Reads in Limitations from a Preferred Embodiment. .............................................. 28

F. U.S. PATENT NO. 5,623,434 .............................................................. 32

1. Background of the Technology ................................................. 32

2. The Court Should Adopt Samsung's Proposed Construction of "ALU," Which Gives the Term Its Plain Meaning and Full Scope, and Reject AMD's Proposed Construction, Which Adds Nothing to the Understanding of the Term. ...................................... 32

3. The Court Should Adopt Samsung's Proposed Construction of "Bus Coupling Said Carry Save Stage to Said ALU" Rather Than AMD's Proposed Construction, Which Is Incomplete. ................... 34

III. CONCLUSION ................................................................................................ 35

DEFENDANTS' AND COUNTERCLAIMANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF
CV-08-0986-SI

CASES

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.,*
    73 F.3d 1573 (Fed. Cir. 1996)...................................................................... 13

*Bell Atlantic Network Servs. v. Covad Commc'ns Group,*
    262 F.3d 1258 (Fed. Cir. 2001)..................................................................... 6

*Boston Scientific Scimed v. Cordis Corp.,*
    554 F.3d 982 (Fed. Cir. 2009)...................................................................... 23

*Catalina Mktg. Int'l., Inc. v. Coolsavings.com, Inc.,*
    289 F.3d 801 (Fed. Cir. 2002)................................................................. 10, 11

*Digital Biometrics, Inc. v. Identix, Inc.,*
    149 F.3d 1335 (Fed Cir. 1998)...................................................................... 2

*Freescale Semiconductor v. Promos Tech.,*
    561 F. Supp. 2d 732 (E.D. Tex. 2008) ......................................................... 11

*ICU Med., Inc. v. Alaris Med. Sys.,*
    No. 2008-1077, 2009 WL 635630 (Fed. Cir. Mar. 13, 2009)........................ 4

*iLOR, LLC v. Google, Inc.,*
    550 F.3d 1067 (Fed. Cir. 2008)................................................................ 15, 17

*In re Paulsen,*
    30 F.3d 1475 (Fed. Cir. 1994)...................................................................... 10

*Kumar v. Ovonic Battery Co.,*
    351 F.3d 1364 (Fed.Cir.2003)........................................................................ 5

*Negotiated Data v. Dell, Inc.,*
    No. 2:06-CV-528-CE, 2009 WL 186180 (E.D. Tex. 2009).................... 11, 33

*Netcraft Corp. v. eBay, Inc. et al.,*
    549 F.3d 1394 (Fed. Cir. 2008).................................................................... 17

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd., et al.,*
    521 F.3d 1351 (Fed. Cir. 2008).................................................................... 14

*Oki Am., Inc. v. Advanced Micro Devices, Inc.,*
    No. C-04-03171-CRB, 2006 WL 3290577 (Nov. 16, 2006)......................... 26

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)............................................................. passim

*Rambus Inc. v. Hynix Semiconductor Inc., et. al.,*
   569 F. Supp. 2d 946 (N.D.Cal. 2008) .................................................................. 26

*Tandon Corp. v. U.S. Int'l Trade Comm'n,*
   831 F.2d 1017 (Fed. Cir. 1987) ........................................................................... 25

*U.S. Surgical Corp. v. Ethicon, Inc.,*
   103 F.3d 1554 (Fed. Cir. 1997) ........................................................................... 33

*V-Formation, Inc. v. Benetton Group SpA,*
   401 F.3d 1307 (Fed. Cir. 2005) ............................................................................. 5

*Vitronics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576 (Fed. Cir. 1996) ............................................................................. 22

**STATUTES**

35 U.S.C. § 112 .................................................................................................... 25

DEFENDANTS' AND COUNTERCLAIMANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF
CV-08-0986-SI

# I.    INTRODUCTION

The arguments advanced by Plaintiffs and Counterdefendants Advanced Micro Devices, Inc. and ATI Technologies, ULC (collectively, "AMD") in support of their proposed constructions for the disputed terms of the AMD patents are characterized by the violation of two central canons of claim construction. For some patents, when it suits AMD's strategy, AMD seeks to limit the scope of the claims to a particular specification embodiment. The Federal Circuit has repeatedly warned against confining the claims to specification embodiments. For other patents, AMD moves to the opposite extreme, wholly ignoring the patent specification in an attempt to broaden its claims beyond what the inventors described as their inventions. Patent claims, however, should be construed in a manner consistent with the written description in the specification, and when the inventor consistently and throughout the specification uses limiting terminology to describe the invention itself (and not simply a preferred embodiment), the claims are so limited. Defendants and Counterclaimants (collectively, "Samsung") ask the Court to adopt Samsung's proposed constructions because Samsung avoids both of these errors, proposing constructions that are consistent with the intrinsic evidence but that do not limit the claims to specification embodiments.

# II.    ARGUMENT

## A.    U.S. PATENT NO. 6,784,879

The central dispute between the parties is whether the claims of the '879 patent are limited to methods and devices for use with a computer system, as Samsung contends, or encompass methods and devices that can be used on anything imaginable, as AMD contends. The relevant factors governing claim construction all demonstrate that the claims describe methods and devices for use on a computer. The specification, the art cited during prosecution, the understanding of a person of ordinary skill in the art at the time of the invention as evidenced by other prior art in existence at the time the application was filed, and extrinsic evidence point the way for the Court.

The patent both begins and ends with a succinct statement of what the invention is. The '879 Patent describes the invention as a "method and apparatus for controlling background video on a computer display." '879 Patent, Abstract. In the final paragraph of the specification, where one typically finds boilerplate language stating that the invention is not intended to be limited to the

1

specific descriptions in the specification, one finds instead in the '879 patent a confirmation that the patent is limited to "computers."

> The preceding discussion has presented a method and apparatus for controlling background video. By providing a video control icon which, when selected, pops up a control panel, live video can remain in the background while its attributes are changed via the control panel. This allows a user to simply adjust the attributes of the live background video without having to bring it in focus. **As such, the overall operations of a computer system is improved.**

'879 Patent at 3:46-54 (emphasis added). In total, the word "computer" appears in the less-than-three-column specification 22 times. See *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1345-48 (Fed Cir. 1998) (consistent usage of word "array" in specification as meaning two dimensional data structure limits the term to a two dimensional data structure).

Not only does the specification consistently use the word "computer" to describe the invention, it also uses other words that are understood by persons of skill in the art to refer to attributes of a computer. One of those terms is "control panel," the term at issue at this time. As the intrinsic evidence and prior art demonstrate, the term had a well-understood meaning to people of skill in the art, namely a phrase that referred to a feature of the user interface on a computer.

### 1. Background of the Technology

The '879 patent is directed to solving what the patent says was a drawback in prior methods of displaying live video on a computer display. The problem is described exclusively in terms of a computer and with extensive use of metaphors for computers: desktop, window, computer monitor, computer screen, and application. *See generally* **Background of Invention**, '879 Patent at 1:5-53.[1] The drawback described is that when live video is being shown in the background, i.e., acting as the desktop pattern, on a computer display, it was necessary to bring that live video into "focus" to change any attributes of that desktop video, such as volume, channel, muting, and the like. *Id.* at

---

[1] *See, e.g., id.* at 1:12-15 ("Computers are known to include a central processing unit . . . ."); 1:15-17 ("The computer further includes a computer monitor which provides visual representations of the data being manipulated."); 1:23-24 ("The displaying of live video on a computer monitor may be done in several ways."); 1:24-26 ("A first displaying approach is to have the live video being displayed in the entire display area of the computer monitor."); 1:29-31 ("Alternatively, the live video may be presented in a window of the computer screen . . . ."); 1:33-35 (In the background mode, the live video is acting as the desktop pattern.").

1:33-41. But bringing the desktop video into "focus" required moving the application that the user was actively displaying or working on into the background, i.e., taking it out of focus. *Id.* at 1:42-48. As the inventor puts it, "[a]s one can readily appreciate, this can be somewhat burdensome to the user and is an ineffective use of the computer system." *Id.* at 1:48-50. The solution, according to the patent, is to provide a method and apparatus for allowing control of desktop, i.e., background video, while the video remains in the background. *Id.* at 1:51-53. The purported solution, according to the '879 patent, is that "[g]enerally, the present invention provides a method and apparatus for controlling background video on a computer display." *Id.* at 2:3-5. The "invention," not simply a preferred embodiment, is immediately thereafter described.

> This may be accomplished by providing a video control icon, which is visible on the display. The video control icon relates to the live video being displayed as the background. Once selection of the video control icon has been detected, the computer displays a control panel for the live video while the live video remains in the background. . . . The user then makes an adjustment via the control panel to the live video and once such an adjustment is made, the control panel is removed from the screen. All this [sic] done while the live video remains in the background, thus other applications that were in focus remain in focus.

*Id.* at 2:5-18.

Claim 1 claims the invention described in the specification using substantially the same words (with the addition describing the source of the live video):

> **1.** A method for providing control of background video, the method comprising the steps of:
>
> (a) providing a video control icon that is visible on the display, wherein the video control icon relates to live video that is being presented as a background on a display wherein the live video is received from at least one of the following: a DVD player, live television broadcast, a recording device, a satellite television broadcast and a cable television broadcast;
>
> (b) detecting selection of the video control icon; and
>
> (c) when the video control icon has been selected, providing a control panel while the live video remains in the background and an application that was in focus remains in focus.

## 2. The Court Should Adopt Samsung's Proposed Construction of "Control Panel."

The larger context to which the parties' dispute applies arises from AMD's attempt to stretch the claims to accuse Samsung TVs, camcorders, phones, and cameras, none of which are

3

personal computers.[2] AMD disregards the intrinsic evidence, which compels the conclusion that the patent is limited to personal computers and does not cover the products AMD has accused.

