ROBERT T. HASLAM (Bar No. 71134)
rhaslam@cov.com
MICHAEL K. PLIMACK (Bar No. 133869)
mplimack@cov.com
CHRISTINE SAUNDERS HASKETT (Bar No. 188053)
chaskett@cov.com
SAMUEL F. ERNST (Bar No. 223963)
sernst@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

ALAN H. BLANKENHEIMER (Bar No. 218713)
ablankenheimer@cov.com
LAURA E. MUSCHAMP (Bar No. 228717)
lmuschamp@cov.com
JO DALE CAROTHERS (Bar No. 228703)
jcarothers@cov.com
CHRISTOPHER J. LONGMAN (Bar No. 234473)
clongman@cov.com
COVINGTON & BURLING LLP
9191 Towne Centre Drive, 6th Floor
San Diego, CA 92122-1225
Telephone: (858) 678-1800
Facsimile: (858) 678-1600

Attorneys for Defendants and Counterclaimants SAMSUNG ELECTRONICS CO., LTD., SAMSUNG SEMICONDUCTOR, INC., SAMSUNG AUSTIN SEMICONDUCTOR, LLC, SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, SAMSUNG TECHWIN CO., LTD., and SAMSUNG OPTO-ELECTRONICS AMERICA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADVANCED MICRO DEVICES, INC., et al.,<br><br>Plaintiffs and Counterdefendants,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., et al.,<br><br>Defendants and Counterclaimants. | Case No. 3:08-CV-0986-SI<br><br>**DEFENDANT AND COUNTERCLAIMANT SAMSUNG ELECTRONICS CO., LTD.'S REPLY CLAIM CONSTRUCTION BRIEF**<br><br>**PUBLIC REDACTED VERSION**<br>DATE: May 6-7, 2009<br>TIME: 3:30 p.m.<br>COURTROOM: 10, 19th Floor<br>JUDGE: The Honorable Susan Illston |

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................. 1

II. ARGUMENT .................................................................................................................... 2

    A. The Court Should Adopt Samsung's Proposed Constructions for the '065 Patent. ................................................................................................................... 2

        1. The Term "Accumulatively Averaging Working Conditions" Does Not Exclude Weighted Averages. ................................................................ 3

        2. The Term "Working Condition" Does Not Limit the Claims to an Alignment and Exposure Process. ....................................................... 6

        3. "Extracting a Correction Condition" is Not Limited to the "Correction Element" Value Mentioned in the Preferred Embodiment Equation. ......... 7

        4. The Information "Corresponding to an Alignment State" is Not Limited to One Layer on a Semiconductor Wafer as Compared to Another. .................................................................................................. 9

    B. The Court Should Adopt Samsung's Position On the Disputed Term "Separate Instruction Sets" in the '750 Patent. ..................................................... 10

        1. "Separate Instruction Sets" in the Claim Preambles Should Not Be Construed Because It Does Not Substantively Limit Those Claims. ........ 10

        2. "Separate Instruction Sets" Cannot Be Limited to One CISC x86 Instruction Set and one RISC PowerPC Instruction Set. ......................... 12

        3. "Mere extensions of instruction sets do not constitute separate instruction sets because they do not have dependent encodings of instructions" Is Not a Limitation of "Separate Instruction Sets." ............. 14

III. CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

CASES

*Andersen Corp. v. Fiber Composites, LLC*,
   474 F.3d 1361 (Fed. Cir. 2007) ............................................................................... 13

*Bass Pro Trademarks, L.L.C. v. Cabela's, Inc.*,
   485 F.3d 1364 (Fed. Cir. 2007) ............................................................................... 12

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
   334 F.3d 1294 (Fed. Cir. 2003) ................................................................................. 5

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002) ........................................................................... 11, 12

*Exxon Research & Eng'g Co. v. United States*,
   265 F.3d 1371 (Fed. Cir. 2001) ................................................................................. 9

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ............................................................................... 14

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ........................................................................... 4, 13

*Purdue Pharma L.P. v. Endo Pharms., Inc.*,
   438 F.3d 1123 (Fed. Cir. 2006) ............................................................................... 14

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ................................................................................... 6

## I. INTRODUCTION

In an attempt to avoid infringement, Plaintiffs and Counterdefendants (collectively, "AMD") have offered tortured and unduly narrow constructions for the disputed terms of the patents asserted by Samsung Electronic Company, Ltd. ("Samsung").[1] AMD's proposed constructions must be rejected because they improperly limit the claims to particular preferred embodiments or to non-limiting preamble language. The Court should adopt Samsung's proposed constructions, which are rooted in the language of the claims and the specifications' descriptions of the actual inventions, and not just the preferred embodiments.