When the specification uniformly and repeatedly describes the invention, construing the claim consistent with that usage does not impermissibly read a limitation into the claim from the specification. Rather, construing the claim in that manner is consistent with the Federal Circuit's focus on reading the claims as a person of skill would "after reading the entire patent." *ICU Med., Inc. v. Alaris Med. Sys.*, No. 2008-1077, 2009 WL 635630 at *3 (Fed. Cir. Mar. 13, 2009) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc)). Here, the Abstract, the "TECHNICAL FIELD OF THE INVENTION"("This invention relates generally to *computer displays* and more particularly to providing control of background video."), the problem being solved, and the description of the "present invention" all refer to uses in connection with computers.

Moreover, the '879 Patent is uniformly couched in terms of art that are used in the context of personal computers. For example, the patentee says that "[i]n the background mode, the live video is acting as the desktop pattern." '879 Patent at 1:33-34. "Desktop" is a term unique to personal computers, which, according to the prior art *Macintosh Desktop Reference* for the Macintosh personal computer, means "[y]our working environment on the computer – the menu bar and the background area on the screen." Declaration of Christine Saunders Haskett in Support of Samsung's Responsive Claim Construction Brief ("Haskett Decl."), Ex. 1 at SAMAMD0248363. Manuals for prior art Windows-based personal computers, such as the IBM Aptiva, also refer to the background of the computer display as the "desktop." *Id.*, Ex. 2 at SAMAMD0247794.

As another example, the claimed inventions make use of a "video control icon." "Icon" is another term of art used in the context of personal computers to refer to a symbol or word in a windowed operating system that corresponds to a function or application. The prior art cited on the face of the patent is all directed at computers, and several of the references discuss the use of

---

[2] The patent specification defines "computer" as follows: "Computers are known to include a central processing unit, cache memory, hard drive memory, floppy disk drive memory, CD ROM drive, audio processing circuitry, and video processing circuitry. The computer further includes a computer monitor which provides visual representations of the data being manipulated." '879 Patent at 1:12-17.

computer icons.[3] For example, U.S. Patent No. 5,668,571 to Pai is directed to a "Method and Apparatus for Generating Hardware Icons and Cursors," and explains that in Windows and Apple operating systems, "[t]he primary reason GUI programs make micro-computers more user friendly is they allow users to manipulate software-generated icons such as a screen menu to achieve a task." Haskett Decl., Ex. 3 ("Pai Patent") at 1:17-21. Prior art user manuals for Apple personal computers include extensive discussions of the "icons" used in those computers' operating systems. *Id.*, Ex. 1 at SAMAMD0248032, 75.[4]

In construing the one term chosen by the parties for construction at this stage of the litigation, the uniform and repeated usage of the term in the context of computers should guide the Court to adopt Samsung's proposed construction for "control panel.":

| Proposed constructions of "control panel" | |
|---|---|
| **Samsung's proposed construction** | **AMD's proposed construction** |
| "An area of the personal computer screen containing control functions." | Requires no construction; or <br> "Board, panel, etc. for the control or operation of electrical or other apparatus"; or <br> "An area of the screen containing control functions." |

The patentee consistently refers to the "control panel" limitation in the context of computers. "Once selection of the video control icon has been detected, *the computer displays a control panel* for the live video while the live video remains in the background." '879 Patent at 2:8-10 (emphasis added). "FIG. 1 illustrates a graphical representation of a computer screen **10**" and in this figure, "the control panel **30** is presented in focus." *Id.* at 2:20-21, 30, Fig. 1. Later, the patentee states again that "a control panel is provided *on the computer display* while the live video

---

[3] "[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence." *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed.Cir.2003); *see also V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005).

[4] The patent also describes in computer terms the ways in which the icon can be selected: "a cursor selection of a mouse, a touch screen selection, a keyboard selection, or any other means for selecting an icon . . ." '879 Patent at 2:26-29. The use of the term "application" likewise connotes a computer program for performing some function, and the specification's reference to applications that are "in focus" as ones that are being "actively displayed and/or worked upon" reinforces that the invention is claimed in the context of computers, for one does not work upon or actively display, as opposed to simply display, features on a TV, camera, or camcorder.

5

remains in the background." *Id.* at 3:21-23 (emphasis added). In cases like this, "when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *Bell Atlantic Network Servs. v. Covad*, 262 F.3d 1258, 1271 (Fed. Cir. 2001). Here, the patentee consistently refers to the "control panel" as being displayed "by a computer" in a specification that repeatedly states that the patented inventions are for use with and intended to solve a problem inherent in personal computers.

Moreover, contemporaneous extrinsic evidence confirms that "control panel" in this context was a term of art used in the context of personal computers. The *Microsoft Computer Dictionary* from the time of the '879 Patent application defines "control panel" as follows: "*In Windows and Macintosh systems*, a utility that allows the user to control aspects of the operating system or hardware, such as system time and date, keyboard characteristics, and networking parameters." Haskett Decl., Ex. 4 (*Microsoft Computer Dictionary* (3d ed. 1997)) at SAMAMD0275191 (emphasis added). The *Macintosh Reference* from 1990 contains a chapter on "Using the Control Panel," and explains that "[y]ou can change many of the standard settings for your Macintosh by using the Control Panel." *Id.*, Ex. 1 at SAMAMD0248037-40. The *IBM Aptiva Handbook* from 1996 similarly describes the "Control Panel" available in Windows 95 for use with the IBM Aptiva computer. *Id.*, Ex. 2 at SAMAMD0247794. These contemporaneous references confirm what is plain from the intrinsic patent evidence: that the term "control panel" is a term of art used to describe a feature of the user interface of a personal computer. In using that term, and in stating repeatedly in the specification that the claimed inventions are for use with computers, the patentee declared to the public that his claims are limited to personal computers.

Against this overwhelming evidence, AMD argues that the '879 patent is not limited to personal computers because Claim 5 recites "providing the live video as the background on a computer display, a television, or a monitor." AMD Br. at 34. Rather than expanding the scope of the claims, this claim merely lists three types of displays that could be used to display computer applications with live video background. The Apple Macintosh computer was available at the time of the patented inventions either with a display built into the same body as the computer or with a separate "monitor" that could be connected via a cable to the main body of the computer. *Id.*, Ex. 1

at SAMAMD0248236. Accordingly, claim 5 allows for the patented user interface to be displayed either on a "computer display" or on a "monitor."

In addition to built-in displays and monitors, it was not unusual for consumers to connect their personal computer to a television set and to use the television set as the computer display. Indeed, ATI, the company which employed the inventor, Mr. Orr, sold and patented products targeted specifically at permitting users to display computer generated data, graphics, or video on a TV screen. *Id.*, Ex. 5 (Orr dep. at 157:20-158:22)

REDACTED

Mr. Orr's testimony is confirmed by numerous patents, all assigned to ATI, that teach that televisions can be used as displays for personal computers:

- U.S. Patent No. 6,118,493, filed on April 1, 1997, relates to "selecting a channel from a plurality of channels displayed on a computer." *Id.*, Ex. 6 ("'493 Patent") at 1:7-8. In the claimed system, "[t]he video graphics circuit **16**, which may be RAGE PRO from ATI Technologies . . . produces the display . . . which may be displayed on the television **24** or the computer monitor **22**." *Id.* at 3:22-28.

- U.S. Patent No. 5,900,868, filed on April 1, 1997, relates to "displaying a plurality of channels on a computer." *Id.*, Ex. 7 ("'868 Patent") at 1:6-7. This patent also says that "[t]he video graphics circuit **16**, which may be RAGE PRO from ATI Technologies . . . produces the display . . . which may be displayed on the television **24** or the computer monitor **22**." *Id.* at 3:25-31.

- U.S. Patent No. 5,987,106, filed on June 24, 1997, relates to "computer controlled audio muting or volume control systems." *Id.*, Ex. 8 ("'106 Patent"), Abstract. In the claimed system, "[t]he personal computer **12** also serves as a phone answering and interface system and provides graphic and text output either on monitor **14** or on TV monitor **26c**." *Id.* at 3:14-16.

Accordingly, it is specious for AMD to argue that claim 5 expands the patent beyond personal computers merely because it recites that a television may be used as the computer display.

AMD has also submitted a declaration from Dr. Andrew Wolfe opining that U.S. Patent No. 5,761,417 ("'417 Patent"), cited on the face of the '879 patent, claims a "media streamer" device, rather than a personal computer. Wolfe Decl. ¶ 56. Dr. Wolfe then points out that "Henley discusses a 'control panel' as part of a 'media streamer' device." *Id.* Dr. Wolfe overlooks,

7

however, that the "media streamer device" of the Henley patent is a "a 'video friendly' *computer subsystem* which enables isochronous data stream delivery in a multimedia environment over traditional interfaces for that industry." Haskett Decl., Ex. 9 ('417 Patent at 2:54-57) (emphasis added). The claimed "media streamer" is not something different from a computer, but is repeatedly stated to be made up of PC's, i.e., computers. See Figure 1, which depicts "a block diagram of a media streamer that incorporates the invention" and Figures 1A - 1D, which are block diagrams of the various components depicted in Figure 1. Henley makes clear that virtually every component in Figure 1 is comprised of a PC. *See* '417 Patent at 7:29-34 (tape storage node 17 contains a PC); 7:61-62 (disk storage node 17 contains a PC); 8:21-23 (communication node 14 contains a PC); 8:39-41 (control is configured as a PC). The '417 patent, like the '879 patent, is related to personal computers and nowhere mentions the cell phones, camcorders, digital cameras, and flat-screen TV's AMD is improperly attempting to sweep within the claims of the '879 patent.