AMD argues that the Court should limit the claims of the '065 patent to one of the specification embodiments applying the claimed methods to a specific photoresist alignment and exposure process. Several of the claims are limited to photolithography processes; other claims are not so limited. But none of the claims should be limited to the particular process and specific equations set forth in an example embodiment. AMD's argument fails, not only because the Federal Circuit has repeatedly cautioned against importing limitations into the claims from a specification embodiment, but also because AMD consistently confuses two of the steps in the claimed methods in making its arguments. This results in AMD arguing that various steps in the claimed methods are restricted to aspects of the exemplar embodiment corresponding to entirely different claim elements. The Court should reject this approach.

Arguing in favor of its overwrought construction of the preamble term "separate instruction sets" in the '750 patent—which Samsung contends should not be construed at all—AMD distorts the prosecution history of the patent to arrive at a definition that would not only limit the claims to the patent's preferred embodiment, but would also preempt limitations from the bodies of the at-issue claims. The Court should either decline to construe the term at all, or, alternatively, should adopt Samsung's plain meaning construction of the phrase.

---

[1] The parties are asking the Court to construe disputed terms from two of Samsung's asserted patents: U.S. Patent Nos. 5,740,065 ("'065 patent") and 5,781,750 ("'750 patent").

## II. ARGUMENT

### A. The Court Should Adopt Samsung's Proposed Constructions for the '065 Patent.

Because AMD's arguments confuse aspects of two steps in the claimed methods, Samsung will begin by clarifying these two steps and how they relate to the description of the preferred embodiment to which AMD seeks to limit the scope of the claims.

*Extracting an optimal working condition*

One step in all of the claimed methods is to "extract an optimal working condition by accumulatively averaging working conditions of lots previously manufactured." *See*, e.g., '065 patent, cl. 1. This means that the patented methods perform a mathematical averaging operation on a set of working conditions (such as exposure time or polishing rate) from prior lots to determine a single value representative of the set. The aspect of the exemplar embodiment corresponding to this step in the process is described at column 3, lines 29 to 54.

*Extracting a correction condition*

A different step in the methods of claims 1-7 and 9-10, which relate to photolithography applications, is to "extract[ ] a correction condition by extracting information corresponding to an alignment state of said process." '065 patent, cl. 1. This is a check on the optimal working condition that is performed with reference to information regarding a lower layer of the chips currently being manufactured. The aspect of the exemplar embodiment corresponding to this step in the process is described at column 3, line 55 through column 4, line 10.

*AMD's conflation of these two steps*

One of the inputs into the exemplar embodiment equation for extracting an optimal working condition is a "correction element," which is "obtained by subtracting an objective value from a subjective value" obtained from previous lots. *Id.* at 3:43-47. AMD has confused the two steps in the claimed methods by arguing that the "correction condition" step present in some of the claimed methods is synonymous with this "correction element" in the exemplar embodiment equation for extracting an optimal working condition. *See* AMD Br. at 16 (construing "extracting a correction condition" to mean "subtracting an objective value from a resultant value so that, when this

difference value is added to the optimal working condition, a process can be performed without error."); *see also* Edgar Decl. ¶¶ 23-26 (committing the same mistake). Even if it were appropriate to limit the claims to an exemplar embodiment, nowhere in the passage in the specification describing the embodiment's step for extracting a "correction condition" does the term "correction element" appear or the language, "subtracting an objective value from a resultant value," to which AMD would improperly limit the "correction condition" limitation. '065 Patent at 3:55-4:12.

As discussed below, AMD's mistake contaminates its proposed constructions for two of the terms before the Court at this time. Because AMD believes that the "correction element" is synonymous with the claimed "correction condition," AMD excludes the "correction element" from the exemplar embodiment equation for calculating the optimal working condition, resulting in a construction of "accumulatively averaging working conditions" that excludes a disclosed embodiment. And because AMD believes that the "correction element" is synonymous with the claimed "correction condition," it proposes a construction of "extracting a correction condition" that is limited to a single input into an exemplar embodiment equation for performing an entirely different step in the claims – extracting an optimal working condition.