Finally, AMD argues that the '879 Patent is not limited to computers because the specification "teaches that the invention's 'processing unit' can be 'a microprocessor, microcontroller, a digital signal processor, a microcomputer, or any other means for processing digital information based on programming instructions.'" AMD Br. at 34-35 (citing '879 Patent at 2:53-56). AMD relies again on the declaration of its expert, asserting that "[o]f these, only a 'microprocessor' generally would represent the processing unit of a 'personal computer' to one of skill at the time of the invention." AMD Br. at 35 (citing Wolfe Decl. ¶ 53).

Dr. Wolfe's unsupported opinion is contradicted by the prior art cited in the patent and other art in existence at the time of the patent. The Pai patent explains that Microsoft Windows, IBM, and Apple operating systems are used with "micro-computers": "Graphical user interface (GUI) programs such as the WINDOWS[TM] program, the IBM[TM] program, the IBM[TM] OS/2[TM] program, or the APPLE[TM] System 7.1 program are commonly used to make *micro-computers* more user friendly." Haskett Decl., Ex. 3 at 1:15-19 (emphasis added). Elsewhere, the Pai patent devotes several columns and two figures to a processor engaged in signal processing operations – *i.e.*, a "digital signal processor." *Id.* at 4:22-6:37, 7:63-9:38, Figs. 1 & 2. U.S. Patent No. 5,321,805 to Hayman, which is also intrinsic evidence cited on the face of the '879 patent, describes systems for

8

use with "personal computers" and "[s]lightly more powerful . . .work stations." *Id.*, Ex. 10 at 1:22-25. In the claimed systems, "[a] *microcontroller* 44, such as an INTEL 8751, controls the operation of the external bus interface 40 to maintain communication between the MPU 32 and the other computer connected to the external bus 38." *Id.* at 4:66-5:2 (emphasis added). The use of the terms "microcomputer," "microcontroller," and "digital signal processor" in the '879 patent therefore serves to confirm that the patent is directed at personal computers, and not cell phones, TV's, cameras, and camcorders.[5]

In addition, AMD's argument is premised on a misquotation of the specification. The specification nowhere "teaches that the invention's '*processing unit*' *can be* 'a microprocessor, microcontroller, a digital signal processor, a microcomputer or any other means for processing digital information based on programming instructions.'" AMD Br. at 34-35 (citing '879 Patent at 2:53-56) (emphasis added). Rather, the specification states, "[t]he central processing unit **42** *may include* a microprocessor, a microcontroller, a digital signal processor, or any other means for processing digital information based on programming instructions." '879 Patent at 2:53-54 (emphasis added). Accordingly, even if Dr. Wolfe's opinion were that a computer CPU can never *include* these devices, the Court would have to ignore it in any event. "[A] court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history.'" *Phillips*, 415 F.3d at 1318.

Accordingly, the Court should adopt Samsung's proposed construction of "control panel."

**B.    U.S. PATENT NO. 5,559,990**

**1.    Background of the Technology**

The '990 Patent involves a computer memory having an improved "burst mode access." As the patent explains, "burst mode" memory access was known in the prior art and involves the

---

[5] ATI's own patents are also instructive here. For example, U.S. Patent No. 5,999,860, filed on July 16, 1997 and assigned to ATI, includes a "schematic block diagram of a *computer system* 10 that includes a *processing unit* 12." Haskett Decl., Ex. 11 at 2:51-53 (emphasis added). "The processing unit 12 may be an Application Specific Integrated Circuit (ASIC), such as a video graphics processor, microprocessor, digital signal processor, microcontroller...." (*id.* at 2:56-57) – in other words, precisely the same devices that AMD and ATI here argue could never constitute a processing unit for a computer system.

ability to read out multiple, consecutive memory locations, when the memory is presented with a single address. '990 Patent at 1:8-55, Fig. 2. According to the patent, the alleged improvements result in faster memory access times, power savings, or both. These alleged advantages are accomplished by separating a memory bank into multiple subarrays, each with its own dedicated circuitry. '990 Patent at 1:59-2:44. While the information on one side of the memory bank, *i.e.*, one subarray, is being read out, the access operation on the other side of the memory can be started. '990 Patent, Fig. 3A, 3B, (sub-array arrangement) and Fig 4. (timing diagram). This results in a "ping-pong"-type effect, in which first one side of the memory, and then the other, is reading information out of the memory. *Id.* Because the memory locations are interleaved between the two halves of the array, the data, when it is read out, is in the correct order. This "ping-pong" effect is what is responsible for achieving the alleged speed advantages touted by the '990 Patent.

The alleged power savings achieved by the '990 Patent relate to the "sense amplifier" portion of the memory circuit, which serves to amplify the small voltage in a memory cell that indicates whether the cell contains a "1" or a "0." Sense amplifiers, when turned on, consume relatively large amounts of power. In some of the claimed embodiments, the sense amplifiers of one subarray are only turned on when data is being read out of that subarray, and they are turned off when the subarray is preparing to read information out, but is not yet ready to do so. '990 Patent at 1:59-2:44. As a result, power savings are allegedly achieved.

**2.** **"Integrated Memory" Is Not a Limitation, But If It Were, It Is Not Synonymous with "Integrated Circuit."**

| Proposed constructions of "integrated memory" | |
|---|---|
| **Samsung's proposed construction** | **AMD's proposed construction** |
| Requires no construction; or "A memory containing one or more integrated circuits." | "A memory fabricated in a single integrated circuit." |

Terms appearing in the preamble will not limit the scope of a claim if they "merely state a purpose or intended use of the invention," *In re Paulsen*, 30 F.3d 1475, 1479 (Fed. Cir. 1994), or give a name to a structurally complete invention defined in the body of the claim. *Catalina Mktg. Int'l., Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002). Although there is no "litmus test" for deciding whether a preamble limits claim scope, the Federal Circuit has identified

the following guideposts to assist in this determination: (1) whether the claim is a "Jepson" type claim; (2) whether the preamble phrase provides antecedent basis for a term that appears later in the body of the claim; (3) whether the preamble is essential to understand limitations or terms in the body of the claims; (4) whether the preamble recites additional structure that is underscored as important by the specification; or (5) whether the applicant clearly relied upon the preamble during prosecution to distinguish the claimed invention from the prior art. *Id.*

As AMD appears to concede, guideposts 1-2 and 5 are not present here. "Integrated memory" is also not essential to understanding the terms in the body of the claims (guidepost 3), given that the body of claim 20 consists of a detailed list of known structures (e.g. registers, decoders and sense amplifiers). Pashley Decl. ¶¶ 24, 28. AMD attempts to latch on to guidepost 4, but nowhere in the specification is an integrated circuit embodiment identified as important to the alleged invention or its alleged speed and power savings. To the contrary, as AMD concedes, the patent specifically teaches that the invention need not be integrated into an integrated circuit. '990 Patent at 13:8-9 ("some embodiments are not integrated into one integrated circuit"). Integrated circuits are a disposable option, not an important aspect of the invention.[6]

If the Court does construe "integrated memory," it should look to how the term was used in the early 1990s, when the patent was filed. At that time, multiple-chip memories that were integrated into a single operative memory, known as "integrated memories," were prevalent in the memory industry. Pashley Decl. ¶¶ 26-34 and Exs. C-I. Examples of integrated memories that were not manufactured as a single integrated circuit included Intel's iMC001FLKA memory card, which incorporates eight integrated circuit memories into one integrated memory system, and U.S. Patent No. 5,502,667 titled "Integrated Multichip Memory Module Structure," which discloses an integrated memory comprised of "n memory chips." *Id.* The Pinkham reference, upon which

---

[6] The cases AMD cites construing the preamble term "integrated circuit," not "integrated memory," are inapposite. *See Freescale Semiconductor v. Promos Tech.*, 561 F. Supp. 2d 732, 749 (E.D. Tex. 2008) (patentee distinguished the prior art during prosecution based on the preamble term); *Negotiated Data v. Dell, Inc.*, No. 2:06-CV-528-CE, 2009 WL 186180 at *19 (E.D. Tex. 2009) (The preamble term "disclose[d] a fundamental characteristic of the claimed invention," was "found throughout the specification," and was used "to describe the preferred embodiment").

AMD's expert, Dr. Wolfe, relies, discloses an embodiment in which multiple integrated memories are manufactured as an integrated circuit. Pinkham, however, does not teach that integrated memories are limited to single integrated circuit embodiments.[7] Persons involved in the design of memory products in the early 1990s understood the term "integrated memory" to include, but not be limited to, memories formed as a single integrated circuit. *Id.*

Finally, the '990 Patent contains dependent claims 6 and 14 that specifically call out a single integrated circuit. AMD could have limited claim 20 to a single integrated circuit by using similar language but chose not to. If "integrated memory" is construed, it should be construed as "a memory containing one or more integrated circuits." AMD concedes as much. AMD Br. at 6 ("[T]he claim elements could be found in a combination of one or more integrated circuits.")

### 3. Samsung's Proposed Construction of "Burst mode…" Is Taken Directly from the Appeal Brief AMD Submitted to the Patent Office.

| Proposed constructions of "burst mode" | |
| --- | --- |
| Samsung's proposed construction | AMD's proposed construction |
| "A mode for sequentially accessing memory locations in which the memory receives the address of one memory location and provides in response the contents of a plurality of consecutive memory locations." | "A serial transfer mode in which a memory transfers the contents of a plurality of locations in response to the address of one location." |

Samsung's proposed construction of "burst mode" should be non-controversial, as it is taken directly from AMD's Appeal Brief to the Patent Office that resulted in allowance of the '990 patent claims. As defined by AMD, "[b]urst mode access is a sequential access in which the memory receives the address of one memory location and provides in response the contents of a plurality of consecutive memory locations." Fahrenkrog Decl., Ex. I (Appeal Brief at 2).