### 1. The Term "Accumulatively Averaging Working Conditions" Does Not Exclude Weighted Averages.

Samsung proposes construing the term "accumulatively averaging working conditions" to mean, "performing a mathematical operation on a set of working conditions to determine a value representative of a set." AMD does not quarrel with Samsung's evidence that the word "average" is a broad term, which refers to determining a value representative of a set by applying a mathematical operation to the set. *See, e.g.* Declaration of Samuel F. Ernst in Support of Samsung's Opening Claim Construction Brief, Ex. 3 at 80 (defining "average" as "a single value (as a mean, mode, or median) that summarizes or represents the general significance of a set of unequal values"). Rather, AMD argues that the word "accumulatively" limits the claims to a particular mathematical algorithm and that Samsung's construction would improperly encompass "*any* kind of 'mathematical operation.'" AMD Br. at 13. AMD argues that "Samsung impermissibly reads 'accumulatively' out of its construction." *Id.* This is incorrect.

Samsung's construction does not encompass "*any* kind of 'mathematical operation,'" but rather describes an average, which is a mathematical operation that determines a single value representative of a set. Moreover, Samsung's construction properly accounts for the "accumulatively" limitation in a way that is consistent with the ordinary meaning of that term to one of skill in the art. As both parties' dictionary definitions indicate, the word "accumulate" simply means to increase gradually in quantity or number. *Id.* The claims use this term because the patented methods average working conditions from previous lots over time to arrive at the optimal working condition. After the claimed method is performed for a lot, the data is stored and "used for resetting the working condition of the next process." '065 Patent at 5:21-22. In this way, the previous working conditions are "accumulatively averaged." AMD is incorrect that Samsung ignores the "accumulatively" limitation. Samsung's construction applies to "a set of working conditions," and Samsung stated in its opening brief that "[t]he definition of accumulate adds . . . the concept of gathering the set of values as lots are performed." Samsung Opening Br. at 17. But Samsung is amenable to the Court adding the following emphasized language to the construction of this term if it will add clarity: "Performing a mathematical *averaging* operation on a set of working conditions *over time* to determine a value representative of the set."

The real dispute arises from AMD's incorrect claim that the word "accumulatively" excludes a *weighted* average.[2] Dr. Edgar opines without support or citation that "[m]oving averages, weighted averages, and exponentially weighted moving averages ("EWMA") are recognized as distinct calculations that would have various similarities and differences from 'accumulative averages' depending on the application." Edgar Decl. ¶ 21. This assertion must be disregarded because "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005).[3]

---

[2] A weighted average would assign different weights to the values to be averaged, in the same manner, for example, as a final exam might be weighted more than a midterm exam.

[3] The admonition that expert testimony "suffers from bias that is not present in intrinsic evidence," *Phillips*, 415 F.3d at 1318, is particularly warranted in the case of Dr. Edgar. As AMD's process engineer Christopher Bode disclosed at deposition,

REDACTED

*(Footnote continued)*

Moreover, Dr. Edgar's assertion is contradicted by the very "learned treatise" upon which AMD relies. AMD cites to a Wikipedia webpage and states that it "describe[es] a 'cumulative average' as 'an unweighted average of the sequence of $i$ values $x_1 \ldots, x_i$ up to the current time." AMD Br. at 14 (citing Beasley Decl., Ex M).[4] In fact, the full sentence quoted by AMD without the ellipsis reads, "[t]his is the cumulative average, which is *typically* an unweighted average of the sequent of $i$ values $x_1, \ldots, x_i$ up to the current time." Beasley Decl., Ex. M at AMD001989800 (emphasis added). Elsewhere the Wikipedia article states that "a cumulative average is a type of moving average," and that "[a] moving average could also use a weighted average instead of a simple average, perhaps in order to place more emphasis on more recent data points than on other data points longer ago in time." *Id.*, Ex. M at AMD001989798. And like the contemporaneous learned treatise relied upon by Samsung, *Introduction to Statistical Quality Control*, the Wikipedia article describes a wide range of mathematical formulas that can be used to accumulatively average a data set. Beasley Decl., Ex. M at AMD001989801-803. Accordingly, the extrinsic evidence confirms that the term "accumulatively averaging" does not exclude weighted averages.