Notwithstanding the representations made to the PTO, AMD now seeks to rewrite the definition to omit the reference to consecutive memory locations. AMD's construction not only contradicts what it told the PTO, but also the specification: "When a memory is read sequentially (that is, consecutive reads access memory locations at consecutive addresses), that memory access

---

[7] AMD's focus on "a" and "an" does not suggest that integrated memory means integrated circuit. At most, these terms suggest *one integrated memory*, not one integrated circuit.

can be made faster by reading from the array several consecutive locations simultaneously. Such a 'burst mode' access is provided by memory 202 of FIG. 2." '990 Patent at 1:36-40.

AMD's sole support for attempting to read "consecutive memory locations" out of the burst mode is an exchange during the prosecution that distinguished burst mode from other serial transfer modes. Serial transfers include accessing "a plurality of locations … in response to the addresses of the plurality of locations," whereas burst mode is limited to accessing "a plurality of locations … in response to the address of one location." Fahrenkrog Decl., Ex. H (04/27/1995 Amendment at 4). Consecutive memory locations were not mentioned during this discussion because it was not relevant to the distinction being made. Nothing suggests that AMD was attempting to define burst mode here, and AMD's subsequent statements on appeal confirm that no omission was intended.

Further, assuming that the exchange relied upon by AMD can be considered an alternative definition of burst mode, this exchange failed to convince the examiner to allow the claims. Haskett Decl., Ex. 12 (05/17/1995 Office Action, "the changes made do not distinguish over the prior art as applied"). Only after AMD appealed this final rejection, offering the construction of "burst mode" proposed by Samsung, were the claims allowed. The narrowest—and last—of the inconsistent definitions that AMD offered, and which enabled AMD to obtain issuance of the claims, is the controlling definition of the term "burst mode." See, e.g., *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996) ("Where there is an equal choice between a broad and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having the narrower meaning, we consider the notice function of the claim to be best served by adopting the narrower meaning.").

**4. Each of the Asserted Claims Recites a Sequence of Memory Locations, Comprised of a Memory Cell or Cells Sharing a Single Address, Which Are Consecutively Addressed.**

| Proposed constructions of "consecutively addressed memory locations" | |
|---|---|
| Samsung's proposed construction | AMD's proposed construction |
| "A set of addresses following one after the other in order from L1 to Ln wherein each memory location represents a memory cell, or cells, associated with a single address." | Requires no construction; or "Addresses following one after the other in order." |

13

AMD attempts to dissuade this Court from construing "consecutively addressed memory locations" by arguing that addresses, memory locations, and memory cells are ordinarily understood terms. AMD Br. at 9. While these terms may be understood by persons skilled in the art, they are foreign to most prospective jurors. Further, while the parties agree that "consecutive addresses" refer to addresses following one after the other in order, they disagree as to whether this construction is sufficient to address the memory location component of the "consecutively addressed memory locations" limitation. Given this dispute, a construction is required. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd., et al.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

AMD's primary objection to Samsung's original proposed construction is that it excludes the embodiment of Figure 5, which has multiple cells comprising a single location and sharing a single address. Samsung's modified construction eliminates this unintentional exclusion, and expressly includes "a memory cell, <u>or cells,</u> associated with a single address."

The parties also agree that "[i]n the context of this patent, a cell is only one bit of memory." AMD Br. at 9. Because only one bit of memory is contained in each cell, a single address is used to access the bit of information. Pashley Decl. ¶¶ 36-37. Even when a memory location consists of multiple cells, a single address is used to access all cells associated with the memory location. '990 Patent, Fig. 5; Pashley Decl. ¶¶ 36-37. The disputed portion of Samsung's construction—wherein each memory location represents a memory cell, or cells, associated with a single address—captures this agreed upon relationship.

The one-to-one correspondence between memory locations and addresses is also supported by the specification. '990 Patent at 1:10-17 ("FIG. 1 shows a memory 110 having an array of 1-bit memory locations (or 'cells') M-0 through M-15. Each location M-i has unique address i."); 3:61-4:4 ("Each memory location M-i has address i."); Fig. 3A & 3B; Fig. 5; *see also* 2:10-15; 5:12-14. Figure 9 provides a translation table showing how each "address" is related to a physical "memory location," *i.e.*, a cell or group of cells. '990 Patent at 15-26; Fig. 9. X- and Y-decoders use this relationship to match an "address" with the "location" to be accessed.

AMD also criticizes Samsung's use of the generic descriptors L1 and Ln to refer to memory locations, yet the patent repeatedly uses these descriptors in both the specification and the asserted

claims. Nonetheless, the language "from L1 to Ln" could be omitted without fundamentally changing the construction. At a minimum, this Court should construe "consecutively addressed memory locations" as "a set of addresses following one after the other in order [from L1 to Ln] wherein each memory location represents a memory cell, or cells, associated with a single address."

### 5. The Specification, Prosecution History and Claims all Specify Which Sense Amplifiers are Enabled/Disabled.

| Proposed constructions of "enabling / disabling sense amplifiers" | |
| --- | --- |
| **Samsung's proposed construction** | **AMD's proposed construction** |
| "Developing a signal on the output of a sense amplifier only when it is transferring data from its output to the memory output, and not developing a signal on the output of a sense amplifier when data is being transferred from a memory location to the sense amplifier."[8] | "Sense amplifiers are enabled when they are selected to develop a signal on their outputs, and are disabled when they are not selected to develop a signal on their outputs." |

The parties do not dispute how sense amplifiers are enabled and what happens when sense amplifiers are enabled. Rather, the dispute over this term centers on AMD's attempt to disregard the claim language specifying which sense amplifiers are enabled and which are disabled.

The claim limitation is not, as AMD suggests, "sense amplifiers … are enabled/disabled." AMD Br. at 10. The actual claim language is, "the sense amplifiers <u>from which the contents of said location L1 are being transferred</u> are enabled and the sense amplifiers <u>to which the contents of said location L2 are being transferred</u> are disabled." '990 Patent at Claim 3 (emphasis added).[9] AMD's

---

[8] For claim 8, the proposed construction allows for multiple sense amplifiers to be enabled and includes the language "or developing a signal on the outputs of a predetermined number of sense amplifiers whose outputs are to be transferred to the memory output immediately after the currently enabled sense amplifiers transfer its data to the memory output." The language regarding which sense amplifiers are disabled is identical in claims 3, 8 and 23.

[9] AMD held out claim 3 as representative of claims 8 and 23 during prosecution of the '990 patent. Fahrenkrog Decl., Ex. J (03/21/1994 Amendment at 15-16); Haskett Decl., Ex. 13 (09/23/94 Amendment at 4). AMD's representations that claims 8 and 23 were "allowable for reasons similar to the reasons discussed above in connection with Claim 4"(issued claim 3) renders its arguments as to claim 3 binding on claims 8 and 23. *iLOR, LLC v. Google, Inc.*, 550 F.3d 1067, 1075 (Fed. Cir. 2008)("When iLOR added [the additional claim] during prosecution, it argued that the claim was 'similar to' and 'allowable for at least the same reasons' . . . . iLOR's representation that this newly added claim was similar to the pending claims, and its contemporaneous failure to put the examiner on notice that it was attempting to capture previously surrendered subject matter, renders the representations it made with respect to the [prior art] reference applicable to [the new claim].")

proposed construction reads out substantial portions of claims 3, 8 and 23 specifying that it is the sense amplifier "from which the contents" are being transferred to the output that are enabled and the sense amplifiers "to which" information is being transferred that are disabled. *Id.*, Cls. 3, 8, 23.

The description of which sense amplifiers are enabled and which are disabled is not only contained in the claims, but is also found throughout the specification:

> In some embodiments, <u>each sense amplifier is enabled only while its output is transferred to the memory output</u>. In other embodiments, several sense amplifiers whose outputs are to be transferred immediately after the output of the current sense amplifier, are also enabled. <u>The other sense amplifiers are disabled</u> providing power saving. '990 Patent at 2:38-44. (emphasis added).

> In some embodiments, to save power, <u>sense amplifier circuits are disabled when their outputs are not transferred to the memory output</u>. '990 Patent, Abstract. (emphasis added).

The control circuit recited in claims 8 and 23 for performing the selective enabling and disabling is also defined as enabling "only the sense amplifier circuit being read … to reduce power consumption" or "a certain number of sense amplifier circuits to be read immediately after, so as to allow those sense amplifier circuits sufficient time to develop their output signal." *Id.* at 5:45-54.

During prosecution, AMD again explained the importance of which sense amplifiers are enabled/disabled when it used this feature to distinguish the claimed invention from the prior art:

> Claim 4 [issued claim 3] dependent from Claim 2 further distinguishes from Pinkham and Rao, taken singly or together, by reciting that … the <u>sense amplifiers from which the contents of L1 are being tranferred are enabled</u> and <u>the sense amplifiers to which the contents of L2 are being tranferred are disabled</u>, but these latter sense amplifiers become enabled subsequently for amplifying the contents of L2. Fahrenkrog Decl., Ex. H (04/27/1995 Amendment, p. 5); *see also* Haskett Decl., Ex. 13 (09/23/1994 Amendment, p. 3).

And AMD again emphasized which sense amplifiers were enabled or disabled in its appeal to the Patent Office, subsequent to which this limitation was singled out as the sole basis on which claim 8 was allowable. Fahrenkrog Decl., Ex. I (Appeal Br. at 3); Haskett Decl., Ex. 14 (Notice of Allowability at 7 (claim 8 combines pending claims 7 and 8); Comments on Reason for Allowance at 1). AMD cannot walk away from those statements now to obtain a construction for litigation that is far broader than the construction urged during prosecution. *Phillips*, 415 F.3d at 1317.