Nor is AMD correct that the term "accumulatively averaging" is limited to the specific mathematical algorithm AMD proposes as its construction: "individually summing over previous values of that parameter and dividing the result by the total number of terms in the summation. In an accumulative average, the number of terms in the average grows by one as each new value is calculated." AMD Br. at 13. As support, AMD points to the equation in the preferred embodiment, and argues that the term is limited to this particular equation by virtue of the word "accumulatively.":

REDACTED

---

[4] Because the Wikipedia article is not contemporaneous with the patented inventions, it is irrelevant to the claim construction inquiry. *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed. Cir. 2003) (Non-contemporaneous authorities "are not contemporaneous with the patent, do not reflect the meanings that would have been attributed to the words in dispute by persons of ordinary skill in the art as of the grant of the '003 patent, and for those reasons are not considered in our de novo claim construction analysis.")

$$X_m = \frac{1}{n-1} \sum_{i=1}^{n-1} (X_n \pm \mathcal{E})$$

(n is a natural number of over 1)

AMD Br. at 14.

The problem with AMD's construction is that it is even narrower than the preferred embodiment equation to which AMD purports to limit the claims. The preferred embodiment equation not only "individually sum[s] over previous values of that parameter and divid[es] the result by the total number of terms in the summation [with] the number of terms in the average grow[ing] by one as each new value is calculated" (AMD Br. at 14); the embodiment equation also introduces a "correction element," which is represented by the $\mathcal{E}$ term. '065 patent at 3:43-45 ("In the above equation (1), the $\mathcal{E}$ term indicates a correction element obtained by subtracting an objective value from a resultant value.") AMD's own expert acknowledges that the exemplar equation includes this correction element. Edgar Decl. ¶ 21. Yet AMD's construction ignores the correction element, thereby excluding the preferred embodiment, and therefore must be rejected. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (a claim construction excluding a preferred embodiment is "rarely, if ever, correct and would require highly persuasive evidentiary support").

The Court should give the term the full scope of its meaning: "performing a mathematical operation on a set of working conditions to determine a value representative of the set."

### 2. The Term "Working Condition" Does Not Limit the Claims to an Alignment and Exposure Process.

Samsung agrees with AMD that the term "working conditions" refers to settable parameters or machine settings, but because the machine settings control variables in the fabrication process, such as exposure time and polishing or etching rate, the term also encompasses the variables that these machine settings affect. *See* Samsung Opening Br. at 3 ("working condition" refers to "variables and the machine settings used to control them").[5] Moreover, contrary to AMD's

---

[5] AMD's expert apparently agrees that the term "working conditions" encompasses the "variables" that machine settings affect. *See* Edgar Decl. ¶ 22.

assertions (AMD Br. at 15-16), these are often variables that can be measured, such as exposure dose.

Where AMD errs is in insisting that the "working conditions" term limits the claims to alignment and exposure processes. Samsung does not dispute that claims 1-7 and 9-10 are limited to photolithography processes by virtue of the "alignment state" limitation.[6] But there is no basis for arguing that claims 8, 11, and 12 are limited to photolithography processes. These claims have no "alignment state" limitation, and the specification discusses a wide range of fabrication processes other than photolithography processes, including "etching processes" and "chemical vapor deposition." '065 patent at 1:46-47. Dr. Edgar's assertion that "parameters cited by the inventors as part of the 'working condition' are all manipulated alignment variables" is incorrect. Edgar Decl. ¶ 22. For example, the specification refers directly to "process variables (etching time, etching activation energy, and so on)," (1:53-54), and Dr. Edgar concedes that etching is not part of the alignment and exposure process. Edgar Decl. ¶ 16 ("After alignment and exposure, the wafer is moved to a different machine to perform etching.") The term "working conditions" does not limit the claims to an alignment and exposure process.

### 3. "Extracting a Correction Condition" is Not Limited to the "Correction Element" Value Mentioned in the Preferred Embodiment Equation.

"Extracting a correction condition" is a step in the claimed photolithography methods whereby information related to an underlying layer serves to correct the accumulatively averaged working conditions. By their plain terms, these claims only require that one "extract[s] a correction condition by extracting *information* corresponding to an alignment state." *Id.*, Cl. 1 (emphasis added). AMD confuses this "correction condition" step with the accumulatively averaged working conditions step by contending that this "information" is limited to a particular phrase in the description of the preferred embodiment for the accumulatively averaging calculation: "Subtracting an objective value from a resultant value so that when this difference value is added to the optimal

---

[6] This is why Samsung stated during the prosecution of the Japanese patent application AMD relies upon, "[c]learly, said alignment relationship setting is not needed in etching and other operations that do not require alignment precision." AMD Br. at 20 (quoting Beasley Decl., Ex. Q at SAMAMD0038792).

working condition, a process can be performed without error." AMD Br. at 16; *compare with* '065 patent at 3:43-45 ("In the above equation (1), the % term indicates a correction *element* obtained by subtracting an objective value from a resultant value.") (emphasis added). AMD is misguided because the "correction element" is merely a value in the exemplar embodiment equation for calculating the optimal working condition; it is not the same as the claimed "correction condition."