The specification, prosecution history, and claim language all specify that the sense amplifiers are *only* enabled when they are transferring data to the memory output and are disabled

16

when data is transferred to them from the memory array.  Accordingly, the sense amplifier limitations in claims 3, 8, and 23 should be construed as "developing a signal on the output of a sense amplifier only when it is transferring data from its output to the memory output, and not developing a signal on the output of a sense amplifier when data is being transferred from a memory location to the sense amplifier."  *iLOR*, 550 F.3d at 1073-74 ("displayable" meant "automatically displayed" when "the claim language is viewed in light of the specification and prosecution history"); *Netcraft Corp. v. eBay, Inc. et al.*, 549 F.3d 1394, 1397-99, 1402 (Fed. Cir. 2008) (the patent specification's consistent description of the invention as having a necessary feature means the feature is part of the claimed invention).

## C.    U.S. PATENT NO. 5,248,893

The '893 Patent claims a particular modification to a transistor known as a MOSFET (metal-oxide-silicon field effect transistor).  This involves introducing a curved surface underneath the gate of the transistor, thereby extending the effective length of the "channel."  The channel is an area of the substrate through which current flows between one terminal (the source) and another terminal (the drain) when a particular voltage is applied to a third terminal (the gate).  As was well-known, and as the patent describes, a portion of the channel "pinches off" just before the drain.  Current nonetheless continues to flow through this "channel-free" region, else the transistor would not operate.  The disputed terms are "channel-free region" and "channel-free zone."

AMD contends that these terms refer to any areas where a channel is absent.  This construction disregards the specification, figures, and prosecution history, which uniformly locate the "channel-free region" and "channel-free zone" more precisely as the area between the pinched-off channel and the drain through which current flows.

### 1.    Background of the Technology

Figure 9 of the '893 Patent (reproduced below) illustrates the source, drain, gate, channel (13) and channel-free regions (the length of which is labeled "Lg1").  Application at the gate electrode (in the figure, $V_G$) of a voltage sufficiently large in magnitude causes a channel to form at the surface of the silicon under the gate, and the MOSFET to be considered in an "on" state.  Gosney Decl. ¶ 7.  The channel exists beneath the gate from the source to the drain and includes

17

charge carriers (either electrons or electron holes) of the same type as in the source/drain regions. *Id.* Current flows from the source to the drain when a voltage is applied at the drain electrode (in the figure, $V_D$). *Id.* at ¶¶ 7, 11.

When the drain voltage rises to a sufficiently large magnitude, the channel under the gate retracts and *pinches-off*, meaning it terminates before it reaches the drain. *Id.* at ¶¶ 7, 15-16. This



**FIG. 9**
**PRIOR ART**

results in a channel-free region under the gate, indicated by the labels Lg1 and "channel-free length" in Figure 9 of the patent.

It is important to note that charge carriers continue to flow—i.e., current flows— through this channel-free region. *Id.* at ¶¶ 7, 16; Haskett Decl., Ex. 15 (Keith Leaver, *Microelectronic Devices* 125 (2d ed. 1997))

("The channel is said to be PINCHED OFF at the drain . . . . Thus, an extremely short depletion region forms between the channel itself and the drain . . . . The electrons in the channel must flow across this depleted region in order to reach the drain.").

The '893 Patent asserts that it is desirable to increase the effective length of the channel by making the surface under the gate around which the channel will be formed concave rather than planar. *See* '893 Patent at 2:38-41, 2:67-3:2; *id.* at Fig. 4 (reproduced at right). Such a structure allegedly increases the channel-free region (denoted Lg2 in the figure) and reduces some of the negative effects caused by a short channel. *Id.* at 4:3-8, 4:13-37.



**FIG. 4**

DEFENDANTS' AND COUNTERCLAIMANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF
CV-08-0986-SI

### 2. "Channel-Free Region" and "Channel-Free Zone" Mean "Area Without a Channel and Through Which Current Flows Between the Channel and the Drain."

| Proposed constructions of "channel-free region" and "channel-free zone" | |
|---|---|
| **Samsung's proposed construction** | **AMD's proposed construction** |
| "Area without a channel and through which current flows between the channel and the drain."[10] | "The terms 'channel-free region' and 'channel-free zone' refer to areas where there is no channel." |

The '893 Patent, the prosecution history, and the understanding of one of skill in the art make clear that "channel-free region" and "channel-free zone"[11] refer to the portion of the substrate located between the pinched-off channel and the drain and through which current flows.

The patent calls out the particular portion of the substrate the inventors considered to be the channel-free region. Figure 9 depicts the length of the channel-free region, labeled **Lg1**, the **channel-free length.** This region represents the portion of the substrate that no longer has a channel, which pinches off before reaching the drain. The patent explains: "It is seen from FIG. 9 that channel region 13 retracts from the drain 5 when the operating voltages $V_D$ and $V_G$ are supplied. In other words, between one end of the channel region 13 and the drain 5, there is a region of a length Lg1 without a channel being formed therein." '893 Patent at 2:3-8.

The channel-free region also is depicted in the claimed embodiment of Figure 4. "By comparing FIG. 4 to FIG. 9, it can be seen that the two MOS transistors have the same occupying area, except that the distance Lg2 between the end of channel region 12 and the drain 5 is longer than the distance Lg1 indicated in FIG. 9." '893 Patent at 4:3-8. This channel-free region, Lg2, is created by the same phenomenon that creates the channel-free region/zone Lg1 in the conventional transistor depicted in Figure 9, *viz.*, the channel pinching off as it retracts.

---

[10] This construction modifies Samsung's original construction to use the word "channel" rather than "inversion region/zone," to which AMD objected, and to identify more clearly the region indicated as one in which current flows "between the channel and the drain." This, and certain other modifications to Samsung's original constructions, are explained in Exhibits 29 and 30 to the Haskett Declaration.

[11] The term "channel-free region" appears in claim 1, while "channel-free zone" appears in claim 4. Because neither party contends the terms have different meanings, Samsung's arguments apply with equal force to each term.

The region comprising the "channel-free region" is also shown in the prosecution history.[12] The terms "channel-free region" and "channel-free zone" were introduced in claim amendments in response to a rejection. Haskett Decl., Ex. 16 (5/19/92 Office Action). In the amended claims, the term "channel-free region" was followed immediately by the label Lg2, describing precisely the portion of substrate covered by the term. *Id.* at Ex. 17 (7/7/92 Amendment at 3 introducing the term "a channel-free region (Lg2)" into claims 1 and 2). The parenthetical label remained in the claims until allowance, when it was removed, as were other informalities, by an Examiner's Amendment. *Id.* at Ex. 18 (3/22/93 Notice of Allowability at 3); *see id.* at Ex. 19 (11/10/92 response to office action in which the label Lg2 remained in the claims). The applicant's statements to the Patent Office also are instructive: "Referring to Fig. 9 . . . , it is seen that a ***'channel-free' zone (which is the region labeled Lg1)*** develops . . . ." *Id.* at 10 (emphasis added). "Fig. 4 shows a . . . ***'channel-free' zone Lg2***." *Id.* at 11 (emphasis added). *See* Gosney Decl. ¶ 18.

The applicant thus repeatedly identified "channel-free region" and "channel-free zone" as the portion of the substrate labeled Lg2 in Fig. 9 (or Lg1 in the prior art Fig. 4). This was already evident from the patent figures and description, and the prosecution history confirms it.

Having identified the portion of the transistor being referred to, one of skill in the art would understand that although no channel exists in the channel-free region, current continues to flow. "[A]n extremely short depletion region forms between the channel itself and the drain, illustrated in Fig. 4.8 (b) [channel-free region indicated by gray oval].



---

[12] The prosecution history, while not specifically cited in the parties' joint claim construction statement with respect to this term, nevertheless is fair rebuttal here [*see, e.g.,* Lee Decl. at ¶ 23 (asserting that "[n]othing in the intrinsic record" cuts against AMD's construction)] and reinforces the nomenclature—made clear by the patent's figures and written description—that "channel-free region/zone" refers to the areas labeled *Lg1* and *Lg2*. *See* Gosney Decl. ¶¶ 19-22.

*The electrons in the channel must flow* across this depleted region in order to reach the drain." *Id.* at Ex. 15 at 125 (emphasis added). Gosney Decl. ¶¶ 7, 16.

AMD asks the Court to find a "channel-free region" anywhere a channel is absent, rather than in the "pinch-off" region where the applicant affirmatively located it. AMD's construction ignores the patent's specification and prosecution history and focuses only on claim 4, a claim added during prosecution that calls for a channel-free zone in an off state. However, this approach puts the cart before the horse. The '893 Patent applicant's own statements in the patent, the figures, and the prosecution history define the channel-free region/zone. A skilled artisan would understand this to be the pinch-off region through which current flows between channel and drain. Gosney Decl. ¶¶ 17-19, 21. Claim 4 must be interpreted in that light. Further, AMD provides no evidence, beyond Dr. Lee's bare assertion, that Samsung's construction is inconsistent with the language of claim 4.

## D. U.S. PATENT NO. 5,377,200

### 1. Background of the Technology

The '200 Patent relates to circuitry for reducing power consumption of built-in testing logic used in computer processors. '200 Patent at 1:6-8. The patentee acknowledges that many electronic systems can test the integrity of their components with a built-in self-test. *Id.* at 1:13-16, 1:27-29. If this testing circuitry is always kept in a normal power state, it consumes power even when not in use. *Id.* at 1:37-47. To reduce this power consumption, the '200 Patent discloses use of a configuration register to put the testing logic into a low-power state upon receipt of a reset signal. *Id.* at 1:56-2:2. Later, if the configuration register receives a "key signal" that matches a "predetermined data pattern"—like a key fitting a lock—it puts the testing logic into a normal power state. *Id.*

### 2. "Data Pattern" Means "a Pattern of Bits Representing Information and Not Representing an Address or an Instruction."

| Proposed constructions of "data pattern" | |
|---|---|
| Samsung's proposed construction | AMD's proposed construction |
| "A pattern of bits representing information and not representing an address or an instruction" | "Bit sequence" |

The Court should adopt Samsung's construction of "data pattern" because it is consistent with the plain meaning of the term, the specification, and contemporaneous dictionary definitions. In contrast, AMD's proposed construction would improperly exclude the preferred embodiment.