A "condition" is a broader term than an "element" in an equation, and can include any "information" related to an alignment state, such as, for example, the identification of the equipment that sets the alignment in the lower layer. *Id.* at 5:53-55. The patent states, "[w]hen the parameters are added for processing using the same equipment, it is possible to set more precise optimal parameters. Thereby, it is also possible to minimize errors generated in the alignment & exposure process." *Id.* at 5:53-54. Dr. Edgar contends that, despite what the specification says, equipment I.D. information cannot be a "correction condition" because "[a] parameter value identifying a piece of equipment could not be added (mathematically) to an 'optimal working condition.'" Edgar Decl. ¶ 29. Dr. Edgar's placement of "mathematically" in parentheses is revealing because mathematical addition is not the only type of "adding." In fact, the claim term "adding" has the broader meaning of "taking into account," as shown in the next line of the specification: "As discussed in the foregoing description, in the present invention, the correction for errors generated in previous processes is *taken into account* to thus set a new working condition in the interior thereof." '065 patent at 5:58-61 (emphasis added).

Dr. Edgar states that "[t]he patent contains no teaching or explanation of how equipment identification could be used in process control." Edgar Decl. ¶ 31. This is incorrect. At column 5, lines 24-52 the specification describes a preferred embodiment method for computing the optimal working condition. "The CPU **18** reads the various kinds of parameter values stored in the memory **20** to thereby perform a step **117** of producing the optimal value for each parameter from the read value." '065 patent at 5:37-40. In the next paragraph, the specification states that this optimal working condition could be subjected to a correction condition "[w]hen the parameters are added for processing using the same equipment." *Id.* at 54-55. AMD contends that this equipment I.D. information could not be the claimed "correction condition" because "this passage says nothing

- 8 -

about alignment or layer positions." AMD Br. at 18. But the very next sentence says, "Thereby, it is also possible to minimize errors generated in the alignment & exposure process." *Id.* at 5:56-57.

Accordingly, AMD and Dr. Edgar are mistaken. The claims are fully enabled and definite when the term "extracting a correction condition" is given the full scope of its meaning,[7] including when the "information" constituting the "correction condition" is equipment I.D. information. The Court should construe "extracting a correction condition" to mean, "creating a value or data set to be used to affect the determination of a current working condition."

### 4. The Information "Corresponding to an Alignment State" is Not Limited to One Layer on a Semiconductor Wafer as Compared to Another.

Samsung does not dispute that when the patent claims the step of "extracting information corresponding to an alignment state," the information to be extracted must relate to alignment. AMD contends that Samsung reads the "alignment state" limitation out of this term in proposing that it be construed to mean, "relating to a lower layer or a reference layer formed during the manufacturing process of a semiconductor device." AMD Br. at 17. This is incorrect. Whenever one extracts information related to "a lower layer or a reference layer," this necessarily relates to the alignment of the respective layers. Accordingly, Samsung takes account of the "alignment state" limitation by limiting the information to be extracted to information relating to a lower layer or a reference layer. In this regard, Samsung does not object to the addition of the following emphasized language to its construction, if it will add clarity: "relating to *the alignment of* a lower layer or a reference layer formed during the manufacturing process of a semiconductor device."

The parties' disagreement arises from AMD's assertion that the specific information to be extracted related to an alignment state must be "the relative position of one layer on a

---

[7] Although AMD purports to preserve its indefiniteness argument in a footnote, it is plain that AMD has abandoned that argument. AMD Br. at 17 n.7. AMD states that it "is not presently seeking judgment of invalidity of indefiniteness." *Id.* at 17. Moreover, both AMD and Dr. Edgar are able to articulate proposed constructions for the term "extracting a correction condition." "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). Accordingly, if, as AMD posits in its footnote, "Samsung's constructions are adopted," the claim is by definition not invalid for indefiniteness.

semiconductor wafer as compared to another layer." This narrow construction disregards the claim language stating that the information need only "correspond[ ] to," and not constitute, an alignment state. Both parties agree that "corresponding to" is a broad term meaning "relating to." Accordingly, the information to be extracted need only relate to an alignment state; it need not be the specific alignment measurement to which AMD would limit the claims.