AMD construes "data pattern" to mean "bit sequence." A sequence refers to a series, or succession, so the plain meaning of "bit sequence" must be a series, or succession, of bits (e.g., one after another in time). The preferred embodiment, however, shows that the "data pattern" is matched to the "key signal", which is a multiple-bit input such that all of the bits arrive in parallel (at the same time) rather than in series. The parallel nature of this data in the preferred embodiment is explicitly illustrated both in the specification text and by the standard, diagonal-line symbol across key input 24 in Figures 1 and 2.[13] '200 Patent, Figs. 1 and 2 and col. 3: 40-44. A parallel set of bits is not a serial sequence of bits, as would be required by AMD's construction. Because it would exclude the preferred embodiment, AMD's construction is untenable. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (claim construction excluding preferred embodiment is "rarely, if ever, correct and would require highly persuasive evidentiary support").

On the other hand, Samsung's construction for "data pattern" is consistent with the claim language and the specification, which illustrate that a pattern of bits is compared to a predetermined value, or data pattern, to determine whether they match. AMD contends that this "data pattern" is not limited to traditional data (e.g., the predetermined number corresponding to the "key" value input), but rather should also be construed to include addresses and instructions. Comparison of a "key" to an address or an instruction would be nonsensical. AMD provides neither intrinsic evidence nor any objective extrinsic evidence (e.g., dictionary definitions) in support of its attempt to broaden the interpretation of "data" in "data pattern." Rather, AMD relies solely on an assertion that the patentee did not specifically restrict the term "data" and an expert declaration.

Neither of AMD's arguments has merit. That the patent did not expressly exclude addresses and instructions from "data" is irrelevant and would have been unnecessary because

---

[13] Figures 1 and 2 are discussed in the section of the patent titled "Detailed Description Of The ***Preferred Embodiment***," '200 Patent at 3:24-25 (emphasis added); *id.* at 3:26, 4:36.

contemporaneous dictionaries show that one of ordinary skill in the art already would understand the term "data" to exclude addresses and instructions. *Phillips*, 415 F.3d at 1322-23 ("[J]udges are free to consult dictionaries and technical treatises at any time in order to better understand the underlying technology . . . ."). In the computer arts, there is a distinct difference between data, address, and instruction information. This is exemplified in the definition of "bus":

> Bus: A set of hardware lines—wires—used for data transfer among the components of a computer system.... *One group of wires* (actually, traces on a printed circuit board), for example, *carries data; another carries the addresses (locations) where specific information can be found; yet another carries control signals* to ensure that the different parts of the system use their shared highway without conflict.

Haskett Decl., Ex. 20 (Microsoft Press Computer Dictionary 58 (2nd ed. 1994)) (emphases added). This definition shows that data information, address information, and control information each are considered separate types of information.[14]

The definition of "data" further supports Samsung's proposed construction: "Data: General term for the numbers, letters, and symbols that serve as *input for computer processing*." *Id.* at Ex. 21 (McGraw-Hill Electronics Dictionary 132 (5th ed. 1994)) (emphasis added). Because it serves as the input for computer processing, common sense dictates that "data" cannot also encompass computer instructions, which actually perform the processing. This distinction between data, addresses, and instructions is not new. As early as 1966, "data" was "used to distinguish input and output information from instructions." *Id.* at Ex. 22 (Jack Horn, Computer and Data Processing Dictionary and Guide 35 (Prentice-Hall 1966)).

In sum, a "data pattern" when properly construed in the context of the '200 Patent does not include addresses or instructions, and the patent itself belies AMD's proposed construction, which improperly excludes the preferred embodiment.

---

[14] Although "bus" does not appear in the claims, it is permissible to look to definitions of non-claim terms to inform the meaning of a claim term. *See Boston Scientific Scimed v. Cordis Corp.*, 554 F.3d 982, 987 (Fed. Cir. 2009).

## E.    U.S. PATENT NO. 4,737,830

### 1.    Background of the Technology

The '830 Patent discloses the use of decoupling capacitors connected directly between the power supply (Vcc) and ground (Vss) busses to reduce voltage spikes that can cause circuit malfunctions. '830 Patent at Abstract. Specifically, claim 1 requires one or more MOS capacitors consisting of 1) top plates formed by the gate electrodes, 2) bottom plates formed by doped regions in the substrate and 3) gate oxide between the plates as an insulator. *Id.* at Claim 1.

AMD has only asserted claims 5 and 6, which depend from Claim 1 and add a limitation requiring that the gate electrode of claim 1 be "divided into a plurality of segments and each of said segments is independently connected electrically" to one of the busses. *Id.* at Claims 5, 6; AMD Br. at 18, line 13. As AMD correctly points out, this additional limitation in Claims 5 and 6 "creates redundancy that allows the capacitor to continue to operate even if one segment suffers a fabrication defect or burns out." *Id.* at 18, lines 6-8.

### 2.    AMD Impermissibly Extends Its Construction Regarding the Structure of the *Top* Gate of a Capacitor ("Gate Electrode") to Preclude Segmented *Bottom* Plates.

AMD's construction of a limitation concerning the gate electrode, which is the *top plate* of the capacitor, should be rejected because it impermissibly reads in limitations from a preferred embodiment in order to preclude another structure altogether -- segmented *bottom* plates. [15] *See Phillips*, 415 F.3d at 1323. Samsung's construction, by contrast, gives full scope to the claim as written. Samsung defines "gate electrode...is divided into a plurality of segments" to mean that "in the improved integrated structure of claim 1, the gate electrode is divided into two or more separate gate electrode segments."

| Proposed constructions of "Gate electrode...is divided into a plurality of segments" | |
|---|---|
| **Samsung's proposed construction** | **AMD's proposed construction** |
| "In the improved integrated structure of claim 1, the gate electrode is divided into two or more separate gate electrode segments." | "For each doped region (lower plate), the gate electrode (upper plate) is divided into a plurality of segments." |

---

[15] In the context of the '830 patent, the terms "top plate" and "upper plate" are used interchangeably as are the terms "bottom plate" and "lower plate."

There is no dispute that the term "gate electrode...is divided into a plurality of segments" describes the division of the gate electrode, or top plate of the MOS capacitor, into a plurality of segments. The dispute is whether, as AMD contends, the term requires that the gate electrode segments share a common doped region, or bottom plate. Such a restriction is neither consistent with the plain language of the term nor otherwise required by the claim. Claim 5 states:

> The integrated circuit structure of claim 1 wherein said gate electrode under said bus is divided into a plurality of segments and each of said segments is independently connected electrically at a spaced apart point to one of said busses to thereby form a plurality of parallel capacitors distributed along said busses.

As the plain language reveals, claim 5 deals only with the division of the *gate electrode* into a plurality of segments, and makes no reference to the doped region, or lower plate. Claim 5 places no limitation on the bottom plate, which can therefore be a single, solid plate or a segmented plate.

Claim 5, as well as claim 2, depend from claim 1. Accordingly, claim 1 must be broad enough to cover claims 2 and 5, but claim 5 must also be distinguishable from claim 2. *See* 35 U.S.C. § 112 ¶ 4 (2000); *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987). With these relationships in mind, it is clear what is, and what is not, required by each claim:

- Claim 1 requires <u>"one or more"</u> MOS capacitors. It can be satisfied with one top plate (one segment) and one bottom plate (one segment) but allows either or both of the top and bottom plates to be a plurality of segments. '830 Patent, Claim 1.

- Claim 2 requires <u>two or more</u> MOS capacitors, meaning at least two top plate segments with a common bottom plate, two bottom plate segments with a common top plate, or two top plates with two bottom plates. *Id.*, Claim 2.

- Claim 5 requires a MOS capacitor structure with <u>at least two top plate segments,</u> but does not specify the number of segments for the bottom plate. *Id.*, Claim 5.

Accordingly, claim 1 permits a single capacitor, with one top and one bottom plate, but allows more and allows either or both plates to be segmented. Hassoun Decl. ¶ 25. Claim 2 narrows claim 1 by requiring segmentation of either the top plate or the bottom plate, or both plates. *Id.* at ¶ 26. Claim 5 narrows claim 1 to instances where the top plate is segmented, but does so without placing any limitation on the bottom plate, and requires that each top plate is independently connected electrically to the bus. *Id.* at ¶ 27. Therefore, as to the bottom plate, claim 5 must be given the full scope of claim 1—it can be either a single plate or segmented. *Id.* at ¶ 28.

AMD seeks to limit claim 5 to a structure requiring a single, solid bottom plate by reading in a limitation from a preferred embodiment shown in Figure 16. However, the limitations of the single embodiment of Figure 16 cannot, by themselves, limit the claim. *Phillips*, 415 F.3d at 1323. And while AMD also relies on comments made by Judge Breyer in previous litigation, *Oki Am., Inc. v. Advanced Micro Devices, Inc.*, No. C-04-03171-CRB, 2006 WL 3290577, "Memorandum and Order" at *12, filed November 16, 2006 (Breyer, J.), those comments were in the context of a summary judgment ruling on invalidity, not a formal claims construction. In reaching the claim construction issue in this case, there is a compelling basis for this Court to reject AMD's argument: Neither the language of claim 5 nor the specification limits claim 5 to the preferred embodiment. [16]

In support of its contention that the embodiment in Figure 16 should limit claim 5, AMD points to advantages of using a single (or common) bottom plate, such as reduced resistivity. AMD Br. at 19-20. But the mere fact that one disclosed embodiment has advantages over another is not grounds to read it into the claim. *Phillips*, 415 F.3d at 1323. Claim 5 is about dividing the *gate electrode* (top plate) into a plurality of gate segments regardless of whether the bottom plate is a common plate or is divided into segments. Accordingly, the Court should construe "gate electrode…is divided into a plurality of segments" in accordance with the plain meaning of the term itself: that the gate electrode is divided into two or more separate gate electrode segments.