That the information to be extracted can be a wide range of information related to alignment—and not just the relative position of one layer compared to another—is also plain from the specification. The information to be extracted can be "the alignment state of an alignment key" in one embodiment. '065 patent at 3:61. In another embodiment, the information to be extracted can be the identification of the equipment used to set the alignment of the lower layer. *Id.* at 5:54-57.

Accordingly, the Court should construe this term to mean information relating to a lower layer or a reference layer formed during the manufacturing process of a semiconductor device.

### B. The Court Should Adopt Samsung's Position On the Disputed Term "Separate Instruction Sets" in the '750 Patent.

Because the preamble is not a limitation, there is no need to construe the preamble term, "separate instruction sets." But if the phrase is to be construed, Samsung's proposed construction ("distinct groups of instructions") is a plain meaning, practical definition that sets out the key, undisputed feature of the instruction sets—namely that there are at least two groups of instructions—in a way that is consistent with the remainder of the limitations of the claims in which it appears. AMD's proposed construction, by contrast, would encumber the phrase with all manner of additional, unsupported limitations and would render other claim limitations superfluous.

#### 1. "Separate Instruction Sets" in the Claim Preambles Should Not Be Construed Because It Does Not Substantively Limit Those Claims.

Both claim 1 and claim 14 expressly claim "<u>a</u> first instruction set" and "<u>a</u> second instruction set" in the body of each claim. *See* '750 patent, cls. 1, 14 (emphasis added). The phrase "separate instruction sets," which appears only in the preambles of those claims 1 and 14, does not provide an antecedent basis for these terms or for any other language in the bodies of claims. *See id.* AMD does not dispute this. Nor does AMD contend that the bodies of the claims fail to comprehensibly

- 10 -

SAMSUNG ELECTRONICS CO., LTD.'S REPLY CLAIM CONSTRUCTION BRIEF
CV-08-0986-SI

set forth the functions of and relationships between the first and second instructions sets. Instead, AMD's argument for why the preamble must be limiting is based entirely on the appearance of the phrase "separate instruction sets" in the prosecution history of the '750 patent. But neither the prosecution history itself nor the cases AMD relies upon support AMD's conclusion.

In order for an applicant's statements to the PTO to render a preamble limiting, there must have been a "clear reliance on the preamble during prosecution *to distinguish the claimed invention from the prior art....*" See *Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 810 (Fed. Cir. 2002) (emphasis added). Here, *none* of the statements to which AMD points rely on the "separate instruction sets" language from the preamble to distinguish the claimed invention from the prior art. Instead, the references to separate instruction sets are in the context of describing other limitations, which appear in the *bodies* of the claims. It was those other limitations—not the preamble term—that the applicant was relying on to distinguish the prior art.

For example, the first purportedly limiting statement cited by AMD does use the phrase "separate instruction sets" when distinguishing the Ueda reference. But the argument itself was not about the existence or nature of separate instruction sets. *See* AMD Br. at 6. Rather, the applicant was distinguishing references that disclosed the use of co-processors, because co-processor-based systems required separate "execute units." *See* Ernst Decl. Ex. B at 12-13. What the applicant thought critical was that the '750 patent discloses and claims a single execute unit. *See, e.g.*, '750 patent 7:1-11; cl. 1. How that execute unit operates on the instruction sets claimed in the '750 Patent is set out fully in the bodies of claims 1 and 14, not in their preambles. That the applicant described a "result" of having a single execute unit by referring to "separate instruction sets" does not transform the latter phrase into a limitation of the claims.[8] *See Catalina Mktg.* 289 F. 3d at 810.

Other references to separate instruction sets were merely a shorthand way of referring to the first and second instruction sets specified in the bodies of the claims. For example, the applicant's

---

[8] The applicant's statements to the PTO distinguishing the Lee and Agnew references are similar to the statements about Ueda: although the applicant used the phrase "separate instruction sets," the argument in fact distinguished the prior art on the basis of the use of co-processors. Ernst Decl. Ex. D at 6-7.

argument regarding Onishi was that that reference did not suggest "decoding and directly executing two instruction sets." Ernst Decl. Ex. C at 11. There is no dispute that the at-issue claims of the '750 patent require two instruction sets that are separately decoded and executed. But those limitations are found in the bodies of the claims, not in the preamble. The fact that the applicant used the phrase "separate instruction sets" to refer to them does establish the necessary "clear reliance *on the preamble*" as a separate limitation.[9] *See Id.* at 808.