### 3. The Court Should Adopt Samsung's Construction of "Electrically Connected Directly" and Reject AMD's Proposed Construction That Impermissibly Reads in Limitations from the File History.

| Proposed constructions of "electrically connected directly" | |
|---|---|
| **Samsung's proposed construction** | **AMD's proposed construction** |
| "Connected through a direct and physical electrical connection, which includes no intermediate devices, to the Vcc current bus and the Vss bus" | "The bus and the capacitor are connected without any intervening active devices, such as transistors" |

---

[16] In the *Oki* case, Judge Breyer did not have the benefit of a full claim construction process on this term, nor did Judge Breyer issue a claim construction order. Even where the same Court has issued a claim construction regarding the same patents in a prior litigation, "it is better to get claim construction right than it is to get claim construction settled," and the court should consider arguments as to why the previous construction should be modified. *Rambus Inc. v. Hynix Semiconductor Inc.*, *et. al.*, 569 F. Supp. 2d 946, 966-67 (N.D.Cal. 2008).

DEFENDANTS' AND COUNTERCLAIMANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF
CV-08-0986-SI

The parties agree that the term "electrically connected directly between said busses" relates to the connection of the plates of the MOS capacitor to the busses and precludes certain intermediate structures, or devices, between those capacitors and the busses. AMD contends Samsung's construction is incorrect because "intermediate structures" in Samsung's proposed construction improperly includes metal lines, as well as active and passive devices. Samsung disagrees with this reading of its proposed construction, but to eliminate any possible confusion replaced "intermediate structures" with "intermediate *devices*" to allow this Court to focus on the real dispute between the parties, which is simply whether the term "electrically connected directly" precludes all intermediate devices (active or passive), or only active intermediate devices, as AMD suggests. As so understood, the dispute should be resolved in Samsung's favor: Nothing in the claim language, the patent, or the file history suggests that only intermediate active devices prevent a direct connection.

As Dr. Hassoun points out, a "direct" connection is a point-to-point connection. Hassoun Decl. ¶ 32. If a passive device, such as a resistor, intervenes between two points, the connection is no longer point-to-point, and therefore not direct. *Id.* Therefore, a person of ordinary skill in the art would consider a direct electrical connection to preclude not only an intervening active device, but also any intermediate passive device, such as a resistor. *Id.*

AMD argues that in the file history, the applicant distinguished over certain prior art references on the basis that they lacked a direct connection because there were intermediate transistors. This is merely one example of an indirect connection. Nothing in the intrinsic evidence suggests that a transistor is the only intervening device to prevent a direct connection. *Id.* at 33-34.

### 4. The Court Should Adopt Samsung's Construction of "Vcc Current Bus" and Reject AMD's Proposed Construction.

| Proposed constructions of "Vcc current bus" | |
| --- | --- |
| Samsung's proposed construction | AMD's proposed construction |
| "The main power supply bus on an integrated circuit for receiving external current and providing that current to the integrated circuit" | "An internal bus (main conduit) for an integrated circuit that supplies charge for the transistors and capacitors" |

The dispute surrounding the term "Vcc current bus" centers on AMD's misunderstanding of Samsung's construction. AMD read the word "external" in original Samsung's construction as

modifying the word bus, as opposed to the term "power supply" that it preceded. As a result, AMD argued that the Vcc bus is internal rather than external, and that Samsung's construction should use the word "power" as opposed to "charge." To focus the actual dispute between the parties, Samsung proposes a simplified construction that clarifies that the bus, while not itself external, receives current from an external source. This construction also replaces "power" with "current," which is at least as precise as AMD's term "charge." With those clarifications, the only real dispute between the parties is whether the bus provides current to the entire integrated circuit or only to the transistors and capacitors. Accordingly, Samsung's proposed construction properly indicates that the bus provides current to the entire integrated circuit, as opposed to selectively providing charge just to the transistors and capacitors, as AMD proposes.

A person of ordinary skill in the art would understand that a Vcc current bus provides current to the entire circuit. Hassoun Decl. ¶ 36. That is the very purpose of the bus—to receive external power and provide current to the integrated circuit. *Id.* The description of the Vcc bus throughout the patent confirms that the patent is referring to the main conduit of power or current. *Id.* at ¶ 37. The patent explains that "[s]ince the Vss and Vcc busses in a typical VLSI chip or die are fairly wide, such an MOS capacitor can be formed beneath one or both of the busses to thereby have a minimum impact on the [available] space on the die." '830 Patent at 3:57-61. This is discussing the main, current handling busses typically found on a chip -- i.e., "the main power supply bus on an integrated circuit for receiving external current and providing that current to the integrated circuit."

### 5. The Court Should Adopt Samsung's Construction of "Independently Connected Electrically" and Reject AMD's Proposed Construction That Impermissibly Reads in Limitations from a Preferred Embodiment.

| Proposed constructions of "independently connected electrically" | |
|---|---|
| Samsung's proposed construction | AMD's proposed construction |
| "Each gate electrode segment is connected through a separate electrical path that is not shared by any other gate electrode segment" | "A gate segment is 'independently connected electrically' if it has its own connection or can connect without having to go through another segment" |

It is undisputed that "independently connected electrically" requires connecting each gate electrode segment to the Vcc bus through a path that does not go through (*i.e.*, is not shared with)

another gate electrode segment. The dispute is whether it is permissible, as AMD would allow, for the gate electrode to have *additional* paths connecting it to the Vcc bus that *do* go through another gate electrode segment. This is untenable because, taking into account a basic principle of electricity, it is in conflict with the very embodiment AMD cites as support. Hassoun Decl. ¶ 40.

A basic principle of electricity is that current will flow wherever there is a path. *Id.* at ¶ 41. Current is not confined to one single path but will, instead, follow all paths simultaneously. *Id.* Thus, if a gate electrode segment of a capacitor has a connection to the bus that is not shared by any other gate electrode segment *and* a connection to the bus that *is* shared by another gate electrode segment, current will flow through *both* paths at the same time. *Id.* Furthermore, if one gate electrode segment fails and is shorted to ground (causing the capacitor to fail), *all* gate electrode segments connected to it will also fail because of the shared path(s). *Id.*

The following diagram illustrates the point. Gate electrode segment 1 (top plate 1) has a direct path to the Vcc bus shown as a dashed black line, and gate electrode 2 (top plate 2) has a direct path to the Vcc bus shown as a solid black line. Defects in the gate oxide below the gate electrode segments can short (connect) the capacitor to ground rendering it useless. If, however, that gate electrode segment (top plate 1) is connected to the Vcc bus only through path 1 (or only through direct connections that avoid other segments), a defect in the gate oxide can be isolated, such as by severing its connection to the bus. The remaining gate electrode segments (and the capacitors they form) continue functioning, and this creates redundancy in the capacitor's design, a redundancy AMD claims is "one of the key innovations" of the '830 patent. AMD Br. at 18.



Now, consider the diagram below, which AMD's construction would permit, where gate electrode 1 has two paths to the Vcc bus, one direct path shown as a dashed black line (path 1) and one path that is shared (goes through) gate electrode segment 2 (path 2).



Vcc

top plate 1                    top plate 2

As explained above, current will flow through both path 1 and path 2 at all times. A defect in the gate oxide associated with gate electrode segment 1 will short that capacitor to ground. In this configuration, however, severing the direct (dashed black line) connection will not isolate the defective capacitor. Instead, the current will still flow between the Vcc bus and top plate 1 using the shared path (path 2) through the other gate electrode segment, effectively shorting *both* capacitors to ground even if the defect is associated only with one. The shared path renders both capacitors useless. Therefore, the ability to create redundant capacitors that can be electrically isolated from each other by "independently connect[ing them] electrically" is lost under AMD's proposed construction, but is maintained under Samsung's.

Nor is AMD's construction consistent with Figure 16.[17] As AMD acknowledges, one stated purpose of the structure claimed in Claim 5 is to create redundancy. '830 Patent at 5:26-43. This redundancy guarantees that if one capacitor fails due to a defect in the oxide, the other capacitors will still function properly in the circuit. AMD's construction, by allowing alternate, shared paths from among gate electrodes to the bus, makes such redundancy impossible. Hassoun Decl. ¶ 43.

Figure 16 of the '830 Patent depicts "a modification of the capacitor construction" in which "capacitor 16 is provided with a number of separate gate electrodes 18'". '830 Patent at 5:11-14. In this embodiment, "[e]ach gate electrode 18' has a separate tab 19'...to connect...with Vcc bus 4." *Id.* at 5:14-16. The separation of the gate electrode into separate segments, each having an independent connection to the gate, permits isolation of any defects in the gate oxide, as the

---

[17] While Samsung disagrees that Claim 5 should be limited to this single proposed embodiment, Samsung does agree that FIG. 16 represents one possible embodiment of Claim 5 and, further, that the Court should not construe "independently connected electrically" to exclude this embodiment, as AMD proposes.

DEFENDANTS' AND COUNTERCLAIMANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF
CV-08-0986-SI

presence of such a defect would allow the connection between the affected gate electrode and the bus to sever, leaving the remaining gate electrode segments operable. *Id.* at 5:33-39. This isolation is possible in Fig. 16 because there is no path from each gate electrode to the bus other than the single, independent path created by tab 19'. Under AMD's construction, each gate electrode could have a path to the bus that was shared with another gate electrode (path 2 above). In that case, a failure in the gate oxide under one plate would create a short to ground and would result in failure of *all* gate electrodes and, likely, of the entire chip. Hassoun Decl. ¶¶ 41-43. This is because current would also travel through the shared connection (path 2), irrespective of any separate, unshared connections. *Id.* Samsung's construction solves this problem by requiring that the path between each gate electrode segment and the bus is *not* shared by any other gate electrode segment.