AMD's principal case on this issue contradicts its position. In *Catalina Mktg.*, the Federal Circuit recited the general rule that "clear reliance on the preamble during prosecution" *can* transform that preamble into a limitation, but then went on to hold that there had been no such reliance in the case before it. *See Id.* at 808, 810. In that case, the Court held that the applicant's statements characterizing the invention using language from the preamble did not establish reliance on the preamble because the basis for the examiner's rejection was not directly related to that term. *See Id.* 810. AMD has not shown that this case requires a different outcome.[10]

### 2. "Separate Instruction Sets" Cannot Be Limited to One CISC x86 Instruction Set and one RISC PowerPC Instruction Set.

The potential for confusion and mischief inherent in AMD's attempt to read the "separate instruction sets" terms in the preambles of claims 1 and 14 as substantive limitations is fully realized by the construction AMD proposes. AMD's overreaching construction of this single preamble term would impermissibly narrow many of the carefully chosen (and thoroughly prosecuted) limitations of the bodies of the claims.

AMD's attempt to rewrite the patent begins with its substituting the phrase, "one CISC x86 instruction set architecture and one RISC PowerPC instruction set architecture," for the broad language of the claims: "a first instruction set" and "a second instruction set." AMD first argues

---

[9] Similarly, the applicant's references to "separate instruction sets" in the Brief on Appeal are general references to the claimed first and second instruction sets. Ernst Decl. Ex. E at 4.

[10] AMD's other case also fails to adequately support its position. *See Bass Pro Trademarks, L.L.C. v. Cabela's, Inc.*, 485 F.3d 1364 (Fed. Cir. 2007). In *Bass Pro*, because the claim at issue had three instances of the word "comprising" with the disputed term appearing both before *and after* one of the "comprising" phrases, there is ambiguity about whether the disputed term in that case occurred only in the preamble. There is no such ambiguity here.

that the patent does not teach the use of any instruction sets other than CISC and RISC. AMD Br. 7. While it is true that the preferred embodiment of the invention is described with reference to CISC and RISC instruction sets, AMD's attempt to use this preferred embodiment to limit the scope of the claims is contrary to the law. The Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323. AMD's attempt to change the language of the claims is particularly ill-advised here, where the '750 patent specifies that "the invention applies to other instruction sets besides RISC and CISC." *See* '750 patent, 5:2-8. Moreover, the patent claims RISC/CISC systems and methods separately from systems and methods covering a broader range of instruction sets. *Id.*, cls. 1, 14, 15, 18.

AMD also argues that, because the '750 patent's inventors directly addressed CISC and RISC instruction set systems in the course of the prosecution, CISC x86 and RISC PowerPC instruction sets must be incorporated as limitations of the claims at issue through their preambles. AMD's argument is without merit. The case upon which it principally relies, *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369 (Fed. Cir. 2007) lends no support to its position. In *Andersen*, the patentee's statements to the PTO distinguished the prior art at issue there by arguing that the invention had a feature that the prior art lacked (namely, forming plastic into pellets as an intermediate step). Based in part on those statements, the Federal Circuit concluded that pelletization was part of the limitations of the claims. *Id.* at 1369.

By contrast, in the prosecution of the '750 patent, the examiner had cited prior art systems that disclosed a particular *use* of RISC and/or CISC instruction sets, and the applicant's responses were directed to showing how the *use* of those instruction sets was patentably distinct in the '750 patent. The distinguishing argument was not that the invention disclosed the use of RISC and CISC while the prior art did not (as would be analogous to *Andersen*) but that the same RISC and CISC instructions used one way in the prior art were used in a new and distinct way in the '750 patent. The verbatim language of AMD's own brief shows the point:

> The PTO's first rejection stated that de Nicholas rendered claim 1 obvious because it directly executed RISC instructions *while emulating CISC instructions*. Examiner's Action, Jun. 16, 1994, at 5 (Ex. C). In response, the applicant distinguished the '750

- 13 -

invention from de Nicholas by arguing that the '750 invention *"execute[s] both CISC and RISC instruction sets in hardware."*

AMD Br. at 8 (emphases added). What was being distinguished by the applicant here was not a prior art system that disclosed the use of instruction sets generally—in which case references to CISC and RISC in the application might suggest limitation to the particular species of instruction sets—but rather the *ways* of executing the instruction sets. Because the applicant was not directly addressing the characteristics of the instruction sets themselves, these statements do not represent a "clear and unmistakable" disavowal *of the scope of the term 'instruction set'* as would be required to work a prosecution history disclaimer under the cases AMD itself cites. *See Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006) (disavowal must be "clear and unmistakable"); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) (same).