Dictionaries from the relevant time period confirm that "independent" means that the connection is separate and isolated, not affiliated with or depending on any other connection, such that each gate electrode must connect to the Vcc bus through a connection that is not shared by any other gate electrode segment. *See,* e.g., Haskett Decl., Ex. 23 (American Heritage Dictionary at 654 (2d ed. 1982)) ("independent . . . 5. not dependent on or affiliated with a larger or controlling group or system"); *Id.* at Ex. 24 (Britannica World Language Dictionary at 643 (1964)) (independent . . . 4. separate or disconnected"); *Id.* at Ex. 25 (Webster's Ninth New Collegiate Dictionary (1983)) ("independent . . . 1: not dependent: as . . . (2) not affiliated with a larger controlling unit b (1): not requiring or relying on something else"). Further, the use of the term "independent" when speaking of electrical connections in other patents and scientific publications at the time also indicates that the word "independent" refers to isolation. See, e.g., *Id.* at Ex. 26 (U.S. Patent No. 4,617,482 (1986) at Fig. 2, 4:23-26) ("The first and second parts have a common input terminal 17 but are independently connected with gate electrodes 36 and 26 of the P- and N-MOST 11 and 12."); *Id.* at Ex. 27 (U.S. Patent No. 5,289,631 (1994) at 6:38-44) ("The external connection pads, interconnection layers and temporary substrate pads are insulated from one another to form a plurality of independent electrical connection paths between the chips I/O pads and the external connection pads.").

As such, the term "independently connected electrically" must mean that each gate electrode segment is connected through a separate electrical path that is not shared by any other gate electrode segment.

### F. U.S. PATENT NO. 5,623,434

#### 1. Background of the Technology

The '434 Patent relates to reducing the size (e.g., layout area) of a multiplier by allowing it to re-use circuitry within an arithmetic and logic unit ("ALU"). This reduction is possible because the multiplier and the ALU have overlapping functionality. While an ALU typically performs addition, a multiplier must also be able to add the carry signal and the sum signal produced by its carry save stage. In prior art data processing systems, the multiplier employed its own dedicated adder (called a "carry propagate adder"). In an effort to decrease circuit size, the '434 Patent discloses use of the adder in the ALU to perform the addition required during multiplication, thereby obviating the need for a separate, dedicated adder in the multiplier circuit.

Proper signal routing and signal selection allow the multiplier and ALU to share an adder. A type of selector called a multiplexer is used to control whether the ALU receives signals from the multiplier or from its standard inputs. During multiplication the carry signal and sum signal are routed unchanged from the carry save stage of the multiplier to the ALU, which then performs the addition. In contrast, for other operations the ALU receives signals from its standard inputs.

#### 2. The Court Should Adopt Samsung's Proposed Construction of "ALU," Which Gives the Term Its Plain Meaning and Full Scope, and Reject AMD's Proposed Construction, Which Adds Nothing to the Understanding of the Term.

| Proposed constructions of "arithmetic and logic unit (ALU)" ||
|---|---|
| Samsung's proposed construction | AMD's proposed construction |
| "A conventional circuit which performs arithmetic and logic operations (e.g., addition) within the data processing system and optionally includes registers capable of receiving inputs from multiple sources within that data processing system." | "Unit that can perform both arithmetic and logic operations." |

In contrast to AMD's proposed construction of "arithmetic and logic unit (ALU)," which merely reorders the words in the term itself, Samsung proposes a construction—grounded in the

32

intrinsic record—that actually clarifies the meaning of "arithmetic and logic unit." *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (stating that "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims"); *Negotiated Data*, 2009 WL 186180, at *15 (stating that proposed construction using the very terms to be defined would "not enlighten the jury as to its meaning" and rejecting the proposal).

AMD does not dispute that the term ALU is used throughout the intrinsic record of the '434 Patent, to mean a conventional, or well-known, type of circuit. *See* '434 patent at 1:10-13, 1:17-19. Instead, AMD attempts to conjure up a dispute as to whether an ALU can perform both arithmetic and logic operations where no such dispute exists. In its Opening Brief, AMD suggests that by including the parenthetical "(e.g., addition)" in its proposed construction, Samsung has "improperly read the limitation 'and logic' out of the claims." AMD Br. at 27. This is not Samsung's intention, nor is that the effect of the parenthetical, which is merely exemplary rather than limiting. In fact, the arithmetic operation of addition itself requires a series of logic operations within the ALU and is repeatedly used in the claims and specification as an example of an ALU operation. *See* '434 Patent at claims 1, 8, and 11; Abstract; 1:22-26, 2:21-23, 2:37-39, 3:13-15.

Where the parties do differ is with respect to whether an ALU can optionally include registers. The intrinsic evidence establishes that "ALU" should be construed to optionally include registers. In other words, some ALUs may have registers while others may not. This fact is clear from the specification and claims and, therefore, inclusion of "optionally includes registers" in the construction serves to ensure the term is given its full and proper scope. In particular, AMD correctly observes that claim 3 refers to input registers coupled between multiplexers and the ALU, which indicates that in that instance the registers are outside the ALU. In contrast, however, the specification also explicitly contemplates input registers residing within the ALU. For example, the specification states that "ALU 130 includes registers 131 and 132" in its description of a conventional data processing system. *See id.* at 1:19-21 (describing Fig. 1*a*), 1:64-67; *see also id.* at Figs. 2-3 (drawing ALU 230 and input registers 231 and 232 identically). Therefore, to give this

term its full scope and to avoid ambiguity, ALU is properly construed to "optionally include[] registers" as proposed by Samsung.

For these reasons, this Court should adopt Samsung's proposed construction.

### 3. The Court Should Adopt Samsung's Proposed Construction of "Bus Coupling Said Carry Save Stage to Said ALU" Rather Than AMD's Proposed Construction, Which Is Incomplete.

| Proposed constructions of "bus coupling said carry save stage to said ALU" | |
|---|---|
| **Samsung's proposed construction** | **AMD's proposed construction** |
| "[A] physical path between the carry save stage and ALU that does not modify the value from the carry save stage." | "Bus that can transfer information between the carry save stage and the ALU." |

With Samsung's present construction, the only real dispute between the parties regarding this term is whether the path ("bus") can modify the output values from the carry save stage of the multiplier before they reach the ALU. While AMD argues such modification is acceptable, such a construction would be inconsistent with the disclosed invention and should be rejected.

It is undisputed that the '434 Patent discloses a physical path between the carry save stage of the multiplier and the ALU to allow the ALU to add the carry and sum signals during a multiplication operation. *See* '434 Patent at 3:2-14, Figs. 2 and 3. Contrary to AMD's suggestion, Samsung did not intend its original construction to rule out multiplexers or registers in that path merely by referring to the physical path as "direct". Rather, Samsung's original construction sought to convey the fact that the values travel without modification from the carry save stage to the ALU to allow the required addition to be correctly performed. To eliminate any uncertainty, Samsung's proposed construction now omits the word "direct". With this simplification of Samsung's construction, the only dispute is whether the path ("bus") can modify the output values from the carry save stage of the multiplier before they reach the ALU.

The claimed path (bus), however, cannot modify the values from the carry save stage, despite AMD's assertion to the contrary. The entire purpose of the patent is to allow the ALU's adder to be used to add together the carry and sum outputs of the carry save stage of the multiplier. *See id.* at claim 1; 3:2-14. Consequently, AMD's construction, which would permit a "bus" to modify the values from the carry save stage, is inconsistent with the functionality of the pathway

disclosed in the patent. As AMD's expert, Dr. Andrew Wolfe, explains, "the patent describes busses for *transferring* information between circuits that perform operations on the information." Wolfe Decl. at 14 (emphasis added). It does not contemplate the use of busses for modifying information.

The extrinsic evidence further supports Samsung's proposed construction because a person of ordinary skill at the time of the invention would have understood that a "bus" was "[a]n internal electrical pathway along which signals are *sent* from one part of the computer to another." Haskett Decl., Ex. 28 (QUE's Computer User's Dictionary (1994) at 70) (emphasis added). [18]

Therefore, both the intrinsic and extrinsic evidence support the construction of "bus" as a physical pathway that is merely a conduit for the information to be transferred, or sent, from the multiplier to the ALU. A person of ordinary skill of the art would have understood that the operation performed by a "bus" was "transferring" or "sending" information. Therefore, modification of the data while traversing the path would be inconsistent with the disclosed invention. Accordingly, when claim 1 recites a "bus coupling said carry save stage to said ALU," it refers to a physical pathway between the carry save stage and ALU that does not modify the value from the carry save stage.

## III.    CONCLUSION

For the foregoing reasons, Samsung requests that the Court adopts Samsung's proposed claim constructions.

---

[18] This construction is similarly consistent with the dictionary definition offered by AMD, which defines "coupling" as "[t]he association of two or more circuits or systems in such a way that power or signal information may be transferred from one to another." *See* Fahrenkrog Decl., Ex. O.

DATED: March 30, 2009                    COVINGTON & BURLING LLP


                                         By /s/ Robert T. Haslam
                                                ROBERT T. HASLAM

                                         Attorneys for Defendants and Counterclaimants
                                         SAMSUNG ELECTRONICS CO., LTD., SAMSUNG
                                         SEMICONDUCTOR, INC., SAMSUNG AUSTIN
                                         SEMICONDUCTOR, LLC, SAMSUNG
                                         ELECTRONICS AMERICA, INC., SAMSUNG
                                         TELECOMMUNICATIONS AMERICA, LLC,
                                         SAMSUNG TECHWIN CO., LTD., and SAMSUNG
                                         OPTO-ELECTRONICS AMERICA, INC.