AMD compounds its error of limiting the claims to the patent's preferred embodiment by trying to further limit the terms CISC and RISC to the "x86 instruction set architecture" and the "PowerPC instruction set architecture," respectively. None of AMD's cited examples of purportedly limiting statements to the PTO make any mention of the subspecies of CISC and RISC instruction sets that AMD would have the Court read into claims 1 and 14—namely x86 architecture and PowerPC architecture. *See* AMD Br. at 8 ("applicant distinguished the '750 invention from de Nicolas by arguing that the '750 invention 'execute[s] both CISC and RISC instruction sets in hardware'"; "['750 patent invention has] an execution unit that 'executed both RISC and CISC instructions"; "'[t]he claims recite at least a RISC and CISC instruction decoder'").

### 3. "Mere extensions of instruction sets do not constitute separate instruction sets because they do not have dependent encodings of instructions" Is Not a Limitation of "Separate Instruction Sets."

By tacking on the third sentence of its proposed construction of the term "separate instruction sets"[11] AMD appears to be trying to use this claim construction proceeding to short-circuit the procedures for determining infringement *vel non*. While Samsung agrees that "a mere extension of a single instruction set...," would not meet the limitations of the claims, that language

---

[11] That sentence is: "Mere extensions of instruction sets do not constitute separate instruction sets because they do not have dependent encodings of instructions."

should not become embedded in the construction of a preamble term "separate instruction sets." The reason is simple: the relationship between instruction sets that is claimed in claims 1 and 14 is defined by the bodies of the claims themselves. The applicant's language from the prosecution history that AMD cites in its own brief helps make this clear. The reason that the applicant said that extensions of instruction sets did not meet the limitations of the claims is because "[m]ere extensions of instruction sets must have dependent encodings." Ernst Decl. Ex. D at 7. In other words, the applicant was confirming that the instruction sets of the claims must have independent encodings. But that limitation—the independent encodings of the instruction sets—is explicitly a part of the bodies of claims 1 and 14. Claim 1 requires, in part:

> [a] second instruction decode means for decoding only a subset of instructions from a second instruction set, said second instruction set having *a second encoding of instructions, said first encoding of instructions independent from said second encoding of instructions*.

'750 patent, cl. 1 (emphasis added).

It is undisputed that, for Samsung to prove that AMD infringes claims 1 and 14, it will have to show that AMD's products have two independent encodings of instruction sets. But that requirement is entirely independent of the term at issue in this claim construction proceeding, and the Court should therefore decline to saddle the preamble term "separate instruction sets" with AMD's overwrought construction.

Finally, AMD argues that Samsung's plain meaning construction—"distinct groups of instructions"—is improper because it would allow the claim to cover extensions of instruction sets. This might be true if the claim consisted of nothing more than the preamble. But that, of course, is not the case. Rather, and as discussed above, *the body of the claim* sets out the relationship of the claimed instruction sets to each other, including whether an extension of one instruction set could constitute a second "encoding...independent from" the first. *See* '750 patent, cl. 1. And that, in turn, is a question of infringement, not claim construction.

## III. CONCLUSION

For the foregoing reasons, Samsung requests that the Court adopts Samsung's proposed claim constructions for the disputed terms of the '065 and '750 patents.

| | |
|---|---|
| DATED: April 8, 2009 | COVINGTON & BURLING LLP<br><br>By   / s / Robert T. Haslam<br>      ROBERT T. HASLAM<br><br>Attorneys for Defendants and Counterclaimants SAMSUNG ELECTRONICS CO., LTD., SAMSUNG SEMICONDUCTOR, INC., SAMSUNG AUSTIN SEMICONDUCTOR, LLC, SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, SAMSUNG TECHWIN CO., LTD., and SAMSUNG OPTO-ELECTRONICS AMERICA, INC. |